1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION

3  UNITED STATES OF AMERICA       )
                          )
4            Plaintiff,     )   CRIMINAL ACTION FILE
                          )   NO. 1:06-CR-147-WSD-2
5  v.                   )
                          )   ATLANTA, GEORGIA
6  EHSANUL ISLAM SADEQUEE (2)    )
                          )
7            Defendant.     )
  _____)

8

9               TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
10             UNITED STATES DISTRICT JUDGE

11            Tuesday, March 3, 2009

12

13

  APPEARANCES OF COUNSEL:
14

  For the Plaintiff:          OFFICE OF THE U.S. ATTORNEY
15                       (By:  David E. Nahmias
                            Robert C. McBurney
16                   Christopher Bly)

17  For the Defendant:          GARLAND SAMUEL & LOEB
                       (By:  Donald Franklin Samuel)
18
                       Khurrum B. Wahid
19

20

21

      *Proceedings recorded by mechanical stenography*
22       *and computer-aided transcript produced by*
           NICHOLAS A. MARRONE, RMR, CRR
23          1714 U. S. Courthouse
           75 Spring Street, S.W.
24           Atlanta, GA  30303
           (404) 215-1486
25

1          Tuesday Afternoon Session

2          March 3, 2009

3          3:19 p.m.

4          -- -- --

5          P R O C E E D I N G S

6          -- -- --

7          (In open court:)

8          THE COURT:  All right.  Good afternoon, everybody.

9     This is a status conference in the United States v.

10    Ehsanul Sadequee, which is Criminal Action No. 06-CR-147.

11         Would counsel please announce their appearances?

12         MR. McBURNEY:  Robert McBurney, along with

13    David Nahmias and Christopher Bly for the United States.

14         THE COURT:  Good afternoon.

15         MR. McBURNEY:  Good afternoon, Judge.

16         MR. SAMUEL:  Don Samuel for Mr. Sadequee.

17         MR. WAHID:  Khurrum Wahid for Mr. Sadequee.

18         THE COURT:  Good afternoon.

19         And good afternoon, Mr. Sadequee.

20         THE DEFENDANT:  Good afternoon.

21         THE COURT:  There are five things I would like to

22    cover this afternoon in this status conference.  Let me just

23    list them, and then let me take them up one at time to at

24    least give you some context for the reasons why I want these

25    matters addressed this afternoon.

The first is, Mr. Sadequee, I got your letter dated February 23rd in which you asked me a number of questions about the Speedy Trial Act and what the process is for the processing of your trial and what you might do to have the Court reconsider the existing trial schedule. And so I want to address that.

Second, Mr. Samuel sent me a letter on your behalf on February 24th in which he asked me to look further into what you had told me at the last hearing, which is what would be the process and what would be the considerations that you might have in representing yourself, either by yourself or in what we legally call a hybrid fashion, which is where you might do some things and your lawyer might do some things. And so I wanted to take that up, and that's the reason why that's on the agenda.

My recollection is that, and I have been reminded by your counsel, that there was an evaluation that had been done on issues of competency. My understanding is that that -- I could receive a report on that. I think I need a report on what the results are on that, because that might affect the processing of the case. So I want to go over that.

The last time we were together, we talked about the request to have certain depositions be taken under Rule 15, and my understanding is that some progress has been made on

that.  I have gotten a written report on some of that progress, but I would like an update on where we stand today.

And then finally there was a request about the conditions of your detention at the federal institution and some specific things about how you might review evidence and some contact visits, your access to the phone to make calls to your lawyers, and then there is I think a food issue.  And I want to take all of those up.

Let me begin with some context for the questions you asked me in your letter about speedy trial.

And as you know, I was assigned this case -- or I'm substituting for Judge Cooper as the successor judge in the case, and early after the case was assigned to me I began to look at the docket and began to look at what time would be required to process the case in order to get you to trial, and my view was and my desire was to get you to trial as promptly as possible.

I have had one other case involving the Classified Information Protection Act.  It's a difficult process.  Procedurally there are just some things the statute requires us to do.  I understand all those because I had hearings involving the other case I had in Montgomery, Alabama.

So I'm aware of what's required under the statute, and I'm aware of what all lawyers, whether you are

representing a defendant or you are representing the

government, what obligation they have to me to present

information for me to make decisions under the Classified

Information Protection Act.

So as I looked at the docket of the case, I had

input from the lawyers for the government and your lawyers as

to what time would be required for them to be able to comply

with their obligations not only to get the case generally

ready for trial, but also to meet the requirements of the

statute that was passed by Congress in providing issues and

information to me to make decisions on how to treat

classified information.

I listened to their proposal for the timetable for

it, and my first reaction was couldn't we do it in a shorter

period of time.

And so based upon what was presented to me by the

government and by your counsel, I ended up trying to be

objective rather than just rushing through this to say what

really is necessary for the case to be properly processed and

for me to meet my obligations and thus for the lawyers in the

case to meet their obligations to me under the Classified

Information Protection Act.

And I ultimately concluded that a schedule along

the lines of what I entered I think it was on November 17th

of 2008 was what was required in order to meet the

obligations of the lawyers and my obligation under the
statute and under the rules of court to properly prepare the
case for trial.

I did make some amendments to what was proposed to
me, because I thought that there were things that needed to
be changed in order to manage the case in a way that I
thought was most efficient.  But I ultimately entered an
order that set the case processing and set due dates and
deadlines to make sure that the case was efficiently and
fairly prosecuted to a conclusion.

When I did that, because I have been doing this a
while, I knew what my obligations were under the Speedy Trial
Act, and that I had to keep those obligations and your rights
under the Speedy Trial Act in mind when I decided what the
case schedule should be.

As you know, because you said so in your letter,
that there is a guarantee of a speedy trial under 18 U.S.C.
Section 3161.  But there are also times within the processing
for a speedy trial that are excluded from the speedy trial
calculation.

And when I entered my order on November 17th --
while I didn't do so then, I'm going to do so now -- I did
take into account the factors that are set forth under
18 U.S.C. Section 3161 (h) (7) (A), which is to balance and
only allow a continuance -- and I determined that the

schedule really was a continuance of the case because we were

setting a trial date, and that that request for that schedule

was presented to me jointly by your counsel and counsel for

the government.

But in deciding whether or not that schedule was

one that was consistent with the rights that are provided

under the Speedy Trial Act, I had to consider whether the

ends of justice were served by allowing the schedule that was

requested, and that the ends of justice being served by

allowing the continuance for a schedule that was presented

outweighed the best interest of the public and the defendant

in a speedy trial.

And I found in considering hard the schedule that

was presented that it was in the interest of justice and was

not outweighed by the interests of the public and the

defendant in the speedy trial to set forth the schedule that

I entered in the case in November.

When I did that, I evaluated the factors that are

set forth in the statute, and thought that if this schedule

that was proposed and as I carefully evaluated it, that the

continuance was one that was necessary to make sure that

there wasn't a miscarriage of justice, because I thought to

more aggressively force, especially in CIPA-type

presentations, could result in justice being miscarried and

there being mistakes made as to what you would be entitled to

under the statutes and the hearings to which you would be entitled if you wanted to challenge some of the decisions that had been made in the classification.

All of those have to ultimately be decided by me, and I needed to make sure that the lawyers for the government and for the defendant had enough time to do that, and then I had enough time to consider their positions.

One of the other criteria is what is the nature of the case and is it unusual or complex. Of the cases I have handled, either as a lawyer or now as a judge or even as a government official, this is one of the most unusual and complex cases that I have ever handled. So it is out of the mainstream of cases that normally are presented to the Court because there are issues here that do not ever arise in other litigation.

So I didn't think, especially given that this was such an unusual and complex case, that if I did not allow the schedule that was requested and that I ultimately decided was the right schedule for the case, I thought that it would be in the absence of that unreasonable to expect that either of the parties could adequately prepare for the pretrial proceedings or for the trial itself if we simply abided by the statutory speedy trial rules, that there had to be additional time in order for the case to be justly and fairly litigated.

1    I also determined that if I did not allow the time

2    that was being requested by your lawyers, and even at that

3    time if you were simply representing yourself, I think you

4    would need the time to prepare the case for an effective

5    presentation in a case that I have already said is complex

6    and unusual, even taking into account that I knew that your

7    lawyers and that you personally were going to exercise due

8    diligence in getting it ready, but I knew because of my

9    personal experience and my experience on the bench that

10    additional time was in fact necessary.

11    Then finally I decided that the continuance -- and

12    all of these are my findings in allowing the schedule to be

13    put into place that I put into place, that I wasn't doing

14    this because there was a general congestion on my

15    calendar.  In fact, there were other times when I could have

16    tried the case, and I'm not -- I wasn't allowing the

17    continuance to be ran because I thought that there was a lack

18    of diligent prepation or failure to obtain available

19    witnesses on the part of government.

20    I simply concluded for all the reasons I have

21    stated and for all the findings I have made that what was

22    being presented to me as I modified it was what was required

23    to reach a just result, and that ultimately I concluded that

24    the schedule that was put into place was one that served the

25    ends of justice and were not outweighed by the interests of

1    the public or you in a speedy trial under the act.

2        So those are the reasons I put that into place, and

3    I understand now that you would like to revisit that.  And

4    I'm happy to do that based upon where we are in the case,

5    which I would note is that we are still in the processing of

6    the case.

7        I know that you have seen the considerable amount

8    of time that has been required to consider the various

9    motions that have been filed on your behalf and have worked

10    through the process that we have in place for the Magistrate

11    Judge to enter original report and recommendations, and then

12    we have considered all of those, and we are in the process of

13    concluding the orders on the motions and the R&Rs that have

14    been filed.

15        As you know, they have not been short, they have

16    been lengthy, and I have been personally involved in all of

17    them because I want to make sure that there is an adequate

18    review, to include listening to all of the interview tapes

19    personally and reviewing each and every one of the orders

20    that were entered allowing searches and interceptions to be

21    conducted.  As you know, there were a lot of those, and

22    I personally read all of them.

23        So we then are to your letter, which your first

24    question was:  Do I have a right to a trial within sixty days

25    of arrest?

The Speedy Trial Statute entitles you to a speedy trial, but with certain provisions for time to be excluded from the calculation of those days.  And I have tried to explain to you why I thought and why I found that the schedule that was submitted to me that I have in place provided for a reasonable continuance of the trial according to the schedule that I entered.

You then asked:  Is it possible to enforce or exercise this right of mine?

I have in fact gone back and revisited whether there would be any way for me in good conscience and consistent with the requirements of the statute to amend that to now take away time that I had granted to you and your lawyers to prepare for trial.

And I think that that would not be appropriate, because there are rights that you still have under these statutes and obligations that I have in evaluating those rights that are required to be processed according to the deadlines and the schedule that is in place.

And then you asked:  Can you exercise your speedy trial rights?  And if so, what steps need to be taken to enforce the Speedy Trial Act?

While this was not in the form of a motion, I have basically considered your letter as one in which you wanted me to revisit whether it would be possible to expedite your

trial.

You know you are the second of two trials.  It was forecasted to me when I got into the case that everybody believed, although no motion had yet been filed, that the trials were going to have to be separate.  Based upon what I knew about the case then and what I know of the case now, I thought that that was going to be required anyway. Somebody has to go first and somebody has to go second.

And they are long trials.  They are probably -- I set aside a month for each of the trials with a period in between to allow the preparation, now that everybody would know what was presented in the first trial, for the commencement of the second trial, which is yours.

I guess theoretically we could maybe move that back some period of time and not have what I thought was a reasonable time and the time that was requested by the lawyers, which is to have a thirty-day interim period for everybody to consider what had happened in the first trial and get prepared for the second trial, that I guess considering information that might be provided to me by the government I could see if there is any way of shortening that.

But in all candor, we are only talking about one or two weeks by which we might collapse the period.  And it seems that if people are getting -- as most lawyers do and

most clients do, begin to pace out when you are this close to a trial, begin to pace out their preparation, I'm not sure that that would be a meaningful difference or one that would ultimately serve your purposes.

The next question is:  What are the obstacles preventing me from starting the speedy trial clock?

Well, the speedy trial clock has started, but there has been time excluded from that because of the litigation activity in the case, and I have made my findings as to why I thought that the schedule that is in place and was put in place in November was the proper schedule.

And for the reasons I have stated here this afternoon, there are periods of time that are excluded from the speedy trial clock.  Even though it is running, it gets stopped throughout this process as there is permitted activity under the statute which is excluded from the calculation, assuming I reach the opinion, which I have reached after I applied the criteria that I am required to apply, that in balancing the interest of justice and the rights of the public and the defendant that the continuance is an appropriate one, which I had found it to be.

There is probably nobody that understands more your desire to get this concluded, but there has been a lot of activity on your behalf to raise issues, all of which from what I have seen so far were entirely appropriate if not

necessary issues to raise and that should have been and were

required for me to address.  And that causes this process to

be more extended in a case that's as unusual and complex as

this one.

So on the one hand I'm trying to balance what's in

the interest -- what's in your interest in getting the

process concluded against my duty to make sure that the

process is a fair one and in compliance with the statute, and

I have tried very hard to do that.

So that's at least my response to the questions

that you have presented.  And I'm open to anything else that

you would like me to consider.

THE DEFENDANT:  I appreciate your response,

Judge.  Thank you.

Some questions I would like to ask is what are the

obstacles preventing me from starting the speedy trial clock,

which I understand gets stopped for legitimate exclusions?

If I understand correctly, you are saying that

based upon your analysis and your evaluation, that it's in

the interest of justice to extend or to give a

continuance.  But I would like to point out that it's been

approximately three years since I've been arrested, so how

much more longer -- so at this point in the case, when I ask

to start the clock for 70 days, to get to trial within 70

days, it's not like I'm really getting -- you know, I mean,

it's been long overdue.  I'm not getting my trial 70 days

after indictment.  I'm getting my trial, you know, more than

three years after my indictment.

So why can I not at this stage, having all this

time pass and everything that's been filed and all that, why

can't I at this stage, you know, get the speedy trial clock

started, you know, to take 70 days?  If my question is

clear?

THE COURT:  Because the statute provides for a

speedy trial, but it imposes upon me an obligation to look at

it not just from the perspective of somebody who wants a

prompt processing.  My obligation is greater than that.  It's

to the institution of justice and to the processing of a case

as important as this, to make sure that not only are your

rights protected, but the public's interests are protected,

and that there is adequate time to address the matters that

have to be litigated, which the statute recognizes are

excluded from the time period provided for in the statute.

And it's always a balancing between the two

ultimate issues in the statute, which is if you are going to

set a date -- and in this case it's effectively a continuance

that was requested by your counsel, and I think properly

requested based upon everything that I knew at the time that

the request was made -- that I have to look at whether or not

I should change just the simple calendar calculation of the

1    time to trial.

2         Where somebody wants to go beyond that, in order

3    for me to do that, I have to do this balancing that the

4    statute by its terms provides, and that is would the ends of

5    justice be served by allowing the schedule that was

6    requested, which was basically a continuance beyond a strict

7    calendar counting.  And the continuance should be permitted

8    if the ends of justice would be served by it so long as it's

9    not outweighed by the best interest of the public and the

10   defendant in a speedy trial.

11        All I can say is I have done my very best in trying

12   to honestly, objectively and fairly look at your interests as

13   you have stated them to me and as I knew them to be before

14   you ever sent your letter against what was being requested to

15   make sure that in a very unusual case that has this overplay

16   of the Classified Information Protection Act and my

17   requirements as an officer of the court and as the Court

18   itself to make sure that those obligations that you have to

19   the Court and that the Court has to you are met.

20        And that's why -- and as you know by looking at the

21   schedule, that we are in the process of doing that, that

22   those -- some of the first filing in that process has been

23   made.  In order to make sure that everybody has the input

24   that they are entitled to have to me, there are responses

25   that people are entitled to, and I have to let that process

work out according to the mandates of the statute. And it is
an overlay of process that exists only in these kinds of
cases.

So I don't think -- you call them obstacles. What
I think the statute does -- and I have tried to apply the
statute in a meaningful and fair way to you and to everybody
involved in the case -- is looking at the general rights
that's set forth in the statute, considering the uniqueness
of this case and the processing required in this case, I have
tried to do this balancing of these interests, and concluded
in November and in looking at the schedule as recently as the
last couple of days to prepare for this still believe that in
order for the rights that the parties have under the statute
to be fully exploited, that it's necessary to have the
schedule that's in place.

THE DEFENDANT: If I may ask bluntly a simple
question. I am understanding that you are saying that it is
not possible for me to start the 70-day speedy trial
clock. It's not possible --

THE COURT: The 70 days is running. What I'm
saying is that there are certain periods that are excluded
from that. They were excluded from that at the request of
including the people representing you to put into place the
schedule that's put into place, and the statute allows for
the exclusion of time.

I think what you are requesting is to say that that is not a schedule that you like anymore. But the fact is that the schedule anticipates and requires things the statute requires that now must be done. And at this stage I think it's impractical, if not impossible, to say let's do all of that stuff that the schedule anticipates or let's not do the stuff.

I can't not do it because the statute requires that it be done. And I can't say, well, let's do it in a shorter period of time, because the statute requires certain responses as people identify information that they want to contest that's been classified.

And I know you would like to do that over the next couple of weeks, but that's not possible.

THE DEFENDANT: You mentioned the 70 days is running but there is exclusions because of things filed by my counsel.

THE COURT: Yes.

THE DEFENDANT: You are referring to the CIPA proceedings?

THE COURT: And motions that have been filed.

THE DEFENDANT: I have spoken to my lawyers about that, and I am willing to withdraw whatever is filed from my side of the case, my counsel, which is hindering the speedy trial clock.

1       I spoke with them and I told them whatever is

2   hindering the clock from my side of this case, I am willing

3   to withdraw it if it will in fact help.

4       THE COURT:  Let me give you a status report.  There

5   are two motions that I have yet to issue orders on.  One of

6   those motions is being reviewed and I think will be approved

7   and issued today or tomorrow.  The other has been drafted,

8   I'm finalizing it, and I suspect that it will be entered next

9   week.

10      So as a practical matter, we have already invested

11  the enormous amount of time that was required to address each

12  of the pending motions.  And unless something happens that I

13  don't anticipate, all of the pending motions will be decided

14  by the end of next week.

15      So that's really not holding up anything, because

16  we have already done the work on those.

17      THE DEFENDANT:  So then if I understand correctly,

18  the only thing holding it up is the CIPA procedures -- or the

19  CIPA?

20      THE COURT:  Right.

21      THE DEFENDANT:  And I also discussed that with my

22  lawyers.

23      And could you summarize what we talked about?

24      MR. SAMUEL:  What Mr. Sadequee asked us,

25  Your Honor, is to withdraw any motions that we filed pursuant

to CIPA.

I have described the Speedy Trial Act in slightly different terms than you have. What I have said in essence is that we have the 70-day period, but the clock in essence has been stopped ever since the first motion was filed. There never has been a period of time during which the clock, any days have gone by.

THE COURT: Well, not meaningfully. I mean, technically it does start, but then it immediately stops.

MR. SAMUEL: It's terminology.

THE COURT: Right.

MR. SAMUEL: Judge Brill in fact within a few weeks of beginning of trial, Docket No. 55, declared the case complex, and in our metaphorical way, the clock never started at that point.

So the way I have been discussing it with Mr. Sadequee in the last couple of weeks is, you know, envision a clock, that the 70 days, we haven't started counting any days off yet because the motions have just never allowed the clock to start ticking.

And then Document 55 having declared it complex, even if all motions suddenly were done, in theory, you would have to make a finding to start the clock, it's no longer complex, we should start the 70 days, if you were so inclined.

1      So what I have said to Mr. Sadequee is in order to

2   trigger the statutory 70-day period -- and I don't advocate

3   this, but in order to do it, we would have to withdraw all of

4   our motions so that nothing is stopping the clock under

5   section (f), I think, and under (h) (8) you would have to say

6   it's no longer complex, it's no longer in the interest of

7   justice to stop the clock and grant a continuance.

8      Then we have the issue of the government motions,

9   which in my understanding of the act, at least to some extent

10  the government's motions stop the clock.  To which

11  Mr. Sadequee said, well, let's just agree to all those

12  motions.  I'm not advocating this, but these are our

13  discussions.  I don't want to waive any privilege, needless

14  to say.

15     And I think what Mr. Sadequee wants -- and I

16  certainly understand it, he's spent a long time in prison in

17  really intolerable conditions to some extent -- anything we

18  can do to expedite the trial including, by the way, swapping

19  places with Mr. Ahmed, if our trial could go first rather

20  than his trial.

21     I think some of our motions are important.  I think

22  declassifying information is important.  But this is

23  Mr. Sadequee's case, not my case, and I think he's making a

24  voluntary, intelligent decision, although one I wouldn't

25  make, to stop the motion practice.  That you are going to

grant the government's motions in all likelihood anyway, he

views it that way.  To the extent we are seeking to

declassify additional information that maybe won't get

declassified, so be it.

That's the way Mr. Sadequee views it, and I hope

he's okay with me articulating it.  And the question is

having done all that, can we speed it up, can we have a trial

in May, can we have a trial even as early as, you know, late

April or something, or swap with Mr. Ahmed, as I said, who

doesn't seem to be as earnest about wanting to go first.

Is that fair?

If today the clock started, again my metaphorical

clock started, we stop all motions, we concede all the

government's motions with regard to CIPA, we agree with all

their substitutions, there is no reason for a motion

practice, there is no reason to litigate those issues, can

the Court make a determination that we are no longer in the

realm of complex cases --

THE COURT:  No, I could never do that.

MR. SAMUEL:  I know, I'm just putting forth our

argument.

-- and start this trial as soon as possible?

THE COURT:  I mean, I agree with everything

Mr. Samuel has said about we have looked at it different

ways.  I guess that's because he's an advocate and I'm a

1    neutral.

2         But if you step back, as a practical matter, I

3    don't see why anybody would want to give up their rights to

4    have motions decided, to assert rights that they have under

5    the CIPA statute, when effectively we are only talking about

6    a very short period of time that could be saved.

7         I don't know why you would want to do that, and

8    I think that it would be something that if I was you, I would

9    never want to give up for a short collapsing of the time that

10   you would get to trial.

11        Now, the one thing I do agree with -- and I'm glad

12   the marshal is here -- is that we ought to have a discussion

13   about your detention and what I think you are entitled to do

14   and access that you are entitled to have, which I believe in

15   the end of this either everybody will agree will be different

16   or I will order it to be different.

17        Because especially now as you are getting ready

18   with your lawyers to try the case, that you are entitled to

19   things which I want to make sure that you have.  And that's a

20   little longer down the list, but that is going to change.

21        I don't know if you know this, but when you had the

22   incident in prison and I found out about it, I ordered the

23   warden and the marshal to appear in my chambers and told them

24   that I would not put up with that.  That I wanted to know

25   exactly what happened, I wanted to know why it happened, and

I told them that it should not have happened and it will not happen again.

And I told them and they know that I have a personal ongoing continuing interest in what's going on in your detention, and now that I have some additional information about changes, like I have done in one other case, I have told the warden that the conditions will be different, and they will be different for you.

And hopefully that will give you more of an ability to participate and to prepare for what is going to be a very important time for you where you ought to be -- your paramount interest I would hope is that you want to make sure that every right that you have is raised and that every right that you have to a ruling from me is asserted and that you get ruling from me, so that you have a complete exercise of your right to trial and your right to effective assistance at trial and that you have a proper record of the proceeding so that all legal issues that you want to raise are in fact raised and preserved.

And to me, if I was you, I would absolutely want that, and I would not give up a short period of time just because you want to get to trial quicker. Because I think that that is clearly outweighed by your personal interest and I think the interest that your lawyers have that all of your rights be fully asserted and that you get every right to

which you are entitled.

THE DEFENDANT:  The reason I want to hasten the process or I want to activate the speedy trial clock is not merely because I want to have the trial quicker.  There are a number of reasons, all of which I don't think I can get into right now.  But it's partially due to, as you have mentioned, I was assaulted on October 28th, last year, 2008, and I -- a series of things have happened since which I believe was government-orchestrated, although they will deny it, which is understandable.

There is a number of reasons -- which if you want me to, I can get into right now, otherwise perhaps it's not the best time -- for which I do -- I want to get to trial as soon as possible.

I know that's a vague answer, but I do want to make it clear that it's not just because -- as you mentioned, it is a short period of time if I can get to trial within 70 days from now as opposed to in August, but it's much more than that.  I mean, it's not merely because I want to get to trial faster.

THE COURT:  What's the government's response to swapping the trials?

MR. McBURNEY:  Judge, as you noted, there was a pretty clear likelihood that we were going to need to sever the two, and they are now formally severed by being in

different indictments.

The government's position has been consistent all along, initially with Judge Cooper, and now with Your Honor, that Ahmed should go first for a variety of reasons.

But first, because the schedule is in place and Ahmed is going first, we have already begun to line up witnesses who would testify only in the Ahmed case to be there. Those are not insurmountable logistical hurdles, but the schedule has now been in place for three, four, five months, and we have begun to plan accordingly.

But secondly, in terms of the ends of justice, it is expected that Defendant Ahmed would be compelled to testify if he did not take the stand voluntarily in the case against Defendant Sadequee, hence the severance, because of his statements that he gave.

That becomes an exceedingly complex endeavor if Defendant Sadequee goes first. We would have to have an entire *Kastigar* team to be in court for Defendant Ahmed's testimony against Defendant Sadequee while the team that would be taking the rest of the case would be effectively walled off during the trial and in preparation, et cetera.

So in terms of the government being able to set forth the case that it is entitled to set forth, the ordering was not coincidental, Defendant Ahmed's case first, and then he can choose to testify willingly or in a much cleaner

fashion be immunized and compelled to testify in the second

case, which would be Defendant Sadequee.

As you pointed out, the trials are not a year

apart.  There may be some slight ability to bring them closer

together if the case in Ahmed's case ends on time.

But for less important but not inconsequential

logistical reasons, we have already begun to line up the

witnesses and sent out subpoenas for the Ahmed trial starting

in January.  But the more --

MR. SAMUEL:  June.

MR. McBURNEY:  I'm sorry, June.

But the more serious and in some ways

insurmountable issue that Sadequee would not be called to

testify against Ahmed, but Ahmed would be called to testify

against Sadequee, that ordering was intentional.

THE COURT:  Well, let's do this.  The nature of

your letter which I wanted to respond to today and what I

hear you saying today is that you would like for me to enter

a formal ruling on a motion that you would like to make under

the Speedy Trial Act.

If in fact after this discussion you want to make a

formal motion to me under the Speedy Trial Act, then I will

give you until the end of next week to submit any other legal

authorities or analysis of the statute that you would like to

make, I will give the government ten calendar days to respond

1   to that, then I will give you five calendar days to reply to

2   their response, and then I will enter an order on your

3   motion, so that that will be a matter of record, everybody

4   will have their say legally under what the Speedy Trial Act

5   requires or obligates me to do, in addition to the rulings

6   and the findings I made here today and announced today.

7           And I'm willing to do that because it seems to me

8   that if in fact you are now asking for a formal ruling, that

9   I have an obligation to let everybody have their say and to

10  follow the regular process, although I'm collapsing the

11  amount of time that's required for the briefing to be done.

12          So if you would like to do that, I will look

13  forward to receiving your motion next Friday.  And the sooner

14  you get it in, the sooner it would be processed because the

15  time -- the ten days will run from whatever time he files the

16  motion.

17          All right.  The next issue then would be

18  Mr. Samuel's letter on your behalf to look further into your

19  desire to participate in your trial.

20          So I'm open to hearing what else you would like to

21  say about that in addition to what we talked about last

22  time.

23          THE DEFENDANT:  Well, as I have spoken with my

24  lawyers, they have told me that I can ask -- I have a right

25  to go *pro se,* and there is the possibility if the Court

grants that I can go for hybrid.

And with regards to that, what choice I would make, I need to first get some clarity on prior to trial, from now till trial, what's the difference in our, meaning my lawyers' and I, our roles in the case in going hybrid as opposed to going *pro se*? If my question is clear?

THE COURT: Well, let me give you kind of the two scenarios.

If you were to go *pro se* and your lawyers were simply -- and the jury would know that you are representing yourself, but you would have the obligations to represent yourself and you would have the duty to do what's necessary to represent yourself but to have your lawyers available likely as consultants.

But that would mean, for example, that it would be your job and only your job unless you happen to think to consult with your lawyers that if the government introduced a piece of evidence and you did not object to that, even though you had a valid legal objection, that objection would be waived, because you elect to represent yourself.

And that's why it's I think extremely important that you think seriously about whether you would want to run that risk, that you would be responsible -- I have been doing this 30 years, and this is -- I have this at the ready for me because I know this book, this is about all the Rules of

Evidence and a synopsis of all the cases that are germane to the Rules of Evidence. It has all -- I mean, what are there, a hundred Rules of Evidence, which I have taken 30 years to learn and still need a book.

But if you represent yourself, if they try to introduce evidence, and even if they did it in good faith, but you would have a legal right to object to it and I would have the obligation to consider it and say it's not admissible.

If you don't make that objection, that evidence comes in, and you wouldn't have -- generally would not have a right on appeal to contest my ruling because you didn't object to it. In fact, I wouldn't make a ruling; it would just come in.

And that's why it's so unusual, highly unusual for somebody to say that they want to represent themselves.

Now, there is authority to allow a hybrid, which in loose terms would mean that you would share responsibilities. But before I decided whether I will permit that and in order for me to properly make sure that the case is conducted in a way that is fair, I would require you to tell me what exactly the hybrid would look like.

For example, there are some -- I know of one case where a defendant wanted a hybrid relationship, but that's because they wanted to question two witnesses, and it was

clear going forward what the lawyer was supposed to do and what the client was going to do.

And so, you know, I would not exercise my discretion to say you are hybrid, do whatever you want, and sit here every day not knowing who is going to be responsible for what.  So you would have to have a discussion with your lawyers if you wanted to propose to me for me to exercise my discretion to permit it so that I would know when I'm making my decision what exactly I'm allowing.

So you would have to say here is what my responsibilities are going to be, here is what my lawyers' responsibilities are going to be, so that at any point in time I could say, oh, this is something that Mr. Sadequee is going to do or this is something that Mr. Samuel or Mr. Wahid is going to do.

But I would -- before I would approve that, I would require specificity as to what you wanted.

THE DEFENDANT:  If I can get hybrid, in terms of in court or at trial, I would definitely intend to interview witnesses.  I don't know which witnesses or experts or who the government intends to bring, but some of the individuals, such as the FBI agents, I would like to interview them or cross-examine them.  I also perhaps would make some statements in the opening statement or closing statement.

And as to prior to trial, as in from now to trial,

whatever procedures or anything related to this case, I would want to be -- for example, as of now -- I mean, till now, my lawyers have been filing motions, you know, just normal procedural stuff, sometimes or usually without my notice, which is okay, like to dismiss Count One, motion to dismiss that.

But if I do go hybrid, prior to trial, whatever takes place within this case, I would want to be -- I would like to have the final say instead of my lawyers having the final say.  I mean, that's prior to trial.

Now, at trial I would just want to interview some witnesses and have some statements, and the rest, you know, I would leave it up to my lawyers.

THE COURT:  All right.  I am going to give you -- do you have a calendar, please?

Because I don't really understand what you are asking, I'm going to give you -- today is March 3rd -- you have until the 27th to file a motion with the Court specifying what exactly you are requesting me to decide, and if what you are really talking about is a hybrid relationship, you need to specify who is going to be responsible for what, so that I know when I consider your request that I know specifically what you are considering.

Then I will give the government until April 13th to respond.  And then if you want to reply, then you should file

your reply by the 20th of April.

So you will know late April, early May, what my decision is on whatever the request is that is set forth in your motion.

MR. SAMUEL: Just briefly, because he and I have talked about this too, and maybe I can explain it better. He does want to do hybrid at trial, and we will do our best to identify the witnesses or proceedings that he wants to handle at trial.

His concern is between today and trial having kind of veto power over what gets filed and what doesn't get filed.

And what I have said to him is we have pretty much for the last two or three years done this as a team, if you will. We argue. There is some times he's asked me to do things and I said I think that's a terrible idea and I don't, and I go back the next time to visit him and he says I really want you to do it. And usually I do it. I mean, I don't think we have ever come to the point where he has said do something and I have said no and that's the end of it. And I said we will probably continue that process.

As a matter of law and ethics and whatever other source of law there is, I do have veto power over motions that get filed, the wording of the motions. I'm never going to do something that he asked me to do that's unethical. He

never has.  I'm never going to do anything that misrepresents
anything to the Court.  He's never asked me to.

There have been times he's asked me to file motions
that I think are frivolous, if you will, just because I
have -- maybe because I have tunnel vision and it may be that
he has got a better view of things, and occasionally I have
even filed those motions.  I'm not going to identify them for
the Court at this time.

And I said on a go-forward basis we will continue
that way, and we will comply with your direction to file
something.  It may be -- just to kind of give you a
heads-up -- what we ought to do is continue in that
process.  He obviously feels free to write to you, and he
should continue to do so.  And if he thinks I'm not doing
something that he wants me to do, he should alert the Court.
If he think I've done something he doesn't want to happen,
the same thing.

Our concern -- his concern is between now and the
first day of trial, what does it mean that you have agreed to
do hybrid.  Once we get to the first day of trial, we know
what hybrid means.

THE COURT:  Well, I think that you have sort of an
informal hybrid already.

I think what Mr. Samuel has said is he does have
obligations to the Court and to his profession and to the

justice system, and there are certain things he can't do even
if you directed him to do it.

And I think that happens -- I mean, that happened
to me when I was representing clients, we also had this
discussion.  They might want to do something, I wouldn't
think it's in their best interest, and we would have long
discussions, often very robust discussions about that, and at
the end of the day I would make my recommendations.

And if they said, no, I want you to do something,
and it was ethical for me to do it, even though it was
against my better judgment, I generally deferred to the
client.

It sounds to me like that's what you are
doing.  But what you ultimately -- and I think what
Mr. Samuel is proposing is that if there was something that
you insisted that he do and he was unable professionally to
do it, that he would ask you to say that that doesn't
preclude you from sending and filing something for me to
consider.

And so far I think everything that you have
submitted has been polite and appropriate and I suspected
that it wasn't always something that Mr. Samuel agreed with,
but I haven't been offended by what I have gotten.  And in
fact, I understand what your position is and have tried to
appreciate what your circumstances are.

But there might be a time when you presented something to me outside of what Mr. Samuel is filing that I would probably write back and say it's improper to do that, I can't consider that, but I would let you know.

And it seems to me that that gets you what you want, it gets you say if something -- if you ever had a conflict with your lawyers, if you insisted that they do something or if you insisted they not do something, that I'm offering you this independent channel to file something with me directly.

And if it's not something that is appropriate, I will understand that you are a *pro se* litigant, I will let you know that in an appropriate way that what you want me to do is either something I can't do or if you want me to do something, I will tell you I can't do it.

THE DEFENDANT:  Would it be possible for me to, as my lawyer explained, so that till trial I have veto power, that till trial, I'm considered *pro se,* and then at trial I would take hybrid?

THE COURT:  I'm not inclined to do that, because I don't know -- I don't know of any you get to be *pro se* during one part and hybrid during another part.

I mean, if you want to do that, you may file a motion and I will consider it, but I'm not going to decide that now.  Because, one, this is an evolving discussion.  I'm

1    really not quite sure what you want.

2         But if you want me to formally consider something,

3    I'm going to have the government have the right to respond to

4    that, and then I will decide it in a written order so that

5    the record is clear as to what you want and what I'm allowing

6    or disallowing.

7         And if you are going to file that, you probably

8    ought to file that by the end of next week, which would be

9    March 13th.  Same ten days to respond to that, and five days

10   if they want to reply.

11        MR. McBURNEY:  And, Judge, for clarity purposes,

12   this wouldn't be the defendant's request for hybrid

13   representation where he's identifying who is doing what?

14   This would be --

15        THE COURT:  My understanding is that he wants to

16   have two different relationships, and that what he wants is

17   between now and trial, he wants to be *pro se*.

18        MR. McBURNEY:  No relationship.

19        THE COURT:  No relationship, meaning that

20   Mr. Samuel would be off the hook.

21        But I want that in the form of a motion because

22   I think, one, I'm not sure I can do that; and second, I want

23   to be more thoughtful about my response to that, because it

24   is not clear to me that I can do that and I'm not going to

25   decide that today.

1          THE DEFENDANT:  Being *pro se*, I'm still allowed to

2    have counsel.  I'm out of court; right?  I'm still

3    communicating with my lawyers.

4          THE COURT:  If you are *pro se*, Mr. Sadequee, you

5    could not ever talk to your lawyer if you don't want to.  So

6    I'm not going to define your relationship with your

7    lawyer.  You are going to have to do that.

8          What you are saying is you ultimately want the

9    authority between now and trial if you so choose never to

10   talk to your lawyers and to solely represent yourself and do

11   what you think is consistent with the law, the Rules of

12   Procedure and in your interest.

13         And what you are asking me to do -- because, you

14   know, I'm not the monitor of your representation.  I can't

15   call you every week and say how is it going with your

16   lawyer.

17         The law says that there are certain things that you

18   are entitled to do.  What I want you to do is to articulate

19   to me in writing because I can't get a clear picture today,

20   and then I will do the legal research required with the

21   assistance of whatever anybody wants to submit to me, and

22   then I will make a legal ruling so that if in fact you end

23   up not -- that should I allow you to be *pro se* in this

24   changing way in which you want to go through this trial, that

25   it will be clear that whatever mistakes are made are your

mistakes.  But that's going to be in writing and you are

going to get a thoughtful order from me outlining what the

law is and what I allow.

So I think we have got the schedule for those two

issues.  The next question would be to receive the report on

the evaluation.

MR. SAMUEL:  Your Honor, this was not a competency

evaluation in terms of whether Mr. Sadequee is competent to

proceed to trial.  We have never questioned that.

We engaged the services of a psychiatrist --

I wanted to make sure he's a psychiatrist, not a

psychologist -- but a psychiatrist to evaluate his condition

based on his confinement and the duration of his

confinement.

And we have received that, and based on the

evaluation we now want to bring to the Court's attention some

confinement issues.

So it was not -- it never was a competency

issue.  I never thought Mr. Sadequee was not competent to go

to trial.  He's always coherent with me, coherent with the

Court.  So that's not the issue.  The issue was more --

THE COURT:  Mental health well-being?

MR. SAMUEL:  Mental health well-being based on the

conditions of the prison, so that we could then bring to the

Court's attention these confinement issues, which is -- well,

you have depositions next, but the last issue we will address

today.  And I think the psychiatric report has been helpful

to me and Mr. Wahid in understanding what the conditions have

brought, if you will.  I think that's where we are.

THE COURT:  So would you like -- what I hear you

saying is that this evaluation has been helpful and you

wanting to bring to my attention certain things about his

condition that would -- that the evaluation has helped you

determine are recommendations and assistance you would like

from me to change his current circumstances and access and

other specifics?

MR. SAMUEL:  Precisely.

THE COURT:  Let's do that now.  We will get to the

Rule 15 depositions at the very end.

MR. WAHID:  Your Honor, the main things that the

evaluation made clear to us is that Mr. Sadequee's isolation

over the last three years have, combined with the way -- the

manner in which he was brought from Bangladesh, have combined

to both traumatize him and to now present substantial

impediments to him in helping prepare his case.

He's having difficulty with certain issues that the

psychiatrist felt could be in some way mitigated if he had

more contact.  The isolation has created this problem, so the

solution was to have contact visits or more regular contact

visits -- he is getting some contact visits -- more regular

contact visits with his family.

At the moment I believe he has five video-link visits with his family per month. If some of those could be contact visits, or one a month or something of that nature could be instigated.

The increasing of phone --

THE COURT: What do you mean by video-link visits?

MR. WAHID: He's not actually physically in the room with his family. His family is in the jail, but they are in a room watching him on a screen, he's in another room watching them on a screen.

THE COURT: So they are not even in -- they are not even in the --

MR. SAMUEL: If you will, I did it last week just because they couldn't give me a room, which is another issue.

There is a TV camera -- I sit at a table. There is a TV camera and headphones. I put the headphones on. There is a microphone that's hidden somewhere in the device. He I think is maybe not even on the same floor but somewhere, I assume he's also looking at a TV because we nod at each other. He's wearing headphones.

And we talk, like a video conferencing that I'm sure you do in chambers occasionally. But there is no -- you are just looking at a screen.

1          THE COURT:  Is there any facility there where there

2     is separation but people can at least be present and see each

3     other through a glass?

4          MR. SAMUEL:  There is that, and it's called the SHU

5     visitation.  But that to some extent is even worse because

6     you can't talk through the glass.  I mean, it's solid

7     something or other.

8          But they do -- they have occasionally provided

9     contact visits like every other pretrial inmate.

10         THE COURT:  Okay.

11         MR. SAMUEL:  And what we are asking for -- I'm

12    going to be a little more generous with us than Mr. Wahid

13    was -- is twice a month.  In other words, every other

14    visit.

15         Everybody else who goes there gets contact visits,

16    every other pretrial inmate --

17         THE COURT:  How often is the policy to give them

18    contact visits?

19         MR. SAMUEL:  I think it's five times.

20         MR. McBURNEY:  No, no.

21         MR. SAMUEL:  For us or anybody else?

22         THE COURT:  If you were somebody else in pretrial

23    detention, what's the policy on contact visits?

24         MR. SAMUEL:  I thought it was every visit.

25         MR. McBURNEY:  Judge, I'm not speaking for BOP, and

1   we will get you an answer as soon as we can ask those

2   questions.

3           But one important distinction, these ways that the

4   defense counsel are describing something applying only to

5   Defendant Sadequee, everyone, everyone charged with a

6   material support type crime is housed in the same way.

7           I'm not supporting or defending the way Defendant

8   Sadequee is being housed.

9           THE COURT:  I understand that.

10          MR. McBURNEY:  So the understanding --

11          THE COURT:  Generally how many contact visits does

12  somebody in pretrial detention have if you are not a material

13  support defendant?

14          MR. NAHMIAS:  Actually, Your Honor, I can say,

15  because we have to sort out the pretrial facility at the

16  Bureau of Prisons.  In some pretrial facilities, for example,

17  Paulding County where the two police officers who were just

18  sentenced last week were held for over a year, they had zero

19  contact visits for more than a year in custody.

20          THE COURT:  Well, that wasn't my case.

21          MR. NAHMIAS:  I'm just saying, though, in pretrial

22  marshal's custody in this district, there are cases --

23  I mean, the standard for a person in pretrial segregated

24  conditions is zero.  And so we will have to see the SHU

25  versus the general population pretrial, because I think the

standard is very different for people who are being held in
the pretrial SHU versus the pretrial general population.  We
can get you that information.

But as to people held I know from another trial in
the pretrial segregated scenario, and they were being held in
pretrial because of their status as law enforcement officers
and cooperators, not as material support defendants, they had
no family contact for more than a year.

THE COURT:  Well, let me ask you this.  If he was
convicted and assigned to a prison, wouldn't he have contact
visits?

MR. NAHMIAS:  The status is, yes, that after -- and
the status is in most facilities -- it depends where the
Bureau of Prisons puts him.  It would not be the case if he
were assigned at ADMAX, it would not be the case I think in
some of the parts of the facility in Terre Haute where there
are a number of material support defendants.  It is the
standard practice for people in general population, but it is
not the standard for pretrial.

That may seem kind of counter-intuitive because
pretrial conditions should maybe be better, but that is not
the standard --

THE COURT:  Well, that's not the BOP standard and
it's not the Marshal Service standard, but I'm the Court and
we are going to impose what I think is the appropriate

standard.

And what I want you to do is I want you to investigate how we can increase contact visits.

MR. NAHMIAS:  Okay.  And just to be clear about the different levels, there are these video links, there are the face-to-face but through glass visits, and there are the kind of literal contact visits with -- and I believe for attorneys they can have contact visits, I mean, depending on logistics, but they have unlimited.

The question is, just so we are clear, the Court is interested in family actual physical contact visits?

THE COURT:  Well, that's the issue that we are talking about right now.

MR. NAHMIAS:  Okay.

THE COURT:  And I want more contact visits.  And I want you to discuss amongst yourselves what meets the needs of both parties so that more of that happens.

MR. NAHMIAS:  Be happy to.

THE COURT:  The second issue is I want him to be able to talk to his lawyers.  In this kind of case which the government has poured enormous resources in, he has a right to have private conversations with his lawyers on a reasonable schedule, and apparently that's not happening.

MR. McBURNEY:  Let's hear about that.

MR. SAMUEL:  Let me explain -- and I will do it as

1    quick as I can.

2         Since the assault back in October, the Bureau of

3    Prisons' position is he can never be in the visitation room

4    with anybody else.  It's him or nobody.  You know what I

5    mean, he's got to be by himself if he's brought down.

6         The way the prison works is on five days of the

7    week, I believe, people come and visit pretrial inmates.  It

8    is very hard for a lawyer to get in there on some day when

9    there is not other visitors there.

10        THE COURT:  Right.  So what you are saying as a

11   practical matter, that because the Bureau of Prisons wasn't

12   able to protect him against this assault, that they have

13   enacted a policy that as a practical matter prohibits him

14   from having the same rights as other pretrial detainees

15   because they have imposed this artificial, arbitrary and

16   capricious rule that they have to be -- he has to be alone.

17        So the solution will be that they have got to find

18   time when he can be alone and so that those -- that those

19   meetings can be facilitated.  If that's what they believe is

20   required, they will find a way for that to happen so that his

21   contact with his lawyer is not abated.  And you need to work

22   that out.

23        MR. WAHID:  Your Honor, on that same general issue,

24   Mr. Sadequee has been trying to make calls to his attorneys,

25   and he's finding there is no easy way to get that done.

And it may be in part because of some sanctions against him, but my understanding was that should not apply to legal calls.  He had at one point asked for a legal call and didn't get it until three weeks later.  His attorneys were expecting a call and it didn't come.

THE COURT:  Look, I understand your complaint. There is a way, because the prison has done this in a previous case, to accommodate him, to allow him to make more frequent calls as he gets ready for trial to his lawyers. And I will go back and look at the arrangement that I made for this other defendant, and we will make the same arrangement here.  But I'm not going to impede his ability to exercise his right to counsel.

But, Mr. Sadequee, if you break the rules, you are going to be held accountable for that.  And the one thing I will not do is require the Bureau of Prisons, even if -- and I understand that you were making three-way calls.  If you know that that's not permitted, even if your desire to make three-way calls was because you wanted to talk with a particular person, which I guess is your wife, if you are not allowed to do that, you can't do that.

Because everybody else that wants to make three-way calls to call family members, if they have to abide by that rule, so do you.  And whatever consequence they suffer, you will suffer too.

1    MR. WAHID:  Which actually brings up another point,

2    Judge, which is one of the recommendations that the

3    psychiatrist did make was to have some mechanism to have some

4    contact with his wife.  They were married a very brief amount

5    of time before he was taken from there.

6         So I'm not sure if there is any mechanism to do

7    that, but that was definitely one of the things that was

8    recommended to us.  One of the suggestions was three-way call

9    through the attorney to his wife in Bangladesh.

10        THE COURT:  Well, if you can propose some way that

11   gives the prison assurance that -- right now the process that

12   I understand that Mr. Sadequee was using had potential for

13   mischief.  But if there is some way that he can contact,

14   which would not incur any other financial obligation on

15   behalf of the prison because he wants to make a call

16   overseas, which I guess is what he wants to do, and they can

17   be assured that somebody is monitoring that call, whether

18   it's you or somebody else, then I would propose that to the

19   government to see if they can't work that out with the Bureau

20   of Prisons.

21        But it's got to be reasonable, it's got to be in a

22   way that doesn't cause the BOP to incur an expense that they

23   would not otherwise incur for other people.

24        And if you can't resolve that, let me know, and I

25   will see if I can resolve it.

1       MR. WAHID:  I think the final issue was access to

2  review his discovery.

3       We have a number of items that are on CD.  There is

4  a computer in the prison that we have used on a couple of

5  occasions, but it's generally not working.  It has not worked

6  for the last few months I have been there.

7       My understanding is that --

8       THE COURT:  Wait a second, one second.  Is it true

9  that there is a computer at the prison that is supposed to be

10  available to inmates that doesn't work?

11       MR. McBURNEY:  That's not -- we learned about this

12  today.  I'm not disagreeing with them.  I don't have an

13  answer.  They brought that up today when we were preparing

14  for this session.

15       THE COURT:  Well, could you find out whether in

16  fact they make available a computer that is really not

17  available?

18       MR. McBURNEY:  Right.

19       MR. SAMUEL:  It's in the attorneys room.  It's been

20  months since it's worked.  It works one day and then -- BOP

21  knows that.

22       MR. WAHID:  Last time we were there, we did ask

23  them, and they said they were waiting on some part, and they

24  had been waiting for some time.

25       MR. McBURNEY:  We will get you an answer, and it

1    may be action needs to be taken.  I don't know the answer.

2            We also will look at other means for both

3    defendants -- I recognize that this is a hearing for

4    Defendant Sadequee, but Defendant Ahmed has the same need and

5    right to review -- it's a discovery-intensive case.  Most of

6    it is on disks, it's not paper.  We would try to do the same

7    for Defendant Ahmed.

8            I understand the Court's desire --

9            THE COURT:  There is a computer, and they have done

10   this in the past, to allow an inmate that's in pretrial

11   detention to review it in the library.

12           MR. McBURNEY:  Yes, that's precisely my

13   understanding.

14           THE COURT:  I'm trusting that you are going to look

15   into a solution to this problem that should not be a problem.

16           MR. McBURNEY:  Correct.  I have an overall response

17   when they are done, but, yes.

18           MR. WAHID:  And in all candor, Judge, Mr. McBurney

19   and the government have actually been working with us as we

20   have been going along and they have been more than

21   cooperative with us.  So I'm not suggesting anything of them.

22           THE COURT:  I know that.  But even the government

23   sometimes gets frustrated with --

24           MR. WAHID:  So there is a need --

25           THE COURT:  -- the policies and procedures at the

pretrial detention at the Atlanta Penitentiary.

MR. WAHID:  There is a need generally for him to review those CDs.  We are coming up pretty close, and we really need to have him start going through those.

THE COURT:  I know.

Mr. McBurney, can you report to me by the end of the week on -- I mean, it seems to me that that ought to be something that we ought to be able to fix quickly.  Could you at least give me a status report on whether we could -- because those things are -- you know, we are getting close to trial.  These are things that he needs.  He needs to talk to his lawyer, he needs to review evidence to prepare for trial, and we need to resolve that sooner rather than later.

MR. McBURNEY:  Agreed, and by the end of the week, yes.

THE COURT:  Thank you.

MR. WAHID:  The final issue was there were some items seized from him.  Now, he has a lot of legal material that because he could not get it on CD we printed it out and would give it to him.  It's somewhat voluminous, so he has a lot of material.

I believe his cell -- I think he changes cells very quickly or they move him around once a month or something.

During the process some items get seized from him.  Some items that get seized are sometimes his notes that

1   he's making.

2          We would either like them back, or they should be

3   preserved in some safe place that prevents that information

4   from becoming either public or have access to the

5   government's attorneys.

6          THE COURT:  Here is what I would propose on

7   that.  Are these notes in English?

8          MR. WAHID:  Yes.

9          THE COURT:  I want you to look into that,

10  Mr. McBurney.  And if in fact the Bureau of Prisons is taking

11  notes that he's made and you want me to, I will do an

12  *in camera* inspection of those notes to see under what grounds

13  the Bureau of Prisons could be seizing his personal notes on

14  materials that you are now representing to me he's doing in

15  preparation for trial.

16         Because then I'm going to ask the Bureau of Prisons

17  under what authority they are doing that.

18         MR. WAHID:  Thank you.  And I think that -- he has

19  an issue that I would like us to discuss before we raise it

20  here in court because we haven't raised it before.  So I'm

21  going to ask him to not have me raise it at this point and

22  let me do that.

23         If he wishes to on his own raise it, he could raise

24  it right now.

25         There was one last issue that I did just see on his

notes which was commissary. Because he's in the SHU, he does

not -- the commissary that's in the SHU is extremely limited

whereby the commissary for pretrial detainees, for everybody

else, is much more extensive.

He has issues where he's not able to sometimes get

access to things that he would want. He feels it's unfairly

punitive to him, and that that was one of the issues.

And the other one was that the walls of his

cells --

THE COURT: Well, let's start with the

commissary. He needs to provide a list of things that he

would like to Mr. McBurney, and if they are things that are

available in the commissary, that for some reason the Bureau

of Prisons doesn't facilitate him getting out to the

commissary and forces him to use this other one, do you think

you could arrange to help him get those out of the main

commissary?

MR. McBURNEY: We certainly would look into it,

assuming it's not a security issue or anything like that.

THE COURT: I understand.

MR. McBURNEY: And this is a discussion that we

have had. And again I will address some of these with the

Court when they are done with their list of items.

THE COURT: But what I would like to see is, you

know, I think one of the problems here is we get a little bit

these -- there are things there that he wants.  We need to
start saying what is it specifically and put it in writing
what you want rather than making these general complaints.

Because I can deal with specifics.  What I can't
deal with, because I don't know what's in the limited
commissary and I don't know what's in the main commissary,
but it seems that if I can review -- if it's necessary for me
ultimately to review what the specific request is because
it's been in writing and given to the government and the
government says that they can't do it, then I could look at
it and make a decision on whether or not the request was
reasonable and whether the response was reasonable.

And if I have to, I will be the arbiter of whether
something is reasonable and get something delivered that
seems to me a reasonable request that was unreasonably
denied.

MR. WAHID:  Agreed, we can get you a list.

THE COURT:  Okay.

MR. WAHID:  The last item was that -- and I'm not
sure if it's in the cell he's in this month, but he's had an
ongoing complaint that the cell that he was placed in had a
lot of graffiti --

MR. SAMUEL:  It's been taken care of.

MR. WAHID:  -- pornography on the wall.

Okay.  It's my understanding he's not in that cell

1    anymore.  But that was an issue; it's not an issue anymore.

2         Okay.  Thank you.

3         THE COURT:  All right.  On these issues about these

4    concerns about the conditions, is there anything else we need

5    to discuss from the government's perspective?

6         MR. McBURNEY:  Only one, Judge.  And I will

7    certainly make all the inquiries you have directed me to

8    make.  I will report back to the Court whatever I have

9    learned or resolved by the end of this week.

10        Several of the items about which the defendant is

11   complaining are -- and you have alluded to this, but some of

12   them are the product of his own acts.

13        We don't need to get into lots of details, but he's

14   been written up several times for three-way calls and for

15   obstructing the movement of his door, jamming items in the

16   door so the cell wouldn't open when the officers are trying

17   to take him out.  Those are reasons why his items are

18   seized.

19        All inmates in the SHU move every 21 days, standard

20   procedure, every single one of them, pretrial or not.  Not

21   all inmates jam the doors.

22        When that happened I heard right away from

23   Mr. Samuel:  Wait, my client's goods were taken from him.

24   Why does he not have his goods?

25        I called right away BOP:  Why does

Defendant Sadequee not have his stuff?

They sent the report:  He rolled up a magazine and stuck it to jam the door.  For whatever reason, good or bad, that's not something he's supposed to do.

The response was he doesn't have paper in his cell anymore for a while so he doesn't do something like that.

So I'm unaware, but I will inquire that they are randomly seizing notes or a radio or items in other than a legitimate reaction to documented misconduct on his part.

Infractions, not marijuana or a shank or anything like that, but the three-way calls, the blocking of the door.  And he may have his own justification for that because of the incident; nonetheless, it's a violation, and the BOP per their own regulations were taking some of these items.  I will find out if they still have anything and, if so, why.

I do know that as a result of either the second or third write-up for three-way calls there are some sanctions still in place.  The first time he was written up, they agreed to waive the sanctions, in part at our request because it seemed to impede with visits with family, et cetera.

So the conditions are not ideal, he's been in custody for a long time, it's pretrial, not postconviction.  We will continue to work with the defense, and we will turn to the Court if we can't get answers that we think are reasonable.

But I want the Court to understand that the BOP has been extremely responsive to our requests when we are notified by the defense.  We are hearing about certain things for the first time right now, and I hope in the future we could work before we need to get the Court involved.

THE COURT:  Thank you.  I mean, that's why we need to -- I want to make it clear that if you have got a complaint, I want a record of it, I want a communication with the government, because I am going to give them first opportunity to correct it.

But if it's not corrected and somebody believes it has to be brought to me, I'm not going to deal with generalities and vague descriptions.  I'm going to be able to say here is what you said didn't happen, this is what their response was, so that I will have a fixed record of what the complaint is, what the response was, so that I can decide it.

But we are going to move from these general late complaints and put into process a procedure whereby if you have a concern, it's addressed in writing to the government, the government gets to try to resolve it, and if they can't, I am always available to you to resolve these things.  We can do it by telephone or we can do it in a meeting.

But my guess is that whenever I put something like this into place, you don't have to come to me because now

1    everybody understands what the complaint is and what the

2    proper response is, and you work it out and we don't have

3    these little irritations that people apparently are having.

4         So I would encourage you to follow up on the

5    process we talked about today.

6         MR. WAHID:  Absolutely, Your Honor.

7         THE DEFENDANT:  I also would like to request to be

8    allowed to have interviews with the media or contact with --

9    media interviews, if that would be possible?

10         THE COURT:  If you would like to request that, put

11    it in writing and I will consider it.  I will give the

12    government a chance to respond.  I don't know what the law is

13    on that.

14         When were you told of this hearing?

15         THE DEFENDANT:  Last week.

16         THE COURT:  Well, you have the ability when there

17    is a hearing scheduled to send me a letter telling me what

18    you want to address.

19         In the future if we have a hearing or you want a

20    hearing to address something, send it to me in writing.

21    Please don't bring them up like you have today, issues that I

22    have no knowledge about, that the government obviously

23    doesn't have any knowledge about, because I can't prepare to

24    address issues when they are brought up in this manner.

25         The reason why we are having this hearing is

because you wrote, and within a very short period of time

I scheduled this.  So we are extremely responsive in this

case at all levels.  You have my full and undivided

attention.

        But your obligation to me is to let me know what it

is and let me know in writing so that I can do my job, which

is to understand the issue, understand the law as it applies

to that issue, rather than asking me in an open forum like

this to address issues about which I have no background nor

preparation nor proper response because I don't know anything

about it.  And that's what you owe me.

        THE DEFENDANT:  Thank you.

        THE COURT:  You are welcome.

        Rule 15 depositions?

        MR. WAHID:  Your Honor, I gave a short update to

Mr. McBurney earlier today.  Essentially there were three

categories of witnesses in the sense of three different

nations in which they reside:  Canada, U.K. and Pakistan.

        The easiest one, starting with Pakistan, we are

going to withdraw our request to depose those witnesses,

which were the leaders of LET.

        The Canadian witnesses, we are going to withdraw

our request to depose the two that are in custody that I have

listed.  We have Mr. Sadequee's aunt, Manzu Huq, who is

prepared to come.  I simply have to get the proper

information to Mr. McBurney for the travel, but she's a
Canadian citizen is my understanding.  It shouldn't be a
problem.

The ones I have spent most of my time on are the
two individuals in custody in the United Kingdom,
Mr. Ahbid Khan and Younis Tsouli.  I have through Mr. Khan's
attorney got permission to go speak to Mr. Khan, and
Mr. Samuel and I just have to go do that as quickly as we
can.

Mr. Tsouli has been notified that we wish to speak
to him.  We haven't -- that attorney, his attorney has not
heard back from him yet, has sent him a follow-up letter, and
in a conversation recently suggested that if we are already
going to be there, that we may just want to arrange to go to
the jail and if he talks to us, he talks to us, if he
doesn't, he doesn't.  So that may be the quickest way to
resolve that issue.

And in relation to those -- there were transcripts
of Mr. Khan's trial.  I know that Mr. McBurney had expressed
an interest at some point that he would be interested in also
seeing if we were to order it, so I mentioned that to him
today that we actually placed an order.  At some point we
have to deal with paying for it, so we might want to
cooperate on dealing with that and get that transcript.

Mr. Tsouli, we haven't been able to track down as

1    to how to get that.  If we do, then I will address that issue

2    as well.

3            THE COURT:  It sounds to me like there is good

4    communication on those issues and that that's a report, that

5    there is really nothing for me to help you with, but that I

6    know that if you do need my help, that you will approach me.

7            MR. McBURNEY:  The only point of clarification I

8    have, I thought there were four Canadian witnesses:  Ms. Huq,

9    Jahmaal James, Fahim Ahmed and Mubin Shaikh.

10            So there is one you didn't refer to, and I need to

11   know the status of that.

12            MR. WAHID:  We are withdrawing all three who were

13   arrested in Canada.  Just two are in custody, one was not in

14   custody.  But having -- we are withdrawing those three

15   names.  So the only --

16            THE COURT:  So there is only one Canadian?

17            MR. WAHID:  Manzu Huq.

18            MR. McBURNEY:  Just to complete the report from the

19   government's side, all signs that we get from the State

20   Department as well as law enforcement is that getting a visa

21   for Ms. Huq, if she even needs one, should be easy.

22            And he left, but I will give you the Ahmed

23   side.  They have two Pakistani nationals that they have

24   requested, and the same green light.  Currently there appear

25   to be no obstacles to get them the appropriate visas.  They

1    have given us all of the identifying information we need.

2          And so it's simply get to the consulate and there

3    should be no problem for Mr. Martin's two Rule 15 witnesses

4    to actually be here to testify rather than be deposed.

5          THE COURT:  Are they family members?

6          MR. McBURNEY:  I believe that one is a cousin and

7    the other is somewhat of a religious or spiritual advisor

8    that Defendant Ahmed met while in Pakistan.  But they

9    wouldn't be deposed; they would actually be here for trial to

10   testify, much like Ms. Huq would be if that's the course the

11   defense takes.

12         THE COURT:  Okay, that's helpful.

13         Well, that's all I had on my list.  Is there

14   anything else that the government wants to bring up?

15         MR. McBURNEY:  No, sir.

16         THE COURT:  Mr. Samuel?

17         MR. SAMUEL:  No, Your Honor.  Thank you.

18         THE COURT:  Mr. Wahid?

19         MR. WAHID:  Thank you.

20         THE COURT:  All right.  Then we will be in

21   recess.  Thank you.

22                (Proceedings adjourn at 4:50 p.m.)

23

24

25

1                    C E R T I F I C A T E

2

3     UNITED STATES OF AMERICA      :
                                    :
4     NORTHERN DISTRICT OF GEORGIA  :

5

6              I, Nicholas A. Marrone, RMR, CRR, Official Court

7     Reporter of the United States District Court for the Northern

      District of Georgia, do hereby certify that the foregoing 63

8     pages constitute a true transcript of proceedings had before

9     the said Court, held in the city of Atlanta, Georgia, in the

10    matter therein stated.

11             In testimony whereof, I hereunto set my hand on

12    this, the 5th day of March, 2009.

13

14

15

16                         /s/ Nicholas A. Marrone
17                         _____
                           NICHOLAS A. MARRONE, RMR, CRR
18                         Registered Merit Reporter
                           Certified Realtime Reporter
19                         Official Court Reporter
                           Northern District of Georgia
20

21

22

23

24

25