IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL ACTION FILE |
| | ) | NO. 1:06-CR-147-WSD |
| v. | ) | |
| | ) | ATLANTA, GEORGIA |
| SYED HARIS AHMED (1) AND | ) | |
| EHSANUL ISLAM SADEQUEE (2) | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
UNITED STATES DISTRICT JUDGE

Wednesday, May 20, 2009

APPEARANCES OF COUNSEL:

For the Plaintiff:          OFFICE OF THE U.S. ATTORNEY
                            (By:  David E. Nahmias
                                  Robert C. McBurney
                                  Christopher Bly)

                            DEPARTMENT OF JUSTICE
                            (By:  Alexis L. Collins)

For Defendant Ahmed (1):    MARTIN BROTHERS
                            (By:  John Richard Martin)

For Defendant Sadequee (2): GARLAND SAMUEL & LOEB
                            (By:  Donald Franklin Samuel)

                            WAHID & VIZCAINO
                            (By:  Khurrum B. Wahid)

*Proceedings recorded by mechanical stenography*
*and computer-aided transcript produced by*
NICHOLAS A. MARRONE, RMR, CRR
1714 U. S. Courthouse
75 Spring Street, S.W.
Atlanta, GA  30303
(404) 215-1486

I N D E X

*Witness*                                        *Page*

EVAN F. KOHLMANN
        Direct (By Ms. Collins)                  4
        Cross (By Mr. Martin)                    69
        Cross (By Mr. Wahid)                     105
        Recross (By Mr. Martin)                  144
        Redirect (By Ms. Collins)                153
        Recross (By Mr. Martin)                  179
        Recross (By Mr. Wahid)                   188
        Redirect (By Ms. Collins)                194
        Further Redirect (By Ms. Collins)        234
        Further Recross (By Mr. Martin)          247

```
1                    Wednesday Morning Session

2                         May 20, 2009

3                          10:58 a.m.

4                          -- -- --

5               P R O C E E D I N G S

6                          -- -- --

7                      (In open court:)

8            (In open court:)

9            THE COURT:  Good morning.  This is the *Daubert*

10   hearing in the United States v. Syed Haris Ahmed and

11   United States v. Eshanul Islam Sadequee, which is Criminal

12   Action No. 06-147.

13           Would counsel please announce their appearances?

14           MS. COLLINS:  Alexis Collins for the United States,

15   and sitting with me is Robert McBurney and Christopher Bly.

16           THE COURT:  Good morning.

17           MR. MARTIN:  Jack Martin on behalf of Mr. Ahmed.

18           THE COURT:  Good morning.

19           And good morning, Mr. Ahmed.

20           DEFENDANT AHMED:  Good morning.

21           MR. SAMUEL:  Don Samuel for Mr. Sadequee.

22           MR. WAHID:  Khurrum Wahid for Mr. Sadequee.

23           THE COURT:  Good morning.

24           And good morning, Mr. Sadequee.

25           All right.  This is the hearing concerning
```

1  Mr. Kohlmann.  Is the government ready to proceed?

2          MS. COLLINS:  Yes, Your Honor.

3          Before we proceed, the government wanted to ask --

4  and we have already talked with defense counsel for

5  Mr. Ahmed -- just like with Dr. Ofshe yesterday, his

6  testimony was considered part of the trial testimony.

7          For purposes of Mr. Kohlmann's qualifications and

8  methodology as well as any cross, we were wondering if that

9  would be possible with respect to Mr. Ahmed's trial since

10  that would be before Your Honor?

11          THE COURT:  Mr. Martin, do you have any objection

12  to that?

13          MR. MARTIN:  We are agreeable to that.

14          THE COURT:  Then I will consider that in connection

15  with Mr. Ahmed's trial.

16          MS. COLLINS:  Thank you, Your Honor.  Then we would

17  begin by calling Mr. Kohlmann to the stand.

18                  --  --  --

19                  EVAN F. KOHLMANN

20  being first duly sworn by the Courtroom Deputy, testifies and

21                  says as follows:

22                  --  --  --

23                  DIRECT EXAMINATION

24  BY MS. COLLINS:

25  Q.   Good morning, Mr. Kohlmann.

1    A.    Good morning.

2    Q.    What is it that you do?

3    A.    I work as an international terrorism consultant.

4    Q.    And can you summarize very briefly the subject matter of

5    your work?

6    A.    Yes.  I collect open source information, research about

7    terrorist organizations, terrorist movements, terrorist

8    financing, terrorist recruitment, and terrorist propaganda.

9        I take that information and distill it into either

10   unclassified open source memorandum for the purposes of law

11   enforcement, academics and others, or I distill it in the

12   form of academic papers, books and other materials, including

13   advice to Congress or whoever else has a need or a want for

14   this kind of information.

15   Q.    And do you focus -- what types of groups or specific

16   individuals do you focus on?

17   A.    Well, I focus, generally speaking, on the Arab Afghan

18   movement and organizations that have links to the Arab Afghan

19   movement.  By Arab Afghans, I'm referring to Arab Mujahideen

20   or holy warrior fighters who came to Afghanistan during the

21   1980s to fight there.

22       But that conflict extends beyond Afghanistan.  My honors

23   thesis at Georgetown focused on the transnational aspect of

24   this, how these organizations moved on from Afghanistan to

25   other conflict zones, and how they internetwork with each

1  other.  So this is a key aspect of what I do.

2  Q.   And just for the court reporter, you mentioned a word

3  Mujahideen.  Could you spell that, please?

4  A.   Of course, excuse me.  M-u-j-a-h-i-d-e-e-n.

5  Q.   And what does that word mean?

6  A.   It means, roughly translated in Arabic, holy warriors.

7  Q.   And --

8  A.   It comes from the root word jihad, which means holy

9  struggle.

10           MS. COLLINS:  I approach the witness, Your Honor?

11           THE COURT:  You may.

12  BY MS. COLLINS:

13  Q.   I just put before you what has been marked as

14  Government's Exhibit 2.

15       Do you recognize that?

16  A.   Yes, I do.

17  Q.   What is it?

18  A.   This is a copy of my resume'.

19           MS. COLLINS:  Your Honor, at this time we would

20  move to admit Government's Exhibit 2.

21           THE COURT:  Any objection?

22           MR. MARTIN:  No objection.

23           MR. SAMUEL:  No objection.

24           THE COURT:  Okay.  It's admitted.

25  BY MS. COLLINS:

1    Q.    Now, you mentioned your undergraduate studies.    Where

2    did you do those?

3    A.    I was student at the Edmund A. Walsh School of Foreign

4    Service at Georgetown University in Washington, D.C.

5    Q.    And what was your degree and major?

6    A.    My degree was in International Politics with a focus on

7    International Security Studies.    I also achieved a

8    certificate in Islam and Muslim Christian Understanding from

9    the Prince Al-Waleed Bin Talal Center for Muslim Christian

10   Understanding.

11   Q.    And what do you mean by international security studies?

12   A.    International security studies, focusing on war and

13   peace in the contemporary world.    But my particular focus was

14   on the Middle East and the Muslim world.

15        Much of my research focused on Afghanistan, the Arabian

16   Gulf, also known as the Persian Gulf, North Africa.    But

17   again focusing on radical or extremist or dissident movements

18   in general that had appeared in the Middle East in the Muslim

19   world during the 1980s and 1990s.

20   Q.    Now, you mentioned earlier your honors thesis that

21   related to the Arab Afghan movement.

22   A.    That's correct.

23   Q.    Can you explain a little more, just briefly, what issue

24   about the Arab Afghan movement you were discussing in that

25   paper?

1  A.   Yes.  I had sought to compare four different Arab Afghan

2  movements following the end of the Soviet Afghan War of the

3  1980s, and trying to examine, even though these individuals

4  had come from similar base, they had all fought in

5  Afghanistan or they had links back to fighters in

6  Afghanistan, why upon returning to their countries of origin,

7  namely, Egypt, Saudia Arabia, the Caucasus and Algeria, why

8  is it that these individuals followed different paths, why is

9  it that they achieved different relative degrees of success,

10  and trying to understand what factors allowed Arab Afghan

11  movements to succeed or fail in a given region, in a given

12  country, or following a given path.

13  Q.   And what time period did that cover?

14  A.   Well, covering the beginning of the paper the Soviet

15  Afghan War of the 1980s.  I wanted to first of all show the

16  establishment of the Arab Afghan movement, of the

17  Makhtab-e-Khidamat, the office of Mujahideen services, and

18  then tracing that up until about -- my honor thesis was

19  published in April of 2001, so it was covering the period up

20  until April of 2001.

21  Q.   And did any of those groups you mentioned, the

22  Makhtab-e-Khidamat, did any of those have any relation to

23  later groups that turned out to be terrorist organizations?

24  A.   Yes.  I mean, one of the initial figures in the chapter,

25  the initial introductory chapter to my thesis was

1    Osama Bin Laden, the founder of Al-Qaeda.  And of course, the

2    Makhtab-e-Khidamat has actually been designated by the

3    United States government as being the predecessor

4    organization of Al-Qaeda.

5    Q.    Now, while you were at Georgetown, did you write any

6    other major papers that are related to your current field?

7    A.    Yes.

8    Q.    And can you talk about how many did you write, other

9    than your honors thesis?

10   A.    First of all, in order to get a certificate in Islam and

11   Muslim Christian Understanding, I had to write what's known

12   as a capstone thesis.

13        A capstone thesis is a thesis paper where you meet with

14   your mentor at the CMCU, Center for Muslin Christian

15   Understanding, and you pick a paper topic.  In my case, my

16   paper topic was Religious and Political Modernization in

17   Early Twentieth Century Afghanistan, trying to examine how

18   some of the same political currents that are in Afghanistan

19   now can be traced all the way back to the early 20th

20   century.

21        And my mentor in that project was the director of the

22   center, Dr. John Voll -- or excuse me, the deputy director of

23   the center, Dr. John Voll.

24   Q.    As part of your study at the Center for Muslin Christian

25   Understanding, did you have to undertake any special studies?

1  A.   Yes.  In addition to writing my capstone thesis, I also

2  had to take a year-long intensive study in Islamic history

3  and Islamic ideology and Islamic thought, which included

4  memorization of lots of Arabic terminology, which is

5  essential to understanding Islam.

6       I also had to take course work in Islamic modernism to

7  understand how different individuals had tried pushing

8  forward modern views of Islam in the contemporary world and

9  the struggles that they have faced and what experiences they

10  had.  So, yes.

11      Now, in addition I should say I wrote one other paper of

12  significance while I was at Georgetown.  I set up an

13  independent research seminar with a senior member of the

14  Department of Government Faculty, Dr. Andrew Bennett.

15      And the purpose of doing that was in order to engage in

16  an indepth study of the Soviet Afghan War of the 1980 itself,

17  and trying to understand how that conflict had eventually led

18  to the development of the Taliban, the Taliban meaning the

19  students movement that's currently fighting in Afghanistan

20  during the 1990s.

21  Q.   Now, in the course of -- in writing those three papers

22  that you talked about, your honors thesis on Arab Afghans,

23  the paper that you did for the Center for Muslim Christian

24  Understanding, and the other thesis that you wrote, what

25  types of sources did you use when you were researching those?

1  A.    I focus, then and now both, I focus on open sources.

2  Q.    And just can you explain what that means?  What is open

3  source?

4  A.    Open sources are nonclassified sources.

5       In other words, a closed source would be an intelligence

6  report, it would be a spy report.  I don't deal with that

7  kind of information.

8       What I deal is in terms of getting as original

9  information as possible but from open sources; i.e., number

10  one, going out and interviewing people directly in the field,

11  going and speaking with people.

12       Now, in the world of terrorism, that can be very

13  challenging.  Most terrorists aren't exactly looking to meet

14  with Americans.

15       So I move to what are known as secondary sources, which

16  would be original video recordings, original audio

17  recordings, books, magazines written by the individuals who I

18  am writing about.

19       So in other words, I probably can't get an interview

20  with Osama Bin Laden personally in Afghanistan; however, I am

21  able to get my hands on video recordings of Osama Bin Laden

22  speaking at a time.

23       I am able to get my hands on books written by his

24  intimate associates as they were forming Al-Qaeda during the

25  late 1980s and early 1990s.

1     I'm able to get my hands on original communiques issued

2  by terrorist organizations.  For instance, the Armed Islamic

3  Group in Algeria.

4     These sources are not as good as meeting someone in the

5  field, but certainly if you have a video recording of someone

6  saying something, it's fairly certain that they did say it,

7  and that's a very, very powerful and a very useful source.

8     So those are the main sources I use.

9     Now, I also supplement those with what are known as

10  tertiary sources.  Tertiary sources would be newspaper

11  articles, magazine articles.

12     Now, these are the kind of sources that we don't

13  generally like to use, because it's hard to know for sure,

14  you know, how accurate journalists are.

15     However, certain publications, *The New York Times*, for

16  instance, has an extremely good reputation, and if they quote

17  somebody as saying something, it's fairly certain that they

18  said it.  They have a very good editorial process.

19     So those kind of tertiary sources can also be relevant

20  to help flesh out more detail about the subject that you are

21  writing about.  But again the best sources would be the

22  primary and the secondary sources.

23  Q.   Okay.  And we will talk more about how you obtain access

24  to those sources later.

25     What -- for these papers that you wrote, was there any

1  type of approval or review process at the school?

2  A.    Yes.

3  Q.    Can you describe that process?

4  A.    Yes, of course.  For my honors thesis -- the honors

5  thesis is somewhat of an involved process.  Georgetown

6  doesn't offer the opportunity to all students to write an

7  honors thesis.  It's something you have to apply for.

8       In order to apply for it, you have to have a topic which

9  you are already interested in writing about, which is unique,

10  and which pushes forward social service in some way which

11  makes it worthwhile for you to write the paper.

12       I applied to the Department of Government, and I was

13  selected with about four other students from my class to

14  write honors theses for the Department of Government.

15       Now, in order to write the thesis itself, even after

16  being selected to do it, I then had to engage in a full

17  semester-long course taught by the director of the Department

18  of Government, Dr. Joseph Lepgold, L-e-p-g-o-l-d, who over

19  the space of a semester intensively showed us the proper

20  methods for research and writing for thesis documents, for

21  thesis papers.

22       Number one, how to conduct good research, how to

23  evaluate good sources, how to write properly, how to do

24  proper comparative analysis.

25       Once the course itself was over, then we were expected

1  to write the thesis.  However, throughout the writing of the

2  thesis, obviously I was working very closely with

3  Dr. Lepgold, my advisor, and also Dr. Michael Brown, who was

4  the the director of Georgetown's National Security Program at

5  the time, who was also helping me mentor this project.

6      Once I finished the paper and once I submitted the

7  paper, the process is still not over.  Because at that point

8  the paper goes in front of a committee of senior faculty

9  members from the Department of Government at Georgetown

10 University.

11     They as a committee then vote on whether the paper has

12 achieved what it is supposed to have achieved, it is quality

13 enough, it is level enough to achieve honors.

14     If it is approved, you receive honors.  Mine was

15 approved.

16 Q.   Now, while you were at Georgetown, did you end up

17 working for any professors?

18 A.   Yes.

19 Q.   And who?

20 A.   I worked as a research assistant for Dr. Mamoun Fandy,

21 M-a-m-o-u-n F-a-n-d-y, at the Center for Contemporary Arab

22 Studies, CCAS, at Georgetown University.

23 Q.   What type of work did you do for Dr. Fandy?

24 A.   Dr. Fandy was at that point putting the final touches on

25 his book *Saudi Arabia:  Politics of Dissent*.

1    In his class work that I was doing with him separately,

2    I was doing a lot of work on the Saudi dissident groups that

3    he was writing about, including Osama Bin Laden, and that was

4    also the focus of some of the research I was doing for him

5    was helping him research those topics, research those

6    individuals, and other aspects that were going into his

7    work.

8    But, yeah, I mean, I was working as his research

9    assistant.

10   Q.   Looking at your resume', you also attended University of

11   Pennsylvania Law School?

12   A.   That's correct, yes.

13   Q.   While you were there, did you continue to study or deal

14   with issues in international terrorism?

15   A.   Yes.

16   Q.   In what way?

17   A.   Well, in law school, first of all, I took course work

18   that specifically was directed in the aim of terrorism and

19   national security law:  Cybercrime, terrorism and diplomacy,

20   terrorism and democracy.  I was focusing very heavily on

21   national security law.

22   But separately from that, in the Graduate School of Arts

23   and Sciences at the University of Pennsylvania, I also did

24   course work in Afghanistan Islamism.

25   Q.   Did you write any papers that were related to issues of

national terrorism there?

A.   Yes.  In addition to the papers that I wrote for my law

school classes and in order to get credit for the class in

Afghanistan and Islamism, I was required to write a

full-length term paper in which I compared

Gulbuddin Hekmatyar and Ahmad Shah Masood --

G-u-l-b-u-d-d-i-n H-e-k-m-a-t-y-a-r, and Ahmad Shah Masood,

A-h-m-a-d S-h-a-h M-a-s-o-o-d -- two Afghan war lords,

comparing and contrasting their histories, their backgrounds,

and how they had contributed to the history and development

of Afghanistan.

Q.   Now, while you were in school, did you also do any

outside work?

A.   Yes, I did.

Q.   And for what entity?

A.   I worked starting in February of 1998 for the

Investigative Project, which is a Washington, D.C., based

think tank and policy group.

Q.   Now, is that a nonprofit or for-profit organization?

A.   It's a nonprofit organization.

Q.   And what is the purpose of the Investigative Project?

A.   The Investigative Project was founded in 1995 in order

to help promote nonprofit counterterrorism research.  In

other words, in order to help promote the idea of going in

and doing a lot of ground-level research on terrorist

organizations, terrorist financing, terrorist recruitment

that other people didn't have the time or resources to

dedicate to this process.

And the idea was that we would then take our results,

the research that we had gotten, again distill it into

memorandum, and then distribute these memorandum to

journalists, to congressmen, to law enforcement, anyone that

this information could be useful to.

Now, naturally everything that we did was very

heavily-researched based.  So in addition to giving the

actual memorandum, we would carefully footnote everything and

also give original sources as well.

So if a journalist was writing a story about a bank

account, we would be able to show here is the bank account,

here is the transfer, here is something.  Everything we did

was very carefully backed up with documentary evidence.

Q.   And you talked about everything we did.  What were your

duties when you were working there?

A.   My specific responsibility there was tracking Al-Qaeda

and Arab Afghan organizations.  But in order to do that,

I covered a wide variety of different aspects, everything

from fund raising, recruitment, propaganda.

I also branched into several other organizations which

the investigative project focused on including Hamas.  But

again the main focus of my research was on Arab Afghan

1    movements.

2    Q.   And what would be some examples Arab Afghan movements

3    that you focused on at that time?

4    A.   Primarily, of course, Al-Qaeda starting in August of

5    1998 with the bombing of the U.S. embassies in East Africa.

6         But aside from just Al-Qaeda itself, there were other

7    organizations as well, such as the Libyan Islamic fighting

8    group, such as the Egyptian Islamic group, such as the

9    Islamic Jihad movement in Egypt.

10        There are a bunch of other organizations that either

11   work underneath Al-Qaeda's umbrella or else simply have the

12   same ideas or similar ideas as Al-Qaeda but separate.  So you

13   have to study all of these organizations to understand how

14   they interact and how they work.

15   Q.   Now, what was the -- would you actually produce work

16   product yourself from the research that you were doing?

17   A.   Yes.

18   Q.   And what was the vetting or review process for that work

19   product?

20   A.   Well, anything that gets put out -- in the investigative

21   project, anything that was written, number one, had to be

22   reviewed by basically every other staff member, including the

23   director of the organization.  Nothing left that organization

24   without being proofread at least five or six different times

25   by five or six different people.

1    The reason being is because of the fact that you are

2  dealing with issues of terror finance, recruitment.  These

3  are very serious criminal issues.  We didn't want to accuse

4  anyone of doing anything that they weren't actually

5  responsible for, and we wanted to make sure that if we were

6  making a particular allegation, that there were sufficient

7  facts to back that up.

8    So everything had to be very carefully footnoted.  And

9  again, since most of what we were doing ended up in the form

10  of congressional testimonies and whatnot, for obvious

11  reasons, everything, all the Ts had to be crossed, all the Is

12  had to be dotted.

13  Q.   Now, how long did you work for the Investigative

14  Project?

15  A.   I worked at the Investigative Project from again

16  approximately February of 1998 until January of 2004.

17  Q.   What did you do after you left the investigative

18  project?

19  A.   After I left the investigative project -- well,

20  I finished my law degree, but I also began my own consulting

21  business, providing similar services to what I did at the

22  Investigative Project, however now open to a wide variety of

23  clients.

24  Q.   And has the focus of your research changed at all since

25  you left the Investigative Project and entered into your own

1   consulting business?

2   A.    I don't think it's changed.  I think it's expanded

3   slightly only because of the fact that we have had new

4   frontiers of research open up in places like Iraq that didn't

5   exist previously, so those areas achieved greater

6   significance in my research.  But the research itself is the

7   exact same.

8   Q.    Do you also work in relation to your consulting work on

9   groups in Pakistan?

10  A.    Very heavily.

11  Q.    And what would be some examples of those groups that you

12  studied?

13  A.    Lashkar-e-Tayyiba, Jaish-e-Mohammed, J-a-i-s-h dash e

14  dash M-o-h-a-m-m-e-d, the Tehrik-e-Taliban Pakistan,

15  T-e-h-r-i-k dash e dash Taliban Pakistan.  Sipah-e-Sahaba.

16      I study a large group -- large number of groups in

17  Pakistan.  I work with a colleague who is there right now.

18  Q.    Now, what types of clients do you consult for as part of

19  your business?

20  A.    Well, I consult for almost anyone who is interested in

21  my research.  I provide information to wide variety of

22  different people, everything from academics, government

23  agencies, law enforcement, human rights organizations,

24  journalists, academic institutions.

25      Really, the idea is -- I mean, it's stated in my

website.  The idea is to provide an information clearinghouse

for people involved in very detailed counterterrorism

research.  Policymakers, law enforcement, academics, human

rights activists, whoever is interested in this stuff, I'm

more than happy to give my research to.

Q.   Now, you just mentioned your website.  What is the name

your website?

A.   My website is located at *www.globalterroralert.com*.

Q.   And you said you use it as clearinghouse for what?

A.   What I do is, number one, my own papers, the papers that

I write.  For instance, I recently published a paper about a

group in Somalia.  I will post links on the site itself so

people have access to my analysis.

But more importantly what I do there is I provide

examples of raw information from terrorist

organizations.  Now, obviously this has been selectively

chosen for information that I believe would be helpful to

people involved in counterterrorism research.

But it is information, raw information that helps

academics, policymakers, law enforcement, anyone else

understand the mechanics of what's going on on the ground.

It's one thing to hear about drone strikes, it's one

thing to hear about bombings.  It's another thing to see

this, and see the actual people involved, and see the

details.  And that's what we provide.

1    Q.    Now, you mention that you do some consulting for

2    government agencies.  Are these foreign or U.S. government

3    agencies?

4    A.    Both.

5    Q.    And can you just -- can you mention some of the U.S.

6    government entities that you have consulted for?

7    A.    Sure, of course.  The Federal Bureau of Investigation,

8    the U.S. Department of Justice, the U.S. Department of State,

9    the U.S. Department of Defense, the Internal Revenue

10   Service.

11        I have also done consulting work on behalf of a variety

12   of different intelligence agencies indirectly.  But that's

13   about it.

14   Q.    And do some of those services include things like

15   speaking at government-sponsored events or conferences?

16   A.    Yeah.  With regards to intelligence agencies, the work

17   that I do is primarily giving presentations at

18   conferences.  It's not in the form of spying.

19   Q.    Do you do any consulting in connection with criminal

20   cases?

21   A.    Yes.

22   Q.    And in fact, you have been retained here in this case?

23   A.    That's correct, yes.

24   Q.    In how many cases have you been retained as an expert in

25   a federal criminal case by the U.S. government?

1   A.   I believe this would make it eighteen.

2   Q.   And are those listed there on page two of your resume'?

3   A.   That's correct, yes.

4   Q.   And those include military commissions as well?

5   A.   Those are the cases in which I have been hired as a

6   consultant.   I should say the cases where I actually

7   testified in as a witness, that would be twelve.

8   Q.   Okay.   And the cases where you have been retained as a

9   consultant, that also includes military commission cases?

10   A.   Actually that would be an additional two.   I don't think

11   I included that in that number.

12   Q.   And those are listed here on your resume'?

13   A.   Yes.   The additional two cases would be Palulu and

14   Homden in the Guantanamo Bay tribunes.

15   Q.   Now, what are some of the general topics of your

16   testimony that you presented in the cases for which you have

17   testified as an expert witness?

18   A.   Generally speaking, I talk about transnational terrorist

19   groups, primarily relating to the Arab Afghans.   So

20   everything from Al-Qaeda itself, Al-Qaeda's leadership,

21   Al-Qaeda financing, Al-Qaeda recruitment, to the same

22   aspects, the history of these organizations, not just

23   Al-Qaeda, but also groups like Lashkar-e-Tayyiba, like

24   Jaish-e-Mohammad.

25       These are not Al-Qaeda, but these are groups with

similar ideologies or a similar background or similar
heritage.  And part of what I do is study the comparative
differences and similarities between these different
movements.  It's a comparative analysis.

     A lot of times I'm brough up to talk about Chechnya,
Pakistan, Afghanistan, comparing these movements, explaining
what each one of them is.

Q.   As part of that, do you -- have you had any occasion to
testify about how these groups, either the propaganda that
they disseminate or how they use that for recruiting
purposes?

A.   Starting when I began my research back in 1998, one of
the most lucrative areas of research that was open to me was
online databases and the internet, the reason being is
because I'm relatively young, I'm computer savvy, and most of
the people that are in my field are not.  So this was a great
open area for me to get into.

     And so one of the big areas of research that I do is
that I engage in the comprehensive collection of terrorist
propaganda videos.  And I store all these in a massive,
massive library database.  And what I do is that I collect
these videos and I collect these communiques off the
internet, because in many cases they are the best sources of
information that we have about some of these organizations.

     It used to be that terrorist groups went to television

stations, or they would conduct interviews with *The New York Times*. They don't do that anymore.

Nowadays if you want to get access to original interviews, original speeches, original documents distributed by terrorist organizations, the number one place to get that information is from the internet.

Q. Okay. And we are going to talk more about that as well.

In the course of when you testify about these things -- or you have testified about these things in other federal cases?

A. That's correct, yes.

Q. Now, are there cases where you are retained, but you ended up not testifying as an expert?

A. Yes.

Q. And just looking, you actually had different columns on your resume' indicating where you were hired, where you testified as a fact witness, and where you testified as an expert; is that correct?

A. That's correct.

Q. They are on page two. So I just want to ask you questions about a couple of these.

Were you retained as an expert in the case *U.S. v. Jose Padilla* in the Southern District of Florida in 2007?

A. Yes, I was.

1   Q.   And what was, just very briefly, the nature of the
2   allegations in that case?
3   A.   The nature of the allegations was material support of
4   terrorism, an individual who allegedly had gone to a
5   terrorist training camp and allegedly was involved in other
6   criminal activities.
7   Q.   And what was the topic of your proposed testimony or
8   what were you retained to deal with?
9   A.   Specifically I was going to testify about the conflict
10  in Bosnia-Herzegovina and the conflict I believe also in
11  Chechnya, although it turned out Bosnia ended up not being in
12  the litigated case in court.
13  Q.   So you didn't end up testifying in that?
14  A.   No, my testimony wasn't needed.
15  Q.   And also there is a case *U.S. v. Ahmed Omar Abu Ali* in
16  the Eastern District of Virginia in 2005?
17  A.   That's correct, yes.
18  Q.   What were the nature of the allegations in that case?
19  A.   This was an individual who had allegedly joined Al-Qaeda
20  in Saudia Arabia and was involved in planning for
21  antiAmerican activities with individuals involved with
22  Al-Qaeda in Saudia Arabia.
23  Q.   What was the topic of your proposed testimony there?
24  A.   Al-Qaeda in Saudia Arabia.
25  Q.   And did you end up testifying in that case?

```
 1   A.   No, I didn't.
 2   Q.   Did the court conduct any type of *Daubert* hearing on
 3   your qualifications or methodology?
 4   A.   No.  I actually never appeared in court.  My
 5   understanding was the paperwork was submitted late.  I was
 6   brought in as kind of a late addition, and my understanding
 7   is the judge decided it was too late to be submitting expert
 8   witnesses.
 9   Q.   Now, on your resume', you list several upcoming cases
10   there at the bottom in which you have been retained but your
11   testimony is forthcoming.  Have you, since you wrote this
12   resume', testified in any of those cases?
13   A.   Yes, I believe actually I have.
14   Q.   Which one?
15   A.   I have testified in *United States v. Oussama Kassir* in
16   the Southern District of New York, which took place
17   approximately three weeks ago in the Southern District of
18   New York.
19   Q.   And were you subjected to a *Daubert* hearing in that
20   case?
21   A.   No, the judge rejected holding a *Daubert* hearing in that
22   case because he didn't feel it was necessary.
23   Q.   Now, you said earlier that you have also consulted with
24   foreign governments as well?
25   A.   That's correct.
```

Q.   What -- just can you name a couple of the foreign
governments that you have consulted with?
A.   Sure.  I have done consulting work on behalf of the
SO-15 Counterterrorism Command at New Scotland Yard in the
United Kingdom, Central Scotland Police, West Yorkshire
Police, the International Court of Justice at the Hague, the
State Security Prosecutor in Copenhagen, Denmark, the Supreme
Court of Bosnia-Herzegovina in Sarajevo, the Supreme Court of
New South Wales in Australia, Sydney, Australia.
Q.   Are all of those consultations related to criminal
cases?
A.   Yes.
Q.   And have you testified as an expert in any of those
cases?
A.   Yes.
Q.   And are those listed on page three of your resume'?
A.   They are indeed.
Q.   Now, have you also consulted for any United Nations
entities?
A.   Yes.
Q.   What ones would those be?
A.   Number one, I worked as a consultant on behalf of the
International Court of Justice at the Hague, working on war
crimes prosecutions of individuals from Bosnia-Herzegovina.
I also worked on behalf of -- well, I don't know if you would

1   quite call it a UN agency, but it's an international agency,

2   the Office of the High Representative of

3   Bosnia-Herzogovina.

4       I also do consulting work and I give presentations on a

5   pretty regular basis on behalf of the United Nations security

6   teams both in Afghanistan and in East Africa.

7   Q.   And you mentioned also that you consult with private

8   sector entities and individuals; is that correct?

9   A.   Yes.

10  Q.   Have any of those been in connection with civil cases?

11  A.   Yes.

12  Q.   And have you actually testified as an expert in any

13  federal civil cases?

14  A.   Yes.

15  Q.   What civil case, and can you briefly describe your

16  testimony?

17  A.   Of course.  Last year I testified as an expert witness

18  on behalf of the plaintiffs in *Gates v. Syria*.  That case was

19  a case by -- filed by victims of terrorism against the

20  government of Syria, the allegation being that the government

21  of Syria had allowed Al-Qaeda operatives to transit through

22  Syria into Iraq, and thus bore some degree of responsibility

23  for the acts that those individuals had carried out inside of

24  Iraq, particularly the beheading of a U.S. hostage in

25  Iraq.  That was the plaintiff.

1    And specifically my testimony was identifying particular

2  videos released by Tanzim Al-Qaeda, the Al-Qaeda network in

3  Iraq, namely the videos of the execution of these hostages.

4    I also testified about other documents which I recovered

5  from Al-Qaeda in Iraq, indicating that Syria, the Syrian

6  government was aware of the role that Al-Qaeda operatives

7  were playing and had done nothing of it.

8  Q.    Taking a look back at page one of your resume', at the

9  top there you say, you talk about the 9/11 Finding Answers

10  Foundation?

11  A.    That's correct.

12  Q.    What is that?

13  A.    The 9/11 Finding Answers Foundation or NEFA was founded

14  after 9/11 in order to help promote nonprofit

15  counterterrorism research, a similar idea to the

16  Investigative Project.  Very, very much focused on Al-Qaeda

17  and present national security threats to the United States,

18  but trying to help a wide, wide scope of people understand

19  this.

20    The notion being that there is a lot of talk and there

21  is a lot of debate about terrorism, but what's missing are

22  the facts, what's missing are the, you know, here is what's

23  really happening, let's base our debate and our policy on

24  these facts.

25    So we were trying to put out as much factual information

1    to let people make up their own minds, to let people decide

2    for themselves, you know, what do these facts mean.

3        So the NEFA puts out -- has a vast library of documents,

4    court cases, video recordings, transcripts, relating to

5    terrorism and counterterrorism again, for, you know,

6    journalists, academia, human rights activists, anyone who is

7    interested in using this for the right purposes.

8    Q.    What is your role at NEFA as a senior investigator is

9    what you have on your resume'?

10   A.    Number one, one of the big things I do is provide them

11   with information.  I provide them with research.  I give them

12   copies of original audio recordings, original video

13   recordings, original communiques.

14       I have help provide translations services.  I have a

15   research assistant who is a native Arabic speaker, so

16   sometimes he does translation stuff for them.

17       I provide them with analysis.  I speak in conferences on

18   their behalf.  We do a lot of that stuff.

19   Q.    And when you -- when you publish articles through NEFA,

20   are they subject to any review?

21   A.    Oh, yes.

22   Q.    What is that process?

23   A.    Number one, I should add that before anything goes to

24   NEFA, I take my papers and I have -- I have a collection of

25   colleagues that I submit them to, colleagues that include my

former mentor at Georgetown, Dr. John Voll, people that

include everyone from Dr. Mark Lynch in GW University in

Washington, D.C., a wide variety of people.  Dr. Mark Sageman

who I'm currently working on a research project with.  I will

send my papers out to these people to begin with in draft

form to get comments, to get feedback.

But then even after that's over, then the papers have to

be very carefully proofread by all the senior management of

NEFA, by all of my colleagues at NEFA.

And after that, I then have to go through -- and,

I mean, it's a laborious process.  Once again, as with the

Investigative Project, NEFA is putting out very, very

detailed information about terrorist financing, terrorist

recruitment, et cetera.  These are criminal issues, and it's

very important that every fact is very carefully

cross-checked and every fact we have a source for.

So it's a very rigorous process and it takes quite a bit

of time.

Q.    I would like to talk just briefly about some of the

publications that you have done.  Have you published any

books?

A.    Yes.

Q.    And how many?

A.    I published one so far.

Q.    And what's the title of that book?

A.    It's *Al-Qaeda Jihad in Europe:  The Afghan-Bosnian Network.*

Q.    When was it published?

A.    It was published in 2004 in the United Kingdom.

Q.    And can you provide a very brief synopsis of that book, the topic of the book?

A.    The idea behind the book was that when I was doing the research for my honors thesis at Georgetown, I realized that there was one I guess you would call it geographic area that was being left out of my analysis.

I focused on four areas in my thesis, but I was coming up with a lot of research, a lot of very interesting information about the conflict that had taken place in Bosnia-Herzegovina, in the Balkans during the 1990s, and the involvement of foreign fighters.

So after I finished my thesis I thought, you know, it would be very, very interesting, and there is nothing else out there about this, about the role of foreign fighters, particularly foreign fighters that come from the Arab Afghan movement in the Balkans during the 1990s, not because they were a lot of people, but because it was a very unusual group of people, and some of these people ended up becoming very famous later on, and kind of tracing where they had come from.

So essentially that's exactly what it was, very similar

to my honors thesis, except focusing now on one particular

country that the Arab Afghans had gone to after the end of

the Afghan War and trying to understand why is it that

these -- first of all, trying to understand what happened

there, you know, the actual facts as told by people on the

ground.

But then on top of it, trying to why the Arab Afghans

had met such a terrible failure in the Balkans, why the

Bosnians, even though they were Muslims, by and large

rejected the Arab Afghans in their ideology and their

approach towards Islam and their approach towards politics,

and trying to understand how those lessons could be

extrapolated and be applied to places like Iraq, which was

ongoing at the time I was writing my book.

Q.   Now, what was the target audience for that book?

A.   Well, it was published by an academic press, and it is a

very, very detailed book.  It's not a general interest book.

It was mainly published for other academics, policymakers,

law enforcement.  It has hundreds of footnotes.

It's not a general interest book, but the idea was is

I felt that what was really missing was a history of the

foreign fighters in Bosnia-Herzegovina as told by them in

their own language, in their own documents.  Because the west

by and large has not really documented this phenomena at

all.  The best sources are their sources.

1  Q.   And has the book actually been used in academic

2  settings?

3  A.   Oh, yes.

4  Q.   Do you know of any of them?

5  A.   Yes, it's been used as a course book in Johns Hopkins

6  University, Harvard Kennedy School of Government, it's been

7  used at the University of Kent, it's been used in

8  Australia.

9       I mean, if you do a search for it on the internet, you

10 will see it's available on a lot of different reading lists

11 and scholastic book sellers I guess you would say.

12 Q.   Since it was published by an academic publisher, was it

13 subject to peer review before it was published?

14 A.   Not just peer review.  First of all, the publisher

15 itself picked peer review -- I didn't pick the peers.  The

16 peers were picked by them.

17      But then even after that, because of the fact that the

18 book was published in the United Kingdom and because of the

19 fact that it had an entire chapter on terrorist financing,

20 the publisher was extremely cautious and wanted to make sure

21 that every single fact could be proven with documentation.

22 Because in the United Kingdom, libel law is very, very

23 serious, it's very strict.

24      So a libel attorney, British libel attorney read through

25 my entire -- again not somebody I hired, somebody that was

hired by my publisher, read through the entire thing.  So

everything was very, very carefully cross-checked because the

publisher wanted to make sure that after a series of

different lawsuits that had recently been filed against

similar books, that this wouldn't happen with mine.

Q.   Now, in addition to your book or after your book, have

you continued to write articles in papers?

A.   Yes.

Q.   And do you have on page three of -- or page four, excuse

me, of your resume', it says major papers, are these some of

the papers that you have written?

A.   Yes, they are.

Q.   Is this a complete list or just highlights?

A.   No, this is just highlights.

Q.   Now, some of these papers -- what type of publications

have you published these papers in?

A.   I publish them wherever I have an opportunity to

publish.  Obviously NEFA, the 9/11 Finding Answers

Foundation, pays me to write papers on their behalf, so

that's my first obligation.

      But I have also published papers in everything from *The

Sentinel,* which is the official publication of the West Point

Counterterrorism Center, last summer I was invited to publish

a chapter in the *Annals of the American Academy of Social and

Political Sciences*, which was releasing a special edition of

the *Annals* which was edited by Richard Clark, the former
White House counterterrorism czar, who invited me to write a
chapter for that *Annals* about home-grown terrorism.

I am currently working on a chapter on behalf of
Dr. Javier Jordan at the University of Granada in Spain for a
Spanish-language academic publication for a chapter about
Al-Qaeda in the Islamic Maghreb, M-a-g-h-r-e-b.

But, yeah, I mean, it's everything from academic
journals to 9/11 Finding Answers Foundation to I guess you
would call it practitioner journals which is what I would
consider *The Sentinel* to be.  But, yeah.

Q.   And have you written articles on Lashkar-e-Tayyiba or
other Pakistani groups?

A.   Yes.  In fact, I just wrote several articles for *NBC
News* about Lashkar-e-Tayyiba back last December following the
bombings -- or excuse me, following the attacks on hotels in
Mumbai.  As part of that, I actually interviewed the official
spokesman for Lashkar-e-Tayyiba.

Q.   And is one of the -- actually on your resume' on page
four, do you have one of these articles listed, "The
Jihadists of Pakistan, Jaish-e-Mohammed" --

A.   That's another report that I published on behalf of NEFA
that includes a chapter on Lashkar, yeah.

And I should add as well, Lashkar also comes up in my
book because of the fact that one of the central characters

in my book in addition to being very involved in Jihadi

activities in the Balkans in Bosnia was also credited by

Lashkar as being one of the co-founders of Lashkar-e-Tayyiba.

Q.   Have you also written articles about terrorism and the

internet, terrorist groups' use of the internet?

A.   Yes.

Q.   You may have mentioned a couple of them.  Did you write

an article for *Foreign Affairs Magazine*?

A.   I neglected to mention that one.  Yes, last year

I wrote -- I was invited to write a piece in *Foreign Affairs*

about terrorist use of the internet.  The reason I was

invited to write that piece was because of the fact that I

had given two presentations in front of the Council on

Foreign Relations in New York and in Washington, D.C., on

this subject, and one of those in attendance at the

presentation was the editor of *Foreign Affairs*, which is a

CFR publication, and after giving my presentation he invited

me to write a piece about this.

Q.   And in fact, have you also written any articles on some

of the co-conspirators in this case?

A.   Yes.

Q.   Specifically Younis Tsouli and Ahbid Khan?

A.   Yes.

Q.   What was the source of information that you used in

those articles?

A.   Well, it was a combination of sources.  Number one, at
one time I was in direct contact with Mr. Tsouli and others.

     But number two, I served as a consultant on behalf of
the West Yorkshire Police in the case against Mr. Khan and
his associates.  As a result of me serving as a consultant in
that case, I was given access to the raw preserved hard
drives of Mr. Khan and others in that case, and I was asked
to review the contents of that material.

     Separate from that, I have also come across material in
other cases that I have worked on related to co-conspirators
involved in this case.

Q.   And is that something that we asked you to do?

A.   No.

Q.   Have you -- let's see.  Do you attend -- you mentioned
speaking before the Council on Foreign Relations.  Do you
regularly attend conferences in your area of international
terrorism?

A.   Yes, I regularly attend and speak at conferences.  In
the last four months I have attended conferences in New York
at the United Nations on two separate occasions, one of them
was actually me and Dr. Mark Sageman presenting was the focus
of the meeting.

     I have also attended a conference on behalf of the OSCE,
the Organization for Security and Cooperation in Europe,
where I did a presentation two months ago in Belgrave.

1    I am supposed to give some presentation on behalf of the

2    State Department coming up in a few months.  Last summer I

3    was in Spain, I did a series of presentations on behalf of

4    the U.S. State Department to European Muslim entrepreneurs.

5        So, yeah, I think you could say it happens quite

6    frequently.

7    Q.    I would like to turn now to talking about the sources

8    that you use and your methodology and how you arrive at the

9    information that you then go on to publish.

10        You mentioned a couple of those sources, and the first

11    one that I want to talk about is when you talk about the

12    original materials that you obtained from terrorist groups.

13    And you mentioned some of those types.

14        Just what types -- what exact types of materials are you

15    talking about when you say I use original materials from

16    terrorist groups?

17    A.    Sure.  Well, number one, there is the idea of getting a

18    communique.  Terrorist organizations issue official

19    statements.  Those are called bayans or communiques,

20    b-a-y-a-n-s.

21        I collect all the communiques.  Sometimes they are

22    numbered, sometimes they are not.  I collect all of them, and

23    I save them in a database so they are instantly

24    recoverable.

25        Aside from written communiques, there are also

magazines.  Organizations, militant organizations produce

their own magazines.  I collect those magazines, I translate

those magazines, I excerpt those magazines, I go through

them.

There is also video recordings and audio recordings.

Long before the internet came about, terrorist organizations

had been filming themselves on camera, and they have been

distributing that for propaganda reasons, for communications

and for other aspects.

I collect all of those video recordings, and I have a

vast collection dating all the way back to the late 1980s of

original recordings.  Some of these recordings were maybe

never actually meant to be publicly distributed, but I have

gotten a copy of them.

Recordings of individuals at conferences in the

United States, recordings of people in conferences

abroad.  People at meetings in Afghanistan,

Bosnia-Herzegovina, Pakistan and elsewhere.

But like I said, it's a combination of text documents,

video and audio recordings primarily.

Q.   And just touching on things that you said, when you are

talking about people speaking at conferences, people doing

this, these are people who are associated with terrorist

organizations --

A.   Yes.

1  Q.    -- or terrorist themselves?

2  A.    That's correct, yes.  Either individuals who are

3  representatives of terrorist organizations, people who are

4  discussing terrorist organizations, their own personal, you

5  know, accounts and knowledge of terrorist organizations on

6  camera, anything again that helps us understand and that we

7  can look at this and say, look, you know, this is not the

8  same thing as being able to sit and question this person

9  face-to-face, but they are saying that on camera, and it's a

10 pretty damning piece of evidence.

11 Q.    Now, how do you get these materials?

12 A.    Well, prior to 9/11, obviously there was the internet

13 prior to 9/11, but there were other ways as well which I got

14 these materials.

15     Number one, I got in direct contact with what I call

16 Mujahideen clearinghouses primarily based in the

17 United Kingdom.  These were organizations that essentially

18 sold Jihadi propaganda.

19     They were willing to sell it to you if you knew where

20 they were located, if you knew how to get in touch with them,

21 if you knew how to reach them.  It wasn't that difficult, but

22 you had to know where to go.

23     The other thing was that I would contact people

24 directly.  At one point I discovered that a close friend of

25 Osama Bin Laden from Saudia Arabia had written a book in

Arabic all about the founding of Al-Qaeda as told by personal
interviews with the individuals involved with the founding of
Al-Qaeda.  The book was written in Arabic, it was published
in Saudia Arabia, and it was not widely distributed.

I hunted and I hunted, I found the contact information
for this individual in Saudia Arabia, I contacted him, and I
said, Look, I understand you have written the definitive book
about the Afghan Jihad.  It's not available here in the
United States.  Can you please send me a copy?

Sure enough he sent me a copy with his compliments.

So it's a combination of doing that.  It's a combination
of also going on the internet.  As I said before, one of the
big places -- or the place, really, where terrorist
organizations or militant organizations distribute their
propaganda, their video, their audio, their text documents,
these days is on the internet.

In order to get that material, you have to be registered
on particular Arabic-language discussion forums on the
internet which serve as the primary distribution points for
this material.

What you have is you have users that go online, users
that are actually in the field from these Jihadi
organizations, and they will post this stuff and distribute
it to people around the world.

Now, it's not secret if you know where to find it, but

the problem is finding it.  I have been tracking it for so

long that I know where to look.  And so after looking and

after collecting, I have assembled a database that is about a

terabyte and a half in size, which is like a million

megabytes, millions and millions of megabytes of information,

millions of documents, video recordings, audio recordings.

And everything is very, very carefully saved into kind of a

library-style format.  These are the records.

Q.    Now, how do you know when you obtain these materials,

whether from a bookstore or from the individual directly or

from the internet, how do you know they are authentic?

A.    That's one of the big issues, how do you know whether

something is really what it is?

       Well, number one, in some of these recordings, you have

explicit video or audio of somebody who is very

recognizable.  Osama Bin Laden, and he's in Afghanistan with

Zawahiri, with his top deputy, it's clearly legitimate.

       But in many cases what we have had is we have actually

had Al-Qaeda come out and say, If you are looking for

information about us, look here, particularly when it comes

to online sources.

       With the online sources that I use, every single online

source that I use to collect information from has been

explicitly and directly named by Al-Qaeda as the place, the

place -- not one of the places, but the place to get their

information from.

Q.   Is that true for the other groups that you study, such as LET or any other groups that you --

A.   Any other -- recently a group popped up called the Turkestan Islamic Party, which is a group that very few people ever heard of, but it's a group that we have been focusing research on.  How do you know what this group is?

Well, it turns out that this group has issued a statement saying if you want information about us, go to this particular group, these people online, this virtual group, this website online, that's where all of our information is.  If it doesn't come out through there, it's not official.

And dozens of groups have done this.  Shabaab al-Mujahideen, a group in Somalia, did the same thing recently.  The reason being is because these groups have gotten very sensitive about the media printing stories about them which they regard as fraudulent or untruthful or lies.

So the only way that they can get out their own perspective is through the internet.  So they very aggressively say, Don't go to al-Jazeerah, don't go to al-Arabiya, don't go to NBC News or ABC, go right here.  If you want to know where our stuff comes from, it's right here.

Q.   Now, once if you determine that a particular item is

authentic, it is what it is, it comes from a terrorist

organization or a terrorist supporter, how do you then assess

whether the information that's in there is actually reliable

or truthful?

A.    Well, you know, that's a big issue, that these are

propaganda recordings.  You have to take them with a grain of

salt.

        However, I'm not looking in this to try to get the

political perspective of these individuals.  I understand

what their political perspective is.  What I'm looking at

here is for original video of people we have never seen

before, individuals speaking, individuals talking, or talking

about others, trying to learn about mechanics of the

internals of this organization.

        Because what these groups don't realize is that in every

propaganda recording they release, sure, they are

broadcasting a message, but these recordings also contain a

lot of factual information which we didn't have access to

before or at least we didn't have confirmation of, what

somebody looks like, what kind of clothes they are wearing,

where they might be speaking from, who they are standing next

to.

        Recently a group in central Asia wanted to prove their

pedigree as being an official Al-Qaeda affiliated group.  So

what did they do?  They released a video of their senior

leader meeting with Bin Laden and Zawahiri in Afghanstan, the

idea being, Look, see, if you have any doubts that we are in

contact with these guys, here is video of us meeting with

them.

So, you know, you can't say that they are working

together on a daily basis, but that video proves beyond a

shadow of a doubt that they have been in contact with each

other.  And that's something that before we had that video we

could only guess at, we could only surmise at.

Q.   Now, you mentioned that you collect this original source

material and you put it in a database.  Now, when you do

that, can you -- are you able to go back and figure out where

and how you obtained it?

A.   Yes.

Q.   And how -- how do you do that?   How does that work?

A.   Everything that I save into my database is, number one,

saved in a very, very careful format, so that I can recover

it very quickly.

First of all, I put the date of the original document,

the date when it was, you know, issued or whatever.  The

source:  A website, an individual, an organization, wherever

it came from.  A title.

And then if it comes from the internet, documents from

the internet often have what are known as thread numbers,

kind of like a telephone number, a unique identifying number,

which allows us to recover that message off of a forum any
time in the future.  Again, like a specific identifier
number.

So even just from the file names alone, everything
I save, the file names alone, you can see the source, the
date it was saved, where it came from, what's in there, and
sometimes even the unique numeric identifier number where it
came from specifically on the internet.

On top of that, then every single document that I get is
then carefully filed away into electronic folders based upon
organizations, dates, regions.

And then on top of that, everything in the database is
indexed with software that's known as ISYS, I-S-Y-S, which
allows us to do what is known as a Boolean search,
B-o-o-l-e-a-n, through this information.  By Boolean I mean
that I can literally type "and," "if," "or," "nor," kind of
the same things you see in LexisNexis, but for anything in my
database.

So if I'm trying to find out how many times someone's
name comes up within five words of a particular organization,
no problem, instantaneous results through all the documents
in my database.

Q.   You also mentioned that a lot of the materials, source
materials are in foreign languages?

A.   That's correct.

Q.   And although you studied a little bit of Arabic, do you consider yourself fluent?

A.   No, I'm fluent in English and French.

Q.   Now, how then do you review those foreign language materials?

A.   I would never try to translate something on my own for professional purposes because I'm not a fluent speaker, so I have a research assistant who works with me at my office in New York who is a native speaker, who is native Jordanian, who sits there and works with me.  And anything I need translated from Arabic, he translates.

      Now, occasionally I have other documents which appear which are not in Arabic.  We have documents that appear in Turkish and other languages.  I have contacts from all over it world, Pakistan, Turkey, Europe, elsewhere, where if I need translators, if I need people to do work, it's no problem.

      These are either students, grad students, they are stringers, they are people that are involved in doing this on a regular basis and they are very familiar with this.  They are all native speakers obviously, and I find that for translating purposes, I prefer to use only native speakers.

Q.   Now, the second type of source material that you talked about is actual interviews with terrorists and their supporters.  Can you give some examples of the types of

1  people you are talking about, and are these personal

2  interviews that you have done with them?

3  A.    Sure.  Back in 2001, I interviewed Sheikh Abu Hamza

4  al-Masri.  Abu Hamza is currently awaiting extradition to the

5  United States to face criminal charges.

6      Abu Hamza has served for many years as the acknowledged

7  spokesman for Mujahideen groups in various different parts of

8  the world, including the Taliban, including different Arab

9  Mujahideen outfits in the Arab peninsula and elsewhere.

10     Anyway, the point of this is I went to his office in the

11 United Kingdom, his mosque, and I sat with him and his

12 followers, and I interviewed him in great length.  I also

13 interviewed Sheikh Omar Bakri Mohammad.  Omar Bakri Mohammad

14 founded an extremist organization in the United Kingdom known

15 as Al-Muhajiroun.

16     I actually went underground in Al-Muhajiroun and I even

17 joined them, but I followed them and I went to all of their

18 events and I spoke at length with Sheikh Omar and I went to

19 their side events and I spoke with their -- I was doing a

20 comprehensive study of the group and the people involved and

21 whatnot.

22     I have also interviewed Dr. Mohammed Al-Massari, who was

23 involved in procuring a satellite phone for Osama Bin Laden

24 in 1996, and also distributed Osama Bin Laden's first

25 declaration of war in 1996.

1      I have also interviewed Dr. Saad Al-Faqih, who was also

2  involved in procuring a satellite phone for Osama Bin Laden

3  in 1996.  He's been designated as a specially-designated

4  terrorist entity, I believe, by the United States

5  government.

6      I have also interviewed the official spokesman of

7  Lashkar-e-Tayyiba, Abdullah Muntazir, I interviewed him twice

8  over the telephone back last December.

9      At the conclusion of our second interview, Mr. Muntazir

10  invited us to send someone with a camera to LET's

11  headquarters in Muridke, Pakistan, at which time -- again,

12  I'm not in Pakistan, I'm located in the United States, so I

13  had my colleague in Peshawar go down with a camera, and went

14  there and he filmed the whole thing, and then sent the video

15  to me over the internet.

16      So within twenty-four hours I had interviewed Lashkar's

17  leader twice or spokesman twice, and we had original video of

18  the inside of Lashkar's camp in Muridke.

19  Q.   Have you also interviewed anyone who has fought with any

20  of these organizations, Lashkar-e-Tayyiba or otherwise?

21  A.   Yes.  Particularly with Lashkar-e-Tayyiba, I have

22  interviewed Ismail Royer.  Ismail Royer is an American

23  national who joined Lashkar-e-Tayyiba I believe in 2000,

24  2001, and who was at Lashkar's facilities over in Pakistan,

25  was at Lashkar's recruitment office with Australian

1  David Hicks, who was later captured in Afghanistan.

2      Mr. Royer eventually pled guilty, and as part of his

3  cooperating agreement spoke with me in jail.  We engaged in a

4  long interview, and we discussed at great length how he had

5  joined Lashkar, how he got information about them, how he got

6  in contact with them, the fact that he looked up their

7  internet website, various different other aspects.

8  Q.   And are there other cooperating defendants that you have

9  spoken with in this same vein?

10 A.   Yes.

11 Q.   Now, how do you assess the reliability of the

12 information that these people provide?

13 A.   It's basic social science, comparative analysis.

14     I collect as many accounts of a particular historical

15 event or a particular aspect of an historical event as

16 possible, and then I compare and contrast those accounts.

17     And you try to take into account, some of these accounts

18 are written by people with biases, political biases or other

19 biases, but the idea is that by comparing and contrasting

20 these various different accounts, you can find out what the

21 common threads are, what everyone seems to agree on.

22     And you can also see what are admissions against

23 interest.  Many times in these recordings or in other -- you

24 know, in interviews I do or whatnot, people will say things

25 which are against their interest.  It doesn't make any sense

1   for them to advertise this.  If it's not true, why would they

2   be advertising it?  It's against their interest.  So that's a

3   very, very powerful indicator that what they are saying is

4   probably accurate.

5   Q.   You mentioned earlier you also deal with tertiary

6   sources.

7   A.   That's correct.

8   Q.   And you mentioned government materials, scholarly works,

9   other open source database documents.  How do you fit those

10  into your analysis?

11  A.   I really use those in order to flesh out detail at the

12  end.  Those are not my primary sources.  But if I come across

13  a particular interesting article in *The New York Times* which

14  cites somebody, which includes a quotation from somebody

15  important from an organization or from the United States

16  government, certainly that's relevant and interesting and

17  worthwhile to include in my analysis.

18       Sometimes it's just helpful because of the fact that if

19  you are trying to establish that a particular event occurred,

20  i.e., the Taliban took over Kabul on this particular date,

21  it's just helpful to be able to refer to say, Look, *New York*

22  *Times*, you know, reported on this date, if you have any

23  question about when that took place, go ahead.

24       But that's not the focus of my analysis.  That's not

25  where -- it's not the focus of my research.  It's just really

1   to flesh out additional detail.

2   Q.   Now, the types of sources that you use, are those

3   commonly used by other academics and experts in your field?

4   A.   They are the exact same.

5   Q.   And do other academics use sources that you don't?

6   A.   I couldn't think of one that they don't -- I mean, the

7   primary sources to do this research for are going out and

8   interviewing terrorists and terrorist organizations, and it's

9   collecting their propaganda and collecting their

10  materials.  I mean, that's the way you do this.

11  Q.   As you obtain more and more information that you

12  determine to be reliable, do you modify or reevaluate your

13  opinions or conclusions, if necessary?

14  A.   Of course.  I mean, this is an ongoing project, and I'm

15  looking for -- the ultimate search is for truth, you know,

16  facts.  If I ever find out anything that contradicts what I'm

17  saying or -- it's not something that happens very frequently,

18  but if I do find something that contradicts, sure, I mean,

19  that's the first thing I do is I try to understand why does

20  this conflict with what my understanding is and how does --

21  how should this change my view, how should this alter my

22  view.

23       I would like to consider myself to be a fairly

24  open-minded guy.  That's one of the reasons I enjoy talking

25  with members of these organizations and people that represent

1    these organizations, because even if I don't agree with them,

2    it's very interesting to speak with them.  You learn a lot.

3    Q.   Now, how does the methodology that you use, this

4    analysis of reliability and synthesis into your opinions, how

5    does that differ from the method that you studied originally

6    at Georgetown as part of traditional social science

7    methodology?

8    A.   It's direct, it's not an outgrowth.  It's the

9    method.  It's the same method that Dr. Joseph Lepgold taught

10   me back in 2001, the same method that was taught to me by

11   Dr. Michael Brown, Andrew Bennett, all the folks at

12   Georgetown.

13        It's certainly been focused by my time in law school and

14   in my experience in having to write long papers and whatnot,

15   but the method itself is established back then.

16   Q.   Is it the same methodology that other experts in your

17   field use?

18   A.   I mean, comparative analysis is the basic social science

19   method.  It's -- I would call it a critical method.

20   Q.   Now, is it the same methodology that you use when you

21   were retained as an expert in cases?

22   A.   Yes.  I mean, exactly what I'm doing is I'm comparing

23   and contrasting information that is either in my possession

24   and is given to me or comparing different sources, I'm

25   contrasting different sources, and I'd like to think that

1    I present as inclusive an opinion as possible that includes

2    as many facts and as many sources so that people can go back

3    and see what the breadth of research is available on this

4    particular topic.

5    Q.   Now, I would like to turn to the testimony that you have

6    been retained to provide in this case.

7        If you were allowed to testify in this case, the

8    government would ask you to provide context about certain

9    pieces of information in various items in evidence.

10       Is that something that you have testified about in other

11   federal cases, that nature of that testimony?

12   A.   Yes, very frequently I'm asked to evaluate specific

13   pieces of evidence and comment about where that evidence most

14   likely comes from, what is it, what is its significance.

15   Q.   Now, just taking an example, if there is a statement or

16   a communication where people are talking about fighting with

17   Lashkar-e-Tayyiba, one of the questions we might ask you to

18   explain to the fact finder is what is Lashkar-e-Tayyiba, what

19   are its goals, what is its purpose, how do people become

20   fighters.

21   A.   Sure.

22   Q.   Is that topic, have you testified about that in other

23   federal cases?

24   A.   I just testified about it two weeks ago in the Southern

25   District of New York in Oussama Kassir.  That was one of the

specific subjects of my testimony in Kassir.

Q.   Are there other cases where you testified about that as well?

A.   I have testified about that particular subject many of the cases I have testified about.

Q.   And is the basis of knowledge that you have used to make that, to provide that type of background information, how does that relate to the basis of knowledge you use in your articles about Lashkar-e-Tayyiba --

A.   Well, I interviewed --

Q.   I apologize, my question what is the basis -- how does the base of knowledge that you would use to provide that type of background information in your testimony relate to the base of knowledge that you would use when you are writing about Lashkar-e-Tayyiba or discussing it with other experts in your field?

A.   It's the same.  I mean, I don't have two bases of research.  I only have one.  I have my research, and from that I write everything.  My opinion is my opinion, regardless of whoever hires me.  My opinion is based on my research, and my research doesn't change.  My research is what it is.

         THE COURT:  Can I interrupt for a second? I thought you were going to explain what information you had that gives you an understanding about Lashkar-e-Tayyiba.

1    I thought you were cut off on that.

2            THE WITNESS:  Of course, Your Honor.  I would be

3    happy to do that.

4            In addition to the two interviews that I did with

5    the official spokesman for Lashkar last September, I have

6    obviously the original video recording that we did.  We went

7    to the Lashkar camp in Muridke.  So we have video of the camp

8    itself, we have video of Abdullah Muntazir, the spokesman,

9    speaking about what Lashkar does, about the different

10   activities and whatnot.

11           Separate from all of that and aside from my

12   interview with Ismail Royer, who fought with

13   Lashkar-e-Tayyiba, who was recruited by Lashkar-e-Tayyiba,

14   I have also reviewed and I have a collection of hundreds and

15   hundreds of original documents from Lashkar.

16           A video of a Lashkar-e-Tayyiba training camp, which

17   is extremely rare because Lashkar generally doesn't allow

18   video recordings of their camps.  Propaganda posters created

19   by Lashkar, distributed by Lashkar.

20           I have a complete archive of what is known as the

21   Taiba Bulletin.  Lashkar issued an official news release

22   service in English and in Arabic and a couple other

23   languages, and it was known as the Taiba Bulletin, T-a-i-b-a

24   Bulletin.  I have a complete archive of all of the different

25   Taiba Bulletins.

1    I have a complete archive of all of their websites

2  along with all of the material on there.  In fact, after

3  speaking with Mr. Muntazir, apparently I know what's on their

4  website better than he does.

5    So, yeah, I think, Your Honor, I have everything

6  from original documents, to speaking with them directly,

7  speaking with people that fought with them, who have been

8  recruited by them in the Americas.

9    THE COURT:  Thank you.

10    MS. COLLINS:  Thank you, Your Honor.

11  BY MS. COLLINS:

12  Q.    Turning to another example, you might be asked to

13  identify or explain the significance of a particular website

14  that is discussed frequently or participated in by people

15  involved in the case.  Have you done that type of testimony

16  before in other federal cases?

17  A.    Again, that was as recently as two weeks ago in the

18  Kassir case up in the Southern District of New York.

19  Q.    Have you done that in other cases as well?

20  A.    Because of the fact that a lot of my research is focused

21  on the internet and internet websites, and one of the things

22  that I do is I collect archived copies of these websites and

23  I collect archived copies of posts on the forums and whatnot,

24  that is a major area of my discussion and my research, yeah.

25  Q.    Now, are you familiar -- and to bring it little bit

closer to this case, are you familiar with something called

Tibyan Pub, Tibyan Publications?

A.   Yes.

Q.   How are you familiar with it?

A.   I, number one, have a collection of I believe every

single document ever produced by Tibyan Publications as a

production.

     Number two, I used to browse their forum before it

became locked to the public.  In other words, at a certain

point you are required to have a user name and a password to

be able to access it.

     I also have reviewed posts, postings from the Tibyan

Publications forum, which I have come across either in other

forums or else in my work as a consultant on behalf of

British law enforcement.

     Those include everything from discussions among people,

members on Tibyan to even an effort by certain individuals at

Tibyan to take over the forum.

Q.   Have you testified about Tibyan Publications?

A.   Yes.

Q.   How many times?

A.   At least three or four different times.

Q.   Are those in U.S. cases or abroad?

A.   Both.

Q.   And the basis of knowledge for talking about that

1  website is what?

2  A.   Well, I know the website, I have all the materials from

3  the website, I read all the materials from the website.

4       The materials from Tibyan Publications come up in

5  basically every single case that I'm hired in that involves

6  computers, so it's something that I encounter on a very, very

7  frequent basis.

8  Q.   And what is the significance, based on your research and

9  knowledge, of Tibyan Publications?

10  A.   Tibyan Publications takes fatwahs or religious edicts

11  and other materials which are designed to encourage people or

12  instruct people on how to carry out terrorist attacks or why

13  they should carry out terrorist attacks and translates this

14  material into English, the idea being to expand the reach of

15  traditional terrorist propaganda put out by Al-Qaeda from

16  beyond an Arabic-exclusive audience into an audience of

17  people who speaks Arabic, English, French, Dutch, German, you

18  name it.  Primarily English, though.

19       In addition to books, I should say, they were also

20  taking Al-Qaeda propaganda films, videos of suicide bombers,

21  and they have created English-language versions.

22           MS. COLLINS:  Your Honor, may I have just one

23  minute?

24           THE COURT:  Yes.

25           MS. COLLINS:  Thank you.

1          Your Honor, I don't have any further questions.

2          THE COURT:  All right.  Thank you.

3          Mr. Martin?

4          MR. MARTIN:  Could we take the morning break now?

5   I would like to discuss with my expert the testimony he just

6   heard today and maybe he might have some suggestions for my

7   cross-examination.  I can start a little bit, but before I

8   conclude I want to talk with him.

9          THE COURT:  I think that makes sense.  Why don't

10  we -- it's almost 10:30.  Why don't we break until 10:45.  We

11  will be in recess for fifteen minutes.

12         (A recess is taken at 10:27 a.m.)

13                        --  --  --

14         (In open court at 10:48 a.m.:)

15         THE COURT:  Did that give you enough time,

16  Mr. Martin?

17         MR. MARTIN:  Yes, sir.

18         Let me before I begin mention a concern I have.

19         We have heard more than an hour's worth of

20  testimony about Mr. Kohlmann's background and the types of

21  things he does and so forth, but we only had a few minutes as

22  to exactly what he's going to testify about.

23         And I talked to counsel in the interim, and I am

24  told that he's going to testify about what he believes LET is

25  about, sort of the general structure of LET, its mission,

what it says on its website, those types of things, what he
maybe had learned over his investigations from talking with
people about LET.  I sort of understand that.

And then he was going to testify about Tibyan and
the -- that website, which is sort of a clearinghouse which
translates things.

Is that -- I want to make clear, is that the sum
total of his testimony?  Because that could help me in
knowing where I need to go on cross-examination.

As opposed to more fact-based testimony, which I
have seen in some of his materials or some of his reports
where he would say, well, this person was a member of LET,
and this person was recruited for LET or something like that,
which to me goes beyond the kin of an expert witness.

And that was what I was a little bit troubled from
the examination, because we never got that from the
government.

Now, maybe we should have the government, before
I begin, sort of clarify for me at least what it is exactly
that they are going to call this witness to testify to so I
will know the extent to which I will need to cross-examine
him.

THE COURT:  I think that's a fair request.

MS. COLLINS:  Your Honor, as we have -- we have
spoken with Mr. Martin as well as Mr. Samuel and Mr. Wahid,

and also in the pleading that we filed I believe last week talking about Mr. Kohlmann's testimony and his qualifications.

What Mr. Kohlmann is going to talk about is his testimony is very much tied to the evidence that's admitted at trial. And so, yes, he will talk about what Lashkar-e-Tayyiba is and what it does, and the reason that's relevant is because for an 18 U.S.C. 2339 --

THE COURT: I don't think that's what Mr. Martin is saying.

I think Mr. Martin is saying that he understands that his testimony would provide context for LET as an organization, what it posts on its website, and what its website says about what it is or whatever materials he's also familiar about. And with respect to that testimony I don't think Mr. Martin has a problem.

What he has a problem with, which I think I would have a problem with, is your first statement that he's going to focus on the evidence that's presented in the case without ever disclosing what it is. Because I do think in your examination at one point you said there might be specific pieces of evidence, and we will ask for him to interpret that in context of whatever he knows.

I don't know what that means.

MS. COLLINS: Yes, Your Honor.

1          What we are talking about is there are certain

2     items, videos, there are recordings that the defendants or

3     the co-conspirators possessed.

4          There are organizations, people, items that they

5     talk about in their communications.

6          THE COURT:  Well, I know.

7          MS. COLLINS:  I can give you specific examples.

8          THE COURT:  I think that's what Mr. Martin is

9     asking, and I think that's your obligation, to state exactly

10    what is it that's at issue.

11         MS. COLLINS:  Absolutely.

12         THE COURT:  Because he's about to cross-examine

13    without knowing what that is.

14         MS. COLLINS:  Sure.  And Tibyan Publications is an

15    example of that.  There are communications, several of them,

16    where Mr. Ahmed recommends these publications to various

17    people with whom he's talking about Jihad with.  He says it's

18    a great website, it has very good information, I have read

19    it, you should read it to.

20         Mr. Kohlmann is here to provide some context for

21    what is Tibyan Publications.  That's something that's outside

22    of the kin of the normal lay person, the average juror.  They

23    don't know what that is.

24         And so he would say Tibyan Publications is this.

25         How do you know?

1    I have seen it.

2    THE COURT:  So the two things so far you have said,

3  LET as an organization and the content of its websites.  Now

4  Tibyan Publications, what it posts and what its function is.

5    MS. COLLINS:  Uh-huh.

6    THE COURT:  What else?

7    MS. COLLINS:  There are many examples.  A lot of

8  them are individual people or items.  There are lots of them.

9  I don't have a complete list here.  Before trial we can

10  obviously go through that with defense counsel.

11    Some other examples I can give you right now is in

12  a communication --

13    THE COURT:  Well, let me tell you what I'm having a

14  problem with with these generalizations.

15    I mean, Mr. Martin and you heard him say that in

16  the past he has stated that certain specific people are

17  members of certain organizations.  That's an opinion which

18  would be based upon his research.

19    If he's going to express opinions, I think all

20  Mr. Martin is asking is tell me all the specifics.  You keep

21  saying there is lots of them, and there might be groupings of

22  kinds of evidence that you intend to introduce, such as a set

23  of communications in which Mr. Ahmed or Mr. Sadequee talk

24  about Tibyan Publications, you can probably generally

25  describe that.

1    But I think there has got to be a more -- or a

2    specific articulation, which I think you haven't done yet,

3    even for the defendants as to what is the exact evidence or

4    the categories of evidence about which you seek to elicit

5    opinions from the defendant -- I mean, from the witness.

6         MS. COLLINS:  Sure.

7         Another category of evidence are communications in

8    which they discuss Jihadist publications such as --

9         THE COURT:  I'm going to tell you, if you are going

10   to do that now, you are going to be bound by it.  So if you

11   happen to forget one or the other, this hearing is going to

12   be over and I'm not going to allow it.

13        So you need to -- I think the request that they

14   have made is fair.  I haven't seen it, including in your

15   submission, which as early as this morning I have read,

16   doesn't do that for me.

17        This is a *Daubert* hearing in which we have taken a

18   flip, we have gone through his qualifications, which I guess

19   was the best thing to do, but ordinarily in a *Daubert* hearing

20   you say, here are the specific opinions that are going to be

21   offered by the witness, here is the -- and having stated

22   those, so that I can make a determination as to whether or

23   not he's qualified to express those opinions, and then

24   secondly, whether or not they are relevant to the issues in

25   the case.

1     But after those are expressed, then you state, now

2     having heard his background, what the basis is for those

3     opinions, so that I can enter an order to determine whether

4     or not one or more of those are offered or all of them are

5     offered.

6          But I think the thing to do is -- and what I would

7     expect and I think it's the government's obligation is to do

8     that, is to say -- I'm happy for you to do it today.  I would

9     prefer it to be done today.  But you need to list the

10    categories, or if they are not -- if you can't categorize

11    them, the specific pieces of evidence you intend to have him

12    express an opinion on, generally go over what opinion he's

13    going to express.

14         But when we are done doing this, that's going to be

15    what I'm going to allow, and if something is forgotten, it's

16    going to be excluded.

17         MS. COLLINS:  Your Honor, then what we would like

18    to be able to do then is go through and we can compile a

19    list, I would be happy to do that and share it with defense

20    counsel for the specific either magazines, people, things

21    that the defendants and their co-conspirators either

22    possessed or talked about that we believe will be admitted at

23    trial and that we believe would need some type of contextual

24    statement.

25         THE COURT:  So when is that going to happen?

1          MS. COLLINS:  It cannot be right now.  We will do

2     that as soon as possible.

3          May I have a minute to talk with my co-counsel?

4          THE COURT:  Yeah.

5          MS. COLLINS:  We propose that the defendants can go

6     on with whatever cross-examination they have on his

7     qualifications, methodology, the other parts of the *Daubert*

8     hearing, and perhaps after lunch we can come back with a

9     list.

10         THE COURT:  Does that make sense to you,

11    Mr. Martin?

12         MR. MARTIN:  This will be relatively short.  I

13    might go to into LET.  On other things I will reserve.

14         THE COURT:  Okay.

15                      --  --  --

16                  CROSS-EXAMINATION

17    BY MR. MARTIN:

18    Q.   Good morning, Mr. Kohlmann.

19    A.   Good morning.

20    Q.   Is that how you pronounce your name, Kohlmann?

21    A.   Kohlmann, that's right.

22    Q.   Mr. Kohlmann, as I understand it, you do not have any

23    graduate degrees other than your law degree; is that correct?

24    A.   Well, yeah.  But I did graduate work in the Graduate

25    School of Arts and Sciences in order to get that degree.

1    In other words, my degree, my law degree is premised on

2    course work I did both in law school and the graduate school.

3    So while that is my graduate degree, it's a little bit

4    disingenuous to say that it's only in law.

5    Q.   All right.  As I understand your testimony, you got a

6    J.D. degree; correct?

7    A.   That's correct.

8    Q.   And you got permission from the law school to get credit

9    for these courses that you were taking in Arts and Sciences

10   or wherever?

11   A.   The Graduate School of Arts and Sciences, that's

12   correct.

13   Q.   Toward your graduate degree in law?

14   A.   That's correct, yes.

15   Q.   But the simple answer to my question is that you do not

16   have a graduate degree in Islamic studies?

17   A.   No.

18   Q.   Islamic history or anything like that?

19   A.   No, that's correct.

20   Q.   You don't even have a Master's degree in that; is that

21   correct?

22   A.   No, that's correct.

23   Q.   And the thesis that you wrote was an undergraduate

24   thesis; is that correct?

25   A.   It was an undergraduate honors thesis, that's correct,

yes.

Q.   Now, with regard to the types of things that you do --
by the way, you got a certificate from the Center for
Christian Understanding at Georgetown?

A.   Center for Muslim Christian Understanding.

Q.   Muslim Christian, excuse me.  And John Esposito is the
director of that program; is that correct?

A.   That's correct, and the deputy director is
Dr. John Voll.

Q.   And Dr. Esposito is somebody you respect?

A.   Yeah, sure.

Q.   He's a well-known expert in these areas; is that
correct?

A.   He doesn't work in the same exact areas that I do, but
he is pretty well known.  I mean, he wrote *The Oxford
Encyclopedia of Islam*, so --

Q.   Right.  Now, with regard to the type of work that you
do, as I understand it, you have basically -- you have
several different sources, and some of them we would call
secondary, some of them you would call tertiary, and then
there are a few that might be called primary sources; is that
correct?

A.   Well, I don't know -- I don't know, numerically
speaking.  But there are primary, and there are secondary,
and there are tertiary sources.

1   Q.   For example, one of your primary sources would have been

2   your interviews with the two individuals that you spoke

3   with -- well, actually the spokesperson, Mr. Muntazir?  Is

4   that how you pronounce it?

5   A.   Abdullah Muntazir, yeah.

6   Q.   Muntazir from LET?

7   A.   Yes.

8   Q.   I'm going to use LET for short because it's easier for

9   me to say referring to Lashkar-e-Tayyiba.

10  A.   Of course.

11  Q.   And you spoke with Mr. Ismail Royer?

12  A.   Ismail Royer, that's correct.

13  Q.   And those are the two primary sources that you had with

14  regards to LET?

15  A.   Well, also we went to the camp.  I physically didn't go

16  because I wasn't in Pakistan and I couldn't get there in

17  twenty-four hours, but my colleague went, drove down from

18  Peshawar to their headquarters in Muridke, filmed the whole

19  thing, and I have the video -- and I instructed him what to

20  do.

21      Now, the video includes not just the camp itself, but

22  also speeches given by Mr. Muntazir and other individuals

23  associated with LET.

24  Q.   Now, that camp is right west of Lahore in Pakistan; is

25  that correct?

A.    Approximately, yes.

Q.    It's a 75-acre campus?

A.    It's a very, very large campus.  It's in a large plot of
land.

Q.    It's an open and notorious site there in Pakistan?

A.    Yes.

Q.    It has an Olympic-size swimming pool?

A.    When you say Olympic-size swimming pool, it has a
pool.  It's not a small pool.  To call it an Olympic-size
swimming pool, that might be overselling the case a bit.

Q.    Horse stables?

A.    It has stables, it has a pharmaceutical lab, it has a
chemical lab, it has a seminary, it has -- it's a
full-fledged complex.  It has lots of different things, and
it's surrounded by a large barbed-wire fence.

Q.    Dormitories?

A.    Oh, yes.

Q.    Offices?

A.    Yes.

Q.    Schools?

A.    Yes.

Q.    A large white mosque?

A.    That's correct, yes.

Q.    So it's a notorious place there.  That's called the --
is the name it goes by, that camp or that opening,

1   Jamaat ud-Dawa?

2   A.   Jamaat ud-Dawa is the name of the political link of

3   Lashkar-e-Tayyiba.  It used to be known as Markaz ud-Dawa,

4   M-a-r-k-a-z ud-Dawa.

5       Now, they sometimes refer to the headquarters in Muridke

6   as Jamaat ud-Dawa, but it's just because the group that runs

7   it is Jamaat ud-Dawa.

8   Q.   And that's known to be, as you say, the political arm of

9   LET; correct?

10  A.   It's been designated by the United States government as

11  an official part of LET, not just the political wing, yes.

12  Q.   Some people call it a front for LET?

13  A.   I would call it interchangeable, an interchangeable arm

14  of LET.

15  Q.   LET is a pretty open organization in Pakistan, is it

16  not?

17  A.   What do you mean by open?

18  Q.   It has a website?

19  A.   That's correct, it did have a website.

20  Q.   And that website was, what was it called,

21  *dawacenter.org*?

22  A.   It's had lots of websites.

23  Q.   Give us some of them.

24  A.   *Dawacenter.org*, *Jamatuddawa.org*, there was a

25  *Taibacenter.20M.com*.  They have been -- because of the fact

1    Markaz ud-Dawa changed their name because of the fact that

2    they were designated by the United States government, so they

3    changed their name to Jamaat ud-Dawa.  So each time they keep

4    changing their name, they keep inaugurating a new website.

5         So they have had several different websites that they

6    have gone through.  It's the same basic website.  There was

7    also *tammacenter* or -- I can't even remember.  There has been

8    bunch of them.

9    Q.   And you collected those websites in your archives?

10   A.   I have a complete archive of all of those websites.

11   Q.   And there are telephone numbers --

12   A.   Correct.

13   Q.   -- that you could call LET.

14        If you wanted to get in touch with LET, here is our

15   number, call us, and we will answer the phone; right?

16   A.   Correct.

17   Q.   It doesn't take a lot of secret maneuvers to get to

18   LET?  You could go to the website or call them on the phone?

19   A.   That's why it's such a popular group.

20   Q.   Let me ask you a little bit about LET's -- let me stay

21   with LET for a while -- LET's history and the history of the

22   Kashmir dispute between Pakistan and India?

23   A.   Okay.

24   Q.   Have you studied the history of that ongoing dispute

25   going back to the '40s?

A.    Yes, but the majority of my research focuses on what's

happened since 1989.

Q.    You do recognize that when the British left India, there

was a division between Pakistan and India between the Muslim

majority areas and the Hindu majority areas?

A.    Yes.

Q.    And that Kashmir was a Muslim majority area; correct?

A.    I have not done a census myself.

      I think the appropriate way of saying it is that Kashmir

is a mixed territory of Hindus, of Muslims, of Sikhs and

others, and that it's disputed, the control is disputed.

      There are two regions of Kashmir, the Azad Kashmir,

which is Muslim majority, and Jammu Kashmir, which is

supposed to be Hindu majority.

      I have never personally done a census, I couldn't tell

you which one is the exact majority, but again it's a mixed

population.

Q.    Well, I'm talking to you as an expert.  You studied that

subject --

A.    Right.

Q.    -- and the history of that dispute.  Doesn't it grow out

of the fact that that was a majority Muslim area --

A.    Again --

Q.    -- at the time -- excuse me, at the time that the

British --

A.    You are making judgments on --

        THE COURT:  Excuse me, you need to let him finish

his question before you answer.

        THE WITNESS:  I apologize, Your Honor.

BY MR. MARTIN:

Q.    The British left India in 1947; correct?

A.    Yes.

Q.    I will back up a little bit.

        And there were agreements at that time to divide that

country between majority Muslim areas and majority Hindu

areas?

A.    That's correct.

Q.    And present day Pakistan is a majority Islam Muslim

area; correct?

A.    That's correct.

Q.    Present day Bangladesh was the majority Muslim area

which was originally part of Pakistan?

A.    Formerly known as East Pakistan, correct.

Q.    And Kashmir was a disputed area, because even though it

was a majority Muslim area, India claimed it; correct?

A.    Again, I would be careful, because I think you are

making historical judgments on issues that I don't think have

been fully resolved.

        I think the proper historical way to put it is that

there is a mixed population of a significant number of

1   Muslims, if not a Muslim majority, and that the area

2   controlled by India, namely Jammu Kashmir, includes many -- a

3   large Muslim population.

4       So I think the way to put it is that India is in control

5   of a territory with a significant Muslim population.  I think

6   that's the most appropriate way to put it.

7   Q.   Let me ask you if you know this.  Do you know who was

8   the Maharaji of Kashmir at the time in 1947 at the time it

9   was divided?

10  A.   I have no idea.

11  Q.   Do you know whether he was Hindu or Muslim?

12  A.   I believe he was a Muslim.

13  Q.   You believe he was a Muslim?

14  A.   I don't know.  I mean, I just said to you my focus of my

15  research on Kashmir was from 1989 forward.  Obviously I know

16  of the wars that took place in '49 and the '70s, but the

17  focus is on what took place in the war from 1989 on.

18  Q.   So you would concede to me that you are not an expert on

19  the area of the history of the Kashmir conflict dating back

20  to the '40s, how it started, what was the legal issues, what

21  were the majority populations, so forth?

22  A.   I know the general outlines, but I keep trying to tell

23  you, the focus of my research is on transnational Jihadi

24  movements.  There was no transnational Jihadi movement in

25  Kashmir prior to 1989.  It didn't exist.

So I studied the Kashmir conflict as a corollary of the propaganda and of the arguments put out by Islamists that are fighting in Kashmir.  But since there were no transnational Jihadists fighting in Kashmir prior to 1989, the history before then is not really -- it's not a focus of my research.

Q.   All right, I understand.  But you are aware that India and Pakistan have fought several wars over the Kashmir --

A.   Yes, I'm very familiar with the general outline of the conflict.

Q.   And that by 1972, there was what's generally called the line of control that divides up Kashmir; correct?

A.   The LOC, yes.

Q.   It's not unlike North and South Korea, those types of demilitarized zones over a disputed area; is that not correct?

A.   Approximately, yeah.

Q.   I don't mean precisely, but there is a division -- both India and Pakistan claimed that Kashmir should be part of their own country; correct?

A.   It's a disputed territory.

Q.   And there is a dispute and wars over it; correct?

A.   Correct.

Q.   And currently there is what's called the line of control where Pakistan controls basically the western and a slice of -- the northern part and the western part, and India

controls the eastern and southern part of Kashmir?

A.    Azad Kashmir is the Pakistani controlled part, Jammu

Kashmir is the Indian controlled part.

Q.    And the northern, very northern part is basically in the

Himalayas, and there are Muslim tribes up there; correct?

A.    It's controlled by the Chinese.

Q.    There is also a dispute between India and the Chinese

about certain areas in this whole disputed area; correct?

A.    Correct.  There is a glacier that they have fought over.

Q.    And you are familiar with the Pakistani Interservices

Intelligence Agency; correct?

A.    The ISI.

Q.    The ISI.  And the ISI has been involved in supporting

guerilla activities over the years; is that not correct?

A.    Where?

Q.    Well, let's start with Kashmir.

A.    Yes.

Q.    And early days with the Mujahideen against the Soviets

in Afghanistan, that was a conduit for American support to

those people; is that correct?

A.    Yeah, sure.

Q.    ISI?

A.    Yeah.

Q.    And the ISI has notoriously also been linked with LET;

is that not true?

A.    That's correct, yes.

Q.    And that's a Pakistani governmental agency that has used LET in its conflict or disputes over the line of control or the whole province of Kashmir or the state of Kashmir?

A.    Well, there hasn't been any definitive proof showing the ISI role in Lashkar, but I think it is something that's been so widely reported that it's fairly accepted that the ISI has played some role in this, and senior individuals in charge of the ISI have more or less acknowledged that they have supported Islamic militant groups in Kashmir.

Q.    Are you familiar with Musharraf?

A.    Pervez Musharraf?

Q.    Yes, former president of Pakistan?

A.    Yes.

Q.    And Musharraf, would he be someone who would -- let me back up.

      He was a military man when he came to power; is that correct?

A.    He was the head of the army, yeah.

Q.    Head of the army.  And he was later elected, but he continued to be head of the army; is that correct?

A.    Well, he installed himself.

Q.    Right.

A.    But he continued to be head of the army.  He continued to live in the army house in Rawalpindi.

Q.   And Musharraf, if you are aware, has also been involved

through the ISI in using LET and other organizations to stir

up trouble in Kashmir for the advantage of the Pakistani

government?

A.   Musharraf personally?

Q.   Personally, through his government, if you are aware?

A.   I think the answer to that is that it's possible, but

Musharraf also banned LET.  The government of Pakistan I

believe in 2003 issued an official ban on LET.

Q.   I understand.  But there was a period of time in which

Musharraf was identified with ISI and LET, is that not

correct, before he banned them?

A.   I don't know if you could draw a personal relationship

between Pervez Musharraf and LET.

     If you are going to say that the ISI provided funding or

may have provided some kind of support or logistics to the

LET at some point, I would say that's probably true.  If you

are saying that Pervez Musharraf played a direct role, I have

absolutely no basis of knowledge of that.

Q.   You don't know one way or the other?

A.   I don't believe anyone in this room has any way of

knowing that.

Q.   But ISI at that time was an agency of the government of

Pakistan, which Musharraf was the president; correct?

A.   That's true.  But I think it's also fair to note here

that there have been many suggestions that Mr. Musharraf and
others in charge of the Pakistani government do not have full
control over the ISI.

So I think to say that because the ISI did something,
that means that Pervez Musharraf endorsed it, that's not a
real relationship.

Q.   Do you -- you say you rely upon secondary sources such
as *The New York Times*?

A.   No.  Those would be tertiary sources.

Q.   Tertiary sources, *New York Times,* reputable
publications?

A.   Reputable ones, yes.

Q.   Do you consider *The New Yorker Magazine* a reputable
publication?

A.   It really depends who the writer is.  There have been
articles written by colleagues of mine who, like, for
instance, Lawrence Wright I believe has written some stuff in
*The New Yorker* who is a very good writer.  I know Larry
really well.

Others who have written articles in *The New Yorker* --
*The New Yorker* is not an academic publication, and it doesn't
have the same journalistic standards that *The New York Times*
and other publications do.

I would use *The New Yorker*, I would cite it in something
if somebody was interviewed in an original interview in

1    *The New Yorker* that said something that he hadn't said or she

2    hadn't said somewhere else.  If there was a specific fact

3    that I believe was very credible.

4        But I think you have to be kind of more careful with

5    those kinds of source.

6    Q.    Do you know who Mohammed Abbas is?

7    A.    That's a pretty common name.

8    Q.    Do you know a Mohammed Abbas who is a spokesperson or

9    leader of LET?

10   A.    Not off the top of my head, no.

11   Q.    You haven't ever interviewed him?  He's also known as

12   Abu -- forgive me for my pronunciation -- Ehsaan,

13   E-h-s-a-a-n?

14   A.    He's not the official spokesperson of

15   Lashkar-e-Tayyiba.

16   Q.    He's a spokesperson?

17   A.    He's not the official spokesperson.

18   Q.    Who is?

19   A.    Abdullah Muntazir.

20   Q.    Chief administrator of the Dawa camp, Jamaat ud-Dawa?

21   A.    Who is the chief administrator?

22   Q.    Yes.

23   A.    I off the top of my head don't know.

24   Q.    Do you know if it's Muhammad Abbas or not?

25   A.    As far as I know, no, but it's possible.  I can tell

that he's definitely not the chief spokesman of Lashkar, he's

not the foreign representative of Lashkar.

I have the business cards of the chief spokesmen of

Lashkar because not only have I spoken with them, but others

who have spoken with them and have given me their contact

information.  He was not one of them.

Q.    So you have a business card?

A.    Yeah.

Q.    So somebody could just call that number on that business

card and talk to that person?

A.    Yes.

Q.    Okay.  Is LET identified with any particular strain of

Islam?

A.    Yes.

Q.    What is it?

A.    It's known as the school of Ahl-e-Hadith, the people of

the Hadith.  Ahl is A-h-l.

Q.    Can you give us any more information about that?

A.    Sure.  Ahl-e-Hadith is a particular sect of Sunni

Islam.  Sunni is the majority version of Islam.

Ahl-e-Hadith are -- I guess you would call it, it's a

particular sect which is based in particular mosques in

particular regions, primarily in Pakistan.  They have a --

I guess you would call it a fairly puritanical perspective.

It is very commonly associated by those in the Middle East

with another strain of Islam known as Salafi Islam.

It believes in terms of very kind of return to the principles of the Profit and of the Hadith and of the Quran.  It also -- Lashkar has very strict prohibitions against television, against drawing human figures.

This is one of the reasons why so few videos have been produced by Lashkar, because they really have a very serious issue with representations of the human form.

Q.  Let me ask you one question regarding Tibyan?

A.  Yes.

Q.  As I understand it, you understand Tibyan to be a website that essentially collects publications, articles, lectures, whatever, that might be relevant to people interested in Islam.  And one of their services is that they translate these things; is that correct?

A.  That's one part of what Tibyan is.

Tibyan is two things.  Tibyan is, number one, a distribution site for translated materials from terrorist organizations written by different Al-Qaeda commanders or released by -- whatever it is.  It's distributed by them.

And then on top of it, Tibyan also operated a discussion forum, an online English-language discussion forum where people come online who were supporters of these ideas or were interested in these ideas and could discuss them, could debate them, could debate specific topics.

1     One specific debate which got a lot of attention on the

2  Tibyan forum was a debate involving a user who called himself

3  C4 Explosive who was debating with other people about when

4  it's right to kill women and children and when it's not

5  justified to kill women and children.

6     This was a many, many thread argument of different

7  discussions and whatnot.

8  Q.   So somebody who was interested in that subject could go

9  to that website and get a translated version of this article,

10  the one you just mentioned?

11  A.   Well, the latter was a discussion forum that you have to

12  be a member of, you have to be a discussant, a participant

13  in.

14     If you are not a supporter of the ideas that are

15  involved in this, you will get kicked off, which is why I

16  wasn't a member.

17  Q.   All right.

18  A.   The other aspect, the fixed website where they are

19  distributing the stuff to anyone, yeah, that's available

20  publicly to anyone.

21  Q.   And you have downloaded that?

22  A.   I have a complete archive.

23  Q.   And if it's in Arabic, it's already been translated for

24  you, correct, so you don't have to get it translated?

25  A.   I don't know anything that Tibyan put out in Arabic.

Q.   But there are other websites you can go to and find
Arabic type of information, lectures, articles, essays by
scholars or whoever; correct?

A.   That's correct, yes.

Q.   And then you would sometimes have those translated if
you thought they were of interest?

A.   Yeah.  I do what's called information triage.  I go
through every single piece of information that comes off my
desk, and I get a rough Arabic or rough translation of
whatever it is.  If it's in Arabic, Turkish, whatever.

     I determine what the document or the video, audio,
itself is.  If it is something that contains information or
appears to contain information which would be relevant to my
research which would be interesting and which I believe
others would have an interest in, I then give this to my
translator or my translators, whoever I'm working with, and
I say, Look, you know, we need this done, take a look at
this, see what's in this, come back.

Q.   And if it was of interest, you would post it on your
website?

A.   Not everything.  I only post a small selection of stuff.

Q.   But you post what would be called Jihadi type of
information on your website?

A.   Not really.  I take excerpts of materials and I
translate them, and frankly it's most the people that are

1   involved in this field.  I carefully check the IP addresses

2   of people that visit my website.  Most people involved with

3   terrorist organizations stay very far away from my website

4   because they are afraid of being tracked by law enforcement.

5   Q.   All right.  But you at least keep these items in your

6   archives; correct?

7   A.   For law enforcement, yeah, sure.

8   Q.   For whatever purpose, research purposes, law enforcement

9   purposes, your purposes; correct?

10  A.   Yeah.  But if I notice that somebody is downloading them

11  that shouldn't be, I report that information to law

12  enforcement.

13  Q.   I understand.

14       Now, have you ever monitored a website called Jihad

15  Unspun?

16  A.   Yes.

17  Q.   Have you archived the information that you have seen on

18  that website?

19  A.   Some of it.

20  Q.   If there was an announcement of a video to be taken in

21  2004 about -- do you know who is the person who runs that

22  website?

23  A.   Yes.

24  Q.   What's her name?

25  A.   Her name is Beverly Geisbrecht

Q.   And does she have an Arabic name?

A.   Khadija Abdul Qahar, I believe.

Q.   And where is she presently?

A.   She's presently somewhere in Waziristan, north Pakistan.

Q.   Is she a hostage?

A.   We don't really know.  Supposedly she's a hostage, but nobody really knows for certain.

Q.   She's missing?

A.   She's missing.  She has recorded video with Taliban operatives in Waziristan, and she claims to be a hostage. However there is still some question about whether she's a hostage, or whether or not she's engaged in some kind of fund-raising activity on behalf of the Taliban.

Q.   If in her website in 2004 she announced a project such as making a video or some sort of film regarding -- would that be something you would have preserved in your archives?

A.   Probably not, because of the fact that I was mostly focused on gathering original materials from original organizations.

     Jihad Unspun is a secondary organization.  I collected material from there, you know, on a certain basis.  If I saw something that was interesting, I got it.  But that particular -- what you are describing doesn't ring a bell.

Q.   Doesn't ring a bell?

A.   No.

Q.   But it's something you could check?

A.   Oh, yeah, of course, I would be happy to.

Q.   With regard to -- oh, I wanted to ask you this about the
Taiba Bulletin.

A.   Yeah.

Q.   That's like a newsletter or something?  Tell me what
that is?

A.   It was an online newsletter which was disseminated over
primarily Yahoo! news groups.  If you knew what
Lashkar-e-Tayyiba was and you wanted information about it,
you could sign up on this news group to receive a copy of
their newsletter.  Their newsletter was disseminated in
Arabic, in English, and I believe actually also in Urdu.

     It was an electronic newsletter with updates from
Al-Qaeda leaders, speeches by Abdullah Muntazir, speeches by
Hafiz Mohammed Saeed, and other senior Lashkar leaders.  It
was their news wire I think is the best way of putting it.

Q.   Now, with regards to your information on LET, their
purposes and motives and operations, that's based upon your
two interviews that you had with Mr. Royer and Mr. Muntazir?

A.   Actually three interviews.  I did two interviews with
Mr. Muntazir.  I did an interview with Mr. Royer.

     Go ahead, sorry.

Q.   I'm just going on.  You sent somebody to go take some
pictures of the camp?

A.   Well, it's my employee, yeah.

Q.   I didn't mean to minimize it.  You sent somebody to take some pictures.

A.   Uh-huh.

Q.   You have reviewed a video of the camp?

A.   I have a video.

Q.   You have a video of the camp?

A.   I should be clear, so we are clear here, I had my own video of the Muridke camp, and then I also have video of an actual military, explicitly only military training camp run by Lashkar in central Pakistan separate.

Q.   How did you get that?

A.   I obtained that from a colleague in Washington, D.C.

Q.   So somebody in Washington, D.C., gave you a video and told you this is a video of a training camp of LET?

A.   I believe there are actually identifiable LET commanders in the video.  You can see their faces.

Q.   You could look at these people's faces and identify them?

A.   I am pretty sure I know who one of them is.  I can show you the video and I can give you the guy's name and I can show you a photo.

Q.   Give me the guy's name?

A.   I don't have it in front of me.  I can show it to you.  I have the video.  I have his name.

Q.   So you have a video -- let me just understand

exactly.  You have a video that some person gave you that

appears to be a training camp in which there appears --

A.   It specifically says Lashkar-e-Tayyiba camp.

Q.   It says on the video?

A.   Yeah.  It says Lashkar-e-Tayyiba camp, and it has

someone in the video who I recognize from other photographs

of Lashkar-e-Tayyiba leaders.

Q.   I'm not fussing at you.  I'm just trying to get the

basis; okay?

     So there is a person there that you think you recognize

as a person --

A.   I'm pretty sure it's him, yeah.

     Again, everything that I know leads me to believe, not

to mention the fact that the tactics that are being shown

in the video are exactly verbatim the tactics that are

described in the Taiba Bulletin that are taking place at

their camps.

Q.   Tell me exactly what you mean?

A.   LET military camps are a little bit different from other

military camps.  They focus on very specific things; right?

     Al-Qaeda camps, there's a lot of stuff about explosives,

there's a lot of stuff about surface-to-air missiles and

whatnot.

     LET camps are mostly focused on training squads of

fighters who can take over and hold particular I guess zones,
whether it's a building, whether it's -- whatever it is.
They are called fedayeen squads.  It's a different style of
combat.

       With Al-Qaeda, the operations that they carry out, the
martyrdom operations, known as amilyat istishadiya, the
martyrdom operations.  With LET, they refer to their
operations as fedayeen or commando operations.

       If you look at this video, to my mind and from reading
the very specific discussion of the tactics that LET trains
in their camps, as written by LET operatives in the Taiba
Bulletin, in their website, these are exactly the fedayeen
stuff that they are teaching.

       And it's again slightly tweaked from what you
have seen -- from what I have seen in other videos of other
camps.  I believe it's legitimate.

Q.    Okay.

A.    By the way, the name of the individual is Hafiz Adbur
Rehman Makki.  The name of the individual that I believe
that's in the video, Hafiz Abdur Rehman Makki.  H-a-f-i-z
A-b-d-u-r R-e-h-m-a-n M-a-k-k-i.

Q.    Do you know who does the translations for Tibyan?

A.    Specifically know?   I have some idea of who, yeah.

Q.    Who?

A.    Well, you want me to give you specific names?

Q.   Yeah.

A.   Ahbid Khan.  The other names I don't know.

Q.   Okay.  You don't know if they have more than one translator?

A.   I'm sure they do.

Q.   They do a large volume of translations, don't they?

A.   Well, not to mention the fact that after Mr. Khan was arrested, they continued to release translations.

Q.   Is Clear Guidance a website that you sometimes watch?

A.   Yeah, I have a lot of material saved from Clear Guidance.

Q.   Tell us about that?

A.   Clear Guidance was a website, discussion forum on the internet, very similar to Tibyan Publications.  In fact, you could almost call it an exact mirror or substitute for Tibyan Publications.  Virtually the same conversations that were taking place on the Tibyan Publications forum were also taking place on Clear Guidance.

     Clear guidance was run by two individuals, one individual by the name of Sarfaraz Jamal, S-a-r-f-a-r-a-z J-a-m-a-l, who is currently in exile in Jordan, and also another individual, Daniel Maldonado, D-a-n-i-e-l M-a-l-d-o-n-a-d-o, who is currently being held in a federal penitentiary here in the United States.

Q.   When you say you monitor these websites, does that mean

1  that you go on them every day?

2  A.    Yes.

3  Q.    Were you going to be doing that today?

4  A.    Yes.  I have already done it today.

5  Q.    You have already done it today?

6  A.    Yes.

7  Q.    So you wake up in the morning and pull up the website

8  and see if there is anything new on there?

9  A.    I check the websites literally every single chance I get

10 in front of a computer.  The longest periods of time that I

11 go without me checking these sites are when I'm sitting in a

12 courtroom.

13 Q.    And are you looking for changes on the websites?  What

14 are you looking for?  Are you looking for new information on

15 the websites?

16 A.    I'm looking for anything.  I'm looking for anything that

17 can teach me about what's going on on these sites, about what

18 discussions are taking place, material that's being traded.

19       I am interested, number one, in the organizations that

20 are using these sites to disseminate their material.  So in

21 other words, I'm interested in the substantive detail that

22 can be learned about groups like Al-Qaeda in Iraq, about the

23 Taliban.

24       Number two, I'm also interested in the people that are

25 actually physically on these forums and that are talking with

each other and that are chatting and are sharing information
in what they are doing.

So again initially I got involved in these forums
because I was looking for information about these groups,
about the Jihadi groups, about the Mujahideen groups,
substantive information that I could use for my research
about the groups.

But as I got more involved in this, the people
themselves took on an equal level of importance.

Q.   Now, with regards to your analysis of the information,
it's one thing to get information.  It's another thing to
analyze it.  Would you agree with me on that?

A.   I agree, yes.

Q.   That is based upon your undergraduate studies; correct?
I'm not finished.  In part.

A.   (Nods head.)

Q.   Your graduate studies while you were in law school;
correct?

A.   (Nods head.)

Q.   A book you have written about Islam or Jihadi in Europe
or whatever it was, the one -- what was the name of the book?

A.   Al-Qaeda's Jihad in Europe.

Q.   And your work with the foundation, NEFA?

A.   NEFA, that's correct.

Q.   And what was the -- the group that was called --

1   A.    Investigative Project?

2   Q.    Yeah, Investigative Project, I wanted to make sure I had

3   it exactly right, in which you don't send anything out unless

4   it's been reviewed by the people already in the office;

5   correct?

6   A.    Well, that's a standard -- that also applies to NEFA

7   and --

8   Q.    It does?

9   A.    Yeah.

10  Q.    And that's the review process for those articles is to

11  look at them internally and you make sure that --

12  A.    Well, it's not just internally.  Again, because of the

13  fact that I deal with a collection of colleagues on a daily

14  basis, people that are in academic institutions, that are

15  practitioners and whatnot, and because of the fact that this

16  is a collective learning process, all of us are learning

17  together, one of the things that I do is as soon as I have a

18  draft of a paper that I'm working on, or a draft of anything,

19  I will immediately e-mail it out to dozens of different

20  people, people that are academics, people that are

21  practitioners, people from different perspectives.

22        And what I'm looking for there is feedback from them

23  about my analysis, about the sources that I have used, about

24  all of that.

25        And then I take their comments, and I help that to shape

the eventual final draft.  Now, the final draft is then

reviewed internally.  But it's important to understand that

because of the fact that I -- like I write for a blog that

has several other -- several other, it's ten other

contributors to the blog, all about CT issues.

So everything that I talk about, whether it's on the

blog or it's in private conversation, we are talking about

these issues constantly in the background, we are sharing

research, we are sharing papers.

Recently I passed my paper to a colleague in London, he

passed a paper he was working on back to me, he asked me,

Look, I'm working on something else and I need this piece of

research, I know you have it, I don't, can you send it to

me?  No problem, I sent him that video.  He sent me back

something else.

We exchange information.  And the idea is is that by

doing collective review, hopefully everything here is being

carefully checked.

Q.    I understand.  And what's the name of your blog?

A.    The Counterterrorism Blog.

Q.    Counterterrorism Blog?

A.    It's not my blog.  I'm a contributor to it.

Q.    You are a contributor.  It's called Counterterrorism

Blog?

A.    Yes.

Q.   With regards to your finding these websites, you do this

daily, are you looking for new websites?

A.   Yes.

Q.   How do you do that?

A.   I participate in discussions with people -- or I

shouldn't say participate.   I watch conversations,

discussions of people on sites that I am already on talking

about, Hey, there is a new site, check this out.

Because there is a saying out there, there is ten

thousand terrorists websites out there, and that might be

true, but there is only about five or ten or fifteen that are

really significant.

And just because you have a website up somewhere that

says something doesn't mean anything.   It's much more

significant if you have a website and meanwhile you have all

these people who are saying, Hey, this is great, let's go

there, let's get this.   That's a website you want to pay

close attention to.

If you have another website just hanging out in midspace

and nobody is visiting it, it could have all the most

wonderful things in the world, but it's probably not that

interesting because nobody is looking at it.

Q.   And you say you are a computer savvy person?

A.   I used to be a computer programmer, yes.

Q.   How old are you?

A.    Now I'm 30.

Q.    30, just turned 30, so you grew up in the age of the
internet; correct?

A.    I don't know if I just turned 30, but I grew up in the
age of the internet, that's definitely true.

Q.    And younger people tend to be able to use this as a
device to find all sorts of websites; correct?

      I will withdraw that.

A.    The only reason I would be careful of generalizing it is
because a very good friend of mine, Reuven Paz, who is in his
70s or later, and he's an old guy, and he is more computer
savvy than me.

Q.    I only mention it because you mentioned it originally.

A.    It's true, though, the internet --

Q.    So you look at these websites, people are talking about
other websites, a computer savvy guy goes quickly to that
website, which may lead you to another website.  So you are
sitting up in Dawsonville, Georgia, or at Georgia Tech
University on a computer, you can get access to these things
fairly easily?

A.    Only if you have a log in and a password.

Q.    But to get to the website, you find a website and you
get in?

A.    You have to have a log in and password.

      The only reason I have a log in and password for these

1    sites is because I have been doing this for so long that I

2    was around when these websites started up.

3         So when they first began back in 2003, I was an early

4    adopter, that's the way of putting it.  And in the early

5    beginning it was kind of difficult for them to tell exactly

6    who was who.  So I snuck in, snuck in.

7         But to give you some idea of how difficult it is if you

8    didn't sneak in early on, most people in law enforcement

9    don't have access to these sites, or many people in law

10   enforcement don't have access these sites.  Many people don't

11   have access to log in and passwords.

12        I have been asked by law enforcement to recover

13   particular posts from particular forums that are log --

14   Q.   I'm sorry, go ahead.  Sorry.

15             THE COURT:  Mr. Martin?  Mr. Martin?

16             MR. MARTIN:  Sorry, I just --

17             THE COURT:  No, no.  You have to be careful because

18   the microphone will pick up your conversation.

19             MR. MARTIN:  I'm sorry.

20   BY MR. MARTIN:

21   Q.   I wanted to make sure -- my question wasn't very

22   precise.

23   A.   Sure.

24   Q.   You were talking about these online forums that you

25   have to -- to get in there, you have to have the log in

number?

A.   Well, that's the primary way through which all of this
stuff is disseminated.

Q.   But to get to the actual website where the translations
and the publications -- for example, in Tibyan, you don't
need to have a log in?

A.   The Tibyan website that you are describing, the ones
with the translated materials, that's true, you didn't.  But
that was one of only maybe three or four websites that you
didn't have to have a log in and password to access.

     Jihadi groups, for example, Al-Qaeda in Iraq, everything
that Al-Qaeda in Iraq distributed was distributed through a
forum known as the Ansar forum, A-n-s-a-r.  That's where
their stuff came through.  You had to have a log in and
password to access it, and they weren't giving out log ins
and passwords unless there was some way for them to vet you,
i.e., for them to say you are a real Jihadi, okay, come on
in.

Q.   So if somebody wants to get access, all they do is say,
I'm a real guy, and they vet you to some extent?

A.   It's much more complex than that.  It's usually what
happens is that what they do is they say, okay, if you want
to come on this forum, you have to be able to provide the
name and contact information for someone who is already on
here who we trust and who we know and who you know

1    personally.  Not over the internet, but you know

2    personally.

3        And so what ended up happening was is that people

4    started having their friends come on by saying, you know, I

5    know this guy, he's a real Jihadi, but it's not easy.

6        And the guy who is running this was very paranoid about

7    security arrangements.  And so he made it very difficult, and

8    he also -- they went through various different steps where

9    they would go through and try to clear out anyone that they

10   thought was a spy, anyone that they thought was a -- you

11   know, you had to be very careful.

12   Q.   It's a simple question; if you can answer it simply, I

13   would appreciate it.  In order to get into some of these

14   websites or these chat rooms, whatever, you have to show some

15   sort of credibility or some sort of creed with the Jihadi

16   movement; correct?

17   A.   Most of time that's true, yeah.

18   Q.   And that would be a way now to have access to something

19   you otherwise wouldn't have access to?

20   A.   That's true, yeah.

21        MR. MARTIN:  Your Honor, that's all I have at this

22   point.  I reserve whatever --

23        THE COURT:  All right, Mr. Samuel, Mr. Wahid?

24        MR. WAHID:  Thank you, Judge.

25                    --  --  --

1          CROSS-EXAMINATION

2     BY MR. WAHID:

3     Q.   Mr. Kohlmann, let me start with asking a little bit

4     about your sources and methodology?

5     A.   Of course.

6     Q.   One of the things that you said is that you look at the

7     items on the website, you watch videos.  Just now you were

8     talking about other web sites where there are discussions

9     going on.  Are you also looking at those discussions?

10    A.   Well, it's one in the same.  What will happen is that,

11    for instance, say Al-Qaeda in Iraq will go on a discussion

12    forum that they have particular access to and they will post

13    say a new video, or somebody will post it officially on their

14    behalf.

15         What you have is, first of all, you have the message

16    where people are downloading the message.  And then the

17    forums offer you the opportunity to issue a reply, to write

18    your own reply.  So you can then below their first initial

19    message, then you can write another message, a reply.

20         So if you see the initial message, you will

21    automatically see the first like 25 replies.  So basically

22    every single time that I went on and I saved a copy of a

23    communique or a link to a download video, that naturally also

24    included discussion among people who are watching the video,

25    yeah.

Q.   So obviously you download the video; you talked about
that.  And then the discussions that you are looking at are
only the discussions related to the video.  Is that the only
discussions you would look at?

A.   No, no.  That's the other thing is that the forums
themselves are divided into specific rooms.  You have one
room which I call the Jihad data section, the communiques,
videos.  In order to post in that section, you have to be an
authenticated real organization.  In other words, I can't go
in there and post something.  You have to be the official
representative of Al-Qaeda here, the Taliban here, and you
have to be able to prove it.

Q.   You can go in and look at it.  You can't post, but you
can look at it?

A.   You can look at it, exactly.

    The other rooms involved are like general discussion
rooms, there is a religion room.  I very aggressively also
monitor the other rooms as well because of the fact that the
official stuff all comes through here, right, but there are
some unofficial things that trickle through.

    Sometimes you will have an Al-Qaeda operative in Iraq
who will have gotten his hands on a copy of a video that
hasn't been released yet.  It is about to be released, but it
hasn't been released.  And he will post a message on the
forum saying, Hey, guys, look at this, it's about to come

out, check out this, and it will be on the general

forum.  It's critical to be able to monitor those

conversations as well.

So what I do on daily basis is first I look at every new

post in the Jihad data section, then I go to the general

section, then I go to the video section, then I go to the

martyrs section; in other words, announcements of people who

have been slain fighting in combat recently.  But I go

through each one, yeah.

Q.   And when you are looking at these discussions, unlike

the video where you can identify who is in the video and is

it really in that area, are you familiar with having seen

that area, would the discussions -- you really don't know who

is posting those discussions; right?

A.   For the most part, no.

Sometimes there are clues.  There are people who will

have some piece of information or piece of product where it

didn't come from the official Jihadis, but clearly it's real,

clearly it's authentic, clearly they got it from somewhere.

Q.   When you say clearly, why are you saying clearly?

A.   Well, for instance, there was a group on the internet

known as the Islamic Media Center, and the Islamic Media

Center would disseminate stuff on these forums.  It's a

general forum, right, and they would disseminate propaganda

videos.

They weren't the latest propaganda videos.  They were
propaganda videos from ten years ago.  Ten years ago; right?
So it wasn't like they got this directly from Al-Qaeda today,
but I know these videos.  They are extremely rare, they are
extremely difficult to find.  They are not available on the
internet, not until these people put them on there.

So how did they get their hands on them?  Well, it's
possible they were really lucky, or more likely they had some
kind of access to a source for these videos.

In the case of the Islamic Media Center, what they did
is they went to Abu Hamza Al-Masri's mosque in the U.K. and
they got all the stuff out of his library.

So, yeah, that's I think a good example.

Q.   And it would be fair to say that based on what you just
said, there is a certain amount of assumption that you have
to make when you are watching all this and you are making an
analysis, because you don't know -- like you said, you don't
know where they got it from.

It could have been just some guy left it lying around
somewhere and you walked into the room and there it was and
they said, Wow, look at this, this is cool, let me put this
on the web?  You really don't know how he got it?

A.   It's a process, it's over time.  It's a process.  You
analyze -- it's comparative analysis, it's exactly what I
have always been doing.  You compare over time the material

that's put out by someone, you compare over time, and after a
while you can pretty much determine very conclusively whether
or not someone has real access to something.

Now, when I say real access, look, it could mean that
they are walking into a bookstore and they are buying the
stuff, not any bookstore obviously, but they have access to
something. But the point is is that you can quickly tell
what is authentic and what's not.

And the other thing is because of the fact that all of
the stuff is being distributed over discussion forums, if you
go on and you distribute a communique that's illegitimate,
you distribute a video that's illegitimate, not only will you
get kicked off, but you will get attacked. I mean, people
will go after you, because it's a very serious thing to
masquerade as something that you are not.

These people take that very seriously, and so, you
know -- again it's a serious thing.

Q.   I don't want to cut you off, but what I'm asking,
though, is you would agree there is a certain degree of
assuming that you have to do in the course of your work?

A.   I don't know if it's assuming. I think it's comparative
analysis. It may be an expert opinion.

But I think "assumption" is avoiding the fact that all
of this is based upon a daily analysis or rigorous analysis
of everything. It's the same kind of analysis that goes into

1    any kind of expert opinion.

2    Q.    As you said on direct, there would be times where -- and

3    you didn't specify a particular time, but you were asked

4    would you change your opinion based on new information, and

5    you said yes?

6    A.    Yes.

7    Q.    And that's because certain assumptions you had made

8    prior would be borne out to be untrue, and therefore you

9    revised your opinion based on the new set of assumptions you

10   developed?

11   A.    Yes.  I can give a specific example.

12   Q.    Yes, that would be correct, that's what I'm asking, that

13   process?

14   A.    Look, again, I don't have any -- I don't have any

15   agenda.  I'm nonpartisan.  So if there is something that

16   comes up, a piece of evidence that clearly shows that

17   something that, you know, other evidence, you know, we have

18   got to be careful about this, I'm the first one to say

19   that.

20        In fact, with regards to Lashkar-e-Tayyiba, immediately

21   after the attacks in Mumbai last November, there were a load

22   of accusations that Lashkar-e-Tayyiba was responsible for

23   Mumbai.

24        And I immediately said, I said, look, it looks like

25   Lashkar, but that's not enough to say they did it.

So I called up Abdullah Muntazir, and he said, No, we didn't do it.

And so in my article for *NBC News*, the headline was Abdullah Muntazir denies LET had any role, emphatically denies this.

Again, I am in this for the facts. I don't have any partisan side. I'm nonpolitical.

Q.   As we go towards the issue of your methodology, that's what I'm really focusing on right now, part of your methodology incorporates having to make assumptions, and then you predicate an opinion based on those assumptions; correct?

A.   Again, I have a problem with the word assumption. But if you are saying that I am doing a comparative analysis and I'm deriving a conclusion from doing a comparative analysis, that's social science, yeah.

Q.   Well, the example you gave about the video, it's not really a comparison so much as you are saying you don't know -- you have A, B, F, G.  You don't know C and D, but you can kind of piece together based on other situations what you think happened with C and D?

A.   I mean comparative analysis over time.  Like, for instance, the example that I gave, the Islamic Media Center. They are issuing messages on a daily basis, and I'm collecting all the messages and all the videos.

Now, if they distribute one original video or one

1    unusual video or one -- you know, you could draw a million

2    assumptions off of that; right?   But over time, if you save

3    a hundred or hundred fifty communiques, ten different

4    websites, ten different training manuals, all this different

5    stuff, all these different videos, and it all matches up to

6    the same source, I wouldn't call that an assumption.   I would

7    call that social science.   I mean, that's basic -- you know,

8    that's basic comparative analysis.

9    Q.   You would agree that someone could be posting on a

10   website or being part of a chat and in the Clear -- in the

11   Clear --

12   A.   Clear Guidance.

13   Q.   Yeah, Clear Guidance chat, he or she could be known

14   under one particular e-mail address or name, IM name, and

15   then on Tibyan Publications' website, he could be using a

16   different name, and it could be the same guy?

17   A.   Yes.

18   Q.   And similarly you would agree that five people could be

19   just sharing a particular e-mail address?

20   A.   Yes.

21   Q.   So the e-mail address can be *KhurrumWahid.com* and ten

22   people can be using that e-mail address?

23   A.   That's exactly correct, yes.

24   Q.   So when you are reading the chats that are going on, you

25   really don't know who it is that's posting that chat.   But

1   you just know -- you know the moniker of that person?

2   A.   Right.  When I -- unless I have reason to be able to

3   identify and say that that person is this person and they

4   posted it, no, no, no.  And I'm very careful about that.

5       If I say somebody posted something on this date,

6   I identify that somebody with their user name.  And I have --

7   you know, it's certainly true that in some cases you have

8   organizations which have one log in and would share two or

9   three different people.

10      There have been cases in Iraq where operatives in

11  Al-Qaeda in Iraq that had like ten IDs and say just take one

12  and use one of these while you are online here.

13      But most of the time these IDs become valuable because

14  of the fact that you establish credentials, you establish

15  notoriety.  And so for a lot of people it's very important to

16  have their own user name and their own consistent user name

17  so that no matter what forum they are on, number one, they

18  are given a due level of respect by other users; number two,

19  that if they post something, somebody isn't going to say who

20  the hell is this guy; and number three, you know, they are

21  proud of this.  A lot of these people are very proud of what

22  they are doing, and they are not -- they want to be known for

23  this.

24  Q.   Let me ask you about authenticity.  You gave an example

25  earlier where you said some of the stuff is self-evidently

authentic, and you gave an example of an Osama Bin Laden

release where you see him talking and he sitting next to

Zawahiri; right?

A.   Yes.

Q.   I mean, it would be true, though -- and correct me if

I'm wrong -- that the U.S. government often when those videos

come out, they originally don't comment, they say that we

need time to check the authentication of this particular

person, the voice --

A.   They may say that, but that's meaningless.  They know

immediately when it comes out whether it's legitimate or

not.  It's not difficult to tell.

Q.   But there are official statements from the U.S.

government when those come out saying, Well, we need time to

analyze this video to determine whether it is really in fact

a message from Osama Bin Laden, and they are checking things

such as not just the voice itself, but to check to see what

is he saying and could this have been made months and months

ago, that sort of thing; right?

A.   That's correct.

Q.   So there is still some analysis that goes in, even when

it's Osama Bin Laden, just to verify the authenticity?

A.   Oh, I think it's kind of obvious.

     The first thing I do if I get a video from Bin Laden is

I get a transcript of it and I go through the whole

1    transcript.

2         Number one, you are looking for things that could

3    identify when it was recorded, because one of the biggest

4    questions about Bin Laden is is he alive or is he dead, does

5    he refer to things that have happened recently.  But, I mean,

6    this is kind of basic stuff.

7         I think when they are talking about authenticating, my

8    understanding is they are talking about voice authentication,

9    they are talking about doing a scientific analysis, trying to

10   actually compare voices.  However -- and I wouldn't discount

11   that, it's certainly necessary.  But --

12   Q.   But you don't do that yourself?

13   A.   For those of us who have listened to enough recordings

14   of Dr. Ayman al-Zawahiri and Osama Bin Laden, their voices

15   are very recognizable.  I can't say that I have a scientific

16   rigor of a software program to compare the wave lengths.

17        But number one, I have never encountered a recording

18   from Bin Laden that -- a new recording that I didn't believe

19   was legitimate; and number two, neither has the Central

20   Intelligence Agency nor any U.S. government agency that I'm

21   aware of.  They have never come up with a new recording of

22   Bin Laden that has been released through official sources

23   which they then went back and were unsure of the authenticity

24   of.

25        Again, if you know Bin Laden's voice, if you know

Zawahiri's, if you know the voice of Abu Musab al-Zarqawi,

they are very characteristic voices. I mean, if you listen

to them over and over again, it's immediate, I mean, you can

recognize them.

Q.    Do you speak Arabic?

A.    Not fluently, no. But in order to study Islam, I had to

learn obviously quite a bit of Arabic vocabulary.

Q.    So you know terms, but you couldn't put a sentence

together, that sort of thing?

A.    I can put some sentences together. It's like, for

instance, I know Shahada, I know things like that. But

because of the fact that I'm dealing mostly with native

speakers, I try to get native speakers to do my

translation.

        I can use my own Arabic abilities to do triage, sure,

and identify what people are talking about, you know, I can

identify subject of conversations, people they are mentioning

and whatnot, so I can identify if something is interesting to

me.

        But for actual translation, I really feel that no matter

what language it's in, you really want to give it to native

translators.

Q.    So when you are online and looking at the websites, are

you there with the translator with you at the time?

A.    Yeah, he sits right next to me.

1   Q.   So when you are listening to something, the translater

2   would say this is what it is, or is he saying this sounds

3   interesting?  How does that work?

4   A.   No, I will pull up something and I will listen to it or

5   I will see it and I will say, hmmm, what is this?  I will

6   say, Come over here, take a look, say is this what this is,

7   they are talking about this, are they talking about this,

8   what are they talking about, what else did they mention, did

9   they mention anything about this aspect, et cetera.  So,

10  I mean, he sits right next to me.

11  Q.   Do you speak Urdu?

12  A.   No, that I do not.

13  Q.   Do you have an Urdu translator?

14  A.   I have Urdu translators in Pakistan.  I also have

15  Turkish translators in London.  I have Pashto translators in

16  Pakistan.  I have a network of different people in Pakistan

17  who I work with.

18  Q.   When you are watching a video or you are in your office

19  and you are looking at a website with something that's Urdu,

20  do you have somebody there with you, or how do you know

21  what's on that?

22  A.   No, in that case I have to send them a copy of the video

23  or a copy of the document, and then they get it back to me.

24       But unfortunately because of the fact that we deal with

25  Arabic, Pashto, Urdu, Turkish, Somali, a couple other

1  different ones, there is no way for me to have a translator

2  next to me that does all those languages.  I have to focus on

3  the language that comes up most frequently, which is Arabic.

4  Q.   Have you been to Pakistan?

5  A.   Me personally, no.

6  Q.   Have you been to Bosnia?

7  A.   Yes.

8  Q.   At the time you wrote your book, *Al-Qaeda's Jihad in*

9  *Europe,* had you been to Bosnia?

10  A.   I was in Bosnia the same year I wrote my book.

11  Q.   In part of, in preparation of the book, did you go to

12  Bosnia?

13  A.   It wasn't for preparation of the book.  It was for

14  preparation of something else.

15      I worked on behalf -- I worked on behalf of the Office

16  of the High Representative in Bosnia.  I did a short-term

17  consultancy with them in Sarajevo.  The reason that they

18  hired me to do that work was because they had read my book

19  and they believe that I had significant value to add to their

20  program.

21  Q.   You talked about on cross by Mr. Martin, you talked

22  about *The New Yorker* and it not being an academic

23  publication?

24  A.   Correct.

25  Q.   Are you saying that you wouldn't therefore cite

something like *The New Yorker*?

A.   I didn't say I wouldn't cite it.  I just said I would
have to really carefully check what their sources are because
of the fact that it's not like *The New York Times,* it's not
something where I know the editorial process is so strict
that these facts are very -- unfortunately I know of several
*New Yorker* articles with very serious factual errors recently
about similar subjects as this.  So that makes me kind of
reticent.

There was an article by Adam Gadahn that was in
The New Yorker, a very interesting article, but it also had
some very serious factual mistakes.

So the issue is that, hey, this is a very interesting
article, I wouldn't want to ignore it, but if I was going to
start citing facts from it, I would want to have at least a
reasonable belief that what the facts are that I'm citing,
the specific facts that I'm citing are actually accurate and
true.

Q.   And how would you do that?  Let's say you are citing
something from a website.  How would you go about confirming
that what that website is saying is actually accurate?

A.   Well, comparative analysis, number one.  I would compare
it to other documents about the same subject from other
sources and see whether or not it matches.

I would attempt to contact the organization itself, for

instance, Lashkar or the Islamic Army in Iraq.  I would just

interview the Islamic Army in Iraq.  My question was that

there have been bombings in Baghdad recently, nobody knows

who has done them.  Was it Al-Quaeda, was it somebody else?

Rather than try and guess at this, why not just call up the

insurgents or contact them directly and say, Look, I work for

a media company, I'm very interested in this, tell me, who

did this, who in your mind, who did this?

     Their answer is their answer.  I can't say it's 100

percent factually true, but in my research I will say, Look,

the Islamic Army of Iraq said this, Al-Qaeda said this, these

people said this.  My conclusion based upon studying those

three accounts is the following.

Q.   Your book has a number of cites in it, and there are

some claims in there, I just don't see the cites for

them.  Maybe you know where they come from.

     One of them in the preface you talk about there being

about five thousand Mujahids who are generally loyal to the

Afghan Jihad?

A.   Right.

Q.   Going through the book, there was no cite to that?

A.   No, that is my own extrapolation from all of the

sources.  I mean, that would be like reading my entire

bibliography.

     I don't think that's a controversial figure,

though.  I think the same figure has also been repeated by

individuals in the U.S. government as well.

Q.   But that would be an opinion, though?  That's your

opinion?

A.   Well, it's an opinion, but I think it's been directly

repeated.  I can try to find you a source, but I believe it's

been directly reported by senior figures in the U.S.

government publicly.

Q.   A number of your sources -- I wouldn't say all, but a

large number of your sources in your book are what you have

referred to as tertiary sources?

A.   Uh-huh.

Q.   Such as *The Guardian,* which is a newspaper in London,

you know, *The Times,* which a newspaper in London.  So your

book seems to have a large content of it predicated upon

reading the news and citing to what's already in the news?

A.   No.  My book was mainly focused on four or five

principal documents which I obtained directly from

organizations which told the story of the Arab Afghans in

Bosnia.

     Number one, the video *Martyrs of Bosnia*, *Shuhadaa*

*al-Busnia*.

     Number two, *Operation Black Lion*.

     Number three, *Operation Badr*.

     Number four, the various different materials put out by

1    Azzan Publications, including the biographies of all of the

2    foreign fighters who were killed there and their stories of

3    who fought there.

4         What I did is I wrote a draft based on those documents,

5    and then I realized, hold on a second, there is a lot of

6    other stuff that happened in Bosnia-Herzegovina other than

7    this small group of guys, and it would be very interesting to

8    take their perspective, the perspective of the Arab Afghans

9    as told through the *Martyrs of Bosnia*, *Operation Badr,*

10   *Operation Black Lion*, all these different biographies, and

11   contrast that with the views of western journalists and

12   others, UN, whoever, who were on the ground at the time.

13        Now, when you say large number, I think it depends the

14   way you read it.  But I think you should understand that the

15   main basis for my book -- and if you watched the videos,

16   *The Martyrs of Bosnia*, *Operation Badr, Operation Black Lion*,

17   I think you will pretty much see that that is the basis for

18   the book.  The book itself follows those videos very

19   carefully.

20   Q.   Although the citations in the book -- and at the end of

21   every chapter, you have the citations that go to that

22   chapter?

23   A.   Right.  But again, I'm trying to do a comparative

24   analysis, so I don't want to just report one source for

25   everything.

So in several cases where there was a fact, which was a very generic fact, or in some cases *The Guardian* -- I mean, it happens that Bosnia was a war that took place in Europe, so there were a bunch of European journalists that got excellent access on the ground in Bosnia which you wouldn't get today in Pakistan or Iraq.

They got original interviews with Mujahideen, they got original interviews with people on the ground.  For the most part I was quoting people who were, you know, senior members of the Bosnian military and others who were quoted in these articles.

I wasn't citing them for the truth of what they were saying.  What I was citing was the fact that they were people who were saying this and were being quoted by western journalists as saying it.

The reason why I included all the footnotes was so all the people can see this is where this comes from or if you have any question about the source or if you have any question about what's being said here, you know, go back and look.

But, again, I think you really should understand that the book is based upon Arab Mujahideen documents which I obtained primarily from places in Europe focusing on the history of the Arab Afghans in Bosnia, and everything else in there was fleshing out detail that I had learned from there.

Q.   I will draw your attention to one particular area I was

just looking for the source on.  It was on page 85.

     There is a statement you make, and here you are talking

about essentially some of the issues or some of the instances

that were going on at the time in Bosnia.  And there is one

line here where you say they knocked over pews, and you are

talking about the -- about 30 Arab guerrillas.  They knocked

over pews and other sacred symbols of the ancient church,

vandalized the historic and irreplaceable murals above the

main altar, and finally scraped off the faces of Jesus and

the Virgin Mary, another painting near the altar?

A.   Yeah.

Q.   And that is cite 75, which is citing to David Sheehan,

"The Road to Guca Gora," St. David's Relief Foundation, and

it's a website.

A.   You can see the same thing in *Martyrs of Bosnia*.  I

mean, it's in the video, you can see it.  They are in the

church.  You see them in the church.  You see them doing --

the only reason I cited that is because of the fact that

I didn't want people to say, Well, the Jihadi said it, but

how do you know that it really happened.

     Well, this was someone who was a physical eyewitness,

who went into the church after it was liberated or whatever

by UN forces, and who went there and physically saw the

evidence.  Now --

Q.   Did you speak to David Sheehan yourself?

A.   No, but I have the video.  I have the video of them doing it.  I mean, I have the video of the fighters in the church doing this, knocking over the pews, writing on the wall.  I mean --

Q.   Well, your account on page 85 gives a context to that, and you are citing a witness, but really what you are getting it from is a video clip you saw that somebody else put into there, edited in, and a website link that talks about it.

A.   No, no.  I'm doing a comparative -- again, this is what comparative analysis is.  This is social science.  You take an original document, which is the video recording, which was put -- which was created by Mujahideen, the Mujahideen brigade in Bosnia, the official brigade.  It's their official publication, it was in one of their official videos.  It's not a secret video.

And I am comparing that and I am saying, Look, we think this happened, they claim it happened, they have video of it.  Here we have an observer who was a western observer who was unconnected with the Mujahideen who went in there and observed the same thing.

Now, one account alone or one account alone is just one account, but you take those two accounts together -- I mean, there is no dispute that that happened.

What's more, you should be very careful, because in

 1   working for the International Court of Justice at the Hague,

 2   I also had the opportunity to review thousands of original

 3   documents, original reports, memorandum and whatnot between

 4   UN security agencies, the Army of Bosnia-Herzegovina, the

 5   Muslim Army of Bosnia-Herzegovina, and other organizations

 6   back during the 1990s.

 7       In many cases I had information from those documents

 8   where I couldn't cite those documents because they are not

 9   public documents, but I know facts took place.

10       So it was a matter of trying to find other sources which

11   also described those same incidents.  But these are from

12   original documents created by the Muslim Army --

13   Q.   Have you seen *Martyrs of Bosnia*?

14   A.   Have I seen the video?

15   Q.   You have seen the video; right?

16   A.   I could probably cite the script to you.

17   Q.   And it's your contention that there are scenes of the

18   Mujahideen desecrating, vandalizing the Guca Gora?

19   A.   I can show you -- I can give you time codes.  It says

20   Guca Gora.  It's not -- again, this is something that I have

21   dealt with in extreme detail, particularly that incident in

22   Guca Gora.

23   Q.   And you are quite certain about that?

24   A.   I will give you time codes, I will give you screen

25   shots, you can be the judge.  I mean, you can see them

inside, you can see them in front of the thing, they are

cheering, they are knocking stuff over.

Again, if you want to see the video, I'm happy to

provide you time codes and screen shots.

Q.   I'm not going to go through the whole book, but you

would agree with me that there are a number of cites.

I mean, you can deem what you -- in terms percentage and that

sort of thing, but there are a number of cites where you are

citing either websites or tertiary sources, as you call them?

A.   Again, I would just -- I repeat to you to be careful

because of the fact that in working for the International

Court of Justice at the Hague and the OHR in Bosnia, I was

given access to a lot of information, some of which are

documents, original documents, very credible, that are not

public.  I can't reproduce them.

However, I know the information in them, and I have

written about it at great length, and I have discussed it

with people in the Balkans and at the ICJ.

Now, it's true, it's factual.  I wish I could use those

sources.  I can't.  I have a whole 80- or 90-page report

which is for the ICJ which is the same thing based upon Army

of Bosnia-Herzegovina original documents which they provided

to me.  I cannot make those public, so I have to use the best

sources I can.

Now, I can tell you again those facts are backed up in a

tremendous amount of research, and I would be -- I would be

surprised if you could find someone to dispute what happened

in Guca Gora in June of 1993.

Q.   Just so we are clear, though, in terms of the

methodology and how you collect them and how you research and

then publish, you are very comfortable relying upon -- tell

me if I'm wrong -- relying upon citing tertiary sources?

A.   I'm not.  I keep saying that, I'm not comfortable with

it.  I do it in order to flesh out detail.

       But in order to establish -- my primary sources, the

sources I rely on most are original recordings, video

recordings, audio recordings, communiques, magazines,

et cetera, put out by Jihadi movements.

       Now, frequently those don't cover every aspect of

something going on in a conflict like Bosnia, which is

terribly complex, and the last thing that I want to leave

people with the understanding of was that the Bosnian War was

only about a group of fifty or hundred guys running around

central Bosnia killing people, because that's not what it was

about.

       I wanted to give people a greater perspective of what

the conflict was about, who the players were, and what was

going on in the midst of all this stuff.  So I had to use

other sources.

       But again I think if you watch the videos, if you watch

those three videos, *Operation Badr, Operation Black Lion*, and
*Shuhadaa al-Busnia*, *The Martyrs of Bosnia*, you will see that
my book very carefully traces the account of the Mujahideen
themselves, and that the reason why I use secondary or
tertiary sources is in order to make sure that people
understand that this is an account which has been established
by facts, not just by the Mujahideen, but also by western
journalists, by independent observers, by law enforcement, by
anyone else who had an opportunity to observe this.

Q.   You spoke on direct about the laborious review that goes
into the fact checking of something you publish?

A.   Yes.

Q.   You talked about the NEFA documents?

A.   Yes.

Q.   You have documents that you have put forth for NEFA on a
number of different individuals, some of whom are cases you
had testified in, some are not, some are cases you observed,
you know, ranging from cases here in the United States to
cases in the U.K. and other places; correct?

A.   Are you asking if I published a lot of stuff through
NEFA?  I published a lot of stuff through NEFA.

Q.   Talking about all these individual cases, talking about
a number of cases?

A.   Well, the stuff that I write for NEFA, I just write.  If
it happens that a particular subject is relevant to a case

I'm working on, that's great, because I have information from

that case.

    But I just published a huge paper with them about

Shabaab al-Mujahideen in Somalia.  I'm not working on a case

involving Shabaab, I'm not hired by anyone to do this.  I did

it because I have been collecting the research over the last

three years and I felt it was time to, you know, to write

something.

Q.    Did you recently put out one on Kasam?

A.    Kasam?

Q.    A document on Kasam, did you put one out recently?

A.    Kasam what?

Q.    The individual whose case you were just testifying in up

in New York?

A.    You mean Kassir?

Q.    I'm sorry, Kassir.

A.    The NEFA Foundation released a copy of my expert report,

but I didn't write -- I didn't write anything about that.

I just wrote my expert report, and after the case was already

adjudicated and Mr. Kassir was found guilty, then they posted

a copy of my expert report, yeah.

    But that wasn't written for NEFA.  It was written -- it

was the exact verbatim report that was submitted to the

court.

Q.    And the documents that, if there is a document like that

1  that NEFA then publishes, do you get compensated for that?

2  A.    No.  I get -- they pay me to do work for them.  I am

3  expected to do a lot of things.  I don't get paid extra

4  money, and in fact, I don't get paid that much money.  I get

5  paid money by them, but it's a nonprofit group, so they have

6  a limited budget.  The idea is for nonprofit counterterrorism

7  research.

8  Q.    Let's just talk about some of the terms that -- you

9  watched the videos, you studied terms in order to be able to

10  identify terminology for a jury; correct?  I mean, that's one

11  of the things you do?

12  A.    Yes.

13  Q.    Would you say that there is a certain multiple

14  interpretation possible for some of the terms you define?

15  A.    You would have to give a specific example, because I

16  can't think of one.

17  Q.    When you say Islamicize, you have used that term a few

18  times.

19  A.    I haven't used Islamicize once today.

20  Q.    You used it once, but let me refer you to specific

21  spots.  In your book on page 115, you say in spite of

22  vigorous efforts to Islamicize the not only Muslim Bosnian

23  population, and then you go into what that is, and

24  specifically you say that the locals could not be convinced

25  to abandon pork, alcohol or public displays of affection.

1      Is it your position that Islamicize means for

2  individuals to abandon pork, alcohol, public displays --

3  A.    That should have really been in quotes.  The idea was

4  that --

5  Q.    The word Islamicize is in quotes.

6  A.    What's that?

7  Q.    The word Islamicize is in quotes.  Not the whole

8  paragraph, but that word is in quotes.

9  A.    It's in quotes in there?

10  Q.    Yeah.

11  A.    It should be, because that's the idea, because that's

12  not really -- that's not -- the Mujahideen came into Bosnia

13  with the idea that they were going to teach the Bosnians

14  about real Islam.  In other words, Salafi hard-core

15  puritanical-style Islam.

16      Now, Bosnian Islam is much different.  Southeastern

17  Europe is a confluence of many different cultures and many

18  different religions, and Bosnian Islam has a tradition of

19  being very moderate, of being very open to other faiths, and

20  to borrow it from other faiths, and also being fairly

21  liberal.

22      So there is a history of people in the Balkans who are

23  Muslims who are eating pork, drinking alcohol.  It wasn't a

24  big deal.

25      These guys came in with the idea that, you know, these

poor Bosnians, they don't know anything about Islam, we are

going to teach them about real Islam.  And so that's what

I meant by Islamicize.

    But the idea is Islamicize, because they were already

Muslims, they were being converted to a different sect or

different view of Islam, or that was the idea anyway.

Q.   So when you say a statement like that and you put

Islamicize in quotes, are you putting it in quotes because

it's not your term that you are coining, or are you putting

it in quotes because it could have multiple meanings?

A.   No, I'm putting it in quotes because of the fact that

Islamacize without quotes would give the suggestion that

these people weren't already Muslims, and they

were.  Islamicize by quotes, I mean their version of Islam,

their perspective of Islam, their reading of Islam.  That's

what I mean.

Q.   And would it be fair to say that there are other terms

like that that you would comment on that would -- where in

this situation, for example, your position is that the not

eating pork, for example, or abstaining from alcohol, those

things, are one particular version of Islam?  Is that what

you are saying there?

A.   Those are supposed to be key tenets of Islam; right?

But just because something says something, in the Bible, the

Quran, whatever document it is, that doesn't mean that all

1  Islamic sects or all Muslims follow that.  And I think it's

2  kind of, to be honest, it's kind of arrogant to suggest that

3  it is.  I think people follow the religion that they want to

4  follow.

5      It happens that in the Quran it says you are not really

6  supposed to eat pork, you are not supposed to drink

7  alcohol.  The idea that Muslims don't eat pork and don't

8  drink alcohol is ridiculous.  I mean, people do.  It depends

9  how religious you are.

10      Now, in Bosnia the tradition was liberal Islam, it was a

11  liberal interpretation of Islam.  It was we are Muslims, we

12  believe in Allah, we believe in the Profit, have faith in all

13  this, but we just feel like these particular aspects -- the

14  same way a lot of Jews don't keep kosher, or a lot of

15  Christians don't go to church on Sunday, but they still

16  consider themselves Christian.

17  Q.  Would you say, though, that there is -- there are terms

18  like that -- you just basically told me that there is, you

19  know, certain things that are considered tenets of Islam,

20  like no pork, no alcohol?

21  A.  Right.

22  Q.  And that the way you have characterized it there,

23  though, is you put it in a sentence where you are saying that

24  the Mujahideen who came at that time were trying to convert

25  or Islamicize or their brand of Islam by preaching those what

1    you just said were core tenets of their religion.

2         Would you be telling the jury that these particular

3    things are core tenets of a religion, are you going to get

4    into that sort of thing?  How are you going to use the

5    characterization of some of these terms?

6    A.   I wouldn't characterize what someone's version of Islam

7    is.  That's not what I'm here for.  I mean, people are free

8    to believe whatever religion they want to believe or whatever

9    sect of religion they want to believe.

10   Q.   Obviously that's not --

11   A.   I'm not going to make a judgment about what -- excuse

12   me, I'm sorry.

13        THE COURT:  No, it was Mr. Wahid that interrupted

14   you as he continues to go down this track which is not very

15   productive.  So let's try to get this wrapped up and go on to

16   something new.

17   A.   I am not going to comment about what real Islam is or

18   what real Islam isn't.  That's none of my business.

19   Q.   You talked a little bit about the process of these

20   websites and why they exist.  You said that to a certain

21   extent the idea is -- you said there were thousands

22   potentially of these websites out there, maybe ten, fifteen

23   that are of some significance?

24   A.   Yeah.  Approximately, yeah.

25   Q.   And it would be of value for others to start saying,

1   Hey, look at that website; right?

2   A.   Yes.

3   Q.   Because it would give it significance, it would give it

4   credibility, it would make it more significant.

5       If you are trying to have your website one of those top

6   ten or fifteen websites, you would need other folks to start

7   getting the buzz out?

8   A.   Yeah, sure.  But it's mostly organic, though.  This is

9   like -- it's like trying to make something the top of

10  Billboard Top 20.  Unless you have a lot of people who

11  actually like the song, it's not going to go up there.  No

12  matter how many people call in to American Idol, if they are

13  not a good singer, they are probably not going to win.

14      It's the same thing.  You can try to push people to a

15  site, but if ultimately you don't have something on there

16  that's drawing people organically in and of itself, they are

17  not going to keep coming back.

18  Q.   And the idea would be for these websites, they are

19  trying to get people to come to the websites; right?

20  A.   Of course.  Well, trying to get people?  Who people?

21  They are trying to get people who are their supporters.  They

22  are trying to discourage people who are not their supporters

23  from coming.

24      This is -- I mean, there is a very -- the thing about

25  the forums, you have to be kind of careful, because there are

some people who go on there and think that they can go on
there and start discussions, debating the fine tenets of
Jihad, Mujahideen and whatnot.  Something to understand is
that these forums are social networks of people who for the
most part have very similar views.

     If you go on there and you start expressing wildly
divergent views, you will get removed, you will get kicked
off.  They don't accept that.  They only accept the
proliferation of one particular viewpoint on these particular
forums.

     It's not really surprising, because the forums are set
up with a pretty clear purpose.  Again, if you start
expressing wildly divergent views, you are going to get
kicked off.

Q.   Although there are divergent viewpoints in the chats.

A.   Divergent to a degree.  When I say divergent, I mean if
you go on to one of these forums and you start saying
terrorism is wrong or that killing people is wrong and stuff
like that, good luck to you.

     If you go on there and say, Well, I believe in Al-Qaeda
and I believe in Bin Laden and all this, but under this
specific instance, do you really think we should still be
killing women and children, even then you would be risking
getting kicked off.

     With that alone, people have gone on to these forums and

have expressed support for Hamas and have gotten kicked off,

support for Hamas, the reason being is because Al-Qaeda hates

Hamas, hates them, and is constantly attacking them.

So if you go on these forums and you say you are a Hamas

supporter, forget the fact that it's maybe a designated

foreign terrorist organization, forget all that, you are from

the wrong perspective, get out of here.

Q.   You had interviewed Omar Bakri; is that right?

A.   Yes.

Q.   And he's essentially the Sheikh for al-Muhajiroun?

A.   The founder.

Q.   The founder.  And the al-Muhajiroun perspective is one

of more of -- they are sort of seen as the big talkers in the

so-called Jihadist world and not really doing anything?

A.   It depends.  Some people feel that way.  It depends

who.

There are some people who criticize Omar Bakri for

talking a lot and not doing a lot, but those people are also

maybe not aware of how many al-Muhajiroun members have

actually gone to Jihad front lines after being recruited in

the U.K.  And I think if they did, they might have a little

bit of a wider perspective of that.

Q.   But it's fair to say there is diversity of view within

the Jihad community?

A.   I mean, people dislike each other for personal reasons.

1    I mean, when I interviewed Abu Hamza Al-Masri, he started

2    disparaging an Algerian Arab Afghan to me.  That was one of

3    the reasons I --

4    Q.   On philosophical grounds there is a difference of

5    opinion?

6    A.   Mostly it's personal.  There is some philosophical

7    differences, but I think you have to understand that just

8    like anybody else, personal disagreements play a huge role in

9    the arguments that take place.

10         Many times the disagreements are not so much

11   philosophical as they were personal, and they become embodied

12   in very, very nitpicking kind of things.  But I think you

13   have to understand, these people are just like anybody else.

14   Personality disputes play a huge role in their social

15   networks, just as important as politics.

16   Q.   You have reviewed -- you have seen the Tibyan

17   Publications website; correct?

18   A.   Yes.

19   Q.   You have seen the entire website?

20   A.   Which website?  Are you talking about the website for

21   distributing publications, or are you talking about their

22   forum?

23   Q.   Well, which website did you see?

24   A.   I have seen both.  But the one I'm more familiar with is

25   the website to distribute publications, because I was only

observing Tibyan until it got locked.  I didn't have a user

name on Tibyan, and because of the fact that I didn't know

anyone in the real Jihadi circle that would authenticate me

as a user, I couldn't get online.  I tried several times, but

it wouldn't allow me.

Q.    Have you drawn an opinion based on what you know about

Tibyan as to whether or not it was trying to get folks to go

out and commit Jihadist activity?

A.    Yes.

Q.    And what is your opinion on it?

A.    Yes, it was.

Q.    And why is that -- what is the basis of that opinion?

A.    My basis of that opinion is, number one, the specific

things that they distributed, which specifically said

explicitly you cannot cater the conditions of Jihad to where

you live, i.e., Europe.  You have to participate in Jihad,

holy struggle, violent holy struggle, no matter where you

live, whether it's in Europe or elsewhere.

      Those kinds of specific instructions, I mean, you can

only take them in one way.  Tibyan distributed explicit

Al-Qaeda publications translated into English.  *Constants of

the Path of Jihad* written by Sheikh Yousef al-Ayyiri, the

founder of Al-Qaeda in Saudi Arabia, that book is the single

most influential book in terms of home-grown terrorism

networks on earth.  It pops up in every single case.  It's

extremely influential.  And the version that pops up is not
the original Arabic language version, it's the English
translation by Tibyan.

The translation of the video *Battle of Omar Hadeed,*
which is one of the most famous videos of Al-Qaeda in Iraq,
would you believe that their English translation is more
prolific than the original Arabic version because they did
such an incredible job with it?

And they not only translated the thing, they even
translated the songs, the anasheed, the songs in the
background which are telling people go to jihad, go fight
people, blow them up.

The subtitles, one guy says, I want to say to anyone who
is watching this video, anyone who is watching this CD:  It's
your obligation to participate in amilyat istishediya, the
martyrdom operations.  It's your obligation, your personal
obligation to follow in my footsteps.  I mean, that's -- it's
a pretty explicit message, I think.

Q.    Did you get -- you did some work on Ahbid Khan's case?

A.    That's correct, yes.

Q.    Did you get a copy of what was known at MB-12?

A.    Yes.

Q.    And you have reviewed that disk?

A.    Yes.

Q.    Is that where you have seen Tibyan Publications, the

1    backup?

2    A.   The backup -- yes, that's correct.  The backup of their

3    forum, that's correct.

4    Q.   I'm almost done.

5         You mentioned about Ismail Royer.  You interviewed

6    Ismail Royer.  Ismail Royer was, according to his own

7    statements, was the public relations person for LET; correct?

8    A.   He was assigned by an individual in Pakistan to serve as

9    their American liaison.  In other words, he went there to go

10   meet with them because he wanted to get training, and they

11   said to him, We don't really have anyone right now in the

12   U.S.  You would be a great guy.  Do you want to kind of act

13   as kind of our contact there?

14   Q.   Did you also get any information from Mr. Royer that he

15   felt LET was essentially working -- was condoned by the

16   Pakistan government, it was okay to be part of LET?

17   A.   I will double-check on that for you, I promise, but my

18   recollection is he didn't speak about that.

19        He was an American, so his understanding of what the

20   relationship between the Pakistani government and LET was is

21   probably -- that's probably not a good source of knowledge

22   for that sort of information.

23   Q.   Well, it would be fair to say that when he joined LET,

24   he didn't think there was anything wrong with it because

25   there was so public of an organization in Pakistan?

A.    Be very, very careful when you say that.  The way that

he learned about LET was from a Saudi Al-Qaeda

operative.  The way he learned about LET was from a Saudi

Al-Qaeda operative who gave him the phone number and address

of a camp in Pakistan, a Saudi Al-Qaeda operative.

Be very careful to say he didn't think there was

anything wrong with this.  He knew that there was something

wrong with this.  He just felt that according to his personal

philosophy, there was nothing wrong with it.  Legally

speaking, I think he was pretty clear there was something

wrong with this.

Q.    Well, based on your conversation with him, he told you

he didn't think there was anything wrong with it?

A.    He didn't -- he never said that.  He never said

that.  My take on it was that from a philosophical

perspective he didn't -- he thought this was justified.

From a legal perspective, he never gave me an indication

at any time that he thought this was legal,

permissible.  I think it was pretty clear from the fact that

he got the information from a Saudi Al-Qaeda operative, it

was probably not legitimate or legal.

Q.    LET also put out press releases; right?

A.    That's correct, yes.

Q.    And in fact, when he was the communications person

there, he put out the press releases.  There wasn't any

1    attempt to hide LET?

2    A.    Who?

3    Q.    Ismail Royer?

4    A.    Ismail Royer didn't put out press releases, not that I

5    know of.  Not that I know of.  They were put out by LET

6    people in Pakistan.

7          He collected them on his computer or he had some on his

8    computer, but as far as I understand it, he never mentioned

9    to me that he had any role in producing LET propaganda.

10         MR. WAHID:  One moment, Your Honor.

11         Nothing else, thank you.

12         MR. MARTIN:  Your Honor, I had just two questions

13   I wanted to ask, or two areas.

14                          -- -- --

15                    RECROSS-EXAMINATION

16   BY MR. MARTIN:

17   Q.    Do you know who Hafiz Mohammed Saeed is?

18   A.    Yes, he's one of the founders.  Lashkar-e-Tayyiba was

19   founded by a group of people, some of whom had fought in the

20   Afghan War of the 1980s, and some of whom were religious

21   clerics.

22         Hafiz was the cleric or one of the top clerics, and he

23   was basically taking over as head of the organization.

24   Q.    And even though that organization has been declared a

25   terrorist organization by the United States and the Pakistani

1   government and the UN, he still preaches openly in Pakistan,

2   does he not?

3   A.   Yes.

4   Q.   And do you know who Hussain Haqqani is, H-a-q-q-u-a-i?

5   A.   Q-q -- I'm sorry?

6   Q.   He's the present Pakistani ambassador to the

7   United States?

8   A.   I'm sorry, I'm not familiar with him.

9   Q.   Have you ever -- do you read books about LET or --

10  A.   Yeah, sure.

11  Q.   Are you familiar with the book *Between Mosque and*

12  *Military* that he wrote --

13  A.   No, I'm not familiar with that.

14  Q.   -- about the connection between LET and the Pakistani

15  government?

16  A.   I'm not familiar with that book.

17        Again, I think it's relatively clear that during the

18  1990s, there were contacts between the ISI and LET.

19  Q.   That continued into the 2000s?

20  A.   I would say that's probably true.  I just would caution

21  you that there has not ever been any definitive evidence of

22  that relationship.

23        It's just -- there have been ex-ISI people who have

24  talked about that in abstract terms, but as far as I know,

25  there are no sources of information beyond the recollections

1  of a few ISI people.  There is no documentary evidence.

2  I think that's the way to put it.

3  Q.   But you are not familiar with this particular book about

4  that subject?

5  A.   No, but again, if documentary evidence doesn't exist,

6  they can't have it either.

7  Q.   But -- and maybe I will just phrase it just a little bit

8  differently.  It is widely perceived in Pakistan, is it not,

9  that there is a connection between LET and the ISI?

10  A.   I think it's assumed.

11  Q.   Assumed, that's fair enough.

12       MR. MARTIN:  Thank you.

13       THE COURT:  Does it make sense now to take a lunch

14  break so that the government can put together their list?

15  And if so, how long will it take to do that?

16       MS. COLLINS:  Your Honor, I think we understand the

17  Court's concern, as well as defense counsel's concern, and we

18  are very sensitive to that.

19       And I think what we would like, what we would

20  propose to do is have a chance to speak with defense counsel

21  and figure out exactly what level of specificity they need,

22  what it is they are looking for that will enable them to

23  proceed and do what they need to do in terms of

24  Mr. Kohlmann.

25       And then we can speak with Ms. Birnbaum to relay to

her what kind of our joint proposal -- or a proposal for how to proceed.

THE COURT:  All right.  Well, I will say this.  I think that what was missing was a predicate discussion about the matters on which Mr. Kohlmann will offer opinions.

I think a lot of it has been covered today already, but I think it's to make sure -- and especially in the Sadequee case, I don't want to be in the position where there is some expression by Mr. Kohlmann of some opinion and we not have covered that or to have the lawyers for Mr. Sadequee say, Well, look, we had no idea he was going to say that, because that would be disruptive and it wouldn't be efficient in the trial.

So what I want is everybody should leave here today, including me, knowing those topics or categories of topics that will be covered in the trials so that there is awareness as to what the government is going to do and what the defense ought to be required to respond to.

MS. COLLINS:  Yes, Your Honor.

THE COURT:  That's my goal.

MS. COLLINS:  Thank you, Your Honor.  We understand.

THE COURT:  So your suggestion is for us to wait until we hear from you after you have had your

1    discussion.  Is that correct?

2            MS. COLLINS:  Yes, I think that would be hopefully

3    appropriate.

4            THE COURT:  And that will be no sooner than an

5    hour, I assume.

6            MS. COLLINS:  We would like to have the chance to

7    talk with them as fully as we need to.

8            THE COURT:  All I'm saying is I can do something

9    for an hour?

10           MS. COLLINS:  Yes, Your Honor.  At least,

11   Your Honor.

12           THE COURT:  And the people in the gallery can go

13   something for an hour because we will not be back any sooner

14   than one hour?

15           MS. COLLINS:  Yes, Your Honor.

16           THE COURT:  All right.  Then we will be in recess

17   for an hour or more.

18           MS. COLLINS:  Thank you.

19                (A recess is taken at 12:32 p.m.)

20                        --   --   --

21

22

23

24

25

Wednesday Afternoon Session

May 20, 2009

2:49 p.m.

-- -- --

(In open court:)

THE COURT:  I understand you have concluded your discussions.  How did they turn out?

MS. COLLINS:  Yes, Your Honor, we did.  Thank you for giving us the extra time that we requested to do that.

We have spoken with defense counsel, and we have produced a list that I would like to tender as Government's Exhibit 3.

If I can hand this to Ms. Birnbaum?

THE COURT:  You may.

MS. COLLINS:  And we have discussed this list with the defense, and we have reached agreement on most -- on three parts of it, and we would like to put in additional testimony about one of the sections.  And I don't believe it will be that lengthy, but we would like to put that in at this time.

THE COURT:  So the categories on which you are in agreement are what?

MS. COLLINS:  Categories I, Category II, and IV.

THE COURT:  And what does it mean that you are in agreement?

1        MS. COLLINS:  There is -- they don't believe that

2   at this hearing they require any further testimony or

3   cross-examination on those topics.  That's our understanding.

4        THE COURT:  Is that correct, Mr. Martin?

5        MR. MARTIN:  Yes.  I mean, for example, on number

6   one, there is LET, we have already gone into in some detail.

7   There are some other organizations, he would give similar

8   type testimony regarding those organizations if it becomes

9   relevant.

10       I mean, we are not obviously conceding, they

11  haven't shown why Al-Qaeda, for example, is relevant.  If

12  that becomes something that's relevant, it's not as big of a

13  problem in my trial without a jury, but that's what we are

14  agreeing to.

15       And the websites, it's similar.  We understand

16  there are a couple more websites, and we understand the

17  nature of his testimony is going to be I looked at these

18  websites and this is what I see on them, basically.

19       And number four, the way that's described to us is

20  that in some of the communications, there will be a reference

21  to a person's name or a phrase, that he would say that's

22  somebody who is a sheikh somewhere or is a member of some

23  sort of group, and we understand that.

24       Number three becomes the real problem for us.

25       THE COURT:  Well, does that mean that with respect

at least Categories I, II and IV, that you are agreeing that

he can be qualified as an expert on those categories?

MR. MARTIN:  Yeah, for what it's worth, yes.

THE COURT:  All right.  And for Mr. Sadequee, is

Mr. Sadequee agreeing that Mr. Kohlmann with respect to

Categories I, II and IV is qualified as an expert on those

categories?

MR. WAHID:  With the understanding, Judge, the

proffer the government has made, which is that he will really

just be defining terms, not really going beyond that.  And we

have expressed our concerns to them about where we felt it

would be going too far.  So we would obviously reserve the

objection at that time.

Otherwise we are okay with it.

THE COURT:  All right.  So the remaining question

is whether Mr. Kohlmann has a sufficient background to

testify with respect to Category III.  Is that where we end

up today?

MS. COLLINS:  I believe so, Your Honor.

THE COURT:  Mr. Martin?

MR. MARTIN:  And it also goes to we have seen those

two reports, and in those two reports, a lot of it tends to

be just fact stuff, not really opinion testimony.  I went to

a trial, I heard somebody say something, that becomes a

hearsay problem.

1          So we don't know exactly what -- and I have

2    discussed that with counsel, I don't think they intend to go

3    that far.  But we want to make sure that what he's giving is

4    truly opinion testimony and not as a fact witness.

5          MR. WAHID:  In addition, Your Honor, basically if

6    it is fact, we need to know when is he speaking as a fact

7    witness so that we can make the hearsay objection, and when

8    is he speaking as an expert.

9          And then if he is speaking as an expert on those

10   areas, what is the expertise as to those areas.  I don't

11   think we have heard that yet.

12         THE COURT:  So because I am also trying to manage

13   my workload, does that mean that you are withdrawing any

14   objection to his testimony, and that you are agreeing that he

15   is qualified to testify with the reservations that if

16   something is not relevant or something might come up at trial

17   that you can object?  But you accept him as an expert in the

18   Categories I, II and IV?

19         MR. MARTIN:  That's correct.

20         MR. WAHID:  Yes.

21         THE COURT:  All right.  Then let's move to the

22   matters concerning Category III.  How do we want to start

23   with that?

24         MS. COLLINS:  Your Honor, we can start with some

25   preliminary questions, if that's all right?

1    THE COURT:  All right.

2                   -- -- --

3              REDIRECT EXAMINATION

4    BY MS. COLLINS:

5    Q.   Mr. Kohlmann, are you familiar with someone who uses the

6    name Irhaby007, and that's spelled I-r-h-a-b-y --

7    A.   Yes.

8              THE COURT:  Hold on.  Here's a promise I made to my

9    court reporter over lunch.  That I would make you slow down

10   and give some pause between a question and an answer.

11             MS. COLLINS:  Yes, sir.

12             THE COURT:  If I break that promise, I will be in

13   jeopardy.

14             MS. COLLINS:  No problem, Your Honor.  Let me say

15   that again slowly.

16   BY MS. COLLINS:

17   Q.   Are you familiar with the user Irhaby007?

18             THE WITNESS:  Your Honor, I apologize as well.

19   A.   Yes, I am.  In English that's translated as

20   Terrorist007.

21   Q.   How are you familiar with that?

22   A.   Irhaby007 was a user and an administrator on several

23   discussion forums.  In fact, the primary discussion forums

24   which I was studying, researching and collecting information

25   from.

Mr. Tsouli began as a member on these forums, essentially contributing, discussing. However, increasingly he began to push himself into a role of assisting in the distribution of propaganda produced by Jihadi organizations, videos, audios, communiques.

In the beginning it was simply Mr. Tsouli taking these materials and copying them for other people. However, at a certain point it became clear that Mr. Tsouli's relationship had progressed beyond merely being a follower and being someone who was directly interacting with Al-Qaeda in Iraq.

In October 2005 -- excuse me, October -- yes -- no, October 2004, excuse me, on Mr. Tsouli's message forum, the designated representative of Al-Qaeda in Iraq posted a new video of an attack, an IUD, and improvised explosive attack in Iraq.

Within seconds, almost simultaneously a second message appeared attached to that message written by Irhaby007 with extra download links for this video.

Now, physically it would not have been possible for someone to have replied to that message in the amount of time -- it wouldn't have been possible for someone to read it and reply to it. Clearly these two messages were posted as a group together. So in other words, they were part of the same series of messages.

A few lines down the representative of Al-Qaeda in Iraq

wrote a response, another response saying, God bless you

Irhaby007, you are near and dear to our hearts, and you are

providing us with a critical service.

And that caused people to -- people on the forum to go

crazy, because they all knew Irhaby007 as being someone who

is just like them, just a member on the forum, and now this

guy was somebody being congratulated by Al-Qaeda in Iraq and

apparently had a direct relationship with them in the sense

that he was publishing their original materials on their

behalf.

Several months later while pursuing Mr. Tsouli online,

I was looking at a website that he had created, and I found a

hidden directory that was not supposed to be public.  And

inside of that directory was a makeshift website under

construction for Al-Qaeda in Iraq.

That website contained copies of publications that had

already been distributed by Al-Qaeda in Iraq over the Ansar

forum, this forum that I have been discussing, and it also

contained other materials which had never before been

released by Al-Qaeda in Iraq.

So clearly whoever was in charge of this or owned this

folder had access to material from Al-Qaeda in Iraq which had

not been publicly distributed.

Subsequent to that I was given access by British police

to communiques, e-mails, messages that they recovered from

the Ansar forum, messages that were being sent between

representatives of Al-Qaeda in Iraq and Mr. Tsouli and

others.

Mr. Tsouli from those conversations was operating as

matchmaker for Al-Qaeda in Iraq.  In addition to providing

logistical services in terms of setting up a website or

helping to distribute their propaganda, what also was

occurring was that users on the Ansar forum who recognized

Mr. Tsouli -- or, excuse me, Irhaby007 and knew about his

relationship with Al-Qaeda -- it was an obvious

relationship -- would write to him and say, Look, I'm here,

I don't have any way to Iraq, I want to join the fighters,

I want to join the Mujahideen, help me get there.

And Mr. -- excuse me, Irhaby007 would essentially act as

the matchmaker, would broker arrangements for these

individuals so they could travel to Damascus, Syria, at which

point Irhaby would give their telephone number to an Al-Qaeda

recruiter there and they would then get picked up and brought

into Iraq.

At a certain point messages began to be posted on the

Ansar forum, the same forum, announcing the fact that large

groups of members of the Ansar forum were headed into Iraq

and were meeting up with each other in guesthouses.  And that

when they discovered that they were all members of

Irhaby007's discussion forum, they all became very teary eyed

1   and happy and gleeful, because that was something very

2   serious.  Everybody knew Irhaby007.

3   Q.   There was a lot of information in that answer.  I have

4   to break it down a little bit.

5   A.   I'm sorry, no problem.

6   Q.   One of the things you said is Irhaby007 was the

7   administrator of certain forums?

8   A.   Yes.

9   Q.   What forums was he an administrator of?

10  A.   Well, he was a co-administrator on several forums, but

11  the most significant one that he was a co-administrator on

12  was Muntada al-Ansar.  Muntada in Arabic means forum,

13  al-Ansar means the partisans or supporters.  And this website

14  explicitly was a forum for supporters of Jihad.

15       And so Mr. Tsouli again was a very active discussant and

16  active poster on this forum.

17  Q.   How do you know that he was an administrator?

18  A.   Well, because he was able to edit other people's

19  messages.  In several cases, videos or communiques would be

20  posted by Jihadi groups, and then there would be a notation,

21  an automatic notation that the forum software automatically

22  puts in there saying this message was edited by Irhaby007.

23       Now, ordinary users can't edit other people's

24  messages.  The only person that can edit other people's

25  messages is someone what is known as a super user or an

administrator account.

Q.   How -- were you monitoring the Muntada al-Ansar at this time?

A.   I monitored Muntada al-Ansar from February of 2004 until it finally went offline for good in October of 2005.

Q.   Now, the second thing I want to touch on is you throughout your statement, you have equated Irhaby007 with Mr. Tsouli.  How do you know that?

A.   I apologize for that.  The reason that I know that is Mr. Tsouli -- excuse me, Irhaby007 was using one particular forum and left a message there but was not obfuscating his internet protocol address; in other words, the location where he was accessing the internet from.

     This address became known to British police, at which point British police traced this IP or internet protocol address back to a small flat in London, at which point they launched a raid on the flat.

     When they got to the flat, they found Mr. Tsouli at his computer constructing a website called Youbombit!  And they discovered on Mr. Tsouli's computer all of the information regarding Irhaby007.

     I should add as well, following Mr. Tsouli's arrest, Irhaby007, the name, the moniker disappeared, and everyone has pretty much acknowledged online that Mr. Tsouli is Irhaby007.

1    Q.   Now, when you are talking about the first part of your

2    explanation of who Irhaby007 was and what he was doing, you

3    said that he was -- that there were messages that -- there

4    was a message by the designated representative of Al-Qaeda in

5    Iraq, and it was immediately followed and grouped with

6    another posting by Irhaby007?

7    A.   That's right.

8    Q.   How do you know that the poster was the designated

9    representative of Al-Qaeda in Iraq?

10   A.   In the late spring of 2004, internet websites were

11   getting a very big reputation as being the go-to places to go

12   for Jihadi information.  However during that time period,

13   there were several communiques that popped up which were

14   attributed to be Abu Musab al-Zarqawi in Iraq and went under

15   various names like the Talhid Islamic movement, similar to

16   what Zarqawi's organization was, but not the same.  And they

17   were posted on internet discussion forums, and they were not

18   legitimate messages.

19        And so what Al-Qaeda did, Al-Qaeda got upset, Al-Qaeda

20   in Iraq became upset by this, these fake communiques.  So

21   they issued a statement and they said, Look, they said, it

22   should be obvious to everyone by now, but if it's not obvious

23   we will be very explicit about it.  The only person who is

24   the authorized distributor for our material is the head of

25   our media wing, Abu Maysarah al-Iraqi.  If it doesn't come

1    from Abu Maysarah al-Iraqi, it's not from us, it's not

2    legitimate.

3        So this was another big clue that what was going on on

4    the Ansar forum was the real deal.

5        I should add, Abu Maysarah, Abu Maysarah al-Iraqi was

6    only on the Ansar forum.  There was no Abu Maysarah on any

7    other forum.  And these statements were given great

8    credibility, not just by myself, but by everyone else

9    involved in studying this, following this, and frankly in the

10   people that liked that stuff.

11   Q.   And those postings were clearly designated being from

12   this individual Abu Maysarah al-Iraqi?

13   A.   Yeah.  Up until November of 2004, every single video,

14   every single communique from Al-Qaeda in Iraq was

15   specifically personally posted by Abu Maysarah al-Iraqi.

16   Q.   And the forum that these were posted on were what, the

17   one you mentioned before?

18   A.   Right, the Muntada al-Ansar forum.

19   Q.   Now, after you discussed the two postings that were

20   grouped together, one by Abu Maysarah al-Iraqi, the other one

21   by Irhaby007, you said that there was another Al-Qaeda in

22   Iraq person who posted something about that.

23       I'm not sure that I understood what you meant by that.

24   Could you explain that again?

25   A.   I'm sorry.

1   Q.   Or did I get that wrong?

2   A.   I think you may have gotten that wrong.

3   Q.   Okay.  Well --

4   A.   Sure, I think I was explaining that essentially what

5   happened was that you had an initial message posted by

6   Maysarah with a link to a video.  Then attached to that,

7   because it was literally issued within seconds, it was

8   simultaneous basically, from Irhaby007 with an extra series

9   of download links.

10          And then people started writing messages back saying,

11  Oh, thank God, you know, Allahu Akbar, God is the greatest.

12  And then a few messages down in the same thread of messages,

13  Abu Maysarah posted another message.

14          And it's important to understand that Abu Maysarah is

15  only posting communiques and videos for Al-Quaeda in Iraq.

16  He's not a discussant, he's not someone who is going on and

17  discussing, chatting with people.  He's posting the messages,

18  posting communiques, and that's it.

19          And then all of the sudden he writes his first ever

20  noncommunique, nonvideo message, which essentially says,

21  Irhaby007, you are the greatest, may God protect you, you are

22  playing an essential role for us.

23          And for someone whose job it was to disseminate

24  communiques and videos, to write a personal message directed

25  at Irhaby007 publicly, that was huge.  No one ever was given

1   that honor, before or afterwards, never.

2   Q.   So just so I'm clear, the Abu Maysarah, who posted this

3   personal message publicly about Irhaby007, is the same

4   Abu Maysarah al-Iraqi who was posting the communiques, it was

5   the same user name?

6   A.   Exactly, exactly.  The exact same user name.

7   Q.   Going on to the second part of your testimony where you

8   talked about finding a hidden directory, what site did you

9   find that on?   How did you locate that?

10  A.   Essentially what was going on was that in order to

11  release video recordings, Al-Qaeda in Iraq video recordings,

12  again what they would do is they would post the message on

13  the Ansar forum, Abu Maysarah would come on and post a

14  message saying here is a new video, here is what is in it,

15  signed Al-Qaeda in Iraq.

16       But all of the sudden I noticed that the links to

17  download the video, instead of being hosted on websites like

18  *Yousend it.com,* which are like free file-transfer sites, so

19  if a file is too big to attach it to an e-mail, you put it on

20  this temporary site and just include a link, people click on

21  the link and they download it, all of the sudden the links

22  were all going to the same domain but what was a private

23  posting domain.  In other words, like a private web posting

24  account that someone had set up.

25       This wasn't a free hosting service.  This was a

commercial hosting account, and it was the same account every
time where the videos were being hosted.

So I looked into the folder, and I discovered that in
that folder, there was an archive of dozens and dozens of AQI
video recordings. So then I started poking around elsewhere
in that folder where all these video recordings which are
being advertised by Abu Maysarah and distributed on the Ansar
forum are being hosted, and this is what is known as the
AQCORPO account.

This web hosting account was registered under the name
AQCORPO, short for AQ Corporation, or Al-Qaeda
Corporation. The idea behind this website was it was going
to be the home page for Al-Qaeda on the internet -- Al-Qaeda
in Iraq on the internet.

So they included magazines, links to videos, propaganda
posters, you name it. But this was all stored in that same
folder which was being advertised, files which were being
directly advertised by Abu Maysarah al-Iraqi.

Q.   On Muntada al-Ansar?

A.   Right, exactly.

Q.   How do you know that that folder that you are talking
about that was registered as AQCORPO, how do you know that
that was linked to Tsouli or or Abu Maysarah?

A.   It's my understanding -- I can double-check this, but I
believe there were also files which were being uploaded by

1    Mr. Tsouli into the same folder and being linked to download

2    for other people.

3       So in other words, it was a commercial hosting account

4    under the name AQCORPO which was serving for commingling of

5    files which had clearly been edited by Mr. Tsouli, and also

6    files which were original video and audio recordings from

7    Al-Qaeda in Iraq.

8    Q.   Now, you mentioned when you were talking about this

9    earlier about some of the materials that you found in that

10    folder.  How do you know that certain materials were not --

11    had not been released yet?

12    A.   Well, because I have collected every single thing that

13    Abu Maysarah al-Iraqi has released ever since they started

14    releasing stuff on the forum.

15       From doing this, I have a complete archive of virtually

16    every single video recording, audio recording and communique

17    that has ever been released by Al-Qaeda in Iraq, Abu Musab

18    al-Zarqawi, or any of his affiliates, period.  I have a

19    complete archive of all of that stuff.

20       And in some cases in the very beginning they were

21    actually numbered, so it was kind of easy to tell, number one

22    is number one, number two is number two, if you are missing

23    number three, you are missing number three.

24    Q.   Does this link back up to your testimony earlier about

25    representations that only this individual, this Abu Maysarah

al-Iraqi, would be promulgating items from Al-Qaeda in Iraq?

A.   Yeah, I mean, that's true, because up until late, very late in 2004 when they started expanding their distribution operation, there was no such thing as an official release from Al-Qaeda in Iraq that was not released by Abu Maysarah al-Iraqi.

Anything that came out supposedly from Zarqawi, a statement or whatnot, that didn't come from him, it was quickly shot down in the forums, not just by Tsouli or Irhaby007, but by other users who said, Hey, that's not Abu Maysarah al-Iraqi, that's not legitimate, delete that message.

Q.   And at this time --

MS. COLLINS:  May I approach the witness?

THE COURT:  You may.

MS. COLLINS:  Your Honor, I have just placed before the witness Government's Exhibit 4.

BY MS. COLLINS:

Q.   Do you recognize that?

A.   Yes.

Q.   And what is it?

A.   This is a copy of an expert report which was solicited by the SO-15 Counterterrorism Command in Scotland Yard which I wrote regarding the AQCORPO website which I have just been discussing.

1          MS. COLLINS:  Your Honor, at this time we would

2   admit for purposes of this hearing Government's Exhibit 4.

3          THE COURT:  Any objection?

4          MR. MARTIN:  No.

5          MR. WAHID:  No.

6          THE COURT:  All right.  It's admitted.

7   BY MS. COLLINS:

8   Q.   In that report that's Government's Exhibit 4, do you

9   discuss some of the things that we have just been talking

10  about in terms of the creation of your location of this

11  directory, the creation of the AQCORPO account, and the files

12  and folders that were -- and the materials that were located

13  there?

14  A.   Yeah, I was just going to say the one thing that's in

15  here that I forgot to mention is the other reason that we

16  knew that the AQCORPO account was controlled or created by

17  Irhaby007 is when Al-Qaeda in Iraq videos began to be posted

18  from that directory, there was actually written in English on

19  the message:  With the compliments of Terrorist007,

20  Moheb al-Shaykayn and Abu Maysarah al-Iraqi.

21  Q.   And that was -- just so I'm clear, that was written on

22  what?

23  A.   On the message where the link was to a video hosted in

24  this -- again, so you can go on the forum, new message, the

25  message is posted by Abu Maysarah al-Iraqi or eventually

other Jihad correspondents took over responsibility for posting, and in this there is an explanation of what the video is and the link to download it, and the link is hosted in the AQCORPO website.

And at the bottom of the message it actually says in English:  With the compliments of Irhaby007, Moheb al-Shaykayn, who is the other administrator of the Ansar forum, and Abu Maysarah al-Iraqi, who is again representative of Al-Qaeda in Iraq.

So again, this is again showing the relationship between Tsouli -- or between Irhaby007 anyway and Abu Maysarah.  It's a direct relationship.

Q.   Now, the third part of the information that you were to provide in your testimony had to deal with e-mails that you reviewed on the Ansar, Al-Ansar forum --

A.   That's correct.

Q.   -- where that involved some matchmaking I think was the term that you used?

A.   Yes.

Q.   Now, just so I'm clear, those were in a specific part of the Ansar forum, or were they -- does the Ansar forum have more than one forum attached to it or forum rooms?

A.   The Ansar forum was one of the very first forums, so in the beginning there was no Jihad data section, there was no official communique section.  At that time everything was

being posted in the general forum.

The way that you knew something was legitimate or not was based upon who was posting it. So if it was a user, a super user, an administrator, like Irhaby007 or Moheb al-Shaykayn, that was a good indication it was legitimate, because it's an administrator. Or if it's being posted by an official correspondent on there from a Jihadi organization.

Other than Abu Maysarah al-Iraqi, there was another user who was associated with Ansar Islam in northern Iraq. There was another user associated with some other group. There were particular users who were essentially the correspondents.

What ended up happening was organically over time, someone said, Why would we keep having these guys who are real representatives of Jihadi organizations, why would they post this stuff in the general forum? We should just create a separate room which only they can post in, and that way we don't have to worry about, you know, this whole business of authenticating, proving it's us, and writing "With the compliments of." You just put it there and that way everyone knows this is legit.

But this is before that happened.

MS. COLLINS: Your Honor, may I have just one minute?

1            THE COURT:  All right.

2    BY MS. COLLINS:

3    Q.    A question for you, and I think this actually may have

4    been in some of your reports.  Have you had personal

5    interaction with Irhaby007?

6    A.    Yes.

7    Q.    Can you describe that?

8    A.    Yes.  In August of 2005, shortly before the Ansar forum

9    last went offline, a new version of the forum was created on

10   a new domain, *Ansary.info*.  It's the same forum, just a new

11   domain name because they had been shut down, their old domain

12   had been shut down.

13         And in order to welcome users back to the forum,

14   Irhaby007 posted a video recording of an interview with

15   *The Washington Post* that I had done along with several others

16   talking about cyberterrorism.  So there was video, and he had

17   posted the video of me talking about this stuff.  And it was

18   a screen report, so you could see the mouse moving around in

19   the video, and he was doing some odd things around my face,

20   it made me a little uncomfortable.

21         So I created a new account on the Ansar forum under my

22   real name, and I went on and I sent a private message to

23   Irhaby007 saying, Look, you obviously know who I am, and

24   I obviously know who you are, and, you know, if you have

25   something you want to say to me or if you have something you

1   need to get off your chest, you know, there is no need to go

2   walk around in big circles, you can say it directly to me.

3       And he proceeded then to write me back a personal

4   e-mail, you know, Dear Evan -- literally, "Dear Evan."  I

5   don't do interviews, but if you have any questions, if you

6   want to know anything, just come on the Ansar forum, I would

7   be glad to talk with you.

8   Q.   I have just put in front of you Government's Exhibit

9   6.  Do you recognize that?

10  A.   Yes, I do.

11  Q.   What is it?

12  A.   This is an article that -- or a piece I wrote for

13  *Foreign Affairs* September-October 2006 titled "The Real

14  Online Terrorist Threat" which describes the evolution of

15  terrorist propaganda on the internet and specifically talks

16  about my interactions with Younis Tsouli and Mr. Tsouli's

17  various role in producing and distributing content on behalf

18  of Al-Qaeda in Iraq.

19          MS. COLLINS:  At this time the government would

20  admit Government's Exhibit 6 for purposes of this hearing.

21          THE COURT:  Any objection?

22          MR. MARTIN:  Not for the purposes of this hearing.

23          MR. WAHID:  No objection.

24          THE COURT:  It's admitted.

25  BY MS. COLLINS:

1   Q.   Now, I would like to talk a little bit about another

2   category of testimony that you may be asked -- that the

3   government would seek to admit, and that is about an

4   individual that you have talked about previously in your

5   testimony with both the government and with defense counsel,

6   Ahbid Hussain Khan.

7        You talked a little bit already about how you are

8   familiar with him.  Are you familiar -- do you have any

9   familiarity with his connection to any Pakistan terrorist

10  groups?

11  A.   Yes.

12  Q.   How do you have that familiarity?

13  A.   I have reviewed private conversations and letters

14  sent -- and discussions sent between Mr. Khan and individuals

15  in the United Kingdom and also alleged representatives of

16  both Jaish-e-Mohammed and Lashkar-e-Tayyiba.

17       The context of these conversations indicated that

18  Mr. Khan had personally visited the Lashkar recruitment

19  office in Attock, the town of Attock in Pakistan, had

20  directly e-mailed with both individus from Lashkar and Jaish,

21  and was apparently seeking to make arrangements with them to

22  receive training on behalf of himself and a group of other

23  people.

24  Q.   And just because I'm not sure that this specific

25  organization came up earlier, you mentioned Jaish-e-Mohammed?

1    A.    That's correct.

2    Q.    What is that?  Could you just explain briefly to us what

3    that is?

4    A.    Jaish-e-Mohammed means the Army of Mohammed.  It is a

5    designated foreign terrorist organization, it was designated

6    I believe in 2001.  It's an organization that is in

7    Pakistan.  It has very, very strong links to the

8    Taliban.  They used to produce a joint newspaper together.

9         It was founded by a guy named Maulana, M-a-u-l-a-n-a,

10   Masood, M-a-s-o-o-d, Azhar, A-z-h-a-r, after Mr. Azhar was

11   freed from an Indian prison as the result of a hijacking of

12   an Indian airliner in December of 1999.

13   Q.    And what is it that Jaish-e-Mohammed does?

14   A.    Jaish-e-Mohammed is, like Lashkar, interested in the

15   cause in Kashmir; however, like Lashkar, their cause is much

16   larger than that, and also encompasses trying to establish an

17   Islamic state inside of Pakistan, and also to provide

18   assistance to other Jihadi organizations from around the

19   world, the Balkans, Afghanistan, you name it.

20        They are -- they are a Pakistani group, but they have

21   transnational aspirations.

22   Q.    Do they have training camps anywhere?

23   A.    Yes.  They have a very notorious training camp which is

24   in a town known as Balakot, which is in northeastern

25   Pakistan.  The training camp is very, very well known.

Western journalists have even tried going there.  It's very difficult to get anywhere near it because of the fact that Jaish doesn't want anything near it.

You can see there is something there, and there are satellite photos that have been taken of it.  But they will not let anyone who is not Jaish anywhere near the camp.

Q.   Have you reviewed or seen anything that would connect Khan with that Balakot area?

A.   Yes.

Q.   What was that?

A.   On Mr. Khan's computer, there was detailed maps and geographic information about Balakot specifically, along with another document which was titled, *An English* -- excuse me, *An English Guide to the Paktoh Language for Irhabees*, i.e., a guide to local language, Paktoh for would-be terrorists.  And essentially what this was was basic translations of local terminology that you would use in a training camp in this region, words like sword, knife, gun, bomb, explode, things like that.

As well as the fact Mr. Khan was recorded himself in video traveling through Balakot, Monsera, and up right next to where this camp is located up in the mountains.

In that video he actually even filmed footage of a Lashkar-e-Tayyiba propaganda poster.

Q.   This is a video that you reviewed?

1    A.    Yes.

2    Q.    Where did you -- where was it located?  Where did you

3    review it?

4    A.    The video itself was seized from the possession of

5    Mr. Khan by West Yorkshire police.  I was given a copy and

6    I reviewed it subsequently.

7          I should add one thing, I was also present for the court

8    testimony of Mr. Khan in the United Kingdom during his

9    trial.  During his testimony, Mr. Khan described at great

10   length about his trip to Balakot, his travels near Balakot,

11   and his -- specifically he went with his own attorney, went

12   scene-by-scene through this video explaining where they were

13   and what they were doing and where this was located.

14         So there is no question he was definitely in Balakot.

15   Q.    I have put in front of you Government's Exhibit 5.  What

16   is that?

17   A.    This is a copy of a report that I produced on behalf of

18   the NEFA Foundation.  Its title is Anatomy of a Modern

19   Home-Grown Terrorist Cell, Ahbid Khan, et al.

20         This essentially was meant to be an expanded version of

21   my initial expert report that I drew up on behalf of West

22   Yorkshire police with the assistance also of the testimony --

23   when I sat in court, I created a transcript of everything

24   Mr. Khan said.

25         So I had the benefit of then adding Mr. Khan's own

testimony, plus other pieces of evidence that had surfaced

afterwards.  So an expanded expert report.

Q.   Now, you mentioned just now that you --

     MS. COLLINS:  Oh, for purposes of this hearing,

Your Honor, we would tender Government's Exhibit 5.

     THE COURT:  Any objection?

     MR. MARTIN:  No objection.

     MR. WAHID:  No objection.

     THE COURT:  It's admitted.

BY MS. COLLINS:

Q.   You just said that when you were in court, you created a

transcript and you listened to what he said.  When you were

doing your -- during the course of your work, your research,

do you -- is that a source of information that you relied on,

the statements of whether they are a defendant or a

cooperating witness --

A.   Of course.

Q.   -- in court?  Is that something that you rely on?

A.   Yes.  It is certainly true that I rely upon sworn

testimonies of individuals in court in the United Kingdom and

the United States.

     I also rely upon evidence, pieces of evidence that are

submitted as evidence in cases in the United Kingdom and the

United States.

Q.   Is that a source of information that other experts in

1   your field rely upon?

2   A.   Yes.

3   Q.   Are there any experts who would not rely on that type of

4   information?

5   A.   I can't think of anybody.  It would be very silly not to

6   rely on it.

7        I mean, if you have an original document which is

8   submitted as an exhibit in a court case, it would be rather

9   silly not to use that.  It's an original document.  You can

10  always say it came from a court case.

11       But this is not like quoting an argument.  I mean, this

12  is a fact, this is -- whether you have got a video recording

13  from a store in Pakistan or you get it as a piece of evidence

14  in a court case, it's still a video recording and it still

15  has value.

16  Q.   Now, when you are assessing the value of those -- that

17  type of testimony or statements from defendants or

18  cooperating witnesses, do you put it through any type of

19  analysis or evaluation of its reliability?

20  A.   Yeah, again comparative analysis.  I compare what's

21  being said in the testimony, I compare evidence, exhibits

22  that are submited in court, along with what I have gained in

23  my own research, and I try to see does this match up, do

24  these names match up.

25       To give you an example, one of the documents I rely on

1   is the testimony of an individual involved with the '98 East

2   Africa embassy bombings who was interrogated by FBI agents

3   shortly after he was arrested.  He said some very interesting

4   things.

5       But it's an FBI 302 document.  It's not something I

6   would want to rely on on its own.

7       However, I also have a video recording which was

8   produced by Islamists in Somalia which tells basically

9   verbatim the exact same story that this individual did in

10  this 302.  So it's the same names which don't pop up anywhere

11  else, the same exact retelling of events.

12      That's pretty strong corroboration when you have the

13  same story being told both by actual Jihadis in the field

14  right now and individuals who are being questioned by law

15  enforcement upon their arrest.

16  Q.   And I guess when you -- when you do that, after you have

17  done that, that is the same type of analysis you would apply

18  to any other type of information you have and then including

19  it in the report, you have done -- if you have included it in

20  the report, you have done that type of analysis on it?

21  A.   Yeah.  I just don't copy and paste things.  Every piece

22  of information I put into here I have to carefully analyze,

23  especially when I wasn't the one who initially dug up the

24  evidence.  I have to make sure it's legitimate, it's

25  authentic and it's reliable.

1     But luckily for us, by again doing basic comparative

2  analysis, comparing that to primary and secondary sources

3  that I have gathered independently, comparing it to the

4  reports and tertiary documents, newspapers and whatnot, it's

5  pretty quickly -- you can pretty quickly tell what is real

6  and what is not.

7     But again if you have a video recording of someone

8  saying something, regardless of whether it's submitted as

9  evidence in a case or whether I get it from a bookstore in

10  Pakistan, ultimately it's a video recording of someone saying

11  something, and that has the same level of value ultimately in

12  terms of deciding facts.

13     MS. COLLINS:  Your Honor, may I have just

14  minute.  I think I am almost done, but I want to make sure.

15  BY MS. COLLINS:

16  Q.   I think I just have one more question for you.  It may

17  morph into a couple, but let's see.

18     Based on evaluating all the types of evidence that you

19  evaluated as well as the other research that you have done,

20  have you developed any opinion as to whether Mr. Khan served

21  as a recruiter for Lashkar-e-Tayyiba or Jaish-e-Mohammed?

22  A.   Yes.

23  Q.   What is that opinion?

24  A.   Yes, he did.

25     I mean, if you want me to go into detail, there is

specific detailed conversations that Mr. Khan engaged in
where he specifically laid out the plan for which he was
going to speak and negotiate with Jaish-e-Mohammed and
Lashkar.  He preferred Jaish, others preferred Lashkar.

The reason that they preferred particular groups was
because there was a perception among different people that
particular groups would be able to give them better levels of
training and would be able to more effectively push them into
Pakistan or another real hot zone where they could join real
players.

But that was the sentiment.  The sentiment was which of
these groups is going to give us the highest level of
training and is able to most easily push us into a real front
line that is not in Pakistan and is not in Kashmir, i.e.,
Afghanistan or Chechnya.

MS. COLLINS:  I think that's all, Your Honor.

THE COURT:  Okay.  Mr. Martin?

-- -- --

RECROSS-EXAMINATION

BY MR. MARTIN:

Q.   Mr. Kohlmann, starting with the Irhaby007 materials and
the al-Ansar website, as I understand your testimony, your
conclusions that Mr. Tsouli has some relationship with
Al-Qaeda in Iraq is based upon the circumstances of things
you have viewed on these websites; is that correct?

A.   It was based upon a comprehensive study of every message

distributed by Al-Qaeda in Iraq, yeah.

Q.   You saw, for example, the fact that on one of the

entries on the website, Mr. Abu Maysarah -- is that how you

pronounce it? -- congratulated Mr. Tsouli or Irhaby007 for

his assistance in posting something, for example.

A.   Right.

Q.   Now, you also said that Mr. Tsouli you understood from

other circumstances was at least a co-administrator of this

website; is that correct?

A.   Well, I mean, I know it, but he had to be, because he

was editing other people's messages.  Any time you edit a

message, anyone can see.  It says edited by, you know,

Irhaby007.

Q.   Indeed you described him in your report as a super

administrator.  Is that correct?

A.   Super user or super administrator, that's right, yeah.

Q.   Which doesn't forbid or foreclose the possibility that

some of these postings that you saw and were attributing to

Al-Qaeda in Iraq could have been actually edited or posted by

him?

A.   Well, he wasn't an administrator in the beginning.  He

became an administrator later on.  In the beginning he was

just a member.

      When Abu Maysarah's messages were initially posted on

the Muntada al-Ansar forum, Irhaby007 wasn't an administrator

yet.

Q.   How do you know that?

A.   Because he wasn't an administrator yet.  I know the

administrators at that point.  There was a list.

    I mean, I could show you.  You can also look at the

guy's account and you can see that he was not listed as an

administrator back then.  The reason he became an

administrator was because of the fact that over time, he

demonstrated the fact, willingness to help run the forum in

terms of helping repost links and helping redistribute

stuff.

    So eventually they said, Well, why would you do this

informally?  Why don't you just become an member, an

administrator for the forum?

    But back when Abu Maysarah first began posting things,

it's my understanding that Irhaby was not an administrator.

Q.   So that's your factual conclusion?

A.   That is my understanding, yeah.

Q.   Your understanding.  And we do know -- you do know for

certain that he was a super user, administrator at least by

April of 2005; correct?

A.   Earlier than that.  I would say by October of 2004 he

was almost certainly an administrator.  I can probably give

you an exact date where he definitely was.

Q.   But you are uncertain exactly when he may have become a super administrator before?

A.   It was after May of 2004.  The reason why I say that is because in May of 2004, the Ansar forum experienced some very serious technical difficulties.

In May of 2004 Abu Maysarah used the Ansar forum to distribute the Nick Berg beheading video, and that got a tremendous amount of negative publicity for the forum and they got basically shut down.

It's my understanding that one of the reasons that Irhaby became an administrator was because he helped resurrect the forum after it got knocked offline in May of 2004.

Q.   That's your understanding?

A.   Yeah.

Q.   With regards to Mr. Khan, you are saying that based upon testimony that you have heard, people you have talked to, investigations made by police departments and so forth, you have done a comparative analysis sufficient for you to conclude as a terrorist expert that Mr. Khan was a recruiter for JEM, Jaish --

A.   Well, they actually -- it's important to understand that my conclusions were not based upon reading police assessments.  They were based upon -- I was given forensically-preserved copies of the hard drives.  I was told

very, very little about the case, and I was asked to please

go through this and -- simply go through the whole hard drive

and see what I thought was interesting.

They didn't point me to specific files, to specific

directories.  They just said, Here, take a look.  And so

I went through the whole hard drive file-by-file, and

everything that's in my report was dug out by me.  It was --

none of this was from police assessments.

So I think the way to put it is that it's true, there

was a comparative analysis, but the comparative analysis was

of the raw evidence, the raw hard drive.

Q.   I understand.   You looked at private conversations

I think was the word you used, testimony, correct, is one of

things you relied upon, a video that was seized you relied

upon.

A.   Uh-huh.

Q.   Court testimony.  And based upon that, you have done a

comparative analysis, your word, to conclude that he was a

recruiter for those two organizations, LET and JEM; correct?

A.   Yeah, the communications that I reviewed appeared to be

very similar to previous communications I have seen in other

cases involving Lashkar-e-Tayyiba.

Q.   I want to make sure I have the right number.

Government's Exhibit 5, that's your report about Mr. Khan;

correct?

1   A.   That's correct, yeah.

2   Q.   And you talked about your report only including those

3   sources of information that you found reliable and so forth;

4   correct?

5   A.   Yeah.

6   Q.   And one of the sources of information, page 20 of your

7   report, is, one, a press release from the United States

8   Attorney's Office for the Northern District of Georgia and

9   the indictment in this case.  Is that not correct?

10  A.   Yeah, because I wanted to be able to lay out the fact

11  that on March 23, 2006, a federal grand jury in Atlanta,

12  Georgia, issued a sealed indictment.

13       I didn't -- I wasn't using those -- I wasn't judging the

14  truth of the accusations of the charges.  I was simply using

15  those to say an indictment was filed on that date.

16  Q.   Well, you did include that as part of the information in

17  your report, did you not, sir?

18  A.   I --

19  Q.   And let me finish the question.  And said in there,

20  according to the superseding indictment filed on July 2006,

21  you summarize various facts in the indictment.  Is that not

22  correct?

23  A.   That's correct.  But I nowhere -- I just -- again,

24  I stated it for the fact of the indictment.  I'm not saying

25  that the facts in the indictment are true, I'm not saying the

charges in the indictment are true.

It happened that because of the fact that two of the individuals mentioned in the indictment were specifically in discussions that I reviewed on this hard drive, I had no choice but to mention the fact that, you know, these individuals were later indicted and here is what they were indicted for.

I made no -- as far as I understand it, other than quoting their exact conversations, I made no judgments whatsoever as to their ultimate guilt or innocence.

Q.   The earliest date that you believe that Mr. Tsouli became a super administrator of the website al-Ansar would be what?

A.   I believe -- again this is an estimate, but I would say May 12th, 2004.  May 11th was the day that the Nick Berg video was released, so it would be sometime after May 12th.

If you would like, I can try to nail that date specifically down.  It was never really an issue, but I may be able to nail it down more specifically.

Q.   And how would you that?

A.   By -- I have a database of lots of messages that were saved from the Ansar forum, and I can go back through and I can see whether or not there is any indication in any of those that Mr. Tsouli was an administrator earlier than that.

1     But I am fairly certain he was not.

2 Q.  But you would only know that if Mr. Tsouli specifically

3 indicated on the edit that he had made the edit.  Is that not

4 correct?

5 A.  No, that's not correct.  If he did anything on the forum

6 which only an administrator could do, it would say -- there

7 would be an indication of such.  And it's part of the

8 software, it's part of the forum software, you can't remove

9 those indications.

10     Again, my understanding is -- and I'm fairly certain

11 about this -- is that he was not an administrator prior to

12 May of 2004, but I can try to get down a specific date for

13 you.

14 Q.  Let me ask you to do one other thing for me.  We talked

15 afterwards, your testimony earlier today, about Jihad Unspun?

16 A.  Yes.

17 Q.  And in particular about an announcement that the

18 administrator or the host of that, Ms. Qahar, I think she

19 goes by Beverly.  Beverly -- what's her last name, do you

20 know?

21 A.  Beverly Geisbrecht.

22 Q.  Geisbrecht, had made an announcement in 2004 that she

23 was going to travel to Pakistan for the purpose of some

24 project, a documentary or something.  You had some

25 independent recollection of that?

A.    Well, she definitely made -- over time has made several
postings like that.  In fact, she, like I said, is over in
Pakistan right now.

I am not sure whether I have that posting, but I will
see if I can find any detail on it in my records, yeah.

Q.    Do you have a recollection from your reviewing these
websites that she said she was going to go on a trip, and
then she later canceled it?

A.    I have a general recollection that she made some kind of
an announcement about a trip to Pakistan, but beyond that I'm
not really sure.  I know that again, this was something --
this is an idea that she had mentioned over time, and she may
have made more than one trip.

Q.    And would you check on that and let us know about it?

A.    Certainly, my pleasure.

Q.    And that may have been something you preserved, it may
not have, is that what you are saying, that announcement in
your archives?

A.    Yeah.  I mean, Jihad Unspun is not -- because of the
fact that it's run by a Canadian lady who, you know, is a
Canadian lady, it's not really a primary source of
information for me, so I don't really -- I don't visit it on
a daily basis.

But if I do have a copy of it, I would be happy to
determine that, no problem.

1        MR. MARTIN:  Thank you.

2        THE COURT:  Mr. Wahid?

3        MR. WAHID:  Thank you.

4                    --  --  --

5                 CROSS-EXAMINATION

6    BY MR. WAHID:

7    Q.    The report you have on the AQCORPO website --

8    A.    Yes, sir.

9    Q.    -- that's from August of '06 --

10   A.    It was --

11   Q.    -- dated at the top?

12   A.    That's a good question.  Yeah, I'm not sure exactly what

13   that date is referring to.  It was written on behalf of

14   British police sometime in 2006, but I'm not sure it was

15   exactly in August.

16   Q.    Well, the date says August '06 on it.  Was that the date

17   of release, the date --

18   A.    Again, I have to check exactly where this came

19   from.  It's the version that I gave to British

20   police.  That's almost certainly the date that I turned it

21   into them.

22   Q.    Okay.  Do you recall when you drafted it?

23   A.    August of 2006, yeah.

24   Q.    Okay.  So you drafted this in August of 2006 --

25   A.    Yeah.

Q.    -- or a version similar to this?

      And at that time you didn't know that Irhaby007 was

Younis Tsouli?

A.    Actually I did.

Q.    You did?

A.    Mr. Tsouli was arrested in October of 2005.  I knew

within days of his arrest that Mr. Tsouli was Irhaby007.

Q.    And do you use his name in this report?

A.    Mr. Tsouli?

Q.    Yes.

A.    No, because of the fact that I like to be very specific,

very precise.  And in this case, as much as I know Mr. Tsouli

from the court case and from everything else in the

newspapers or whatever that that's his identity, at no point

in time -- I should emphasize, at no point in time on the

Ansar forum did Irhaby ever come on and say, I'm Younis

Tsouli, no.

      But on the same card, you should also know that most

people on these forums have acknowledged that Tsouli is

Irhaby007, and stories have been posted about Tsouli and

whatnot.

      But to be very clear, again, before he was arrested, no

idea who Irhaby007 was.  I suspected he was in the UK, but

that was it.

Q.    So it would be fair to say that your information that

1  Irhaby007 is Younis Tsouli comes from the arrest and the
2  subsequent events?
3  A.   That would be fair, yes, again, although following that
4  Irhaby007, the user name, disappeared, and there was postings
5  on the forum saying, Our brother has been arrested, this is
6  the story about his arrest, et cetera.
7       But, you know, I mean, for the most part, again, it was
8  before October of 2005, I had no indication what Mr. Tsouli's
9  real identity -- or Irhaby007's real identity was.  Excuse
10 me.
11 Q.   And up until he got arrested, were you familiar with any
12 of the other user names or e-mails that Irhaby would have
13 been connected to?
14 A.   User names and e-mails?  Yes, e-mails.
15 Q.   Up until the point he gets arrested, not after, based
16 upon what you knew while he was still at large?
17 A.   Yes, because Mr. Tsouli -- Mr. Tsouli -- you could reach
18 Mr. Tsouli by sending him a private message over the forum.
19 If you followed what he was doing, you could probably find a
20 way to get in contact with him.
21 Q.   Did you get in contact with him through the forum?
22 A.   Through the forum.
23 Q.   Not through a separate way?
24 A.   No, no, I sent him a private message over the forum and
25 I actually included my e-mail address, because I said, Just

in case you delete my account immediately after reading this,

you can send me an e-mail directly back to my main e-mail

address.

So he sent me an e-mail from like a blank message, but

it was -- you know, it was from him.

Q.    Okay.  So other than the Irhaby007, you didn't have any

communications that gave you -- that he had some other e-mail

address he was using other than the blank one you just

mentioned?

A.    I'm assuming he used many e-mail addresses.  I mean,

most people do.

I know some of them.  I don't think I could have known

all of them, though, because I'm sure he was using ones that

I wasn't familiar with, I hope for his sake.

Q.    At the time when he was still at large, my question is

did you communicate with him other than through the Irhaby --

A.    Through the Ansar forum.

Q.    Yeah, other than through the Ansar forum?

A.    No, no, no.  It was electronically.

Q.    And let's talk about Ahbid Khan.  Your information about

Ahbid Khan for the most part seems to be from the

trial.  Would that be correct?

A.    That's right.

Q.    And the evidence that you are talking about was evidence

that was presented in that trial?

A.   That's right.

Q.   You also were working as a consultant at that time for the Crown; correct?

A.   Yes, that's correct.  Yes.

Q.   So you had access to that evidence in that capacity?

A.   Yeah.  They anticipated calling me as an expert witness in the trial, but what ended up happening was that Mr. Khan's lawyers stipulated to what was in my report.  So my testimony -- I was there in case something should come up, but my testimony wasn't needed.

Q.   But would it be fair to say you were the only consultant they were using in this context in Mr. Khan's case to go through the data, to do that analysis?

A.   I couldn't really answer that question.  I don't really know.

Q.   Has anyone else, any of your colleagues ever published anything saying that they were doing the same thing, that they had access to MB-12?

A.   Not that I can think of, but I really don't know.  I don't know.  That's not something that's always information that gets shared with me.

Q.   As somebody who was hired essentially by the Crown to go through this information, you had special access to it that wasn't publicly available?

A.   That's correct, that's true.

1    Q.   So that would be different than the way you were

2    doing -- how you looked at everything else that we have been

3    talking about, which is public access, what you call open

4    source?  This is not open source, this is really you are

5    going to a piece of evidence that is not public?

6    A.   Well, it was an open source when I first looked at

7    it.  It was open source when I published this report

8    because --

9    Q.   We are talking about Mr. Khan; right?

10   A.   Yeah.  I'm now referring to what is marked as

11   Government's Exhibit 5, Anatomy of a Modern Home-Grown Terror

12   Cell, this was written in September 2008.  Mr. Khan was

13   convicted in August of 2008.

14        This was written independently of the trial, after it

15   was already over, and the reason I was able to publish this

16   was because the evidence then was public.

17   Q.   Right.  At that point it was public?

18   A.   Right.

19   Q.   But the time when you first interacted with the

20   information and you observed the trial, during that time it

21   wasn't public?

22   A.   Well, the trial was public.

23   Q.   Obviously once it was introduced, it became public in

24   the trial?

25   A.   Yeah.

1    Q.    But --

2    A.    The underlying evidence prior to July of 2008, I would

3    say that's true, it was not public evidence, yeah, for the

4    most part.

5              MR. WAHID:  Thank you.

6              THE COURT:  All right.  Any redirect by the

7    government?

8              MS. COLLINS:  I think I may have one question.

9                          -- -- --

10                    REDIRECT EXAMINATION

11   BY MS. COLLINS:

12   Q.    Just so we are clear, when you were speaking with

13   Mr. Martin, you referred several times to your understanding

14   of something?

15   A.    Right.

16   Q.    Is your understanding, by that -- what do you mean by

17   that?

18   A.    I mean this is the conclusions that I have reached after

19   studying hundreds and hundreds of messages posted on forums,

20   these forums in particular, reading discussions among other

21   people talking about these things on the forums.

22        In other words, this the collective wisdom not just of

23   me and other experts that are doing this, but also people

24   that are using the forum.  That's one of the easiest ways of

25   finding out things about the forums is reading what other

1    people are writing about.

2        The conclusions that I reach, when I say my

3    understanding, it should be clear, it's not just my

4    understanding, it's also the understanding of other users on

5    the forum.  This is what people have -- this is the basis of

6    my research.

7    Q.   But to the extent that you are talking about your

8    understanding of something, that's you are saying based on

9    your analysis, based on your research --

10   A.   Based on my research.  To be very clear, it's not

11   hearsay.  It's my personal -- I have personally observed

12   this, this is what I have concluded from what I have

13   personally observed on the forum.

14   Q.   So basically your understanding is your expert opinion?

15   A.   Right, exactly.

16             MS. COLLINS:  That's all, Your Honor.

17             THE COURT:  Any follow-up, Mr. Martin?

18             MR. MARTIN:  No further questions.

19             THE COURT:  Mr. Wahid, any further cross from you?

20             MR. WAHID:  No, Your Honor.  Thank you.

21             THE COURT:  I think I want to hear from the parties

22   on Category III.  I don't want to release Mr. Kohlmann until

23   we have that discussion in case there is something else

24   I need.

25             So why don't we ask you -- we appreciate you being

with us.  Would you, though, mind just stepping out into the

vestibule while we have this discussion?

THE WITNESS:  Of course, my pleasure.

THE COURT:  I'm still not sure what the government

is trying to elicit from the witness on Category III.

I have looked at your description here, and now

I've compared it to the testimony.  What I gathered from the

testimony is different than what is here.

What I gathered from the testimony is that -- and

this will be a thumbnail sketch, but that Mr. Kohlmann has

reviewed these forum postings, and included in these forum

postings was what he testified as to be a simultaneous

posting of a video and then some additional information which

would indicate that things were happening simultaneously,

that those things that were happening simultaneously connect

Mr. Tsouli up with Al-Qaeda in Iraq, the fellow's name which

I can't pronounce.

That then there was this hidden Al-Qaeda in Iraq

web page, and that that indicated a connection between the

two.  And then there was other activity, forum activity that

he observed that would indicate to him by its context that

Mr. Tsouli was matching people that were interested in

joining Al-Qaeda in Iraq with somebody in Damascus, Syria,

for the purpose of referring them to whoever was in charge of

activities in Iraq on behalf of Al-Qaeda.

And that that's being offered to show Mr. Tsouli's
connection with recruitment I guess more pointedly as
supported by his other activities and his involvement in
connection with Al-Qaeda in Iraq.  I think I understand that
evidence.

With Khan, it looks to me like based upon his
hearing Mr. Khan's testimony in the trial in Britain that he
has concluded that he also was a recruiter.  It's not quite
as clear to me exactly who he was recruiting for except maybe
this Jaish-e-Mohammed organization in Pakistan.  But that
testimony just didn't come out as clearly as the testimony he
had with respect to Mr. Tsouli.

So that's my general understanding.  I guess what
I want to know is if he is asked about Mr. Tsouli, what
opinion is he expressly going to provide in the trial?
I mean, I think I know what he knows; I just don't know what
he's going to say.

MS. COLLINS:  I understand, Your Honor.

Could I have just one second?

I think to answer Your Honor's question, we need --
I would like to take a step back and talk about the elements
that we have to prove, because I think this will explain what
his -- what he will say and I will link it up.

In the context of a 2339 (a) charge --

THE COURT:  I think I understand the charge.

```
 1              MS. COLLINS:  Yes, Your Honor.

 2              THE COURT:  What I'm trying to get is -- maybe I'm

 3       just too set in my ways, but I generally work from what's the

 4       opinion and what's the basis for the opinion.  It is still

 5       unclear to me what the opinion is.

 6              At some point you have to say, What is your opinion

 7       with respect to Mr. Tsouli, and normally the expert witness

 8       says, My opinion is three statements, X, Y and Z.

 9              I just haven't gotten that.

10              MS. COLLINS:  Yes, Your Honor.

11              I think the opinion that he would say is that

12       Mr. Tsouli and Mr. Khan --

13              THE COURT:  Start with --

14              MS. COLLINS:  I'm sorry, Mr. Khan for purposes of

15       this, I apologize, Your Honor.

16              Mr. Khan was involved in a conspiracy to provide --

17       was part of --

18              THE COURT:  Mr. Tsouli?  We are starting with

19       Mr. Tsouli.

20              MS. COLLINS:  Oh, you would like me to start with

21       Mr. Tsouli?  Sure.

22              That Mr. Tsouli was involved through his

23       connections with Al-Qaeda in Iraq and the work that he was

24       doing for them, that he was involved in their conspiracy to

25       murder abroad, and that is the predicate conspiracy of the
```

2339 (a) charge, one of them.  We have two.

And that is the purpose --

THE COURT:  And one of the pieces of evidence on that is the IED that was the subject of the postings in the forum?

MS. COLLINS:  Some of the evidence are things that he posted on the forum, some of the evidence are things that he had on his computer that indicate that he was supporting the conspiracy -- that conspiracy to murder abroad.

But in terms of the testimony that he talked about today in terms of what he was doing for that organization, that shows that he was part of that conspiracy.

THE COURT:  I'm not sure he ever went that far and did that sort of analysis.  But I guess you are proffering to me that at trial that he would say, By the way, I have looked at these other communications, and I found that people were working together and -- that they were working together, and I have further information from my review of what's available, that in working together, they were in fact engaged in acts of violence that caused death to people?

MS. COLLINS:  I think he would do that by explaining the purpose, which we may not -- which we would be happy to ask him about here, of why -- and he actually did get into this a little bit -- talking about why is Al-Qaeda in Iraq so involved in disseminating this media, why is that

so important to them, what function does that play in how

they achieve their goals, how they carry out their

activities.

And it's that aspect, that part of the conspiracy

that Mr. Tsouli was directly involved in.  But it still is an

integral part of their violent activities which are the

murder and maming, but it's part of that whole -- it's part

of that conspiracy.  And that's what -- that's ultimately the

fact that his opinion relates to.

THE COURT:  I don't think he went into anything

about why it was important for Al-Quaeda in Iraq to get this

information out.  He talked about them getting it out, but he

never stated based upon his review what the import of that

was and what the end game of it was other than the fact

that -- I try to be an informed citizen and read a lot about

what's going on in the world, I know basically what Al-Qaeda

in Iraq does or is alleged to do in the press reports, so I

have that background.

I don't recall him ever saying that in his study of

all of this, that he knows the scope of its activities in

Iraq, which of course if that got into the trial would have

to be admitted through somebody who was competent to offer

that evidence to a trier of fact.

MS. COLLINS:  Sure.  Then we would request

permission to recall him and I would be happy to ask him

1    those questions to flesh out his knowledge of that.

2          Then going on to Mr. Khan, if that leaves

3    Mr. Tsouli -- or should I talk further about that?

4          THE COURT:  No, I think I understand Mr. Tsouli and

5    what the gaps are.

6          MS. COLLINS:  Then going on to Mr. Khan, it's

7    basically the same idea, that through the items that he

8    talked about that he reviewed from -- that he located on his

9    hard drives, the letters between him and the organizations,

10   offering to provide training for people who he brought over,

11   other items that were on his hard drive including the video

12   of Mr. Khan in the -- around the Jaish-e-Mohammed camp area,

13   and basically all the information he talked about with

14   respect to Mr. Khan, saying that his activity as a recruiter

15   for these organizations joined him as part of the conspiracy,

16   that organization's conspiracy to murder abroad.

17         THE COURT:  And I guess I'm supposed to get that

18   from the short statement he made that Jaish-e-Mohammed was a

19   terrorist organization?

20         MS. COLLINS:  And he's also -- and Mr. Khan is also

21   part of the conspiracy to support -- with LET in terms of his

22   bringing not only the defendants, but other people over to

23   LET as well.  So all of those things --

24         THE COURT:  There is nothing about Mr. Khan and LET

25   that I recall.  There is lots about Mr. Khan and

Jaish-e-Mohammed, unless I just missed that in his

presentation.

I mean, the one point when he finally expressed

what his opinion was, it did have to do with recruitment,

although I took it in the context of not recruiting for LET,

but recruiting for Jaish-e-Mohammed.  But like I say, maybe

I missed that.

MS. COLLINS:  That's something we would be happy to

clarify with him, Your Honor.

THE COURT:  Let me ask -- and then there are these

reports.  It seems that the reports are basically writings of

his testimony in a way, the reports contain a lot of

information upon which he relied -- I mean, he obviously

didn't read the report and reach an opinion.  He relied upon

the underlying information that happens to be summarized and

presented in the reports.

So, you know, the rule is you can rely -- an expert

can rely upon those things that experts in their line of work

would rely upon, but that if it's inadmissible -- it has to

be independently admissible before it can be admitted at a

trial.  The expert can't simply admit inadmissible evidence,

although they can base their opinion on it.

So I'm still confused about, because I have got all

these reports, how those are going to be used, because

I think that's one of the problems that the defendants have,

the uncertainty of the use of those.

MS. COLLINS:  Yes, Your Honor.  I was not admitting that for the purpose -- I don't anticipate we would ever admit those at trial.  Those were for the purpose of this hearing to help establish his qualifications to talk about these, just to show these are reports that he's written, they are published, they have been published through all the venues that we talked about earlier in the day, and, you know, for feedback, for peer review, that was the purpose of admitting those.  It was not for the purpose of an actual trial exhibit.

THE COURT:  I guess somebody I thought before lunch made the comment that they were concerned about the use of the reports.  But that clarifies that for me.

All right.  Those are my open questions, but before we bring Mr. Kohlmann back in, I would like a synopsis from Mr. Martin and from Mr. Wahid as far as their views based upon what he has testified about so far, and projecting out that he's probably going to answer the questions that I have.

What are your concerns about --

MR. MARTIN:  Let me, if I may, start with Mr. Khan first.

It seems to me that Rule 702 is not meant to be a device merely to call somebody an expert and then be a

mechanism to present otherwise inadmissible hearsay
testimony.

It seems to me that all his opinions about Mr. Khan
are based upon what he heard Mr. Khan say in a trial in the
United Kingdom, which obviously is hearsay, what reports and
other matters that he learned from Scotland Yard or the other
investigators in England, and what he may or may not have
seen in various different e-mails that the government will
put into evidence in this case.

THE COURT:  Well, he did say that he has reviewed
communications, which I understand to be either forum
communications or e-mail exchanges, that those communications
show his connection to this Jaish-e-Mohammed group that was
founded by Maulana Masood Azhar, if I wrote that down right;
that the organization was interested in the cause in Kashmir
and in creating an Islamic state in Kashmir; that they had a
training camp for people that were joining Jaish-e-Mohammed,
that that training camp existed in Pakistan, that it was
impossible to get near it, that it's near Balakot.

That information on his computer showed that he was
connected to the area of the camp, and that there was on his
computer a video showing the camp.

And so you take all of that and you couple it with
his sworn testimony in a proceeding, which I believe people
that -- sounds to me like people that are doing this

connecting-the-dots kind of work to determine who is doing

what in the area of terrorism around the world would in fact

rely upon the sworn testimony of somebody in a trial or about

their activities or their admissions about their activities

to corroborate the connection that he's already testified

about to him to this one organization, and now I understand

LET as well.

So I don't see it as you do, you know, he's coming

in -- maybe I misspoke to begin with.  He's not coming in and

saying, Yes, I listened to his testimony, let me tell you

what he said.  There was a lot of predicate work that he has,

plus independent review of writings and detail that was on

his computer, and that the final piece of that was his

testimony at trial.

MR. MARTIN:  Surely a DEA agent or FBI agent

wouldn't be able to come in here and testify, I attended a

trial in Colombia, I have reviewed all sorts of transmissions

and telephone conversations, whatever evidence he might have,

and I can conclude and tell you that Mr. Jones is a drug

distributor for some cartel in Colombia.

Just because we are calling him an expert on

terrorism -- and we certainly will give him some leeway

talking generally about these different groups that he

studied, and there is some sort of literature about that, and

that may be helpful to the jury that there are these such

organizations, the history of conflict between Pakistan and
India and so forth.

But for him to take that expertise and then say,
Now look at these particular facts in this case, and I'm
going to tell you based upon testimony in another trial out
of the country, police reports, communications I have
reviewed which aren't in evidence in this case, and
I conclude that he is an operative for this particular cartel
or, in this case, terrorist group. I mean, that's ultimately
what he's doing.

Just that we are calling him a terrorism expert
doesn't mean he has some sort of cache just to come in and
tell the jury or you as the fact finder what I conclude from
the evidence.

I don't see how this testimony is anything that you
as the fact finder or a jury as the fact finder would not be
able to make its own assumptions and conclusions from, that
he doesn't add anything as an expert, and therefore it
doesn't really help the jury, which is the initial
requirement under Rule 702.

So that's my biggest problem with Khan is it seems
to me he's just sort of a summary witnesses of the state's
evidence -- or the government's evidence as to Khan's role in
this alleged conspiracy based upon stuff that is not in
evidence ostensibly because he as a terrorism expert reviews

trial testimonies and stuff like that and coming to
conclusions.

Just like why wouldn't the police officer be able
to do the exact same thing, or FBI agent, or a trained FBI
agent in terrorism?  Why wouldn't he be able to come and take
the stand and say the same thing?  We surely wouldn't allow
that.

I don't see just because he's an independent
contractor that we would allow it.  That's my first concern
about him.

With regards to the Irhaby007, again, a lot of what
he's telling us, I don't understand how he can draw the
conclusion he says he draws necessarily from what he
testified to, of the facts he testified to, or whether that
conclusion is anything that you need an expert to talk about
or the fact finder could draw those conclusions if they
want.

But essentially what he's saying is that at some
point -- he's unclear about the date -- Mr. Tsouli became an
administrator on this website, that there were postings made
by Al-Qaeda in Iraq, and I guess that part of it where he
says this is why I know it's Al-Qaeda in Iraq, I don't see
those elsewhere, I guess that's of some use from his
expertise, that it looks like they were a forum, an outlet
for propaganda that was being put out by Al-Qaeda in Iraq.

1    How you then say therefore he is someone who is

2    supporting every criminal venture or terrorist venture or

3    violent venture that Al-Qaeda in Iraq is pursuing, especially

4    since this whole internet forum is just a place where lots of

5    stuff is being posted from all sorts of different sources --

6    THE COURT:  Yeah, but isn't that the point?  I

7    mean, if they have to show that these two men were engaged in

8    terrorist activities, and you say that it's not helpful,

9    well, I can tell you already that having somebody who has

10   gone through those hundreds and hundreds of communications to

11   draw out those that would tend -- that in fact relate to a

12   particular person, one, to identify who they are in reality,

13   who is the person behind the screen name, and to show and to

14   point out how those show the nature of his activities and his

15   relationship to Al-Qaeda in Iraq I think is very helpful to a

16   trier of fact.

17        Otherwise in your world, they would have to come in

18   and dump all of that information on the jury, that the jury

19   would have to go through each one of those, that they would

20   have to spend days and days going through this elaborate

21   database, and understanding and digesting the information to,

22   one, even identify those that relate to --

23   A.   I don't know if in this particular one instance we are

24   talking about, we are talking about numerous.  We are talking

25   about a posting that was made in October of 2004, that

simultaneous posting --

THE COURT:  Mr. Martin, I think I'm kind of computer savvy, but I would never be able to look at those and say through the detail that's on the posting electronically that there was virtually a simultaneous posting of those two that connect those up.  You have got to have somebody explain that.

MR. MARTIN:  That from a technical -- I will concede, from a very technical point of view -- and of course, he hasn't really been qualified as an computer expert.  From a technical point of view that --

THE COURT:  He's not a computer expert, but he is an expert with respect to the digesting of this information, which means embedded in that is that you have to be able to do that.

So I mean, you are trying to deconstruct the fellow and trying to say, well, he can't do that, he can't do this, he can't do that, so he can't do any of it.  What I'm trying to do is say how is this person as an expert different -- and I would disagree with you about what DEA agents can and cannot do about pulling together conversations, because --

MR. MARTIN:  If it's in evidence, sure.  But not conversations that aren't in evidence.

Of course they all the time dissect surveillance tapes and so forth, this is what they were talking about.

1    But it's all in evidence.

2           I have never seen a DEA agent talk about the

3    testimony in a trial in Colombia as to what some witness said

4    as an expert.

5           THE COURT:  Well, we can quarrel about that, but

6    that's not relevant here.

7           This is a discipline in my view that while not

8    mature is in fact a discipline, that is, the analysis of

9    information on the internet about terrorist organizations,

10   where there is some group of individuals, which I think this

11   person is part, that are taking a new area which has been

12   I think vetted by peers -- and by not only peers, but I think

13   by law enforcement authorities and the like, that when they

14   put this information out, it's subject to being criticized,

15   reviewed and analyzed and altered, that the value of somebody

16   like this to take very complicated processes -- look, I have

17   read some of these exchanges.  We are not talking about you

18   and I exchanging an e-mail about what time we are going to

19   meet for a court case.

20          We are talking about streams of information that

21   take literally hours and hours to finally understand the flow

22   of it, who is saying what, who is what, what's important,

23   what's not important.

24          And I think that there is value, and I think it

25   would be very helpful, especially to a jury, to have some

1    guidance on this.

2              MR. MARTIN:  I don't want to belabor that point.

3              I will say that with regard to those e-mails and so

4    forth, we are not objecting to him coming in and saying this

5    is what this person's name is, this is the type of lingo that

6    I see in these e-mails that mean -- for example, Curryland

7    might mean something, picnic might mean something.  We have a

8    lot of information about those types of -- it's almost like

9    drug jargon, and we are not objecting to that.

10             What really seems to trouble me is to use him as a

11   summary witness basically to nail down an important issue in

12   this case, which is whether Mr. Tsouli is a person who

13   supports murderous terrorism around the world, as opposed to

14   some guy that just has a website in U.K. and puts up there

15   whatever comes along.

16             And that's what he's trying to do, to say based on

17   this, I say he's a supporter on this.  That's something you

18   can conclude aside from what he can do.  Now, you may

19   conclude that, but I don't think he can do that as an

20   expert.

21             And similarly with regards to Khan, I don't think

22   we can say Khan is a recruiter for LET or JEM or whoever else

23   they are saying he is based solely upon evidence that's not

24   in this courtroom, evidence from a trial in U.K. and other

25   messages that he's reviewed over the years.  And that's such

1   an important ultimate issue in the case.

2           THE COURT:  I know, but it's the terrorist use of

3   these websites and these electronic communications which

4   I think is unique in current history with respect to any

5   subset of human activity that you need somebody who has

6   studied and analyzed that to understand what happens and to

7   interpret what happens within this very different new breed

8   of communications among people that -- which we now know

9   across the country and across the world admit that that's one

10  of their principal ways of communication.

11          So it seems to me that there is a sense of conduct

12  that occurs in these rooms that unless you have studied them

13  and have a lot of exposure to them, you don't really know the

14  nature of the communications or their import.

15          And I don't think a juror -- I don't think I could

16  fully understand that without somebody to be able to, in

17  their expert opinion, say I know how -- when this person

18  interacts this way with this other person, I can tell you

19  that that's the way terrorist organizations in these chat

20  rooms and forums communicate, encourage, direct and support

21  each other in terrorist activities.

22          MR. MARTIN:  But surely you and I, anybody in this

23  room would understand if somebody -- he says this

24  Abu Maysarah says, Thank you for your good work helping us,

25  I mean, that's no subtle or unusual or thing beyond our kin.

I mean, if that's what he's trying to do, he's trying to say I'm trying to give you fact evidence to support the notion that --

THE COURT: No, what his opinion on that is that that was extraordinarily unusual. That the importance there is not that he said that, it's that in all of the work he has done, he had never seen that before. And I think that is important.

That's what makes him different than you and I looking at that. Because what we don't know if we had just read that, we would say, well, yeah, he's obviously encouraging it. What you don't know is that somebody affiliated with Al-Qaeda in Iraq had never done that before, and here you have this extraordinary contemporary exchange in which apparently somebody was killed that somebody decided to surface and say that's what we want.

MR. MARTIN: For posting that video. In other words, thank you for posting that video is what I understood him to say.

THE COURT: But it wasn't just some ordinary Joe.

MR. MARTIN: Oh, no, it was --

THE COURT: It was someone who was unknown and had never surfaced in a chat room like that before, and you and I, nobody would have known that. But somebody who has just pored over this stuff --

1            MR. MARTIN:  That conclusion I don't have much

2    problem with.  That's a little like saying who somebody is.

3            But then as I understand you are going to allow

4    them to do is give an opinion:  Therefore, he must have been

5    someone -- that Tsouli is someone who supports all of the

6    activities of Al-Qaeda in Iraq, I think is beyond his kin as

7    an expert, it is beyond the basis of information that he has.

8            THE COURT:  That's not what I heard.  What I heard

9    was that he was going to say that he was in -- I guess was

10   working with and supporting the activities without saying,

11   and by the way, here are the specific activities that we know

12   they are supporting.

13           MR. MARTIN:  Well, I heard him.  Of course, we will

14   see.  That's one of the problems I have with the actual

15   e-mails in evidence or the postings, whatever they were, to

16   say thank you for posting these things or thank you for

17   supporting our efforts, that's a big difference.  If all he's

18   doing is just being a clearinghouse, that doesn't necessarily

19   transfer into him being someone who supports all the

20   activities.

21           You know, this is -- quite frankly, in a nonjury

22   setting, we can sort of sort all this out as we go through

23   it, and you can hear the opinion and receive it and maybe

24   give it less weight -- I would argue for you to give it less

25   weight.

1    THE COURT:  It would not be the first time after a

2  *Daubert* that I actually heard the testimony of an expert and

3  I said that's not exactly the way I thought it was going to

4  come out.

5    MR. MARTIN:  I mean, my general exception in both

6  of those areas is that he becomes really more of a fact

7  witness than an expert witness, and therefore he crosses the

8  line.

9    But I will let -- this is really more an issue with

10  a jury.  I will let Mr. Wahid speak on it.

11    MR. WAHID:  Judge, as to Ahbid Khan -- and I think

12  that Mr. Martin laid it out, but I think it's clear that his

13  full understanding of what Ahbid Khan may or may not have

14  done really comes not from his being an expert in the sense

15  that he has testified all morning, but specifically because

16  he was retained to really function as an agent of the British

17  government's prosecution in that particular case.  Not as an

18  independent, but to actually go through a particular set of

19  evidence that was going to be used against Mr. Khan at

20  trial.  I don't think --

21    THE COURT:  But that's actually information that he

22  probably would not otherwise have had access to.

23    MR. WAHID:  Right.

24    THE COURT:  The fact he had access to it because of

25  his capacity as someone helping the government I don't think

 1    disqualifies him from now employing and interpreting and

 2    using that information, even though he commonly uses -- I

 3    mean, your point in his cross-examination was, well, that

 4    wasn't your open source stuff.

 5         Well, I don't think you can say because it's not

 6    open source, somehow it comes out of the kind of -- the

 7    bailiwick of the information that you ordinarily use.  I

 8    would say the opposite is that it could be, that it was

 9    better information because it was seized by law enforcement

10    authorities.

11         So I'm not buying that argument.  But --

12         MR. WAHID:  The other issue to that is there

13    obviously becomes an issue of him being put up as an

14    independent expert and talking in that sense about that

15    particular set of facts.  He's really not.  He's there as a

16    prosecution witness in that case.  But --

17         THE COURT:  Well, except in fairness to him, before

18    he ever got to that bucket of information, he talked about

19    other information that he had from the sort of stuff that he

20    does all the time.

21         MR. WAHID:  But not about Mr. Khan.  And I know you

22    said that when Mr. Martin was talking, and I was looking

23    through my notes and I did not see that.  And we can maybe

24    bring the witness in to do that.

25         THE COURT:  We may need to do that.

1    MR. WAHID:  But I don't believe he had information

2  about Mr. Khan separately.  I think that all came about when

3  he was asked to look at this database, which was this hard

4  drive known as -- the British evidence item was known as

5  MB-12, that that database was a big deal because it was the

6  largest volume of material and that sort of thing, and that's

7  why they brought him in.

8       Bottom line is that really what he would be doing

9  is being a fact witness.  He went there, he physically saw

10  all the stuff, he had an opportunity to read everything

11  himself, he then sat through a trial, he typed up his notes,

12  sort of transcribed as he said the trial.  He's really going

13  to come back and just regurgitate that information here.

14       That is really proving an element through him being

15  a fact witness and not as an expert.  And I think that he has

16  to be viewed differently if he's going to be able to testify

17  to that information.  It has to be viewed as a fact

18  witness.  I think, you know, all the items of hearsay should

19  apply as a fact witness.

20       Really this is a mechanism to get around, I

21  believe, our ability to confront some of that evidence as

22  well.  There is a transcript.  We can just say, fine, we will

23  just bring in the transcript.  Mr. Khan testified for five

24  days.  If that's what they want to do, just enter the

25  transcript.  But we don't do that either.

        I don't know how we would confront, quite frankly,

that evidence and the items that he's going to say he

reviewed that we don't have access to, unless it's going to

be turned over to us in discovery at some point everything

that he reviewed in order to make that opinion.

        And I don't think it's really even an opinion that

he's making that it's a new opinion.  In other words, it's

not an opinion after the fact.  Obviously he said something

to the British authorities that led them to believe that this

is worth pursuing in a criminal case or this is going to help

us in our prosecution.

        THE COURT:  Well, I think that's all speculation

and conjecture.  I'm trying to deal with what are the facts

here.

        And I'm unclear about the sources of his

information, and the reason I -- I do agree with you, he did

say he literally -- I think he said he transcribed his

testimony and used that.

        MR. WAHID:  The reason --

        THE COURT:  What is the connection between --

I think I know, but let me confirm this.  What's the

connection between the defendants and Mr. Khan?

        MR. WAHID:  Right, and that's what I was getting

to.  Thank you, Judge.

        The reason I bring that point up about the

prosecution in Britain on this case is that they ended up

prosecuting Mr. Khan and a couple of co-defendants, and it

had nothing to do with Mr. Sadequee.

THE COURT:  Well, I don't care why they prosecuted

him.  I want to know what the connection is between him --

MR. WAHID:  The connection in this case is that --

the allegation is that there are chats between Mr. Khan,

Mr. Sadequee, Mr. Tsouli and others that are part of this

conspiracy that's at issue in this case, the conspiracy to

create this video and use it in a mechanism to scare

Americans, that effect.

THE COURT:  That's right, the video that the

defendants are alleged to have taken to D.C. ended up being

found on his computer.

MR. WAHID:  Right, on that MB-12.

And the real issue, though, is clearly that's

unlike his testimony as we have already talked about this

morning where he would be defining a term or something.  This

is really an element that the government has to prove that we

have the right to confront.  And I'm not quite sure based on

what I have heard so far how we would go about effectively

doing that.

And as to Mr. Tsouli -- and I assume the government

will have some other witness who will say that this e-mail or

this moniker is Mr. Tsouli's somehow, because he didn't know

that at the time he was doing his work.  He may know that
now, but he knows that now also because of subsequent
readings or having, you know, been at the trial and being
involved in that way.

THE COURT:  So you think if that moniker is being
used by somebody else before that, that for some reason if
you don't learn about it until some point in time, you can't
relate it back?

MR. WAHID:  No, I'm just saying at the time he
drafted his August 2006 report, you know, he did not know.

THE COURT:  No, he did know.  He said he didn't put
it in the report.

MR. WAHID:  That's correct, he knew it from other
sources, not from public sources.

THE COURT:  And he did not put it in the report
because --

MR. WAHID:  It was from a confidential source.

THE COURT:  Right.

MR. WAHID:  The real issue is going to come down to
as to Mr. Tsouli is -- and again, Mr. Tsouli was charged and
arrested and convicted completely on a separate issue than
Mr. Sadequee is here for.

The idea is that because a witness is going to get
on and say Mr. Tsouli was a terrorist, and because Mr. Tsouli
was talking to Mr. Sadequee, you can infer Mr. Sadequee is

also a terrorist, that's really the issue that's going to come about here. As an unindicted co-conspirator in the case, they are not going to --

THE COURT: No, I disagree with that. I mean, we are talking about probative evidence. Does that tend to be probative on an issue in the case? I think that, as you have just articulated, I think that connection is probative.

I mean, you can argue that it doesn't show that at all and they haven't proved what they were supposed to prove beyond a reasonable doubt. But the question here is can an expert like Mr. Kohlmann come in and provide -- and it's a much harder argument that you have with Mr. Tsouli because there is such specific data that would connect a specific act with an organization and specifically with Mr. Tsouli.

Now, if they can connect up the defendants with Mr. Tsouli, then you can argue whether that's connection is strong enough to prove what they want to prove. But the data, the information seems to be more compelling than what I admit is less compelling with respect to Mr. Khan.

MR. WAHID: I think it's also important to know what Mr. Tsouli actually was convicted of, because he eventually pled guilty. They started the trial and he pled guilty. He pled guilty to charges -- my understanding is that those charges are not what we would consider material support charges here. It's a different type of charge.

1          THE COURT:  Well, you can stipulate to that,

2    I guess, unless the government objected to it.

3          MR. WAHID:  Well, I think it's important as well to

4    know what he would say.  If he's going to say he's a

5    terrorist, is he talking about what he was convicted of, or

6    is he saying -- is it strictly confined to that interaction

7    that we heard about?

8          Is he also going to get into the fact that he was

9    convicted of this, this and this?

10         THE COURT:  Well, it seems on cross-examination, if

11   you wanted to clarify and make sure that his opinion is based

12   only on what he's actually reviewed and that information to

13   reach his opinion and you wanted to make it clear that

14   Mr. Tsouli was not convicted of a similar charge as exists in

15   this case -- I never know how it's actually going to come up,

16   but it seems at least in the realm of reasonable examination

17   on cross to say, you know, wait a second, to the extent that

18   he's been convicted, you need to know what it is, I'm sure he

19   knows or that somehow can get admitted.

20         MR. WAHID:  Well, again it goes to how much does he

21   know.  And to be able to say part of a story because I only

22   know part of a story would limit what I can really cross him

23   on and therefore what I can present as the full story to the

24   jury.

25         Both with Mr. Khan and Mr. Tsouli I do believe

there is an issue of confrontation here, because these are

not having an expert come in and just define what does Jihad

mean.  He's basically saying that the guys that the defendant

was speaking to are terrorists, and therefore you can infer

that they are terrorists.

THE COURT:  But the cases say that the

confrontation right, especially when you are speaking

about -- even if the opinion of an expert is based upon

inadmissible evidence, that the confrontation right is

satisfied by the right to cross-examine the expert, to show

what in fact he did and did not rely upon, and the

reliability of that.

MR. WAHID:  And I think the interaction that he

talked about on the May -- I don't know the date -- 12th,

2004, where he was talking about a very specific instance

where he's watching it online, that sort of thing, that falls

within the subject matter of what he is an expert on.

But I believe that watching the trial and just

bringing back information and knowing about what happened in

Tsouli's trial and going there and getting -- looking at the

data specifically that he may have had access to, that is not

something that he would have access to in the methodologies

described, I believe that makes him more of a fact witness,

and I think that changes --

THE COURT:  You know, you would be arguing -- if he

did not go to the trial, you would be arguing that it was not

responsible, it was not a responsible thing to do, not to go

and listen to his testimony, because it might have differed

from the information that he got through his regular

activities.

It seems to me, first, I recall him saying that he

does not rely upon government interpretations or indictments

or convictions to reach his conclusions; that his conclusions

are based upon data, information that he gleans from a

variety of sources.

And these two particular cases you had, after he's

reviewed -- let's stick with Mr. Tsouli for a second.  He's

reviewed all of this other information.  I don't recall him

actually sitting through Tsouli's trial, but I could be wrong

about that, listening to his testimony.  That seemed to be

more focused on Mr. Khan.

But that he reached certain conclusions about who

Mr. Tsouli was and what he was doing.  But -- and let's

assume he did sit through and listen to Mr. Tsouli's

testimony.

MR. WAHID:  I could be wrong.  I may be mistaken on

that.

THE COURT:  I don't know, I may be wrong too.  We

have an equal right to be wrong, and we can get that

clarified when he comes back.

But just for the sake of fleshing this out, that he in fact listened to Mr. Tsouli's testimony.  That's just more information, although the quality of which is pretty good since if he testified, it had to be under oath in a formal proceeding, and I would expect him -- and I would believe it was in fact a responsible thing to do, to listen to that, because in fact if he heard things that discredited conclusions that he had reached and opinions he had reached based upon his prior review, that he needed to change it.

But I don't ever hear him saying, I'm going to be a parrot here, all I'm going to do is come in here and repeat to you what he said at trial.  I think he's been very careful not to do that and to state that that would be irresponsible to do that.

MR. WAHID:  But what analysis is he doing when he's just going in either sitting through Khan's trial or going through -- I don't know, I would have to find out more about his basis on Tsouli other than what he's already said.

But the question is what's the analysis there?  It would be akin to I don't know of any situation where --

THE COURT:  It's the same analysis that any reconstruction expert in a products liability case does.  They go out and they say here is what I saw, then I talked to people and here is what they told me.  I don't know if it's true, but that's what they said they saw.  And

here was an observer at the side of the road in a parked car
and they saw something.  And I take all of that and do this
critical examination and analysis and reach an expert
opinion.

And you can come and challenge me all you want, to
say, Well, you don't know if it's true what Mrs. Smith saw
when she was driving behind the car, and you don't know if
Mr. Jones who was there at the side of the road had a
clear -- in fact, when you talked to him, it wasn't really
that clear, but you still relied upon that, to discredit the
opinion.

MR. WAHID:  I beg to differ, I think that's
different than the idea of sending -- I mean, why wouldn't
the government then simply just send an agent to every other
trial that's going on and have them watch them and come back,
and that guy can go around the country testifying to
everybody they decide to connect as a co-defendant.

THE COURT:  Because it's -- I don't see why you
have a problem with somebody's sworn testimony and an expert
saying let me add that to the universe of information
I already know.

MR. WAHID:  Are they going to introduce the other
sworn testimony?  Is that what we are going to see?

THE COURT:  If you want to, I bet they will.

MR. WAHID:  I don't know.

1          THE COURT:  Well, let's ask them.  Turn around and

2     ask them.

3          MR. WAHID:  How do I cross that sworn testimony?  I

4     don't know.  Isn't that why we have Rule 15 depositions?

5          It just seems to me that -- I'm just not familiar

6     with having seen that before, and it seems to me that

7     that would --

8          THE COURT:  Are there any cases that say you can't

9     do that, that an expert can't rely upon the sworn trial

10    testimony of somebody in reaching an opinion?

11         MR. WAHID:  It would seem to me he's not an expert

12    then at that point.  It's a fact witness.  And I think

13    that's --

14         THE COURT:  What I'm saying, are there any cases

15    that adopt your position?  My guess is there are not.  In

16    fact, my guess is -- and I haven't looked at it because this

17    is the first time this has been articulated -- is that there

18    are cases probably that discredit that position.

19         But I don't know.  I will give you a chance to

20    submit those cases.

21         MR. WAHID:  That's essentially the arguments that I

22    have as to Mr. Khan and Mr. Tsouli and his testimony.  And

23    maybe we can ask him little more about Mr. Tsouli.

24         THE COURT:  We have spent so much time on this

25    testimony, your fear is that he really -- with respect to

1    Mr. Tsouli, your fear is that by having listened to his trial

2    testimony, assuming he has, that he will be unduly influenced

3    by that or will unduly rely upon that in expressing his

4    opinions?  Is that the fear that you have?

5            MR. WAHID:  Assuming that his opinion is going to

6    be that Mr. Tsouli is a terrorist who is supporting -- or is

7    a supporter, I'm sorry, a supporter of Al-Qaeda in Iraq, and

8    he's going to say that based upon what he told us with this

9    e-mail, the simultaneous posting issue of the video and a

10   comment right after it, and another individual thanking him

11   for something at a later data, based upon that type of

12   testimony I don't have an objection.

13           Based upon him saying other things about what

14   Mr. Tsouli was involved with, getting into what he was

15   convicted of and all that type of testimony, and then saying

16   obviously to connect that to Mr. Sadequee that Mr. Sadequee

17   was talking to Mr. Tsouli, I think that is a problem, because

18   I believe it goes from an expert into fact.  Because the

19   basis of it -- I would have to see what the basis of it is,

20   but at the moment that would be my concern.

21           THE COURT:  Well, let's find out from the

22   government -- one of the problems here is -- I think we avoid

23   all this if we do it my way, but we haven't done it my way,

24   because we don't get the opinions and then we don't drill

25   down to see what the opinions are based on.

1          So I think at least I am uncertain where, because

2    we don't know -- we know now what the opinions are, but we

3    don't know whether Mr. -- can you move over just so I can see

4    her?

5          MR. WAHID:  I will sit down.

6          THE COURT:  The concern is about this trial

7    testimony.

8          First of all, did he listen to Tsouli's trial

9    testimony?

10          MS. COLLINS:  No, Your Honor.  Mr. Tsouli did not

11    testify at trial.  He pled guilty.

12          THE COURT:  Yeah, so that's what I -- I didn't

13    think he testified.

14          So does that resolve the issue with respect to

15    Mr. Tsouli, Mr. Wahid?

16          MR. WAHID:  Again, if I know how broad his opinion

17    is going to be, if it is limited to Mr. Tsouli in connection

18    to Al-Qaeda in Iraq, then it really has nothing to do with

19    what he was I think charged with in the end anyway.  I don't

20    think it has anything to do with that case that he is charged

21    with.  I think it will be based upon on what he talked about

22    here today.

23          Like I said, if it's limited to that type of

24    testimony of his interaction by what he does on the internet,

25    I don't have an objection to that part.

1       THE COURT:  Does the government intend to have

2  Mr. Kohlmann say -- well, now we know he hasn't testified,

3  and by the way, I'm right because he pled guilty and was

4  convicted of whatever offense he was convicted of.

5       MS. COLLINS:  No, Your Honor.  I don't anticipate

6  asking him what Mr. Tsouli was convicted of.

7       THE COURT:  Well, sometimes I'm not worried about

8  what you ask.  I'm more concerned about what he says.

9       MS. COLLINS:  Yes, Your Honor, we will tell him not

10  to talk about that, and that's not something we would want or

11  need to elicit.

12       THE COURT:  If they are instructed, which I will

13  instruct them now that they should not go into the fact that

14  he pled guilty to any offense or any conviction that he has,

15  does that address your concern with respect to Mr. Tsouli?

16       MR. WAHID:  Are we going to be telling the jury

17  that Mr. Tsouli has been convicted of anything?  What are we

18  going to tell them about Mr. Tsouli?  Who is going to say it

19  other than what Mr. Kohlmann just said?

20       MS. COLLINS:  We are not sure, but any testimony

21  about that would not come from Mr. Kohlmann.

22       THE COURT:  That seems to be a relevancy issue.  If

23  somebody else intends to do that, that's a separate I think

24  relevancy issue.

25       But now we are just talking about what Mr. Kohlmann

is going to say.  If Mr. Kohlmann is mute on that and doesn't

talk about being prosecuted, indicted, and convicted after

pleading guilty, which is what I'm telling the government

they should not do and which they are saying they weren't

going to do anyway, with respect to this witness, does that

resolve your concern?

MR. WAHID:  Yes, assuming it's not coming from --

the other information is not coming from this witness.

If it's limited to what he said, as I have stated

before, I don't have a concern with that section.

THE COURT:  All right.  Now, let's go to Khan.  I

am unclear about where his -- because we do know because we

have the transcriber here that he actually got -- I got the

impression that he relied a lot about what he said at trial,

but I don't know where that fits in and I don't know how he

used that in connection with the opinions that he reached.

So I think that is a valid area.  We ought to bring

him back in and try to be more disciplined in going through

to find out what the basis of his opinion is and more

specifically where the sworn testimony comes in.

MS. COLLINS:  Yes, Your Honor.

THE COURT:  Before we go to Mr. Khan -- I'm not

ignoring you, Mr. Martin.

MR. MARTIN:  That's okay.

THE COURT:  But if in fact I don't consider the

conviction -- and I will say, I don't even know what he was

indicted for, so I wasn't going to consider that anyway.

I think it's what he has done in connection with his

day-to-day activities that's important to me, not the fact

that somebody might have been convicted of something.

MR. MARTIN:  I mean, if he testifies that he saw

these e-mails, the whole thing he said he saw about e-mails,

the posting and what he saw, that it was unusual, but doesn't

draw any larger conclusions from all that, which I think is

beyond his expertise, that this is something I saw that was

unusual, I hadn't seen before, and it showed there was, if

these were actually posted like this, some connection between

Tsouli and them, I have no problem.

What worries me is when he says this, therefore,

shows he supported all their activities, which I don't think

he can fairly say with the evidence that he has.

THE COURT:  Well, it depends what's actually

in.  You know, if there are communications that he's reviewed

that he has connected up with Mr. Tsouli -- and I'm not

saying that this is the evidence, but just to look at the way

the evidence might come in, if he says, and by the way, I

have 14 instances where he endorsed specific acts where

people were killed in terrorist attacks, that would be

different.

MR. MARTIN:  That's not -- what I understood the

testimony to be is that the fellow from Al-Qaeda in Iraq was
thanking him for facilitating the posting of these --
whatever they were posting.  That's what I understood his
testimony to be.

THE COURT:  Well, I think his testimony goes beyond
that.  I think he was applauding him for --

MR. MARTIN:  Whatever.

THE COURT:  -- for violent --

MR. MARTIN:  But it wasn't Tsouli saying I agree
with everything you are doing.  It's him saying thank you for
doing this or we applaud you or this is helping us or
something like that.

THE COURT:  And whatever inference is drawn from
that is drawn.

MS. COLLINS:  Your Honor, I think that that's
something that we can also flesh out, I can flesh out with
some questions from Mr. Kohlmann.

THE COURT:  Let's have Mr. Kohlmann come back in.

We are in the process of cramming these four hours
of testimony into seven hours now.  I guess when I told you
we were going to be done by early afternoon -- and I'm a
pretty good judge on how long things go -- but I was wrong on
this.

MR. McBURNEY:  We have some equal rights to be
wrong about that.

1    THE COURT:  But it's really the break that the

2    government took to have the discussions over lunch, that's

3    what put us behind.

4                       -- -- --

5                    FURTHER DIRECT EXAMINATION

6    BY MS. COLLINS:

7    Q.   Mr. Kohlmann, you are still under oath.

8    A.   Okay.

9    Q.   I have a few questions for you to explain a little

10   further some of the things that you talked about today.

11        One thing we talked about today is Jaish-e-Mohammed, and

12   you identified some things about them, but I neglected to ask

13   you, did they engage in violent activity?

14   A.   Yeah, their premise is violent activity.  They actually

15   are a splinter group of another designated foreign terrorist

16   organization, and the people that founded Jaish-e-Mohammed

17   felt that the previous organization was not radical enough.

18   So they found -- they were not violent enough, so they

19   founded a new organization, Jaish-e-Mohammed, which would

20   more firmly advocate violence.

21        So, yeah, I would say that that is their primary

22   methodology, violence.

23   Q.   Advocate violence or engaged in violence?

24   A.   Engaged in violence.

25   Q.   Can you talk a little about that, what types of

activities are you talking about?

A.    Well, before I discussed how Lashkar-e-Tayyiba focuses on tactics, like fedayeen, like swarming a target, taking it over and trying to hold it.

Jaish-e-Mohammed uses the tactics of suicide bombings.  Several Jaish operatives and Jaish members have carried out suicide bombings over the last five years including specific attacks targeting Pervez Musharraf, the former president of Pakistan, for assassination.

Jaish-e-Mohammed activists have also been picked up inside Afghanistan by the U.S. forces there, they have been picked up all across Pakistan.  But again, they have engaged in everything from straight combat against U.S. forces in Afghanistan to suicide bombings.

THE COURT:  And how do you know that?

THE WITNESS:  Because of the fact that individuals who have carried out the suicide bombings in Pakistan were later identified by Pakistani police, and they were known Jaish-e-Mohammed operatives.

Now, the Pakistanis were never able to conclusively say that the leadership of Jaish-e-Mohammed ordered this attack, but I think it's pretty clear that the membership of Jaish-e-Mohammed is engaged in this kind of behavior.

This is the kind of methodology that they -- and also I should add as well that in their own publications,

they have specifically stated this.  Maulana Masood Azhar

wrote a book called *The Virtues of Jihad* where he laid out in

extreme detail, you know, what are the precepts of

Jaish-e-Mohammed and, you know, how -- what are we supposed

to do.

And I guess you could say that his version of Jihad

is pretty much firmly rooted in the idea of violent struggle.

Q.   What was the name of the individual that you just said?

A.   Maulana Masood Azhar, A-z-h-a-r.  This is the same

individual that I referenced before who was freed from an

Indian prison in 1999 when hijackers took control of an

Indian airliner and commandeered it and flew it to Kandahar,

Afghanistan.  In order to get that airliner free, the

hijackers demanded Masood Azhar be freed.

So when he came back to Pakistan, he formed this new

organization Jaish-e-Mohammed in again 2000.  It's a

relatively new organization and it is, you know, the

Pakistani government has said the exact same thing,

Your Honor, the Pakistani government in their prohibition of

the organization have specifically accused them of being

responsible for suicide bombings.

Q.   And is Jaish-e-Mohammed the organization whose training

camp in Balakot you referenced when you were speaking about

Mr. Khan earlier?

A.   That's correct.  They have several training camps, but

the principal one which they are known for is the Syed Ahmed

Shaheed camp, which is in Balakot.

Q.   And do they accept fighters from outside Pakistan or

other places into that camp?

A.   Yes.  In the joint Taliban/Jaish-e-Mohammed publication

known as Dharb-i-Munin, Jaish actually specifically wrote

about the Syed Ahmed Shaheed camp, described what was going

on there saying it was welcome from Mujahideen all over the

world who were coming there to fight the true battle and that

they were looking for people to donate money and come there

and get training, that the new generation of Mujahideen would

come from this camp.

Q.   Now, another group that we talked about extensively this

afternoon is Al-Qaeda in Iraq, and you talked about the

spokesmen, the individuals posting to Muntada al-Ansar, the

Abu --

A.   Abu Maysarah.

Q.   Excuse me, Abu Maysarah al-Iraqi.  Now, what is -- from

Al-Qaeda in Iraq's perspective, what is the purpose of

disseminating those items, those videos that you were talking

about, the Nick Berg beheading, other things, on these

forums?

A.   Well, there is two purposes.  The first purpose is that

back at that period of time, there were a lot of people who

simply do not believe that Abu Musab al-Zarqawi existed.

There were a lot of people in the western world who argued he didn't exist and that this was all a conspiracy of whoever to carry out these bombings.

And Zarqawi was very insistent on proving his existence. But in order to prove his existence, the reason that he was doing that was to win followers.

The problem that Al-Qaeda in Iraq had, it was a very small group and it was all foreign fighters in the beginning. It was very few Iraqis, it was almost all foreign fighters. And Zarqawi was relying on one particular tactic which other groups did not rely on, which was suicide bombings.

In order to carry out a steady stream of suicide bombings inside of a place like Iraq, and you can't get local Iraqis to do it, well, who do you turn to? The only people around are foreign fighters, people recruited from places like Saudia Arabia, Kuwait and other countries, including the west.

Now, how do you get someone to want to go to Iraq and blow themselves up? Well, you disseminate videos on the internet which glorify acts of violence, like beheadings, like suicide bombings. You show videos of bombers on their way to carry out an attack and cheering and celebrating and smiling and I'm on my way, and you should all follow in this path.

1    And that was the clear message.  I mean, that was in

2    every single suicide bombing video released by Zarqawi's

3    organization, every single one, there was a message from the

4    bomber to the outside world -- in some cases, very

5    specifically:  Everyone who is watching this video or

6    watching this on CD, listen to my words.  It's your

7    obligation to follow in my footsteps.

8    Q.    Now, just -- and this is a very quick question, but just

9    so we are all clear.  When you are talking about Zarqawi and

10   his organization, you are talking about Al-Qaeda in Iraq?

11   A.    That's correct.  Prior to October of 2004 it was known

12   by another name, but in October of 2004 Zarqawi swore

13   allegiance to Osama Bin Laden, and after that period of time,

14   it became known exclusively as Al-Qaeda in Iraq.

15   Q.    If that is Al-Qaeda's purpose in distributing these

16   materials, what value is then provided by an Irhaby007 in

17   providing additional links you said to those materials?

18   A.    Well, the problem that Al-Qaeda had was that they were

19   making great videos, they were wonderful videos.  The problem

20   was they were having difficulty distributing them to

21   people.

22       When the Nick Berg video came out, they didn't know

23   where to host it.  So they tried hosting it on a couple

24   different temporary sites.  By the time that the actual

25   announcement reached anyone's e-mail boxes, those sites were

1   overloaded.  You couldn't access -- the video was

2   inaccessible, and people started posting messages saying, How

3   can you post this link and then the link doesn't even work?

4   You are teasing us with this.  Come on, guys.

5       And it just seems like for some reason the whole idea of

6   hosting internet websites, which usually requires a credit

7   card, which these guys don't have, real Jihadis in the field,

8   they couldn't set up the way to host this material.  They

9   needed someone to distribute it for them, and they needed

10  someone to market it for them, create, you know, flashy

11  advertisements for internet websites, flashy previews.

12      And I suppose they might have been able to find someone

13  eventually, but what ended up happening was that Tsouli or

14  Irhaby007 was doing such a great job of it on his own that at

15  a certain point, I mean, his abilities far superseded anybody

16  else's.  He was doing critical tasks for them.

17      When Mr. Tsouli was eventually arrested, these

18  organizations got together and formed an organization which

19  is now responsible for doing everything that Mr. Tsouli --

20  that Irhaby007 used to do, distributing, marketing, all of

21  that.  That's the responsibility of a whole virtual

22  organization.  That's what Tsouli used to do.

23      And that was critical, absolutely critical, because if

24  the videos don't reach anybody, then they are no good.

25  Q.  They are no good for the purpose of --

A.    Recruiting, or for anything else.  They are useless.  I
mean, these videos are used for financing purposes, they are
used for recruitment, they are used for propaganda.  If they
don't reach anybody, if nobody sees them, they are no good.

     Because of Irhaby007, because of the work that he did,
Abu Musab al-Zarqawi earned the nickname "The Sheikh of the
Slaughterers."  The only reason he earned that nickname was
because Zarqawi was singularly associated in 2004 with one
thing above anything else:  Beheading videos on the internet
that were distributed over a wide variety of internet
websites and reached a lot of people.

Q.    And those were assisted and distributed by Irhaby007?

A.    Not only -- in the beginning it was assisted.  In the
end, he was doing it deliberately on their behalf.  They were
asking him to do this.  They were asking him to set up
websites, and he was doing it at their specific request.

Q.    I would like to -- one question about Irhaby007,
Younis Tsouli.  Have you reviewed his hard drives and other
material?

A.    I have reviewed material from his desk top.  I have
reviewed some of the material that was seized from his
computer and from the Muntada al-Ansar forum, material siezed
by British police from the Ansar forum.

     However, I was not given a forensically-preserved copy
of his drive as I was in Operation Praline involving

1    Mr. Ahbid Khan and his associates.  In this case I was given

2    specific pieces of evidence and asked what is the

3    significance, who is this person, who is Abu Anas al-Shami?

4    Who is this person?  Why would someone create a log in on

5    this forum calling himself Abu Anas al-Shami?  What does that

6    mean?

7         It happens that Abu Anas al-Shami was one of the deputy

8    commanders of Al-Qaeda in Iraq, so that was something that

9    I went into.

10        But a forensic examination of the hard drive is not

11   something I did.

12   Q.   And to your knowledge, did Mr. Tsouli testify at trial?

13   A.   He did not.  He pled guilty before the trial was over.

14   Q.   I would like to turn now to talk about Mr. Khan, who we

15   also talked about pretty extensively earlier.  And you talked

16   about information linking him to Jaish-e-Mohammed.  I would

17   like to talk about information linking him with

18   Lashkar-e-Tayyiba and that organization.

19        Are you familiar with any -- have you reviewed any

20   information that would link him to recruitment for

21   Lashkar-e-Tayyiba?

22   A.   Yes.

23   Q.   And what is that information?

24   A.   Well, it's a variety of different sources.  Number one,

25   he engaged in online discussions with other individual's,

namely Wasim Mughal, about their interactions with

Lashkar-e-Tayyiba in which he explained to Wasim Mughal in

detail his visit to a Lashkar office in Attock, his

communications with Lashkar, and they discussed back and

forth whether or not they preferred Lashkar or

Jaish-e-Mohammed, and why.

From that conversation, it was pretty clear that both of

them had been in touch with Lashkar-e-Tayyiba.

Q.   And who was Wasim Mughal?

A.   Wasim Mughal was a co-conspirator involved in the case

against Mr. Tsouli.  He also was convicted, and is currently

serving a prison sentence in the United Kingdom.

Q.   Is there any other information that you have reviewed

involving Mr. Khan and LET?

A.   I believe on Mr. Khan's computer, there are also copies

of anasheed songs, Islamic music which were specifically

downloaded from the Lashkar-e-Tayyiba official website.

Q.   And what significance is that to you, based on your

research and knowledge about --

A.   Well, these files were only available on the Lashkar

website.  So if someone had them on their computer,

presumably they either visited the Lashkar website or they

obtained Lashkar material from somebody else.

And aside from that, the lyrics of these songs were

extremely intense.  The lyrics of the songs went along the

lines of we are going to stick the sword into Bill Clinton,

the sword is going to be dripping blood, we are going to kill

the Americans.  They were very, very explicit lyrics.

And I actually asked Abdullah Muntazir about these songs

when I interviewed him, and he wasn't able to explain to me

what they were doing on the site or what Lashkar was trying

to suggest by putting them on there.

Q.   And Mr. Muntazir is the --

A.   Muntazir, yes.

Q.   Mr. Muntazir is the head -- the spokesman for LET you

referenced earlier in your testimony?

A.   Yes.  I pointed him to the location of the songs on the

site, and I read him the lyrics, and I asked him what they

were doing there.  And he mumbled something, and then he

said, I can't respond to this, I can't answer that question.

Q.   Now, when you were talking about the opinion that you

had reached with respect to Mr. Khan, you talked about some

of the sources of information that you used to reach that

opinion.

Now, could -- did you reach -- at the time before

Mr. Khan testified, had you reviewed his -- the forensically

preserved media and hard drives that he had been arrested

with and had been picked up by British police?

A.   Yes.

Q.   Had you already formed an opinion about Mr. Khan's

1    activities and what he was up to?

2    A.    I had some idea but, yeah, it was -- a lot of it was

3    confirmed by Mr. Khan himself during his own testimony.

4          Mr. Khan specifically described Lashkar-e-Tayyiba,

5    specifically showed a Lashkar-e-Tayyiba propaganda poster on

6    a video that he recorded, identified what Lashkar was.

7          He seemed to have quite a bit of knowledge of

8    Lashkar-e-Tayyiba.

9    Q.    But before he testified, you knew what Lashkar-e-Tayyiba

10   was; correct?

11   A.    Yes.

12   Q.    And when you had reviewed -- you talked about when you

13   reviewed his hard drive and you saw the video of him by the

14   Lashkar-e-Tayyiba propaganda poster, did you already know

15   what that was?

16   A.    I had some idea, but when he said specifically on the

17   stand that's a Lashkar-e-Tayyiba propaganda poster, that was

18   a pretty good confirmation of it.

19   Q.    It was confirmation?

20   A.    Yeah.

21   Q.    And the other -- the communications that you referenced

22   where he was talking about his links with Lashkar-e-Tayyiba,

23   you had reviewed those before he testified?

24   A.    Long before he testified, yes.  And in my expert report

25   in that case, which was submitted long before he testified,

there is a lot of information in there about both Jaish and
Lashkar, I believe.

Q.   And reviewing the other items, the recordings, the
video, the items on Mr. Khan's hard drive, you had reviewed
that before he testified?

A.   Yes, up to a year and a half.  Yeah, I reviewed these
materials in late 2006 and 2007, which was at least a year
and a half before Mr. Khan ever testified.

Q.   So the use that you put to having reviewed all that
information on his hard drive and all the other information
that you have that you already knew of Lashkar-e-Tayyiba
based on your own research, then what role did Mr. Khan's
testimony then serve for you?

A.   As confirmation.  It was confirmation, fleshing it
out.  It was admissions against interest, but things that
I already was pretty positive of, because I already had
communications of.

     It was certainly helpful to hear that testimony, but it
was just one more piece of the puzzle.

Q.   So one more piece of the puzzle, but it wasn't your sole
basis for your opinion?

A.   No, no, no.  I mean, if you read my expert report --
I mean, this is not my expert report.  I gave you a copy of
my expert report which is dated long before Mr. Khan ever
testified, I had ever spoken with Mr. Khan or seen

Mr. Khan.  I didn't even know what Mr. Khan looked like when I wrote that.

     And I was pretty certain of his contacts and connections with Lashkar-e-Tayyiba and Jaish-e-Mohammed long before he ever admitted to it on the witness stand.

          MS. COLLINS:  Your Honor, may I just have one second?

          Unless Your Honor has another area I need to go into, I don't have any more questions.

          THE COURT:  Mr. Martin, do you have anything else?

                    --   --   --

                    RECROSS-EXAMINATION

BY MR. MARTIN:

Q.   Just in two sentences, if you can, what is your opinion about Mr. Khan and Jaish-e-Mohammed and LET?  What is the ultimate opinion?

A.   What his links were to them?  That he was attempting to negotiate with them in order to bring over groups of individuals from North America and Europe to receive training at camps run by either Jaish-e-Mohammed or Lashkar-e-Tayyiba with the intention of either bringing those people back to North America or else putting them into another Jihad zone, namely either Afghanstan or Chechnya.

Q.   That was his intention?

A.   That was his intention.  And he essentially advertised

1  on internet forums saying, If you would like to go through

2  Jihad, if you would like to get training, let me know.

3          MR. MARTIN:  All right.  No other questions.

4          THE COURT:  Mr. Wahid?

5          MR. WAHID:  No questions.

6          THE COURT:  All right.  Thank you very much,

7  Mr. Kohlmann.

8          THE WITNESS:  Thank you very much, Your Honor.

9          THE COURT:  Based upon what I have heard, I would

10  assume the issue still is the extent to which it would be

11  permissible for him to use the testimony of Mr. Khan at his

12  trial in reaching his opinion?  Is that a fair summary of

13  what the issue is that I have to decide?

14          MR. MARTIN:  I believe all of the other

15  communications and things that he talked about which are not

16  in evidence.

17          There will be -- I'm not trying to create a false

18  issue here.  There will be some evidence of communications

19  between my client and Mr. Khan that is relevant to what he

20  just talked about.  But all these other, information about

21  the purposes of what he described he was trying to do seems

22  to me beyond -- there may be a relevancy question, but it's

23  also is he's just doing nothing more than testifying as a law

24  enforcement person as to his conclusion about a critical

25  issue in the case.

I think what Mr. Wahid said, I think it is a violation of 702 or the purpose of 702 and also our confrontation rights.

THE COURT:  All right.  Here is what I'm going to have you do.  Now that the record has ended, you will file motions.  The motions -- today is Wednesday -- will be due the end of business on Monday -- well, Tuesday since Monday is a federal holiday, in which you will specify the testimony that has been presented that you seek to exclude and the grounds for it.

The government will file by the end of the day on -- I guess we can separate this because the second trial isn't until later.  We ought to deal first with the Ahmed trial.

So, Mr. Martin, your deadline is the end of business on Tuesday.  The government will respond by the end of business on Thursday, and then, Mr. Martin, if you want to respond, do it by the end of business on Friday.

For Mr. Sadequee, his -- you know, it would help -- it's going to be the same issue for both.  Would it be too burdensome to ask you to meet the same deadline?

MR. WAHID:  Could I hear that again?

THE COURT:  End of business on Tuesday, then the government has to respond by the end of business on Thursday, and then if you wanted to have a reply of any kind, it would

be by the end of business on Friday.

Can you meet that deadline?

MR. WAHID:  Yes.

THE COURT:  All right.  And what I expect is in the motions to exclude his testimony, pretty specific what you expect based upon what he said to say, and if it's more than one area, because Mr. Martin has said that -- I think what Mr. Martin is saying is that if he expresses the opinion that he was out recruiting people and that he bases that opinion based upon all the communications and what he saw on the website, that he believes that's excluded, I guess because Mr. Khan or Mr. Tsouli is not here, that that's a violation of the confrontation clause.

So I want all those arguments.  If you don't make them, I am doing to deem them waived.  But I want you to say here is specifically what we expect him to say, here is why we think the law doesn't allow it.  And do that for each item of his testimony that you seek to exclude.

Now, I would give this admonition to the government.  One, when this witness testifies, he has to testify pursuant to direct examination questions, and this rambling testimony that was allowed that was in my view unorganized and disjointed will not help me decide this case as I will be deciding the case for Mr. Ahmed, and I promise you a jury will never understand all of this.

1          And this has to be done in a more organized,

2   thoughtful way for any trier of fact to get the evidence

3   that's necessary to reach a just decision.

4          While we are all together, is there anything else

5   we need to discuss today?

6          MR. SAMUEL:  Your Honor, we have a bond motion

7   pending.  I don't know what the Court's pleasure about when

8   to schedule that or how to schedule it or what to do on

9   that.

10         We would just like to know what the Court's

11  inclination is on that.

12         THE COURT:  Has the government responded to the

13  motion?

14         MR. McBURNEY:  Yes.

15         THE COURT:  Are you going to reply any further to

16  their response?

17         MR. SAMUEL:  I can if the Court wants me

18  to.  I didn't know if you were just going to set it down for

19  a hearing.

20         You previously indicated you do not want

21  Magistrate Brill to handle it, you wanted it addressed to

22  you.  I didn't know if you were just going to schedule it for

23  argument, possible hearing.

24         I can certainly reply.  There is nothing in their

25  moving papers that were factually inaccurate, but I will.

1          THE COURT:  I mean, is there any reason to have an

2     oral hearing, or can I decide it on the submissions?

3          MR. SAMUEL:  I think we would like to have a

4     chance, not this afternoon, but to have a chance to at least

5     argue it to you.  I don't think we really have a factual

6     dispute that would require testimony.  We emphasize the

7     length of his detention, the conditions of his detention,

8     they have responded with the facts that are unexceptional.

9          So it's really argument as opposed to any factual

10    dispute that's required.

11         THE COURT:  My schedule is really awful right now,

12    but we will try to find some time to do that.  It will have

13    to be a short hearing because I have got things scheduled all

14    next week already in anticipation of the trial that starts

15    the following Monday.

16         But we will see what we can do.  We will get back

17    in touch with you tomorrow.

18         MR. SAMUEL:  Thank you, Your Honor.

19         Do you want me to file a reply?  Let me relook at

20    their papers.

21         THE COURT:  I have got enough paper to keep me busy

22    for a long time, so I'm leaving it up to you to file a

23    reply.  But I'm assuming that if there was a reply, it would

24    be something totally new that you had not already presented

25    in your original motion.

1        MR. SAMUEL:  Then don't count on it.  Thank you.

2        THE COURT:  All right.  That's the right

3  answer.  Thank you.

4        Anything else we need to discuss before we

5  adjourn?

6        MR. McBURNEY:  No, sir.

7        THE COURT:  Mr. Martin?

8        MR. MARTIN:  No, sir.

9        THE COURT:  Mr. Samuel, Mr. Wahid?

10        MR. WAHID:  No, thank you, Judge.

11        THE COURT:  All right.  We will be in recess.

12            (Proceedings adjourn at 5:11 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3   UNITED STATES OF AMERICA        :
                                     :
4   NORTHERN DISTRICT OF GEORGIA     :

5

6           I, Nicholas A. Marrone, RMR, CRR, Official Court

7   Reporter of the United States District Court for the Northern

    District of Georgia, do hereby certify that the foregoing 254

8   pages constitute a true transcript of proceedings had before

9   the said Court, held in the city of Atlanta, Georgia, in the

10  matter therein stated.

11          In testimony whereof, I hereunto set my hand on

12  this, the 21st day of May, 2009.

13

14

15

16                          */s/ Nicholas A. Marrone*

17          _____
                            NICHOLAS A. MARRONE, RMR, CRR
18                          Registered Merit Reporter
                            Certified Realtime Reporter
19                          Official Court Reporter
                            Northern District of Georgia
20

21

22

23

24

25