<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
 2                          ATLANTA DIVISION

 3    UNITED STATES OF AMERICA        )
                                      )
 4                   Plaintiff,       )     CRIMINAL ACTION FILE
                                      )     NO. 1:06-CR-147-WSD-2
 5    v.                              )
                                      )     ATLANTA, GEORGIA
 6    EHSANUL ISLAM SADEQUEE (2)      )
                                      )
 7                   Defendants.      )
      _____)

 8
                        TRANSCRIPT OF PROCEEDINGS
 9          BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
                    UNITED STATES DISTRICT JUDGE
10
                         Tuesday, May 26, 2009
11


12    APPEARANCES OF COUNSEL:

13    For the Plaintiff:          OFFICE OF THE U.S. ATTORNEY
                                  (By:  David E. Nahmias
14                                      Robert C. McBurney
                                      Christopher Bly)
15
                                  DEPARTMENT OF JUSTICE
16                                (By:  Alexis L. Collins)

17    For Defendant Ahmed (1):    MARTIN BROTHERS
                                  (By:  John Richard Martin)
18
      For Defendant Sadequee (2): GARLAND SAMUEL & LOEB
19                                (By:  Donald Franklin Samuel)

20

21
              Proceedings recorded by mechanical stenography
22             and computer-aided transcript produced by
                    NICHOLAS A. MARRONE, RMR, CRR
23                     1714 U. S. Courthouse
                       75 Spring Street, S.W.
24                      Atlanta, GA  30303
                         (404) 215-1486
25
</pre>

1                Tuesday Afternoon Session

2                     May 26, 2009

3                       3:03 p.m.

4                       -- -- --

5                P R O C E E D I N G S

6                       -- -- --

7                   (In open court:)

8          THE COURT:  This is a hearing in the United States

9    v. Sadequee, which is Criminal Action NO. 06-CR-147.  And

10   it's on Mr. Sadequee's renewed motion for pretrial release.

11          Would counsel please announce their appearances?

12          MR. McBURNEY:  Robert McBurney for the

13   United States, with the assistance of Ms. Collins and

14   Mr. Bly.

15          MR. SAMUEL:  Don Samuel for Mr. Sadequee,

16   Your Honor.

17          THE COURT:  All right.  Good afternoon.

18          And good afternoon, Mr. Sadequee?

19          THE DEFENDANT:  Good afternoon.

20          THE COURT:  Well, let's try to frame the

21   issue.  This is Mr. Sadequee's second request to be released

22   on bond.

23          Mr. Samuel, the statute 18 U.S.C. Section 3142 (e)

24   (3) (C), because this is an offense that qualifies under

25   subsection (C), thus the presumption under the statute is

1    that no condition or combination of conditions would

2    reasonably assure the appearance of the defendant or the

3    safety of the community, although that is a presumption that

4    is rebuttable by the defendant.

5          I have read everybody's submissions.  I understand

6    the test that is required to be applied under the statute.

7          So it's Mr. Sadequee's motion.  We will hear first

8    from you.

9          MR. SAMUEL:  Good afternoon, Your Honor.

10    I appreciate you scheduling this on fairly short notice.

11          As you know, we have previously had a release

12    hearing, a detention hearing that was held must be going on

13    almost three years ago now, three and a half years ago.

14          Let me remind the Court, if I may, just for the

15    record, remind you just a little bit of the timeline of

16    events.

17          THE COURT:  I have read the submission.

18    I understand the timeline.  I have considered this already.

19          MR. SAMUEL:  It is significant to the defense, and

20    one of the reasons we think that there is in essence a change

21    in circumstances, which the government protests we have not

22    been able to establish, the length of time that Mr. Sadequee

23    has now endured the solitary confinement at the United States

24    penitentiary --

25          THE COURT:  Well, is it the length of time, or is

1    it the conditions?

2          I mean, we have addressed the conditions once

3    before.

4          The length of time is largely -- I mean, of course

5    I have only been in the case a shorter period of time than

6    Judge Cooper was, but as you know, I have spent an enormous

7    amount of time dealing with the multiple motions that have

8    been filed by the defendant, all of which I felt were

9    important and appropriate.

10          But a lot of this has been prolonged by two

11    things.  One is the number of motions filed, and the second

12    is that we are dealing with classified information.

13          And, you know, the defendants, Mr. Ahmed and

14    Mr. Sadequee, their counsel, including you, proposed to me a

15    schedule which you told me when I first got into the case and

16    because of the procedures, especially because of the

17    classified information that was involved, would allow us to

18    schedule the trials only this summer, even though I told you

19    at that time that I wanted to move them up, but I was

20    persuaded by all the lawyers in the case, including you and

21    Mr. Wahid, that that wasn't possible.

22          So, you know, and after having had that discussion,

23    I clearly understood that that wasn't possible, because of

24    the nature of the case and the number of motions that were

25    pending.

1        I have entered over 250 pages of orders in this

2  case on the various motions that have been filed.  So a lot

3  of this is just a processing that's been required, and that

4  there hasn't been any request for his release during the

5  whole time that this processing was going on, including at

6  the request of the defendants.

7        MR. SAMUEL:  Well, let me respond first by making

8  sure the Court knows that we are not contending that the

9  Court has been procrastinating.  Far from it.  I mean, the

10  exact opposite, in fact.  You have been going at a pace

11  that's keeping us all up at nights, so to speak.  So this

12  motion is not --

13        THE COURT:  I can go faster if you want.

14        MR. SAMUEL:  If you do, you are going to have

15  less -- the work product will suffer.

16        But so don't assume that or read it into my

17  motion.  If I said something that led to that, I didn't mean

18  it.

19        THE COURT:  No, I'm not.  What I'm saying is this

20  is a case --

21        MR. SAMUEL:  That takes time.

22        THE COURT:  This presumption arises under the

23  statute.  The case does take time.

24        MR. SAMUEL:  It does.

25        THE COURT:  And there are two reasons for

that.  One is the nature of the information, which I think everybody has worked through not just thoughtfully, but has worked through in a way that I thought was fair, I thought -- was fair to everybody, fair to the Court, fair to the defendant, and fair to the government, as we dealt with sensitive classified information.

So I am not sure -- and I'm convinced based upon our prior discussion about the scheduling that if we had tried to do it more quickly, the chances of there being an incorrect ruling or unfairness to the parties was something that was a risk, and that's why I agreed to the timetable.

MR. SAMUEL:  And we don't disagree with the timetable, Judge.  That's what I want to emphasize.  We are not saying the Court is the cause of any problem here, nor for that matter for the past six, eight months or almost a year the government either.

Our concern here is not that someone is at fault and therefore he should be released pending trial.  Nor is it a speedy trial problem; that motion has come and gone.  Or we are claiming that because of government procrastination or the Court's overcrowded docket or whatever that we are entitled to relief.

Regardless of why we have been here for three years, we have been here for three years.  Maybe it's the necessity of the case.  Maybe it's the fact that CIPA, you

1  know, puts somewhat intolerable burdens on everybody,

2  including the prosecutors.  We have got all these other

3  agencies they need to deal with in order to take one small

4  step of progress.

5        But it's nobody's fault.  The fact of the matter is

6  Mr. Sadequee remains in prison for three years having never

7  been convicted of a crime and we will now argue to you,

8  proffer to you, not posing any danger to the community or to

9  society, not posing any danger to any witnesses, and really

10  not posing any risk of flight.

11        The fact that he's been there three years is a

12  fact, and it is an undeniable fact.  But let's not assign

13  blame anywhere, because it's irrelevant to why I think -- why

14  the defense contends he is entitled to bond.

15        It is true, as the government says, most cases

16  don't require three years.  And this is not a particularly

17  complicated case.  It has just lots of complicated procedural

18  hurdles we have to go through.  I mean, the facts of the case

19  are not particularly complicated at all.

20        We have witnesses overseas, we have CIPA hearings

21  we have to go through, there are intriguing issues.  But the

22  facts of the case are not complicated at all.

23        The fact that it takes three years to get through

24  it, though, shouldn't rest on Mr. Sadequee's shoulders, and

25  that's what we are contending.

1       For whatever reason, for whatever reason it takes

2  three years, we contend that is a factor that the Court

3  should consider strongly in deciding whether he should be

4  released pretrial.

5       THE COURT:  But you are asking -- I mean, we are

6  two months from trial.  You are asking at the time when

7  I think the circumstances are most acute for him either to

8  flee or to present a danger when he's on the cusp of being

9  tried on these very, very serious charges involving activity

10  which by its nature is activity that would present a harm to

11  the well-being if not the lives of people.

12       MR. SAMUEL:  The allegations of the indictment

13  would certainly qualify for that, the nature of the crime

14  which is charged.  I don't think that the facts and the

15  discovery and the evidence which has come to light in the

16  last three years would support that kind of belief.

17       THE COURT:  But as you know, there was a video

18  taken of a very, very public set of places that has been

19  discovered in the course of the investigation, including in

20  places where none of us would have want it to be on

21  computers.

22       MR. SAMUEL:  Your Honor, the so-called casing

23  video -- and I'm sure you have seen it by now; if not, it's

24  been described to you in sufficient detail.  It is a series

25  of three or four five-second clips, pictures of the

White House, which you can every night on the NBC News,
CBS News or whatever news channel you watch.

Pictures of the Washington Monument.  If you go on
YouTube you could find I would guess a million images of the
Washington Monument.  Anybody could --

THE COURT:  But that wasn't put in somebody's
travel log.  That was in fact delivered to others.

MR. SAMUEL:  But to what end?  To what end?  I
mean, the fact that Mr. Sadequee can take a cell phone and
take a picture of the Washington Monument and ended up
sending it to a website doesn't make him dangerous.  It
simply doesn't.

I understand they have the presumption, I
understand the government has got the finger on the scale
here with the presumption.  But that video, that casing
video, to compare -- to suggest, as I think the government
ultimately will do, that somehow that means Mr. Sadequee was
involved in going to blow up one of these buildings or was
going to attack one of these buildings, there is actually no
evidence to support that at all.

I don't even think the government believes that at
this point, that that casing video had anything to do,
anything to do with a suggestion that someone was going to
attack the buildings, anything, use whatever verb you want to
use.

1    THE COURT:  No, the government has submitted in the

2    course of this case, which I have heard, is that that was how

3    he sought to gain credibility with these terrorist

4    organizations so that he might be accepted into a training

5    camp.

6    MR. SAMUEL:  Well, I don't think that is

7    accurate.  Maybe that's the government's view.  I think there

8    is certainly another side to this case, which is that the

9    casing --

10    THE COURT:  I'm not saying -- all I'm saying, look,

11    I'm basing this decision on a presumption that arises from a

12    statute passed by Congress.

13    MR. SAMUEL:  Exactly.

14    THE COURT:  And it's already been decided once that

15    at the time that he was denied bond in the past, that that

16    presumption was not overcome, which meant that at that time

17    he was found -- that there was insufficient evidence to show

18    that the presumption that he was a flight risk and a

19    presumption that he could harm the community did not warrant

20    allowing him under the circumstances of this case and the

21    criteria that you have to apply, to allow him to be

22    released.

23    Now, there has to be -- you would have to argue

24    that there is some fundamental change in the facts that now

25    the presumption is overcome.  But I would submit to you that

the crimes charged are the same, that the weight of the

evidence, if anything, probably has developed some, I don't

think that it has eroded based upon my view and understanding

of the case now.

The history and the circumstances of the defendant

is that he still has substantial ties to people outside the

country.  I sometimes get communication from those

substantial ties outside the country.  So not only did I

understand that those existed, I now have had communications

with my chambers to show that.

And the nature and seriousness of the danger seems

to me to be the same, if not more aggravated, because we are

closer to trial and the ultimate outcome of the case, which

could be adverse to the defendant.

MR. SAMUEL:  Well, let me address those in the

order in which you have raised them.

You mentioned we are on the cusp of trial before

and at the end of your -- just now.  I'm not sure why being

closer in time to trial makes him more of a flight risk.

We don't believe he's a flight risk.  We don't

believe the evidence supports the contention he's a flight

risk other than the presumption --

THE COURT:  Because most of the people I've seen

that flee flee closer to trial when they are on bond than

flee immediately, at least has been my personal experience.

1    MR. SAMUEL:  I don't have that much experience.  I

2    have some flee just before closing argument, so it's true

3    that during the course of trial sometimes things aren't going

4    well.  But I'm not sure that I would say I have done an

5    empirical study.  Most people flee before they get caught I

6    think.

7            But at any rate, he's not the type of person who

8    would flee.  His mother lives here, his sister lives here,

9    his other sister lives here, his brother lives here.  You

10   have seen most of them in court time and time again, and I'm

11   sure they are here today as well.

12           He's lived here his entire life in Atlanta.   He's

13   an American citizen, he's born here in the United States,

14   he's lived in Atlanta all but the first year or eighteen

15   months of his life.

16           THE COURT:  All of that -- all of those facts are

17   the same as they were the last time this was heard.

18           MR. SAMUEL:  I agree, there is no change of facts

19   with regard to his history of where he has lived all these

20   years and where his family lives.  One of the other sisters

21   has now moved to Atlanta, so she lives here as well.

22           He does have a wife who lives in Bangladesh, and

23   she is on her way over here.  So she will actually be in the

24   United States just before trial.  We expect her to be a

25   witness at the trial.

1    And he's never lived in Bangladesh for any period

2    of time other than just before he was arrested in this

3    case.  There is no suggestion that he went to Bangladesh as

4    part of flight.  When he was in Bangladesh, he learned that

5    there was an investigation at that time, and did not flee

6    from there, did not leave his father's home, even though he

7    knew he was under investigation then.  He did not try to go

8    undercover or something like that.

9    He's given all the indications, all the empirical

10    evidence at this point that he's not a flight risk.  So all

11    we have -- all the government has going for it, all the

12    government has going for it is the presumption.

13    And we would suggest that given his family living

14    in the Atlanta area, again, sisters, mother, brother, given

15    that he's lived his whole life here, given that he's an

16    American citizen, he's obviously willing to relinquish his

17    passport -- I assume the government probably already has

18    it -- we believe that the presumption has been overcome with

19    regard to flight risk.

20    With regard to dangerousness, again, the casing

21    video you mentioned before, I don't believe the government

22    contends that the reason the casing video -- well, you did

23    acknowledge that it wasn't for purposes of this is a good

24    target, here is the White House in case you didn't know where

25    it was, or here is the Washington Monument or the Pentagon in

case anybody doesn't know where they are.  It was instead
designed in part we believe the government evidence shows to
lend credibility not to himself as a terrorist at all, but
rather to lend credibility to a website that he and others
were working on.

It was actually a very scholarly web
site.  Mr. Kohlmann testified about it last week, the Tibyan
website.  It was a scholarly website that was involved
primarily in translating Islamic texts, some of which were
very opposed, for example, to LET.

The government never mentions that, that one of the
leading texts that Mr. Sadequee translated on the website was
showing why LET was bad, or LET is not an organization that
should be promoted by people with whom he associated because
of whatever religious or political reasons.

So what we have is really kind of quintessential
First Amendment activity at el-Tibia.  I mean, the essence of
the First Amendment is the right to translate text, some of
which may be very unpopular, but to have a dialogue and to
have a website that has a dialogue.  It is not revolutionary,
it is not promoting -- it's not yelling fire in a crowded
theater, he's not promoting any kind of overthrow of the
American government, but -- and for the most part it wasn't
even original -- actually for the most part almost invariably
it wasn't even original material written by

Mr. Sadequee.  He's just a translator.

He is very scholarly, despite the fact that he hasn't graduated from high school.  He's fluent in Islamic, he memorized the Quran, and he translates texts, some of which are opposing viewpoints.

The casing video --

THE COURT:  I'm not here to try the case.

MR. SAMUEL:  I understand.

THE COURT:  And everything that you have just said existed the last time this motion was heard.

MR. SAMUEL:  I agree with that.

THE COURT:  What you are really looking for is a different venue and a different decision from a different person.

MR. SAMUEL:  I will point out that we never appealed Magistrate Brill's decision.  So to some extent we do have a right to appeal.  We waited for three years, so we are entitled --

THE COURT:  So is this your appeal?

MR. SAMUEL:  We would rather not view it like that only because the standards change yet again, but -- and we would rather rely on the new record.

But if I could just get back to -- I don't want to try the case here, I don't want the government to hear me try the case, I don't want to give a closing argument today.

1          But when you said that the casing video was

2     designed to enhance his credibility with terrorists, I think

3     that's not right, and I think the government -- maybe they

4     are standing or sitting behind me shaking their head, but

5     I think that the evidence shows that the casing video was

6     more designed to enhance the credibility of this website, so

7     that people would come to the website, so that scholars would

8     come to the website, so debates would be conducted on the

9     website, opposing views would --

10          THE COURT:  But we know where it was found.

11          MR. SAMUEL:  Well, yes, I agree.

12          THE COURT:  It wasn't sent in the mail, it wasn't

13     sent by Federal Express.  It was hidden in a piece of

14     luggage, wasn't it?

15          MR. SAMUEL:  No, it was sent digitally to

16     Mr. Tsouli, and Mr. Khan had it.  I mean, it got distributed

17     at some point.

18          But again when we are talking about distributed it,

19     it's not a whole lot different than if somebody took a

20     photograph of the Washington Monument, if you went and bought

21     a postcard of the Washington Monument and the Pentagon and

22     mailed it to all the most evil people on earth you could

23     think of, it's less than that.  It's less than that.

24          It's a cell phone video of a couple monuments in

25     Washington without anybody suggesting let's attack these

1   buildings, let's bomb this building, let's do something

2   here.  It's just --

3           THE COURT:  Look, I have the benefit of having read

4   the transcripts, I have listened to the interviews, and I

5   know that somebody did not go to a book on Washington, D.C.,

6   and take pictures of the photographs.  That there was --

7   I understand the circumstances under which -- and there is

8   something about that conduct that is different than it just

9   being simple pictures.  It shows something about the mindset

10  of somebody and why they did what they did.

11          And I'm judging that only because the criteria

12  requires me to look at the history and characteristics of the

13  person and the nature and circumstances of the offense

14  charged.  I'm not saying -- my view ultimately will be the

15  one that the trier of fact adopts.  I'm dealing with a record

16  based upon my understanding of the case, applying the factors

17  on the limited issue of whether the presumption under the

18  statute is rebutted.

19          MR. SAMUEL:  And we believe the presumption is

20  rebutted, because if all the government needs to do is list

21  the statute and say this is the crime with which you are

22  charged, if that's enough and the case is over, then we

23  wouldn't be before you today.

24          There has to be some right of the defendant to

25  contest the sufficiency of the evidence, contest the

1  sufficiency of the proof to rebut the presumption.  Otherwise

2  there would be no need ever to have a hearing.  They'd list

3  an indictment, they say this is the statute 2339 (A), case

4  over.  We would never have a hearing, we would have never

5  been before Judge Brill.

6           So my right to argue to you that the casing video

7  borders on being juvenile, to being adolescent and not being

8  the slightest bit either designed or --

9           THE COURT:  Well, let's not get hung up on my

10  observation about the video.

11           MR. SAMUEL:  Okay.

12           THE COURT:  I have studied through months the facts

13  of this case, through the deciding of multiple motions,

14  through the reading and listening to 13 hours' worth of

15  transcripts of interviews, and so I have a broad picture of

16  the nature of the offense and generally what the evidence is

17  that has been presented to me in the motions.

18           So we are not talking about a single video.  That's

19  a piece that fits into everything else that I'm aware of

20  about the nature and circumstances of the offenses charged.

21           MR. SAMUEL:  If you read the bill of particulars of

22  the government and what is the material support, it's the

23  video.  I mean, it is the heart of this case is that

24  video.  That is the heart of the government's case, it's that

25  and, you know, Mr. -- and Haris Ahmed going to Pakistan and,

you know, maybe he's going to join a training camp there or

maybe he's going to go to school, and ultimately says my

parents don't want me to train, to go to a training -- mommy

doesn't want me to go to a training camp, so I'm not going to

go.

That according to the bill of particulars is the

material support, it's Haris Ahmed going to Pakistan and

saying my mother doesn't want me to go, so he comes home when

asked to join a training camp, and this casing video.

So we can put those two to the side, but when we

put those two to the side, we have concluded our

investigation of the material support that this man is

alleged to have provided to anybody, either LET or any other

organization.

I mean, even if you look at the indictment, there

are things like he sent a casing video to Mr. Tsouli; okay?

That's what he does, undenied.

THE COURT: Look, Mr. Samuel, I understand all

that. That was a long time ago. I am dealing with that

information that has been brought to my attention and with

which I am now familiar as a result of being emersed in this

case for months. That's what I'm judging my understanding

and my application of the facts to the criteria that I'm

required to apply under 3142.

MR. SAMUEL: All I can do is address what the

government in their bill of particulars says this is what the material support is.

All I'm responding to is the Court's suggestion let's put the video casing clip aside.  If we put it aside, we put most of the government's case aside, because that's what the government contends is the material support.

Conspiracy to provide material support and providing material support.  It's the casing video, and Haris Ahmed flying to Pakistan and turning around and coming home.

I can tell you a little bit more about Mr. Sadequee's background, what he's done growing up in Atlanta here.  Again, his scholarly efforts to translate various texts that he's been translating.

He's volunteered for peace organizations here in Atlanta.  He spent years volunteering for an agency known as Raksha, which was a nonviolent organization, promoting nonviolence among people from this community.  He did volunteer work with a number of other peace organizations here in Atlanta.

He is not someone who poses a danger to the community, he is not someone who poses a risk of flight, given his family connections, the community support, and he's not someone who we believe would violate in any way the terms that the Court imposes for his release.

The fact that we are on the cusp of trial, perhaps even more so the need for him to be out, for him to be able to come to his attorney's office, for him to be able to meet with the lawyers in this case, and painstakingly review the various evidence, the evidence that you have reviewed, rather than the three-hour time slots we get per week to visit him at the United States penitentiary to review the information --

THE COURT:  Well, look, with all due respect, I have made special accommodations.  I have met with the warden of the prison.  If you want more time, let me know and I will get you more time.

But nobody has -- you have never come to me and said that the arrangements that I required the prison to make are insufficient.  And without you saying that it's insufficient for you to meet with him and prepare -- you know, I have authorized your co-counsel to go over and conduct interviews in London, I have extended that trip. I have authorized payment for you to sit through the trial of Mr. Ahmed.  I mean, I have done everything that you have asked.

MR. SAMUEL:  I have no complaints with the Court.

THE COURT:  Well, then don't tell me that three hours -- that you need more than three hours.  If you need more than three hours, I will make those arrangements.  But

you have never said that before, Mr. Samuel.

MR. SAMUEL: I agree, I have never complained about -- you have done, whatever it is, eleven -- 101 yards, whatever the expression is, to help facilitate things at the prison. And Mr. McBurney has also helped me enormously.

But we are still -- as far as contact visits go, we either get Tuesday morning or we get Tuesday afternoon, or Wednesday morning or Wednesday afternoon.

THE COURT: Well, if you are complaining about that, I will fix that.

MR. SAMUEL: Well, I'm not complaining.

THE COURT: Well, yes, you are.

MR. SAMUEL: It's a reason why we should get bond, it's a reason why. I would rather spend twelve hours a day with him, like I do with most of my clients in preparation for trial in the last two months --

THE COURT: I can arrange that too.

MR. SAMUEL: I don't want to spend that much time in the prison, Your Honor. I would rather do it at my office. If you could arrange that, that would be the perfect arrangement.

At any rate, we believe we have overcome the presumption with the information we supplied to the Court with our proffer, and that conditions can be imposed by the Court if you allow him to be released to assure the safety of

1    the community and that he's not a flight risk.

2         THE COURT:  All right.  Thank you.

3         Mr. McBurney?

4         MR. McBURNEY:  Thank you, Judge.  I will be brief

5    and answer the question I heard you ask several times.

6         The only thing that the government sees having

7    changed from Judge Brill's ruling, which replicated a ruling

8    by a district court judge in the Eastern District of New York

9    on less serious charges, a 1001, is that arguably factor two

10   of the four factors --

11        THE COURT:  It doesn't -- I have never been

12   persuaded by somebody else exercising their discretion in

13   another district, that that's the way I will exercise my

14   discretion here.  I have always exercised my discretion with

15   what I believe justice and law requires.

16        MR. McBURNEY:  Different set of facts, more serious

17   charges here, I agree.

18        Factor number two, the weight of the evidence.  I

19   think that's the only thing that has changed from the time

20   that Judge Brill ruled, and I believe that that factor now

21   weighs more strongly in the government's favor.

22        The facts are out there.  There have been rulings

23   since then, initially by Judge Brill, but ultimately orders

24   issued by this Court that puts the government's case in a

25   stronger posture.

1          The defense, as you have noted, has filed any

2   number of motions legitimately seeking to suppress certain

3   things.  Those motions have been denied.

4          And so now the government sits, unlike it did back

5   when Judge Brill ruled, knowing that certain things that are

6   damaging, prejudicial, but admissible evidence can come in at

7   trial.

8          That's the government's answer to your

9   question.  Nothing else has changed.

10         Time has passed, but as the Court has noted, we

11  have worked with the Court's assistance in getting -- Court's

12  direction getting the Bureau of Prisons to accommodate the

13  needs of Defendant Sadequee as we hear about them, and I have

14  heard of no new complaints from the last round of

15  conversations or communications we had with the Court that

16  resulted in ensuring family contact visits for the defendant,

17  regular contact legal visits, restoration of telephone

18  privileges and et cetera.

19         I haven't heard anything new.  What I have heard is

20  he's been in prison for a long time, but you have already

21  documented how this has been moving along.

22         Finally, the last thing I would note -- I'm not

23  going to quibble will the factual statements, we don't need

24  to try the case right now, I don't agree with much of what

25  Mr. Samuel said about our case -- but we have agreed

consistent with our schedule to move the defendant's trial up

from the original very aggressive trial schedule that was set

because things changed in the calendar.  So the government

remains willing to get Defendant Sadequee into court as soon

as is practicable.

The issue before Your Honor is what has changed

since Judge Brill issued her ruling.  The answer is nothing

favorable to the defendant.

THE COURT:  Mr. Samuel, would you like to respond?

MR. SAMUEL:  I don't have a rebuttal to what he

said, no.

THE COURT:  Well, as I have noted, I have been

immersed in this case.  I have read a number of the

communications.  I have a much more complete picture than I

had even two months ago from all of the information that I

have reviewed over the course of I guess the last six months

or so, maybe seven months.

And I have invested an enormous amount of time in

this case, and I believe I'm close to being up to speed with

all the -- with the parties themselves.

The nature and circumstances of this offense, I

note that the statute pays special attention to charges of

terrorism, that the maximum punishment authorized if there is

a conviction in this matter, and even the guideline range

that the government notes -- and I don't know, generally

I took a glance at the guidelines, but this is a very, very

significant case, if nothing else as reflected by the

authorized punishment and what I believe the guidelines

ultimately -- kind of where we would be ultimately in the

guidelines.

I disagree strongly with Mr. Samuel's view that

being closer to trial mitigates in favor of release.  I have

been doing this work for 32 years.  My experience in the

government and in my defense work is that if there is a time

when the anxiety and pressure of somebody facing a charge

like this causes them to do things which they otherwise might

not do, it's as they get closer to trial, and not as the

charges are initially brought against them.

I believe that the risk of flight and the risk of

danger to the community enhances in a case like this as you

get closer to the date of trial, which we have in fact moved

up at my request.

I do understand the weight of the evidence against

the defendant, because I have pored over it, and that

I understand I believe the evidence that has been presented

in the course of the multiple motions that I have had to

review and my review of the significance of the information

that is available to all of the parties in this case, and

believe that the weight of the evidence does not mitigate in

favor of rebutting the presumption.

1    The history and the characteristics, while there

2  are some laudable things apparently that the defendant has

3  done, that if you look at his conduct over the course of the

4  matter for which he was under investigation and his

5  philosophical commitment to the matters that are central to

6  this case, I believe that those are at most a neutral

7  factor.

8    And ultimately I believe that the nature and the

9  seriousness of the danger that he presents to the community

10 and his risk of flight is at this point in time

11 significant.

12   It is -- I don't know of any set of circumstances

13 in a case like this where I could in good conscience, even if

14 the presumption had been rebutted, which I find that it has

15 not, that I can't imagine any set of circumstances that would

16 allow me in good conscience, as somebody who has a

17 responsibility to the justice system and more importantly a

18 responsibility to the community, that would assure that he

19 would be here to defend against the charges that have been

20 brought against him so a just result can be returned and so

21 that, while we are awaiting that process, that the community

22 can in fact be kept safe.

23   And for that reason I am denying the motion.

24   Is there anything else that we need to discuss

25 while we are all together?

1          MR. McBURNEY:  No, sir, not from the government.

2          THE COURT:  Mr. Samuel?

3          MR. SAMUEL:  No, Your Honor.

4          THE COURT:  All right.  We will be in recess.

5              (Proceedings adjourn at 3:36 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3     UNITED STATES OF AMERICA        :
                                       :
4     NORTHERN DISTRICT OF GEORGIA     :

5

6            I, Nicholas A. Marrone, RMR, CRR, Official Court

7     Reporter of the United States District Court for the Northern

      District of Georgia, do hereby certify that the foregoing 29

8     pages constitute a true transcript of proceedings had before

9     the said Court, held in the city of Atlanta, Georgia, in the

10    matter therein stated.

11           In testimony whereof, I hereunto set my hand on

12    this, the 28th day of May, 2009.

13

14

15

16                            /s/ Nicholas A. Marrone

17                            _____
                              NICHOLAS A. MARRONE, RMR, CRR
18                            Registered Merit Reporter
                              Certified Realtime Reporter
19                            Official Court Reporter
                              Northern District of Georgia

20

21

22

23

24

25