```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION

3
    UNITED STATES OF AMERICA,  )
4                              )
                               )
5   -vs-                       )  Indictment No. 1:06-CR-147-02-WSD
                               )  Volume 1
6   EHSANUL ISLAM SADEQUEE,    )  Pages 1-295
         Defendant.            )
7

8              Transcript of the Jury Trial Proceedings
              Before the Honorable William S. Duffey, Jr.
9                      August 3 and 4, 2009
                        Atlanta, Georgia
10

11
    APPEARANCES OF COUNSEL:
12
    On behalf of
13  the Government:                 David E. Nahmias,
                                    United States Attorney
14
                                    Robert C. McBurney,
15                                  Assistant United States Attorney

16                                  Christopher Bly,
                                    Assistant United States Attorney
17
                                    Alexis L. Collins,
18                                  Department of Justice

19
    On behalf of
20  the Defendant:                  Ehsanul Islam Sadequee, Pro Se

21  Standby Counsel:                Donald F. Samuel, Esq.
                                    Khurrum B. Wahid, Esq.
22                                  Amanda Clark Palmer, Esq.

23  Amanda Lohnaas, RMR, CRR
    Official Court Reporter
24  United States District Court
    Atlanta, Georgia
25  (404) 215-1546
```

1                                INDEX

2       Monday, August 3, 2009

3       Preliminary Matters                              2

4       Voir Dire and Striking of the Jury
        (Not transcribed)                                18

5       Tuesday, August 4, 2009

6
        Jury Sworn                                       29

7       Preliminary Instructions to the Jury             29

8       Opening Statement by the Government               43

9       Opening Statement by the Defense                  63

10      Witnesses for the Government:

11      Douglas McGee
12           Direct Examination                          69

13      Mohamad Omer Kamal
             Direct Examination                          88
14           Cross-Examination                          139
             Redirect Examination                       173

15      Veera Boonyasait
16           Direct Examination                         193

17      Michael Williamson
             Direct Examination                         211
18           Cross-Examination                          248

19      Aparna Bhattacharyya
             Direct Examination                         253
20           Cross-Examination                          259
             Redirect Examination                       262
21           Recross-Examination                        264

22      Mark Richards
             Direct Examination                         269
23

24

25

1          (Monday, August 3, 2009, 9:28 a.m.)

2          THE COURT:  Good morning.  This is the trial of the

3   United States versus Ehsanul Sadequee, which is Criminal Action

4   Number 06-CR-147.

5          Counsel, please announce your appearances.

6          MR. MCBURNEY:  Robert McBurney for the United States

7   with Alexis Collins, David Nahmias, the U.S. Attorney, and

8   Christopher Bly.

9          THE COURT:  Good morning.  We'll start with you,

10  Mr. Samuel.

11         MR. SAMUEL:  Okay.  Don Samuel, Mr. Sadequee, with me

12  at counsel table is Khurrum Wahid, Tim Mansour and Amanda Clark

13  Palmer.

14         THE COURT:  Good morning.  And good morning,

15  Mr. Sadequee.  I understand that you would like to represent

16  yourself in this proceeding; is that correct?

17         MR. SADEQUEE:  Yes.

18         THE COURT:  Can you pull the microscope closer to

19  you?

20         I have to ask you a number of questions before I can

21  evaluate whether to allow you to represent yourself.  I don't

22  think we've gone over a number of these matters before so let

23  me get some background information.

24         Can you tell me how old you are today?

25         MR. SADEQUEE:  I was born July 30th, '86, so I am 23.

1          THE COURT:  Tell me what your education is.

2          MR. SADEQUEE:  I studied in Georgia until -- well, in

3     middle school and then I moved to -- well, I didn't move to, I

4     attended a boarding school, an Islamic boarding school in

5     Toronto, Canada.  Ajax, Canada, to be exact.

6          THE COURT:  By boarding school, you mean high school,

7     basically?

8          MR. SADEQUEE:  Well, it's an Islamic school.  I mean,

9     they call it like a madrassa but it's not, you know, like what

10    you hear about in Pakistan, it's in Toronto, Canada.  But they

11    had a high school education according to the Canadian system as

12    well and I didn't fully graduate from there.

13         So what happened is that I moved back to Bangladesh

14    for a couple of years.  I did my O levels partially.  You know,

15    over there they follow the British education system, the

16    levels, O levels, they didn't have high school the way we have

17    over here.  And I didn't finish that, either.

18         So then when I came back to the States in '04, I did

19    my GEDs and SATs, which I, you know, got good scores on.  And

20    then I went back to Bangladesh in '05, in 2005, August, and I,

21    in early 2006, I began my first semester at university, North

22    South University in Dhaka, Bangladesh, the capital, and I

23    finished one complete semester, and I was arrested the day

24    after.

25         THE COURT:  Have you ever studied law?

1          MR. SADEQUEE:  Not in a -- not a college of law but I

2     have studied, you know, just the way prisoners study.

3          THE COURT:  Have you done a fair amount of that

4     self-study in law?

5          MR. SADEQUEE:  I believe I'm prepared enough.  I'm

6     not a lawyer, I understand.

7          THE COURT:  And I'm pretty sure that you've never

8     represented yourself in any other criminal action, including

9     any traffic violation.  Have you ever represented yourself

10    before in a matter?

11         MR. SADEQUEE:  No.

12         THE COURT:  During, let's focus on the last few

13    months and your relationship with your lawyers, how often have

14    you been in contact with them and how have you been in contact

15    with them?  That is, what's the means?  Was it personal visits,

16    was it telephone calls, was it a mixture of those things?  Can

17    you answer frequency of contact and how?

18         MR. SADEQUEE:  Usually it is through contact visits,

19    which they come -- recently they've been coming almost on a

20    weekly basis.  But throughout the last three years of my

21    incarceration, you know, sometimes they've came once a month or

22    so.  But these attorneys of mine, Mr. Wahid and Mr. Samuel,

23    they've been coming for the last several months almost on a

24    weekly basis.  And then also, yes, I do phone, have contact

25    over the phone with them, also on a weekly basis, I would say.

1          THE COURT:  Do you understand the charges that you

2    face?

3          MR. SADEQUEE:  Yes.

4          THE COURT:  Can you tell me what you understand the

5    charges to be?

6          MR. SADEQUEE:  Well, the four counts are, if I may

7    summarize in my own words, basically, is conspiring or plotting

8    to help terrorists and terrorist organizations and also the

9    actual aiding of and providing help to terrorist organizations

10   or terrorists.

11         So one is plotting to do that and one is actually to

12   have done, provided -- actually having provided assistance to

13   terrorists and terrorist organizations.

14         THE COURT:  So you're aware in that general

15   description that you've given me that there are actually two

16   conspiracy counts and two counts for actually doing something

17   that we call substantive counts.  Are you aware of that?

18         MR. SADEQUEE:  Yes.

19         THE COURT:  Do you understand that if you are found

20   guilty of the crime that's charged in Count One, that I could

21   sentence you to as many as 15 years in prison, impose a term of

22   supervised release for life that follows imprisonment, and fine

23   you up to $250,000?  Do you understand that?

24         MR. SADEQUEE:  Yes.

25         THE COURT:  Do you understand that if you are found

1    guilty of the crime charged in Count Two, that I could sentence

2    you to as many as 15 years in prison, impose a term of

3    supervised release, also for life, following imprisonment, and

4    fine you as much as $250,000?  Do you understand that?

5              MR. SADEQUEE:  (Nods head.)

6              THE COURT:  Sorry?

7              MR. SADEQUEE:  Yes.

8              THE COURT:  Do you understand that if you are found

9    guilty of the crime charged in Count Three that I could

10   sentence you to as many as 15 years in prison, impose a term of

11   supervised release for life after imprisonment, and, again,

12   fine you as much as $250,000?  Do you understand that?

13             MR. SADEQUEE:  Yes.

14             THE COURT:  And on Count Four, do you understand that

15   I could sentence you to as many as 15 years in prison, impose a

16   term of supervised release for that count of life following

17   imprisonment, and fine you as much as $250,000?

18             MR. SADEQUEE:  Yes.

19             THE COURT:  Do you also understand that if you are

20   found guilty of more than one of these crimes that I can order

21   the sentences that can be -- upon which you can be required to

22   serve to run consecutively, that is, that you would serve one,

23   when that's over then you would serve the next one, and if

24   there was more than that, then I could order that you then

25   begin serving the third and then begin serving the fourth?

1    Say, for example, you are convicted of all four counts, so it's

2    not just 15 years, it would be 15 times four.  Do you

3    understand that?

4             MR. SADEQUEE:  (Nods head.)

5             THE COURT:  And do understand that -- have you ever

6    talked about the sentencing guidelines with your lawyers?  Do

7    you understand generally how --

8             MR. SADEQUEE:  Yeah.

9             THE COURT:  -- they work?

10            MR. SADEQUEE:  Yes.

11            THE COURT:  And do you understand that they may

12   affect your sentence if you are found guilty of one or more of

13   these offenses?  Do you understand that?

14            MR. SADEQUEE:  Yes.

15            THE COURT:  If you represent yourself, the way I

16   would put it is that you will be on your own, that you will

17   have to make all of the decisions that are required to be made,

18   you have to do everything that is required to be done, and that

19   those will be your decisions alone, that I'm not going to be

20   able to tell you or advise you or consult with you or help you

21   try your case; the case will be your case and it will be your

22   responsibility.  Do you understand that?

23            MR. SADEQUEE:  Yes.  If I may ask that I'm -- that my

24   attorneys be allowed to sit with me so that I could consult

25   with them?

1          THE COURT:  You represent yourself.  They will sit

2    behind you and I will allow you to consult with them when we

3    are not in session.

4          MR. SADEQUEE:  Okay.

5          THE COURT:  Are you familiar with the Federal Rules

6    of Evidence?

7          MR. SADEQUEE:  I've gone through them, yes.

8          THE COURT:  Do you understand that it's those Rules

9    of Evidence that will govern what may or may not be introduced

10   in the case?

11         MR. SADEQUEE:  Yes.

12         THE COURT:  And that in representing yourself, you

13   will be required to comply with these rules and to abide by my

14   rulings on those rules, which are fairly complicated?  Do you

15   understand that that's going to be your responsibility?

16         MR. SADEQUEE:  Yes.

17         THE COURT:  Do you understand that if I rule on a

18   piece of evidence that you must follow my ruling?  Do you

19   understand that?

20         MR. SADEQUEE:  Yes.

21         THE COURT:  Are you familiar with the Federal Rules

22   of Civil Procedure?  Which are different from the Federal Rules

23   of Evidence, civil procedure talks about the procedures during

24   the course of a trial and it's in a different volume of rules.

25         MR. SADEQUEE:  I have not gone through this civil

1    procedures.  I was told that the Rules of Evidence is what I'm

2    required to know for trial.

3            MR. MCBURNEY:  Judge, I'm sorry, you asked him twice

4    about Rules of Civil Procedure, that may have thrown him for a

5    loop.

6            THE COURT:  Maybe not.  Have you ever heard of the

7    Rules of Criminal Procedure?

8            MR. SADEQUEE:  Yes.

9            THE COURT:  Okay, I'm sorry, I misspoke.  Have you

10   had a chance to review the Rules of Criminal Procedure?

11           MR. SADEQUEE:  That I have not gone through, no.

12           THE COURT:  Well, those are rules that apply to the

13   processing of a criminal case and they have -- certain parts of

14   those rules apply to criminal trials.  You are going to be

15   responsible for knowing those rules and following those rules

16   and doing whatever the rules require or what they allow, will

17   be totally up to you.  Do you understand that?

18           MR. SADEQUEE:  Yes.

19           THE COURT:  That that's another one of your

20   responsibilities, even though those rules are complex, you are

21   going to have to be deemed to be responsible and to know them.

22   Do you understand that?

23           MR. SADEQUEE:  Yes.

24           THE COURT:  I think I have told you this before, in

25   fact, I'm sure I have.  I've been doing this, that is being a

1    lawyer, since 1977, and despite my experience in a wide variety

2    of matters and a wide variety of courts and lots of experience

3    in federal court, these rules are very difficult.  The trying

4    of a case is very hard.  It's a dynamic process that requires

5    skill and training and judgment.

6          And as I've told you before, and I will tell you

7    again, that in my very strong opinion somebody who is trained

8    in the law, specifically the lawyers that have been appointed

9    to represent you, could do a much better job, and I think an

10    excellent job, of representing you in this matter, and that

11    they would do a much better job than you can do.

12          I think is it is a very, very unwise choice for you

13    to make to represent yourself.  While you have some familiarity

14    with the law and some familiarity with the rules, and maybe

15    better than some, maybe even pretty good familiarity with the

16    Rules of Evidence, you have to know all of those things and you

17    have to have the experience necessary to represent yourself.

18    And I think your lawyers are much more prepared and capable and

19    competent to represent you and I strongly urge you not to

20    represent yourself.

21          Have you discussed your decision to represent

22    yourself with your lawyers?

23          MR. SADEQUEE:  Yes.

24          THE COURT:  Having explained to you the penalties

25    that can be imposed upon you if you are found guilty, and after

1    our discussion about all the difficulties in representing

2    yourself in this case, is it still your desire to represent

3    yourself and to give up your constitutional right to be

4    represented by a lawyer?

5          MR. SADEQUEE:  Yes.

6          THE COURT:  Has this been entirely your decision to

7    represent yourself?

8          MR. SADEQUEE:  Yes.

9          THE COURT:  All right.  I find that Mr. Sadequee has

10   knowingly and voluntarily waived the right to counsel; I

11   therefore will permit him to represent himself in this matter.

12         I appoint Mr. Samuel and Mr. Wahid as standby counsel

13   in the event that Mr. Sadequee chooses to change his mind and

14   to, at some time in the trial, to be represented by counsel,

15   that they would be available and would take over representation

16   at that point.

17         They are, and you shall, Mr. Samuel and Mr. Wahid,

18   stay in the courtroom and stay there in the back so you will

19   keep abreast of what's going on in the course of the trial.

20         I don't have any objection, even though I have

21   allowed Mr. Sadequee to represent himself, that at times when

22   we are not in proceedings here in the courtroom that if he

23   wants to ask you some questions and you want to consult with

24   him, I will allow him to do that.  All right, that concludes

25   that matter.

1          I have, as I told you, I was going to draft a

2    limiting instruction for the Rule 404(b) instruction as it

3    would relate to the December 2001 e-mail.  I'm going to give

4    you a copy of that so that you will understand what instruction

5    that will be.  I don't think that's going to come up today, so

6    if you have any comments on it I would appreciate you just

7    making pen and ink changes, unless they're more extensive than

8    that, we might be able to take it up at a break or in the

9    morning but that's just to give you some advance notice of

10   that.

11         MR. BLY:  Judge, to give you notice of when that is

12   going to be coming in, it will be Agent Williamson, who is

13   fourth on the government's list.  It will be one of the first

14   exhibits that we deal with with Agent Williamson.

15         THE COURT:  Then I think that we are ready to do the

16   follow-up voir dire unless there's something else I need to

17   take up before.

18         MR. MCBURNEY:  Two quick points, one related to the

19   voir dire, which I will say second.

20         But, first, at some point before we begin with

21   opening statements, the government is asking that the Court

22   review with the defendant -- it may be his counsel can do it --

23   the Court's rulings on the three motions in limine filed by the

24   government so that we don't have an issue of the defendant

25   inadvertently wading into those areas that the Court ruled on.

1    I don't know if you want to do that on the record or direct me

2    to get with Mr. Samuel so he can talk to his client about it,

3    but it was the lawyer's -- defendant was here but it was the

4    lawyers who litigated and you ruled upon.

5            THE COURT:  Well, it's a different issue as between

6    what the lawyers know and their involvement in the pretrial

7    matters of Mr. Sadequee.

8            MR. MCBURNEY:  I agree.

9            THE COURT:  Mr. Samuel, have you had a chance to

10    review the orders that I entered with Mr. Sadequee, and does he

11    understand what restrictions I have imposed upon the trial of

12    the case?

13            MR. SAMUEL:  Your Honor, he was present in court,

14    heard your ruling, and I have shared with him your order.  I

15    have a copy with me, which -- if I may, I know I'm not going to

16    be saying a lot here but I need to know a little bit of your

17    protocol.

18            We have, you can't see, a lot of it is in the back,

19    there's a lot of exhibits, a lot of documents, a lot of paper.

20    How would I get that to Mr. Sadequee during the course of a

21    witness?  Do I hand him pieces of paper?  If an exhibit is

22    being shown to the jury, may I bring the notebook up to him to

23    show him the exhibit?  He doesn't have a computer.  We've got

24    it hard copy and on disks.

25            I've been in situations like this where a judge

1    allowed me to sit at counsel table and just give him paper if
2    it becomes -- it's a very paper-intensive case.  I've had other
3    judges who say, "I don't want you anywhere near the defendant
4    while the jury is in the room."
5           But he's not going to see exhibits if I can't sit
6    with him and open up the notebook to the right page.  I don't
7    think the marshals are going to be crazy about him getting up
8    and walking to the back bench to grab exhibit notebooks.
9           I would ask you to reconsider allowing one of us or
10   both of us to sit at counsel table, not to talk, the mike won't
11   be on us, but simply to facilitate the paper, the exhibits.
12   Even a rule of evidence, if we can just show him, open the book
13   to the right page if it comes up.
14          We won't interfere with his right.  This is not a
15   *McKaskle* issue where the defendant doesn't want us present.  As
16   he said, he wants us to be there.  You've got my word we will
17   not interfere with his right to represent himself or engage in
18   anything that will make the jury to think whatever it is that
19   concerns the Court.
20          I hope the government wouldn't object to our being
21   present.  We will do it in the most unobtrusive way.
22          THE COURT:  Well, you are present.  There's six
23   inches between your table and Mr. Sadequee's table.
24          MR. SAMUEL:  Yes, I meant the counsel table.  Again,
25   with notebooks full of exhibits.  And even his motion in

1    limine, for example, that's why I bring it up to you because,

2    really, I want to know your protocol during the trial, I have

3    the motion in limine ruling, I have it in the back of the room,

4    I'll have to grab it.  I have the pleading book with me.

5          I would urge you to consider allowing us to be there,

6    and "be there" meaning at counsel table with him, sitting to

7    the side.

8          THE COURT:  If all you want to do is sit to the side

9    of counsel table and help him administratively by providing

10    exhibits, which, in my mind, is if he's representing himself it

11    doesn't mean that you hand him a folder, saying these are all

12    the exhibits on which you should cross-examine a witness; it's

13    simply that if he says "I need the exhibit having to do with

14    X," that you would help him get that.

15          MR. SAMUEL:  If Mr. McBurney says, you know, "Now I'm

16    going to tender 238," I've got to grab 238, show it to him.

17    Otherwise, Mr. McBurney is going to be very unhappy, having to

18    bring it over to him, each document.  You're not going to be

19    happy with that, either.

20          THE COURT:  Mr. McBurney, what's your view on that?

21          MR. MCBURNEY:  That we're going to ask the same

22    thing, maybe not right now but after some time had passed.  If

23    it's purely clerical, if you will, and it doesn't slow things

24    down, it's not "I need a conference with my lawyer again," we

25    have no objection; I think it will cause things to move faster.

1          THE COURT:  So if that is what you're asking, Mr.

2    Samuel, I will allow that administrative help.

3          MR. SAMUEL:  And we don't need that even during --

4    even this morning because I've put the first 25 questionnaires

5    here in front of him, he's got my list of proposed questions

6    that I submitted to the Court last night, he's got Mr.

7    McBurney's list of proposed questions.  So we don't have to do

8    it right now but maybe over the lunch break we can start doing

9    that.  Thank you.

10          MR. MCBURNEY:  One other thing, Judge, considering

11    voir dire, there have been, since Wednesday when the potential

12    jurors filled out the questionnaire, a few articles.  This

13    morning there was one in the *AJC* on the front page of the Metro

14    section.  So the government would ask, when we get a group of

15    12 here, you ask them, besides do you recognize anyone, have

16    any of you had any exposure to the media that has added to your

17    knowledge about the case.

18          It doesn't seem to be a big issue based on our review

19    of the questionnaires.  As of Wednesday, there was one, maybe

20    two jurors who even knew anything about the case or had heard

21    of the previous trial.  That may have changed between Wednesday

22    and now, and rather than us bringing in each person to find

23    out, we have an opportunity when there's a group of 12 for you

24    to ask a generic question.

25          THE COURT:  They know more about this case from

1   reading the description on the front of the questionnaire than

2   they do from any press report that I've reviewed.

3          MR. MCBURNEY:  Okay.

4          THE COURT:  All right, are we ready to bring in the

5   first 12 prospective jurors?  Let's bring them in, please.

6          (Jury selection and striking of the jury ensued;

7   following proceedings outside the presence of the jury at 4:25

8   p.m.)

9          THE COURT:  The jury has retired and have gone home

10  for the evening.

11         Let me go over some matters to make it clear how I

12  intend for this trial to be conducted.

13         First, I have told all of the people who have

14  appeared here today, including all of these jurors, that Mr.

15  Sadequee is representing himself.

16         Is there anything else that the government believes,

17  or Mr. Sadequee believes, I should say to them about your self-

18  representation tomorrow when I give them my preliminary

19  instructions?

20         MR. MCBURNEY:  I believe in at least the final charge

21  you will instruct them that questions by Mr. Sadequee when he's

22  questioning witnesses, his opening statement, if he gives one,

23  his closing argument, if he gives one, is not evidence.  I'm

24  going to make that point in the opening.  So if you think it's

25  appropriate to be the first person to say that, we'd ask that

1    you include that, that this is -- not to say that it's

2    different but there will be self-references in his questions

3    and in his opening that wouldn't occur otherwise, and it might

4    help the jurors to understand that when he's acting as

5    advocate, meaning his own attorney, that's not evidence, just

6    like it's not when I say something or argue something.

7         THE COURT:  I always in my preliminary instructions

8    tell them that nothing that is said in the openings constitutes

9    evidence in the case.  The question is -- and I think it might

10   be too much at this point to go further than that, about

11   questions and information that may be embedded in questions.

12   So it seems, at least at this point, to make sense just to make

13   it clear that in the openings that it is not evidence, that the

14   only evidence is that which is presented during the course of

15   the trial after the introduction of evidence begins.

16        Is that satisfactory to the government?

17        MR. MCBURNEY:  Yes, as long as that's not a

18   prohibition on my opening of explaining what I just said.  Not

19   the Court saying it, but I intend to make clear that I believe

20   the instructions from the Court at the end of the trial will be

21   questions from Mr. Sadequee don't constitute evidence,

22   et cetera.

23        THE COURT:  I think that makes sense and if that's

24   not -- I mean, they will know that they have to listen to my

25   instructions.

1          Do you have any objection to him making that

2   statement, Mr. Sadequee?

3          MR. SADEQUEE:  No, no objection.

4          THE COURT:  No?  Okay.  Can you pull the microphone

5   up a little closer so I can catch your voice a little better?

6          MR. SADEQUEE:  No objection.

7          THE COURT:  Thank you.  Openings, didn't I say 30

8   minutes a side?

9          MR. MCBURNEY:  I believe so.  It may have been a

10  little longer but I think it was 30 minutes.

11         THE COURT:  Jessica says it was 30 minutes, so that

12  was a nice try trying to get a few extra minutes.  It will be

13  30 minutes.

14         Mr. McBurney, your clock will be on the left.

15  Mr. Sadequee, your clock will be on the right.  When you begin

16  speaking it will begin there, it begins running.

17         Why don't you turn one on so we can all see how it

18  works?  So you will see that it begins counting down and when

19  it gets to 30 you need to be done with your opening.

20         An opening is a forecasting to the jury of the

21  evidence in the case.  It will not be anything else.  You may

22  state your -- those matters which may be stated in an opening,

23  but it may not be an exposition or a statement about one's

24  faith, one's belief in their country.  It is about the evidence

25  in the case.  Do you understand that, Mr. Sadequee?

1          MR. SADEQUEE:  Yes.

2          THE COURT:  I will say this to the audience, since

3     I've had an experience before, that at the end of any

4     presentation that there will be no audible outbursts, no

5     showing of any gestures or the like.  You are here as citizens

6     of the country that have the privilege of watching a criminal

7     trial.  And if there are any audible outbursts, as I

8     experienced in the last trial, I will remove you.  So that's

9     for the benefit of those that have the privilege of observing

10    the trial.

11         MR. SADEQUEE:  I have one question.  As Muslims,

12    before we begin any speaking we usually begin by praising God

13    and sending prayers on the Prophet Muhammad, like an

14    introduction, and then we begin whatever it is that we speak

15    about.  That's a general, well-known principle.

16         THE COURT:  Well, you've never done that today.

17         MR. SADEQUEE:  Well, because it's not a speech I'm

18    giving.  It's just a sentence or two I'm saying at a time.  But

19    before we write any letter, for example, we start in the name

20    of Allah, most gracious and most merciful, peace and blessings

21    on the Prophet, and then, you know, it's pretty well known

22    amongst Muslims.

23         So I mean, there's no objection to that?  It's not

24    going to be like a whole lecture on Islam but it's just -- it

25    begins with a prayer, basically, and then I go on to the topic

1   of what I am -- you know, the case.

2               THE COURT:  Mr. McBurney?

3               MR. MCBURNEY:  If it is limited to, I'm not calling

4   it equivalent, but "it may please the Court," et cetera, before

5   one gets into the content of the opening -- there's a religious

6   angle to this -- I don't object if it is brief.

7               THE COURT:  Why don't you represent to me right now

8   what you intend to say at your beginning?

9               MR. SADEQUEE:  I would start with, for example, the

10  first chapter of --

11              THE COURT:  I don't want a for example.  I want you

12  to tell me exactly what you intend to say tomorrow.

13              MR. SADEQUEE:  The prayer would be the first chapter

14  of the Quran, basically, which is like five verses -- no, seven

15  verses and the phrase, "Peace and blessings be upon the Prophet

16  Muhammad and on his descendents and on his family."  Is there

17  any objection?

18              THE COURT:  Well, this is a criminal trial; it's not

19  a place to pray.  Do you contend that your religion requires

20  you and that it would be an abridgement of your First Amendment

21  rights not to be able to recite the first seven verses of the

22  Quran before you made your opening statement in a court of law?

23              MR. SADEQUEE:  Well, Islam, our Prophet he said that

24  any speech that does not begin by praising God and sending

25  blessings on the Prophet --

1          THE COURT:  You may say that.

2          MR. SADEQUEE:  No, no, he said that, it's an

3    unblessed speech.

4          THE COURT:  You can say those two statements that you

5    just made because those are short.  So if you want to say what

6    you just said, which is similar to what Mr. Ahmed said in his

7    closing, he did not recite the first seven verses of the Quran

8    as a prayer.  So if you want to say, basically ask for the

9    blessings of the Prophet Muhammad and what you say, and you can

10   do that in two or three lines, I will allow that.

11         MR. SADEQUEE:  It will not be more than one minute,

12   talking about 60 seconds, just very brief and I will go on to

13   my opening statement.

14         THE COURT:  Well, I need for you to tell me the two

15   or three lines that you are going to say and I need for you to

16   tell me that now.

17         MR. SADEQUEE:  Well, I haven't formulated it yet but

18   it would be basically, "In the name of Allah, God, the most

19   gracious, the most merciful, all praise belongs to God, the

20   ruler of the world, the most gracious, the most merciful, the

21   king of the day of judgment, it is he alone whom we worship and

22   he alone whom we seek help from."

23         THE COURT:  That's too long.  If you want to say

24   something short, you may do that.  But I've been here before.

25   It's going to be clear what you -- how you begin this because

1    this is a court of law; it's not a place for somebody to

2    espouse their religious beliefs.  So if you want to have a two

3    or three-line introduction think about that tonight, but you

4    will represent to me tomorrow before the jury comes in what it

5    is you intend to say.  Is that understood?

6           MR. SADEQUEE:  Yes.

7           THE COURT:  Second, everybody giving their statements

8    will stand behind the podium.  You will not stand in front of

9    the podium at any time.  All of the openings will be made from

10   the podium.

11          Do you understand that, Mr. McBurney?

12          MR. MCBURNEY:  I do, with one question.  If I stand

13   here so I'm facing the jury, it's not behind to Your Honor but

14   it's behind the jury, is that sufficient, or do you mean behind

15   when I'm addressing the Court?

16          THE COURT:  You see the left-hand side of the podium?

17          MR. MCBURNEY:  My right-hand side, yes.

18          THE COURT:  Where your right hand is right now.

19          MR. MCBURNEY:  Yes.

20          THE COURT:  You cannot go in front of that.

21          MR. MCBURNEY:  Understood.

22          THE COURT:  Do you understand that, Mr. Sadequee?

23          MR. SADEQUEE:  You're saying I cannot pass beyond

24   that?

25          THE COURT:  Yes.  All questioning of witnesses will

1    be from the podium.

2              Do you understand that, Mr. McBurney?

3              MR. MCBURNEY:  Yes, sir.

4              THE COURT:  Do you understand that, Mr. Sadequee?

5              MR. SADEQUEE:  (Nods head.)

6              THE COURT:  Whoever the court security officer is

7    that is stationed in this seat next to the jury, if you want to

8    show a witness a document, you indicate that to the court

9    security officer and he will have the additional duty tomorrow

10   of making sure that exhibits that you want to show to a witness

11   are delivered to the witness, that they will not be delivered

12   by counsel or Mr. Sadequee.  Do you understand that?

13             MR. MCBURNEY:  I do, and the court security's officer

14   last name?

15             THE COURT:  It depends who they assign here but

16   you'll know that in the morning.

17             MR. MCBURNEY:  Okay.

18             THE COURT:  Do you understand that, Mr. Sadequee?

19             MR. SADEQUEE:  Yes.

20             THE COURT:  If there are any objections, and

21   specifically ones that have to be taken up with me privately,

22   we will excuse the jury to the jury room and I will take them

23   up in open court outside their presence, unless it's a matter

24   that involves classified material and then I'll decide how to

25   deal with that.  I'm not quite sure how to do that at this

1   point.  I think it's unlikely that that's going to come up and

2   I would ask the government to make those objections only if

3   they are certain that that's a problem because it might require

4   me to clear the courtroom.

5              MR. MCBURNEY:  Understood.  We may need to talk with

6   you, perhaps with standby counsels, as to how we can make that

7   objection without making it clear to everyone else that that's

8   the basis for the objection.  I have some thoughts on that but

9   I also understand your caution and we'd be certain that we're

10  heading in that direction.

11             THE COURT:  And I gave you a proposed 404(b) limiting

12  instruction.  Is there any objection to the instruction?

13             MR. MCBURNEY:  No objection.

14             THE COURT:  Mr. Sadequee, any objection?

15             MR. SADEQUEE:  No.

16             THE COURT:  All right, then that's the instruction

17  that I will give following the introduction and admission of

18  the December 2001 e-mail.

19             Those are the housekeeping matters and procedures

20  that I wanted to address.  Is there anything else that the

21  government would like us to take up at this time?

22             MR. MCBURNEY:  No, sir.

23             THE COURT:  Mr. Sadequee, anything else from you?

24             MR. SADEQUEE:  No.

25             THE COURT:  All right, we will be in recess.  We will

1    begin promptly at 9:00.  Actually, we're going to begin at

2    8:55, and the marshal service, will you make sure that he is

3    over here so that I can listen to what he proposes to say in

4    his opening?

5            I would ask you, Mr. Sadequee, and admonish you that

6    I am going to hold you to the rules of the court and that would

7    include what an appropriate opening statement is.

8            The other thing I would say is if I tell you that you

9    may not do something, you will stop.  Do you understand that?

10           MR. SADEQUEE:  Yes.

11           THE COURT:  And do you also understand that if there

12   is an objection and once I rule on it, that you must follow my

13   ruling?  Do you understand that?

14           MR. SADEQUEE:  Yes.

15           THE COURT:  All right, we will be in recess until

16   8:55 tomorrow morning.

17           (Proceedings adjourned at 4:40 p.m.)

18                    * * * * *

19

20

21

22

23

24

25

1           (Tuesday, August 4, 2009, 8:55 a.m.; jury not
2    present.)

3           THE COURT:  All right, good morning, everybody.

4           Mr. Sadequee, did you have a chance to think about
5    how you want to begin this morning?

6           MR. SADEQUEE:  Good morning.  I believe you just
7    wanted to know the introduction phrases that I wanted to use,
8    and so I was -- basically three lines that I wanted to say:  In
9    the name of God, the Lord of grace, most merciful, all praise
10   belongs to God, the Lord of all the worlds and peace and
11   blessings be on the last Messenger Muhammad.

12          THE COURT:  I think that that's fine.

13          Is there anything else we need to discuss before we
14   bring the jurors in?

15          MR. MCBURNEY:  Not at this time, Judge.

16          THE COURT:  Anything else that you would like to
17   discuss, Mr. Sadequee?

18          MR. SADEQUEE:  No.

19          THE COURT:  All right, let's bring the jurors in.

20          (Jury returned to the courtroom.)

21          THE COURT:  All right, good morning, ladies and
22   gentlemen.  I hope you had a good evening.  I told you that we
23   would begin this morning with the trial of the case, and we are
24   about to do that.

25          You recall yesterday when you came in to be

1    introduced to the participants you were given an oath.  We now

2    have a different oath to administer to you because you now

3    begin a different function as the jurors in the case.

4            So if each of you would please raise your right hand,

5    let me swear you in as jurors.

6            Will you well and truly try the issues in the matter

7    entitled the United States versus Ehsanul Islam Sadequee, which

8    is Criminal Action Number 06-CR-147, and render a true verdict

9    according to the law and the evidence, so help you God?

10           If you will, say "I will."

11           THE JURORS:  I will.

12           THE COURT:  You have now been sworn to try this case

13   and by your verdict you will decide the disputed issues of

14   fact.  I will decide all questions of law and procedure that

15   arise during the trial.

16           Before you retire to the jury room at the end of the

17   trial to deliberate upon your verdict and to decide the case, I

18   will instruct you, which is a different way of saying that I

19   will explain to you, the rules of law that you must follow and

20   that you must apply in reaching your verdict.

21           Nothing that I say or do during the trial is intended

22   to indicate or should be interpreted by you as an indication of

23   how I feel about the case or what your verdict should be.  That

24   is solely within your providence.

25           As I told you before, the defendant has elected to

1    represent himself in this action, and the law allows him to

2    represent himself in this proceeding.

3         The evidence presented to you during the trial will

4    primarily consist of the testimony of witnesses and tangible

5    things and items that comes in a variety of forms, which

6    includes papers and documents and sometimes physical things,

7    and we will refer to those as exhibits.

8         And sometimes there are stipulated facts which may be

9    agreed on by the parties.  I don't know if there will be any of

10   those, but those are facts that you can accept as true if, in

11   fact, they are introduced.

12        That's a broad description of the evidence.  I want

13   to tell you, though, what is not evidence because, as I told

14   you yesterday from time to time, the only facts that you may

15   consider and the only evidence you can consider is that which I

16   allow to be admitted in this case.  So I thought it would be

17   helpful to tell you what isn't evidence.

18        The following are not evidence:  The statements, the

19   questions, and the arguments of counsel or of the defendant are

20   not evidence.

21        Objections to questions are not evidence.  When a

22   lawyer makes an objection, it is because they have an

23   obligation to their client to make objections when they believe

24   evidence being offered is improper under the Rules of Evidence,

25   and the defendant has the same right.

1          You should not be influenced by the objection or by

2     my ruling on the objection.  If the objection is sustained,

3     ignore the question.  If you are instructed that some item of

4     evidence is received for a limited purpose only, you must

5     follow that instruction and consider that evidence according to

6     the limitation that I tell you applies.

7          Third, testimony that I have excluded or told you to

8     disregard is not evidence and you may not consider that.

9          And anything you may have seen or heard outside the

10    courtroom is not evidence and it must be disregarded, which is

11    why I've told you not to read any press reports, or if someone

12    were to approach you to give you information, that needs to be

13    reported to me because that's not evidence.

14         Bottom line is you are to decide this case solely on

15    the evidence presented here in the courtroom.

16         There are actually two kinds of evidence:  direct and

17    circumstantial.  Direct evidence is direct proof of a fact,

18    such as testimony of an eyewitness.  Circumstantial evidence is

19    proof of a fact or facts from which you may infer or conclude

20    that other facts exist.

21         Excuse me, I just need for you to move the

22    microphone.

23         MR. SAMUEL:  Okay.

24         THE COURT:  I will give you further instructions on

25    these, as well as other matters, at the end of the case, but

1  keep in mind that you may consider both kinds of evidence, both

2  direct evidence and circumstantial evidence.

3        It will be up to you to decide which witnesses to

4  believe, which witnesses not to believe, and how much of any

5  witness's testimony to accept and how much to reject.  And I'll

6  give you guidelines for determining what we call the

7  credibility of the witnesses in my instructions to you at the

8  end of the case.

9        This is a criminal case and there are three basic

10  rules about a criminal case that you must keep in mind.

11        First, the defendant is presumed innocent until

12  proven guilty.  The indictment against the defendant brought by

13  the government is only an accusation and nothing more.  It is

14  not proof of guilt or of anything else.  The defendant, as we

15  say, starts out with a clean slate.

16        Second, the burden of proof is on the government

17  until the very end of the case.  The defendant has no burden to

18  prove his innocence, or to present any evidence, or to testify.

19  Since the defendant has the right to remain silent, the law

20  prohibits you from arriving at your verdict by considering that

21  the defendant may not have testified.

22        Third, the government must prove the defendant's

23  guilt beyond a reasonable doubt, and I'll give you further

24  instructions at the end of the case as to what that means.  But

25  bear in mind that in this respect, a criminal case is different

1   from a civil case because the standard of proof is different in

2   a civil case, it's lower, meaning that in a criminal case it is

3   higher.

4        In this case, the defendant is charged with two

5   conspiracies and two what we call substantive offenses.  I will

6   give you detailed instructions on the law at the end of the

7   case regarding what the government must prove beyond a

8   reasonable doubt before the defendant can be convicted of these

9   offenses.  And it's these later instructions, those that I give

10  you at the end of the case, and the reason why they're given to

11  you at the end of the case after all the evidence is in is

12  because those instructions control your deliberations and they

13  will guide you in your determination whether the government has

14  proved beyond a reasonable doubt the offenses because that is

15  the standard that must be met before he can be convicted of

16  them.

17       But to help you follow the evidence, I want to give

18  you a brief summary of the elements of the four alleged

19  offenses.  We call each of the offenses a "count."

20       The first is Count One.  Count One alleges that the

21  defendant conspired to provide material support or resources,

22  which in this case is alleged to be personnel or property, or

23  to conceal the nature and source of the material support or

24  resources, knowing and intending that the material support or

25  resources would be used to prepare for, or carry out, either,

1    one, a conspiracy to murder or kidnap people outside the United

2    States; or, two, acts of violence with conduct transcending

3    national boundaries.

4         The elements of Count One which the government must

5    prove beyond a reasonable doubt are:  First, that two or more

6    persons in some way or manner came to a mutual understanding to

7    try to accomplish the common and unlawful plan to provide

8    material support or resources to prepare for or to carry out a

9    conspiracy to murder or kidnap people outside of the United

10   States, or acts of violence with conduct that transcends

11   national boundaries; and second, that the defendant, knowing

12   the unlawful purpose of the plan, willfully joined in it.

13        I will, before you deliberate, define terms such as

14   "material support" and "resources" and how to consider

15   statements that a person may express in the context of the

16   elements of the alleged offenses, and I will give a variety of

17   other instructions to apply as you consider the elements on

18   this offense and all other offenses alleged in the case.

19        In Count Two the defendant is charged with the

20   offense of providing, or attempting to provide, as opposed to

21   conspiring to provide, material support or resources, knowing

22   or intending that such support would be used to prepare for or

23   to carry out certain prohibited acts.

24        The elements of Count Two, which the government must

25   prove beyond a reasonable doubt, are:  First, the defendant

1    provided material support or resources, namely personnel or

2    property, attempted to provide material support or resources,

3    or concealed or disguised the nature, location, source or

4    ownership of material support or resources; and, second, the

5    defendant did so knowing or intending that the material support

6    or resources would be used in preparation for, or in carrying

7    out, a conspiracy to murder or kidnap people outside the United

8    States, or acts of violence with conduct transcending national

9    boundaries.

10           Count Three, the defendant is charged with a second

11   conspiracy.  Count Three alleges that the defendant conspired

12   to provide material support or resources to a designated

13   foreign terrorist organization, mainly Lashkar-e-Tayyiba, or

14   LeT, by agreeing to provide personnel to work under the

15   direction and control of Lashkar-e-Tayyiba while knowing that

16   Lashkar-e-Tayyiba has engaged in terrorist activity.

17           The elements of Count Three which the government must

18   prove beyond a reasonable doubt are:  First, that two or more

19   persons in some way or manner came to a mutual understanding to

20   try to accomplish a common and unlawful plan to provide

21   material support or resources to a designated foreign terrorist

22   organization, specifically Lashkar-e-Tayyiba; and, second, that

23   the defendant, knowing the unlawful purpose of the plan,

24   willfully joined in it.

25           In Count Four the defendant is charged with the

1    offense of attempting to provide material support or resources

2    to a designated terrorist organization known as

3    Lashkar-e-Tayyiba, or LeT.  And the elements of Count Four

4    which the government must prove beyond a reasonable doubt are:

5    First, that the defendant knowingly attempted to provide

6    material support or resources to Lashkar-e-Tayyiba, a foreign

7    terrorist organization; second, that the defendant did so

8    knowing that Lashkar-e-Tayyiba has engaged or engages in

9    terrorist activity or terrorism; and, third, that either the

10    defendant is a national of the United States or the offense

11    occurred in whole or in part within the United States.

12           I remind you that I will give you further

13    instructions at the end of the case on the law that you are

14    required to follow, including on the elements of the offense,

15    the various terms that are used in the instructions, guidance

16    on how to consider evidence in the case, including statements

17    that a person may have made and that are introduced into

18    evidence.

19           The summary that I give you here now is simply to

20    help you understand the nature of the charges as you begin to

21    hear the evidence presented.

22           Let me discuss some conduct that is now required of

23    you as jurors in the case.

24           First, I have to instruct you that during the trial

25    you are not to discuss the case with anyone or permit any one

1   to discuss it with you.  That includes amongst yourselves.

2   Until you retire to the jury room at the end of the case to

3   deliberate on your verdict, you simply should not talk about

4   the case with anyone, including each other.

5           Second, do not read or listen to anything touching on

6   this case in any way; and if someone should try to talk to you

7   about the case, please let me know immediately.

8           Third, as I've told you, do not do any research or

9   make any investigation about the case on your own, including

10  Internet research.  And if you see any news or other

11  information about the case, simply take action immediately to

12  avoid hearing or seeing or reading the information that may be

13  published or broadcasted.

14          Finally, don't form any opinion until all the

15  evidence is in.  Keep an open mind until you start your

16  deliberations at the end of the case.

17          During the course of the trial and the presentation

18  of evidence, you will hear the testimony of witnesses and

19  evidence will be introduced.  You should pay close attention to

20  testimony because it will be necessary for you to rely upon

21  your memories concerning the testimony presented to you.

22  Although you can see our court reporter, Amanda, is making

23  stenographic notes recording everything that is said, and

24  you're probably familiar from watching TV programs that this is

25  a verbatim transcript, but those transcripts will not be

1    prepared and, thus, will not be available for your use during

2    your deliberations and so therefore you should not expect to

3    receive them.

4         Exhibits, on the other hand, will be available, and

5    I'll give you an example.

6         If somebody were to show a document, the focus during

7    the trial, although the whole document is admitted into

8    evidence, the focus of the trial and the testimony might relate

9    to a paragraph within a longer document.  Sometimes you would

10   say, well, I really would like to read that paragraph in

11   context.  You will, because once the entire document is

12   admitted into evidence, all the exhibits will be available to

13   you during your deliberations.  So transcripts will not be

14   available; you'll have to rely upon your memory as to the

15   testimony.  But the exhibits will be available to you in their

16   entirety.

17        I have given you the finest of writing implements, a

18   number 2 pencil and a pad.  You, of course, if you want to use

19   some different implement or if you want a different kind of

20   paper, let me know and I can provide that to you.  But those

21   are available to you because you may take notes during the

22   trial.

23        While you may take notes, you are not required to

24   take notes.  It really depends upon how you best assimilate and

25   understand and remember information.  Some people do that best

 1   by taking notes.  Some people do that best by not taking notes.

 2   You'll have to decide for yourself what is the best practice

 3   for you.

 4          Let me give you one warning, and this relates to the

 5   people that elect to take notes.  And I bring this from my own

 6   experience.  I am a note taker.  Sometimes, though, I find that

 7   I get so involved in taking notes that I can begin to miss

 8   things that are happening about which I am taking notes.  I

 9   would just caution you about that, that where you find yourself

10   trying very hard to take notes, that you begin missing what's

11   happening in the courtroom.  That's a good indication to you

12   that you ought to back off on the taking of notes because it is

13   what happens here and what you hear here that is critical to

14   your performing your function as jurors.

15          If you do not take notes, you should rely upon your

16   own independent recollection or memory of the testimony and not

17   be unduly influenced by the notes taken by others during your

18   deliberations.  Notes are not entitled to any greater weight

19   than the recollection or impression of each juror concerning

20   the testimony or evidence presented in the case.

21          I guess that's another way of saying that during the

22   deliberations, you will have your collective memories, and when

23   you have this many people listening to the evidence, that

24   provides you with the opportunity to consider and remember all

25   the evidence that's presented.

1          I've told you that you should keep an open mind and

2     you should avoid reaching any hasty impressions or conclusions

3     during the course of the trial.  Reserve your judgment until

4     you have heard all of the testimony and the evidence, the

5     closing arguments, or what we sometimes called the summations

6     of the lawyers, and my instruction or my explanations to you

7     regarding the law that you must apply in the case.

8          From time to time during the trial I will be called

9     upon to make rulings of law, decide motions made by the

10    lawyers, and make other remarks.  Please do not infer or

11    conclude from any ruling or other comment I may make that I

12    have any opinion on the merits of the case or that I favor one

13    side or the other, because I do not.

14         During the trial I may from time to time have to

15    confer with the lawyers on a matter outside your hearing.  As

16    you know, the only evidence that you can consider is that that

17    I have determined is admissible.  Sometimes I need to have a

18    full discussion about evidence to determine whether or not

19    something is or is not admissible, and if I decide that it's

20    not admissible, having had that discussion in front of you, I

21    make it harder for you if I were to instruct you not to

22    consider something to do so.

23         So the better practice for me is to ask for you, if

24    it's necessary -- and I've had a long discussion with the

25    lawyers and told them that if there are evidentiary issues that

1  require my rulings that should be on our time and not on your

2  time.  Your time should be spent listening to evidence.  And

3  therefore if we have issues about admissibility, I have

4  instructed them that we will do that during breaks or before or

5  after the trial days.  That's the perfect world.

6        Trial is a dynamic process.  I never quite know

7  what's going to happen and things do occur from time to time

8  that are not predicted.  So if I ask you to retire to the jury

9  room to consider something, it's because I've made a

10  determination that in fulfilling my judicial responsibilities

11  that it is best for me to have a discussion with the lawyers

12  outside your presence, but we will try to have that discussion,

13  and I will reach my conclusion as promptly as I can, always

14  mindful of your responsibilities in the trial.

15        The order of the trial is as follows:  In a second,

16  the lawyers for each of the parties, or the lawyers for the

17  government and then Mr. Sadequee, will be permitted to make

18  what we call opening statements.  That's their chance to

19  outline what they expect the evidence to be in the case and to

20  discuss it in the context of their respective positions.

21        The government will first make an opening statement.

22  Next the defendant may, but he doesn't have to, make an opening

23  statement.

24        After the opening statements are done, the government

25  will go forward with the calling of witnesses, which the

1    defendant may cross-examine, and the presentation of evidence

2    and during, and other evidence in addition to witness

3    testimony, that we call the government's case-in-chief.  That's

4    the government's chance to put on their evidence.  They do that

5    in what we call the case-in-chief.

6        When the government finishes, the defense may proceed

7    with evidence and with witnesses if they choose, after which,

8    within certain limitations, if that occurs, I may permit

9    additional witnesses to be called by the government so long as

10   it's in rebuttal to what was presented by anything that may be

11   presented by the defense.  I'll have to decide that once I see

12   how the case progresses.

13       The government begins the case and may, if

14   appropriate, present rebuttal evidence because the law places

15   the burden of proof, or what we also call the burden of

16   persuasion, upon the government.  And as I said, I will explain

17   this burden as part of my instructions to you at the close of

18   the evidence and before you begin your deliberations on a

19   verdict.

20       When the evidence portion of the trial is completed,

21   the counsel for the government and Mr. Sadequee will be given

22   the opportunity to address you and make their summations, or

23   what we call final arguments sometimes, in the case.  And after

24   those are done, I will instruct you on the law.  And then, and

25   only then, can you, upon my instruction, begin your

1    deliberations on the case, which will be privately amongst you

2    only in the jury room.

3            We are now going to start with the opening statements

4    by the government and by Mr. Sadequee.  The opening statements

5    that are made now, including the opening statement by the

6    defendant and the opening statement made by the government, are

7    not to be considered by you either as evidence in the case or

8    as your instructions on the law, which only I can give to you.

9            The statements and arguments are intended to help you

10   understand the issues and the evidence the parties expect will

11   be presented, as well as the position taken by both sides.

12           Those are your preliminary instructions.

13           Are there any objections to the instructions by the

14   government?

15           MR. MCBURNEY:  Judge --

16           THE COURT:  And if there are, then we should probably

17   take that outside --

18           MR. MCBURNEY:  I think you can -- we'll request for

19   you to clarify something but we can talk about that at a break.

20   It won't affect what's going to happen this morning.

21           THE COURT:  All right.  Mr. Sadequee?

22           MR. SADEQUEE:  No.

23           THE COURT:  With that, then, we'll begin with the

24   opening statement by the government.  Mr. McBurney?

25           MR. MCBURNEY:  Good morning.  My name is Robert

1   McBurney and I will be presenting the government's case to you,

2   along with Alexis Collins and Chris Bly, seated at the second

3   table.

4           The person we're here to talk about and you're here

5   to learn about is the defendant, Ehsanul Islam Sadequee, a

6   23-year-old American citizen, born in Virginia.

7           You are here to learn about this defendant and his

8   actions.  He's charge, as the judge explained to you, with

9   material support for terrorism and I want to spend just a few

10  minutes talking about what that is and what that isn't.

11          Material support is the provision of goods or

12  services, property or services.  It is not speech.  It is not

13  saying, "I like Al Qaeda."  It's not saying, "I like

14  Lashkar-e-Tayyiba."  You heard that name in the judge's

15  instructions.  It is providing something in support of

16  terrorists beyond speech.

17          Material support is also not an act of terrorism.

18  The defendant is not charged with saying something in favor of

19  Osama bin Laden, nor is he charged with committing an act of

20  terrorism.  He's charged with providing material support to

21  those who would commit an act of terrorism.

22          You will hear no evidence in this trial that the

23  defendant had a gun, that he was building a bomb, that he had

24  joined a particular terrorist organization, because that's not

25  what the charge is.  It would be a very different landscape if

1    that's what the allegation was, but it's not.

2         Here the defendant is charged with providing

3    personnel -- himself and some of his co-conspirators that you

4    will learn about -- in support of terrorism.

5         He's also charged with supplying property and that

6    property comes in a very specific form:  A series of videos

7    that the defendant and his co-conspirator, Syed Haris Ahmed --

8    Mr. Ahmed also from Atlanta, you'll hear about some in this

9    trial -- traveled to Washington, D.C. in April of 2005, and

10   made over 60 small video clips of different locations in our

11   nation's capital.

12        Six of those videos ended up on the computer of a

13   gentleman by the name of Younis Tsouli, who was arrested in

14   October of 2005 in the United Kingdom.  You'll hear a lot about

15   how Tsouli conspired with the defendant to provide material

16   support for terrorism and how he was in direct contact with

17   Al Qaeda in Iraq and helped facilitate people joining Al Qaeda

18   in Iraq and was very active on the web in disseminating the

19   propaganda of Al Qaeda in Iraq, a close conspirator of

20   Defendant Sadequee's.  He had six of the videos that defendant

21   and Syed Haris Ahmed made.

22        Two of the videos were found on the computer of an

23   Aabid Hussein Khan.

24        I mentioned a bunch of names, these names will come

25   up again, and we hope to have a white board up here where we

1    can track these names and the monikers.  Everyone has an online

2    name as well.

3         You'll learn the Defendant Sadequee was known online

4    mostly as Aboo Khubayb or Aboo Khubayb Al-Muwahhid, that will

5    be spelled for you.  But most everyone you are going to hear

6    about in this case has at least two identities:  their real

7    name and what they were known as online.  Younis Tsouli, for

8    example was Irhabi 007, the Terrorist 007.  Mr. Khan, I just

9    mentioned, was Abu Umar, among other names.

10        Now this conspiracy that I talked about, this

11   agreement that the defendant entered into, is just that, it's

12   an agreement.  He's not charged in two of the counts with

13   actually providing material support; he's charged only with

14   entering into an agreement.

15        So when you hear the word "conspiracy," I want you to

16   think agreement.  It means simply that the defendant entered

17   into an agreement with at least one other person to attempt to

18   provide this material support.

19        I want to touch briefly on the investigation in this

20   case.  Most of what you will hear will be the results of the

21   investigation, but you'll hear a little bit from some of the

22   case agents how it started and some of the steps they took to

23   gather the evidence you will consider.

24        You'll hear that in August of 2005, the FBI in

25   Atlanta received information from foreign law enforcement about

1    an e-mail address, almuwahhid@hotmail.com.  That turns out to

2    be the defendant's e-mail address.

3           FBI investigated, got information about who used that

4    e-mail address, and learned about Syed Haris Ahmed, this other

5    gentleman I mentioned, also based in Atlanta.

6           I want to let you know, you saw this in the jury

7    questionnaire, he had separate proceedings that have nothing to

8    do with what's going on today and the rest of this week.

9           So the FBI began its investigation, first learned

10   about Defendant Sadequee, Syed Haris Ahmed, only in August

11   2005.  Much of the evidence you will be hearing about occurred

12   before then and was gathered subsequently by the FBI and

13   foreign law enforcement as people were arrested and their

14   computers were seized and e-mails were found on computers,

15   chats, instant messages were found on computers.

16          The first series of significant arrests occurred in

17   October 2005.  Younis Tsouli, the gentleman I mentioned, or

18   Irhabi 007, the Terrorist 007, was arrested in London by

19   British law enforcement.  His computer was seized and on it,

20   as I mentioned, were six of the casing videos the defendant

21   made, along with all sorts of information that could be used to

22   support terrorism, ranging from how to build bombs and IEDs,

23   improvised explosive devices, as well as how to get into

24   training camps, et cetera.

25          The second person arrested, Mirsad Bektasevic, first

1    time you're hearing his name, he was arrested in Bosnia in

2    October of 2005.  He's known as Maximus, Maximus.  Maximus was

3    arrested by Bosnian law enforcement in connection with the

4    arrest in the United Kingdom and in connection with the

5    investigation here in Atlanta in possession of 40 pounds of

6    plastic explosives, a bomb belt.  You'll see a picture of it,

7    an actual web belt that clips here with three explosives

8    already attached, and the detonator in the same bag with the

9    belt, a firearm and a video that Mirsad Bektasevic had made

10   showing how to make detonators, some footage of the arsenal he

11   had gathered and an announcement as to what he and his

12   co-conspirators were intending to do in terms of attacks.

13           Finally, the final major step in the investigation

14   occurred in spring of 2006, when the defendant was arrested in

15   Bangladesh and brought back to the United States and his

16   closest co-conspirator here in Atlanta, Syed Haris Ahmed, was

17   arrested.

18           Now, what you will learn in the presentation of the

19   government's case is a chronology that follows roughly these

20   lines:  In terms of the defendant's intent, his state of mind,

21   what it was he was trying to do, you will learn, not as

22   evidence of his guilt in this case but as evidence of his frame

23   of mind, what his plans were, that as early as December 2001,

24   15-year-old Defendant Sadequee sent an e-mail to a website that

25   is closely affiliated with the Taliban in Afghanistan.  The

1       defendant indicated his strong desire to join the Taliban and

2       was asking operators of this pro-Taliban website how can I get

3       to Afghanistan and join the fight.  This is immediately after

4       the September 11th attacks, U.S. forces on the ground in

5       Afghanistan fighting the Taliban.

6              Now we fast forward to the summer and fall of 2004,

7       and you'll see evidence gathered from these hard drives I

8       described that were seized from the defendant's house, Syed

9       Haris Ahmed's house, the individuals in the United Kingdom,

10      Bosnia, et cetera, that the defendant had begun to plug deeply

11      into a series of online forums, websites, where like-minded

12      individuals, supporters of violent jihad exchanged ideas,

13      voiced their support, and talked about how they could do

14      something more than just type online but actually provide

15      material support.  This won't be their words, but how could

16      they get to the front lines.

17             A website in particular you will hear about is called

18      Tibyan, T-i-b-y-a-n, sometimes two A's in there.  It's a site

19      on which the defendant was extremely active.

20             While he was online meeting these people he got to

21      know an individual up in Canada, goes by the name of Azdee.

22      You'll hear more about Azdee from witness testimony.

23             Azdee introduced the defendant to someone down here

24      in Atlanta, Omer Kamal.  You will hear from Omer Kamal, he will

25      come here this morning and testify to you about what he knows

1    about this case.

2           Azdee knew that Kamal was based in Atlanta, the

3    defendant was based in Atlanta; you guys should get together,

4    talk about your shared interest in violent jihad.

5           The defendant had already befriended Syed Haris

6    Ahmed, someone else who shared this interest, and the three of

7    them began to spend time together, not just online but together

8    talking about what they could do to support violent jihad.

9           And it crystallized and the crime was completed --

10   we'll talk about this a little bit more when we get to the

11   law -- in the spring of 2005.  In the spring of 2005 Defendant

12   Sadequee and Syed Haris Ahmed traveled to Canada to meet Azdee

13   and several other like-minded individuals, others who supported

14   violent jihad.

15          Kamal didn't go.  Kamal broke away from the group

16   about then.  He's a student at Georgia State, focusing on

17   accounting, and he will tell you he wasn't willing to go that

18   far.

19          But the defendant was.  And it was in Canada, you

20   will hear, that the agreement was formed, the conspiracy was

21   hatched, and effectively, and according to the law, the crime

22   was complete.  The evidence will show you that it was in Canada

23   that the defendant and Ahmed and the others agreed that the

24   time is now, we need to take concrete steps, we need to go to

25   Pakistan, we need to get into a training camp and join the

1    fight, the fight with LeT, Lashkar-e-Tayyiba, in Kashmir, or

2    with the Taliban in Afghanistan, or with some entity in Iraq.

3    The planning had begun.

4            Specifically on Canada, March 2005, the defendant and

5    Syed Haris Ahmed take Greyhound, go up to Toronto and meet with

6    a series of other supporters of violent jihad.  They form their

7    plan.  And you will see a series of chats, instant messages.

8    It almost looks like a script from a play.  They will say Aboo

9    Khubayb Al-Muwahhid, defendant's online name, colon, and what

10   he typed in.  And it will say Azdee, the Canadian, what he

11   typed in.  Ahmed may be involved.  This Abu Umar, Khan, may be

12   involved.  And they talked very specifically about their plan

13   to get to Pakistan to get training and join the fight, to

14   provide themselves as personnel, as material support for

15   terrorism.

16           The next step the defendant took, the concrete step

17   beyond the agreement that was formed -- again I want to

18   emphasize, what the government needs to prove in particular as

19   to Count One is that there was an agreement to provide material

20   support to terrorists.  That agreement was formed in Canada.

21   Everything the defendant did beyond that, all the evidence you

22   see beyond that, is in addition to the agreement, it's beyond

23   that.

24           In 2005, the defendant, in April 2005, the defendant

25   and Syed Haris Ahmed traveled to Washington, D.C.  This is

1  where they made the videos I described.  They filmed at least

2  62 short clips of various locations in Washington, D.C., not

3  the White House, they didn't focus on the Washington Monument.

4  They filmed the Department of Energy, they filmed the

5  Department of Commerce, they filmed a fuel tank farm, they

6  filmed the World Bank.  There was footage of the Capitol, it

7  was primarily focused on security checkpoints.  These are the

8  videos they made and some of these videos ended up on the

9  computers I mentioned overseas.

10        As I said, the defendant shared them.  And you will

11  see in one instance specifically when and how he sent these

12  videos to Abu Hussein Khan, Abu Umar.  He packed them in files

13  with different names.

14        I want to talk a little bit about this factor, we

15  call it consciousness of guilt.  You will see throughout the

16  evidence that this is not a case about speech.  It is not a

17  case about the defendant having views that may differ from

18  yours or mine, maybe he supports Al Qaeda, the struggles and

19  things that Osama bin Laden stands for.  That speech is

20  protected in this country.  But actions taken to provide

21  material support to those types of people are not.  Those are

22  crimes.  And one way, the government is suggesting, you will

23  see evidence that the defendant and his co-conspirators were

24  aware that they were on the crime side of the line is that they

25  didn't speak openly.

1          I mentioned that the defendant sent two of the casing

2     videos to Aabid Hussein Khan, Abu Umar when he was in the

3     United Kingdom, Khan was in the United Kingdom.  He packaged

4     one of those videos in a file called Jimmy's 13th Birthday.

5     You'll see the chat.  He doesn't say:  Hey, Abu Umar, I went up

6     to Washington with my friend Syed Haris Ahmed, we had a great

7     time and I filmed some places you might like to see.  I know

8     you're interested in learning about energy.  I filmed the

9     Department of Energy, here it is.

10          It's very cryptic.  They talk about scoping and

11    there's alligators in the lake around the building, read the

12    hieroglyphics.  The World Bank video was the name of the World

13    Bank, but he first used hieroglyphics.  Perhaps these videos

14    will inspire the team.

15          You'll see the language and they're always speaking

16    around the issue, using code, using worlds like Land of Two

17    Towers or Pharaoh for the United States.  When they're talking

18    about something happening in the United States, the defendant

19    doesn't say America, or my country, United States.  He and his

20    co-conspirators use terms like the Land of Two Towers or

21    Pharaoh.  When they talk about Pakistan, they say Curry Land.

22    They don't want people to know what exactly they're talking

23    about.

24          You'll see a concept discussed known as "bait."  When

25    the defendant and some of his co-conspirators are figuring out

1    who the leader of this conspiracy should be -- this is how

2    detailed the discussions get -- they don't just say let's do

3    this, but let's give our group a name and we need to have a

4    leader.  And they're talking about possible leaders.  And one

5    concern they have about Syed Haris Ahmed, whom they proposed as

6    a possible leader, is that he's too bait.  In other words,

7    he'll attract the attention of law enforcement because what

8    they're doing is illegal.  It's not just a Boy Scout troop

9    where you can say this is the head of the Boy Scout troop.  You

10   don't need to hide the fact who the leader is and you don't

11   need to worry about whether the leader would attract the

12   attention of the police because that's not what the Boy Scouts

13   are up to.  But you will see in this case the evidence shows

14   we're not talking about Boy Scouts.

15              You'll also hear a little bit about encryption from

16   witnesses, as well as an actual chat that starts out encrypted.

17   The defendant and his co-conspirators kept their conversations

18   away from as many people as they could and they took many

19   steps, to include encrypting their chats so that if you weren't

20   supposed to be a part of it all you get is gibberish, you can't

21   read what it is they're talking about.

22              After Canada and Washington, D.C., both the defendant

23   and his close co-conspirator, Syed Haris Ahmed, left the

24   country.  Ahmed went to Pakistan in July of 2007.  And you will

25   see from a number of chats, you'll also hear from several

1   witnesses, that his purpose for going to Pakistan was not to go

2   be with relatives. He was born in Pakistan and he did see

3   relatives while he was over there, but his purpose for going to

4   Pakistan was to get into a training camp so that he could

5   pursue violent jihad.

6         And he was in the vanguard. You'll see in the chats,

7   Ahmed says: I'll go first, I'll establish the beachhead. Let

8   me get over there, I'll make the contacts and then, Sadequee,

9   you come over, Azdee, you come over, we'll all get together and

10   we'll have our group in Pakistan training to provide material

11   support to terrorists.

12         You'll hear that Ahmed, there for about a month, was

13   talked out of his plan, at least the notion of enrolling in an

14   Islamic madrassa, where he might learn more about Islam and

15   wait for his friends to come over there, by family and

16   spiritual advisors, and he came back to the United States.

17         You'll hear evidence that after he got back, he went

18   back to Georgia Tech in August, he wasn't done. He continued

19   to pursue violent jihad. You'll hear that he was back online

20   researching high explosives, that he continued to communicate

21   in clandestine ways with Defendant Sadequee and others about

22   his plans to pursue violent jihad.

23         Now, the defendant went to Bangladesh in August of

24   2007. The day before Syed Haris Ahmed returned from Pakistan,

25   the defendant was on a plane for Bangladesh. He went to

1   Bangladesh for two reasons, the evidence will show.

2          He went to get married.  You'll hear from a number of

3   witnesses, he went to get married.  In fact, he did get married

4   in Bangladesh.  You'll see in a number of these chats that that

5   was often a cover story discussed by the conspirators as to how

6   to get overseas with an explanation that wouldn't draw

7   suspicion:  Why is this young Muslim male wanting to go to

8   Pakistan or Bangladesh?  I want to get married, I'm going to

9   marry this woman, it's innocent, like that.

10         The evidence is very clear the defendant did get

11  married while he was in Bangladesh.  But he also continued his

12  pursuit of violent jihad and his material support for violent

13  jihad.

14         And it was while the defendant was in Bangladesh that

15  he became particularly close to Mirsad Bektasevic, the Bosnian

16  arrested with the bombs and the gun, and Younis Tsouli,

17  Terrorist 007.  And you'll hear evidence about the discussion

18  of the formation of an organization called Al Qaeda in Northern

19  Europe.

20         In fact, you'll see a formal announcement that the

21  Bosnian gentleman posted on one of these radical websites,

22  conveniently on 9-11 at the precise minute that the first plane

23  hit the first tower.

24         The announcement:  Al Qaeda in Northern Europe.  They

25  will be based in Sweden, and you will see evidence that the

1    defendant was trying mightily to get from Bangladesh to Sweden,

2    bringing his wife along, how to deal with the visa paperwork.

3    He mentioned -- "bayaan" means announcement -- the announcement

4    on 9-11-2005 with the formation of Al Qaeda in northern Europe.

5           And you will see a discussion between the defendant,

6    online chat, between the defendant, Younis Tsouli, and Mirsad

7    Bektasevic about the need to get a video out there announcing

8    what they're doing.  And within that larger video the defendant

9    proposed placing some of his Washington, D.C. casing videos.

10   That's the property I'm talking about that was the material

11   support for terrorists.

12           I want to talk a little bit about the law.  The Judge

13   told you, and he is, as usual, 100 percent correct, he tells

14   you the law but I'm given the opportunity to try to explain it

15   a little bit.

16           The counts are not complicated but the wording is

17   complicated and the way the defendant is charged may seem to

18   you to be a little cumulative.  I want to try to break it down.

19           I want to repeat:  Defendant Sadequee is not charged

20   with committing any terrorist act, no bomb throwing, no

21   shooting, no dead bodies.

22           He's charged with agreeing to provide material

23   support to terrorists, Count One.  And then in Count Two

24   actually taking a concrete step, an attempt in that direction.

25           So Count One, all the government needs to show is

1   that the defendant conspired, that he agreed with others to

2   provide material support.  We've already described in what form

3   that support comes:  people, personnel, himself, Ahmed, Azdee,

4   all these others, or property, the videos.  And that this

5   support had to go, not just anywhere, but to terrorists who

6   were planning on doing something here in the U.S. or something

7   abroad, acts of violence, not just having a part, but acts of

8   violence here in the United States or overseas.

9         There is no requirement for Count One that the

10  defendant actually take a substantial step, that someone get a

11  bomb, although Bektasevic did, that someone have a gun,

12  although Bektasevic did.  The law allows the government to stop

13  the plan before someone enrolls in the flight school to learn

14  how to fly a jet.  The crime was complete in Canada but we have

15  an additional year's worth of evidence.

16        Now, Count Two, the government needs to show -- and

17  this is the concrete step in support of this conspiracy -- that

18  the defendant actually provided, or at least attempted to

19  provide, tried to do something to get this material support to

20  the terrorists, the people or the property, to the terrorists

21  who were going to do something in the United States or abroad.

22        Now, all of the evidence you're going to hear is in

23  support of Count One and Count Two.  Within that evidence there

24  exists a second set of crimes.  You'll see evidence that there

25  was in fact a specific organization that the defendant and his

1    co-conspirators thought about joining.  This is the

2    Lashkar-e-Tayyiba.  That's what the second set of crimes are

3    about, Counts Three and Four focus more narrowly on the fact

4    that the defendant and others had identified one entity that

5    they might provide support directly to.

6         That's Count Three, the conspiracy and agreement,

7    hey, yes, we should do this thing -- not that they followed

8    through -- to provide material support, in this case just

9    personnel, no evidence that these videos were destined for LeT,

10   but that they were going to provide personnel to

11   Lashkar-e-Tayyiba, designated terrorist organization.  In other

12   words, they would get to the training camps and while they were

13   there training, learning the skills, they would be under the

14   direction of Lashkar-e-Tayyiba.

15        Count Four is much like Count Two.  It's the concrete

16   step version of the conspiracy.  Count Four again charges the

17   defendant with attempting to provide material support.  But he

18   took a step, it wasn't just the agreement.  Someone did

19   something.  And in this case they sent Syed Haris Ahmed to

20   Pakistan and he tried to get in.  And you'll see other steps

21   that they took.  But the difference between Three and Four,

22   someone actually took a concrete step to attempt to further the

23   plan to provide people to Lashkar-e-Tayyiba.

24        In the last few minutes -- and if I look up, it's

25   partly for divine guidance, there's also a clock above you all

1    that tells me how little time I have left, but I have a few

2    minutes -- I want to talk a little bit about trial logistics.

3    The judge covered most of this.  This will be quick.

4         The forms of evidence.  The evidence that you get

5    will come from the witnesses who will sit right up there in

6    that empty chair.  There will be what they say and then

7    exhibits that the parties admit through the witnesses.  It

8    won't be what I say and it won't be what the defendant says, so

9    long as he's representing himself, when he's giving his

10   statements and asking witnesses questions.

11        Now, you may well get a communication that has

12   defendant's statements in it, a chat between the defendant and

13   someone else.  That statement of the defendant is evidence in

14   that document.

15        So you'll have witnesses; they'll tell you what

16   happened in the case.  There will be chats, there will be

17   e-mails, there will be some other documents, and you may see a

18   few of the videos from Washington, D.C.  That's generally the

19   format of how the evidence will get to you.

20        Your witnesses will range from FBI agents to an

21   expert on online jihad, things like that.  There will be this

22   Omer Kamal, the friend of the defendant who was involved in

23   some of the early activities I described.  There will be some

24   technical witnesses who talk a little bit about how all this

25   evidence from the hard drives was acquired.  And, assuming we

1     can arrange the logistics, there's a white board over there

2     where we will be keeping track of all these monikers.  You'll

3     keep track in your own way but in an effort so assist you, when

4     someone gives a moniker, so-and-so is Aboo Khubayb, we'll be

5     writing that up so you can keep track of who is who.

6          The first witness you'll hear from is one of these

7     technical folks.  I just want to preview this.  Typically the

8     witnesses will tell you some part of the events of this case.

9     The very first person, who will also appear later in the trial,

10    is simply going to be authenticating some evidence.  You may

11    scratch your head and get real worried that it's going to be a

12    pretty slow trial.  He's basically going to tell you Exhibits

13    1, 5, 10, 15 all came from a particular hard drive.  He's not

14    going to talk about what those exhibits are, you'll see them

15    later.  But don't despair, the witness after that, we get into

16    the facts of the case.

17         The Judge already talked to you about note taking.  I

18    encourage you to do that if that's your style.  You will not

19    get witness testimony back in your deliberation room but you

20    will have your notes and you will have all the exhibits.

21         And just briefly, the Judge talked about this as

22    well, the defendant as lawyer, when the defendant is

23    representing himself, what he says to you and questions he asks

24    the witnesses, it's not evidence.  If it's in a document that

25    the Judge admits, some statement he made, that is evidence for

1    you to consider.

2              I want to close by repeating a couple of important

3    points.

4              It's not a case about the defendant making bombs or

5    throwing bombs.  That's not the charge and that's not our

6    burden.

7              It's a case about an agreement the defendant entered

8    into with others to provide material support, not moral

9    support, not speech, this is not about his ideas; it's about

10   the defendant's actions, his actions in support of violent

11   jihad, of terrorists who were planning on committing acts

12   either in the United States or abroad.

13             It's not a case about speech, it's not a case about

14   the defendant's beliefs; it's a case about what the defendant

15   did.

16             When I come back for closing arguments, provide the

17   government's perspective on what the evidence showed, and I'll

18   end by asking you then what I'll ask you now, and that is weigh

19   the evidence carefully when you're in the deliberating room.  I

20   suggest to you that after you do all that you will find that

21   the evidence will show you beyond a reasonable doubt that the

22   defendant is guilty of the crimes with which he's charged.

23   Thank you.

24             THE COURT:  All right, thank you, Mr. McBurney.

25             Mr. Sadequee?

1          MR. SADEQUEE:  (Foreign language spoken).  I start in

2     the name of God, the Lord of grace, the most compassionate.

3     All praise belongs to God, the Lord of all the worlds, and

4     peace and blessings be upon his last Prophet and messenger to

5     mankind.

6          THE COURT:  Mr. Sadequee, can you move the microphone

7     so it's pointed towards you?  You might want to push it down.

8     I think that will be better.

9          MR. SADEQUEE:  I won't be too long.  It's going to be

10    very brief since I'm not a lawyer and I want to get to the main

11    part of the trial as well.

12          So I want to start briefly about the uncontested

13    facts about myself.

14          My name, my real name is Ehsanul Islam Sadequee,

15    nickname and my family and friends call me by Shifa, which

16    means "cure."

17          I don't want to repeat what Mr. McBurney had already

18    said, so just some brief things about myself.

19          Yes, my main activities online consisted, 90 percent,

20    of translations.  Tibyan Publications is, in the English

21    language, one of the most -- actually, according to one of the

22    experts who will come, the most popular -- what do you call it?

23    -- translating publications of jihadi material in Islam, not

24    just jihad, but many books on jihad, jihad-related.

25          And when we say jihad, I'm not talking about

1  bomb-making, you know, stuff.  It's ideological things on the

2  governance of God upon earth, issues of whether or not it's in

3  Islamic law, what's permissible in terms of international

4  politics, domestic Islamic politics.

5  So all that is considered jihad.  Jihad is not, when

6  we say -- when the prosecutors, they say, translation jihad

7  material, it's not translation of bomb-making materials or --

8  which is legal, anyway, but we're talking about ideological

9  stuff, biographies of people of the past, people of the

10  present, so on and so forth.

11  These things are obviously not things which the

12  mainstream American, non-Muslim, Christian, Jewish, whatever

13  background, atheist, would not agree with but, nonetheless,

14  it's supposed to be protected by the First Amendment.

15  Some other things about myself.  I was arrested,

16  along with a bunch of other young men in different countries,

17  Bosnia, the UK and Denmark, Canada.  They arrested me from

18  Bangladesh.  I was brought over here, I can't go into the

19  details because the government objected to me to say any

20  details about that.

21  So, yes, this international, GTTF, Georgia Terrorism

22  Task Force, investigation was called, code named Operation

23  Northern Exposure, ONE.  Perhaps we'll be able to get into more

24  details about that later on in the case, God willing.

25  I was arrested in April of '06, 2006, brought over to

1    an Air Force base in Alaska and then to New York, where I was

2    in several, couple of months.  Then I've been in Atlanta ever

3    since, more than three years, waiting for my trial, even though

4    I have been trying to get speedier trial.  But, again, that's

5    another objection from the government, I can't go into the

6    details of the conditions of my --

7                MR. MCBURNEY:  Objection.

8                MR. SADEQUEE:  I'm not going --

9                THE COURT:  Sustained.  You have been instructed not

10   to discuss certain matters.  You need to move on, Mr. Sadequee.

11               MR. SADEQUEE:  My online name, which the prosecutor

12   has mentioned, was, it's pen name on publications, Aboo Khubayb

13   Al-Muwahhid.  I had also some other monikers but that was the

14   name through which I used to publish or post online.

15               One of the focuses of mine in this trial will be, as

16   the government has also pointed out themselves in their

17   opening, that coded speech, encrypted speech, and I'll be

18   pointing out these things throughout the trial.

19               I'm not going to be making this opening too long.

20               I went to Bangladesh.  I got married.  That was the

21   purpose of my going to -- that's my homeland.  I came back from

22   Bangladesh some brief time.  Okay, 2001 I went to Bangladesh.

23   I was over there several years, until 2004.  I was studying

24   over there, Islamic studies, as well as my O levels, which is

25   the British system of high school.

1       Then I came back, in 2004, to Georgia and I did my

2   SATs and my GEDs, hoping to get into university over here.  And

3   during my stay in Bangladesh, before I came back to the U.S., I

4   had intended to marry my cousin, Happy, over there.  There was

5   some problems, which we'll get into during the trial as to why,

6   family relations.

7       So I came back to Georgia in 2005 -- I mean 2004, I'm

8   sorry, and then I was here for one year and I was working at a

9   place called Raksha, which helps victims of domestic violence

10  of South Asian community.  My sister also works there.  And the

11  government will be bringing some witnesses from Raksha, my

12  coworkers.

13      Then I went back to Bangladesh in 2005 -- I was here

14  about one year -- 2005, August, to get married.  And I did not

15  know how long I was going to stay over there because I knew

16  that there is just so many problems with my family over there

17  that I don't know how long I was going to stay to get married

18  there.

19      While I was over there I had online contact.  The

20  government says I became very close to Irhabi 007.  Online

21  chats, it's not any physical, I never met the person, never

22  even saw the person, and the chats were from cyber cafes

23  because I didn't have a computer.

24      Anyways, something very important that I want to

25  point out is that the word "conspiracy," if you look into a

1    dictionary, it's synonymous with the word "plan."  Government

2    will always use the word "conspiracy" and this is, the average

3    person might not have -- familiar with the word "plan" because

4    it's a daily word that we use.  We plan to go somewhere, we

5    plan to go to work.

6          So plan, according to my understanding, I believe

7    that everyone else has the same understanding, is that there

8    needs to be a -- and I'll demonstrate this throughout the trial

9    as well.  There is a need for something to be defined, a place

10   that you want to go, a means of transportation that you want to

11   go there to, lodging, where you want to stay, or, in this case,

12   if someone is planning a terrorist attack, what are you going

13   to attack or how with you going to attack, who are you going to

14   attack with, against who, when?

15         So if nothing is there except a vague idea, someone

16   wants to do something somewhere with someone somehow, and

17   nothing is definite, everything is a question mark, blank, then

18   can that be called a plan?  Or is that just called fantasizing,

19   that I want to one day go to Paris, France on a honeymoon.  You

20   know, I want to point out this is, to me, is very important for

21   the jury to understand, everyone to understand, the difference

22   between that.

23         So when someone says, when the government says I was

24   planning a terrorist attack or I was planning to support

25   terrorism, then the government will say, for example, in

1    Canada, they said that, and they will say, that a plan was

2    devised to -- a conspiracy was formed to support terrorism.

3            And we will show that -- the defense, meaning I --

4    will show that in fact there was no plan.  There was a lot of

5    talk about doing a lot of things and no one did anything,

6    right.  So there was people saying that they're going to go to

7    Somalia next month or they're going to go somewhere, like

8    saying I'm going to go to Iraq next week, and nothing.  I never

9    even went online to search for a ticket.  I mean, a lot of just

10   empty talk.  That having been said, that is how it turned out

11   prior to my arrest.

12           After my arrest, after I find out a lot of things,

13   and I don't know how much I can get into this, but about

14   Operation Northern Exposure, hopefully I'll be able to question

15   some of the FBI agents regarding this, and some of the

16   significance of coded and encrypted speech, which the

17   government has and will present who will go into these things

18   in more detail throughout the trial if I'm alive and nothing

19   happens to me, and also -- I don't want to make this too

20   lengthy and I want to get to interviewing the witnesses.  Today

21   hopefully they are going to be bringing my co-defendant, Haris,

22   who I want to be questioning.

23           So I'm not an experienced lawyer, so basically this

24   is my opening as -- I think I'll leave it there.

25           THE COURT:  All right.  Thank you, Mr. Sadequee.

1          The government will call its first witness, please.

2          MR. MCBURNEY:  Government calls Doug McGee.

3          THE COURT:  Please come forward and take a place in

4    the witness box and be sworn in.

5          THE COURTROOM DEPUTY:  Please raise your right hand.

6                    DOUGLAS MCGEE,

7    being first duly sworn or affirmed, was examined and testified

8    as follows:

9          THE COURTROOM DEPUTY:  Please be seated.

10                  DIRECT EXAMINATION

11   BY MR. MCBURNEY:

12   Q.   Good morning, sir.

13   A.   Good morning.

14         THE COURT:  Excuse me, what is that?

15         MR. MCBURNEY:  I think it was our Sanctions system

16   turning on for the first, and hopefully only, time of the day

17   so we can get the exhibits up there.

18         THE COURT:  Thank you.

19   Q.   (By Mr. McBurney)  Good morning, Mr. McGee.

20   A.   Good morning.

21   Q.   Where do you work?

22   A.   I work at the FBI in Atlanta.

23   Q.   What is your position with the FBI in Atlanta?

24   A.   I am a certified forensic examiner and information

25   technology specialist with the Computer Analysis Response Team.

1    Q.    What does that mean you do?

2    A.    That means I identify, preserve, and examine digital data

3    of all types.

4    Q.    Digital data could consist of what types of things?

5    A.    CDs, thumb drives, hard drives, floppies, if we go back to

6    the old school way of doing things.  We even examine cell

7    phones, you know, all types of digital data.

8    Q.    Agents bring these things to you or are you also out in

9    the field trying to find and make cases?

10   A.    It's a mixture of the two.  We actually go out in the

11   field and retrieve data, as well as assist the agents when they

12   bring computers and hard drives and digital data into the

13   office to examine.

14   Q.    But in general is your role a role that supports a case

15   that an agent has begun to make or do you make your own cases?

16   A.    No.  We only support the agents in cases that they have

17   started.

18   Q.    Did you provide support to the case involving Defendant

19   Sadequee?

20   A.    I did.

21   Q.    What types of materials did the agents bring you to

22   examine?

23   A.    We had a range of materials from CDs, cell phones, hard

24   drives, entire computers.  And we actually went out and

25   assisted in the retrieval of data onsite at some locations.

United States District Court

1    Q.   Okay, we'll take talk about some of those.  Tell the

2    jurors briefly what it is you do.  Let's just use a hard drive

3    as an example.  Agent Scherck brings you a hard drive, Hey,

4    this is related to the case with the Defendant Sadequee.

5    A.   Well, leaving out all the administrative work that we have

6    to do, one of the first things we do when we get a hard drive

7    from one of the case agents, and this is a very important

8    function that we perform, is we preserve that digital evidence.

9         We are one of the few forensic disciplines where we

10   have the ability to make a working copy, an exact digital copy

11   of that evidence when we're brought it.  A lot of the other

12   forensic disciplines, DNA analysis, for example, in order to

13   analyze that evidence they have to destroy it in order to

14   analyze it.

15        We actually are able to make an exact working copy of

16   that evidence and only work off the working copy.  We don't

17   have to touch the original once we make that working copy.

18   Q.   Do you have a particular tool, electronic or otherwise,

19   that you tend to use when you are examining a hard drive to see

20   if it has some piece of evidence that an agent has asked you to

21   look for?

22   A.   Yes.  In particular, we have a tool known as a Forensic

23   Toolkit.  It's manufactured by AccessData out of Salt Lake

24   City, Utah.  That's just one of our many dozens and dozens and

25   dozens of tools that we have availability to use.

1    Q.    Does FTK -- is that what we call it?

2    A.    Yes, sir.

3    Q.    Forensic Toolkit, does FTK enable you to search a hard

4    drive for a particular term?  If you were asked to look for the

5    Aboo Khubayb Al-Muwahhid moniker, can you slice and dice a hard

6    drive to see if that moniker appears anywhere in the hard

7    drive?

8    A.    Yes, sir.

9    Q.    Were you asked to do things like that in this case, look

10   for names, words of interest, et cetera?

11   A.    Yes, sir.

12   Q.    Did you receive hard drives only from the United States or

13   digital evidence only from the United States?

14   A.    No, sir.

15   Q.    From, in connection with this case, from Canada?

16   A.    Yes, sir.

17   Q.    Denmark?

18   A.    Yes, sir.

19   Q.    Sweden?

20   A.    Yes, sir.

21   Q.    The United Kingdom?

22   A.    Yes, sir.

23   Q.    Bosnia?

24   A.    Yes, sir.

25   Q.    And then domestically, you mentioned you actually were

1    involved in some acquisition, did you receive any digital

2    evidence from an address known as Brynbrooke Drive?

3    A.    Yes, sir.

4    Q.    That's an address associated with what individual

5    connected with this investigation?

6    A.    Syed Haris Ahmed.

7    Q.    Did you receive digital media from an address known as

8    Nowata Drive?

9    A.    Yes, sir.

10   Q.    That's associated with which individual?

11   A.    I believe that's associated with the defendant.

12   Q.    And how about an organization known as Raksha?

13   A.    Yes, sir.

14   Q.    You got digital evidence from there as well?

15   A.    Yes, sir.

16   Q.    You mentioned that on at least one occasion you were

17   involved actually going out in the field to secure the copies,

18   make the copies, or secure the computer, wherever the digital

19   evidence was.  Which are the ones that we just mentioned were

20   you involved with out in the field?

21   A.    Raksha.

22   Q.    On these hard drives, this digital evidence, were you able

23   to locate instant message or chat communications that people

24   had saved?

25   A.    Yes, sir.

1    Q.    E-mails?

2    A.    Yes, sir.

3    Q.    Address books, meaning buddy lists?

4    A.    Yes, sir.  They're contacts and buddy lists, yes, sir.

5    Q.    Saved files, a Word document or a saved web page?

6    A.    Yes, sir.

7    Q.    All these items that you described finding, were they

8    things that you thought might be of interest or were they the

9    product of search terms that case agents had given you?

10   A.    No, sir.  We are only -- we only look for items that the

11   case agent gives us to look for, sir.

12   Q.    I want to talk specifically about a few sets of digital

13   evidence that you dealt with.  You mentioned that you processed

14   some digital evidence from Nowata Drive, an address connected

15   with the defendant.  Did you -- were you able, based on terms

16   provided by the case agents, to identify any items of interest

17   on that set of digital evidence?

18   A.    Yes, sir.

19   Q.    Are you able, using FTK and your training, to perform what

20   I'd call a connectivity analysis, showing that someone using

21   hard drive X at some point in time sent or received an e-mail

22   from someone using another e-mail address?

23   A.    Yes, sir.

24   Q.    Were you able to perform that kind of work on the Nowata

25   hard drives?

1    A.    Yes, sir.

2    Q.    You mentioned Brynbrooke, an address associated with Syed

3    Haris Ahmed, same type of analysis on that hard drive?

4    A.    Yes, sir.

5    Q.    I'd like you to look at -- you should have a series of

6    exhibits in front of you, we're not tendering many of these

7    through you, we're having you just identify some of them, at

8    the end we'll tender a few -- Government's Exhibit 71.

9    A.    Yes, sir.

10   Q.    71, 75, 124, and 174 through 178.

11   A.    Yes, sir.

12   Q.    Are these all items, hard copy versions that you located

13   and extracted from the Brynbrooke hard drive?

14   A.    They are.

15   Q.    You're looking at a piece of paper right now and not a

16   hard drive, you're not wearing your white lab coat, how do you

17   know?

18   A.    We've reviewed these evidence items prior to this, spent

19   many hours going through all these paper documents and

20   verifying those against the digital files that were found in

21   the digital evidence.

22   Q.    Meaning you held up the paper document to confirm that

23   it's what's on the screen when you find the same thing on the

24   computer?

25   A.    Yes, sir.  And then I initialed off on these documents,

1    sir.

2    Q.    All the numbers I just mentioned have your initial

3    somewhere on it?

4    A.    Yes, sir.

5    Q.    Let's move on to -- oh, one last question about those

6    exhibits.  Are there, in particular the communications, an

7    e-mail or a chat, either in this folder or other folders we'll

8    look at, are there any changes you're aware of to the hard copy

9    version that doesn't exist on the original item as it is found

10    on the hard drive?

11    A.    Yes, sir.  In particular these documents actually have

12    translation of foreign terms and words and the translation has

13    been entered into a document itself.

14    Q.    Okay.  Did you enter the translation?

15    A.    No, sir.

16    Q.    Was the translation entered into the original evidence or

17    a copy made of the original evidence?

18    A.    A copy made.

19    Q.    Beyond that were there any changes made to the evidence

20    that you're aware of?

21    A.    No, sir.

22    Q.    More importantly, did you do anything to change the

23    digital evidence from the form it was in when it arrived in

24    your lab?

25    A.    No, sir.

1    Q.    The hard drive from Raksha, you told the jury you were

2    involved in actually recovering it, did you perform the same

3    type of, you call it connectivity work, that you did with

4    Nowata, finding out if there were e-mail addresses or chat

5    names on that hard drive?

6    A.    Yes, sir.

7    Q.    Did you receive digital media from the United Kingdom in

8    connection to an investigation over there known as Operation

9    Mazhar?

10   A.    Yes, sir.

11   Q.    If you would look at Exhibits 229 and 231.  There should

12   be a folder.

13   A.    I see 229.  However, I do not --

14   Q.    231 should be a disk.

15   A.    CD, I'm sorry, yes.

16   Q.    229 and -- take a step back.  The digital evidence you got

17   from Operation Mazhar in the United Kingdom, was it subdivided

18   in some way?  You get a big package from the United Kingdom.

19   Was the digital evidence broken down by initials or pack or

20   anything like that?

21   A.    Yes, sir.  We actually received multiple hard drives and

22   on each one of those hard drives were directories or folders on

23   those hard drives containing the digital evidence that the UK

24   authorities retrieved.

25   Q.    Exhibits 229 and 231, which you found, were those from a

1    specific subset of the Mazhar evidence?

2    A.    Yes, sir.  This was from the DRH evidence, sir.

3    Q.    You don't know the significance of DRH, but that's at

4    least where it was found?

5    A.    That's correct.

6    Q.    Someone else can explain what that is.  But 229 and 231,

7    you've confirmed, came from DRH?

8    A.    Yes, sir.

9    Q.    You should also have in front of you Exhibit 60.  It

10   should be a document also from Op Mazhar but a different subset

11   of Op Mazhar.

12   A.    Yes, sir.  This exhibit originated from a directory path

13   on the UK evidence known as CJG.

14   Q.    Just a different subset within the Operation Mazhar

15   evidence?

16   A.    Yes, sir.  There were hundreds of exhibits on the evidence

17   provided by the UK.

18   Q.    What type of document is it?  Is it an e-mail, a Word

19   file?

20   A.    This is a Word document.

21   Q.    Are you able, when you recover a Word document from a hard

22   drive, to still examine its properties, who wrote it,

23   et cetera, to whom the copy of Microsoft Word was licensed?

24   A.    Yes, sir.  As a matter of fact, almost all Word documents

25   that a user creates have what is called metadata embedded in

1    that document.  It tells you what version of Word created the

2    document, who the last author was, when the last revision was

3    made to that document.  That's all part of a standard Word

4    document.

5    Q.    And Exhibit 60, the metadata told you what about whose

6    copy of Microsoft Word initially created whatever Exhibit 60

7    is?

8    A.    The company name that was associated with this document

9    was Raksha.

10   Q.    All right, let's move to the large set of evidence in

11   front of you.  Did you also receive from the United Kingdom

12   digital evidence associated with a case known as Operation

13   Praline?

14   A.    Yes.

15   Q.    Was that -- is that associated with a particular

16   individual that you're aware of?

17   A.    To my understanding that was associated with an individual

18   by the name of Khan, spelled K-h-a-n.

19   Q.    Before you you should have -- this will be a long list of

20   numbers so I'll go slowly -- 95 through 97.

21   A.    Yes, sir.

22   Q.    99.

23   A.    Yes, sir.

24   Q.    105 through 108.

25   A.    Yes, sir.

1 Q. 110 through 123.

2 A. Bear with me just a moment.  Yes, sir.

3 Q. 125.  We're almost there.

4 A. Yes, sir.

5 Q. And then 142 through 144.

6 A. Yes, sir.

7 Q. All right.  Do all of these have your initials on them?

8 A. They do.

9 Q. What does that signify?

10 A. Again, that signifies I spent many hours verifying these

11 printed copies against the original digital evidence that I

12 found on the evidence supplied by the United Kingdom

13 authorities.

14 Q. Through Operation Praline?

15 A. Yes, sir.

16 Q. Whatever that may be.  One forensic question about Exhibit

17 96.  First, not going into any content, Exhibit 96 is what kind

18 of thing?

19 A. I'm sorry?

20 Q. Is it an e-mail or a chat or a photograph?  If you can

21 tell.

22 A. It's hard to make out from this but it appears to be just

23 a text document.

24 Q. Were you able, by looking at metadata or some other type

25 of data that you can look at, to determine the last date that

1    that file was modified on the original, wherever that stuff

2    came from, the original digital evidence?

3    A.    Yes, sir.  The modification date was May 3rd, 2005.

4    Q.    Did you also receive hard drives from Bosnia?

5    A.    Yes, sir.

6    Q.    Were you asked to run some of these same searches?

7    A.    Yes, sir.

8    Q.    Mr. McGee, how do you confirm that what you received --

9    you don't need to look through any more of those.  But from

10   Operation Praline, they send you a bunch of digital evidence,

11   how do you confirm that what you got is what they meant to send

12   you?  Meaning didn't get erased when it went through an x-ray

13   machine at an airport, that we're talking about the same

14   evidence?

15   A.    Sure.  In the digital forensics world we use a

16   mathematical function known as MD5 hash and we use that for two

17   different functions.

18         One is to verify that when we have a copy or make a

19   copy that it matches the original.  I guess the best way to

20   explain it would be to imagine you're making a photocopy of a

21   piece of paper and you make a photocopy and that copy -- that

22   copy machine applies this mathematical function that gives a

23   32-digit fingerprint or digital identifier to your original and

24   your copy then comes out of the copy machine and it's able to

25   tell you that that copy is an exact match based upon that

1    identifier.  So that 32-digit alphanumeric character that the

2    MD5 generates, again, just like a digital fingerprint, allows

3    us to say that this is an exact copy of the starting source

4    evidence.

5              So that's one of the ways we validate.  We can also

6    use that same function to find individual files that may match

7    other individual files.

8    Q.   Did the MD5 hash values for all these items we just talked

9    about match?  Meaning what you extracted through FTK and what

10   you do, versus the original evidence as received from the

11   United Kingdom or Brynbrooke Drive or wherever.

12   A.   They did.

13   Q.   Were there video files of particular interest to the

14   investigators in this case that you were asked to search for?

15   A.   Yes, sir.

16   Q.   Videos of what type of thing?

17   A.   The videos appear to be of locations in and around

18   Washington, D.C.

19   Q.   Were you able -- let's take a look at Exhibit 10.  Were

20   you able to find on the digital media from Operation Mazhar,

21   not the Khan case but the other case, any of these Washington,

22   D.C. videos?

23   A.   Yes.

24   Q.   How many?

25   A.   There were six.

1    Q.    Are they on that disk?

2    A.    They are on Exhibit 10, yes, sir.

3    Q.    Have you viewed what's on Exhibit 10?

4    A.    Yes, sir.

5    Q.    Are those exact copies of the six videos of the

6    Washington, D.C. area that you found on the Operation Mazhar

7    hard drives?

8    A.    Yes, sir.

9              MR. MCBURNEY:  The government tenders Exhibit 10.

10             THE COURT:  Any objection?

11             MR. SADEQUEE:  No.

12             THE COURT:  It's admitted.

13   Q.    (By Mr. McBurney)  These files, if you recall, were found

14   where?  And I don't mean what was the file pack, but were they

15   packaged in anything or protected in any way?

16   A.    Yes.  These were, again, included in that forensic

17   evidence that was included in that DRH folder on the Operation

18   Mazhar evidence.

19   Q.    Were they stand-alone files?  Were they zipped into a

20   folder?

21   A.    They were actually included in a zip file on that evidence

22   identified as washington.zip.

23   Q.    Was that file, washington.zip, password protected?

24   A.    It was password protected by the operating system, yes.

25   Q.    What do you mean by that?

1    A.    Windows has a feature known as the encrypted file system,

2    wherein a user can actually encrypt their entire home directory

3    so every file that's in their home directory gets encrypted.

4          In this particular case, if I remember correctly, DRH

5    included over 20,000 encrypted file items.

6    Q.    But just so we're clear on this, you say the operating

7    system encrypted it.  This wasn't Bill Gates deciding that a

8    file should be encrypted.  The user has to take some concrete

9    step?

10   A.    Yes, sir.  The user has to take direct action to turn on

11   the encryption.

12   Q.    Okay.  Let's take a look at Exhibit 11.  Were you able to

13   recover from the Operation Praline digital evidence any of

14   these Washington videos we've been talking about?

15   A.    Yes, sir.

16   Q.    How many?

17   A.    Two.

18   Q.    On Government's Exhibit 11, do those two video clips of

19   Washington, D.C. exist?

20   A.    Yes, sir.

21   Q.    Are they exact copies of what you found on the Operation

22   Praline digital evidence?

23   A.    Yes, sir.  And going back to that MD5 hash, that's how we

24   identify these views as being exact matches.

25          MR. MCBURNEY:  Government tenders Exhibit 11.

1          THE COURT:  Any objection?

2          MR. SADEQUEE:  No.

3          THE COURT:  It's admitted.

4     Q.   (By Mr. McBurney)  Same question about these two files,

5     were they just sitting out in the open in a directory called My

6     Videos of Washington, D.C.?

7     A.   No, sir.

8     Q.   Where did you find these two videos?

9     A.   There were two files found, one in each of the -- they

10    were encrypted .rar files, which is very similar to a zip, it's

11    a compressed archive.  Those -- there was a video file in each

12    one of these .rar files.  One of the .rar files was identified

13    as volleyballcontest.rar and Jimmy's13thbirthday.rar.

14    Q.   Inside the container called volleyballcontest.rar was

15    there some other file about volleyball?

16    A.   No.

17    Q.   Just this Washington video?

18    A.   Just the Washington, D.C. video.

19    Q.   Same question about Jimmy's13thbirthday, was there an

20    invitation or picture of a party hat inside

21    Jimmy's13thbirthday?

22    A.   No, sir.

23    Q.   Just the Washington video?

24    A.   Just the Washington video.

25    Q.   Last exhibit in front of you, Government's Exhibit 12, did

1  you find any of the Washington videos on what we call the

2  Brynbrooke hard drive, the hard drives that you said came from

3  the family home of Syed Haris Ahmed?

4  A.  Yes, sir.

5  Q.  How many?

6  A.  62.

7  Q.  Were those files on the Brynbrooke hard drive in deleted

8  space or unallocated space?

9  A.  No, sir.

10  Q.  In some directory somewhere?

11  A.  Yes, sir.

12  Q.  62 distinct files or copies of --

13  A.  62 distinct files and they were in two separate

14  directories.

15  Q.  Each set of 62?

16  A.  No.  They were spread across two separate directories and

17  the directory names were 2005_04_10 and 2005_04_11.

18  Q.  Is that typically a date or what is that?

19  A.  That typically is a date.  The digital camera software, if

20  you take a series of photos over a series of days, it will

21  actually automatically separate the photos for you.

22  Q.  So translate those numbers that you just read into dates,

23  if they are dates?

24  A.  April 10th, 2005, and April 11th, 2005.

25  Q.  Okay.  And the 62 videos you found using your tools on the

1    Brynbrooke hard drive, are they accurately and completely

2    copied onto Government's Exhibit 12?

3    A.   Yes, sir.

4           MR. MCBURNEY:  Government tenders Government's

5    Exhibit 12.

6           THE COURT:  Any objection?

7           MR. SADEQUEE:  No.

8           THE COURT:  It's admitted.

9    Q.   (By Mr. McBurney)  In that universe of 62, are the six

10   videos found in the Operation Mazhar digital evidence included?

11   A.   Yes, sir.

12   Q.   And the two videos that were found on the Khan or

13   Operation Praline digital evidence?

14   A.   Yes, sir.

15   Q.   So everything found in the UK is also in the group of 62?

16   A.   Yes, sir.

17   Q.   All right, one second.

18           (Pause in the proceedings.)

19           MR. MCBURNEY:  Thank you, sir.

20           THE COURT:  Mr. Sadequee?

21           MR. SADEQUEE:  No questions.

22           THE COURT:  Thank you very much.

23           We want this witness subject to recall, I assume?

24           MR. MCBURNEY:  Yes, sir.

25           THE COURT:  We are going to release you subject to

1    recall.  You should not discuss your testimony with anybody

2    until you have been recalled or released.  Thank you for being

3    with us.

4                THE WITNESS:  Thank you, Your Honor.

5                THE COURT:  Call your next witness, please.

6                MR. MCBURNEY:  Omer Kamal.

7                THE COURT:  Mr. Kamal, if you will come forward,

8    stand in the witness box and be sworn.

9                THE COURTROOM DEPUTY:  Please raise your right hand.

10                   MOHAMAD OMER KAMAL,

11   being first duly sworn or affirmed, was examined and testified

12   as follows:

13                THE COURTROOM DEPUTY:  Please be seated.

14                    DIRECT EXAMINATION

15   BY MR. MCBURNEY:

16   Q.   Good morning, sir.

17   A.   Good morning.

18   Q.   Could you, one, move a little closer to the microphone, or

19   move it closer to you?

20   A.   Sure.

21   Q.   And then, two, state your name, spelling it for the

22   record.

23   A.   Mohamad Omer Kamal, M-o-h-a-m-a-d O-m-e-r K-a-m-a-l.

24   Q.   Mr. Kamal, how old are you?

25   A.   26.

1    Q.    What line of work are you in?

2    A.    An accountant.

3    Q.    Do you work here in Atlanta?

4    A.    Yes.

5    Q.    Where were you born?

6    A.    Baltimore, Maryland.

7    Q.    How long have you lived in -- do you live in the Atlanta

8    area?

9    A.    Yes.

10   Q.    How long have you lived in the Atlanta area?

11   A.    Since 1985.

12   Q.    Is your family originally from the United States?

13   A.    No.

14   Q.    Where?

15   A.    India.

16   Q.    Are you Muslim?

17   A.    Yes.

18   Q.    From what college did you graduate?

19   A.    Georgia State.

20   Q.    When?

21   A.    2005.

22   Q.    You've been working in accounting since then?

23   A.    Yes.

24   Q.    Mr. Kamal, have you been interviewed by the FBI prior to

25   today?

1   A.   Yes.

2   Q.   What was the date of, meaning month and year, if you

3   recall, of your first interview with the FBI in connection with

4   this case, Defendant Sadequee and Syed Haris Ahmed?

5   A.   Around February 2006.

6   Q.   When you met with the FBI back then were you asked

7   questions about your connection to Defendant Sadequee and Syed

8   Haris Ahmed?

9   A.   Yes.

10  Q.   Were you forthright with the agents?  Meaning did you tell

11  them everything you remembered about your relationship with the

12  defendant and Syed Haris Ahmed?

13  A.   The most part, yes, but there were some items that I

14  didn't bring forth until later.

15  Q.   Why is that?

16  A.   I was reluctant.  I wasn't sure if I was the target of the

17  investigation.  There were some items I didn't think were

18  relevant at that time.

19  Q.   In subsequent interviews did you share the information

20  that you withheld in the earlier interviews?

21  A.   Yes.

22  Q.   Did you have an attorney with you during your interviews

23  with the FBI?

24  A.   Yes.

25  Q.   Each time?

1    A.    Yes.

2    Q.    Is this an attorney that you brought or was provided for

3    you?

4    A.    I brought.

5    Q.    Have you been provided immunity for your testimony?

6    A.    Yes.

7    Q.    What's your understanding of how that works?

8    A.    As long as I tell the truth I have nothing to worry about.

9    Q.    What happens if you say something that is untruthful now

10   that you've been sworn in?

11   A.    The immunity agreement is void.

12   Q.    The agreement being?

13   A.    The immunity agreement.

14   Q.    Tell the jurors briefly what it is you were worried about

15   that you sought protection from.

16   A.    I was worried that if I came up here and testified, that

17   maybe later on the government would change its mind and decide

18   to make me a target of the investigation.

19   Q.    What types of things, though?  What I'm trying to explore

20   is what is it that you're worried about that you did that could

21   get you in trouble?

22   A.    Discussed about jihad or went onto websites that promoted

23   it or other activities in connection with it.

24   Q.    We'll talk about all that stuff now.  I want to go back to

25   the summer of 2004.  Summer of 2004 and the fall of 2004,

1    you're still a student?

2    A.    Yes.

3    Q.    At?

4    A.    Georgia State.

5    Q.    Were you active online at that time in Islamic websites,

6    Islamic forums, et cetera?

7    A.    Yes.

8    Q.    These places that you were visiting online, describe them

9    to the jury.

10   A.    Most of them were websites that talked about Islam.  Some

11   talked about mainstream Islam.  Some espoused views that are

12   extreme or that glorify violence.

13   Q.    Were there questions or concerns or interests that you had

14   for which you were seeking answers by going to these places?

15   A.    Yes.

16   Q.    Tell the jury what was going on for you.

17   A.    Basically this was the post-9-11 world.  The U.S. had

18   invaded Afghanistan.  The Iraq war was about to start and it

19   started to pick up and I felt that the U.S. in some way was

20   trying to dominate or colonize the Muslim world and I was

21   looking for answers.  In the media here you only hear the

22   American side of the story and I wanted to hear the other side

23   of the story.

24   Q.    At that time did you perceive that the war on terror had

25   evolved into something else?

1    A.    Yes.

2    Q.    Tell the jury.

3    A.    I felt it was a war on all Muslims around the world.

4    Q.    Were you also exploring online to find out if you had

5    certain obligations, according to Islam?

6    A.    Yes.

7    Q.    Tell the jury about that.

8    A.    Whether, you know, we had to go and support people who

9    were using violence to counter the U.S. initiatives or goals in

10   the Muslim world and how to basically correct the situation in

11   the Muslim world.

12   Q.    When you say people were trying to counter the U.S., what

13   types of places are we talking about in 2004?

14   A.    Iraq, Afghanistan.

15   Q.    What does the term "hijrah" mean?  H-i-j-r-a-h.

16   A.    It means to move from a non-Muslim-dominated place to a

17   Muslim-dominated place.

18   Q.    And the word jihad, j-i-h-a-d, generically what does it

19   mean to you?

20   A.    Generically it means a struggle.

21   Q.    In the context of this war on Islam and dealing with this

22   perception that America is engaged in a war on Islam, did jihad

23   had have a different meaning or more refined than simply

24   "struggle"?

25   A.    Yes.  It meant to use military means in the struggle

1  against the U.S.

2  Q.   And in that meaning of jihad, which I'm going to call it

3  violent jihad, did hijrah have a more specific meaning than

4  simply migration?

5  A.   It could mean to move to a location where it would

6  facilitate you to participate in violence.

7  Q.   Did you at some point contemplate making this type of

8  hijrah, going to Muslim lands to support violent jihad?

9  A.   Yes.

10  Q.   Did you have a particular location in mind?

11  A.   No.  Any theater of combat would have worked.

12  Q.   "Theater of combat" meaning Afghanistan or Iraq or

13  Chechnya?

14  A.   Yeah.

15  Q.   Okay.  I want to talk a little bit about these websites

16  that you went to to answer questions and learn more about these

17  things we just talked about.

18        What's the first site, you can go further back than

19  2004, what's the first site you turned to for answers and

20  information?

21  A.   Either azzam.com or Clear Guidance.

22  Q.   Let's start with azzam.com.  Did it have a particular

23  focus when you first started going there?

24  A.   Originally focused on Chechnya but after 9-11 it focused

25  on Afghanistan.

1    Q.    Azzam.com after 9-11 focused on Afghanistan, which would

2    mean supporting what organization?

3    A.    The Taliban.

4    Q.    Did you visit azzam.com in the post-9-11 period?

5    A.    Yes.

6    Q.    You mentioned Clear Guidance.  Tell the jurors a little

7    bit about Clear Guidance.

8    A.    It's a message board where you can post threads.  All

9    types of people went there.  You could talk about anything from

10    like recipes to politics, jihad or just regular mainstream

11    Islam.  It had a little bit of everything.

12    Q.    When you say jihad, when you're talking about it on Clear

13    Guidance, we're talking about what I call violent jihad?

14    A.    Yes.

15    Q.    So there was at least some segment of Clear Guidance where

16    that was the topic?

17    A.    Yes.

18    Q.    Did you visit that part of Clear Guidance?

19    A.    Yes.

20    Q.    As we move forward in time, what's the next site you begin

21    to frequent?

22    A.    Reviving Islam, that was an intermediary site after Clear

23    Guidance got shut down.

24    Q.    Did Reviving Islam have that same breadth of discussions

25    of Islam ranging from recipes to violent jihad, or was it

1    narrower?

2    A.    Yes, it still had that same spectrum but it did focus a

3    little bit more on jihad and violent jihad.

4    Q.    And after Reviving Islam?

5    A.    Tibyan.

6    Q.    Tibyan, a website.  Same question about spectrums, we go

7    from recipes to violent jihad.  Was Tibyan more focused still

8    than Reviving Islam was?

9    A.    Yeah, it was more focused on violent jihad.

10   Q.    What was the time frame as to when you began going to

11   Tibyan?

12   A.    I would say late 2004.

13   Q.    Late 2004.  When you first went to Tibyan, could you

14   simply just log on and get there or did you have to provide

15   a --

16   A.    Yeah.  You just went on the website and you filled out an

17   application form and within a day you usually got approved,

18   your user name and password.

19   Q.    You were approved when you applied?

20   A.    Yeah.

21   Q.    At some point did you stop going to Tibyan?

22   A.    Yes.

23   Q.    At that point in time -- we'll get there -- was it so

24   simple that you could simply apply and get on Tibyan?

25   A.    I think they had a screening process towards the very end.

1    Q.    Tell the jurors what you mean by a screening process.

2    A.    I guess if the person applied, perhaps the moderators, I

3    don't know exactly how it would work, but they would check to

4    see if someone knew that person from online, or if you knew a

5    friend who worked on the website, you could ask them, you know,

6    you can message them on the Internet chat room to give you

7    access to the website.

8    Q.    So if I tried, I guess in 2005, when you stopped using

9    Tibyan, to get on, and they didn't know me and I didn't know

10   anyone, I couldn't get in?

11   A.    It would have been difficult.

12   Q.    It would have?

13   A.    Difficult.

14   Q.    If we line up all the websites we talked about, Clear

15   Guidance, Reviving Islam and Tibyan, which of the three would

16   you say was the most focused on violent jihad?

17   A.    Tibyan.

18   Q.    Did you meet, while you were frequenting Tibyan or

19   Reviving Islam or Clear Guidance, like-minded persons, meaning

20   people who were interested in this war on Islam and what a

21   young Muslim male in the United States, or in the world, not in

22   the Muslim land, obligations were?

23   A.    Yes.

24   Q.    Share with the jurors some of the names -- when I say

25   meet, I should clarify this.  Did you meet online, not face to

1    face?

2    A.    Yes.

3    Q.    Who were some of the people you met online?

4    A.    Abu Dujanah, Ismiyy, Azdee, Al-Muwahhid, Sbualy.

5    Q.    These are all screen names you're giving?

6    A.    Yeah.

7    Q.    Okay.  Let's talk about Azdee a little bit.  Is that

8    someone that you communicated with electronically, e-mail,

9    chat, et cetera, fairly regularly?

10   A.    For a period of time, yes.

11   Q.    For a period of time.  What's that period?

12   A.    Late 2004 to early 2005.

13   Q.    Where was Azdee based?

14   A.    Canada.

15   Q.    Did Azdee ever introduce you to anyone here in Atlanta

16   online, Hey, whatever you were known as online, this guy is in

17   Atlanta as well, maybe you should talk to him?

18   A.    Yes.

19   Q.    What was the online name of the person that Azdee

20   introduced you to?

21   A.    Al-Muwahhid.

22   Q.    Did you, on Azdee's recommendation, end up communicating

23   electronically with Al-Muwahhid?

24   A.    Yes.

25   Q.    What was the connection Azdee suggested you and

1    Al-Muwahhid might have beyond geography?  You're both in

2    Atlanta.  Was it that he knew you were a Braves fan and

3    Al-Muwahhid was a Braves fan?

4    A.    We both frequented those websites and chat rooms, like

5    Tibyan's or Clear Guidance, websites that espouse those views.

6    Q.    As a result of meeting Al-Muwahhid online, did you and

7    Al-Muwahhid arrange to meet face to face because you're both in

8    Atlanta?

9    A.    Yes.

10    Q.    Did that come to pass?

11    A.    Yes.

12    Q.    When and where?

13    A.    It happened around August 2004 at Grant Park.  There was

14    an event going on called Muslim Day.

15    Q.    You went down there and met Al-Muwahhid?

16    A.    Yes.

17    Q.    Do you see in court today the person that you met in Grant

18    Park in August of 2004?

19    A.    Yes.

20    Q.    Can you briefly describe what he's wearing?

21    A.    He's wearing a beige thobe, I believe.

22    Q.    Okay.  Beard?

23    A.    Yes.

24          MR. MCBURNEY:  All right, let the record reflect he's

25    identified the defendant.

1    Q.    (By Mr. McBurney)  So you met Al-Muwahhid in Grant Park,

2    2004.  Did you get his name then or it remained, Just called me

3    Al-Muwahhid?

4    A.    No.  I got his name.

5    Q.    What name did he give you?

6    A.    Shifa.

7    Q.    Is that the first person you met face to face as a result

8    of your time online in places like Tibyan?

9    A.    Yes.

10   Q.    Did you and the defendant begin to spend time together in

11   person after you met in Grant Park?

12   A.    Yes.

13   Q.    What types of things would you do when you got together?

14   A.    I would bring over, you know, videos or lectures or

15   nasheeds, multimedia stuff.  Or, you know, we just would talk,

16   talk about stuff that we saw on the websites that I mentioned

17   earlier or other things also.

18   Q.    Was there a common theme to the videos you brought over,

19   the lectures, the nasheeds, songs, or whatever you all had been

20   looking at online?

21   A.    Many of them supported violent jihad.

22   Q.    Did the defendant introduce you to anyone else in Atlanta

23   who shared this same interest?

24   A.    Yes.

25   Q.    Who was that?

1    A.    Haris, Syed Haris Ahmed.

2    Q.    Is that someone the defendant already knew based on his

3    representation to you?

4    A.    Yes.

5    Q.    Had you known Syed Haris Ahmed before the defendant

6    introduced him to you?

7    A.    No.

8    Q.    And what generically was it that the defendant said to you

9    as to why you'd be interested in meeting this guy?

10    A.    He shared our same views on violent jihad.

11    Q.    Those views being?

12    A.    That we had an obligation to help those fighting America

13    and other countries.

14    Q.    Month and year that the defendant introduced you to Syed

15    Haris Ahmed?

16    A.    Around either September or October 2005.

17    Q.    So between August and --

18    A.    2004, sorry.

19    Q.    2004.  So between August 2004 and September, October 2004,

20    any contact you had with the defendant was just you and the

21    defendant, no --

22    A.    Yeah.

23    Q.    After you met Syed Haris Ahmed, did he begin to join you

24    at times when you met with Defendant Sadequee to talk about,

25    look at online, matters related to violent jihad?

```
1    A.    Yes, sometimes.

2    Q.    In the fall of 2004, when you met Syed Haris Ahmed, was he

3    a student?

4    A.    Yes.

5    Q.    Where?

6    A.    Georgia Tech.

7    Q.    Did you and the defendant and Syed Haris Ahmed sometimes

8    attend the same mosque?

9    A.    Occasionally, yes.

10   Q.    What was that?

11   A.    14th Street Mosque.

12   Q.    I want to talk a little bit about names but our white

13   board is wedged way in there, so I may get the names from you

14   and we'll revisit this.  We'll have to spell them.

15         First in-person names, you go by what name?  When you

16   would be with -- you went by what name when you were with the

17   defendant and Syed Haris Ahmed?

18   A.    Omer.

19   Q.    And the defendant went by what name?

20   A.    Shifa.

21   Q.    Shifa?

22   A.    Yeah.

23   Q.    Okay.  Had you ever called him anything else when you were

24   talking face to face?

25   A.    Sometimes Ihsan but most of the time I called him Shifa.
```

1    Q.    How about Syed Haris Ahmed?

2    A.    Haris or Haarith.

3    Q.    That second one you said, how do you spell that?

4    A.    H-a-a-r-i-t-h.

5    Q.    Is that a different pronunciation of Haris?

6    A.    Yeah.

7    Q.    So Omer, Shifa and Haris.  In the online world what did

8    you go by?

9    A.    Falook.

10    Q.    Can you spell Falook?

11    A.    F-a-l-o-o-k.

12    Q.    Did you have any other online monikers or names?

13    A.    Yes, Abu Hurayrah, Al-Hindee.

14    Q.    Can you spell Hurayrah slowly?

15    A.    H-u-r-a-y-r-a-h.

16    Q.    Okay.  And Al-Hindee?

17    A.    A-l-H-i-n-d-e-e.

18    Q.    So Falook and Abu Hurayrah, Al-Hindee, what was your

19    online, the e-mail address you used most frequently?

20    A.    Omerkamal@hotmail.com.

21    Q.    So your middle name and last name as one word?

22    A.    Yeah.

23    Q.    All right.  The defendant, you mentioned you met him as

24    Al-Muwahhid.  Did you become familiar with any other online

25    names that the defendant used?

1   A.   Sometimes he would add Aboo Khubayb before Al-Muwahhid.

2   Q.   Let's spell Aboo Khubayb.

3   A.   A-b-o-o K-h-u-b-a-y-b.

4   Q.   So Aboo Khubayb or Aboo Khubayb Al-Muwahhid.  Anything

5   else you saw him use online, e-mail address or moniker?

6   A.   Sadshifa@hotmail.com.

7   Q.   So the Shifa that you mentioned but with s-a-d in front of

8   it?

9   A.   Yes.

10   Q.   And Syed Haris Ahmed, his online name?

11   A.   Sometimes he used Thanda Mazaq and Abu Turaab

12   al-Quraishee.

13   Q.   We'll walk through both of those.  Can you spell Thanda

14   Mazaq?

15   A.   T-h-a-n-d-a M-a-Z-a-Q.

16   Q.   And then this Abu Turaab, whatever it was?

17   A.   A-b-u T-u-r-a-a-b A-l-Q-u-r-a-i-s-h-e-e.

18   Q.   So Abu Turaab, sort of like Aboo Khubayb, but then he

19   added to it Al-Quraishee, and then the Thanda Mazaq you

20   mentioned.

21        Let's talk a little bit about what would happen when

22   you and the defendant, and it sounds like sometimes Syed Haris

23   Ahmed, were together.  Was there a place where you would

24   typically meet when you were going to look at these videos or

25   listen to these nasheeds, et cetera?

1    A.    A lot of times it was at Shifa's house.

2    Q.    Do you remember the street name of where his house was?

3    A.    Nowata Drive.

4    Q.    Nowata Drive, and why was it more often at the defendant's

5    house as opposed to your house, for example?

6    A.    He didn't drive.

7    Q.    And why not Syed Haris Ahmed's house?

8    A.    It was too far away.

9    Q.    Where was that house, if you remember?

10   A.    Somewhere in Dawsonville or Cumming.

11   Q.    Do you remember a street name or just that it was --

12   A.    Way up there.

13   Q.    Okay.  So you're typically at the Nowata Drive address,

14   you guys would talk.  Would you get online at the defendant's

15   house?

16   A.    Yes.

17   Q.    Why would you need to bring videos, other digital files to

18   his house if you could get online at his house?

19   A.    He didn't have DSL.

20   Q.    Meaning?

21   A.    His Internet connection was slow.

22   Q.    He had dial-up access?

23   A.    Yes.

24   Q.    The nasheeds, let's talk about those first, those are

25   songs?

1      A.    Yes.

2      Q.    In Arabic?

3      A.    Yes.

4      Q.    How would those, if they are in any way, be connected with

5      supporting violent jihad?

6      A.    Some of them were like, kind of like Army marching songs,

7      so I guess people fighting there would sing those songs.

8      Q.    Would you at times bring those types of nasheeds over to

9      Defendant Sadequee's house?

10     A.    Yes.

11     Q.    To listen to?

12     A.    Yes.

13     Q.    You mentioned speeches.  Are these speeches of FDR, MLK?

14     A.    Clerics, religious people, some of them extreme, some of

15     them moderate.

16     Q.    Would you ever provide, bring over speeches from folks

17     that we might have heard of, Osama bin Laden or Zarqawi?

18     A.    Yes.

19     Q.    Were any of these speeches in Arabic?

20     A.    Yes.

21     Q.    Back in late 2004, early 2005, when this was happening,

22     were you fluent in Arabic?

23     A.    No.

24     Q.    Was there someone in your group, Ahmed, Sadequee and you,

25     who could translate this?

1    A.    Yes.

2    Q.    Who?

3    A.    Shifa could do it sometimes.

4    Q.    So if a speech was in Arabic he'd try to let you know what

5    was going on?

6    A.    If he understood, yes.

7    Q.    Videos, you mentioned you brought videos over.  Typically

8    what were these videos of?

9    A.    Sometimes they were speeches.  Sometimes there was video

10   clips of insurgents from Afghanistan or Iraq or Chechnya.

11   Q.    Just marching or doing what kinds of things?

12   A.    Sometimes marching, sometimes planting their IED devices

13   or shooting their guns or rockets.

14   Q.    Where did you get most of these things that you brought

15   over to the defendant's house?

16   A.    A lot of times they were from links provided on Tibyan.

17   Q.    So you go to Tibyan to find the IED, improvised explosive

18   device, video.  They wouldn't be on Tibyan but click here and

19   they'll direct you to where it is?

20   A.    Yeah.

21   Q.    Did the defendant ever ask you to keep or to get copies of

22   what you brought him because of his slow computer?

23   A.    A lot of times I would offer it myself, I would burn him a

24   copy and give it to him.  Sometimes he would ask if he could

25   get a copy.

1  Q.   Did he ever refuse, you'd bring him a copy, he'd say, No,

2  no, no, that stuff is not for me?

3  A.   No, not that I remember.

4  Q.   When you would be at the defendant's house viewing,

5  listening, talking about these things, whether or not Syed

6  Haris Ahmed was there, were there other members of the

7  defendant's family who were around, as in the same room with

8  you participating in the discussions and the viewings?

9  A.   No.  Only one time his brother was there for part of a

10  video but that was it.

11  Q.   What's his brother's name, if you remember?

12  A.   I don't remember.

13  Q.   Okay.  Older or younger?

14  A.   Older.

15  Q.   And just one time you recall him being in the room.  What

16  were you watching?

17  A.   I recall it being Osama bin Laden's letter to America but

18  he wasn't there for the whole time.

19  Q.   Okay.  But no other members of the defendant's household

20  routinely joined in with you in discussing any of this?

21  A.   No.

22  Q.   You mentioned that Syed Haris Ahmed's home was much

23  further away, Dawsonville, wherever it was.  Did you ever end

24  up going there with the defendant to get together?

25  A.   I went there.  I didn't go with him, he was already there

1    but, yeah.

2    Q.    But the three of you met --

3    A.    Yes.

4    Q.    -- at Syed Haris Ahmed's house?

5    A.    Yes.

6    Q.    Did you use the computer there?

7    A.    One time, yeah.

8    Q.    Did you discuss some of the same types of things that you

9    talked about and viewed and listened to at the defendant's

10   home?

11   A.    Yes.

12   Q.    When you were doing that at Syed Haris Ahmed's house were

13   there other family members joining in the conversation?

14   A.    No.

15   Q.    Just the three of you?

16   A.    Yes.

17   Q.    Is there anything else you did besides talk and view

18   things when you were at Ahmed's house?

19   A.    We went paintballing.

20   Q.    All right.  We'll talk about that in a minute.  Did you

21   three ever spend time at your house, the Kamal household?

22   A.    Yes.

23   Q.    Same kind of thing, meaning you would do the same kinds of

24   things?

25   A.    Most of the time it was only Shifa who came over and one

1    time Haris came because it was too late for him to drive home.

2    So Shifa was with him, so they slept at my house.

3    Q.    But those times when the defendant came to your house was

4    it -- you played Clue or was it same thing, we're looking at

5    videos, talking about the causes that interested you?

6    A.    Yes, that's correct.

7    Q.    The latter?

8    A.    The videos, yeah, the latter.

9    Q.    As between Syed Haris Ahmed and the defendant, to whom

10    were you closer?

11    A.    I knew Shifa better.

12    Q.    Now, we've talked about, for a while, your face-to-face

13    time with the defendant and Syed Haris Ahmed after you got to

14    know them, fall, winter and early 2005, late '04, early '05.

15    Did you also continue to go online during this time?

16    A.    Yes.

17    Q.    So you're still in contact with Azdee.  You mentioned Abu

18    Dujanah, these other names?

19    A.    Yes.

20    Q.    Did you continue to communicate electronically, chat or

21    e-mail, with the defendant and Syed Haris Ahmed after you had

22    met them in person?

23    A.    Yes.

24    Q.    So both channels were open, face to face and electronic?

25    A.    Yes.

1    Q.    Who is Aboo Sulaymaan online?

2    A.    He was a Somalian who lived in Canada.

3    Q.    A Somalian in Canada?

4    A.    Yeah.

5    Q.    Someone that you met through Tibyan or Clear Guidance or

6    one of these places?

7    A.    Yeah, Clear Guidance.

8    Q.    You mentioned Abu Dujanah.  Abu Umar, did you ever

9    encounter an Abu Umar online?

10    A.    He posted on Tibyan.  He was in the chat rooms but he

11    wasn't on my chat list, my contact list.

12    Q.    Someone you had heard of?

13    A.    Yes.

14    Q.    Did the defendant ever talk to you about Abu Umar?

15    A.    Yes.

16    Q.    What did the defendant tell you about Abu Umar?

17    A.    Said he chatted with him and that he lived in England and

18    he had a lot of people with him that shared the same interest,

19    like-minded people.

20    Q.    The interest being?

21    A.    Violent jihad.

22    Q.    So Abu Umar was in the UK, defendant knew him.  Anyone

23    else besides names you've already given that's now coming to

24    mind that you frequently -- or knew online?

25    A.    No.

1    Q.    How would you typically communicate with these various

2    people online?  E-mail or chat?

3    A.    Mostly chat.

4    Q.    I'm calling it chat.  What would you call it when you're

5    online?

6    A.    Chat.

7    Q.    Chat, okay, that's the same as instant messaging?

8    A.    Yes.

9    Q.    If you and I were online, I might type a sentence, "Hey,

10   Omer, how are you?"  You type back, "Robert, I'm fine"?

11   A.    Yes.

12   Q.    Actual back and forth, not quite voice but typing?

13   A.    Yes.

14   Q.    There's something called voice-over Internet?

15   A.    Yes.

16   Q.    Where you can actually talk as part of the chat, like

17   Skype?

18   A.    Yes.

19   Q.    Did you ever do that with any of these people?

20   A.    Yes, we used Paltalk.

21   Q.    Paltalk?

22   A.    Yeah.

23   Q.    And that enabled you to type and verbally communicate?

24   A.    You could verbally communicate or people would play

25   audios.

1    Q.    Mostly the same people you mentioned, with Paltalk, Azdee,

2    the defendant?  Who would you Paltalk with?

3    A.    Usually the rooms could have like up to 40 people, 40, 50

4    people, so there are large rooms.  Sometimes less, 20.  Azdee

5    was there, Shifa was there sometimes, I was there, Abu Dujanah

6    was there.

7    Q.    So the jurors follow this, you could have a Paltalk group

8    discussion with 20 people able to talk at the same time?

9    A.    Yeah, because we logged in Paltalk, you could search for

10   different rooms.

11   Q.    And all these people, if you had a group of 20 that you

12   were talking to, the common theme for that group would be what?

13   A.    Violent jihad.

14   Q.    When you were chatting online, not e-mail or this Paltalk

15   thing, did you ever encrypt your chats?

16   A.    Yes.

17   Q.    Why?

18   A.    We were afraid, you know, even though we weren't planning

19   violence but just talking about violent jihad, that it would

20   draw the government's interest.

21   Q.    You said you weren't planning violence.  Did you ever

22   discuss online or face to face with the defendant and any of

23   these other people you mentioned the possibility that you in

24   fact might make hijrah and end up, as you put it, in a theater?

25   A.    Yes.

1  Q.   What is Secway Simp?

2  A.   It's an encryption program for MSN.

3  Q.   Is that a program you put on your computer for when you

4  chat?

5  A.   Yes.

6  Q.   If you wanted to chat with me using Secway Simp and I had

7  a copy as well, how would we be able to share communication and

8  be able to see it so it wasn't encrypted?

9  A.   You have a key, so you offer to send that key, which kind

10  of translates the encryption so you can actually see the text

11  the person's typing.

12  Q.   So if I didn't have your personal key, could I view what

13  you're typing in a chat?

14  A.   No.

15  Q.   You'd have to send me the key?

16  A.   Yes.

17  Q.   Did you share your key with Azdee?

18  A.   Yes.

19  Q.   With Syed Haris Ahmed?

20  A.   Yes.

21  Q.   With the defendant?

22  A.   Yes.

23  Q.   Presumably, you had to have their keys as well so you

24  could see their half?

25  A.   Yes.

1    Q.    Did you and the defendant and others that you were

2    corresponding with online ever use code or jargon for terms

3    that were sensitive you were worried about typing in?

4    A.    Yes.

5    Q.    Start with jihad.

6    A.    You could type it with a G, you could say the word J, you

7    could say the word struggle.

8    Q.    So in lieu of typing here are my thoughts about jihad, you

9    might just say the letter J?

10    A.    Yeah.

11    Q.    Or spell it G-ha --

12    A.    Yeah.

13    Q.    And pursuing jihad, the idea of actually getting involved

14    in a violent struggle against whoever the enemy is, was there a

15    shorthand or a code for that?

16    A.    Yes.

17    Q.    What would that be?

18    A.    Could you repeat?  You said a shorthand code for

19    struggling against?

20    Q.    For actually pursuing jihad, someone says, Hey, let's go

21    do this?

22    A.    You could say joining the caravan, the jihadi movement.

23    Q.    Does "joining the caravan" have particular significance in

24    that phrase, in the violent jihadi circles that you're aware

25    of?

1    A.    Yes.

2    Q.    What is that?

3    A.    There's a famous book with that name.

4    Q.    Do you know who wrote the book?

5    A.    Abdullah Azzam.

6    Q.    That same A-z-z-a-m as the website?

7    A.    Yes.

8    Q.    Not the same person but the same word?

9    A.    Yes.

10    Q.    And put Abdullah Azzam in context with Afghanistan or

11    Iraq.  Where does he fit?

12    A.    He was one of the main leaders of the 1980s jihad against

13    the Russians.

14    Q.    And is he connected with any particularly prominent

15    terrorists these days?

16    A.    He was leading the jihadi movement, I guess, before Osama

17    bin Laden.

18    Q.    You talked about code or shorthand for jihad or pursuing

19    jihad.  How about Iraq?  Instead of typing Iraq, what might you

20    or some like-minded individual say?

21    A.    You could say Two Rivers or just the word Rivers.

22    Q.    And the significance of Two Rivers?

23    A.    The Euphrates and the Mesopotamia River.  Iraq has two

24    rivers.

25    Q.    Okay.  Afghanistan?

1    A.    Land of Mountains.

2    Q.    Mountains?

3    A.    Yeah.

4    Q.    The Taliban?

5    A.    Students.

6    Q.    Students.  What does Taliban mean if you translate it into

7    English?

8    A.    Students.

9    Q.    Finally, the United States, rather than saying America or

10   United States, what might you or someone you're chatting with

11   say?

12   A.    I've seen people say like Land of the Pharaoh.

13   Q.    Pharaoh, as in the Egyptian ruler?

14   A.    Yeah.

15   Q.    Okay.  I want to turn back real briefly, you mentioned

16   paintballing a little while ago.  How many times did you go

17   paintballing with the defendant?

18   A.    Maybe three times, three or four times.

19   Q.    Three or four times.  Did Syed Haris Ahmed ever join you?

20   A.    Yes.

21   Q.    Did you and the defendant and Syed Haris Ahmed, if he was

22   in on the conversation, ever talk about steps you could take

23   here in the United States to begin to prepare to make hijrah,

24   to join the caravan?

25   A.    We felt if we went to the woods that might help us, going

1    to the woods, running through them, doing pushups, or

2    practicing our paintball might help us.

3    Q.   Getting physically fit?

4    A.   Yeah.

5    Q.   Did you and the defendant, and if Syed Haris Ahmed was

6    present, did he also discuss that that was one reason to go

7    shoot paintballs in the woods?

8    A.   That was one of the reasons, yes.

9    Q.   There may have been several, but the point I'm trying to

10   make is was this just in your head, Mr. Kamal is thinking, Hey,

11   if I get fit that will help me with hijrah, or is it something

12   you actually openly discussed with the defendant?

13   A.   We did discuss it and we discussed other purposes of those

14   trips as well.

15   Q.   You said you did discuss it?

16   A.   Yeah, we did.

17   Q.   Okay.  You weren't trying out for the Georgia State track

18   team or paintball team?

19   A.   No.

20   Q.   Did you and the defendant ever discuss possible

21   destinations -- I've already asked you what theater you might

22   go to -- possible destinations where one might actually be able

23   to provide support, material support for violent jihad?

24   A.   All the destinations I mentioned were possibilities.

25   Q.   I want to touch on a couple of them.  Did you and the

1   defendant ever talk about the possibility of somehow helping

2   the Taliban?

3   A.   Yes.

4   Q.   What about LeT, do you know what LeT is?

5   A.   Yes.

6   Q.   What does that stand for?

7   A.   Lashkar-e-Tayyiba.

8   Q.   Lashkar-e-Tayyiba, is that an organization that you and

9   the defendant ever discussed?

10   A.   Yes.

11   Q.   Their conflict, their focus is generally, back in, stay

12   focused on 2004, 2005, where was their focus?

13   A.   Kashmir.

14   Q.   Kashmir, which is where?

15   A.   It's a border region between India and Pakistan.

16   Q.   Is it a contested territory?

17   A.   Yes.

18   Q.   Pakistan-India contested?

19   A.   Yes.

20   Q.   What is that LeT wants with Kashmir, as you understand?

21   A.   They want it to be under Pakistani rule.

22         THE COURT:  Mr. McBurney, the court reporter needs to

23   change paper.

24         MR. MCBURNEY:  Sure.

25         THE COURT:  I do want the opportunity to take a

1     mid-morning break.  How much longer do you have?

2             MR. MCBURNEY:  Probably have about -- we could do it

3     right now, I have enough that there will be a little bit after

4     the break.  I won't finish in time for a break.

5             THE COURT:  I told you that the day would have two

6     breaks, mid-morning, mid-afternoon, I think those are

7     appropriate times to break.  I'd like to take our mid-morning

8     break now.

9             Please don't discuss the case amongst yourselves or

10    with anybody else.  We'll be in recess for 15 minutes.

11            (Jury retired from the courtroom at 11:10 a.m.)

12            THE COURT:  The jury has left the courtroom.

13            Was there something, Mr. McBurney, that you wanted to

14    take up at the break?

15            MR. MCBURNEY:  Yes, sir.  With the charge, Judge, you

16    had said that the defendant's statements are not to be

17    considered evidence.

18            I addressed it in opening, I don't know that -- I

19    think it's clear now.  My concern was the defendant may well

20    make statements if he testifies and there will be many, many

21    statements he made that are in the exhibits that will be

22    admitted.  But your language was very clear that nothing he

23    says, his statements are not to be considered evidence.

24            And on the off chance that some jurors say, The judge

25    says his statements are not evidence, I wanted it to be clear

1   to them that the statements he makes as he represents himself

2   are not evidence.

3        I made that point in opening but I'm not the judge,

4   so I would ask that at the appropriate time but before we start

5   getting into chats that have many, many statements by the

6   defendant, that the Court clear up which types of statements it

7   was referring to.

8        THE COURT:  I read what I had written.  I don't

9   recall saying that.  I will look at the transcript.

10       MR. MCBURNEY:  Okay.  We all noted it when you said

11  that -- you said his opening and closing, you said any

12  statements of the defendant are not to be considered evidence.

13  That's what I heard.  You can check the charge and if you don't

14  think it's confusing, then it doesn't need to be cleared up,

15  but that was our concern.

16       THE COURT:  I'll look at that, but the purpose was

17  anything he said, any statements he made in his opening or his

18  closing are not evidence, but I'll look at it.

19       Amanda, if you could find, print out my preliminary

20  instruction, I'll review that.

21       MR. MCBURNEY:  The one other matter, it's a

22  scheduling matter.  Defendant Ahmed is here today, the marshals

23  brought him over, and we need to take care of whatever is going

24  to happen.  Mr. Martin is here and so we could, when we break

25  for lunch, call him and he can make his decision.  But we want

1    to take care of that today, not inconvenience the jury and not

2    inconvenience the marshals with a second trip if we don't do it

3    today.

4              THE COURT:  I'd suggest we do that after, when we

5    take our lunchtime break, do it at the beginning of the

6    lunchtime break.  Is that acceptable to everybody?  Acceptable

7    to you?

8              MR. MARTIN:  You said before lunch or after?

9              THE COURT:  As soon as we break, we'll do it at the

10   very beginning of the break.

11             MR. MCBURNEY:  That's all.

12             THE COURT:  All right, we'll be in recess for 15

13   minutes.

14             (Recess, 11:13 a.m. to 11:32 a.m.; jury not present.)

15             THE COURT:  Anything we need to go over before we

16   continue?

17             MR. MCBURNEY:  One logistical issue, Judge.  We

18   talked with Ms. Birnbaum and the defense.  We have an exhibit

19   that will evolve as people give -- testify as to monikers of

20   individuals.  We want the jury -- it's a demonstrative aid that

21   isn't complete because we don't have testimony as to each

22   moniker.  We're trying to find the best place to put it so that

23   the parties don't need to walk past this line.  So we're

24   suggesting right here.  The defense didn't object.

25             THE COURT:  Any objection?  Is there any objection to

1    placing this here?

2              MR. SADEQUEE:  No objection.

3              THE COURT:  All right.  Anything else?

4              MR. MCBURNEY:  That's it.

5              THE COURT:  Let's bring the jury back in, please.

6              (Jury returned to the courtroom.)

7              THE COURT:  Ladies and gentlemen, Mr. Kamal is still

8    on direct examination.

9              Please continue.

10             MR. MCBURNEY:  Thank you, Judge.

11   Q.   (By Mr. McBurney)  Mr. Kamal, before we pick up where we

12   left off discussing some of the possible destinations, I want

13   to return to the question of monikers, online names.

14   Government's Exhibit 1 is a demonstrative aid over here.  Can

15   you see it?

16   A.   Yeah.

17   Q.   You had mentioned Aboo Khubayb Al-Muwahhid as being an

18   online moniker for the defendant?

19   A.   Yes.

20   Q.   Is this the same moniker, is this how you spell it?

21   A.   Yes.

22   Q.   You also had mentioned Al-Muwahhid and Sadshifa.  Do you

23   see those on here?

24   A.   Yes.

25   Q.   Page 2 is the -- meant to be the monikers you shared with

1    us, Falook, Abu Hurayrah, Al-Hindee and then Omer Kamal, your

2    e-mail addresses, are these the three you mentioned?

3    A.    Yes.

4    Q.    And finally, page 3 of Government's Exhibit 1,

5    demonstrative exhibit, the monikers you shared that belonged to

6    Syed Haris Ahmed, Turaab, Aboo Turaab, Aboo Turaab al-Qurashee

7    and then Thandy Mazaq?

8    A.    Yes.

9    Q.    Those are the same?

10   A.    Yes.

11   Q.    Thank you.  We have been talking about possible

12   destinations that were discussed.  One was going to make this

13   hijrah, the migration, and actually do something in a

14   battlefield, provide some support to violent jihad.  You

15   mentioned the Taliban and Afghanistan and we started talking

16   about LeT and their struggle, their armed struggle in Kashmir.

17   Is LeT actually an army?  Are they wearing uniforms, or is this

18   a terrorist organization?

19   A.    Paramilitary terrorist organization.

20   Q.    They have the flag of Pakistan on the sleeves of their

21   uniforms?

22   A.    I don't know.

23   Q.    So you're not that familiar with it.  Did you and

24   Defendant Sadequee ever discuss LeT as an organization?

25   A.    Yes.

1  Q.   Did you and he discuss the types of attacks they made back

2  in '03, '04, '05 on Indian interests or wherever it was they

3  were attacking?

4  A.   Yes.

5  Q.   What types of attacks were those?

6  A.   Generally they would attack military outposts, send in a

7  few guys and attack it with weapons and then when they were

8  done go back to their base.

9  Q.   Okay.  Are we describing a fully-formed army or what you

10  call an irregular militia that would be making these attacks on

11  the Indian army?

12  A.   Irregular militia.

13  Q.   Did the defendant ever criticize, in discussions with you,

14  LeT in terms of the breadth of its aims?

15  A.   He had mentioned that himself and other people felt that

16  they shouldn't be trying to give Kashmir to the Pakistani army

17  or to the Pakistan government, they shouldn't have a close

18  relationship with the Pakistani government.

19  Q.   And what was the problem with the Pakistani government?

20  A.   It was viewed as a sellout government.

21  Q.   What do you mean by "sellout government"?

22  A.   It was too closely tied with America.

23  Q.   Did you and the defendant and others ever discuss possibly

24  going to Two Rivers or Iraq?

25  A.   Yes.

1    Q.    Did you and the defendant ever discuss what targets might

2    make sense for violent jihadists here in the United States?

3    A.    Yes.

4    Q.    What did you talk about?

5    A.    We said that if, not ourselves, but if others attacked the

6    White House or the Capitol building it would have sent a strong

7    message to the U.S. and force it to change its policies.

8    Q.    Not yourselves, not you or the defendant, but others, that

9    would send a message?

10   A.    (Nods head.)

11   Q.    Did you and the defendant ever discuss targets associated

12   with the United States, maybe not within the United States

13   proper, that you would be willing to strike if called upon?

14   A.    We did discuss Abu Ghraib or Guantanamo Bay.

15   Q.    Abu Ghraib, the military prison in Iraq?

16   A.    Yes.

17   Q.    And Guantanamo where detainees are held?

18   A.    Yes.

19   Q.    At some point after you got to know the defendant and did

20   the paintballing and get online with him and share videos,

21   et cetera, were you invited to go on a trip with the defendant

22   to meet with other like-minded supporters of violent jihad?

23   A.    Yes.

24   Q.    Where was it that the defendant was going?

25   A.    Canada.

1    Q.   Who was he going to meet with in Canada?

2    A.   Azdee.

3    Q.   Did Azdee also invite you?

4    A.   Yes.

5    Q.   How about Syed Haris Ahmed, was he to go on this trip?

6    A.   Yes.

7    Q.   If you recall, what month and year was the trip?

8    A.   Well, they started talking about it in January and they

9   had asked me a few times but I didn't -- I didn't know

10  beforehand when they actually went.

11    Q.   Okay, you learned after the fact?

12    A.   Yes.

13    Q.   Did you go with them?

14    A.   No.

15    Q.   Did you ever have to explain yourself to the defendant as

16  to why you wouldn't join them on this trip to Canada?

17    A.   When they first asked me I said, you know, I was busy with

18  school and other things.  And they didn't make such a big deal

19  of it at that time.  They just put a little pressure but not

20  much.

21    Q.   At some later time did they, to use your words, make more

22  of a big deal out of it?

23    A.   When they returned, yeah.

24    Q.   We'll talk about that in a second.  Did you in fact have

25  conflicts with school that made it unable for you to go?

1     A.    Yes. And I also wasn't interested at that time really to

2     go to Canada with them.

3     Q.    You say you weren't interested. What did the defendant

4     tell you he hoped to do in going to Canada?

5     A.    He hoped to meet with Azdee and any of the other people in

6     Canada who were up there, to at least get to meet them face to

7     face so they at least know these people at a much better level.

8     And if they ever made hijrah and moved overseas, if those guys

9     also were there, they had someone that they trusted that they

10    actually knew.

11    Q.    This is something the defendant told you was the purpose

12    of the trip before he made the trip?

13    A.    He told me that he wanted to meet them and at least get a

14    better understanding of who they are. I assumed the latter

15    part in this because we talked about making hijrah with them

16    and it wasn't clearly said that, you know, if we're going to

17    meet them and then we're going to go and move, but it would

18    help.

19    Q.    Well, try to confine your answers to what you recall the

20    defendant saying as opposed to what you assumed he meant,

21    unless I ask that. I probably won't.

22    A.    Okay.

23    Q.    At some point the defendant and Syed Haris Ahmed returned

24    and you said that was when they were more frustrated or annoyed

25    that you hadn't come along?

1    A.    Yes.

2    Q.    Describe for the jurors what happened.

3    A.    Basically they were like, you know, you should have came

4    with us.  And at that time I wasn't able to hang out with them

5    as much and so I think that irritated them and --

6    Q.    What prevented you from hanging out with them?

7    A.    I was busy.  And also at that time we had conflicts,

8    weren't seeing eye to eye.  They felt that I was becoming soft

9    or not as dedicated to these views that were on these websites.

10   And basically he was mad that I didn't go with them to the trip

11   to Canada.

12   Q.    What type of conflicts were you having?

13   A.    You know, if they called me and they wanted me to meet

14   them, you know, at his house or someplace, I wouldn't make it

15   or I'd sound busy.  And they were basically, like, you know,

16   you need to get your priorities more straight.

17   Q.    And you say these types of views on these websites.  What

18   specifically were they telling you you were not sufficiently

19   committed to?

20   A.    Moving away from the United States, moving to a Muslim

21   land.

22   Q.    To do what?

23   A.    Either to live there or if -- they also felt that the war

24   on terror was going to expand all over the Muslim world and so

25   basically we were on the wrong side of the planet and -- or if

1    we wanted to enter a theater of combat, we couldn't do that

2    from the U.S.

3    Q.    Did the defendant ever tell you after he returned from

4    Canada with whom he met?

5    A.    He did confirm that he met with Azdee and Aboo Sulaymaan.

6    Q.    Aboo Sulaymaan was the Somalian in Canada that you

7    described?

8    A.    Yes.

9    Q.    And what did the defendant tell you that he and they and

10   Syed Haris Ahmed talked about while they were up there?

11   A.    Basically, you know, it's time for us to move away from

12   the U.S., things are getting worse here and we're just wasting

13   our time in the U.S. and so it's time for us to move.

14         And he also discussed that he was already going to

15   move back to Bangladesh and get married.  And he also felt

16   that, you know, the war on terror might expand to Bangladesh

17   and it's better to be there than here and he'll be prepared if

18   he's there.

19   Q.    So the defendant was talking about going back to

20   Bangladesh.  Was Syed Haris Ahmed making similar noises about

21   going to the greater Middle East somewhere?

22   A.    Either Pakistan, they also said, you know, you could end

23   up in Iraq or some other, Palestine, but most likely he was

24   going to go back to Pakistan because he's from there.

25   Q.    You mentioned that after the trip the defendant and Syed

1   Haris Ahmed began to pressure you more.  They had already been

2   to Canada.  What were they now pressuring you to do?  Was there

3   a trip coming --

4   A.   They said they were most likely going to try to move

5   overseas by the end of the summer.

6   Q.   Did you agree to go with them overseas?

7   A.   No.

8   Q.   Did they ever give you the specifics as to when they were

9   leaving?

10  A.   They just told me summer and they kept telling me give

11  them an answer within like two or three weeks.

12  Q.   Did you ever end up giving them an answer?

13  A.   Yes.

14  Q.   What was the answer, first, in essence?  Yes, no, maybe?

15  A.   The answer was no, go on without me.

16  Q.   How did you deliver that message to the defendant and Syed

17  Haris Ahmed?

18  A.   I typed up a note on Notepad and I slid it under the door

19  of Sami Ayoub's door.

20  Q.   Who is Sami Ayoub?

21  A.   He was a store owner and Haris used to work for him.

22  Q.   What kind of store?

23  A.   Perfumery.

24  Q.   Did you, the defendant, and Syed Haris Ahmed have any

25  other connection to Sami Ayoub?

1    A.    Sometimes we attended his Friday sermons.

2    Q.    So he ran a perfume store and also gave sermons?

3    A.    Yeah.

4    Q.    In a mosque or --

5    A.    College, southern Polytech.

6    Q.    But his sermons were about Islam or were they Methodist

7    sermons?

8    A.    About Islam.

9    Q.    You mentioned that you typed up the note on Notepad.

10   A.    Yeah.

11   Q.    Not Microsoft Word.  What's Notepad?

12   A.    It's a very basic text editor that comes standard on

13   Windows, Microsoft Windows.

14   Q.    Did you have no other word processor?

15   A.    That was the first thing that came to mind.  It was easy

16   to type up with.

17   Q.    Did you put the note in an envelope?

18   A.    Yes.

19   Q.    What did you write on the envelope?

20   A.    I told them basically go on without me and, you know, I

21   felt that, you know, we're under government surveillance and,

22   you know, just forgive me for whatever falling out we've had

23   and just go on with their lives.

24   Q.    Okay, that's what was in the note.  My question was did

25   you write anything on this envelope that you slid under the

1    door?

2    A.   Oh, I addressed it to them, yes.

3    Q.   Would you take a look at Government's Exhibit 20.   It

4    should be in front of you.   Do you recognize that?

5    A.   Yeah.

6    Q.   It actually should be two different things.   What is

7    the -- the part of Government's Exhibit 20 that has a sticker

8    on it, what's that?

9    A.   The envelope.

10   Q.   That you wrote?

11   A.   Yeah.

12   Q.   Is that your handwriting on it?

13   A.   Yes.

14   Q.   And what's inside the envelope?

15   A.   The letter that I typed up to them.

16           MR. MCBURNEY:   Government tenders Exhibit 20.

17           THE COURT:   Any objection?

18           MR. SADEQUEE:   No objection.

19           THE COURT:   It's admitted.

20           MR. MCBURNEY:   Can we click 20 up?   Okay.

21   Q.   (By Mr. McBurney)   Is that, the text we see on the screen

22   there, is that your handwriting?

23   A.   Yes.

24   Q.   Is that what you wrote on the outside of the envelope

25   that's in front of you, Government's Exhibit 20?

1    A.    Yes.

2    Q.    I-h-s-a-n, who's that?

3    A.    That's Shifa.

4    Q.    That's just how you spelled the short version of his first

5    name?

6    A.    Yeah, I never had to type his real name.

7    Q.    And then the Harith?

8    A.    That's Haris, yeah.

9    Q.    Can we look at the second page, please?  Now, before we

10   get into the text, it's all jagged.  Did you do that?

11   A.    I don't remember.  I just ripped it.  I probably just

12   ripped the sheet up and put it in an envelope.

13   Q.    What's on the screen, the text of the letter that you

14   typed up to the defendant and Syed Haris Ahmed?

15   A.    Basically it's just me saying, okay --

16   Q.    I'm sorry, you don't need to read it.  Is that the note

17   you wrote?

18   A.    Yes.

19   Q.    There's a standard Muslim greeting?

20   A.    Yes.

21   Q.    The first sentence you write is:  "Go on ahead without

22   me."  What are you referring to?

23   A.    Their plans to move overseas.

24   Q.    So this isn't the Canada trip; this is the hijrah?

25   A.    Yes.

1    Q.   "Please forgive me for any personal wrong in my behavior."

2  What are you referring to there?

3    A.   Our arguments that we had for the past, like, two or three

4  months between us.

5    Q.   The conflicts you mentioned?

6    A.   Yes.

7    Q.   Had your views as to the pursuit of violent jihad begun to

8  diverge from theirs?

9    A.   I wasn't as committed to it as what -- as theirs at the

10  time.

11    Q.   "It is not best to talk about this topic on my phone,

12  because my phone line has a lot of eyes on it."  What are you

13  talking about?

14    A.   I thought the government was -- had me under surveillance.

15    Q.   Okay.  "I also intended to lay low so as to avoid too much

16  connection between me and you all, in case they come to ask me

17  about it."  What's the "it"?

18    A.   When they go overseas.  I was afraid that, you know, if

19  they went overseas and the government might become suspicious

20  about it, so that's why I --

21    Q.   So if you hadn't had contact with them you wouldn't have

22  much to say?

23    A.   Yeah.

24    Q.   Okay.  Did you attempt to convey this same message that

25  you're not going to join them going abroad through some other

1    medium, online or otherwise?

2    A.    Yes.

3    Q.    Can you look at Government's Exhibit 34?  Do you recognize

4    Government's Exhibit 34?

5    A.    Yes.

6    Q.    What is that?  Without going into the content, generically

7    or generally, what is that?

8    A.    It's a private message I sent.

9    Q.    Through what?

10   A.    Tibyan forums.

11   Q.    What's a private message?

12   A.    It's like if you're on a forum, it's like an e-mail sort

13   of thing that works within the forums.  It only goes to other

14   message board members.

15   Q.    And Government's Exhibit 34 contains the message that you

16   wrote, and does it have correspondence from anyone else as

17   well?

18   A.    Yes.

19   Q.    Who else?

20   A.    It has a response from Shifa and Haris.

21              MR. MCBURNEY:  Government tenders Exhibit 34.

22              THE COURT:  Any objection?

23              MR. SADEQUEE:  No objection.

24              THE COURT:  It's admitted.

25              MR. MCBURNEY:  If we can publish the first page of

1    34.

2    Q.    (By Mr. McBurney)  And just if we could, before we magnify

3    anything, there's a picture at the top of some books with guns

4    over them and pen, it says At-Tibyan.  Is this what Tibyan

5    Publications looked like --

6    A.    Yes.

7    Q.    -- in the spring of '05 if you logged on?

8    A.    Yes.

9          MR. MCBURNEY:  If you could magnify the box down

10   here, basically the text of the various messages, please.

11   Q.    (By Mr. McBurney)  Okay, let's start with the original

12   message.  Who is Aboo Hurayrah al-Hindee?

13   A.    That's me.

14   Q.    What is it that you wrote?

15   A.    "Go ahead without me."

16   Q.    What are you referring to?  Go where without you?

17   A.    Their trip overseas.

18   Q.    Then you -- somehow apparently it got to Aboo Khubayb

19   al-Muwahhid.  Who is that?

20   A.    Shifa.

21   Q.    The defendant, and what does he write about your message,

22   "Go ahead without me"?

23   A.    Do you want me to read it?

24   Q.    Read it, please.

25   A.    He said:  "This is how your friend replied today, may

1  Allah not let him die except in a state when the angels are

2  smiting his face and back."

3  Q.   So the defendant is referring to you?

4  A.   Yeah.

5  Q.   And he says:  "May Allah not let him die except in a state

6  when the angels are smiting his face and back."

7        Does that have particular significance in connection

8  with the Quran or something?

9  A.   It's talking about people who don't make hijrah but also

10  within a certain context.  So basically he's insulting me.

11  Q.   He's saying not a nice thing?

12  A.   Yeah.

13  Q.   So you sent it, defendant got it, and then he apparently

14  has sent it to Abu Turab.  Who is that?

15  A.   Haris.

16  Q.   And Syed Haris Ahmed says, in response to reading your

17  message that the defendant sent him, says what?

18  A.   "Just speechless... I guess knowledge without taqwa is

19  really useless...may Allah save us from not acting upon

20  knowledge."

21  Q.   Taqwa, was is that?

22  A.   Like piety, fear of God.

23  Q.   After you delivered your message through these two

24  channels, the note, Exhibit 20, and the private message,

25  Exhibit 34, did the defendant and Syed Haris Ahmed continue to

1    try to contact you?

2    A.    Haris would try to call me continuously.

3    Q.    Did you take his calls?

4    A.    No.

5    Q.    Did you drop off the forums you had been going to, like

6    Tibyan Publications?

7    A.    Yes.

8    Q.    Did you change your e-mail address or stop using it?

9    A.    Yeah, I stopped using it.

10   Q.    After you delivered the two messages, did you have any

11   other contact with either the defendant or Syed Haris Ahmed?

12   A.    No.

13   Q.    Did you ever end up going to Canada to meet Azdee?

14   A.    No.

15   Q.    Did you ever take a trip outside of Atlanta to meet with

16   any other like-minded individual that you met online through

17   Tibyan or Clear Guidance?

18   A.    No.

19   Q.    Did you ever travel to Pakistan or Bangladesh or anywhere

20   else to make hijrah and further pursue violent jihad?

21   A.    No.

22             MR. MCBURNEY:  Thank you.

23             THE COURT:  All right, Mr. Sadequee?

24                       CROSS-EXAMINATION

25   BY MR. SADEQUEE:

1    Q.    (Speaking foreign language.)

2    A.    (Speaking foreign language.)

3    Q.    Just a few.  The government asked you, repeatedly they

4    used the word "discussed."  Did we discuss this, did we discuss

5    that, such as did we discuss going to hijrah, going, moving

6    overseas.

7            Was it, the discussion, I want you to define in more

8    precise terms, was it planning or was it like I think we should

9    do, we should move over to Pakistan or we should do this, and

10   nothing further than that, our discussions?  How -- can you

11   clarify, elucidate for us the nature of our discussions and to

12   what degree of detail or --

13   A.    We didn't have the fine details in our discussions.  We

14   did talk about it.  We made general plans but there was no

15   detailed discussion like, I'm going to buy a plane ticket on

16   this day, so-and-so is going to pick me up.  We didn't have the

17   final -- we didn't have final logistics.  It wasn't like we

18   could go the next day with our discussions.

19   Q.    Did we -- so there was discussions, let's say, about going

20   to Pakistan, right?

21   A.    Yes.

22   Q.    Did you -- you're a Pakistani citizen?  No?

23   A.    No.

24   Q.    No.  Did you ever research visas to move to go to

25   Pakistan?  Because you do not need a visa, you --

1    A.    No.

2    Q.    So you never researched online even about --

3    A.    I didn't think it would be difficult to get a visa but,

4    no, I never researched it.

5    Q.    So would you say that demonstrates a level of -- it shows

6    the intensity of your seriousness when you say you're going to

7    Pakistan, I'm going to go to Pakistan or you're going to go to

8    Pakistan, someone is going to go to Pakistan, that you don't

9    even research, forget getting a visa, you did not even ever

10   research getting a visa, so you must not have been serious at

11   all; am I correct?

12   A.    We had a desire and intention to go, but, no, we did

13   not -- well, I did not research a visa.

14   Q.    A desire?

15   A.    Yeah.

16   Q.    What's "desire" mean?  You would like one day perhaps, it

17   would be cool; is that what it means to you?

18   A.    It means that we did want to go.  We --

19   Q.    What is --

20   A.    It wasn't like farfetched desire.

21          MR. MCBURNEY:  I'm going to interpose an objection,

22   we just need to get the dynamic down.  Defendant needs to not

23   interrupt the witness's answer.

24          THE COURT:  I'll take care of that.

25          THE WITNESS:  We had a strong desire to go, yes.  I

1  wouldn't say that we -- it wasn't like one day, like ten years

2  from now, we did feel that, okay, we are going to go; but, no,

3  we did not make those final logistics with regards to that

4  trip.

5  Q.   (By Mr. Sadequee)  So, and you never bought any plane

6  ticket --

7  A.   No.

8  Q.   -- to go to Afghanistan or --

9  A.   No.

10  Q.   -- Pakistan?  Did you ever research plane ticket prices?

11  A.   To Afghanistan?

12  Q.   Or Pakistan.

13  A.   No.

14  Q.   Off the top of your head, do you know what a price of a

15  plane ticket to Pakistan or Afghanistan would be?

16  A.   Pakistan, I would imagine around 2,000.

17  Q.   And what's the basis of your knowledge for that?  Because

18  you did research on it or because you know family or relatives

19  or --

20  A.   Well, for Pakistan I had no relatives so --

21  Q.   So you never did research with regards to your intention

22  or your desire, as you phrase it, that you want to make hijrah?

23  A.   No, I didn't.

24  Q.   So it was not in relation to that.  The source of your

25  knowledge is --

1      A.    Outside of the research, yes.

2      Q.    Okay.  So you never bought plane tickets to go there, you

3      never researched plane tickets or flight to go there, you never

4      bought or you never got a visa to go to Pakistan or India, you

5      never researched about getting a visa?

6      A.    That's all correct.

7      Q.    Did you ever visit the Pakistani embassy website or the

8      Indian embassy website --

9      A.    No.

10     Q.    -- with regards to --

11     A.    No.

12     Q.    But you talked about it with us?

13     A.    Yes.

14     Q.    That you want to do that?

15     A.    Yes.

16     Q.    But you were capable -- you have Internet connection, I

17     believe?

18     A.    Yes.

19     Q.    So you were capable of doing research for this -- not

20     research, I'm talking about Googling and perhaps --

21     A.    Yeah, I was capable of doing a --

22     Q.    You were --

23     A.    -- search.

24     Q.    -- capable --

25            THE COURT:  Mr. Sadequee, you do have to let him

1    finish his answer before you ask the next question because the

2    court reporter can't take down two simultaneous comments.  So

3    give him a chance to answer before you follow up.  So go ahead.

4    Q.   (By Mr. Sadequee)  So would it be correct if I were to say

5    you have the capacity of doing -- taking those steps, yet you

6    were not taking those steps?

7    A.   We had discussions but I did not take steps for the final

8    logistics, that's correct.

9    Q.   So would it -- so would you agree if a conclusion was made

10   that there's these discussions between yourself, myself, and my

11   co-defendant Haris, about going certain places, hijrah,

12   overseas and -- or Iraq, as was also mentioned, and we had the

13   capacity to do certain research and yet we -- when someone says

14   he's going to do something and he has the capacity to do that,

15   yet he does not do that, would it be a logical conclusion that

16   he's not serious in doing that if he has the capacity?

17   A.   I don't know because that depends on time.  At the time of

18   our discussions we felt strongly that we should do that but

19   that's hard to say yes or no because it depends on time.

20   Q.   What do you mean when you're saying -- I'm going to focus

21   on this term you said, "we felt strongly."  You mean

22   religiously and emotionally?

23   A.   Yes.

24   Q.   We felt strongly about our opinions and our beliefs?

25   A.   Yes.

1    Q.    And about what's happening in the world today?

2    A.    Yes.

3    Q.    So this is synonymous with your desire that you mentioned,

4    that we had a desire?

5    A.    Yes.

6    Q.    We felt strongly?

7    A.    Yes.

8    Q.    And we had discussions on these issues but none of us --

9    you can only speak for yourself.  You never researched --

10   A.    No.

11   Q.    -- about what you just mentioned?  Okay.

12         Another thing that I want to ask you about is after

13   we came back from Toronto, me and Haris mentioned to you, if

14   you can recall, about going to Iraq.  And do you also recall

15   that once in the Atlanta mosque, Al-Farooq, I had a

16   conversation with you, I told you I'm going to Iraq next week

17   or something to that effect?

18   A.    You told me that you guys were going back.  When you guys

19   first came back you mentioned, you did mention Iraq.  But at

20   the most part you guys were talking about hijrah, going back to

21   either Bangladesh, Pakistan, the Muslim world.  When you saw me

22   again at the 14th Street Mosque you were mad that I cut myself

23   off from you guys.  You didn't say that I'm going to Iraq next

24   week, but you did say, "I want an answer in two weeks about

25   hijrah."

1    Q.    I think you're confusing.  There were two specific

2    meetings that we had after coming back from Toronto.  One was

3    me and Haris and you, we were in the truck.  That's when they

4    have, government has --

5    A.    Yeah.

6    Q.    -- the police report and the police stopped us.

7    A.    Yes.

8    Q.    Then there was another one which was -- do you recall the

9    date?

10   A.    Which one?

11   Q.    Outside the mosque.

12   A.    It was in summer.

13   Q.    It was in, I believe it was, I think, July or August, yes,

14   and it was only me and you?

15   A.    Yes.

16   Q.    It was not Haris, okay.  Can you recall, to the best of

17   your memory, what I mentioned -- so you don't recall Iraq being

18   mentioned?

19   A.    I don't recall Iraq being mentioned.  I remember in the

20   first meeting you mentioned Iraq.  But when I came to that

21   meeting I didn't eat breakfast that day, so we had a short

22   meeting, it was like ten minutes.  And then, because I didn't

23   eat breakfast, I passed out because it was like in the middle

24   -- right in the middle of the sun.

25   Q.    You mentioned you believed, in the letter, the letter

1    under Sami Ayoub's door --

2    A.    Yes.

3    Q.    Why would you believe that you were under surveillance?

4    A.    Because I was like MSA president and like I heard my phone

5    clicking and we were talking about these things, so I figured

6    that would put us under government surveillance.

7    Q.    But you weren't?  Did you --

8    A.    I have no idea.

9    Q.    Now, can you mention -- we used to watch a lot of these

10   jihadi videos, right?

11   A.    Yes.

12   Q.    Can you mention -- a nasheed, what's a nasheed?

13   A.    It's an Islamic song.

14   Q.    What type of an impact did those videos and songs have?

15   A.    They make you like pumped up.  They make you -- I mean,

16   they're recruitment videos, so they make you pumped up.  That's

17   what they're designed for, to make you want to go there, to --

18   Q.    So after --

19   A.    -- combat.

20   Q.    Can you just elaborate on that a little bit?  So it

21   affects you emotionally, correct?

22   A.    That is correct.

23   Q.    If someone watches the video?

24   A.    That is correct.

25   Q.    State of the umma, for example?

1    A.    That's correct.

2    Q.    It pumps you up and also it affects you emotionally.  So

3    after watching any of these videos, right, or know of these

4    videos, is it -- would it be accurate to say -- also the

5    nasheeds, and the videos are full of nasheeds, excuse me, so

6    you have the videos and the nasheeds -- would it be accurate to

7    say that a lot of things can be said in the heat of that, being

8    pumped up?

9    A.    It's possible things can be said just in that context in

10   the --

11   Q.    Which would --

12   A.    -- heat of the moment and it's possible you could say

13   those things in the heat of the moment.  I mean, both are

14   possible.

15   Q.    So you are -- in our hyper situation, did we say a lot of

16   things or did you say things that after watching any of these

17   videos which you would then later on, let's say, when you go

18   back home or you go back to work or school or whatever, you,

19   you know, you're kind of like -- it's like a different state of

20   mind where --

21   A.    I mean, you might say some things that you meant when

22   you're watching those videos and there's some things you might

23   have said that you may have not meant, if given time.  Again,

24   both are possible.

25   Q.    But did you in fact ever say things which later on you

1    would say that I wasn't serious or you weren't serious?

2    A.    I mean, for myself, yeah, I can vouch for that.  I mean,

3    as evidence, I used to be more into this type of ideology and

4    later on I left it.  So for myself I can definitely vouch for

5    that.

6    Q.    About the code, what -- why would we refer to the U.S. as

7    Pharaoh Land?

8    A.    Because we felt it was oppressive like Pharaoh.

9    Q.    Does it have more of a Quranic significance to it?

10   A.    Because Prophet Moses, his main opponent was the Pharaoh.

11   Q.    And could you elaborate on how it's the U.S. -- the U.S.

12   is -- to us signifies --

13   A.    Well, we felt at the time that a lot of the foreign policy

14   wasn't fair towards Muslims.  We felt -- we didn't agree with

15   them invading Afghanistan and then Iraq.  And then we saw the

16   Patriot Act and with Guantanamo we felt that they were, you

17   know, arresting people without reason and mistreating people in

18   Abu Ghraib.

19          So that was one of the reasons we used the term

20   "Pharaoh," because we felt it was the most powerful nation on

21   earth, just like Pharaoh was at that time, during Moses's time.

22   Q.    Do we -- do you recall one of the first meetings the three

23   of us had, you and I and Haris, in Georgia Tech, we had

24   conversations regarding -- well, before I get into that let me

25   ask about Tibyan Publications.  When was -- what was my

1   relationship with Tibyan Publications, to your knowledge?

2   A.    You were a moderator.  You posted on there.  You assisted

3   in some of their publications in, I guess, translating.

4   Q.    Well, in the online jihadi cyber community, what would you

5   characterize -- what role does Tibyan Publications play, to

6   your knowledge?

7   A.    What do you mean?

8   Q.    What is Tibyan -- what does Tibyan --

9   A.    It's like propaganda for that type of view, basically.

10  It's a place to discuss that type of view, to encourage people

11  to adopt that type of view.

12  Q.    If I may ask, you mentioned that you left that temple,

13  that ideology?

14  A.    Yeah.

15  Q.    So what ideology do you currently --

16  A.    Mainstream Islam.

17  Q.    Huh?

18  A.    Mainstream Islam.  But I don't see how that's relevant.

19  Q.    Do you remember any conversations we had about the

20  Freemasons?

21  A.    I -- only thing I remember is you just saying that the

22  U.S. dollar would have meant like the eagle and the arrows and

23  all that kind of stuff.

24  Q.    And the ancient Egyptians?

25  A.    Yeah, and how it's connected to the Freemasons.

1    Q.    Do you know -- for example, we took videos of the

2    Freemasons.  Do you know of any reason as to why we would have

3    taken --

4    A.    I don't know why you guys would have taken those videos.

5    Q.    Did we ever discuss about the United States, one of the

6    reasons why Muslims would not like the United States is that

7    the U.S. is trying to establish a New World Order for the

8    Antichrist?

9    A.    Yeah, that's probably one of the reasons.

10   Q.    We discussed this?

11   A.    I saw it on the forums.  I can't remember if we discussed

12   it face to face, but that was on the forums.

13   Q.    On postings?  Did I post any of that material?

14   A.    I can't recall if you posted it.

15   Q.    Do you recall anything --

16   A.    I remember you talking about a dollar bill and how that

17   relates to Freemasons and how they have strong influence over

18   the U.S.

19   Q.    When we speak, right, or when we're conversating online,

20   these codes that we use, how do you make up these codes?  One

21   of the codes, for example, the government referred to, is

22   referring to Iraq as Land of Two Rivers.  How does the Land of

23   Two Rivers mean Iraq?

24   A.    Mr. McBurney asked me if -- the two rivers that are there.

25   And most of the insurgent groups there, they would refer to

1    Iraq as the Land of Two Rivers.

2    Q.    Is it the Euphrates and --

3    A.    Yeah.

4    Q.    So by referring to an attribute of the actual thing, the

5    object that we want to refer to, which is Iraq, you would

6    instead refer to an attribute of the object, so that's the

7    code.  So by referring to -- it's like a branch off of the

8    actual -- sorry.  So would you say when we're making up -- when

9    these codes are -- when we were having these conversations, do

10   we make these codes up off the top of our heads sometimes, or

11   is it something that we're planning, that, you know, this is

12   the code for this, this is this, this is this, or when we are

13   just talking and when I want to say something or you want to

14   say something is it --

15   A.    It can be both.  Sometimes you can just tell in the

16   context what the person typed, what he meant.  I'm sure we

17   discussed J for jihad, we should use that instead of referring

18   to it as that.  But, for example, if I saw -- my first time I

19   saw Rivers I knew what it meant because of the videos and stuff

20   and the postings.

21   Q.    Actually, it shouldn't be considered code because it's

22   very publicly well known, that's what it's referred to by

23   Al Qaeda, correct?  Al Qaeda is not using a code on their

24   videos, are they?  Because it's wide open.

25   A.    Well, it was so Western people wouldn't know what we're

1    talking about.  It doesn't take, probably, a lot of research

2    but I don't know.  I can't answer.

3    Q.   It's a very poor code, then?

4    A.   It wasn't --

5    Q.   My point is that would you agree that these codes are not

6    pre -- it is not planned?  You're conversating with someone

7    and -- or I'm -- you're conversating and you just refer to

8    something in a bit different way than what it's usually termed

9    as?

10   A.   I mean, I don't recall us having like a meeting for like,

11   okay, this is our code for everything.  I do remember for jihad

12   that we said we should use J.  But if a person didn't get what

13   the person was referring to, you'd probably ask for

14   clarification and then use something else to get at what

15   they're trying to talk about.

16   Q.   J is, well, you have because it's the first letter of --

17   A.   Yes, yes.

18   Q.   How many languages do you speak?

19   A.   I speak English.  I write Arabic now and okay, so-so Urdu,

20   not very great at it.

21   Q.   Urdu?

22   A.   Yeah.

23   Q.   Do you recall how many languages I speak?

24   A.   English, Bengali, and you were decent at Arabic at the

25   time.

1    Q.   Do you remember when your -- when you, Haris, and I used
2    to meet, the vast majority of our -- how would you characterize
3    the vast majority of our -- the nature of the vast majority of
4    our meetings?  Not in terms of the subject matter but in terms
5    of the atmosphere of how we used to talk with each other in our
6    discussions.
7    A.   What do you mean by atmosphere?
8    Q.   Was it very serious or very paranoid or we were like
9    joking or was it like were we taking drugs, or what?
10   A.   It varied.
11   Q.   Lighthearted?
12   A.   Many times lighthearted but there were a few times where
13   you'd be serious and say, you know, we need to make hijrah, we
14   need to take things -- you know, everything had its place, the
15   serious stuff, the nonserious stuff.
16   Q.   My question was the vast majority of our discussions and
17   meetings, was it serious, the vast majority, or was the vast
18   majority -- and one more question.  Okay, first answer that.
19   A.   It wasn't like every meeting we had was like we had an
20   agenda, a professional meeting, we're going to cover X, Y and
21   Z, no, it was not serious, if that's what you mean by serious.
22        If you meant serious, you know, are we stern-faced
23   all the time, no, we were not stern-faced all -- most of the
24   time.  But, yes, we had many lighthearted stuff because, you
25   know, we were much younger then.  But there were times where

1    the meetings were serious too as well.

2    Q.    Was there times -- and would you say that -- do you recall

3    making statements amongst us and criticizing ourselves of how

4    we're not serious and how we just joke around and just --

5    A.    Yeah.  I mean, we did say that and that's one reason why

6    we said we should take things seriously.  But we did joke

7    around that we're not serious, that's true.

8    Q.    Do you also recall us saying, because I recall saying

9    this, if I may paraphrase or quote to the best of my memory, do

10   you recall saying something like:  When I'm by myself, meaning

11   yourself, when I'm by myself at home, you know, I'm reading,

12   studying and everything is serious, but when I come meet you

13   guys we just start cracking up?

14   A.    When I first met you, yeah, we did have that dynamic.

15   Q.    This was with Haris also.  Do you recall any --

16   A.    Yeah, I remember when I first started meeting you there

17   were times where we would just laugh at stupid stuff, yes, and

18   I thought, yeah, I laugh too much when I'm with you.  With

19   Haris, yes, but I didn't see Haris as much as you.

20   Q.    Do you ever recall -- because I didn't used to drive, you

21   had a driver's, learner's permit -- do you recall once we were

22   passing by an Ismaili mosque, saying this is a Shia mosque, we

23   should blow it up?  Was it serious?  What I'm trying to get at

24   is was there a serious plan?  Were you planning on doing that

25   or was it just passing by, make a comment and then never think

1    about it, probably never thought about it ever?

2    A.    I don't recall that but I did say negative things about

3    Ismaili center, we should go and take it over.

4    Q.    Did you ever take it over?

5    A.    No.

6    Q.    Did you ever plan taking it over?

7    A.    No.

8    Q.    But you said something like that?

9    A.    That is correct.

10   Q.    How would we know that you weren't planning it when you

11   said it?

12   A.    Because I didn't do it.

13   Q.    And you never --

14   A.    That was four years ago.

15   Q.    But you were driving past it.  You've driven past Ismaili

16   centers, correct?

17   A.    That is correct.

18   Q.    So it might be misconstrued by someone that if you're

19   driving past something and saying that you would blow -- take

20   it over, that you --

21   A.    Can you repeat the question?

22   Q.    It might -- could someone -- let's say someone who was --

23   else with you at that time, someone who doesn't know you, just

24   someone else, right, and hears you and he sees you passing by,

25   saying that you're going to take over this Ismaili center and

1    the Ismailis are known, the Shia are known to be targets of --

2    you're a Sunni, right?

3    A.    Yes.

4    Q.    So Sunnis are targeting Shias' mosques in Iraq and you're

5    saying they would do the same thing, and you're passing by a

6    Shia mosque, could it be misconstrued or could someone who has

7    an ulterior motive try to present you in a way that you were

8    actually trying to take over an Ismaili mosque?

9                MR. MCBURNEY:  Objection.

10                THE COURT:  Sustained.

11    Q.    (By Mr. Sadequee)  What's your view regarding the

12    Ismailis?

13                MR. MCBURNEY:  Objection; relevance.

14                THE COURT:  The question is what is your view

15    regarding the Israelis?

16                MR. SADEQUEE:  No, the Ismailis, the Shias that we're

17    talking about.  I was talking about --

18                THE COURT:  How is that relevant?

19                MR. SADEQUEE:  -- how we were passing by this Shia

20    sect mosque and the witness made --

21                THE COURT:  How is it legally relevant to the case?

22                MR. SADEQUEE:  I think in the general context it

23    would just help clarify.

24                THE COURT:  I'm going to sustain the objection.

25    Q.    (By Mr. Sadequee)  We talked about Guantanamo and Abu

1    Ghraib?

2    A.    Yes.  There was a video of, I think, a female prisoner or

3    about a female prisoner who got raped in Abu Ghraib -- or she

4    was still there, and it was all over the Internet and on the

5    websites and, you know, people were talking about ways to,

6    like, free her.  I mean, I recall us saying that, you know, we

7    should like go there and, you know, go in there and attack it

8    and bust her free because she got raped, or something along

9    those lines.

10   Q.    So you said that we should do this?

11   A.    Yeah.

12   Q.    And I'm sure a lot of people said that you should do this.

13   I'm person who causing the same thing but I will not -- if I

14   did I wouldn't deny it.  But did you plan on --

15   A.    I didn't make specific plans to do that, no.

16   Q.    But you did mention there was -- you did have talks about

17   going to Iraq but --

18   A.    Yes.

19   Q.    -- there was no plans?

20   A.    Yes.

21   Q.    But there was a desire?

22   A.    Yes.

23   Q.    Do you believe -- you said you believe it would be right

24   and just to break into Abu Ghraib and release those --

25   A.    There's a way of going about everything the right way.

1   There's a way of doing things the right way.  Getting her

2   released, I felt, was the right thing.  But if you're asking my

3   opinion today, there's a right way of doing things, not

4   vigilante-type mentality.

5   Q.   Back to codes, would you say that someone who -- being

6   someone who has used codes in the past, and you -- when you're

7   using these encrypted -- when you're encrypting your

8   discussions -- when you're encrypting your discussions do you

9   start to reach a point where -- when you reach a level of

10  proficiency where -- I'm going to leave that question.

11       You've spoken with Azdee.  You mentioned Azdee?

12  A.   Yes.

13  Q.   Who is Azdee, to your knowledge?

14  A.   He was in Canada.  He was a Monian and he was involved

15  with Tibyan.

16  Q.   You've spoken with him?

17  A.   Online chatted with him, to clarify.

18  Q.   When I said that I was going to Canada, who did I say I

19  was going to meet?

20  A.   Azdee.

21  Q.   And from your discussions with Azdee, what type of a

22  person is he?

23  A.   I mean, he supported these views.  He was emotional.  He

24  was good with computers.

25  Q.   You say he was emotional, what do you mean by that?

1    A.   You know, his postings on Tibyan or whatever, I mean

2    they're not like timid posts.  I mean, you know, it's caps,

3    very strong language, harsh, you know.

4    Q.   But those are postings.  But then there's chats?

5    A.   Yeah.

6    Q.   Could you clarify a bit?  What's the difference between a

7    posting and a chat?

8    A.   Posting is like on this message board here and a chat is

9    like, you know, AOL Instant Message, MSN, text messaging just

10   online.

11   Q.   So postings are more public where people you don't know

12   can be reading that, and chats are more private, correct?

13   A.   That's correct.

14   Q.   So only those on your contact list are people who are your

15   friends, online friends, right?

16   A.   That's correct.

17   Q.   So they know you more than someone who's reading these

18   postings?

19   A.   That's correct.

20   Q.   And you've had chats with him?

21   A.   Yes.

22   Q.   So how is he in his chats?

23   A.   Wasn't always serious, that's correct, you know, talked

24   about other things.  He was also busy.  I didn't get to chat

25   with him as much as like others.  Sometimes he was serious in

1    nature.  You know, he'd comment on a story on the news or, you

2    know, a battle in Iraq and, you know, sometimes he was serious,

3    and he also had his light moments as well.

4    Q.   But the vast majority, that's what I'm trying to get at,

5    is the vast majority to your memory.  If you could put a

6    percentage on it, what would you say?

7    A.   It's going to be difficult for me to put a percentage but,

8    yeah, it's true a lot of times when we talked or other people

9    talked, yeah, maybe not all of our conversations were like

10   Islam, I'm going to go to X, Y, and Z, that's correct, that our

11   conversations were not like that.  But, like I said, there were

12   serious.  I can't put a percentage.  There were serious and a

13   lot of lighthearted ones as well.

14   Q.   To your most honest memory, what -- I mean, if you don't

15   remember you can just say I have no memory.  But if you do

16   remember, do you remember saying a lot of time is wasted on the

17   Internet on this nonsense?  At the time, when you still hold

18   the ideology, but when you say nonsense, what do you mean?  Do

19   you mean that this is a bunch of just not serious people who

20   are just shooting their mouths off, or did you mean this

21   nonsense, this is wrong ideology?  Which you held on to that

22   ideology at the time, so what did you mean when you did hold on

23   to the ideology?  What --

24   A.   There's two types of nonseriousness.  I mean, even if

25   you're not actively pursuing moving to a theater of combat,

1    there are other people that are just as religious, they're not

2    extreme but they don't waste time on the Internet.  You know,

3    they pray, they read, they study.  I meant it from that point

4    of view.

5              I also meant it from the point of view some people,

6    you know, they aren't serious, they say that they aren't

7    going -- you know, they're talking junk, basically, there is

8    that as well.

9              If I said -- and I do recall saying that, it was from

10   both, they weren't serious, they weren't really going to do --

11   not all of them but some of them were just, you know, just

12   people posting.  But also not all of them were religious.  You

13   know, they posted all this stuff on the 'net but they weren't

14   practicing, so it's like they weren't serious.  If they're not

15   practicing people, how are they going to go do all these other

16   things?

17   Q.   When you heard that I was arrested, what was your

18   reaction?

19   A.   I was surprised.  I wasn't -- because I was interviewed

20   but I didn't know anything else that happened.

21   Q.   When you were first approached by the FBI were you

22   surprised that they were interviewing you?

23   A.   I was a bit surprised, yeah.

24   Q.   And when they asked you about me -- my question is, if I

25   may go back to that question I asked you earlier, you seemed

1    like you were kind of dodging the answer so I want to ask you

2    just very bluntly and precisely.

3            Can you give a percentage, an estimate of the -- in

4    all our meetings and conversations, you spent time at my house,

5    I spent time at your house, we spent time paintballing each

6    other, what was the nature and atmosphere in our character with

7    each other?  I mean, were we -- and when we say "serious," I

8    mean I'm not saying that we're talking about serious, there's

9    one thing that we were talking about serious issues, then

10   there's another thing is to be serious in what -- in our

11   intentions and in our demeanor, that's correct term, because

12   someone might be talking about Iraq and Afghanistan, which are

13   serious issues, of course, but they might be joking about it.

14   Or they might be expressing something in a very exaggerated

15   manner, their own opinions or beliefs or desires in a manner

16   which is excited or overexcited, I think that's a proper term,

17   which --

18   A.   There are many times where, like you asked me earlier,

19   like we did say things when we are overly excited, yes.

20   Q.   The question is not whether there were times.  My question

21   is what percentage would you put on that?

22   A.   I can't put a percentage.  It's difficult.

23   Q.   Would you say the vast majority was like that or would you

24   just say it was just one conversation out of a hundred that

25   was -- we were joking around?

1    A.   It was not one conversation out of a hundred that we were

2    joking, it was more than that.  I'm not comfortable saying it's

3    a vast majority; I'm not saying it's a vast minority of the

4    conversations.  But I really honestly can't say it was vast

5    majority or the vast minority.  It was a mix.

6          THE COURT:  Let's move on to a different topic.

7    Q.   (By Mr. Sadequee)  In our paintball -- before I get into

8    the paintball, related to it, what is *al Battar*?

9    A.   It's a magazine that Al Qaeda publishes on the Internet.

10   Q.   What's it about?  What's the topics of --

11   A.   I didn't understand Arabic but from what I understood --

12   Q.   You see --

13   A.   -- it was --

14         THE COURT:  Wait.  We really need to ask, when you

15   ask a question, you need to let him answer it.  And you need

16   to, I know it's hard, but you need to wait until he's done with

17   his questions.  Sometimes it's hard to tell that, make sure

18   that you're confident that it's done before you answer it.

19         THE WITNESS:  Okay.  The question?

20   Q.   (By Mr. Sadequee)  What's the topic of -- did you ever

21   have a copy or online copy of any of these -- *al Battar*

22   magazines?

23   A.   Yeah, I downloaded them but I didn't understand them

24   because they're in Arabic.

25   Q.   Have you seen, gone through the pages and seen the

1    pictures on them?

2    A.    What do you mean by -- they didn't have photos.

3    Q.    They had photos of weapons and guns in them?

4    A.    I don't think they had -- they had title headings and

5    basically it was about preparing yourself for jihad.  I don't

6    recall photos.  But I mean, I knew that was what it was about,

7    preparing yourself for jihad.

8    Q.    It was the how to stuff, the training stuff; it was not

9    ideological stuff?

10    A.    I don't recall if it was just ideological or training.

11    And it had some training stuff.

12    Q.    Online did you, or us, have access to training material if

13    we wanted to, such as *al Battar*, which is the --

14    A.    Yes.

15    Q.    -- official --

16    A.    If we wanted to we could download it, that's correct.

17    Q.    -- Al Qaeda training manuals are available online in

18    Arabic and also some in English, not official okayed in English

19    but in Arabic it is, *al Battar*.

20          Now, when we went to paintball, did we ever study or

21    take or mention *al Battar* or any of these other training --

22    A.    No.

23    Q.    -- manuals for terrorist organizations?

24    A.    We did not mention it.

25    Q.    Did we ever -- so we had access to them and knowledge of

1    them, meaning that it is available to us, but we did not

2    utilize them; is that correct?

3    A.    That is correct.  But we did, I remember reading online

4    that it said we should do like pushups and running.  So we

5    didn't actually use a manual but we did that part.  But as far

6    as like when we did the paintballing, you know, we didn't have

7    a set drill that we downloaded or whatever.  But one of the

8    reasons for paintballing was we did read that you should go out

9    and --

10   Q.   So the reason that --

11   A.   -- go out in --

12           THE COURT:  You need to let him finish.

13           THE WITNESS:  Just go out in the woods and get in

14   shape.  But, no, when we did the paintballing it wasn't like we

15   had some consultation with, you know, how to best utilize

16   paintballs or something like that.

17   Q.   (By Mr. Sadequee)  If someone really seriously with

18   determination wanted to do terrorist training or training for

19   jihad and has access to these training manuals from Al Qaeda

20   free online, would they not --

21           MR. MCBURNEY:  Objection.

22           THE COURT:  Why don't you let him finish the

23   question?

24           MR. MCBURNEY:  Well, he will have made his argument

25   that he's trying to make in his question if he finishes it.

1    But I'll wait.  The objection is this is an argumentative

2    question.

3           THE COURT:  There are a number of questions, because

4    I watch them online, that are speeches.  You may ask a question

5    to elicit factual information of what this person knows.  You

6    may not ask questions that summarize your position of the case.

7           You are functioning as your lawyer.  As a lawyer, you

8    are responsible for asking proper questions and a proper

9    question is one in which you elicit information about this

10   person's knowledge.  You cannot state your position in the case

11   through your questions.

12   Q.   (By Mr. Sadequee)  So no training manuals were

13   consulted --

14   A.   That's --

15   Q.   -- but there was mention or talk amongst us about training

16   for jihad?

17   A.   That's correct.

18   Q.   And we had knowledge of -- we had in our possession, not

19   meaning reading it at the time but available to us online,

20   these training manuals?

21   A.   That is correct.

22   Q.   We had -- we never -- did you ever study these training

23   manuals?

24   A.   No.  They were all in Arabic.

25   Q.   I knew Arabic.  Did you and I ever discuss that we should

1    use these for our paintballing?

2    A.    No, we did not.

3    Q.    Did we ever, during the paintballing, did we ever mention

4    these training manuals at all?

5    A.    No.

6    Q.    But we were saying we were training for jihad?

7    A.    That was one of the reasons we went to the woods.  We did

8    mention that, you know, it's good to be in the nature, to

9    reflect on nature.  We also just wanted to have fun as well.

10   But we did say that, you know, that it would help us toward

11   jihad, that's correct.

12   Q.    The place where this, the government phrases it

13   paramilitary, rudimentary paramilitary training, can you

14   describe the place?

15   A.    There was two places.  One was behind an apartment complex

16   you and Haris had lived when you were younger.  And the other

17   place was, I think it was a hunting ground or some forest area

18   by Haris's house, like a mile away.

19   Q.    Can you describe the place as --

20   A.    Which one?

21   Q.    -- how does it look like?

22   A.    Which one?

23   Q.    At Haris's place, the one in Dawsonville.

24   A.    Basically you drove and you parked your car in the grass

25   and then you walked in the woods and it was really hilly and it

1    had a lot of water streams and a lot of trees.

2    Q.   Nice place?

3    A.   Yeah.

4    Q.   Like real beautiful nature type?

5    A.   That's correct.

6    Q.   Did we comment on that?

7    A.   Yes.

8    Q.   Would it be a place where people might like hanging around

9    and staying and relaxing?

10   A.   I mean, that's correct, we saw people off-road in there

11   when we were paintballing once.

12   Q.   What was the mood and the tone of our paintballing?  When

13   we were paintballing, how would you describe it?  Was it

14   like -- you've seen the movie -- not the movie, the Al Qaeda

15   film, *State of the Umma*?

16   A.   Yes, that's correct.

17   Q.   And it has training video -- not only did we have access

18   to training manuals, we also had access to training videos as

19   well, right?  Did we consult these training videos which

20   actually show how to do training, like in --

21   A.   We didn't consult that video and I don't remember us

22   consulting other videos.

23        I do remember, though, like I said, the message board

24   like said, you know, doing pushups and running through the

25   woods.  That's the one thing I can say we kind of did consult,

1    or we saw it online and we kind of implemented it.  But as far

2    as exercises or drills, we did not consult a book or video.

3    Q.    So you read online that pushups and situps are training

4    for jihad and you did it and so that's a training for jihad?

5    A.    That was part of our mindset.

6    Q.    Did we try to imitate anything that we've seen in those

7    training, jihad training videos, like *State of the Umma*, like

8    have a fire in a circle and they're jumping through it?

9    A.    We did not jump through a fire with circle.  Maybe

10   shooting at trees, that might -- I don't know if it was in a

11   video but, I mean, you see scenes of that but that's about it.

12   You know, they have obstacle courses.  We didn't have anything

13   like that, or them sparring against each other, we didn't do

14   anything like that, that's correct.

15   Q.    So what was the mood, back to the question, the actual

16   question I was getting at, what was the mood of our

17   paintballing?  Was it a -- when someone -- if someone is doing

18   rudimentary paramilitary training, the first one that comes to

19   mind is like FARC, you know, in Colombia, paramilitary group.

20   Would you describe it as paramilitary training or would you say

21   this is just some guys having --

22   A.    It wasn't full-blown, I wouldn't describe it as full-blown

23   paramilitary training.  I said we had multiple intentions even

24   when we went there.

25              The only reason -- you could say we had that

1    intention, part of our intention was going there would help us.

2    But it was not like a boot camp, no, it was not like a

3    paramilitary boot camp.  But, like I said, our intentions were

4    mixed but it was not a paramilitary-like training camp or

5    anything like that.

6    Q.   Of course, not a military camp but --

7         THE COURT:  Let's move on to a new subject.

8    Q.   (By Mr. Sadequee)  One last question.  Were we -- was our

9    paintballing, would you characterize it as lighthearted, in

10   that we're having just fun, or was it -- was it more fun or was

11   it more of just training?

12   A.   It wasn't just serious training.  We did have fun in it.

13   Q.   What was the majority of it?  I'm not saying -- does it

14   have just an element of it?  If it has just an element of --

15   A.   I mean it depended, like, you know, if I was near you and

16   I was about to shoot you, maybe I was more serious, okay, like

17   this is a real-time simulation.  The rest of time we were

18   shooting at trees and stuff, no, I mean, it was probably more

19   lighthearted.  You know, it depended on what was going on.

20        But, like I said, it wasn't like pure military or

21   paramilitary training.  It wasn't -- you know, we didn't have a

22   drill sergeant telling us what to do.  It's kind of hard to

23   describe the --

24   Q.   What clothes --

25   A.   -- majority or not.  The clothes we were wearing, jogging

1  pants, sneakers and a T-shirt.

2  Q.   No military clothing?

3  A.   No military clothing, no.

4  Q.   No armor?  No armor or anything like that?

5  A.   No.  We might wear two shirts because it would hurt if you

6  got hit with the paintball.  That might count as armor.

7  Q.   Do we preplan anything of the paintballing or was it just

8  we went to the woods and just do whatever came to our minds?

9  A.   I mean we said, okay, we'll go at this time, but is that

10  what you mean by preplanning?

11  Q.   Preplanning, we're going to go to the woods and have A, B,

12  C, D exercises to do, then once we finish this then we move on

13  to location --

14  A.   No.  It was random, very random.

15  Q.   We just go there and start doing whatever?

16  A.   Yes.

17  Q.   Would you do it again?  I mean, if it was fun --

18  A.   Paintballing just for the sake of paintballing?

19  Q.   Yeah.

20  A.   Yeah, maybe.  Why not?

21        MR. SADEQUEE:  That will be it.  Thank you.

22        THE COURT:  How long is your redirect examination?

23        MR. MCBURNEY:  Five minutes.

24        THE COURT:  All right.

25        MR. MCBURNEY:  I will work to keep it five or under.

1                    REDIRECT EXAMINATION

2     BY MR. MCBURNEY:

3     Q.    Let's start with code, it's a term I used.  By code, you

4     weren't transposing an A for a Z and a B for a Y when you

5     were --

6     A.    No.

7     Q.    -- communicating with people?

8     A.    No.

9     Q.    Pharaoh is a way to write United States?

10    A.    That's correct, or Land of Pharaoh, yes.

11    Q.    Two Rivers for Iraq?

12    A.    Yes.

13    Q.    Was the concern that if someone, Big Brother, was reading

14    through what you had written, the word Iraq or jihad might jump

15    out?

16    A.    That's correct.

17    Q.    If you replaced it with something easy to figure out, Two

18    Rivers equals Iraq, still it wouldn't say Iraq?

19    A.    That's correct.

20    Q.    The defendant asked you several times about a video,

21    apparently you guys watched together, the *State of the Umma*?

22    A.    We didn't watch it together but we had copies of it.

23    Q.    You've seen it?

24    A.    I've seen it, yes.

25    Q.    What does it celebrate?

1    A.    It was basically a video that shows like Osama bin Laden,

2    Azzam, other guys, and it basically tells you the Muslim world

3    is in peril and so like now, it's like it's up to you to like

4    take action and, you know, join violent jihad, that type of

5    thing.

6    Q.    The last thing I want to cover with you is this question

7    of lightheartedness versus seriousness.  When you and the

8    defendant and sometimes Syed Haris Ahmed would get together, it

9    sounds like sometimes you'd joke around?

10   A.    Yeah.

11   Q.    You might joke around about what's going on in Iraq?

12   A.    Yeah.

13   Q.    You might joke around about the need to do something in

14   support of violent jihad?

15   A.    Yes.

16   Q.    Were there also times when you were serious in your

17   discussions about what was going on in Afghanistan?

18   A.    Yes, that's correct.

19   Q.    Were there times when you were serious in your discussions

20   about the steps you and the defendant and Syed Haris Ahmed

21   should take in support of that cause?

22   A.    That's correct.

23   Q.    When you would finish one of these get-togethers and drive

24   home, were you thinking, I'm done with those guys, now it's

25   back to the real world, I don't really believe those things?

1    A.    No.  We still held on to our belief.  I think it was

2    whether am I going to do that tomorrow or -- but we still

3    believed that we had the obligation.  We still -- we had that

4    serious desire, had that serious intention, but, you know, it

5    varied.  Like sometimes, you know, you get back from one of

6    those meetings or discussions and time would pass, maybe a

7    calm, maybe if you got calm you would watch another thing to

8    get you more pumped or keep your commitment.

9    Q.    So we're clear, during calm times, not agitated or worked

10   up by *State of the Umma* or some other video or a nasheed,

11   during calm times did you and the defendant and Syed Haris

12   Ahmed discuss the importance of supporting violent jihad?

13   A.    That's correct.

14   Q.    And for you -- I know you don't know what's in the

15   defendant's heart -- for you at that time, late 2004, early

16   2005, when you were spending time with the defendant and Syed

17   Haris Ahmed, were you serious about the need at some point --

18   before I said it's a question of timing -- to make hijrah, get

19   over to Muslim lands and support violent jihad?

20   A.    That's correct.

21   Q.    Thank you, Mr. Kamal.

22             THE COURT:  All right, does anybody want Mr. Kamal

23   subject to recall?

24             MR. MCBURNEY:  No, sir.

25             THE COURT:  Do you want Mr. Kamal subject to being

1    recalled?

2            MR. SADEQUEE:  Yes.

3            THE COURT:  I'm going to release you subject to

4    recall, meaning that you should not discuss your testimony with

5    anybody until you either have been recalled or you've been told

6    that the case has been concluded.  Thank you.  Do you

7    understand that?

8            THE WITNESS:  So not to discuss the case and I can be

9    called back here to testify, is that what you're saying?

10           THE COURT:  That's correct.  But somebody will

11   contact you.  I'm not saying that's going to happen, that's

12   just a possibility and it's a way of me telling you that until

13   that possibility either happens or the case is over, you

14   shouldn't talk about the case with anybody.

15           THE WITNESS:  Okay.

16           THE COURT:  All right, thank you.  You may step down.

17   Thank you for being with us.

18           We are going to take our lunch break.  We'll take it

19   for an hour, meaning that we should be back ready to go at

20   1:05.  Again, don't discuss the case with anybody because we're

21   just getting into the evidence.  Enjoy your lunch and we will

22   see you back here --

23           THE COURTROOM DEPUTY:  2:05.

24           THE COURT:  2:05, excuse me.  I'm in favor of doing

25   things quickly but not five minutes' worth.

1          (Jury retired from courtroom at 1:05 p.m.)

2          THE COURT:  Can we close the back door, please?

3          The first thing I want to go over is this concern

4    that you have about what I said in the preliminary

5    instructions.  I've gone back to read, because I don't have

6    access to this transcript, I will over lunch, but I'm sure that

7    what I said was that any statements made in the opening

8    statements by counsel or by the defendant are not evidence and

9    can't be considered.  Is that when you thought I said something

10   that you didn't understand or you thought was ambiguous?

11         MR. MCBURNEY:  Yes.  You made that point and then

12   what I'm recalling and the note that I made, and Ms. Collins

13   made almost simultaneously, is we thought you said, beyond

14   that, statements made in opening, closing, and any statement by

15   the defendant is not evidence in this case.  I think what you

16   meant by that, if I heard it correctly, was if he's asking

17   questions, as we've seen, if he's effectively making statements

18   instead of asking --

19         THE COURT:  I understand your concern.  What I'm

20   going to do when the jury comes back is explain to them that

21   any statements that were made during openings or may be made

22   during closings are not evidence and they cannot consider it as

23   evidence, but any statement that is made that's introduced into

24   evidence may be considered.

25         MR. MCBURNEY:  Okay.

1              THE COURT:  Is that satisfactory?

2              MR. MCBURNEY:  Yes.

3              THE COURT:  Any objection, Mr. Sadequee?

4              MR. SADEQUEE:  Could you clarify?

5              THE COURT:  I'm going to tell the jury again that any

6    statement made by counsel or by the defendant in their opening

7    statements or in their closings are not evidence, they may not

8    be considered by the jury as evidence.  But any statement

9    that's introduced into evidence during the course of the trial

10   can be considered, regardless of who made it.

11             MR. SADEQUEE:  No objection.

12             THE COURT:  All right.  Do we have another matter?

13             MR. MCBURNEY:  We do.  I received a surprising report

14   from Mr. Martin.  We were going to call Syed Haris Ahmed now to

15   have him refuse to testify, which is, up until five minutes

16   ago, what I was told he was going to do.

17             Now I'm being told that he may be willing to testify

18   but we need to resolve that outside the presence of the jury.

19   So with the Court's permission, I think we should bring him in

20   and figure out what his answer is.  If his answer is he will

21   testify, we need to figure out when that time is.  It may be

22   today because he's here.  It might not be the first thing that

23   happens after lunch.

24             MR. MARTIN:  Your Honor, may I consult with him just

25   a minute before we bring him in?

1          THE COURT:  Yes.

2          MR. SAMUEL:  Your Honor, while we're waiting, my

3    understanding was in order to facilitate bringing Professor

4    Gerges here you need Mr. Sadequee to ask for it rather than us?

5    Did I misunderstand that?

6          THE COURT:  I never said that.

7          MR. SAMUEL:  I misunderstood.

8          MR. WAHID:  Sorry, Judge.  It was the idea that the

9    order was submitted on the request of Mr. Sadequee to bring him

10   and because we anticipated the trial might be moving quicker

11   than we originally thought, our concern was originally we

12   thought bring him Friday or Monday, so the order simply may

13   need to be looked at today and signed up today.

14         THE COURTROOM DEPUTY:  It was e-mailed to me.

15         THE COURT:  Well, I have not seen that order.  I

16   didn't know that was an issue.  I don't recall discussing it

17   but that doesn't mean we didn't.  If we do bring him, I would

18   expect that he will testify.  So you need to make that -- Mr.

19   Sadequee needs to make the decision whether he's actually going

20   to present him because if he's not and we have to spend money

21   to bring him down here, that would not be a prudent expense.

22         MR. WAHID:  Which is what I was trying to, with Mr.

23   Samuel -- I figured that and that's why I thought Mr. Sadequee

24   should request to the Court directly.

25         MR. SADEQUEE:  I don't think it will be --

1          THE COURT:  Sorry, didn't hear you.

2          MR. SADEQUEE:  I don't think I will call Mr. Gerges.

3          THE COURT:  So you elect not to have me have

4     Mr. Gerges fly to Atlanta because you are not going to call him

5     as a witness; is that correct?

6          MR. SADEQUEE:  Yes.

7          THE COURT:  Thank you.  While we're waiting, Mr.

8     Sadequee, I have been very liberal in allowing you to ask

9     cross-examination questions, but you need to understand that

10    there are rules that apply to the case; you are bound by those

11    rules.  And you have a tendency, I'm chalking it up to the fact

12    that you haven't done this before, to make statements in

13    support of what your position is in the case.  I just want to

14    remind you that's not proper, that what you have to do is to

15    ask a question.  And I'll give you an example.

16         I think you went into a lot of, a number of questions

17    about what was the atmosphere like.  It's okay to say, "Please

18    describe the atmosphere" or "Wasn't the atmosphere jovial?"

19    But what you can't do is say, "Wasn't the atmosphere jovial

20    because isn't it true that when people really don't believe in

21    something, really aren't serious about something, that they

22    would act in a jovial way as opposed to a serious way?"

23         The first question is a proper question.  But your

24    statement about explaining why you want the answer that you

25    want is not, which means you are better served by asking

1    shorter questions.  When they get long is when you have that

2    problem.  I just want to give you that guidance.

3         MR. MARTIN:  Your Honor, before you bring him in, he

4    requested before he made this important decision that he have

5    just a minute or two to pray and that's what he's doing right

6    now and that's what I was waiting on.

7         THE COURT:  Okay.

8         One more hint or suggestion to you in asking

9    questions.  The other thing that you may not do, I don't think

10   you did this but once or twice, but you did make a comment on

11   one case saying, "Do you remember you saying, I was there and I

12   remember you saying."  That's really you testifying.  You can

13   ask him, "Do you remember when we were together saying X?"

14   What you can't say is to say, "I'm going to tell you what you

15   said because I was there and remember that."  That's not

16   proper.  But you can ask the question about what he remembers

17   saying or what he doesn't remember saying.  Do you understand

18   that --

19        MR. SADEQUEE:  Yes.

20        THE COURT:  -- guidance?

21        MR. MARTIN:  Your Honor, while he's doing that, I

22   just wanted to mention a couple of things with regards to the

23   immunity that you've given him.

24        This is an unusual situation, in that he is awaiting

25   sentencing before you and he's about to give testimony.  Under

1  an immunity it would be my understanding, and I would ask the

2  Court if it's of a different opinion to let me know, that this

3  Court could not use anything he says during any of these

4  proceedings with regards to sentencing.  You might want to, we

5  might urge you to, but it occurred to me that immunity would

6  mean that this cannot be used against him in any respect,

7  including sentencing.  It's an odd situation I've never

8  personally confronted before.  I've seen sometimes in cases,

9  but that's an issue I just wanted to present to the Court

10  that's sort of a conundrum in this.

11       The second thing is --

12       THE COURT:  Give me an example of --

13       MR. MARTIN:  I don't know.  I can't give you an

14  example.  Because I know you've heard, I would expect his

15  testimony would be essentially what you've already heard in his

16  interviews, that's what I expect.  But I don't know what might

17  come up, especially on cross-examination.

18       The second thing is with regards to foreign

19  prosecutions, I'm familiar with the Eleventh Circuit case and

20  the Supreme Court case that says as a general matter that is

21  not a concern.  But I have been assured by, just briefly,

22  informally, by Mr. Nahmias that they would make sure that -- we

23  have potential prosecutions, of course, in Canada, United

24  Kingdom and Pakistan, quite frankly, maybe even Bosnia,

25  probably that would be a stretch, but those three, clearly

1   Canada, is a clear possibility if he was refusing to testify

2   and they have tried to perfect that issue in more detail and I

3   don't think it's going to happen.  But I'm just wanting to say

4   to the Court that I've at least been informally assured by

5   Mr. Nahmias that they would make sure that didn't happen.  Is

6   that correct?

7          MR. NAHMIAS:  Just to be clear, I said we can reflect

8   to those governments it wouldn't happen.  It would only be the

9   use of his immunized testimony, in the same way when we turn

10  somebody over to the state we sometimes say you can prosecute

11  him but you can't use his immunized testimony to prosecute him.

12          THE COURT:  Well, I can't do anything about that --

13          MR. MARTIN:  I understand that.

14          THE COURT:  -- but if you want it on the record --

15          MR. MARTIN:  I just want it on the record.

16          THE COURT:  -- the U.S. attorney to state what he

17  would represent to a foreign government, I think you have that.

18          MR. MARTIN:  Yes, sir.

19          (Syed Haris Ahmed entered the courtroom.)

20          THE COURT:  I need first to have you sworn in.

21          THE COURTROOM DEPUTY:  Please raise your right hand.

22          (SYED HARIS AHMED duly sworn/affirmed by the

23  courtroom deputy.)

24          THE COURT:  Did you say yes?

25          DEFENDANT AHMED:  Yeah.

1    THE COURT:  All right, Mr. Ahmed, I believe that you

2    have received an order that I entered on July 15th of 2009, in

3    which the order states, and let me just read it, that you are

4    ordered that you shall, if called in this trial, testify as a

5    witness in the United States versus Ehsanul Islam Sadequee,

6    which was scheduled to begin, and which did begin, yesterday.

7    And I further ordered that if you refused to comply with the

8    order from which I'm reading on the basis of your privilege

9    against self-incrimination that you may not do that, you may

10   not rely upon your Fifth Amendment privilege because I'm

11   ordering you to do that and whatever you would say you have

12   immunity from.

13   Your testimony and any information compelled under

14   the order, I said in this order, may not be used against you in

15   any criminal case except that if you testify in any -- that

16   your testimony and any information derived from it could be

17   used in a prosecution of you for perjury or for giving a false

18   statement or for failing to comply with this order, meaning

19   that while you are ordered to testify, you have to testify

20   truthfully and, if you don't, you could be prosecuted for a

21   further criminal offense.  Now, do you understand the order?

22   DEFENDANT AHMED:  Uh-huh.

23   THE COURT:  Yes?

24   DEFENDANT AHMED:  Uh-huh.

25   THE COURT:  And have you discussed it with

1    Mr. Martin?

2            DEFENDANT AHMED:  Yeah.

3            THE COURT:  And has he explained it to you as well?

4            DEFENDANT AHMED:  Yeah.

5            THE COURT:  If you are called to testify, what is

6    your intention?  Do you intend to testify or do you intend not

7    to testify?

8            DEFENDANT AHMED:  When am I going to be called?

9    Today or tomorrow?

10           THE COURT:  Probably today.

11           DEFENDANT AHMED:  Today?  I guess I'll (inaudible).

12           THE COURT:  I couldn't hear you.  Could you speak

13    into the microphone so I can hear you a little better?

14           DEFENDANT AHMED:  The point is I cannot decide

15    because it's against my religion to testify against Muslims.

16    Okay, so if I -- if I go against order with you will you

17    punish -- I mean is there a punishment?

18           THE COURT:  I'm not to that point yet because you

19    haven't gone against the order.  I don't know what I would do

20    but that's a possibility.  Do you want some more time to talk

21    to Mr. Martin about this?

22           DEFENDANT AHMED:  I think I will testify if it can be

23    of help in pursuit of justice.  That's my only goal, to have

24    justice in any way.

25           THE COURT:  And that will mean that you are going to

1    be called by the government and you will have to answer all of

2    their questions.  Do you understand that?  You have to answer

3    them truthfully.

4            DEFENDANT AHMED:  I mean, of course, I'll answer to

5    anything that can help justice and if I think consciously that

6    it will help justice I will answer.

7            THE COURT:  And then if you are cross-examined you

8    will have to answer those questions truthfully too.

9            DEFENDANT AHMED:  Uh-huh.

10           THE COURT:  All right.  Anything else you think I

11   need to cover?

12           MR. MCBURNEY:  His answer to your second to the last

13   question as I heard it, it was hard to hear, was that he will

14   answer any question that he thinks furthers justice.

15           And he needs to answer every question.  This is not a

16   scenario where halfway through he could decide that's as far as

17   his perception of justice goes.  I think that needs to be made

18   clear, that it's an all-or-nothing scenario, if he thinks

19   there's the possibility, because then we run into an issue in

20   front of the jury of this witness saying, "I'm not answering

21   those questions."

22           THE COURT:  I think just thinking through what would

23   happen, Mr. Ahmed, once you took the stand and were sworn in

24   again, every question that the government asks, you would have

25   to answer.  So if you -- I don't know what questions they're

1    going to ask you, but let's say at some point they ask a

2    question and you in your mind say, Well, that's not going to

3    serve justice in my opinion, you are not going to be able to

4    say, "Well, I'm not going to answer that one."  Nor could you

5    say, if we were 15 minutes into it, that you didn't like the

6    questioning or you felt that it was not going to advance

7    justice, you can't say, "Well, I'm not willing to say anything

8    else, I've said all I'm willing to say."

9            If you testify, you have to testify completely, which

10   would mean you have to answer every question asked of you,

11   regardless of who asks you.

12           DEFENDANT AHMED:  I mean, if I -- I will just sit in

13   and I will hear the question.  You can't hear me?

14           THE COURT:  Just speak slowly and as clearly as you

15   can.

16           DEFENDANT AHMED:  I will just come and sit here and,

17   you know, let the question, I will just hear the question and I

18   will answer as best as I can.

19           THE COURT:  So you will testify in response to every

20   question that is asked of you based upon your knowledge; is

21   that correct?

22           DEFENDANT AHMED:  But, again, the first and foremost

23   priority to me is obedience to my God and that would be the

24   only deciding factor for me.

25           THE COURT:  Well, let's --

1          DEFENDANT AHMED:  We will decide what will happen at

2     that time, you know, if I will be punished at that time, okay.

3     Otherwise, I mean my only priority is to obey Allah so -- but

4     I'll be sitting here.

5          THE COURT:  Let me be clear about this.  If you were

6     asked a question which in your mind requires you to testify

7     against Mr. Sadequee, you have to answer that question.  You

8     can't say, "Well, Allah doesn't let me do that and I refuse to

9     answer that."  You have to answer every question.  You cannot,

10    once you begin testifying, state that your religion doesn't let

11    you answer one or more of the questions that are put to you.

12          That means you're going to be asked some hard

13    questions that are going to impact Mr. Sadequee and if your

14    position is that your religion doesn't let you testify against

15    another Muslim, that's --

16          DEFENDANT AHMED:  It's not only just Muslim; it's

17    about pursuit of justice or injustice.  It's not about just

18    Muslims.  It's in pursuit of justice.

19          THE COURT:  Well, that's not your job, to determine

20    what's justice and what's not justice; that's the jury's job,

21    which means that you are going to have to answer the questions.

22    Are you willing to do that, every one of them?

23          DEFENDANT AHMED:  I mean, if I am going to testify I

24    guess I'll testify.

25          THE COURT:  That seems --

1    MR. MARTIN:  I've gone over this with Mr. Ahmed.  He

2 understands he will be asked -- subjected to the questions he

3 was asked during his interrogation.  He understands that's what

4 he's going to be asked and he knows that.

5    I did also, of course, explain to him that there's

6 certain privileges, attorney-client privilege, they can't go

7 into those, any discussions I've had with him.  But I think he

8 understands the nature of the testimony he would likely be

9 asked about.

10    THE COURT:  So you're confident based upon your

11 discussions that, assuming there's no improper question or --

12    MR. MARTIN:  Right.

13    THE COURT:  -- or privileged, but assuming they are

14 all proper questions asking for his knowledge of the facts,

15 that he will testify and that's what he's told you as well?

16    MR. MARTIN:  Relevant to these proceedings, of

17 course, yes.

18    THE COURT:  All right.  Anything else that the

19 government or Mr. Sadequee would like on this issue of the

20 order and compliance with it?

21    MR. MCBURNEY:  Just a scheduling point.  In thinking

22 more about it and talking about it with my colleagues, I don't

23 expect that we would get to Mr. Ahmed today in terms of being

24 prepared for a meaningful direct examination.

25    THE COURT:  I think the reason why we did this today

1   is because you told me yesterday that he was going to be put up

2   today.  Otherwise we --

3           MR. MCBURNEY:  Yes, sir, because we had been told,

4   every time we asked, until five minutes before he walked in,

5   that there was no chance he was testifying and so we prepared

6   this trial -- there will be some witnesses now we don't need to

7   call.

8           THE COURT:  I understand your position.

9           Mr. Martin, is that true?

10          MR. MARTIN:  That is absolutely true.  It has been

11  fluid throughout but until right before we had this meeting I

12  told Mr. McBurney that he would likely not testify.

13          THE COURT:  All right.  Well, tell me so that the

14  Marshals Service knows when to bring him back.

15          MR. MCBURNEY:  They can take him back now.  They need

16  to bring him tomorrow.  We will commit to getting him on the

17  stand at some point tomorrow.  He need not stay unless

18  Mr. Martin needs to see him any longer.

19          MR. MARTIN:  I'd like to talk to him just a minute or

20  two but he can go back.

21          THE COURT:  Tomorrow is a long time.  Can't you be

22  more specific than committing to just tomorrow?

23          MR. MCBURNEY:  My understanding is they bring them

24  at 9:00.  I'll get back to the Court and the marshals.

25          THE COURT:  They go back at 3:00, too, so --

1          MR. MCBURNEY:  What we'll do with the remainder of

2     the lunch break is figure out when tomorrow he can fit in and

3     I'll report back to the Court before the jury comes in.

4          THE COURT:  All right.  Is there anything else before

5     we break for lunch?

6          I intend to extend the lunch break because this has

7     taken so long, so you should be back at 20 after and we'll give

8     the jury a longer lunch break.

9          All right, we'll be in recess.

10          (Luncheon recess, 1:25 p.m. to 2:21 p.m.; following

11     proceedings outside the presence of the jury.)

12          THE COURT:  Is there anything we need to discuss

13     before we continue?

14          MR. MCBURNEY:  Judge, we looked at the schedule of

15     witnesses and if Syed Haris Ahmed is here by 11:00 tomorrow, we

16     may get to him before lunch, likely after the lunch break, but

17     that's our request of the marshals and we can put in a

18     production order if you need it, but if he could be back here

19     by 11:00 tomorrow, we will not need him before then.

20          THE MARSHAL:  It's taken care of.

21          THE COURT:  All right, thank you very much.  Anything

22     else?

23          MR. MCBURNEY:  Nothing from the government.

24          THE COURT:  All right, let's bring the jurors in,

25     please.

1           (Jury returned to the courtroom.)

2           THE COURT:  All right, ladies and gentlemen, I hope

3      you had a good lunch.  I'm sorry that I had to extend the lunch

4      hour but in a fit of compassion I decided, considering that we

5      had a lot of matters to take up in your absence, that I would

6      actually let the lawyers have lunch.  So as much as I wanted to

7      press on, I think that was the right thing to do.

8           You recall after the openings Mr. McBurney stood up

9      and he did bring something to my attention at one of the

10     breaks.  I'm going to give you an instruction which I think

11     I've already given, but just out of an abundance of caution to

12     make sure nobody misunderstood what I said.

13          When anybody makes a statement or during the course

14     of an opening statement or in a closing argument in this case,

15     lawyer for the government made their opening and they'll later

16     make their closing, and Mr. Sadequee has made his opening and

17     later will make his closing, that's not evidence, as I told

18     you, because that's not something that I admit into evidence.

19     That is just their statements and you may not consider it as

20     evidence.

21          But any evidence, including any statements that I

22     allow to be introduced into evidence, those statements, because

23     they have been admitted, can be considered by you in your in

24     deliberations.  So I just wanted to make sure there wasn't any

25     confusion about that.

1          Does that address your concern, Mr. McBurney?

2          MR. MCBURNEY:  Yes.  Thank you, Judge.

3          THE COURT:  Call your next witness, please.

4          MR. MCBURNEY:  Government calls Veera Boonyasait.

5          THE COURT:  Mr. Boonyasait, if you will stand in the

6    witness box I'll have you sworn in.

7          THE COURTROOM DEPUTY:  Please raise your right hand.

8                    VEERA BOONYASAIT,

9    being first duly sworn or affirmed, was examined and testified

10   as follows:

11         THE COURTROOM DEPUTY:  Please be seated.

12                    DIRECT EXAMINATION

13   BY MR. MCBURNEY:

14   Q.   Good afternoon, sir.

15   A.   Good afternoon.

16   Q.   Take the little sticker off.  Thank you.

17         THE COURT:  And if you will move up just a bit so

18   you're closer to the microphone, please.

19   Q.   (By Mr. McBurney)  Need you to spell your name for the

20   court reporter.

21   A.   My first name is spelled V-e-e-r-a, last name is

22   B-o-o-n-y-a-s-a-i-t.

23   Q.   Sir, where do you work?

24   A.   I work at the Federal Bureau of Investigation.

25   Q.   Where?

```
1    A.    At Washington, D.C.

2    Q.    The capital as opposed to the state?

3    A.    Correct.

4    Q.    Your job for the FBI in Washington, D.C., is what?

5    A.    I am an intelligence analyst.

6    Q.    How long have you worked at the FBI?

7    A.    Three years and ten months.

8    Q.    What did you do before that?

9    A.    I was a graduate student at the University of Florida.

10   Q.    What was the degree you received?

11   A.    Astronomy.

12   Q.    A master's?

13   A.    Ph.D.

14   Q.    Then you joined the FBI?

15   A.    Correct.

16   Q.    You're an intelligence analyst.  Do you work for a

17   particular unit within the FBI?

18   A.    Yes, I do.  I work for the Counterterrorism Internet

19   Targeting Unit.

20   Q.    As part of your job in that unit, do you work with

21   websites and web forums?

22   A.    Correct.  Our mission is to combat the adversarial use of

23   the Internet.

24   Q.    Adversarial use?

25   A.    Yes, terrorist use of the Internet.
```

1    Q.    Have you ever as part of your job reconstituted an

2    archived website?  What I mean by that is have you been given

3    the constituent pieces of a website or a web forum and been

4    asked to put it back together?

5    A.    Yes, I have.

6    Q.    You've done that once or many times?

7    A.    Many, many times.

8    Q.    Have you taught others in your unit or at the FBI how to

9    do that?

10   A.    Yes, I have.

11   Q.    Were you asked in this case, case against Defendant

12   Sadequee, to do that type of work?

13   A.    Yes, I have.

14   Q.    Explain to the jurors what the difference is between a

15   website -- CNN.com, foxnews.com -- and a web forum?

16   A.    Okay.  A website like the CNN.com is usually a website

17   whose content is published by the owner of the website;

18   whereas, a web forum is like your traditional message board

19   where it's user content provided.  So the members who are in

20   the forum make up the content of the website.  So it's just not

21   the owner of the website itself that publishes the information

22   out.

23   Q.    The websites that you were asked to put back together in

24   this case, were they web forums?  In other words, user-created

25   content, or websites, owner-generated content?

1    A.    No.  They were web forums.

2    Q.    Earlier this year did FBI Atlanta send you several disks

3    containing parts of web forums for you to put back together?

4    A.    Yes, they did.

5    Q.    Let's talk about each disk in turn.  On the first disk,

6    and there's not significance as to which one we talk about

7    first, was there an archived copy of a single web forum?

8    A.    Yes, there was.

9    Q.    What is your understanding as to where that came from?

10   A.    The first disk, which contained one single set of the

11   data, came from the seized media as obtained by the British

12   authorities for one of their investigations.

13   Q.    So law enforcement in the United Kingdom got someone and

14   seized digital evidence, you got a piece of that?

15   A.    Correct.

16   Q.    Okay.  What was on that disk?  You said one web forum.

17   What web forum?

18   A.    That web forum was the Tibyan Publications.

19   Q.    When someone archives a website does that entail the

20   destruction of any content?  Not the work you're doing, but the

21   work that actually ends up putting it on a disk.

22   A.    No.  It actually preserves it.

23   Q.    And when you reconstitute, using whatever software you

24   use, is any content lost?

25   A.    No.

1   Q.   On the second disk, what was there?

2   A.   On the second disk there were actually several websites.

3   One was Tibyan Publications and the other one was for al-Ansar.

4   Q.   The Tibyan Publication website, did you reconstitute all

5   the websites you were given, the one on the first disk and the

6   several on the second?

7   A.   Yes.  There were actually two other snapshots of Tibyan

8   Publications that was on the second disk and then there were

9   three snapshots of al-Ansar on the second disk and the

10   snapshots were from different times.

11   Q.   So we had three snapshots in time of Tibyan across the two

12   disks?

13   A.   Yes.

14   Q.   And three snapshots of the al-Ansar forum?

15   A.   Correct.

16   Q.   The Tibyan Publications forum, when you reconstituted it,

17   was it primarily in English?

18   A.   Yes.

19   Q.   Al-Ansar was primarily in what language?

20   A.   Arabic.

21   Q.   Are you able to read Arabic?

22   A.   No, I do not.

23   Q.   Any idea what's on the al-Ansar forum?

24   A.   No, I do not, no.

25   Q.   Okay.  That second disk that we just talked about that had

1    two copies of Tibyan and three of Al-Ansar, where did it come

2    from?

3    A.    That was obtained from a search warrant from a U.S.

4    server.

5    Q.    When you say "server," what do you mean by that?

6    A.    A web server is designed to host websites, in this case a

7    web forum, that a lot of people visited.  It's a bit different

8    than your normal desktop because you expect a lot of people to

9    visit your website and therefore it has special functions to

10    serve a lot of people to visit the website.

11    Q.    So the FBI did some search on a server here in the United

12    States and some of what was found there included two snapshots

13    of Tibyan and three of al-Ansar?

14    A.    Correct.

15    Q.    Were you able to determine, after you reconstituted these

16    websites, the date and time of the snapshot?

17    A.    Yes.

18    Q.    The snapshot of Tibyan that was on the disk of evidence

19    seized from the United Kingdom, what was the date?  Just month

20    and year.

21    A.    Approximately from April 2005.

22    Q.    Okay.  And then the two versions of Tibyan that you

23    reconstituted from the search of the server here in the United

24    States, what were those dates, month and year?

25    A.    One was from October 2005, and the other one was from

1   December of 2005.

2   Q.   The three versions of al-Ansar, were you able to tell a

3   date with things being in Arabic?

4   A.   Yes.  Approximately, they -- two of them came from August

5   of 2005 and the other one from October of 2005.

6   Q.   So there was some date on there in the Roman alphabet?

7   A.   Yes.  The way I determined the last time the website was

8   accessed was through looking at a specific data that recorded

9   the actions made to the web forums and looking at the last

10  actions made for those websites, you could tell when they were

11  last active before they were archived from restoring -- sorry,

12  the information was stored.

13  Q.   So you may have found this date not by looking through the

14  rebuilt website, but through your work --

15  A.   Yes, sir.

16  Q.   -- you're able to find a piece of information that tells

17  you this is when this was last used?

18  A.   Correct.

19  Q.   Okay.  In reconstituting these different forums, what

20  steps do you take to ensure that there isn't any alteration in

21  the data?

22  A.   Normally I do not do anything other than making the

23  website accessible and viewable and not -- I don't touch the

24  content of the website.

25  Q.   Was there any content when you rebuilt these websites that

1    you had to change?

2    A.    Yes, I did.  In order for it to make both websites, which

3    are private forums, viewable as well as accessible, I had to

4    change the passwords to the forum members, to the user

5    accounts.

6    Q.    You describe these as private forums.  What do you mean by

7    that?

8    A.    There are two different types of forums.  One forum is

9    publicly accessible, which means that anyone can go to the

10   website and read, as well as write and communicate with the

11   members of the forum.

12          A private website, as the name suggests, you need to

13   be a member of that website, of that web forum in order to be

14   able to communicate with the forum members.

15   Q.    And both Tibyan and Al-Ansar fell in this latter category,

16   private?

17   A.    Yes.

18   Q.    Somehow you were able to reset the passwords for everyone

19   so that you could log in as any member?

20   A.    Correct.

21   Q.    Would the work you did to reconstitute the websites

22   preserve any private messages if that web forum supported that

23   feature?

24   A.    Yes, it would.

25   Q.    Would it preserve any posts and threads?  And I'll have

1    you explain those terms in a minute.

2    A.   Yes, it would.

3    Q.   I want to focus on Tibyan websites, not Al-Ansar, keep it

4    in English.  If you would look at Government's Exhibit, in

5    front of you, it should be 30, 31-A, and then 32 through 39.

6    34 may not be in front of you because it was admitted.  In

7    fact, it's over here.  Do you recognize the exhibits I just

8    mentioned?

9    A.   Yes, I do.

10   Q.   Including 34, which is already in evidence, are exhibits

11   30, 31-A, and 32 through 39 all different snapshots of the

12   reconstituted Tibyan websites, the work you did?

13   A.   Yes, they are.

14   Q.   Any of the data on there change from what would have been

15   visible to a member who had access to either the April or the

16   October or the December 2005 version of Tibyan?

17   A.   No.

18          MR. MCBURNEY:  At this time the government tenders

19   30, 31-A, 32 and 33, and then 35 through 39.

20          THE COURT:  Any objection?

21          MR. SADEQUEE:  No.

22          THE COURT:  They're admitted.

23   Q.   (By Mr. McBurney)  Let's look at Exhibit 30.  You have a

24   hard copy in front of you and the screen to your left will also

25   have a picture of it.  What do we see here in general?  What is

1    this a snapshot of?

2    A.    This is the log-in page for Tibyan Publications.  Anyone

3    who visits the website will be shown this page as the home page

4    of the website.

5    Q.    You mentioned earlier, because it's a private forum, you

6    need to enter a user name and a password.  This is the screen

7    you were talking about?

8    A.    Yes.

9    Q.    If you put in a user name, put in Robert McBurney and I'm

10   not a member, after the work you did, could I still get on the

11   website?

12   A.    No, you could not.

13   Q.    So I have to put in an actual user name?

14   A.    Correct.

15   Q.    What password after you did your work would I put in if I

16   had an actual user name?

17   A.    Password.

18   Q.    The word "password"?

19   A.    The word "password."

20   Q.    Same for any user?

21   A.    Correct.

22   Q.    Okay.  Let's look at 31-A.

23          MR. MCBURNEY:  And if you could magnify, sort of

24   right up in here.

25   Q.    (By Mr. McBurney)  Now, have we logged in?  This is a

1    snapshot of the website, have we logged in now?

2    A.    Yes, you have.

3    Q.    Under what user name?

4    A.    You are logged in as Aboo Khubayb al-Muwahhid.

5    Q.    So if I typed in that name and the user name and then the

6    word "password" I'm in?

7    A.    Yes.

8    Q.    It says here "Private messages, one unread, total 39."

9    First tell the jurors what a private message is.

10   A.    A private message is personal communication written by the

11   writer of the message to one or more members of the web forum.

12   Q.    And this tells you that the text that says "Private

13   messages, one unread, total 39," what about user Aboo Khubayb

14   al-Muwahhid?

15   A.    This says that at the time when the data for the website

16   was stored, this account had received one private message that

17   was not read and there were a total of 39 private messages that

18   are in his message -- private message box for that account.

19   Q.    Like an inbox for an e-mail account?

20   A.    Correct.

21   Q.    Okay, but these aren't messages that moved through the

22   Internet; they're contained within the forum?

23   A.    Yes.

24         MR. MCBURNEY:  If you could magnify and then just a

25   rectangle around the content here.

1    Q.    (By Mr. McBurney)   These different headers:  Technical

2    Team, Knowledge of the Quran, At-Tibyan Releases, what are

3    these called?

4    A.    These are forums in the website.

5    Q.    So if I were to click on Technical Team, the way you

6    rebuilt this, would I actually get into the Technical Team

7    forum?

8    A.    You may, depending on which forum, if they're private

9    forum or not, you may be able to get into it.

10   Q.    Okay.  Over here there's a heading that says Last Post.

11   It sounds somewhat self-explanatory but let's make sure.  What

12   is the Last Post?

13   A.    That is the last posted message made to a specific forum

14   at that specific time.

15   Q.    So in this third forum down -- I don't remember the name,

16   it doesn't really matter -- who is the user who posted most

17   recently in that forum?

18   A.    Aboo Khubayb al-Muwahhid.

19   Q.    Similarly, whatever the second forum is, somebody named

20   Ibn Umar is the one who posted last?

21   A.    Yes.

22   Q.    Let's look at Exhibit 33.

23           MR. MCBURNEY:  And if you could magnify around that,

24   please.

25   Q.    (By Mr. McBurney)  This is a blowup of what?  We're still

1    logged in as Aboo Khubayb al-Muwahhid.  What are we looking at

2    now?  It's cut off, it goes further down, but what is that?

3    A.    You are now looking at the private message folder for that

4    specific user.

5    Q.    It indicates the inbox contains 21 messages, you have 39

6    stored, et cetera.  Where would the remaining messages be if

7    they're not in the inbox?

8    A.    The remaining 18 private messages would be stored in the

9    outbox, the messages that were written by Aboo Khubayb

10   al-Muwahhid.

11   Q.    That he just hadn't deleted yet, copies of what he sent?

12   A.    Yes.

13   Q.    This very first message, so we can see how it works, this

14   would be a message to Aboo Khubayb al-Muwahhid?

15   A.    Yes.

16   Q.    From whom?

17   A.    Abu Turab.

18   Q.    Whoever Abu Turab might be?

19   A.    Correct.

20   Q.    You're not familiar with any of these user names, are you?

21   A.    No, I am not.

22   Q.    You weren't asked to look for one user name or the other?

23   A.    No.

24   Q.    Just rebuild the websites?

25   A.    Yes.

1    Q.    Let's look at Exhibit 34.   The jurors have already seen

2    Exhibit 34, but if you could just walk us through it real

3    quickly.   We're in a message inside the Aboo Khubayb

4    al-Muwahhid's box.   Who is this message from?

5    A.    The original private message was sent by Aboo Hurayrah

6    al-Hindee and then a corresponding message was then replied to

7    by Aboo Khubayb al-Muwahhid and then finally was sent by Abu

8    Turab.

9    Q.    So this particular document is a message from Abu Turab to

10   Aboo Khubayb al-Muwahhid?

11   A.    Yes.

12   Q.    This is what the private messages look like throughout the

13   forum?   The content may be different, but this is the format?

14   A.    Correct.

15   Q.    What's an avatar?

16   A.    An avatar is basically a user preference for the person's

17   name, the person's profile.

18   Q.    Were there avatars on the Tibyan website?

19   A.    Yes, there are.

20   Q.    Look at Exhibit 35, please.   And if you just -- that's

21   great.   All right, we're in a screen, again within the user

22   Aboo Khubayb al-Muwahhid, it's called Edit Avatar.   Your

23   Current Avatar, it's two guns crossed over a book.

24          Where would this appear, this image of automatic

25   weapons on top of a book?

1    A.    In this instance the avatar, which is the chosen image to

2    represent the user, this image would appear on any of the

3    messages that are associated with this specific user.

4    Q.    If Aboo Khubayb al-Muwahhid made a post on Tibyan, would

5    the guns and book appear as part of that post?

6    A.    Yes, it would.

7    Q.    This is the April 2005 avatar?

8    A.    Yes.

9    Q.    Let's look at Exhibit 38.  Now we've moved to the October

10   2005 Tibyan that you reconstituted and we're again in Aboo

11   Khubayb al-Muwahhid.  Different avatar?

12   A.    Yes.

13   Q.    Do you know who this person is in the picture?

14   A.    No, I do not.

15   Q.    And Exhibit 37, this is the log-in page for Aboo Khubayb

16   al-Muwahhid in October '05.  What's different about the private

17   message entry?

18   A.    There are substantially a lot more private messages in the

19   inbox, in the private message folder.

20   Q.    If we go back to the main exhibit, again we have forums

21   and the last posting in those forums?

22   A.    Yes.

23   Q.    But that would be as of October?

24   A.    Yes, correct.

25   Q.    All right.  And finally we talked about posts and threads

1   before, I want you to talk about that.

2         MR. MCBURNEY:  If you would put up Exhibit 39,

3   please.  And if you could magnify the actual post.

4   Q.   (By Mr. McBurney)  All right, is this a posting as opposed

5   to a private message?

6   A.   Yes, it is.

7   Q.   And it's a post by?

8   A.   Aboo Khubayb al-Muwahhid.

9   Q.   And you have his avatar, this unknown person, and the

10  title of the post is Plan B.  It talks about whatever it talks

11  about.  You mentioned something about an electronic signature.

12  Is there an electronic signature on this posting?

13  A.   Yes.  The last two parts of the message in the red and in

14  orange.

15  Q.   The "O Allah!  Sell us your mercy at the price of our

16  blood," and the lines beneath it which are hard to read in the

17  yellow, that's something that would appear on any post Aboo

18  Khubayb al-Muwahhid made?

19  A.   Yes.

20  Q.   That's not something unique to the text of this message?

21  A.   No.

22  Q.   Now, that's a post.  Explain to the jurors what a thread

23  is.

24  A.   A thread basically is a collection of posts which were

25  written in response to the opening post.

1          So in this case, Plan B, which is a thread, the
2    opening post was written by Aboo Khubayb al-Muwahhid and
3    subsequent posts would then make up the thread of the whole
4    thread.
5    Q.   Okay.
6          MR. MCBURNEY:  Is it a multiple-page exhibit in your
7    system?  Can we look at page 2 of Exhibit 39?
8    Q.   (By Mr. McBurney)  In your hard copy it should be there.
9    So the first page was Plan B.  If we scroll past that.
10          MR. MCBURNEY:  And if you could magnify, please, the
11    second post.
12    Q.   (By Mr. McBurney)  So you're talking about a thread.  What
13    is this next document that, if you were on the screen, if you
14    scroll down, would it be directly below the original post, Plan
15    B?
16    A.   Yes.  This is the first response to the initial post, the
17    opening post of the thread and this was written by Ibn Umar.
18    Q.   By Ibn Umar, someone at At-Tibyan.com?
19    A.   Yes.
20          MR. MCBURNEY:  If you could show the last one.
21    Q.   (By Mr. McBurney)  So this -- does the thread grow?
22    Someone named Abu Dujanah posts something?
23    A.   Yes, sir.
24    Q.   Okay, and then he's got a statement about Allah and
25    learning how to die.  Is that a signature as well?

1    A.    Yes, it is.

2    Q.    Mr. Boonyasait, did you do this same type of work for the

3    Al-Ansar forums, the reconstitution and resetting the password

4    to the word "password"?

5    A.    Yes, I did.

6    Q.    So that any user name, that account would be accessible to

7    an agent who wanted to explore the site?

8    A.    Correct.

9    Q.    Give me one second.

10            (Pause in the proceedings.)

11    Q.    (By Mr. McBurney)  Were you able to tell by looking at the

12    structure of al-Ansar, I understand it's in Arabic, whether it

13    was set up the same way?  Meaning forums, posts, threads,

14    inboxes, et cetera.

15    A.    Structurally they look very similar, the same.

16    Q.    Okay, content we don't know, but what you've described in

17    terms of navigating the Tibyan website, the Al-Ansar appeared

18    similar to you?

19    A.    Yes.

20    Q.    Thank you very much.

21            THE COURT:  Mr. Sadequee?

22            MR. SADEQUEE:  No questions.

23            THE COURT:  Does anybody want this witness subject to

24    recall?

25            MR. MCBURNEY:  No, sir.

1           MR. SADEQUEE:  No.

2           THE COURT:  We appreciate very much your testimony

3    but you should not discuss it with anybody until you hear that

4    the case is complete.

5           THE WITNESS:  Okay.

6           THE COURT:  Thank you for being with us.

7           Call your next witness, please.

8           MR. BLY:  Government calls Michael Williamson.

9           THE COURT:  Please come forward and stand in the

10   witness box, I'll have you sworn in.

11          THE COURTROOM DEPUTY:  Please raise your right hand.

12                      MICHAEL WILLIAMSON,

13   being first duly sworn or affirmed, was examined and testified

14   as follows:

15          THE COURTROOM DEPUTY:  Please be seated.

16                      DIRECT EXAMINATION

17   BY MR. BLY:

18   Q.   Good afternoon, sir.

19   A.   Good afternoon.

20   Q.   If you could, please state your name for the jury.

21   A.   My name is Michael Williamson.

22   Q.   Mr. Williamson, how are you currently employed?

23   A.   I'm a special agent with the Federal Bureau of

24   Investigation.

25   Q.   How long have you been with the FBI?

1   A.   Approximately five years.

2   Q.   Are you assigned to a particular area within the FBI?

3   A.   I'm assigned to the Joint Terrorism Task Force.

4   Q.   How long have you been on the Joint Terrorism Task Force?

5   A.   The same amount of time, the whole time I've been in

6   Atlanta.

7   Q.   The whole five years?

8   A.   Yes.

9   Q.   Agent Williamson, are you one of the case agents on

10  Defendant Sadequee's case?

11  A.   I'm not the case agent.

12  Q.   Are you one of the agents that has worked on the case?

13  A.   Yes, I am.

14  Q.   Throughout the course of your investigation, have you come

15  to learn when Defendant Sadequee was born?

16  A.   He was born in July of 1986.

17  Q.   Do you know where he was born?

18  A.   In the state of Virginia.

19  Q.   Do you know where his family is from?

20  A.   Originally from Bangladesh.

21  Q.   Agent Williamson, throughout the course of your

22  investigation, have you had the chance to review documents that

23  you have -- that you've recovered in the course of this

24  investigation?

25  A.   Yes.

1    Q.   For example, there's been testimony already about

2    documents recovered from various computers and hard drives and

3    things like that.  Have you had a chance to review those kind

4    of documents?

5    A.   Yes, I have.

6    Q.   On the table in front of you there is a stack of documents

7    marked as Government's Exhibits 40 through 58 and 60, and then

8    a whole bunch of As and Bs.  There's a 46-A and B, 47-A and B,

9    48-A, 49-A, 50-A, B, and C, 53-A, 54-A, 55-A, 56-A, 57-A, 58-A,

10   and 60-A and B, ask if you could take a look at those

11   documents.

12   A.   Yes.

13   Q.   Agent Williamson, are those documents that you've reviewed

14   prior to coming in and testifying today?

15   A.   Yes, they are.

16   Q.   And are those documents that you have reviewed, most of

17   which are communications, are those documents that you have

18   reviewed throughout the course of your investigation on this

19   case?

20   A.   Yes, it is.

21        MR. BLY:  Your Honor, I tender Government's Exhibits

22   40 through 58, 60, and then 46-A and B, 47-A and B, 48-A, 49-A,

23   50-A, B and C, 53-A, 54-A, 55-A, 56-A, 57-A, 58-A, and 60-A and

24   B.

25        THE COURT:  Any objection?

1          MR. SADEQUEE:  No.

2          THE COURT:  They're admitted.

3    Q.   (By Mr. Bly)  Agent Williamson, if we could, we're going

4    to go pretty much in order with one exception.  So if you've

5    got them in numerical order, if we could take a look at Exhibit

6    40.

7          MR. BLY:  Your Honor, this is Exhibit 40 which we

8    have discussed previously.

9    Q.   (By Mr. Bly)  Agent Williamson, if you could take a look

10   at Exhibit 40, this appears to be an e-mail.  Is there an

11   indication as to who this e-mail is from and to?

12   A.   Yes, it is.

13   Q.   Who is that?

14   A.   It's to azzam2000@e-mail.com from Shifa Sadequee,

15   sadshifa@hotmail.com.

16   Q.   What's the subject and date of this e-mail?

17   A.   The subject is:  "Salaam, I need to go to Afghanistan."

18   The date is Wednesday, December 5th of 2001.

19   Q.   Do you know how this document was obtained?  I notice the

20   date on there is a lot earlier than most of what the other

21   documents that we're going to be looking at.  Do you know how

22   this was obtained?

23   A.   This document was obtained by a search warrant that was

24   served on the Yahoo! company for all Yahoo! e-mails that were

25   sent to the website www.Azzam.com.

1   Q.   Let's go ahead and take a look at the first paragraph of

2   this e-mail and what does Sad Shifa or Shifa Sadequee say in

3   that first paragraph?

4   A.   "Salaam, my name is Shifa Ehsanul Islam Sadequee.  I'm

5   writing to you because I need to go to Afghanistan to join the

6   Taliban, insha'Allah.  I need your help, or any information

7   that you can give me that may help me do this.  I trust on you

8   on this matter.  Let me tell you my situation."

9   Q.   Does Shifa Sadequee in the course of this e-mail say how

10  old he is when he's writing this?

11  A.   He does.

12  Q.   And how old is he?

13  A.   15-1/2.

14  Q.   And do you know, based on the time frame, where he was

15  when he was writing this?

16  A.   In Bangladesh.

17  Q.   Okay.  Let's skip down to the, I guess, second full

18  paragraph that begins with "I hope."  If you could read the

19  first two lines there.

20  A.   "I hope you are able to give me support, insha'Allah.  I

21  always had intention of joining the Taliban, even prior to

22  September 11th, but I hadn't because I thought that they were

23  in good condition."

24  Q.   Thank you, that's fine for that.  If we could also just

25  skip down to the very last paragraph, the one that begins with

1    "I believe."  Go ahead and read that.

2    A.    "I believe that this is a test from Allah to see who will

3    respond to his invitation for jihad, behind which is Jannah

4    itself.  Like I said, I trust you that you will help me with

5    anything that you have.  Or at least direct me to

6    persons/organizations in Bangladesh that are helping people go.

7    Please mail me ASAP at sadshifa@hotmail.com.  And may Allah

8    reward you for your effort to proclaim his truth."

9    Q.    When did this e-mail fall date-wise in relation to 9-11?

10   A.    This e-mail fell approximately just under three months

11   after September 11th.

12          THE COURT:  I'd like to give the jury a limiting

13   instruction for your consideration of this e-mail.

14          The government has introduced this e-mail, which is

15   authored by the defendant.  The Court has admitted this

16   evidence for a limited purpose.  Specifically, the statement

17   may be considered by you only on the issue of defendant's

18   motive, opportunity, intent, preparation, plan, knowledge,

19   identity, or absence of mistake or accident in connection with

20   the charges in this case.

21   Q.    (By Mr. Bly)  Agent Williamson, if we could, let's go

22   ahead and take a look at Government's Exhibit 41.  It's an

23   e-mail from almuwahhid@yahoo.com.  Who is the e-mail sent to?

24   A.    E-mail is sent to al-Muwahhid@yahoo.com.

25   Q.    I'm sorry, I misspoke, that's who it's to.  Who is it

1    from?

2    A.    Admin@tibyanpubs.com.

3    Q.    Are you familiar with something called Tibyan

4    Publications?

5    A.    I am.

6    Q.    What is Tibyan Publications?

7    A.    Tibyans Publications is a password-protected website that

8    has posted articles in English and other translated languages.

9    It also offers members the ability to communicate by e-mail or

10   chat.

11   Q.    And when was this e-mail sent?

12   A.    This e-mail was sent on Sunday, November 21st, 2004.

13   Q.    What's the subject line?

14   A.    "You have been added to this user group."

15   Q.    What's the first sentence of the e-mail?

16   A.    "You have been added to the Brothers group on At-Tiby257

17   Publications."

18   Q.    And on the bottom of that is there, that e-mail, is there

19   a website indicated?

20   A.    There is a website indicated.

21   Q.    What is that website?

22   A.    Www.tibyanpubs.com.

23   Q.    Let's take a look at Government's Exhibit 42.  What's the

24   information on the top of this, the From, the To, date,

25   et cetera?

1    A.    This e-mail is from admin@tibyanpubs.com to

2    almuwahhid@yahoo.com, sent on January 5th, 2005, and the

3    subject is:  "From Abu Umar from At-Tibyan Publications."

4    Q.    We've seen this name a bunch now, but just to refresh

5    everybody's memory, almuwahhid@yahoo.com, do you know what

6    e-mail address, who that's associated with?

7    A.    That's associated with Defendant Sadequee.

8    Q.    It looks like on this e-mail there's some lines that are

9    in blue and italics.  I think the first one and maybe the

10   second or third line, if we can just blow that up.  Were those

11   blue and italics, were those there when you first viewed this

12   e-mail as part of your investigation?

13   A.    No, they were not.

14   Q.    Do you know what the blue italicized writing indicates?

15   A.    It's the translation.

16   Q.    Is that a translation that you did?

17   A.    No, it's not.  A translator with the Federal Bureau of

18   Investigation translated this.

19   Q.    So that's just translating the non-English words into

20   English; is that right?

21   A.    That is.

22   Q.    Let's look at the first line of this e-mail after the

23   translation beginning with the word "To."  What is that first

24   sentence?

25   A.    "To the administration team of At-Tibyan Publications."

1    Q.   Did you get a feeling for what -- who -- what this e-mail

2    is?

3    A.   Yes.

4    Q.   If you could, describe to the jury what this e-mail is.

5    A.   This e-mail was sent to the members of the administration

6    team of At-Tibyan Publications, and more specifically the

7    moderators.  It told them that they may not always agree with

8    what's posted on the website, and, if they don't agree, to be

9    respectful to their fellow Muslim.

10   Q.   So this e-mail that was sent to the administration team of

11   At-Tibyan Publications.  Did it end up in Defendant Sadequee's

12   e-mail?

13   A.   Yes.

14   Q.   Let's take a look at one more Tibyan e-mail.  Let's take a

15   look at Government's Exhibit 43, which is actually two e-mails.

16   If you could, let's start by looking at the e-mail on the top,

17   the first part of the page, and if you could run through the

18   To, From, Subject and date information for that one.

19   A.   It's to almuwahhid@hotmail.com from tahreek@librabd.net.

20   Subject is a reply, "Assalamu-Alaikum," and the date is

21   Thursday, July 7th, 2005.

22   Q.   Go ahead and read the first two lines or the first two

23   paragraphs there of that top portion of the e-mail.

24   A.   "Assalamu-Alaikum, [peace be upon you].  Thank you for

25   your e-mail message regarding the subject:  "Assalamu-Alaikum,

1    [peace be upon you].  Insha'Allah, [God willing], we will

2    respond to it as quickly as we can.  For your reference, the

3    text of your message is added at the end of this e-mail."

4    Q.    "The text of your message which is added at the end of

5    this e-mail," what is that referring to?

6    A.    It looks like from the bottom was the original e-mail

7    message sent to tahreek@librabd.net and the top part is an auto

8    response back.

9    Q.    Who sent that original message, now the message that is on

10   the bottom half of that sheet of paper?

11   A.    Almuwahhid@hotmail.com.

12   Q.    Beginning with the line that says, "Dear beloved

13   Brothers," what does he say in that e-mail?

14   A.    "Dear beloved Brothers:  I am one of the brothers from

15   At-Tibyan Publications.  I would like to ask you brothers to

16   please translate material regarding jihad against the

17   Murtaddeen, [the apostates], and, Kfur bit-Taaghoot,

18   [disbelievers in idols], and Haakimiyyah, [authority], and

19   Muwaalaat, [supporting], Al-Kuffaar, [the nonbelievers]."

20   Q.    And again, I think this e-mail has got some of the same

21   issues that we saw with the earlier one with the blue

22   italicized writing, we'll see that come up throughout.  Is it

23   your understanding that always represents a translation that

24   was not part of the original document?

25   A.    That's correct.

1    Q.   Agent Williamson, let's go ahead and take a look at

2   Government's Exhibit 44 and 44 -- no, just 44, there are no

3   letter attachments also with that one.  And, Agent Williamson,

4   if you could go ahead and run through the From, To, Subject and

5   date information on that e-mail.

6    A.   This e-mail is from almuwahhid@yahoo.com sent to

7   almuwahhid @yahoo.com.  The date is Wednesday, October 6, 2004,

8   the subject is "amira."

9    Q.   Looks to me like this is an e-mail from and to the same

10   person; is that right?

11    A.   That's correct.

12    Q.   Do you have any idea why that would be the case?

13    A.   The only idea I can think of is the attachments that are

14   on here were downloaded from one location and you didn't have

15   access to them at that location so you would send them to your

16   e-mail, so when you're at a different location you can go back

17   out.

18    Q.   Does the e-mail indicate that there are attachments?

19    A.   It does.

20    Q.   Without going into them specifically, what are the

21   attachments to this e-mail?

22    A.   These attachments, there's a lot of pictures of Osama bin

23   Laden, pictures of aircraft, vehicles, weapons.

24    Q.   We're not going to look at all of them but we'll look at a

25   few.  If we could pull up the one that's got 979 on the bottom

1    of it.  Agent Williamson, do you recognize the person depicted

2    in that photo?

3    A.    I do.

4    Q.    Who is that?

5    A.    Osama bin Laden.

6    Q.    As an FBI agent detailed to the Joint Terrorism Task

7    Force, is that a person whose photo and likeness you're

8    familiar with, even prior to this investigation?

9    A.    Yes, it is.

10   Q.    Let's go ahead and take a look at the photo with the

11   number 984 at the bottom.  Who is that?

12   A.    That is Osama bin Laden with what appears to be a gun or

13   some type of weapon leaning next to him.

14   Q.    We'll look at one more, number 992 at the bottom of the

15   page.  Is that the same person depicted in that photo?

16   A.    It is Osama bin Laden with what appears to be a gun or

17   some type of weapon laying in his lap.

18   Q.    Agent Williamson, let's go ahead and take a look at

19   Government's Exhibit 45.  What is Government's Exhibit 45?

20   A.    This document is from the Yahoo! company showing

21   subscriber information for the e-mail address

22   piddikashorba@yahoo.com.

23   Q.    Does it also list a login name for that account?

24   A.    The login name, yes.

25   Q.    And what is that?

1    A.    Piddikashorba.

2    Q.    Does it show who the person is that registered for this

3    account?

4    A.    Yes, it does.

5    Q.    Who is that?

6    A.    Mr. Syed Ahmed.

7    Q.    Does it list any geographic location for that person?

8    A.    Yes, it does, the city of Roswell, state of Georgia, and

9    country of United States.

10    Q.    Does it indicate a date of birth for Mr. Syed Ahmed?

11    A.    It does.

12    Q.    What is that?

13    A.    December 9th, 1984.

14    Q.    Thank you.  Let's go ahead and take a look at Government's

15    Exhibit 46.  This looks like another e-mail.  If you could run

16    through the To, From, Date and Subject line of this e-mail.

17    A.    This e-mail is from a almuwahhid@yahoo.com to

18    piddikashorba@yahoo.com, sent on Monday, November 15th, 2004,

19    and the Subject is "Fundamental Concepts of G-Had."

20    Q.    Let's put some names with those e-mail addresses.

21    Almuwahhid@yahoo.com is the defendant, correct?

22    A.    Correct.

23    Q.    Who is piddikashorba@yahoo.com?

24    A.    Mr. Syed Ahmed.

25    Q.    And does this e-mail indicate whether there are any

1    attachments?

2    A.    It does indicate that there are attachments.

3    Q.    And what are those attachments?

4    A.    The Fundamental Concepts of G-Had and About the Shaykh who

5    wrote it.

6    Q.    Let's take a look at the Subject line for a second.  It's

7    titled Fundamental Concepts of G-Had.  How is G-Had spelled in

8    this document?

9    A.    G-H-a-d.

10   Q.    Is that a typical way of spelling the word?

11   A.    No.

12   Q.    How is it normally spelled?

13   A.    J-i-h-a-d.

14   Q.    If someone was to search for the word "jihad" in whatever

15   computer or database contains this e-mail and they put in the

16   common spelling, would they have found this e-mail?

17   A.    No, they would not.

18   Q.    Let's take a look at Exhibit 46-A, which is one of the

19   attachments to that e-mail.  What is the title of the document

20   shown in Government's Exhibit 46-A?

21   A.    The title is Fundamental Concepts Regarding Al-Jihad.

22   Q.    Does it indicate who the author of that document is?

23   A.    It does.

24   Q.    Who is that?

25   A.    By the Noble Shaykh, Abdul-Qadir Ibn Abdul-Aziz.

1    Q.    And does it indicate where that document was published?

2    A.    Published at At-Tibyan Publications.

3    Q.    Let's take a look at Government's Exhibit 46-B, which is

4    another attachment to that same e-mail.  What is Government's

5    Exhibit 46-B?

6    A.    It's a "Brief Introduction to the Virtuous Scholar

7    Abdul-Qadir Ibn Abdil-Aziz."

8    Q.    Is that the same person who authored the document shown in

9    Government's Exhibit 46-A?

10   A.    Yes, it is.

11   Q.    Let's take a look at Government's Exhibit 47, another

12   e-mail.  If you could run through the sender, receiver, date

13   and subject for this e-mail?

14   A.    From almuwahhid@yahoo.com to piddikashorba@yahoo.com, sent

15   on Monday, November 15th, 2004, and the subject is:  "Forward,

16   Tibyan and Millat."

17   Q.    Does it indicate whether there are attachments to this

18   e-mail?

19   A.    Yes, it does.

20   Q.    Let's take a look at the first attachment, which is

21   Government's Exhibit 47-A.  If you could read the title of the

22   text attached, first text attached to this e-mail?

23   A.    "Millat Ibrahim (The Religion of Ibrahim) and the Calling

24   of the Prophets and Messengers and the Methods of the

25   Transgressing Rulers in Dissolving it and Turning the Callers

1    Away from it."

2    Q.    Who is the author of this text?

3    A.    Abi Muhammad Asim Al-Maqdisi.

4    Q.    If we could, let's take a look at Government's Exhibit

5    47-B, which is the second attachment to this e-mail, another

6    text.  What's the title of this text?

7    A.    "The Exposition Regarding the Disbelief of the One that

8    Assists the Americans."

9    Q.    And who authored this text, 47-B?

10   A.    Shaykh Nasir bin Hamad al-Fahd.

11   Q.    Let's take a look at Government's Exhibit 48, another

12   e-mail.  Who is the sender and receiver, subject line, and date

13   for this e-mail?

14   A.    From abeumar@thadiq.com to almuwahhid@hotmail.com, sent on

15   Thursday, February 3rd, 2005, and the subject, "Test."

16   Q.    Let's go ahead -- first of all, it was sent to

17   almuwahhid@hotmail.com.  Who is that?

18   A.    The Defendant Sadequee.

19   Q.    And the From is from somebody named Abe Umar.  Do you know

20   who Abe Umar is?

21   A.    Yes, Aabid Hussein Khan.

22   Q.    Let's go ahead and take a look at the attachment of that

23   e-mail, which is Government's Exhibit 48-A.  If we can look at

24   the top of that to begin with, if you could go ahead and read

25   the first sentence?

1      A.   "This information should not leave the tibyanpubs circle,

2      only for those who are involved, as it may expose some brothers

3      even more to danger than currently."

4      Q.   What's the last sentence of that same paragraph?

5      A.   "Keep all information between yourselves and take

6      precautions online and offline."

7      Q.   It goes on to list below that some inquiries that were

8      made.  If you could go ahead and read the numbers that are

9      depicted by 1 and 2?

10     A.   Number 1:  "We're from an organization and we wanted to do

11     a survey.  We wanted to know how you feel about Canadian

12     soldiers sent to Afghanistan since you're from there.  When the

13     sister asked which organization they replied along the lines

14     of, 'it's confidential.'"

15          Number 2:  "They came and asked simple questions about

16     Tibyan, his friends, the masjid," which is mosque.  "If they're

17     ever visited by them, they'll most probably be asked similar

18     questions.  And those are simple ones, answers to them are

19     simple as well."

20     Q.   Let's take a look at the last page of that attachment.

21     Did the author include a note and then a P.S. that they put

22     with this?

23     A.   Yes.

24     Q.   What do they say in the note?

25     A.   The note:  "One should refuse in a calm manner to talk to

1    anyone and teach their family to not answer or give correct

2    information as out of panic, people tend to answer or answer

3    more than ever asked."

4          The P.S.:  "In case you were thinking about it, don't

5    freak out and do haphazard things."

6    Q.   And just to be clear, this document, back to the first

7    line, who was it intended for?

8    A.   It was intended for those involved in Tibyan Publications.

9    Q.   Agent Williamson, let's go ahead and take a look at

10   Government's Exhibit --

11         THE COURT:  Before we go to the next exhibit, can we

12   take a very short break so I can address a note I received?

13         MR. BLY:  Certainly.

14         THE COURT:  Let's break for ten minutes.  We'll be

15   back in at 25 after.  Of course, don't discuss the case with

16   anybody because the evidence is still coming in.  We'll be in

17   recess for ten minutes.

18         (Jury retired from the courtroom.)

19         THE COURT:  Anything we need to discuss before we

20   break?

21         MR. BLY:  Nothing from the government.

22         THE COURT:  This is not related to the case, it's

23   just something that needed to be taken care.  It will just take

24   a couple of minutes.

25         (Recess, 3:16 p.m. to 3:28 p.m.)

1           THE COURT:  Anything we need to take up before we

2   bring the jurors back in?

3           MR. BLY:  Nothing from the government, Judge.

4           THE COURT:  Mr. Sadequee, anything from you?

5           MR. SADEQUEE:  (Shakes head.)

6           THE COURT:  Bring the jurors in.

7           (Jury returned to the courtroom.)

8           THE COURT:  Ladies and gentlemen, we're still on

9   Agent Williamson's direct examination.

10          Please continue.

11   Q.   (By Mr. Bly)  Agent Williamson, before we took a break we

12   were about to look at Government's Exhibit 49, if you can go

13   ahead and look at that.  It looks like we've got another

14   e-mail.  Who are the From, To, Sent and Subject line for this

15   e-mail?

16   A.   From sadshifa@yahoo.com to sadshifa@yahoo.com, sent on

17   Tuesday, February 8, 2005, the subject is "safy."

18   Q.   Does that e-mail indicate whether there is an attachment?

19   A.   It does.

20   Q.   Let's take a look at Government's Exhibit 49-A, which is

21   the attachment to that e-mail.  We've seen a bunch of e-mail

22   communications.  Is this a different kind of communication?

23   A.   This is a chat.

24   Q.   And by looking at this chat can you tell who the

25   participants are in this conversation or chat?

1    A.    Yes, you can.

2    Q.    Who's talking here in this chat?

3    A.    Aboo Khubayb Al-Muwahhid and Safiullah.

4    Q.    And we know an Aboo Khubayb Al-Muwahhid is Defendant

5    Sadequee, and he's talking to someone named Safiullah; is that

6    right?

7    A.    That is correct.

8    Q.    Let's go ahead and take a look at the first page of that

9    chat, skip down about three-quarters to the line that begins,

10    "So akhee."  If you could read from that line down to the

11    bottom of the page.

12    A.    Aboo Khubayb Al-Muwahhid says:  "So, akhee, Aboo Turaab

13    tells me he sent you an e-mail regarding some books to read."

14          Safiullah says:  "Yeah, I realized when he left,

15    yeah, he did.  And I'm reading the material."

16          Aboo Khubayb Al-Muwahhid says:  "Did he give you

17    Millat Ibraaheem, The Truth Faith of Abraham?"

18          Safiullah says:  "Yeah."

19    Q.    In reading this, do you know who Aboo Turaab, who that

20    refers to?

21    A.    Yes.

22    Q.    Who does that refer to?

23    A.    Syed Ahmed.

24    Q.    Okay.  Let's skip over to page 4 of that chat, about

25    halfway down, the line that begins, "Yeah, sorry," if you could

1  read the four lines.

2  A.   Safiullah says:  "Yeah, sorry, I was waiting for the page

3  to come up.  We third worlders use dail ups [sic], slow as a

4  snail."

5       Aboo Khubayb Al-Muwahhid says:  "It's okay,

6  insha'Allah, I use dial-up at my home also."

7  Q.   Based on the part of this chat that came before that

8  conversation, did it appear that the two folks who were

9  chatting were having some technical difficulties?

10  A.   Yes, it does.

11  Q.   And do you know what -- Aboo Khubayb Al-Muwahhid refers to

12  dial-up.  Do you know what that's a reference to?

13  A.   Yes.  That's a reference to the way this computer accesses

14  the Internet, it's through a telephone line.

15  Q.   Let's go and move over to page 5 of that chat, about a

16  quarter of the way down, the line that begins, "I heard you

17  like to read fiction novels," go ahead and start reading.  I'll

18  stop you when we get to a good stopping point.

19  A.   Aboo Khubayb Al-Muwahhid says:  "I heard you like to read

20  fiction novels."

21       Safiullah says:  "Who said that?"

22       Aboo Khubayb Al-Muwahhid says:  "Aboo Turaab.  I hope

23  you can give at least a few hours a day to read regarding

24  Islam.  Tawheed, al-Walaa wal-Baraa, Riddah, Haakimiyyah,

25  et cetera."

1          Safiullah says:  "Yeah, I do."

2          Aboo Khubayb Al-Muwahhid says:  "Insha'Allah."

3          Safiullah says:  "Sorry, bro, I must have

4   disappointed you."

5          Aboo Khubayb Al-Muwahhid says:  "What?  No, akhee,

6   it's nothing like that.  It's just that Aboo Turaab has a lot

7   of hope for you to become firm on this path, in terms of

8   Manhaj, Aqeedah, and acting on the path of Ibraaheem and from

9   what I have experienced in this Da'wah, it first is important

10  to learn our Fundamental Principles which we live for, struggle

11  for, kill for, and die for."

12  Q.   Let's back up a little bit and look, one of those lines

13  had some translations, the line that says, "Tawheed, al-Walaa,"

14  what are the subjects or the translations for those subjects

15  there that Defendant Sadequee was referring to in this chat?

16  A.   "Monotheism, loyalty, and disassociation, loyalty to

17  follow Muslims and to disassociate from nonbelievers."

18  Q.   Skip over to page 6 of that chat, the conversation

19  continues.  Skip down about four, five lines from the top, the

20  line that begins, "Just like that, before someone begins," and

21  go ahead and read for the jury that portion of their

22  conversation.

23  A.   Aboo Khubayb Al-Muwahhid says:  "Just like that, before

24  someone begins the struggle, it is obligatory to know the

25  principles.  Why should we fight?  For what are we fighting?

1   What's wrong if we don't fight?  How much do we have to fight?

2   Against whom?  Ally with whom?  Until when?  Some people get

3   mad or upset if we fight against the murtadd regimes, like

4   Saudi, Egypt, Pakistan, Indonesia, et cetera.  The regimes are

5   murtadd.  Allah has obligated the qatl of the murtaddeen more

6   than that of the Kaafir Aslee.  A person is not a Muslim if he

7   does not hate the kuffaar.  There are many things, akhee.  When

8   many of the brothers begin on this noble path."

9        Safiullah says:  "You are right."

10       Aboo Khubayb Al-Muwahhid says:  "And they begin to

11  learn the Deen in the Light of the Quran and Sunnah.  They

12  learn that they were probably not even Muslim before.  This

13  happened to me and some of the other brothers also.  Even

14  though we used to pray Salaat and fast Ramadhaan before but

15  still, I look back and I say, 'I seek refuge with Allah, I was

16  a kaafir at that time.'  Salaat, Siyaam, keeping a beard,

17  et cetera.  What are all these for?  There is a cause behind

18  this all, a goal.  Islam isn't just Salaat.  Islam isn't

19  confined to the Masjid or just to Ramadhaan.  Some ignorant

20  juhhaal say, 'Islam means peace.'  Wallaahul-Musta'aan!  Islam

21  does not mean peace."

22       Safiullah says:  "Hahaha, not -- it does n-t."

23       Aboo Khubayb Al-Muwahhid says:  "Islam is the

24  language and in the Sharee'ah means, equals 'submission.'"

25  Q.   Thank you.  You referred a couple of times in there to the

1    word "kuffaar."  How is that translated?  It appears on the

2    fourth or fifth line down there on page 7.

3    A.    Nonbeliever.

4    Q.    Let's go ahead and take a look at Government's Exhibit 50,

5    another e-mail.  Who are the sender, receiver, date and subject

6    for this e-mail?

7    A.    From abe_umar@yahoo.com to almuwahhid@hotmail.com, sent on

8    Wednesday, February 23rd, 2005, and subject is "file."

9    Q.    Does it indicate whether there are attachments to this

10    e-mail?

11    A.    Yes, it does.

12    Q.    Let's go ahead and take a look at the attachments.  The

13    first is Government's Exhibit 50-A.  Government's Exhibit 50-A,

14    is there any part of that document other than what has been

15    translated at the very bottom that's in English?

16    A.    No, there's not.

17    Q.    Do you read Arabic?

18    A.    No, I do not.

19    Q.    Based on the translation, what is the title of

20    Government's Exhibit 50-A?

21    A.    *Techniques of Interrogation in the Prisons of the Israeli*

22    *Enemy, and Ways to Deal with Them*.

23    Q.    Take a look at Government's Exhibit 50-B.  Is this another

24    attachment to that e-mail, again, that was all in Arabic?

25    A.    Yes, it is.

1    Q.   What's the translated title for this document?

2    A.   *Security Lessons for the Mujahideen, Interrogation,*

3    *Reasons, Stages and Techniques, How to Face Interrogators and*

4    *to Resist Law Enforcement.*

5    Q.   Just to be clear, this is an e-mail that was sent to

6    Defendant Sadequee; that's correct?

7    A.   That is correct.

8    Q.   Let's take a look at Government's Exhibit 50-C, which is

9    the third and final attachment to that e-mail.  Again, do we

10   have a document written all in something other than English?

11   A.   Yes.

12   Q.   What's the translated title of this text?

13   A.   *The Secret Calling Prepared by the Judicial Committee of*

14   *the Jihad Organization.*

15   Q.   Let's take a look at Government's Exhibit 51, another

16   e-mail.  This one doesn't have a subject but who's the From, To

17   and date for this e-mail?

18   A.   From al-muwahhid@hotmail.com to almuwahhid@hotmail.com

19   sent Wednesday, April the 6th, 2005.

20   Q.   We have seen that almuwahhid@hotmail.com a fair bit but

21   to, the recipient on this e-mail, that's Defendant Sadequee.

22   The From looks similar.  Is there a difference in that From

23   address than the almuwahhid@hotmail that we've been used to

24   seeing?

25   A.   Yes, there is.

1    Q.    What's the difference?

2    A.    There is a dash after "al."

3    Q.    So same group of letters but between the "al" and the

4    "Muwahhid" we have a dash?

5    A.    Yes, we do.

6    Q.    Do you know who is associated with the

7    al-muwahhid@hotmail.com?

8    A.    Yes, I do.

9    Q.    Who is that?

10   A.    Syed Ahmed.

11         MR. BLY:  With the Court's permission, Mr. McBurney

12   has gotten a few more e-mail addresses and monikers, if we can

13   maybe populate Government's Exhibit 1.

14         THE COURT:  You may.

15   Q.    (By Mr. Bly)  Agent Williamson, while Mr. McBurney is

16   doing that, if you can go ahead and read what Syed Haris Ahmed

17   says in this one.

18   A.    "Hey, man, how come you never told me about tibyan.net?

19   They sell pretty nice stuff openly.  I mean even the wasaya of

20   the 19.  Are they related to Tibyan or nor?  Wasalam."

21   Q.    And if we could look at Government's Exhibit 52, who's

22   this from and to and the date for this e-mail?

23   A.    This is from almuwahhid@hotmail.com to

24   al-muwahhid@hotmail.com, sent on Thursday, April the 7th, 2005,

25   and the subject is a reply.

1    Q.    Where does this fall in time in relation to the e-mail we

2    just looked at in Government's Exhibit 51?

3    A.    This e-mail was sent the very next day.

4    Q.    Does it appear to be a response to Government's Exhibit

5    51?

6    A.    It does.

7    Q.    Okay.  And this one, which is authored by

8    almuwahhid@hotmail.com, Defendant Sadequee, what does he say?

9    A.    "They aren't directly related.  They sell some of Abul-M's

10   lectures.  And they were originally supposed to publish Millatt

11   and Tibyan by Nasir al-Fahd, but they didn't have funding.

12   They get raided every other week.  I thought you knew about

13   them, Azzaam Pubs always used to advertise about them, they

14   were originally known as Maktabah, but then they changed their

15   name to coincide with Tibyan Pubs, I think Allaahu A'lam.  Did

16   you get Falook's reply?"

17   Q.    We heard about this name earlier in the day, but who is

18   Falook?

19   A.    Omer Kamal.

20   Q.    Let's look at Government's Exhibit 53.  Who is the sender

21   and receiver, date and the subject line for Government's

22   Exhibit 53?

23   A.    From ibnul_khattab82@yahoo.com to almuwahhid @hotmail.com,

24   sent on Wednesday, April the 20th, 2005, the subject is

25   "Ibtilaa."

1    Q.    Does it indicate whether there's an attachment to the

2    e-mail shown in Government's Exhibit 53?

3    A.    Yes, it does.

4    Q.    Let's take a look at Government's Exhibit 53-A, which is

5    that attachment.  What's the title of this text?

6    A.    *Such are the Messengers Tested, and the Outcome Will Be in*

7    *Their Favor*.

8    Q.    Does it indicate who the author of that text is?

9    A.    Yes, it does.

10   Q.    Who is that?

11   A.    By the Shaykh, the Commander Abu Mus'ab az-Zarqawi.

12   Q.    Do you know who az-Zarqawi is?

13   A.    Yes.

14   Q.    Who is that?

15   A.    Zarqawi was the leader of Al Qaeda in the country of Iraq.

16   Q.    Let me go a little bit out of order here.  Take a look at

17   Government's Exhibit 60.  What is Government's Exhibit 60?

18   A.    This is a document that was found on a hard drive of

19   Waseem Mughal's computer.

20   Q.    Do you know who Waseem Mughal is?

21   A.    Yes, I do.

22   Q.    Who is Waseem Mughal?

23   A.    Waseem Mughal was an individual who was associated with

24   the counterterrorism investigation in the United Kingdom.

25   Q.    And you said this was a document recovered from his

1   computer?

2   A.   Yes.

3   Q.   What is the title of this document?

4   A.   *The Ruling Regarding Killing One's Self to Protect*

5   *Information.*

6   Q.   Did you undertake any investigation to determine where

7   this document was originally created?  I know you said it was

8   found on Waseem Mughal's hard drive in the UK.  Did you do

9   anything to determine where it was originally created?

10  A.   Yes.

11  Q.   What did you do?

12  A.   Well, this document was opened up in a Microsoft Word and

13  we looked at the Properties tab, which shows the author, when

14  it was created, the title, et cetera.

15  Q.   Let's go ahead and take a look at Government's Exhibit

16  60-A, focus in on that box.  What is Government's Exhibit 60-A?

17  A.   This is a computer screen snapshot of the document in

18  Exhibit 60 opened up in Microsoft Word.

19  Q.   You were talking before about the Properties.  What are

20  the Properties box or the Properties function on that document,

21  what does it tell you?

22  A.   It's a tab that will show -- that will give you general

23  information.  As I said, the title, when it was created, who it

24  was created by, if it was at a specific company it will tell

25  you that information.

1    Q.    Let's take a look.  So you said this is a screen shot, is

2    that basically just a picture of what you get when you pull up

3    the Properties box for this document?

4    A.    That is correct, but you also have to push the subtab,

5    which on this one is the Summary subtab.

6    Q.    Does it show the title of the document that we're looking

7    at?

8    A.    It does.

9    Q.    And what is that title?

10   A.    *The Ruling Regarding Suicide to Protect Information.*

11   Q.    And that's the same title we saw on the document in

12   Government's Exhibit 60, correct?

13   A.    It's a little different.  The word here says "Suicide," in

14   Exhibit 60 it says "Killing One's Self."

15   Q.    Okay.  Does the Properties box in 60-A, does it indicate

16   who the author is?

17   A.    Yes, it does.

18   Q.    Who is that author?

19   A.    Sonali Sadequee.

20   Q.    Does it indicate a company associated with the computer

21   used to generate this document?

22   A.    Yes, it does.

23   Q.    What company is that?

24   A.    Raksha.

25   Q.    Let's take a look at Government's Exhibit 60-B.  What is

1    Government's Exhibit 60-B?

2    A.    It's almost the same as 60-A with the document, 60, opened

3    up in Microsoft Word.  It's a computer screen shot again, but

4    instead of the Summary subtab of Properties, the Statistics

5    subtab's pushed.

6    Q.    So it's the same principle, we were looking at the

7    Properties of the document but now we're looking at the

8    Statistics instead of the Summary; is that right?

9    A.    That is correct.

10   Q.    Does this show you when the document was created?

11   A.    It does.

12   Q.    And when was this document created?

13   A.    Tuesday, September the 7th, 2004.

14   Q.    Let's take a look at Government's Exhibit 54.  We've got

15   another e-mail here.  Would you run through the To, From, Date

16   and Subject for this e-mail?

17   A.    From ibn_umar99@hotmail.com, to almuwahhid@hotmail.com,

18   sent on Sunday, May 15th, 2005.  The subject is "Book."

19   Q.    And does it indicate whether there's an attachment to this

20   document?

21   A.    It does.

22   Q.    Let's go ahead and read the paragraph there beginning with

23   "Akhee."

24   A.    "Akhee, I didn't delete the first page, instead I just

25   added the cover before that.  If you want you can delete the

1  second page, it used to be the first, as it contains all the

2  info already present on the cover."

3  Q.  Let's go ahead and take a look at the attachment that was

4  attached to that e-mail, which is Government's Exhibit 54-A.

5  What's the title of that attachment?

6  A.  *The Ruling Regarding Killing One's Self to Protect*

7  *Information*.

8  Q.  And is that the same title that we saw back on

9  Government's Exhibit 60?

10 A.  It is.

11 Q.  Anything different about the way the document looks now as

12 opposed to the way we saw it in Government's Exhibit 60?

13 A.  There's extra information added into the document.  Plus,

14 it also has a cover page with a picture on the cover page.

15 Q.  Let's look at Government's Exhibit 55, another e-mail.

16 Who is the sender and receiver, date and subject information

17 for this e-mail?

18 A.  From damrd7@hotmail.com to almuwahhid@hotmail.com, sent on

19 Tuesday, May 17th, 2005, and the subject:  "Unfinished copy."

20 Q.  Does it indicate whether there's attachments to this

21 e-mail?

22 A.  Yes, it does.

23 Q.  So this an e-mail to Defendant Sadequee.  What is the

24 sender say beginning with "Attached."

25 A.  "Attached here is the unfinished copy of the piece.

1   Unfortunately, bro, I am nowadays constrained by time and work

2   and can no longer do this.  However, I thank you bros for

3   giving me the chance, but I don't think I have the time

4   anymore.  I finished only half of it in English and do hope

5   that you brothers could finish it."

6   Q.   Let's go ahead and take a look at the attachment that the

7   sender is talking about, which is Government's Exhibit 55-A.

8   55-A, is that a document, the first part of which is in English

9   and the second part of which is in a language other than

10  English?

11  A.   That is correct.

12  Q.   Let's see if we can get a little idea what this document

13  is about.  If we skip down on the first page to the paragraph

14  that begins:  "0 Two Parents," if you could go ahead and read

15  that paragraph.

16  A.   "O Two Parents, indeed Islam today is suffering from the

17  onslaught of the Christians and the Jews all over the world and

18  this attack is reality, is aimed at Islam and its adherence by

19  killing and displacing them from their homes, and violating

20  their honor.  And it is not possible for this ummah to rise

21  from this humiliation and disgrace except by the hands of its

22  youth and men when they raise the flag of Jihad and sacrifice

23  themselves and all that they own to assist this deen.  In the

24  even [sic] that this happens, surely we will dominate the world

25  and everything in it just as it was conquered by the earlier

1    people.  Because of that, the fathers and the mothers have to

2    realize their responsibility.  Hence it is obligatory upon them

3    to make Jihad with their sons and their wealth and their voices

4    to gain victory for Islam and raise their honor of their

5    ummah -- of the ummah."

6    Q.   Look at the next page, the second full paragraph, begins

7    "First of them."  What's the author setting out in this

8    paragraph?

9    A.   I'm sorry, can you repeat the question?

10   Q.   Sure.  What's the author setting out in this paragraph,

11   the one that begins, "First of them"?

12   A.   Basically this is talking about a Muslim has two

13   obligations.  The first obligation is to their parents.  They

14   also have an obligation to God.  And it's saying that the

15   Muslims should first ask permission of their parents to go and

16   do jihad and the parents should say yes.  And if they don't,

17   that the Muslim has a greater obligation to God and therefore a

18   parent should not put their kids in a position to have to

19   choose between them and God.

20   Q.   Let's read the two scenarios that they set out there at

21   the beginning, if you can read the first three sentences of the

22   paragraph beginning, "First of them."

23   A.   "First of them:  That you open your breasts to accept the

24   Jihad of your sons and motivate them and incite them upon it

25   and for both of you is the reward equal to their reward.

1    Secondly:  You deter them from Jihad fi sabilillah and for you

2    is the sin and obedience is not owed to you.  And the best for

3    you is that you follow the first alternative from the above

4    situations and motivate your sons for Jihad with delight and

5    obedience to Allah."

6    Q.   Thank you.  Agent Williamson, let's take a look at

7    Government's Exhibit 56, another e-mail.  Who is the sender and

8    recipient for this e-mail?

9    A.   From halsayfedine@hotmail.com to almuwahhid@hotmail.com,

10   sent on Saturday, May 21st, 2005.

11   Q.   I see there's no subject line.  Does it indicate whether

12   there's attachments to this e-mail sent to Defendant Sadequee?

13   A.   Yes, it does.

14   Q.   Let's take a look at Government's Exhibit 56-A, which is

15   the attachment.  What's the title of the text attached to

16   Government's Exhibit 56-A?

17   A.   The title is *Verdict Regarding the Permissibility of the*

18   *Martyrdom Operations*.

19   Q.   Who is the author of this text?

20   A.   By Al-Imam, Al-Hafith, Ash-Shaykh, Abu Abdillah Sulayman

21   Ibn Nasir Ibn Abdillah Al-Ulwan.

22   Q.   Does it indicate the publisher for this document?

23   A.   Yes, At-Tibyan Publications.

24   Q.   Let's get a feel for this document.  In we could, let's

25   look at the first page down towards the bottom, the paragraph

1    that begins, "The pestering," if you could read those lines

2    through the fourth or fifth line on the next page?

3    A.   "The pestering Jews are the gatherers of all the shameful

4    defects and the collectors of the aggravations and the evils

5    and they are the harshest enemies of Allah against Al-Islam and

6    its people.  He, the most High said:  Verily, you will find the

7    strongest among men and enmity to the believers and the Jews

8    and those who Al-Mushrikun.  And Allah has made compulsory the

9    fighting against them and making Jihad against them so that the

10    word of Allah is the highest and the word of those who

11    disbelieve is the lowest."

12    Q.   Skip down to a little more than halfway down that page,

13    the sentence that begins, "And I see."  You can go ahead and

14    read that sentence.

15    A.   "And I see that in this time, in which the Muslims are

16    unable to fully fight the Jews and destroy them and expel them

17    from the Holy Land, that the best treatment and the greatest

18    medicine that we apply to the brothers of the monkeys and the

19    pigs, i.e., the Jews, is that we perform the suicide operations

20    and put forward our souls as a ransom for motivation of Iman

21    and for praiseworthy goals from planting the fear in the hearts

22    those who disbelieve and inflicting harm upon their bodies and

23    losses in their wealth."

24    Q.   Thank you.  Look at Government's Exhibit 57.  The stack is

25    getting smaller.  If you could, we've got another e-mail here,

1    who is the sender and recipient for this e-mail?

2    A.    From ibnul_khattab82@yahoo.com to almuwahhid@hotmail.com,

3    sent Thursday, June 2nd, 2005, and the subject is "Amal."

4    Q.    This e-mail sent to Defendant Sadequee, is there an

5    indication of whether it has attachments?

6    A.    Yes, it does.

7    Q.    Let's go ahead and take a look at the attachment, which is

8    Government's Exhibit 57-A.  What's the title of this text?

9    A.    *The First of the Series of Treatises, Breezes, From the*

10   *Gardens of Firdaws, The Tawhid of Action*.

11   Q.    Does it indicate who the author of this text or speech is?

12   A.    Yes, it does.

13   Q.    Who is that?

14   A.    Imam Abdullah Azzam.

15   Q.    Let's take a look at Government's Exhibit 58.  Who do we

16   have here as the sender and recipient?

17   A.    From wamughal@hotmail.com to almuwahhid@hotmail.com, sent

18   Wednesday, July 20th, 2005, and the subject, "lyrics."

19   Q.    Wamughal, is that e-mail address associated with the

20   Mughal we saw earlier?

21   A.    Yes, it is.

22   Q.    Does it indicate whether there's an attachment to this

23   e-mail sent to Defendant Sadequee?

24   A.    Yes, it does.

25   Q.    Let's go ahead and take a look at Government's Exhibit

1    58-A.  Can you tell from looking at it what Government's

2    Exhibit 58-A is?

3    A.    Yes.  This seems to be a kind of a poem talking about how

4    the Taliban should take over the world.

5    Q.    Would you read the first line of the poem?

6    A.    "Prosper and remain for eternity, you are the Talibaan,

7    take over the whole world, you are the Talibaan."

8    Q.    Skip down to the -- skip a couple verses and go down to

9    the verse that begins "Insha'Allah America."

10    A.    "Insha'Allah America will be broken into pieces,

11    insha'Allah America will be annihilated, Iran is now laying

12    down a challenge, take over the whole world, you are the

13    Talibaan."

14    Q.    Continue reading.

15    A.    "O Allah, prolong the life of Usaamah, O Allah protect him

16    from all dangers, O Allah keep alive this young brave of

17    Arabia, Chechnya, Bosnia and the Valley of Kashmir; we will set

18    free these beautiful lands, we all make this announcement:

19    Take over the whole world.  You are the Talibaan."

20    Q.    One moment.

21                 (Pause in the proceedings.)

22                 MR. BLY:  Thank you, sir.  No further questions.

23                 THE COURT:  Mr. Sadequee?

24                              CROSS-EXAMINATION

25    BY MR. SADEQUEE:

1    Q.    Good afternoon.

2    A.    Good afternoon.

3    Q.    With regards to -- could we put up 60-A?

4          THE COURT:  60-A.

5    Q.    (By Mr. Sadequee)  Just to clarify, as to how or why --

6    you know Sonali Sadequee?

7    A.    Yes.

8    Q.    My sister?

9    A.    Yes.

10   Q.    Do you know how this information or these names got on to

11   the Properties of this file?

12   A.    I believe when a Microsoft Word, the package itself, is

13   loaded on to a computer, you have to input certain information

14   on that software.

15   Q.    So you're saying -- and this is what I'm worried about

16   happened, is that whenever a file is saved on any computer or

17   someone's laptop, whatever -- when it was installed that

18   information gets, that user information gets kept on to

19   whatever file is then saved with that program, right?

20   A.    I'm not sure exactly.  I don't know a lot about computers

21   and installing software.

22   Q.    With regards to this, what I'm saying is that if I use

23   someone else's computer, then this is what this is about,

24   correct?  It's not that someone -- it's not that someone else's

25   identity was falsely entered into that file; it's, rather,

1    someone else's computer was used and once that file is saved,

2    you type up a document and you save it, it registers that as

3    the author and company, correct?

4    A.    I would say so.  I don't know for definite, but yes.

5    Q.    The government asked you to read certain excerpts from

6    these.  If I can get to 49-A, page 7.  If you could read from

7    the line where it says, where the government stopped, "Islam is

8    the language" and then "Islamic law and submission," if you

9    could read down from there.

10   A.    Which page?

11   Q.    Page number 7.

12   A.    Aboo Khubayb Al-Muwahhid says:  "Islam is the language and

13   Sharee'ah means submission."

14         Safiullah says:  "Esactly [sic]."

15         Keep going?

16   Q.    Yes.

17   A.    Aboo Khubayb Al-Muwahhid says:  "We are to submit to

18   Allah, the highest, and we have to make mankind submit to

19   Allah.  You look around today in the world, you see all these

20   people worshipping all these different things.  Some people

21   worship idols, stones, other worship Prophets, others worship

22   the Kings and the Presidents, others worship America, UK,

23   others worship the New World Order.  Others worship music and

24   movies, others worship graves and pirs.  The list goes on and

25   it is our duty to take mankind away from worshipping other

1    Slaves, to worship the Lord of the Slaves.  Today these mental

2    retards are in charge of our affairs.  They call to freedom,

3    liberation.  By Allah, they call to Animalistic Freedom.  They

4    have sex when they want, eat what they want, dress the way they

5    want, buy what they want, et cetera.  They want to be a slave

6    of everyone and everything that exists other than Allah and

7    that is their Freedom, to be a slave of everything and

8    everyone.  But we, the Monotheists who refuse to worship anyone

9    other than Allah" -- keep going?

10   Q.   Yeah, if you could read just that last line.

11   A.   "We refuse to be a slave of these Governments, these

12   desires, these pirs, these sins, these Shayaateen and we

13   declare our Freedom from them and we are only Slaves of Allah.

14   So that is our Freedom, compared to their Freedom."

15   Q.   Thank you.  If we can get Exhibit 59-A, page 4.

16   A.   I'm sorry, which exhibit?

17   Q.   59-A, page 4.

18   A.   I don't think we went over 59.

19        MR. BLY:  I think 59 isn't in evidence, I don't think

20   we used 59.

21        THE COURT:  But it is in evidence?

22        MR. BLY:  59 is not in evidence, neither is 59-A.

23        THE COURTROOM DEPUTY:  I don't have it.

24        MR. BLY:  If you want to show me the document I'll --

25        THE COURT:  That's not in evidence.  By our records

1 that has not been offered or admitted.

2          MR. BLY:  If you want to show me the document, I'll

3 see.  That's not in evidence.

4          MR. SADEQUEE:  That's it, thank you.

5          THE COURT:  Any redirect?

6          MR. BLY:  No, Your Honor.

7          THE COURT:  Does anybody want Agent Williamson

8 subject to recall?

9          MR. BLY:  No.

10          THE COURT:  Mr. Sadequee, do you want him subject to

11 recall?

12          MR. SADEQUEE:  No.

13          THE COURT:  All right, Agent Williamson, we're

14 releasing you.  You should not discuss your testimony with

15 anybody until you hear that the case has been concluded, and we

16 thank you for being with us today.

17          THE WITNESS:  Thank you.

18          THE COURT:  Call your next witness, please.

19          MR. MCBURNEY:  Aparna Bhattacharyya.

20          THE COURT:  Ms. Bhattacharyya, if you will come

21 forward, stand in the witness box, I'll have you sworn in.

22          THE COURTROOM DEPUTY:  Please raise your right hand.

23                    APARNA BHATTACHARYYA,

24 being first duly sworn or affirmed, was examined and testified

25 as follows:

253

1          THE COURTROOM DEPUTY:  Please be seated.

2                    DIRECT EXAMINATION

3    BY MR. MCBURNEY:

4    Q.   Good afternoon.

5    A.   Good afternoon.

6    Q.   Could you state your name and spell all of it for the

7    court reporter, please?

8    A.   Yes.  Aparna Bhattacharyya, A-p-a-r-n-a

9    B-h-a-t-t-a-c-h-a-r-y-y-a.

10   Q.   Where do you work, ma'am?

11   A.   I work for Raksha, R-a-k-s-h-a, Incorporated.

12   Q.   Tell the jurors what Raksha is.

13   A.   Raksha is a nonprofit organization based here in Georgia

14   that serves the South Asian community, which consists of

15   individuals from Bangladesh, Bhutan, India, Pakistan, Nepal and

16   Sri Lanka.

17            Much of the services that we provide are related to

18   addressing domestic violence here locally within the South

19   Asian community.  So we offer counseling, support groups,

20   support around giving help around domestic violence or access

21   to services.

22   Q.   What is your position at Raksha?

23   A.   I'm the executive director.

24   Q.   Do you have the ability to hire and, if necessary, fire

25   people?

1    A.    Yes, I do.

2    Q.    How long have you been executive director of Raksha?

3    A.    Since 1998.

4    Q.    What does "Raksha" mean, the word?

5    A.    "Raksha" means "protection" in many South Asian languages.

6    Q.    At one point did you hire Ehsanul Sadequee, the defendant

7    in this case, as an employee at Raksha?

8    A.    Yes, I did.

9    Q.    When was that?

10   A.    August 2004.

11   Q.    How long did Defendant Sadequee work at Raksha?

12   A.    Approximately one year.

13   Q.    August to August?

14   A.    Approximately, yeah.

15   Q.    '04 to '05?

16   A.    Yeah.

17   Q.    Were there any other members of Sadequee's family who are

18   associated or affiliated with Raksha?

19   A.    Yes.

20   Q.    Who?

21   A.    His sister had a fellowship with the organization.  His

22   brother, his older brother, had temporarily helped out while

23   Ehsanul was on vacation, and the mom had come in to volunteer a

24   little bit.

25   Q.    The sister who worked at Raksha, what's her first name?

1    A.    Sonali.

2    Q.    Why did the defendant stop working at Raksha?

3    A.    He was going home to marry his fiancée.

4    Q.    "Home" means where?

5    A.    Well, he was going to Bangladesh to marry his fiancée.

6    Q.    What type of work did Defendant Sadequee perform during

7    the year he was at Raksha?

8    A.    He helped me with mostly administrative tasks, such as

9    helping me prepare bills, helping me mail out information,

10   copying, faxing, a lot of things, just helping me out.

11   Q.    He wasn't a counselor who would work with victims of

12   domestic violence?

13   A.    No, he was not.

14   Q.    During the year he worked there, were there any other male

15   employees, regular daily male employees?

16   A.    No, there were not.

17   Q.    Did you have any problems with the defendant when he

18   worked there in terms of not showing up or acting out in any

19   way?

20   A.    No, not at all.

21   Q.    He was a good employee?

22   A.    Yes, he was.

23   Q.    Were you sad to see him go?

24   A.    Yes.

25   Q.    Did the defendant have access to computers when he was at

1    Raksha?

2    A.    Yes, he did.

3    Q.    The computers at Raksha, are they connected to the

4    Internet?

5    A.    Yes, they are.

6    Q.    The connection that Raksha had back in August '04 through

7    August 2005, high speed or low speed?

8    A.    High speed.

9    Q.    Not dial-up?

10   A.    No.

11   Q.    Was there one computer in particular that the defendant

12   had access to to do work that you asked him to do?

13   A.    Yes.

14   Q.    Where was that located?

15   A.    It was in the office that we shared together.

16   Q.    That you and the defendant shared?

17   A.    Yes.

18   Q.    Was that the only computer in that office?

19   A.    No.  There were two computers in that office.

20   Q.    One that you used primarily?

21   A.    Yes.

22   Q.    And one for the defendant to use?

23   A.    The defendant used it, along with myself.  It depended on

24   what I was working on.

25   Q.    Not exclusively for him, but if he was on a computer --

1    A.   That's usually the one he was on.

2    Q.   Was there something unique about that computer that

3    distinguished it from a desktop that might be on your desk?

4    A.   It was a donated server.  So it was a server but didn't

5    act as a server, but it was a server-based system.

6    Q.   It wasn't the server, meaning sort of the hub of the

7    network for Raksha, but it was a machine that at some point

8    could have done that?

9    A.   Yes, but it was very old.

10   Q.   Okay.  Did the defendant have access to Raksha after

11   hours?

12   A.   Not unless he was with his sister.

13   Q.   On his own he couldn't get through whatever doors and

14   locks one would need to get through to get into your office

15   space?

16   A.   No, he couldn't.

17   Q.   So if he was using a computer at Raksha, the place had to

18   be open?

19   A.   Yes.

20   Q.   Did your duties typically keep you four square in your

21   office so that on a typical workday you didn't leave your work

22   space?

23   A.   No, they don't.

24   Q.   You moved around the office?

25   A.   I move around the office.  I do training, so sometimes I'm

1    not always in the office.

2    Q.    You leave the office to, as you said, do training,

3    speaking engagements, et cetera?

4    A.    Correct.

5    Q.    Okay.  Was the defendant allowed to stay in your office,

6    Raksha is large, but your space, work on the computer, do

7    whatever his tasks were when you weren't in there?

8    A.    Yes, he was.

9    Q.    I don't know how the computers and the desks were

10   distributed in your personal office that the defendant shared.

11   If you weren't looking over the defendant's shoulder at the

12   screen of the server computer he was using, would you be able

13   to tell what he's doing on the computer?

14   A.    If I wasn't looking over him?  I mean, I was kind of

15   sideways, so, I mean, if I turned around I could see what he

16   was working on.

17   Q.    If you were focusing on the work at your desk and the

18   computer screen on your desk could you see directly to the

19   screen he was --

20   A.    Not necessarily, no.

21          MR. MCBURNEY:  Would you put up Exhibit 60, please?

22   Q.    (By Mr. McBurney)  You should be able -- it's not in front

23   of you but you can see it on the screen or the big screen, the

24   screen next to you.  It's a document entitled *The Ruling*

25   *Regarding Killing One's Self to Protect Information*.  It was

1    found on a computer associated with a gentleman named Waseem

2    Mughal in the United Kingdom, part of an investigation over

3    there into counterterrorism.

4            The jurors have already heard evidence that this

5    document was created using a copy of Microsoft Word licensed to

6    Raksha.  Did you ever assign Defendant Sadequee a project to

7    edit, revise, or do anything to a document involving killing

8    one's self to protect information?

9    A.   No, I did not.

10   Q.   Is that type of document, the theme of that document

11   consistent in any way with the work that Raksha is involved

12   with?

13   A.   Not at all.

14   Q.   One second.

15           (Pause in the proceedings.)

16           MR. MCBURNEY:  Thank you.

17           THE COURT:  Mr. Sadequee?

18                    CROSS-EXAMINATION

19   BY MR. SADEQUEE:

20   Q.   Good afternoon.

21   A.   Good afternoon.

22   Q.   I just wanted to -- as you mentioned, I worked with you at

23   Raksha for a long time, for about one year.  How would you

24   characterize me?

25   A.   Kind, did your work, you cared about the work we did.  One

1   of the reasons we hired you was because you were always there

2   volunteering and then going with your sister to do other

3   activities that were outside your administrative work.

4   Q.   And how long has my sister worked with Raksha?

5   A.   She worked over a year, probably a year and a half.  But

6   she'd volunteered before that and then did some volunteer after

7   her fellowship was over -- no, she was there two, I think it

8   was a fellowship for two to three years.  I think it was a

9   two-year fellowship.

10   Q.   And besides working at Raksha, how long have you known my

11   sister?

12   A.   Just through her community organizing work, her being

13   involved with anti-violence against women.  She had done a

14   fundraiser for Raksha when she was at Georgia State, putting on

15   the *Vagina Monologues*, which raised money for the organization.

16   Q.   At Raksha certain events, like Ek Shaam and others, I had

17   a lot of interaction with, all interaction was with non-Muslims

18   and with children, and how would you characterize that?

19   A.   Your interaction?

20   Q.   Yes, with others that --

21   A.   Always kind, quiet, sweet, warm, loving.  You were always

22   helpful, caring about the individuals you interacted with.

23   Q.   Do you recall, before I left for Bangladesh, how long

24   prior to going -- prior to leaving for Bangladesh, how long did

25   I mention that I was going to go to Bangladesh to get married?

1    A.    For a few months.  I want to say at least two to three

2    months.  I could be wrong, but you had given us a good amount

3    of notice.

4    Q.    And do you remember what reason, like why I'm going to

5    Bangladesh for marriage and some of the background behind my

6    marriage?

7    A.    You were in touch with Happy and you were really concerned

8    about wanting to go back home to marry her.  You wanted to make

9    sure she wasn't married off to somebody else.  You had had --

10   you've known her since childhood, so there was definitely a

11   deep relationship of you two knowing each other for a long

12   time.

13   Q.    And when I mentioned -- when you found out that I was

14   actually getting prepared to get married, how did that -- how

15   did you receive that message, you and fellow coworkers at

16   Raksha?

17   A.    How did I receive it?

18   Q.    Yes.

19   A.    I was probably concerned and protective and wanted to make

20   sure you were making the right decision because I thought you

21   were kind of young to be getting married, so I wanted to make

22   sure you had a plan for how you were going to support you and

23   your wife when you came back.  But I wanted to be supportive of

24   your decision.  But I wanted you to also be realistic on how

25   you could support yourself, given how young you were and how

1   much there would be and the adjustment it would be.  But I was

2   sad to see you go.  I was going to miss you.

3   Q.   But I had notified people that I was coming back?

4   A.   Did you notify them that you weren't coming back?

5   Q.   No, that I was coming back.

6   A.   Yes, you did.  You planned on bringing your wife back with

7   you.

8   Q.   But was it any date given of when I would return back?

9   A.   I think it was dependent on when Happy could get the

10  immigration documentation to be able to come over with you.  So

11  there wasn't a set time because you were relying on the

12  immigration system in Bangladesh, which was not predictable.

13  Q.   That's it, thank you.

14  A.   Thank you.

15          THE COURT:  Any redirect?

16          MR. MCBURNEY:  Yes, sir.

17                     REDIRECT EXAMINATION

18  BY MR. MCBURNEY:

19  Q.   Ma'am, in sharing with you the personal aspects of his

20  life, did Defendant Sadequee tell you about the work he did for

21  Tibyan Publications?

22  A.   No, he did not.

23  Q.   Did he ever mention the website Tibyan in talking to you

24  about what he was interested in?

25  A.   No, he did not.

1    Q.    The defendant took a break of about a week.  I think he

2    even filled out a leave slip for his work there at Raksha in

3    March of 2005, went to Canada.  Did he tell you about his trip

4    to Canada?

5    A.    My understanding, he was visiting one of his relatives in

6    Canada, is what he had told me.

7    Q.    His story to you was I'm going to visit --

8    A.    His aunt.

9    Q.    -- a relative, an aunt in Canada?

10    A.    Yes.

11    Q.    Did he tell you about meeting with his friend Azdee while

12    he was up in Canada?

13    A.    No, he did not.

14    Q.    Did you ever hear of Azdee?

15    A.    No, I did not.

16    Q.    Did you ever hear of his friend Syed Haris Ahmed here in

17    Atlanta?

18    A.    I don't believe I had heard of him.

19    Q.    Did you hear about anything involving his interest in

20    violent jihad?

21    A.    Nothing.

22    Q.    If he had any interest like that, is that something he

23    ever shared with you?

24    A.    No, he did not.

25    Q.    Thank you.

1                    RECROSS-EXAMINATION

2   BY MR. SADEQUEE:

3   Q.   Before I went to Canada, do you recall me saying --

4            MR. MCBURNEY:  Objection.  His statements introduced

5   through the defendant are hearsay.

6            THE COURT:  You may ask her if she told you if she

7   remembers anything you said.  You cannot offer your statement.

8            Ladies and gentlemen, let me ask you to retire to the

9   jury room for a second.

10           (Jury retired from the courtroom at 4:24 p.m.)

11           THE COURT:  All right, the jury has retired.  What do

12  you want to ask?

13           MR. SADEQUEE:  I was going to ask, before going to

14  Canada I had mentioned that one of my friends was to get

15  married in Canada, and if she recalled that.

16           THE COURT:  What's your objection to that?

17           MR. MCBURNEY:  Well, partly the form of the question.

18  He's saying here's something I said.  The defendant cannot

19  introduce his own statements unless he's completing some aspect

20  of his statement that I introduced.

21           THE COURT:  Well, I'm not sure about that.  I mean,

22  if a lawyer was representing him, couldn't the lawyer say:  Do

23  you recall being told, in connection with this trip to Canada,

24  that Mr. Ahmed said it and that Mr. Sadequee said X?

25           MR. MCBURNEY:  The statements of a party opponent are

1   admissible.  He is that party, he can't admit his own

2   statements through anyone other than himself.

3       THE COURT:  Well, you just opened the door to what

4   was said in connection with his trip to Canada and limited it

5   to visiting with his aunt.  I guess the question is whether or

6   not there was something else that was proffered by him in

7   connection with his trip to Canada.

8       MR. MCBURNEY:  Agreed.  And that would be the

9   completeness exception, so to ask the question the way the

10  Court has proposed it is appropriate, not as you've instructed

11  Mr. Sadequee before:  Hey, remember when I said this thing, do

12  you remember that I said this thing, which is exactly how he

13  posed the question.

14      THE COURT:  Okay, tell me again what you want to ask.

15      MR. SADEQUEE:  That prior to going to Canada, one of

16  the reasons of going to Canada, along with visiting my aunt, I

17  had given, I had mentioned to my boss at the time, Aparna, was

18  one was going to visit my aunt, and also that a friend of mine

19  would be getting married in Canada, to visit, I was intending

20  on visiting, and if she recalled that.  That's all.

21      THE COURT:  Mr. McBurney, what's wrong with that?

22      MR. MCBURNEY:  Omitting the quotation marks doesn't

23  change his effort.  I think the appropriate question is:  Do

24  you remember anything else -- assuming I opened the door -- do

25  you remember anything else I told you about that.

1          THE COURT:  Of course, she's on cross-examination.

2          MR. MCBURNEY:  We're dealing with his -- I understand

3     that, but he's feeding his statements in --

4          THE COURT:  But I don't think this witness is going

5     to -- if she wasn't told that, she's not going to say, Well, if

6     you told me that, yeah, I guess you did.  Do you understand the

7     question?

8          THE WITNESS:  I understand the question.

9          THE COURT:  Were you told that?

10         THE WITNESS:  I don't remember so I'm not sure.  I

11    remember him going to his aunt's.  I remember him visiting his

12    aunt, that's what I recall.  He may have but I don't recall

13    that.  I remember him visiting his aunt and I remember -- he

14    may have had a connection, I don't remember a wedding.

15         THE COURT:  So you may ask her if she -- I mean, you

16    now know what she's going to say.  Do you want to ask her that

17    question?

18         MR. SADEQUEE:  Well, I just did, I guess.

19         THE COURT:  In front of the jury.

20         MR. SADEQUEE:  Yes, I would still ask the question

21    because, I mean -- can I go more in depth into it?

22         THE COURT:  If she doesn't remember -- see, now I

23    think what you're trying to do is to ask the question to get

24    your statement into evidence, and you can't do that.  I mean, I

25    find that if you ask that question, she's going to say that she

1    doesn't remember that at all.

2            MR. SADEQUEE:  Okay.  I would still ask the question

3    the way I phrased it earlier and then just leave it.

4            THE COURT:  I'm not going to allow that.  You know

5    the answer.  This witness, outside the presence of the jury,

6    has, under oath, told me that she does not recall you asking

7    that.  For you to ask that question, knowing that that's her

8    answer under oath would be your attempt to try to testify to

9    the jury when you're not under oath, and I will not allow that.

10   That would be the only reason for you to ask that question.

11           MR. SADEQUEE:  But this is something that also I

12   would like to --

13           THE COURT:  Under what rule of evidence are you

14   seeking to introduce the question, introduce this testimony?

15           MR. SADEQUEE:  Okay, I'll leave it, I won't ask the

16   question.

17           THE COURT:  You will not ask the question?

18           MR. SADEQUEE:  No.

19           THE COURT:  Okay, so you elect not to ask the

20   question?

21           MR. SADEQUEE:  Can I ask does she remember anything

22   else of -- prior to me going to Canada?  Does she remember any

23   other reason that I had given her prior to going to Canada for

24   why I'm going to Canada.

25           THE COURT:  So all you want to ask is -- in addition

1     to what you said about his aunt -- you want to ask do you

2     remember any other reason that you went to Canada?

3               MR. SADEQUEE:  Yes.

4               THE COURT:  And that is the specific question you are

5     going to ask?

6               MR. SADEQUEE:  Yes.

7               THE COURT:  Mr. McBurney, do you have any problem

8     with that?

9               MR. MCBURNEY:  No, sir.

10              THE COURT:  Mr. Sadequee, that is the question that

11    you will ask and no other.  Do you understand that?

12              MR. SADEQUEE:  Yes.

13              THE COURT:  Bring the jurors back in, please.

14              Of course, that instruction is subject to her answer,

15    if there's follow-up, I might allow that.

16              (Jury returned to the courtroom at 4:30 p.m.)

17              THE COURT:  Ladies and gentlemen, thank you for being

18    patient with me.

19              You may go ahead and ask your question.

20    Q.   (By Mr. Sadequee)  Yes.  My question is do you recall any

21    other reason I mentioned to you in relation to me going to

22    Canada other than visiting my aunt?

23    A.   I recall you visiting your aunt.  I don't -- I knew that

24    you had gone to school there, so I thought maybe you were

25    connecting with your aunt and other people that you may know

1    but that's all I recall.

2    Q.    Thank you.

3              THE COURT:  Mr. McBurney?

4              MR. MCBURNEY:  No, sir, nothing.

5              THE COURT:  All right.  Does anybody want

6    Ms. Bhattacharyya subject to recall?

7              MR. MCBURNEY:  No, thank you.

8              THE COURT:  Mr. Sadequee?

9              MR. SADEQUEE:  No.

10             THE COURT:  We appreciate your testimony.  You should

11   not discuss your testimony with anybody until you hear that the

12   case is concluded, and we thank you for being with us.

13             THE WITNESS:  Thank you.

14             THE COURT:  Call your next witness, please.

15             MR. MCBURNEY:  Mark Richards.

16             THE COURT:  Please come forward and stand in the

17   witness box, I will have you sworn in.

18                           MARK RICHARDS,

19   being first duly sworn or affirmed, was examined and testified

20   as follows:

21             THE COURTROOM DEPUTY:  Please be seated.

22                          DIRECT EXAMINATION

23   BY MR. MCBURNEY:

24   Q.    Good afternoon, sir.

25   A.    Good afternoon.

1   Q.   Will you spell your name for the record?

2   A.   Mark Richards, M-a-r-k R-i-c-h-a-r-d-s.

3   Q.   Where do you work?

4   A.   Federal Bureau of Investigation.

5   Q.   How long have you been with the FBI?

6   A.   I've been there for 12 years.

7   Q.   What office or field office do you work in right now?

8   A.   In the Atlanta Division.

9   Q.   What unit are you assigned to in Atlanta?

10  A.   Assigned to an international terrorism squad.

11  Q.   Is that part of what's known as the JTTF, the Joint

12  Terrorism Task Force?

13  A.   Yes, it is.

14  Q.   How long have you been with the JTTF?

15  A.   Approximately seven years.

16  Q.   Were you involved in the FBI's investigation into the

17  defendant and Syed Haris Ahmed?

18  A.   Yes, I was.

19  Q.   Do you recognize Defendant Sadequee?  Do you see him in

20  court today?

21  A.   Yes.  He's sitting at the first table next to Mr. Samuel.

22  Q.   There are several beards at that table.  The larger beard

23  belongs to which person?

24  A.   The larger beard is Defendant Sadequee.

25  Q.   Okay, thank you.  During the course of the

1    investigation -- why don't we start with how the investigation

2    began for the FBI.  What month and year did the investigation

3    into Ahmed and Defendant Sadequee begin?

4    A.    August of 2005.

5    Q.    When did Defendant Sadequee, if you know, leave for

6    Bangladesh?

7    A.    I believe he left in August of 2005.

8    Q.    It's about the same time the investigation began.  Did the

9    FBI have an opportunity to interview Defendant Sadequee before

10   he left the United States for Bangladesh?

11   A.    Yes.

12   Q.    Were you involved in that interview?

13   A.    I was not involved.

14   Q.    Where did that interview occur?

15   A.    In New York.

16   Q.    Syed Haris Ahmed, where was he when the FBI's

17   investigation began?

18   A.    He was in Pakistan.

19   Q.    When did he return to the United States?

20   A.    He also returned the same month, August of 2005.

21   Q.    I may have misspoken in the opening.  The year that

22   Defendant Sadequee and Syed Haris Ahmed made their trips to

23   Pakistan and Bangladesh was what year?

24   A.    2005.

25   Q.    No question about that?

1    A.    No question.

2    Q.    Good.  When Syed Haris Ahmed returned to the United

3    States, he came back to Atlanta?

4    A.    Yes, he did.

5    Q.    Was he interviewed by law enforcement the day of his

6    return?

7    A.    Yes, he was.

8    Q.    Did you participate in that interview?

9    A.    I did not.

10   Q.    By the time he came back was the investigation starting to

11   move along?

12   A.    Yes.  We were approximately three weeks into the

13   investigation.

14   Q.    At some point during the investigation did you learn that

15   the defendant traveled to Canada?

16   A.    Yes.

17   Q.    When did he travel to Canada, month and year?

18   A.    He traveled to Canada during March of 2005.

19   Q.    Before the investigation began?

20   A.    That is correct.

21   Q.    Was the FBI aware that Defendant Sadequee went to Canada

22   when he actually made the trip?  If that question makes sense.

23   A.    Ask it again, please.

24   Q.    When Defendant Sadequee took his trip, was the FBI aware

25   of that fact when it happened, or did it only learn about it

1    after the investigation began?

2    A.    We learned about it after the investigation began.

3    Q.    Okay.  Let's talk about some of the specifics of the trip.

4    You should have in front of you Government's Exhibit 71.  Do

5    you recognize that?

6    A.    Yes, I do.

7    Q.    Without going into the content or identifying recipients

8    or senders, what is it?

9    A.    It's an e-mail from Greyhound to thandymazaq@hotmail.com.

10   Q.    Okay.  This is one of the many e-mails and chats,

11   et cetera, from all these hard drives we've talked about?

12   A.    Correct.

13   Q.    And the essence of the e-mail, is it an itinerary?

14   A.    Yes.  It's a --

15   Q.    You don't need to get -- is it an itinerary?

16   A.    Yes.

17   Q.    Are you familiar with this document?

18   A.    Yes.

19          MR. MCBURNEY:  Government tenders Exhibit 71.

20          THE COURT:  Any objection?

21          MR. SADEQUEE:  No.

22          THE COURT:  It's admitted.

23          MR. MCBURNEY:  If we can put 71 up.

24   Q.    (By Mr. McBurney)  Okay, it is from?

25   A.    From Greyhound.

1   Q.   Eticket@greyhound, so an e-mail service, and it's to?

2   A.   To the e-mail address thandymazaq@hotmail.com.

3   Q.   If we turn to Government's Exhibit 1, the moniker chart,

4   Thandy Mazaq, is that a moniker already assigned to Syed Haris

5   Ahmed?  If you can see that.

6   A.   Yes, it is.

7   Q.   So e-mail to Syed Haris Ahmed, thanks him for an order

8   with Greyhound.  Who are the two passengers who will be going

9   somewhere on Greyhound?

10  A.   The first is Mr. Ehsanul Sadequee and the second is Syed

11  Ahmed.

12  Q.   And there's a fare and a fare class, adult or a child?

13  A.   This is an adult fare.

14  Q.   There's a billing address for whatever credit card paid

15  for these tickets.  What is the street for the billing address?

16  A.   The street is Nowata Drive.

17  Q.   And that address is associated with whom?

18  A.   It's the family residence of the Sadequee family.

19  Q.   If we scroll down on the page, I think we get, I guess it

20  would be page 2, magnify the itinerary portion.  Page 2 of

21  Government's Exhibit 71, what day were Defendant Sadequee and

22  Syed Haris Ahmed departing?

23  A.   They were departing from Atlanta on March 6th, 2005.

24  Q.   And their ultimate destination, the bottom line of the top

25  part of the itinerary?

1    A.    Toronto, Canada.

2    Q.    And what day did they arrive there?

3    A.    They arrived on the next day, which would be on March 7,

4    2005.

5    Q.    And then they left Toronto to return to Atlanta on what

6    day?

7    A.    On March 12, 2005.

8    Q.    It's a long bus trip.  What day did they get back to

9    Atlanta?

10   A.    They got back the next day in the morning, March 13, 2005,

11   at 6:45 a.m.

12   Q.    Did the FBI obtain during the course of its investigation

13   any border crossing documents, I guess it would be border entry

14   documents, confirming that the defendant and Syed Haris Ahmed

15   entered the United States in Buffalo, New York, on March 12th,

16   2005?

17   A.    Yes, we did.

18   Q.    Both of them entered?

19   A.    Both of them entered within a minute or two of each other.

20   Q.    Did the FBI at some point obtain bank records for

21   Defendant Ahmed?

22   A.    Yes.

23   Q.    Did those records reflect the purchase that we just saw,

24   two tickets for $138 apiece?

25   A.    Yes.

1    Q.   Take a look at Government's Exhibit 75.  Do you recognize

2    that?

3    A.   Yes, I do.

4    Q.   What is -- it's a three-page document -- what is

5    Government's Exhibit 75?

6    A.   It's a series of e-mails between Zubair Ahmed using e-mail

7    address ibnahmed460@hotmail.com, and the other participant is

8    Syed Ahmed using e-mail address thandymazaq@hotmail.com.

9    Q.   The same e-mail address that the Greyhound itinerary was

10   sent to?

11   A.   Correct.

12   Q.   And before I forget -- and we don't need to put it up --

13   if you go back to Government 71, what was the date of the

14   e-mail from Greyhound?

15   A.   It was February 26, 2005.

16   Q.   In this e-mail chain, at some point does Syed Haris Ahmed

17   refer to a trip he's just taken that corresponds on the

18   calendar with the Canadian trip?

19   A.   Yes, he does.

20        MR. MCBURNEY:  Government tenders Exhibit 75.

21        THE COURT:  Any objection?

22        MR. SADEQUEE:  No.

23        THE COURT:  It's admitted.

24        MR. MCBURNEY:  If we could start on page 2, please,

25   at the bottom.

1    Q.    (By Mr. McBurney)  It's a series -- before you magnify

2    anything -- it's a series of e-mails back and forth.  The

3    oldest e-mail is at the beginning or at the end of this chain?

4    A.    The oldest is at the end.

5    Q.    The first one that started it?

6    A.    Correct.

7    Q.    And the newest e-mail is at the --

8    A.    At the beginning.

9          MR. MCBURNEY:  Okay, if we could magnify this bottom

10   part.

11   Q.    (By Mr. McBurney)  An e-mail from Thandy Mazaq, Syed Haris

12   Ahmed, to this individual, Zubair Ahmed you mentioned.  What's

13   the date of the e-mail?

14   A.    The date is the same day they returned from Canada, it is

15   March 13th, 2005.

16   Q.    Okay, what does Syed Haris Ahmed say in the sentence that

17   starts with "Man"?

18   A.    "Man things have changed, God willing now, went to

19   someplace, don't want to mention online, hooked up with people,

20   just come any time, I'm free, college is no problem.  I'm broke

21   too, ever think about charity.  We will talk when you come."

22   Q.    Where is it that Syed Haris Ahmed and the defendant had

23   just gone?

24   A.    Canada, Toronto.

25   Q.    Now, the Defendant Syed Haris Ahmed, in his next e-mail in

1    this chain, if we go back to page 2, Zubair responds and then

2    Syed Haris Ahmed writes back to Zubair, still March 13th, the

3    day they got back, what does he ask?  What does he say?

4    A.    He says:  "Hey, man, you mentioned a long time ago that we

5    can take loans and then run away from these banks.  Update me

6    on that."

7    Q.    If we can go to page 1, please.  Zubair responded to the

8    question about taking loans and running away and then Syed

9    Haris Ahmed replies.  We're now March 15th, couple days later,

10   what does he say?

11   A.    "Because I've heard that brothers in UK do this scheme and

12   they have scholars who have called it legitimate."

13   Q.    Stop for a second.  When you say "do this scheme," what's

14   the scheme that Syed Haris Ahmed originally brought up?

15   A.    To somehow obtain money, take out loans and default them.

16   Q.    Okay, keep going, so the scholars call legitimate.

17   A.    "Especially if it helps us make migration.  I'm working on

18   my family but if they remain hesitant I will still make

19   migration.  You gotta come to hear our plans."

20   Q.    "His plans" or "our plans"?

21   A.    "Our plans."

22   Q.    If you would look at Government's Exhibit 76.  What is

23   Government's Exhibit 76?

24   A.    It's an e-mail.

25   Q.    Is it an e-mail with an attachment?

1    A.    Yes, it has an attachment.  The attachment is an instant

2    message, pretty long.

3    Q.    Is this an e-mail that the FBI acquired during the course

4    of its investigation?

5    A.    Yes, it is.

6              MR. MCBURNEY:  Government tenders Exhibit 76.

7              THE COURT:  Any objection?

8              MR. SADEQUEE:  No.

9              THE COURT:  It's admitted.

10             MR. MCBURNEY:  If we could put up the first page,

11   please.

12   Q.    (By Mr. McBurney)  It's an e-mail from whom to whom?

13   A.    From Ibn as-Sadequee using the e-mail address

14   almuwahhid@hotmail.com, and it is to al-muwahhid@hotmail.com.

15   Q.    So the sender is who?

16   A.    The sender is Defendant Sadequee.

17   Q.    And we've heard a little bit about, you were not in court,

18   but we've heard a little bit, the jurors have, about who

19   Al-Muwahhid is.  Who's that?

20   A.    That is Syed Haris Ahmed.

21   Q.    So defendant sends an e-mail to Syed Haris Ahmed.  There's

22   no content to the e-mail, meaning text.  What's the subject

23   line?

24   A.    Subject reads:  "Emergency Read This All Urgently."

25   Q.    And the date?

1    A.    The date is Thursday, March 31, 2005.

2    Q.    Is this before or after the defendant and Syed Haris Ahmed

3    went to Canada?

4    A.    This is after the Canada trip.

5    Q.    You mentioned there's an attachment.  Let's look at page 1

6    of the attachment, page 2 of Exhibit 76.

7          MR. MCBURNEY:  If you could magnify like the top

8    third.  That's great.

9    Q.    (By Mr. McBurney)  How many participants are in this saved

10   chat?

11   A.    There are three.

12   Q.    The first one is equal sign dash dash dash capital J,

13   three more dashes and an equal sign.  Somewhere in this chat is

14   that person called by his name?

15   A.    He's called by his name, yes.

16   Q.    And what's that name?

17   A.    He's called by his name Azdee.

18   Q.    Azdee.  So J equals Azdee in this chat?

19   A.    Correct.

20   Q.    Deenin@gawab.com, is he called by a name somewhere in the

21   chat?

22   A.    Yes, he is.

23   Q.    What's that name?

24   A.    James.

25   Q.    And then the third participant in the chat?

1    A.    The third participant is Aboo Khubayb Al-Muwahhid.

2    Q.    And that is?

3    A.    That is Defendant Sadequee.

4    Q.    Azdee is based where?

5    A.    Azdee is in Canada.

6    Q.    Let's look at page 3 of the exhibit.  I'm going to go by

7    exhibit page numbers.

8         MR. MCBURNEY:  If you could magnify, please, starting

9    with, "And when you come."

10   Q.    (By Mr. McBurney)  So James or Deenin says what, starting

11   with the "And when you come"?

12   A.    "And when you come, you will stay on your own, it's not

13   good to stay alone."

14   Q.    J says, Azdee?

15   A.    Sure.  "Since you are alone can't you stay at your

16   aunt's?"

17   Q.    What does the defendant say?

18   A.    "Thing is, I don't want my aunt to get suspicious."

19   Q.    Prior to James and Azdee referring to the defendant's

20   aunt, was there any discussion in here where the defendant

21   said, Hey, guys, you know I have an aunt wherever you might be,

22   or did they bring up aunt?

23   A.    I don't recall if it was mentioned earlier --

24   Q.    Okay.

25   A.    -- in this chat.

1    Q.   That's all I'm talking about, is the universe of this
2    chat, but you don't recall, that's all right.
3         Let's go to page 5, just the first half of the page.
4    The blue text is always which participant?
5    A.   The blue text is Defendant Sadequee.
6    Q.   Yellow is?
7    A.   Yellow is Azdee.
8    Q.   And red?
9    A.   Red is James.
10   Q.   Starting at the top of the page, what is the defendant
11   saying?
12   A.   "Thing is Abu Umar said he is booking an apartment or
13   something."
14   Q.   And Azdee?
15   A.   "Ah, then that's set."
16   Q.   What does James say?
17   A.   "He is depending on us but thing is, he himself is not
18   sure about when he's coming."
19   Q.   Abu Umar, who's Abu Umar?
20   A.   Abu Umar, well, is an -- well, his true name is Ibn
21   Hussein Khan.
22   Q.   Where is he based?  What's home for him?
23   A.   He is, I believe, located in the United Kingdom right now.
24   Q.   When you say "right now," at the time of this chat?
25   A.   Even at the time of this chat.

1    Q.    Okay.  Go to page 6.

2          MR. MCBURNEY:  And if you could magnify sort of the

3    center portion.  That's great.

4    Q.   (By Mr. McBurney)  The defendant identifies someone else

5    who might be coming to wherever this basement or apartment is

6    going to be.  What does he say?

7    A.    He says, "Aboo Sul might be coming."

8    Q.    And Azdee responds?

9    A.    "It sounds like he is coming, he asked me."

10   Q.    Continue with Azdee.

11   A.    "He asked me what we plan on doing.  I'm like

12   paintballing.  He is like cool, I want to do that.  So sounds

13   like he is coming, so basement..."

14   Q.    Keep going, he has one more line, it's not on the screen.

15   What's the last thing Azdee says?

16   A.    "So basement is the best option."

17   Q.    And what does defendant say in response to, "So basement

18   is the best option"?

19   A.    "How much do you think it is?"

20   Q.    Go to page 7, just the top third of the page, what does

21   Azdee say it will cost?

22   A.    "$400, I think."

23   Q.    Then James?

24   A.    James says:  "450 to 500 including everything."

25   Q.    Then the defendant starts talking about time frames.  What

1    does he say in response to the pricing?

2    A.    "For my PP to come back, it takes six weeks."

3    Q.    In the context of this chat and other communications we'll

4    go through, PP means what?

5    A.    Passport.

6    Q.    Let's go to page 8.

7         MR. MCBURNEY:    If you could highlight from the

8    defendant's first line where he says, "Ikhwaan, brothers."

9    Q.    (By Mr. McBurney)    What does the defendant say on page 8?

10   A.    "Also brothers, Turab is genius.    He gave an idea which

11   blows away everything."

12   Q.    Turab is who?

13   A.    Turab is a moniker for Syed Haris Ahmed.

14   Q.    At any point in this chat does Azdee or James say, Who's

15   Turab, who are you talking about?

16   A.    No, I don't recall them saying that in this chat.

17   Q.    In fact, what does Azdee say in response to Defendant

18   Sadequee saying Turab has this great idea which blows

19   everything away?

20   A.    "Turab should be leader because that dude has mad ideas."

21        MR. MCBURNEY:    Page 9, if you could magnify

22   everything from, "Also, we started to," to the bottom of the

23   page.

24   Q.    (By Mr. McBurney)    The defendant says what?

25   A.    "Also, we started to talk to Falook and we told him we are

1    leaving."

2    Q.    Falook is who?

3    A.    Falook is Omer Kamal.

4    Q.    And this chat was sent from Sadequee to Turab before or

5    after the Canada trip?

6    A.    The March 31st, after the Canada trip.

7    Q.    So defendant says:  "We started to talk to Falook, we told

8    him we are leaving."  What does James ask?

9    A.    "He's trustworthy?"

10   Q.    Azdee says?

11   A.    "He has issues but he is all right."

12   Q.    Then the defendant continues with this discussion about

13   Falook.  What does he say?

14   A.    "And so if he wants to join the caravan, then he should

15   join, if not, then let him sell his manhood to his sisters."

16   Q.    Keep going.

17   A.    "He is okay but he is weak and thinks he has an excuse for

18   not going."

19   Q.    The bottom of the page, Azdee explains why Falook is

20   someone important to hang on to.  What does he say?

21   A.    "The thing is -- the thing he can get in very easily since

22   he is desi and sounds American."

23   Q.    Let's jump to the bottom of page 11.

24          MR. MCBURNEY:  And you can just magnify the bottom

25   part.

1    Q.    (By Mr. McBurney)   James comes back to Turab's idea that

2    blows everything away.   What does James say, down at the bottom

3    of page 11?

4    A.    "What was Turab's idea or MSN is not cool?"

5    Q.    MSN is?

6    A.    Speaking online, communicating online.

7    Q.    What does Azdee say in response to James' concern about

8    talking about Turab's idea?

9    A.    "Dude, don't talk about it."

10   Q.    Top of the next page, the defendant weighs in.   What does

11   he say?

12   A.    "We will tell you but, brother, it was like flawless with

13   the permission of God for the birthday I mean."

14   Q.    Let's go to page 15.

15              MR. MCBURNEY:   And if you could enlarge the two

16   paragraphs at the top.

17   Q.    (By Mr. McBurney)   What does James say in his second entry

18   on this page?

19   A.    "Just wanted to suggest, I think it's absolutely essential

20   for Turab to come based on the fact that we still haven't got

21   anything solid as to what we want to do and how to do it, and

22   we should all be here, as the foundation of this.   God knows

23   best."

24   Q.    What does the defendant say?

25   A.    "Brothers, me and Turab will probably drive up to Virgin

1    Mary by ourselves, God willing, and scoop the place, and then

2    return back, and then later I will come when I get my

3    passport."

4    Q.   This chat was forwarded to Syed Haris Ahmed on March 31.

5    A couple weeks later where did Defendant Sadequee and Syed

6    Haris Ahmed go?

7    A.   They went to Washington, D.C.

8    Q.   Which is between what two states?

9    A.   Virginia and Maryland.

10   Q.   And while they were there did they take the videos that

11   we've already heard about from some witnesses?

12   A.   They took several videos.

13   Q.   Let's continue on with page 15.

14          MR. MCBURNEY:  If you could magnify from where J

15   starts talking down to the large blue paragraph.

16   Q.   (By Mr. McBurney)  So there's been discussion about Turaab

17   coming to join something.  What does Azdee say about that?

18   A.   Azdee says:  "Yeah, I don't see the point of Turab not

19   coming, if they are going based on loot, then he doesn't need

20   to work extra."

21   Q.   What does defendant say?

22   A.   "Thing is, he said he wants to gather money, and he will

23   go by himself to Pakland, once we tell him when and where."

24   Q.   Pakland?

25   A.   Pakland is Pakistan.

1    Q.    The defendant continues after he's interrupted by James.

2    A.    "But the thing is, brothers, we shouldn't completely rely

3    on loot.  What if something happens, some bros over there drop

4    out or they get martyrdom, et cetera.  We should have a backup

5    plan.  God knows best.  What do you all think?"

6    Q.    Page 16, the two paragraphs here by Defendant Sadequee,

7    what does he say?

8    A.    "Also, brothers, another possibility I was thinking is we

9    take some money from here, a few thousand each one of us,

10    together about 15,000 or something, and we go to Pakland and

11    then we go loot some of those who reject."

12    Q.    All right, second to last page, up to page 18, please.

13          MR. MCBURNEY:  If you can magnify right in here.

14    Q.    (By Mr. McBurney)  What happens with James on this page?

15    A.    James left the conversation.

16    Q.    So who's left?

17    A.    Azdee and Defendant Sadequee.

18    Q.    What's the first thing defendant says after James leaves?

19    A.    "I'll tell Turab, God willing."

20    Q.    Go to the final page.

21          MR. MCBURNEY:  And you can magnify the whole page.

22    Q.    (By Mr. McBurney)  Defendant repeats it, what does he say

23    in his first entry on page 19?

24    A.    "Okay, I will send this conversation to Turaab, God

25    willing."

1    Q.    And what is it that Defendant Sadequee attached to the

2    e-mail he sent to Turaab, Syed Haris Ahmed?

3    A.    Could you repeat the question?

4    Q.    Sure.  The defendant just said, "I will send this

5    conversation to Turaab."  My question is what is it that

6    Defendant Sadequee attached to this e-mail we have that he sent

7    to Turaab?

8    A.    He sent this conversation attached to the e-mail.

9    Q.    Azdee changes the subject.  What does he say?

10   A.    "I think I figured a plan to get into Pakland without

11   being suspected if Sinaan can work it out."

12   Q.    And then he's cautioned by the defendant?

13   A.    "Is it okay to say over MSN."

14   Q.    Yes, and Azdee says:  "How does one get into Pakistan?"

15   A.    "Marriage is the only way I see as a way to get in there."

16   Q.    And the defendant's response?

17   A.    "Yeah."

18   Q.    Let's shift to Washington.  On what day did Defendant

19   Sadequee and Syed Haris Ahmed travel to Washington, D.C.?

20   A.    I believe it was April 11th, 2005.

21   Q.    Are you sure about which day it was or that's just your

22   best recollection?

23   A.    I believe it may have been April 10th, 2005.

24   Q.    Or on --

25             THE COURT:  Are we going to a new subject?

1          MR. MCBURNEY:  Yes, sir.

2          THE COURT:  Because I promised the jury that I would

3  let them go home at 5:00 and it is that time.

4          MR. MCBURNEY:  It's a very natural break point.

5          THE COURT:  Would this be a good time to break?

6          MR. MCBURNEY:  A perfect break.

7          THE COURT:  I thought it might be.

8          Ladies and gentlemen, it's been a long day and I

9  appreciate very much your attentiveness.  I think it's been an

10  efficient day, but I think you should go home and be with your

11  families.  Of course, when you're with them don't discuss the

12  case with them because that would be improper to do so because

13  the evidence is still coming in.

14          We will begin tomorrow promptly at 9:00.  Because I

15  know traffic is awful in the mornings, it's a little worse now

16  because school has started and those traffic patterns haven't

17  been established yet, so there's generally more traffic coming

18  downtown, which is one of the reasons why I make sure that

19  there are things for you, like breakfast for you to eat in the

20  jury room when you get here.  I think that's in the jury room

21  usually by 7:30, no later than 8:00.  I appreciate very much

22  your note thanking me for that today.  It is a service that we

23  provide to you because of your service to us.

24          So with that, have a good evening, we'll see you

25  tomorrow morning at 9:00.

1           (Jury retired from the courtroom at 5:03 p.m.)

2           THE COURT:  You can step down, Agent.  Of course,

3  don't discuss your testimony between now and tomorrow because

4  you're in the middle of it.  And you are excused for the

5  evening, be back tomorrow morning.  We'll begin promptly at

6  9:00.  And why don't you step out, let me see if there's

7  anything else I need to talk to the lawyers about.

8           Is there anything else we need to discuss now?  I

9  would also like a summary of who will be called tomorrow and

10  with estimations on what witnesses and how long you think they

11  will take, knowing that you will not be held to that but it

12  helps me manage.

13          MR. MCBURNEY:  We're nearly done with Agent Richards

14  this round, he'll be recalled later, but I'm guessing 15 more

15  minutes with Agent Richards.  Following that we have Tim

16  Alexandre, he's from the State Department, talking a little bit

17  about the videos and where people went in Washington.  It will

18  be much shorter than last time.  What do you guess?

19          MS. COLLINS:  About 15 minutes.

20          MR. MCBURNEY:  15 minutes for direct.  And then I

21  believe we'll have someone from the United Kingdom, law

22  enforcement talking about -- how long do you think?

23          MS. COLLINS:  20 minutes, perhaps.

24          MR. MCBURNEY:  Not too long.  Then an agent will be

25  on the stand for several hours going through a number of chats

1    you've seen before.  After that will be Syed Haris Ahmed and

2    that will be a long time.  We have plenty of witnesses

3    following.  Actually, we'll enter a patch of one, two, three,

4    four witnesses who will be ten minutes or less each.  But I

5    suspect that with Agent Allen and -- Syed Haris Ahmed could

6    last four minutes, but assuming he's answering questions, I

7    think that will be a medium-long direct and probably a very

8    long cross-examination.

9           The question you may want to have answered is that we

10   will be, after Syed Haris Ahmed testifies, far more than

11   halfway through, maybe not body count, but in terms of -- there

12   are a couple of long witnesses after that, most of them will be

13   fairly brief.

14          THE COURT:  I think body count is probably --

15          MR. MCBURNEY:  That may not be the right way to put

16   it.

17          THE COURT:  I would say that you would have put up

18   more witnesses than you have remaining, I think that's what you

19   meant.

20          MR. MCBURNEY:  Something along those lines.

21          THE COURT:  Okay.  Mr. Sadequee, tomorrow when

22   Mr. Ahmed testifies you need to be particularly careful about

23   your questions and be guided by the advice that I've given you

24   about what is allowed and what isn't allowed.  You have the

25   evening to prepare for that and you might want to talk to Mr.

1    Samuel and he might help you with some general formulation

2    rules so that that goes smoothly and so that you don't violate

3    the Rules of Evidence or the Rules of Procedure.

4          MR. MCBURNEY:  One point on that, if I may.  We are

5    going to talk about this this evening, but it may be that we

6    have a very narrow focus for Syed Haris Ahmed and it might help

7    if Defendant Sadequee understood the notion of scope of direct

8    and cross.

9          THE COURT:  Mr. Samuel, can you cover that with him?

10   If there's a very narrow direct examination limited to narrow

11   and specific issues, cross, of course, would have to be related

12   to the direct examination.

13         MR. SAMUEL:  I actually have talked to him about

14   that.

15         He just said to me -- you know we can't meet at

16   night.  Mr. Ahmed testifying is to some extent as much -- not

17   to some extent, is as much of a surprise.  If he gets here at

18   8:00 tomorrow morning that will be great, I can meet him on the

19   16th floor.  If he doesn't get here until quarter of 9:00 we

20   may ask your indulgence so we can do what you want to do

21   because it will make things more efficient.

22         THE COURT:  All right.  Anything else?

23         MR. SAMUEL:  I'll be here at 7:30.  I assume there's

24   no chance he will be here before that; is that right?

25         I'm not asking you, Judge.  The record should reflect

1    that I'm looking elsewhere.

2              THE MARSHAL:  We'll put our best effort.

3              THE COURT:  I just talked to the marshals and I'm

4    asking Marshal Mecum if he could please, knowing that he has

5    unlimited persuasive abilities, to let the prison know that I

6    am personally interested in them helping tomorrow morning in

7    assuring that Mr. Sadequee rolls in here before 8:00 so that

8    the meeting with Mr. Samuel and Mr. Sadequee can begin at 8:00.

9    And as I told the deputy, that if it would help for me to make

10   a phone call to the warden, I'm happy to do that, but you are

11   so much more effective.  All right, anything else?

12             MR. MCBURNEY:  No, sir.

13             THE COURT:  All right.  I thought today was an

14   efficient day, I appreciate your cooperation.  We will see you

15   tomorrow morning at 9:00.

16             (Proceedings adjourned at 5:10 p.m.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT:

4    NORTHERN DISTRICT OF GEORGIA:

5

6            I hereby certify that the foregoing pages, 1 through

7    294, are a true and correct copy of the proceedings in the case

8    aforesaid.

9            This the 28th day of August, 2009.

10

11
                         Amanda Lohnaas
12                       _____
                         Amanda Lohnaas, CCR-B-580, RMR, CRR
13                       Official Court Reporter
                         United States District Court
14

15

16

17

18

19

20

21

22

23

24

25