1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3   UNITED STATES OF AMERICA        )
                                    )
4              Plaintiff,           )      CRIMINAL ACTION FILE
                                    )      NO. 1:06-CR-147-WSD-2
5   v.                             )
                                    )      ATLANTA, GEORGIA
6   EHSANUL ISLAM SADEQUEE (2)     )
                                    )
7              Defendants.          )
    _____)

8

9              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
10        UNITED STATES DISTRICT JUDGE, AND A JURY

11                    VOLUME 3
              Thursday, August 6, 2009

12

13  APPEARANCES OF COUNSEL:

14  For the Plaintiff:          OFFICE OF THE U.S. ATTORNEY
                                (By:  David E. Nahmias
15                                    Robert C. McBurney
                                      Christopher Bly)
16
                                U.S. DEPARTMENT OF JUSTICE
17                              (By:  Alexis L. Collins)

18  For the Defendant:          Ehsanul Islam Sadequee, *Pro Se*

19  Standby Counsel:            GARLAND SAMUEL & LOEB
                                (By:  Donald Franklin Samuel
20                                    Amanda Clark Palmer)

21                              Khurrum B. Wahid

22      *Proceedings recorded by mechanical stenography*
         *and computer-aided transcript produced by*
23              NICHOLAS A. MARRONE, RMR, CRR
                  1714 U. S. Courthouse
24                75 Spring Street, S.W.
                  Atlanta, GA  30303
25                  (404) 215-1486

1          I N D E X

2     *Witness*                                    *Page*

3     J. JEMISON

          Direct (By Mr. Sadequee)              550
4          Cross (By Mr. McBurney)               556

5     SYED HARIS AHMED
          Cross (By Mr. Sadequee)               566
6          Redirect (By Mr. McBurney)            663
          Recross (By Mr. Sadequee)             687
7
      MELLISSA HARPER
8          Direct (By Mr. Bly)                   690

9     NEIL RABINOVITZ
          Direct (By Mr. Bly)                   702
10
      WILLIAM PULLER
11         Direct (By Mr. Bly)                   711

12    ZUBAIR AHMED
          Direct (By Mr. McBurney)              721
13         Cross (By Mr. Sadequee)               749

14    ANES CENGIC
          Direct (By Mr. McBurney)              760
15

16

17

18

19

20

21

22

23

24

25

1          Thursday Morning Session

2          August 6, 2009

3              8:34 a.m.

4              -- -- --

5          P R O C E E D I N G S

6              -- -- --

7     (In open court without a jury present:)

8     THE COURT:  Good morning, everybody.

9     Do we have a report on the kites?

10    MR. McBURNEY:  Yes, sir.  We do not have the kites,

11    and I will explain what we have done so far.  Last night

12    Mr. Nahmias and I attempted to reach individuals at the pen

13    in Atlanta, ultimately having to call Washington to get in

14    touch with someone at the pen.

15    We did speak with representatives from USP Atlanta

16    late last night.  They were instructed in no uncertain terms

17    the Court's directive and our interest, the parties'

18    interest, in recovering these items.

19    This morning, three representatives from BOP

20    Atlanta arrived without kites.  We had a discussion about

21    their recollection of the conversations you have already

22    heard about.

23    THE COURT:  Right.

24    MR. McBURNEY:  And we learned that the person who

25    can best answer the question of what may have happened to

them isn't here.  He's been directed to be here, and we have

spoken with him.  It's a Lieutenant Jemison who is the one

that Mr. Samuel recalls being involved in the seizure of the

contraband.  It's Lieutenant Jemison that Mr. Samuel spoke

with saying, Please preserve these.

The person I spoke with several days later when I

was notified by Mr. Samuel is Mr. Johnson, who is here.  He

recalls the conversation.

And this era -- it's important for the setting --

this was a time when probably every other week I was having

to talk to Mr. Johnson because there were issues with phone

privileges, things being taken from the defendant because

three-way calls were being made, the door was being blocked

with a magazine, et cetera.

It was in those series of calls that this incident

occurred, and Mr. Johnson remembers me telling him to

maintain anything that was seized.

Typically what was seized was something like a

radio, which ultimately was returned to the defendant when

the period of penalty was over for an

infraction.  Mr. Johnson has no record of kites being

seized.

He brought with him the individual,

Officer Esselburn, who would maintain anything that was

seized and intended to be preserved, and he said he has never

been given anything.

So the missing piece is Lieutenant Jemison, who by all accounts, defendant and Mr. Samuel, is the one who was involved and was asked by Mr. Samuel to maintain the kites that were seized.

THE COURT:  And where is he?

MR. McBURNEY:  He's en route.

Mr. Nahmias spoke with him.  And his recollection, Jemison's, is that he didn't seize any kites.  He remembers taking things from the defendant, but it was commissary lists that he shouldn't have, not this contraband.

The government's position is not that this incident never occurred.  I distinctly remember speaking with Mr. Samuel about it several days after it happened.

That's what we have done on the ground.  There are individuals from Bureau of Prisons for you to speak with.

We also have done some research on spoliation, provided that research to Mr. Sadequee, and we can get a case to the Court as well when we get to that point.  But I wanted to give you the facts, and I'm prepared to talk about the law at some point this morning.

And lastly, I also spoke, with Mr. Samuel present, with Mr. Sadequee about how we might proceed with the cross-examination of Syed Haris Ahmed knowing that Lieutenant Jemison is on the way and not wanting to delay the

1    jury, and discussed the fact we won't object should the

2    defendant not get answers he expects from Syed Haris Ahmed

3    for the defendant to refer to these notes:  Don't you

4    remember these things, et cetera.

5              And if it turns out they have been destroyed, we

6    can ultimately discuss with the Court outside the presence of

7    the jury the possibility of stipulating to their existence if

8    it's shown -- and this is where the law comes in -- that in

9    fact they are material, they are relevant to what he needs to

10   do, et cetera.

11             But that's the status right now.  We do not have

12   the kites.

13             THE COURT:  All right.  Do you want to say

14   anything, Mr. Sadequee?

15             MR. SADEQUEE:  I would like for you to speak with

16   Mr. -- Lieutenant Jemison to find out why he did not present

17   those kites even though I myself and my attorney, we all

18   asked him for that.

19             THE COURT:  You told me of one kite that you do

20   recall.  Do you recall any other kites that you claim that

21   you need to do your inquiry of Mr. Ahmed?

22             MR. SADEQUEE:  Well, I'm not sure if I need --

23   I needed them, but I would like to use them to, if he doesn't

24   remember something, to refresh his memory, or if he's not

25   answering something --

1          THE COURT:  Well, my question is other than the

2     kite you discussed yesterday that you told me about, can you

3     recall any other kite that you think would help you?

4          MR. SADEQUEE:  I asked him about if he believed

5     there were -- that people we met in Canada were informants,

6     and there is an individual who is not arrested.  I'm not sure

7     I can say the name.

8          THE COURT:  And what did he say in response to

9     that?   Did he send you a kite back?  And what was in that

10    kite?

11         MR. SADEQUEE:  He said that it's possible since

12    everyone else was being arrested and that he's not arrested,

13    so that brings up certain issues of, you know, entrapment

14    possibly.

15         THE COURT:  I'm not talking about your theory.  I'm

16    talking about what he said that you recall was in the kite.

17         MR. SADEQUEE:  He mentioned possible reasons as to

18    why this certain individual could have been an undercover

19    informant and possibly the reason why we should not consider

20    that person to be an undercover informant.

21         THE COURT:  Anything else you remember that was in

22    one or more of these kites that you believe would be helpful

23    to you other than the two things you have mentioned so far?

24         MR. SADEQUEE:  There is a lot of things which

25    I haven't been able to review, so I don't know --

THE COURT:  My question is -- I'm asking you what you remember now.  I understand what you are saying is that you got all of these, these were sent to you, you have read all of these, but you think that there might be something there if you reviewed them that you think might help you, but you can't -- but right now you can't tell me anything further than the two things so far.

But if there is something else, I would like to know.

MR. SADEQUEE:  There is also a lot of discussions on --

THE COURT:  I don't need your characterization of a lot of discussions.  I'm asking you specifically in the kites that you reviewed, what other specific things do you contend that Mr. Ahmed said in a kite that you would like to use in the cross-examination, if necessary?

MR. SADEQUEE:  It's been such a long time since I have read these.  I can't recall.

THE COURT:  I understand.  What I'm asking you -- you need to answer the question.  I'm asking you sitting here today what can you recall is in a kite that you need you think perhaps to conduct your cross-examination.

MR. SADEQUEE:  I cannot recall the exact things or topics I need, but I do know we had discussed things that if I was able to review them, it would refresh my memory so that

I could choose which ones I want to present and which ones
are not relevant to the case.

THE COURT: But the ones that you can remember, you
have told me about all of those today, correct, or last
night? There is no other specific kite you can remember
that you think you might want to use?

MR. SADEQUEE: There is some kites also on things
such as Free Masons and our beliefs, religious beliefs,
political beliefs, debates also that we have had on these
issues.

THE COURT: What is it that Mr. Ahmed said about
the Free Masons in a kite that you recall?

MR. SADEQUEE: There is things that he's read about
them.

And also another thing is --

THE COURT: Let's stick with the Free Masons. What
do you recall him telling you about the Free Masons that you
would like to use?

MR. SADEQUEE: He mentioned that he's read certain
books regarding them, and I would like to ask him, you know,
regarding his beliefs regarding Free Masons.

Another important thing is some of the evolution of
his beliefs, religious beliefs in terms of jihad and stuff
which I would like to ask him about and various debates that
we have had regarding political jihad-related issues, that as

1   well.

2          THE COURT:  And what do you recall was in a kite

3   that you received from Mr. Ahmed about his beliefs regarding

4   jihad?

5          MR. SADEQUEE:  For example, he's revisited his

6   views regarding the necessity for an Islamic war or jihad,

7   the conditions for it, that it can't be haphazardly done, you

8   know, the way it's done in many places in the world

9   today.  It has to be organized under a legitimate Muslim

10  leadership and not people going around randomly with acts of

11  violence.  You know, things such as that.

12         THE COURT:  Now, you admit that every one of these

13  kites you received and read; correct?

14         MR. SADEQUEE:  I received?

15         THE COURT:  All the kites we are talking about were

16  communications directly from Mr. Ahmed to you; correct?

17         MR. SADEQUEE:  Well, I mean, not -- well, it's sent

18  through, you know, the orderlies over there, another inmate,

19  I mean, because I don't have contact directly with --

20         THE COURT:  What I'm saying, what you got in these

21  kites were communications from Mr. Ahmed to you; correct?

22         MR. SADEQUEE:  Yes.

23         THE COURT:  All of which you read?

24         MR. SADEQUEE:  Yes.

25         THE COURT:  And you understood, didn't you, that

1  kites were illegal within the prison?

2          MR. SADEQUEE:  I don't know if the word illegal

3  is -- it's not breaking the law.

4          THE COURT:  Maybe it's too strong.  It's an

5  infraction under the prison's disciplinary rules.

6          MR. SADEQUEE:  That's understood, but everyone in

7  the prison -- no one, even the officers really say anything

8  unless they have something against the inmate.

9          THE COURT:  But you understood --

10          MR. SADEQUEE:  I understand.

11          THE COURT:  You know you weren't supposed to have

12  those kinds of communications; correct?

13          MR. SADEQUEE:  Yes, yes.

14          THE COURT:  And did you understand that those

15  communications were subject to being seized by prison

16  officials?

17          MR. SADEQUEE:  Yes, if there was ever -- I mean,

18  usually in the SHU where me and my co-defendant are housed

19  at, all of the inmates pass kites.  I mean, no one --

20  officers usually don't say anything, and the only time they

21  would say anything is if there is some type of a conflict

22  with that particular officer with that particular inmate,

23  just, you know, kind of harassing an inmate that you are not

24  supposed to have it.

25          Otherwise no one says anything.  It's just like

kind of a --

THE COURT:  All right.  Where is Mr. Jemison?  Why is he not here now?

MR. NAHMIAS:  Your Honor, I directed the warden, who is actually on vacation, and the associate warden to have the appropriate people here today.  We thought that was Mr. Johnson and Mr. Esselburn.

In talking with Mr. Johnson this morning, it turned out that he was not -- we did not have the name of the lieutenant last night, so we had assumed it might be him.

THE COURT:  You assumed it was Johnson?

MR. NAHMIAS:  Right.  When we found out it was Mr. Jemison, I directed Mr. Johnson to get him on the phone, which he did.

THE COURT:  Is he in Atlanta?

MR. NAHMIAS:  He is.  And I directed him to --

THE COURT:  Is traffic heavy this morning that he can't get here?

MR. NAHMIAS:  I directed him to quit his duties, the warden knows that he has a higher responsibility to get to the courtroom as quickly as possible.  It may be any minute.

But what he did tell me on the phone was he remembers getting a directive to seize anything -- or to keep anything that was seized, but the only thing he remembers

1    paper-wise was commissary forms.

2              He may -- in more than a two-minute phone call, he

3    may have more knowledge, but that's where it is at this

4    point.

5              THE COURT:  So is it that he reported to work this

6    morning, and when he got there he was told to come over

7    here?

8              MR. NAHMIAS:  I don't think he knew anything about

9    this until we got him on the phone and the U.S. Attorney

10   directed him to answer my questions and then get down here.

11             THE COURT:  Was that last night or this morning?

12             MR. NAHMIAS:  That was this morning.

13             It's very -- unfortunately, as I have found, it's

14   very difficult to find people at BOP, including using their

15   national command center after hours in the evening,

16   although --

17             THE COURT:  Maybe you are experiencing some of the

18   frustration that Mr. Samuel has experienced.

19             MR. NAHMIAS:  We will remedy those other situations

20   beyond this case when this case is done.

21             THE COURT:  Well, does anybody at BOP know what

22   Mr. Jemison's status is?  Do any of your BOP colleagues know

23   what Mr. Jemison's status is?

24             MR. NAHMIAS:  In terms of getting here?

25             THE COURT:  Yes.

1    MR. NAHMIAS:  I am the one who spoke to him and

2  directed him to come down, and that was at 8:27 or so.  So

3  I'm not sure when he will arrive, but he was directed in no

4  uncertain terms to stop what he was doing and get here.

5    THE COURT:  Do you think that happened?

6    MR. NAHMIAS:  I am not --

7    THE COURT:  I mean, I am convinced that you

8  communicated that to him.  The question is whether or not he

9  would follow that communication.

10    MR. NAHMIAS:  I'm very happy to go check.

11    THE COURT:  If you would.

12    MR. NAHMIAS:  Okay.

13    MR. McBURNEY:  Judge, I do have a collection of

14  cases on spoliation, if you want me to give them to

15  Ms. Birnbaum?

16    THE COURT:  I guess while we are waiting for

17  Mr. Jemison to come, let's do that.

18    I'm sorry, is he here?

19    MR. NAHMIAS:  No, sir.  I'm just listening to

20  what's happening in court while --

21    THE COURT:  Let me make a further record here.

22    I understand -- when were these kites seized?

23    MR. McBURNEY:  I talked with Mr. Samuel about that

24  this morning.  Our best recollection is January, February of

25  this year.  That's when there was these series of events that

1  ultimately led to a hearing before Your Honor about jail

2  conditions and the defendant's issues there.  It was in that

3  time frame.

4         And in speaking with Mr. Johnson this morning, as

5  we tried to refresh our recollection, he agreed that we had

6  been having every other week a conversation about, okay, why

7  was this taken from the defendant, and I was given the

8  explanation.  And it was in one of those conversations that

9  the day before.

10        So I had been told by Mr. Samuel, Okay, a few days

11 ago this event happened, kites were seized.  I asked that

12 they be maintained.  Could you make the same request?  Which

13 I did.

14        Neither Mr. Samuel nor I were able to pin it down

15 to a specific date.

16        I think that was, what, January, February of this

17 year?

18        MR. SAMUEL:  I know it happened the day of a CIPA

19 hearing.  Because we were here -- Mr. Nahmias, Mr. McBurney

20 and I were here I'm thinking January or February.

21        Mr. McBurney is right, it was during all the

22 controversy, you intervened at that point and called the

23 prison.  That's when we started having the family contact

24 visits.

25        So my recollection is January, February.  If I

536

```
 1   looked at a docket sheet, I could pin it to a CIPA hearing.
 2   But --
 3             THE COURT:  Can you pull that up, Jessica?
 4             You know, the docket is actually a matter of public
 5   record --
 6             MR. SAMUEL:  It is.
 7             THE COURT:  -- to which you have access.
 8             MR. SAMUEL:  And I do have --
 9             THE COURT:  But we are a full-service Court, we
10   will get it to you here in a second.
11             While that's going on, let me ask you a couple more
12   questions, Mr. Samuel.
13             First, I don't recall ever being asked to maintain
14   this information, nor do I recall ever it being disclosed to
15   me that there was written material that you wanted me or that
16   you wanted any official action to be maintained.  Is that
17   correct?
18             MR. SAMUEL:  That's correct.
19             THE COURT:  Second, of course, this case has been
20   on a trial calendar since --
21             MR. SAMUEL:  December.
22             MR. McBURNEY:  It would be on the docket.
23             THE COURT:  Yes, I'm fairly familiar dealing with
24   it.  I'll have access to the docket here in a second.  We
25   actually have access, but there are a number of entries, as
```

1    you know.

2          But getting back to the subject.  So I do believe

3    we entered the scheduling order which set this case for

4    trial, and we did that in December.  And that since December,

5    this case has been set for trial -- actually it was set for

6    later in August and I moved it up when I saw that we could

7    make an adjustment to get it tried earlier.

8          Does everybody recall that?  Do you recall that,

9    Mr. Samuel?

10          MR. SAMUEL:  Absolutely.

11          MR. McBURNEY:  Yes, sir.

12          THE COURT:  And Mr. Ahmed was tried not until June;

13    is that right?

14          MR. SAMUEL:  June 1, as I recall.

15          THE COURT:  So from the time of this seizure, if it

16    occurred -- and I'm assuming that it did -- until Mr. Ahmed's

17    trial, there was no official request that was made by the

18    defendant or his counsel in this case for any official action

19    to be taken with respect to the preservation of this, nor was

20    a subpoena served.  Is that correct?

21          MR. SAMUEL:  Well, the word official -- for the

22    Court, absolutely that's correct.  I mean, when I talked to

23    Mr. McBurney, I don't know if that qualifies as official or

24    not, but I asked him to preserve it.  He said okay, as he

25    said.

So it was official in terms of my relationship with the government. But the Court has had no involvement whatsoever in this, to my knowledge.

THE COURT: Yeah, and similarly, you elected not to take any action to make the production of those materials compulsory?

MR. SAMUEL: I think that's correct.

THE COURT: And that that -- and you recognize that compulsory production requires a subpoena, and that's why you served the subpoena a couple of days ago?

MR. SAMUEL: Yesterday.

THE COURT: Yesterday?

MR. SAMUEL: Well, this is *Jencks* material. I mean, in essence it became *Jencks* material when the government through the BOP took possession of it, of a written statement of a witness.

THE COURT: Yeah, but *Jencks* material usually is material that the defendant doesn't have and you ask to be delivered.

MR. SAMUEL: Well, that's right, we don't have it.

THE COURT: Well, the defendant has had it and he's read it.

MR. SAMUEL: He had it and it was seized from him.

When somebody gives me a transcript of a witness

1    and then they seize it, I'm not sure that you could say that

2    I have it.  They have it.

3          And it's not my obligation repeatedly to seek Court

4    compulsion to produce *Jencks* material or what might even be

5    *Brady* material.

6          But as the Court knows, the government and the

7    defense are in routine communication with each other about

8    preservation of evidence and about discovery matters.  And as

9    long as things are going along as it appears to be fine,

10   there is no reason to get the Court involved.  Every time we

11   ask for a piece of paper which they say fine, I wouldn't ask

12   the Court --

13         THE COURT:  I understand that.  But you waited

14   until yesterday to serve a subpoena.

15         MR. SAMUEL:  Well, we didn't know the witness was

16   going to testify until -- today is Thursday --

17         THE COURT:  How did that come about?  Was there a

18   kite from Mr. Sadequee to Mr. Ahmed about his testimony?

19         MR. SAMUEL:  Not that I know of.

20         THE COURT:  Was there any communication directly

21   between the defendant and Mr. Ahmed about the testimony?

22   Don't answer that unless you know the answer.

23         MR. SAMUEL:  Don't answer if I don't know the

24   answer?

25         THE COURT:  No, don't answer it unless you --

          MR. SAMUEL:  My answer is I don't know.  But I
don't have any -- I don't believe the two of them have any
ability to talk to each other in the prison, zero.

          THE COURT:  Well, that's apparently not the case.

          MR. SAMUEL:  Well, talk to each other.

          And I don't know of any recent kites or anything
like that that would -- I don't know.  I know that I talked
to Mr. Martin, that's who I communicate with, Jack Martin,
and I learned --

          THE COURT:  Look, I know how you communicate, and I
know when somebody is represented that you only talk to their
lawyers.  I was wondering whether there was any direct
communication.

          MR. SAMUEL:  I had no earlier knowledge from the
Court nor the government that he was going to testify.  And
as soon as it became clear he was going to testify, the issue
of the kites became ripe.

          And I told the government Tuesday, literally,
I mean, he was -- Mr. Haris announced his intention to
testify Tuesday at noon, and Tuesday sometime around 4:00,
you know, I said we need to get those kites, and they said
they would get on it right away, which I understand they
did.

          THE COURT:  All right.  What's the status of
Mr. Jemison?

1          MR. NAHMIAS:  He left the institution probably

2     twelve minutes ago now.

3          THE COURT:  Why did it take him so long to leave?

4          MR. NAHMIAS:  I don't know.  And he may well have

5     been in a block and has to give up his gear and stuff, going

6     in and out.

7          But in any event, I was told when I walked back in

8     he had left two minutes before.

9          THE COURT:  Let's get -- what's the government's

10    position on the record as it's been developed here and what

11    the Court's response should be, assuming that Mr. Jemison

12    confirms that the kites don't exist?

13         MR. McBURNEY:  Judge, one, I think that

14    cross-examination can proceed at pace.

15         I think that the Court has made a very clear -- has

16    attempted to make a clear record of what the defendant

17    contests this, these lost kites would enable him to do.  It's

18    not clear that he's demonstrated that they have any apparent

19    material exculpatory value.

20         The topics that he described, some of which I'm not

21    sure are relevant because it sounds like views that Ahmed

22    developed postarrest, which I don't think that bears in any

23    way on the case, but it may well be that through his

24    cross-examination the defendant could make one or more of

25    those topics relevant.

1          It's not clear for the second prong for spoliation

2    that the defendant would be unable to get the answers he

3    seeks.

4          THE COURT:  Tell me, remind me what the two prongs

5    are.

6          MR. McBURNEY:  There needs to be a showing -- and

7    this is -- you have cases in front of you, but for the

8    record, the --

9          THE COURT:  Well, I know, but I --

10         MR. McBURNEY:  No, I want to get the cases on the

11   record.

12         THE COURT:  I've only had them five minutes, during

13   which time I have been talking to you all.

14         MR. McBURNEY:  I meant only that I'm going to cite

15   the cases in the record even though you have them in front of

16   you.

17         Two cases, *California v. Trombetta,* 467 U.S. 479, a

18   Supreme Court case from 1984; and *Illinois v. Fisher,*

19   540 U.S. 544, a 2004 Supreme Court case.

20         There needs to be a showing that this information,

21   assuming it's lost to the defendant, had an apparent material

22   exculpatory value.  I don't know that he's made that

23   showing.

24         But he also needs to show that he is unable in any

25   way to obtain comparable evidence.  And we simply don't know

that answer yet.

The defendant has in mind the questions he wants to ask Syed Haris Ahmed. I sense from the direct examination that Mr. Ahmed is eager to answer the defendant's questions that might cast this alleged conspiracy in a less sinister light.

We can't know until the questions are asked. He may say, Of course I remember that discussion we had, and I believe that guy was a plant. Or I never thought LeT was serious. Here is why I lied to the government.

It's only if the defendant can demonstrate he can't get those answers he was hoping to get that then we move to the third prong, which is bad faith on the part of the government.

If they were destroyed, we have at best negligence. If Lieutenant Jemison comes in and says, Oh, you know, I recognize that under regulations I was supposed to keep this, but I was lazy, or we don't do this. I'm not putting words in his mouth, I'm not imputing any bad conduct on his part.

But if it's shown that he should have maintained them and he accidentally destroyed them or he just didn't follow rules, that's not the bad faith showing.

There has been no evidence that I intentionally ignored Mr. Samuel's request. Mr. Johnson has related to

me -- and we can make the record, if we need to -- that he
instructed people after he got my request not to destroy
things.

There is no evidence that there was a malicious
intentional destruction. There may have been negligence; it
wouldn't surprise me. It may not even rise to that level if
because of the way the time flowed and the events flowed
Jemison did what he did before I was able to talk to
Mr. Johnson and word goes out.

Now, there is the issue of Mr. Samuel that day
saying to Lieutenant Jemison, Hey, don't destroy those
things, then that may be negligence on Jemison's part. It's
not a directive from someone in the government, but I don't
want --

THE COURT: By the way, it's still not clear to me
what was seized that day. Was this a seizure just of these
kites, or was this a broader seizure of material?

MR. SAMUEL: My understanding of what happened was
that -- when I go to the visiting room, the prisoner is
brought up and ends up in a little holding room just before
he comes in the attorney room or the visitation room. In
that little holding room he is searched. He's searched
coming in. He's searched going out.

It was in that room, because I could hear the
commotion. So it wasn't downstairs, it wasn't earlier in the

day, it was right outside the door where I first encounter --
when the prisoner is brought up to me.

And right when they came through the door,
Mr. Sadequee was very upset, he came right over to me and he
started saying, They have taken my stuff, they have taken my
stuff.  Whatever the words were.

There was the type of controversy that I don't
think is very helpful in a prison setting, so I tried to calm
everybody down, and I said to Mr. Jemison, Just whatever it
was you took, keep it; okay?  If you feel the necessity of
taking it, I'm not going to have an argument or fight with
you here in the prison, just keep it.

And he said, you know, something along the lines,
he said, Yes, okay, or -- he's not very communicative with me
all the time -- ever.

And that was kind of it.  And then Mr. Sadequee and
I have a private conversation in the attorney room where he
described it to me and talked to me about everything.

When we left, I reminded Mr. Jemison.  Because he
came back up, back into the little private room they go, and
I reminded him, Whatever it was you took, keep
it.  I understand that you don't think Mr. Sadequee is
entitled to have it.  Whether you are right or wrong, keep
it.  And then away they go.

We end up here in court a few days later, and

1    I told Mr. McBurney about this.

2          And can I add something to an answer from a little

3    while ago?

4          THE COURT:  Okay.

5          MR. SAMUEL:  I think we actually did discuss this

6    with the Court, not in the context of kites or

7    communications, because it was during the same time frame

8    that all of his legal materials were seized as a result of an

9    infraction I think with the telephones.  And it was --

10         THE COURT:  That was from his cell, as I recall.

11         MR. McBURNEY:  Yes.

12         MR. SAMUEL:  That is right.

13         MR. McBURNEY:  Different seizure.

14         MR. SAMUEL:  Different seizure.

15         THE COURT:  Now, I remember that.

16         MR. SAMUEL:  But I think when I said, We want all

17   of this returned -- well, what the record says is what the

18   record says.  There will be a transcript of that.

19         I did not specifically identify kites at that

20   point, but we did view all of this as being kind of part of

21   the legal materials, so to speak.  But what the transcript

22   shows is what the transcript shows about what I told you.

23         THE COURT:  Now that I have a clearer picture of

24   what actually happened and what was communicated to

25   Mr. Jemison, let's go on with the discussion of the law.

MR. McBURNEY:  All right.  The government's final perspective is this.  And I think the Court was exploring this with the defendant.

First, it would be better if these items were here.  I suspect that if any of these kites contained something particularly valuable in terms of the defendant's perspective on what would make a good cross-examination, it would have been articulated to the Court.

As you pointed out, these were things to which the defendant had access for quite some time.  And upon repeated questioning from the Court, the few topics he has identified, one, he can still explore with Ahmed, but, two, none is of that burning materiality that typically gets this type of matter into an appellate issue.

We haven't heard anything about, Well, that's when Syed Haris Ahmed said, It was all me, it wasn't you, Mr. Sadequee.  I suspect that that's the kind of thing that Mr. Sadequee would remember.

But that being said, it's the defendant's burden to demonstrate these three prongs.  I don't think that's happened.

But we remain, one, willing to have the defendant explore those areas and refer to the existence of these things with Syed Haris Ahmed if Syed Haris Ahmed in any way appears not to recall discussions, communications, et cetera,

or is giving an answer that the defendant believes conflicts
with his recollection.

And then, two, if necessary, we can revisit the
possibility of the government agreeing that such kites were
exchanged.  I don't want that to be in the defendant's
cross-examination.  I think we need to see where the
cross-examination goes.

But I have laid out the three factors.  I don't
think the defendant has demonstrated any of the three.

And that's where we sit as we wait for
Lieutenant Jemison.

THE COURT:  Can you tell the jurors that I am still
having a discussion on an issue with the lawyers and if they
could please be patient with me?

THE COURT SECURITY OFFICER:  Yes, sir.

THE COURT:  Your response, if any, Mr. Samuel?

MR. SAMUEL:  No particular response.  I mean, the
case law is a little more subtle with respect to good faith,
bad faith.  But I think we would need to develop the facts
from Mr. Jemison.

THE COURT:  But you agree on those three principal
elements?

MR. SAMUEL:  *Trombetta, Youngblood,* those are
clearly the cases.  They tend to deal with evidence as
opposed to *Jencks* material.  I think the standards are

essentially the same.  And *Fisher* most recently.

*Fisher* of course deals with the intentional destruction of scientific reports, but that's because the defendant was a fugitive for ten years and the crime lab said, Well, you know, he's gone, so they destroyed it despite a court order.

All these cases are very fact-specific, you know.

THE COURT:  Well, I love sitting up here waiting until Mr. Jemison can come, but I know that if I sit here you won't talk amongst yourselves if you want to.

So what I am going to do is I'm going to retire, take a short recess.  As soon as Mr. Jemison is here, would you let me know?

(A recess is taken at 9:10 a.m.)

-- -- --

(In open court without a jury present at 9:35 a.m.:)

THE COURT:  All right.  Is Mr. Jemison finally with us?

MR. McBURNEY:  Yes, sir.

THE COURT:  Can I hear from him?

MR. McBURNEY:  Do you want him to come to the podium, as a witness with the defendant asking him questions? I'm not sure what --

THE COURT:  I think he needs to be a witness.

1    MR. McBURNEY:  Okay.

2        Your witness.

3                    --  --  --

4                    J. JEMISON

5    being first duly sworn by the Courtroom Deputy, testifies and

6                    says as follows:

7                    --  --  --

8                DIRECT EXAMINATION

9    BY MR. SADEQUEE:

10   Q.   Good morning.

11       THE COURT:  Would you please move up to the

12   microphone?

13   BY MR. SADEQUEE:

14   Q.   There has been a number of occasions where my legal work

15   has been seized.

16       THE COURT:  Mr. Sadequee, we are talking about a

17   single incident.  Focus on that incident.

18   BY MR. SADEQUEE:

19   Q.   During one of my visitations to my lawyer,

20   Mr. Don Samuel, was there one occasion in which you, as

21   always, go through my legal work and you took out kites?

22   A.   No.  The only thing that I ever took from you -- we

23   search your cell as you are coming out, we search your legal

24   material.  The only thing I took from you was a commissary

25   slip.

1    Q.    When was that?

2    A.    I don't have a specific date on that.  But the only

3    material that you are allowed to take down to the visiting

4    room is only your legal material that you are allowed to

5    take.  Everything else, you know that you leave it in your

6    cell.

7    Q.    So you never, ever seized any kites from my legal work?

8    A.    No.

9    Q.    Are commissary sheets contraband?

10   A.    It's not legal material.

11   Q.    But it is not contraband?

12   A.    No, it's not.

13   Q.    Did you ever -- were you ever confronted by my lawyer

14   once we -- during that occasion, on that specific incident,

15   when I had actually entered into the room --

16   A.    There has been many times you have told your

17   attorney that we have taken --

18        THE COURT:  Mr. Jemison, you need to let him finish

19   his question before you respond.

20        Are you done?

21   BY MR. SADEQUEE:

22   Q.    When I came into the room where my lawyer was waiting

23   for me, I told him that you had taken items from my legal

24   work, which was present within my legal work.

25        And you mentioned to them, That's contraband, you cannot

 1  have that.  Do you recall that?

 2  A.   The specific date you are talking about, no.  But there

 3  has been a number of times you have told your attorney that

 4  we have taken items from you and I have never --

 5  Q.   I'm not referring to --

 6       THE COURT:  Mr. Sadequee, you need to let him

 7  complete his answer.

 8  A.   There has been a number of times that you have told your

 9  attorney that I have taken items from you that we didn't.

10      Now, we shake you down as you are coming out of your

11  cell, and any items that you can't take, you know that

12  I allow you to leave it back in your cell.

13      As far as kites, no.  And if there were any kites, they

14  would be turned in.

15      But on no occasion did we receive any kites from you.

16  Q.   A number of things.  You mentioned just now that there

17  has been a number of occasions in which I said that you have

18  seized from me things which in fact you claim were not seized

19  from me.  Can you give an example of that?

20  A.   You --

21  Q.   When did I accuse you --

22  A.   When did you accuse me of taking something?

23  Q.   -- of seizing items from me which you --

24  A.   Your kufi and --

25  Q.   You did not seize that from me?

A.    No.

Q.    Was that in my possession?

A.    I was not the lieutenant that took it from you, no.

Q.    But the SHU lieutenant, whoever it was, perhaps not you
as an individual, but someone had seized from me which you
then later returned; correct?

A.    At no time did I even know that you were missing your
kufi until your attorney in your cell said something to me.

      I in turn checked your property, and when I seen that it
was in your property, I returned it right back to you.

Q.    So just to clarify this accusation that I accused the
prison of having seized things from me which in fact Mr. --
Lieutenant Jemison is claiming that was never seized from me,
has there been occasions where everything that I had in my
room, in my cell was seized from me, including my legal
work?

A.    There has been times when, on two occasions that I
remember, when you were on a hunger strike, policy states
that all items are removed from the cell.  So all your items
were removed from the cell because you were on a hunger
strike.

      The other time was when you received an incident report
for trying to barricade yourself in your cell and refusing to
submit to restraints.

      And once that incident was resolved, your items that you

1    were approved to have were returned back to you.

2    Q.    During the incident about the hunger strike, my legal

3    work, all of my legal materials were also seized; correct?

4    A.    All I know is that you told your unit team that you had

5    some items that you wanted returned back to you.  Because if

6    you recall, you did not go on a hunger strike on my shift.

7         You say that the items were taken from you.  With

8    approval from your unit team you were returned all your items

9    that you claim were taken from you.

10        Also you received some books that you wanted from your

11   property also.

12   Q.    So to return back to accusations I had falsely accused

13   the SHU officers, the Special Housing Unit officers of

14   seizing the things which they did not seize, can you say --

15   mention anything else?

16   A.    As far as anything taken from you by anybody else,

17   I couldn't acknowledge for that.  But as far as me taking

18   anything from you, no.

19        And if my officers took anything from you, you would

20   have made it a point to let me know and you would have had it

21   more likely returned if you were authorized to have it.

22        At no time did you ever say that I took -- that my

23   officers took any items from you except whenever we had to

24   answer some questions for the Court.

25   Q.    Was there occasions where you mentioned in front of

other officers as well that I hide, quote-unquote, my kites

in my legal material?

A.    No.  I did tell them that you tried to sneak items.

And you are not the only inmate that does

that.  Everybody tries to hide whatever items they don't want

us to find in their legal material.  That's why the legal

material is searched prior to you going on any type of

attorney visits and when we do random shakedowns.  Yes, we do

search items.

But as far as specifically you, no.  Every inmate in

Special Housing, when they are required to be shaken down,

everything is looked into.

Q.    What items have I, as you claim, sneaked -- tried to

sneak through my legal work other than kites?

THE COURT:  Well, this is going a little far

afield.  I have tried to give you some latitude in this.  We

need to stick to your claim about the kites.

MR. SADEQUEE:  May I -- my attorney,

Mr. Don Samuel, was present at the time.  Could he state

on the record --

THE COURT:  If you want to call him as a witness,

you may do so.

MR. SADEQUEE:  Or if he can just -- if he can --

THE COURT:  I mean, he's an officer of the court,

he's made a representation to me, and I have heard his

1    representation.

2              MR. SADEQUEE:  Okay.  That will be all.

3              THE COURT:  Does the government want to follow up?

4              MR. McBURNEY:  Yes, sir.

5                        --   --   --

6                      CROSS-EXAMINATION

7    BY MR. McBURNEY:

8    Q.   Lieutenant Jemison, a kite is a note that makes its way

9    from one inmate in the SHU to another?

10   A.   Correct.

11   Q.   Typically transferred by an orderly or however it

12   happens?

13   A.   Yes.

14   Q.   I won't ask you if you know.  But they are not allowed,

15   having a kite, that's contraband?

16   A.   Correct.

17   Q.   Is it the case that any inmate in the SHU who has a

18   contact visit, a legal contact visit and wants to bring legal

19   materials with him, has those materials searched?

20   A.   Yes.

21   Q.   Not just Defendant Sadequee?

22   A.   Everybody.

23   Q.   Everybody.  Describe for the Court what it is you do

24   when you go through -- if I have a Redwell full of materials,

25   these are my legal materials, what is it you do to search

them?

A.   Basically I would take the -- the majority of the time
I'm the one that searched the Inmate Muwakil's property,
legal work.

Q.   Let me interrupt you for a second.  When you say
Inmate Muwakil, that's the same person as Defendant Sadequee;
yes?

A.   Yes.

Q.   He's known you to as Inmate Muwakil?

A.   Yes.

Q.   All right.  Please continue.

A.   We would go through the -- just go through the
paperwork.  We don't read the material, but any type of
nonlegal-looking items, such as a commissary form, magazines,
of those nature, are not allowed.  We allow them to take
their court transcripts and --

Q.   You do or do not allow them?

A.   We do.

Q.   Okay.  If you find something that is not in your opinion
legal paperwork, what do you do with it?

A.   I will get with his unit team and find out if it's
relevant to his trial.

Q.   Did you discuss the item?  If it's a case about the
music industry and copyright infringement and there happened
to be a magazine about that, you might let that go through?

1    A.    Correct.

2    Q.    Would kites ever be allowed to go through?

3    A.    No.

4    Q.    Now, importantly, where does this search of the legal

5    materials occur?

6    A.    Inside the Special Housing Unit.

7    Q.    Where is that --

8    A.    Right at his cell door.

9    Q.    At the cell door?

10   A.    At the cell door.

11   Q.    Where is that in relation to where Defendant Sadequee,

12   Inmate Muwakil, would meet with Mr. Samuel?

13   A.    Okay.  The Special Housing Unit is located on the second

14   floor, and the visitation area is located on the first

15   floor.

16        So we would have to either go down a flight of stairs or

17   take the elevator down to one story.

18   Q.    Is the lawyer meeting room within earshot -- in other

19   words, if you are in the lawyer meeting room, could you hear

20   what's going on if there is a search of an inmate up in the

21   SHU of his legal paperwork?

22   A.    No, sir.

23   Q.    Do you ever -- did you ever with Inmate Muwakil,

24   Defendant Sadequee, search his legal paperwork only when he

25   got to the visitation room?

1    A.    No.

2    Q.    It's your testimony that the only thing you recall ever,

3    personally recall, taking from the defendant's legal

4    paperwork is a commissary form?

5    A.    Correct.  He had some commissary forms.

6    Q.    No kites?

7    A.    No kites.

8    Q.    Do you recall at some point in calendar year 2009 being

9    instructed by Mr. Johnson -- he is a superior of yours in

10   some respect?

11   A.    Correct.

12   Q.    -- getting a directive from Mr. Johnson to maintain

13   anything that you might seize from Defendant Sadequee during

14   either one of these searches we just described or a shakedown

15   of his cell for whatever reason?

16   A.    Yes.

17   Q.    After you received that directive, did you seize any

18   kites?

19   A.    No.  No, sir.

20   Q.    At any point after you received that directive, did you

21   seize anything that you subsequently destroyed?

22   A.    No, sir.

23   Q.    So is it your testimony that you don't recall ever

24   taking one or more kites from Defendant Sadequee?

25   A.    That is correct.

1          MR. McBURNEY:  One second.

2          Thank you.

3          THE COURT:  All right.  Anything further from

4   Mr. Jemison?

5          MR. SADEQUEE:  No.

6          THE COURT:  All right.  If not, you may step down.

7   We appreciate your testimony.

8          All right.  Is there anything further the parties

9   want to say on this issue?

10         MR. McBURNEY:  I think the record now is complete.

11         THE COURT:  Mr. Sadequee, anything else you want to

12   say?

13         MR. SADEQUEE:  No.

14         THE COURT:  Based upon the information that's been

15   presented, including the testimony under oath of Mr. Jemison,

16   I apply the standards that are set forth in *California v.*

17   *Trombetta*, which is 467 U.S. 479, and the standard as set

18   forth in *Arizona v. Youngblood*, which is 488 U.S. 51.

19         As the parties have already agreed, in order to

20   show that the loss of evidence by the government constitutes

21   a denial of due process, the defendant must show that the

22   evidence was likely to contribute significantly to his

23   defense.  And that's the standard that's set forth in

24   *Trombetta*.

25         And *Trombetta* further explains to meet this

standard of constitutional materiality, evidence must possess

two characteristics.  It has to have an exculpatory value

that was apparent before the evidence was destroyed, and it

must be of such a nature that the defendant would be unable

to obtain comparable evidence by other reasonably available

means.

The loss of potentially useful evidence by the

government does not constitute a denial of due process unless

the defendant could show that the police acted in bad

faith.  That's the principle the Supreme Court announced in

*Arizona v. Youngblood*.

Applying the record to these three issues, you must

begin obviously with the fact that there was a

destruction.  There is now evidence that there was not a

destruction of kites.  The only evidence of an alleged

destruction of kites is that which was presented through the

representations made by Mr. Sadequee.

I note that there has been some confusion about

what happened on that day, including representation that was

made to the Court I know mistakingly -- and I understand

mistakingly -- by Mr. Samuel that the commotion that he heard

outside the lawyer meeting room he assumed, maybe because he

was told by Mr. Sadequee, related to then the withdrawal of

materials from Mr. Sadequee pursuant to this prelawyer

contact search.

1    It frankly does not make sense to me that he would

2 be searched right outside the meeting room.  It does make

3 sense to me, and I credit the testimony of Mr. Jemison, that

4 those searches occur outside the cell.  And there is nothing

5 to dispute that.

6    So I think that there is no showing that there was

7 a seizure or destruction of kites.

8    But assuming that there was, based upon what has

9 been presented to me last evening and this morning, I find

10 that the defendant has not shown that the material that he

11 claims is not available to him was material.

12    First, the evidence has to be evidence that's

13 likely to contribute significantly to his defense, requiring

14 that it be shown that it has exculpatory value that was

15 apparent before the evidence was destroyed, and that it was

16 of such a nature that the defendant would be unable to obtain

17 comparable evidence by other reasonably available means.

18    And then -- and I find based upon what he

19 recalls -- and I am assuming that he has recalled that

20 information that most sticks in his mind as valuable to him

21 in his view in the cross-examination of Mr. Ahmed -- is

22 inherently not material.

23    He has described three matters that he recalls

24 there being an exchange and specifically a receipt of a kite

25 from Mr. Ahmed.  None of them reach the level that they would

be significant to his defense.

First, he told us last night that there was some talk about LeT and that Mr. Ahmed said that it was one of the softer organizations, and that Mr. Ahmed may have said -- at least this is what the defendant claims -- that he thought by stating that they were supporting LeT in connection with this alleged conspiracy, that because that was a Pakistani government-countenanced organization, that law enforcement would be less upset if that's the organization that they were supporting.

Second, he said that there was a discussion and he claims a representation made about his concern that one or more -- his being Mr. Sadequee's concern that one or more of the people with whom they met in Canada may have been an informant.

What Mr. Sadequee recalls about what Mr. Ahmed said is that Mr. Ahmed was explaining why he believed none of them were informants and his position as to why they -- none of the people with whom they met were likely to be informants.

And then finally there was some philosophical discussion about the Free Masons about which Mr. Sadequee claims Mr. Ahmed stated that Mr. Ahmed had made some representations about his views and philosophy about the Free Masons and that he had read books about the Free Masons.

1          None of those matters have any exculpatory value,

2     and I'm not sure they have much probative value in the

3     case.

4          I secondly find that the second element is also not

5     met, that he does have the ability to obtain this evidence

6     simply by cross-examining Mr. Ahmed about it when he is

7     subject to cross-examination today.  I note that the only use

8     that Mr. Sadequee told me he wanted to make of these

9     materials was to, as he put it, refresh Mr. Ahmed's

10    recollection.

11         Finally, there has been no showing that any

12    official acted in bad faith.

13         And finding that none of the elements have been met

14    to show that there was a spoliation of evidence that deprived

15    the defendant of due process, I find that there was no

16    actionable spoliation.

17         Is there anything else from the parties?

18         MR. McBURNEY:  May we release the representatives

19    of the Bureau of Prisons?

20         THE COURT:  Yes.  I would encourage the

21    United States Attorney to have a follow-up with the Bureau of

22    Prisons when this case is over on matters such as this and

23    others that have been raised in this case.

24         MR. NAHMIAS:  I will, Your Honor.

25         THE COURT:  All right.  Is there anything else from

1    any of these BOP witnesses, Mr. Sadequee?

2              MR. SADEQUEE:  No.

3              THE COURT:  Then they are released.

4              Anything else we need to discuss before we bring

5    the jury back in?

6              MR. McBURNEY:  Nothing from the government.

7              THE COURT:  Mr. Sadequee, anything else from you

8    before we bring the jurors in?

9              MR. SADEQUEE:  No.

10             THE COURT:  Let's bring the jurors in, please.

11             (In open court with a jury present:)

12             THE COURT:  Good morning, ladies and gentlemen.

13             I could tell you that we got started later this

14   morning because I wanted you to enjoy your morning

15   refreshments.  The fact is -- and I at least have told you

16   this once before -- that this is a dynamic process.

17             One of my responsibilities is to make sure that

18   there is fairness in the process.  I needed some time to

19   think about a matter this morning and talk to the lawyers

20   about it.  The delay was entirely on my nickel, and it was

21   only because I thought I needed time to make the correct

22   ruling on a matter.  And I appreciate you being patient with

23   me.

24             So with that we are ready to proceed.  If you will

25   bring Mr. Ahmed in, please?

1          Good morning, Mr. Ahmed.  I want to remind you you

2    are still under oath.

3          THE WITNESS:  Okay.

4          THE COURT:  All right.  Mr. Sadequee?

5                    -- -- --

6                 SYED HARIS AHMED

7      being previously duly sworn by the Courtroom Deputy,

8           testifies and says further as follows:

9                    -- -- --

10                CROSS-EXAMINATION

11   BY MR. SADEQUEE:

12   Q.   Good morning.

13   A.   Good morning.

14   Q.   I would like to begin with Exhibit No. 168.

15        This statement that you signed was after which

16   interview, do you remember?   This was the 18th of March?

17   A.   Yes.

18   Q.   Is this the first interview or second?

19   A.   Not the first one.

20   Q.   It's not?

21   A.   Not the first one, no.

22   Q.   Here in the second sentence it's written, There have

23   been no threats or promises made to me.

24        When you signed this, you are saying that you agree

25   everything in here is true; right?

1    A.   I mean, I just signed it, yeah.

2    Q.   Is it true that no threats, the FBI made no threats or

3    no promises?

4    A.   Oh, I was going to sign anything they were going to put

5    in front of me.

6    Q.   No, I'm asking.  The question is did the FBI threaten

7    you with imprisonment or did they promise you that they would

8    not arrest you or anything of that nature?

9    A.   I mean, I was under the impression that I just had

10   cooperate with them at all cost.  I was under this

11   impression.

12   Q.   Throughout the interviews, is there places where the

13   agents told you, This is judgment day?

14   A.   Yeah, one of them said that actually.

15   Q.   And on the audios, that they bang the table, they shout

16   at you, and various other tactics?

17   A.   Yes, uh-huh.

18   Q.   But you are saying that no threats have been made to

19   you?   So I mean, is this not fully accurate, this one

20   example?

21   A.   Oh, yeah.

22   Q.   Is this sentence not accurate?

23   A.   Okay, yeah, they made threats, implied and sometimes

24   explicit threats like, you know, You would be in a six-by-six

25   cell or --

1  Q.   For the rest of your life?

2  A.   -- do you want to be arrested or do you want to have

3  handcuffs on you?

4      So there were implied and explicit threats that

5  I understood that if I don't cooperate or say everything or

6  say what they want me to say or what I think they want me to

7  say, I may be arrested.

8  Q.   Was there moments where you actually explicitly say to

9  the agents, My heart is pounding?

10  A.   Yes.

11  Q.   Have you been interviewed by law enforcement such as the

12  FBI before, or is this the first -- I mean, these interviews

13  were the first experience?

14  A.   Before that I had experience at the airport, but that's

15  the normal, whatever.

16  Q.   So this is the first time that you actually had been a

17  target of an investigation by the government?

18  A.   Yes.

19          THE COURT:  Mr. Ahmed, it's better if you say yes

20  or no so that the court reporter can get your responses

21  down.

22          THE WITNESS:  I said yes.

23  BY MR. SADEQUEE:

24  Q.   Did they make promises to you, like --

25  A.   Like not arrest me?

1  Q.   Yeah.

2  A.   Yeah.

3  Q.   So is this statement here, There have been no threats or

4  promises made to me, is it accurate?

5  A.   It's not accurate at all.

6  Q.   But you signed it?

7  A.   As I said, I was under the impression that I had to sign

8  basically, you know, just to get it over with, just to please

9  them.

10  Q.   Just some background.  You were born in Pakistan?

11  A.   Yes.

12  Q.   How many years did you live in Pakistan?

13  A.   Twelve, twelve years.

14  Q.   Twelve years.  So you were twelve years old when you

15  moved to the U.S.?

16  A.   Yes.

17  Q.   What grade were you in in Pakistan, like school work?

18  A.   I finished seventh I think when I came here.

19  Q.   So you were in middle school?

20  A.   Middle school, yes.

21  Q.   How many languages do you speak?

22  A.   Two.  English and Urdu.

23  Q.   Arabic?

24  A.   I mean, I can understand Arabic and read, but speaking

25  to me, like I'm not fluent in Arabic.

Q.   For example, if you read the Quran, do you need a
translation?

A.   Oh, if the Quran, I can understand what I'm reading.

Q.   So would you say sufficient Arabic?   You are not a
fluent speaker?

A.   I'm not a speaker, but -- I mean, to make sentences,
it's not easy for me.   But to understand or to read, I can
understand, yes.

Q.   You also mention in this Exhibit 168 that Shifa, which
is me, made arrangements online for me to meet Abu Umar who
I met with in front of the post office in Karachi.

     Can you explain that?

A.   It's not here.

Q.   You never had -- you are saying here that -- I will just
reread the sentence.

A.   I can see it now.   I can see it now.

Q.   It's the second sentence of the second paragraph.

A.   Actually at that time, I was, you know, trying to share
the blame with anyone I could.

Q.   When they approached you, the FBI, did they state to you
that you are not the target of their investigation, their
main interest?

A.   Yes.

Q.   Who was the main target of their investigation?

A.   They said that you, you were the main target of the

1  investigation.

2  Q.   So -- and they approached you to find out about me?

3  A.   Yes.

4  Q.   You mention on page two of this exhibit Dobbins Air

5  Base.  You mention right around the middle of the page,

6  I discussed attacking Dobbins Air Base -- Air Force Base.

7       Can you explain how you became -- where did you hear of

8  Dobbins Air Force Base?

9  A.   We were just --

10 Q.   What is Dobbins Air Force Base?

11 A.   It's an Air Force base in Cobb County, in Cobb County.

12 Q.   So how did you find out about this?

13 A.   We were just driving by.

14 Q.   Where were you driving?   I mean, en route to what?

15 Where were you going when you saw Dobbins Air Force Base?

16 Were you intending to go to Dobbins Air Force Base?

17 A.   No, no.  Just going across it.  I mean, it's on the

18 street, you can see it.

19 Q.   How often did you pass by Dobbins Air Force Base?

20 A.   I think often, because it was -- I used to work at a

21 place, and it was on the way to it.

22 Q.   So it's en route to your --

23 A.   My job.

24 Q.   -- your job?

25 A.   Yes.

```
 1   Q.    So basically every day or something?

 2   A.    Yeah.

 3   Q.    Did you -- so that's how you came to know --

 4   A.    I mean, I had known about it before that because I used

 5   to live close to that area before that.  But --

 6   Q.    What was discussed about attacking Dobbins Air Force

 7   Base?

 8   A.    It was just trying to provoke, you know, just

 9   conversation, I guess.

10   Q.    When was it discussed?   Where and when was it

11   discussed?

12   A.    Just as we were going, you know, in the car, I guess.  I

13   was driving across, saw the Dobbins Air Force Base, trying to

14   provoke --

15   Q.    What is the workplace that you are referring to?

16   A.    Oh, the workplace?

17   Q.    Yes.

18   A.    You mean the name of the workplace?

19   Q.    A separate question to the previous question,

20   yes.  What's the name of the workplace?

21   A.    Alanawar (sp.)*, it's a perfume shop.

22   Q.    Which you used to work at?

23   A.    I used to work at.

24   _____

25   * (sp.)  Indicates phonetic spelling.
```

Q.   And I used to also sometimes work at?

A.   You sometimes used to work at.

Q.   So sometimes -- well, how did we use to go to the workplace?

A.   A lot of times, if you used to come with me, I would drive you basically.

Q.   You would pick me up?

A.   I would pick you up from your home, yeah.

Q.   So we would be passing by this Air Force base?

A.   Yes.

Q.   So when was our discussion about this Air Force base?

A.   It wasn't a discussion.  I was just trying to get you to say something, provoke --

Q.   No, my question is to get a better understanding of what this word discuss means.

A.   Oh, there was --

Q.   Was it -- just say what was discussed?

A.   There was no discussion.  I mean, I just said like --

Q.   We should attack?

A.   Yeah, I mean, a discussion means two people talking together.  It was one way basically.

Q.   So was there a plan to attack Dobbins Air Force Base?

A.   No plan, no.  It was my statement which was not backed up with anything, so there was not a discussion.

Q.   Would you say that it was an utterance?

1   A.    Yeah, my utterance that we should attack or something.

2   Q.    How many sentences were spoken about Dobbins Air Force

3   Base, if you could say?

4   A.    I don't recall how many sentences or whatever.

5   Q.    Was it many sentences over a period of days, or was it

6   like literally a three-second sentence or something which has

7   absolutely no value or meaning whatsoever?   What is it -- is

8   it a plan?   Was it something that every time you were going

9   to Dobbins Air Force Base, you were studying and analyzing

10  it, or was it something --

11  A.    I mean, we were just going by and I just saw it and

12  I just said it.  It was like a passing thought you could say.

13  Q.    Is there any chats on the internet, through these

14  hundreds of pages of chats, about attacking any Air Force

15  base?

16  A.    Any Air Force base?   I have not come across any chat

17  that I -- in my trial, I went through the entire chats.

18  Q.    Do you recall any attacks of any military base?

19  A.    I don't recall at all.

20  Q.    How often do you go or -- so you came -- what year did

21  you come to the U.S.?

22  A.    '97.

23  Q.    1997?

24  A.    1997.

25  Q.    And since you came back, how many times did you return

1  to Pakistan or visit Pakistan?

2  A.   I think four times.  Four times.

3  Q.   So since 1997, between 1997 and 2005, which is the last

4  time you went --

5  A.   Yes.

6  Q.   -- which is the issue in this case --

7  A.   Yeah.

8  Q.   -- you went --

9  A.   Four times I think.

10  Q.   -- four times.  Prior to you going to Pakistan in summer

11  of 2005, what was the last time you went to Pakistan?

12  A.   2004.

13  Q.   The very year prior.  What season or what month?

14  A.   It was my summer break.

15  Q.   So you went summer break 2004, and then you went again

16  summer break in 2005?

17  A.   All of my four visits were in my summer break.

18  Q.   Okay.  When did I meet you?

19  A.   Late 2004.

20  Q.   So you went to Pakistan, where you are from, where you

21  lived the first twelve years of your life, before -- just a

22  couple months before you met me in the summer of 2004?

23  A.   I met you like maybe I think fall or late fall,

24  yeah.  So a few months before.

25  Q.   And did you know any of these online people who are

1  involved in our case other than your cousin?

2  A.    Zubair.

3  Q.    But he's not related to you?

4  A.    Oh, no.

5  Q.    But prior to these discussions and these plans,

6  so-called plans about going to Pakistan and the training

7  camp, you were going to Pakistan on a somewhat regular basis,

8  once a year or something like that; right?

9  A.    Yes.

10  Q.    Where did you stay when you used to go?

11  A.    My family.

12  Q.    Could you be -- family, as in?

13  A.    My aunts and uncles, and in 2004 my sister got married

14  over there, so I would sometimes stay with her.

15  Q.    When you went in 2005, where did you stay?  After these

16  conversations about trying to attend --

17  A.    Again sometimes my aunts and uncles and my sister.

18  Q.    So you didn't stay at a training camp?

19  A.    No.

20  Q.    Did you visit a training camp?

21  A.    No.

22  Q.    Did you try to find locations of training camps?

23  A.    Tried to find a location?

24  Q.    Of training camps?

25  A.    I mean, I stayed in Karachi the whole time, the city of

1    Karachi.

2    Q.    Karachi, is that where your family lives?

3    A.    Yes.

4    Q.    So your family, your cousins, your whole sort of tribe

5    is in Karachi?

6    A.    Yes.

7    Q.    So the very place where when you were going in the past

8    to Pakistan, the year prior, 2004, summer of 2004, you were

9    at the same place in the summer of 2005?

10   A.    Yes.  Actually less, because in the previous visit I

11   would go visit in the city Lahore.  But in 2005 I did not

12   even go there.

13   Q.    How long have you been practicing Islam, like praying,

14   more religious?

15   A.    It's a weird question.  I mean, you could say it's a

16   journey.  I mean, I cannot put a definite date to it.

17   Q.    So are you saying that it has been in stages?

18   A.    Yes.

19   Q.    Getting more and more devoted?

20   A.    Yeah.

21   Q.    So that's why you can't say exactly, okay.

22         But in 2004 that you went, did you already start keeping

23   a beard?

24   A.    Yes, I had.

25   Q.    No one amongst your family to be a practicing, you

1  know --

2  A.   Yes.

3  Q.   -- Muslim?

4      What did you do in 2004 prior to going -- not 2005,

5  2004 -- what did you do in Pakistan, briefly?

6  A.   My sister was getting married, so I was busy with her.

7  And then afterwards we would hang out with my cousins and

8  stuff like that.

9  Q.   How many cousins do you have?

10  A.   I mean, I would say --

11  Q.   From both sides of the family.

12  A.   Maybe a dozen like my age.  The ones above and below me

13  are too much to count.

14  Q.   So you are the same age with people you are saying --

15  A.   The ones I would hang out with.

16  Q.   About a dozen or so?

17  A.   About a dozen.

18  Q.   So you have got company?

19  A.   Yeah.

20  Q.   You mentioned your sister had a wedding.  Your sister

21  Marian was married in 2004?

22  A.   Yes.

23  Q.   So in 2005, did your sister have a child by then?

24  A.   Yes.  She had a month old maybe, a month old.

25  Q.   Did you want to meet your nephew?

A.   Of course, yeah.  I mean, I went -- one of my reasons

that I went was to see him -- or her, I should say.

Q.   How close are you to -- how many sisters do you have?

A.   I have three sisters.

Q.   Who are you closest with?

A.   The one who lives in Pakistan, she's the closest to me.

Q.   She's older than you?

A.   Older than me.

Q.   And your other sisters are --

A.   Younger than me.

Q.   You are the second in the family?

A.   I'm the second in the family.

Q.   Are your sisters also religiously practicing --

A.   Yes, they are.

Q.   When did you have an intention of studying Islam in an

Islamic -- a madrassa or Islamic -- when did you -- when did

you -- when did your interest begin in having some formal

education of Islam?

A.   I had -- I would say since as much as 2002 I began to

have an interest, but it was not immediate at that time.

I thought I would begin my studies after college or

something.  But I had in mind a plan that I am going to go

and study since 2002.

Q.   And when did you start after researching various Islamic

schools to study?

1   A.   Again, I don't know the full date, but around 2004 I got

2   a little bit more serious.  Because I remember I mailed --

3   e-mailed -- there is a school in India actually, I e-mailed

4   them about requirements for a visa and stuff, and it was

5   2004, Ramadan of 2004 actually, or it was Ramadan before

6   2004.  I mean, summer of 2004.

7   Q.   Now, prior to going to Pakistan in 2005, which is the

8   main issue here, did you send e-mails to Islamic schools?

9   A.   Yeah.

10  Q.   Which Islamic schools, if you remember?

11  A.   There were many ones.  I said there was one in India,

12  but that was a little bit I think early.

13       Before the trip in 2005, is that what you are asking

14  about?

15  Q.   Yes.

16  A.   Yes.  Before the 2005 trip, I sent e-mails to at least

17  I think two schools in Karachi that I recall.  And I asked my

18  cousin to find out about some other schools.  Not e-mailed,

19  I asked him to find out.

20  Q.   Your cousin being?

21  A.   My cousin's name is, sorry, Safiullah.  Should I spell

22  it for him?

23  Q.   And you are close to this cousin?

24  A.   Yes.

25  Q.   So you were doing online research about various Islamic

schools in Pakistan --

A.   Yes.

Q.   -- prior to going to Pakistan in 2005?

A.   Yes.

Q.   I mean, when you went to Pakistan, did you visit any of those Islamic schools?

A.   Yes.

Q.   Did you -- what happened?

A.   I mean, I inquired about their admission policies and how I could get -- or what would be needed or what would be best for me to do, talking to them.

Q.   Was this a number of Islamic schools, madrassas, a number of them?

A.   Yes.

Q.   Did you prior to 2005, in 2004 or so, did you go to Islamic schools, asking them for, you know, admissions information?

A.   I said prior to -- you mean the summer of 2004?

Q.   2004.

A.   I would go to the schools, but I was not serious about doing it at that time.  But I had intentions, so I was trying to --

Q.   What do you mean you used to go to these schools?

A.   Like, you know, when I would visit Pakistan, I would visit with my cousins just to pray or to -- just to listen to

1   the lectures, but not attend, like officially attend.

2   Q.  Because these Islamic schools and Islamic universities

3   and madrassas, these are also big mosques; right?

4   A.  Yes.  And I mean, they are open.  You don't have to be a

5   student to attend.  You could just sit and listen too.

6   Q.  Just so that we all understand, it's different from

7   universities or schools over here?

8   A.  Yes.

9   Q.  So you were attending these -- or you had attended these

10   even in 2004?

11   A.  Yeah.

12   Q.  So just to compare and contrast, you visited in 2004 and

13   2005, what -- it sounds as though you did the same things?

14   A.  Pretty much the same things, yeah.

15   Q.  With the exception of meeting Aabid Khan, Abu Umar?

16   A.  With the exception of meeting him?

17   Q.  In 2004 you did not meet Abu Umar?

18   A.  I did not meet him then.

19   Q.  Would it be accurate that your activities in Pakistan in

20   2004 were basically the same as in 2005 after these chats?

21   A.  Yes, yes.

22   Q.  And if there was something different, then what was it?

23   Or if there are some things that you did in 2005 in Pakistan

24   that you did not do in 2004 prior to these chats, prior to

25   meeting me, what would it be?

A.   The only thing would be that I seriously inquired about

admission into the schools.   In 2004 it was not as serious,

like immediate discussion.   In 2005 it was immediate:   Okay,

I want to join like next month, can I do it?

Q.   And also in relation to these chats, you met with

Aabid Khan, Abu Umar?

A.   Yes.

Q.   How many times did you meet with Abu Umar?

A.   One.

Q.   One meeting?

A.   Just one meeting, yeah.

Q.   How long was the duration of that meeting?

A.   The whole afternoon, I would say.

Q.   Now, we have in Islam, we have five prayers a day;

right?

A.   Uh-huh.

Q.   Sometimes we calculate the time by that; correct?

A.   Yes.

Q.   So between which prayers was this?

A.   Between lahor and maghrib, so that would be the

afternoon and evening, beginning of the evening prayer.

Q.   The sunset prayer?

A.   The sunset prayer, sorry, yeah.

Q.   Right after the sunset.   So that's when it ended?

A.   Yeah, we prayed and we departed.

1    Q.    So basically you departed at sunset?

2    A.    Yeah.

3    Q.    From the afternoon to sunset, okay.  So that's how many

4    hours?

5    A.    I think it's six hours.  Six.

6          And also I would say that the six hours, we took a bus

7    ride from his home to the park, which was an hour long.  So

8    the meeting itself was pretty short.

9    Q.    And did you guys eat?

10   A.    We ate, we ate at his house, then we took a bus ride

11   to --

12   Q.    Whose house?

13   A.    His house was --

14   Q.    Where did you meet?

15   A.    Like I went to see -- I went to see him close to his

16   house, then we ate, and then we took a bus ride to a park for

17   discussions and stuff.

18   Q.    This is in Karachi?

19   A.    This is in Karachi.

20   Q.    Which is where you live?

21   A.    Yes.

22   Q.    And where your family lives?

23   A.    Yes.

24   Q.    It's not -- so you didn't meet him somewhere other than

25   the location where you live?

1  A.   The whole visit I was in Karachi.

2  Q.   In your hometown?

3  A.   In my hometown.

4  Q.   So how long did you guys meet?

5  A.   I mean, it was a family like feast you could say,

6  because his uncle and outside family were there too.  So it

7  was a pretty decent feast.  So I would say forty-five minutes

8  we talked and stuff.

9  Q.   How many people were in that meal, feast, as you said?

10  A.   He, his cousins and uncle.  So I cannot recall the

11  number, but quite a bit.  I would say --

12  Q.   A big feast?

13  A.   I mean, it wasn't that big, but I would say ten people

14  maybe.

15  Q.   And you had -- who did you -- you were alone?

16  A.   No.  What do you mean, alone?

17  Q.   Was there anyone that you brought with you?

18  A.   Oh, I was alone, yeah.

19  Q.   And his uncles were present?

20  A.   I mean, he had cousins and one of his uncles who gave

21  that feast.  His house was --

22  Q.   And his cousins?

23  A.   Yes, his cousins.

24  Q.   Were his cousins also religious?

25  A.   Some of them were and some of them were not.

1   Q.   They had beards?

2   A.   Some had beards, some did not.

3   Q.   What was discussed during these meetings?

4   A.   Just normal talk.  I don't even recall what we talked

5   about, but, you know, just normal going on, how is America,

6   how is -- I think he's from U.K., Aabid Khan, and he had a

7   cousin from U.K. too.  So I think maybe it was in his honor

8   too.  So we just talked about normal, food and --

9   Q.   You said in his honor?

10  A.   Like, you know, an uncle --

11  Q.   A reception?

12  A.   Maybe like an uncle giving a party for his nephew who

13  was from the U.K., I guess.

14  Q.   Now, Aabid Khan is originally from where?

15  A.   He's Pashto.  I don't know where he was born, but he's

16  Pashto.  That's Pakistani-raised but --

17  Q.   Afghani, raised in Pakistan type of thing; right?

18  A.   Or maybe he was born in U.K.  I don't know where he was

19  born, but --

20  Q.   You have spoken with Abu Umar, haven't you?

21  A.   Yes.

22  Q.   What type of an accent does he have?

23  A.   I could not like pinpoint his accent, but -- he had an

24  accent, but I could not pinpoint whether it was Pashto

25  English -- Pashto English accent or --

Q.   I mean, is he like -- was it a full-fledged BBC British
accent?

A.   Oh, no.  Not that I know.

Q.   Pakistani accent?

A.   Yeah, English accent.

Q.   So you can assume someone speaking like that, he was
originally raised in Pakistan?

A.   Yeah.  I mean, since he was not from Karachi, so I could
not really say.  But yeah, you could say Pashto.

Q.   He was raised in Pakistan?

A.   Yeah, yeah.  I mean, he knew the environment.

Q.   The people.  And he has an accent, heavy accent?

A.   Yeah.

Q.   So when you met with Abu Umar, what else in relation to
this case --

A.   Uh-huh.

Q.    -- was discussed?

A.   Not much was discussed, because again he had his
cousins.  And even in the park, his cousins came with him.

     So I asked him how could I meet him basically at his
place in Peshawar or close to Peshawar.

Q.   You mentioned in the interviews with the FBI on March
15th that when you met Khan in Pakistan, he didn't meet your
expectations?

A.   I mean, well, you know, we met him with his cousins, and

the setting was like a family meeting.  So to me it didn't
seem like all the safest.

Q.   Are you saying that -- so we will come back to this.

     What else was discussed, case related, not, you know,
relatives?

A.   I asked again how I could come to see him in his
hometown.

Q.   What's his hometown again?

A.   Close to Peshawar, some city in --

Q.   That's Northwest --

A.   Northwest Province.

Q.   Which is Taliban territory?

A.   Yeah.

Q.   But that's something else.

     So you asked him how can you go to his -- meet him over
there?

A.   Yes.

Q.   And what else was discussed?   I mean, say what was
discussed.

A.   And then, you know, he told me about like how in
Northwest Province, you know, guns are so common.

Q.   Is this something that -- was this a secret that he was
sharing with you?

A.   He showed me a newspaper ad or something like that of
gun shops in Peshawar.

Q.   Were you unaware of that?

A.   Not really.  I mean, everyone knows at least that in Pakistan, the Northwest Province, guns are like open, like you could say like toys, you know.

Q.   So what else did he tell you?   What else was discussed?

A.   I mean, that's about all I can recall, how could I get to see him.  He told me to take a train and stuff like that.  And then we talked about like how the Northwest Province, it's easy access to guns, I guess.

Q.   And what was Aabid Khan doing in Pakistan other than meeting you?

A.   He told me he had to get married, that's why he came to, like --

Q.   Did he --

A.   He invited me to his marriage ceremony in his hometown.

Q.   Did you go?

A.   I did not go.

Q.   So you asked him about how can you meet him at his hometown, and he invites you to come to his marriage ceremony.  Which according to Islam, as you know, Prophet Muhammad said do not refuse the invitation of your brother, right, one of the Hadiths?

     And so you are interested, there is all these discussions, then you in fact in Pakistan mention to him that

1    you want to visit him or how can you visit him, you inquired

2    about that, and he invites you to his marriage ceremony.  And

3    you don't go?

4    A.   No, I didn't go.

5    Q.   Why?

6    A.   Well, I mean, when I talked to the scholars in the

7    schools that I went to, they seemed to imply that I should go

8    back and finish my studies.  And if I had to catch my studies

9    at Georgia Tech, I had to immediately leave.  My semester was

10   beginning August 18th, so I had to just leave immediately.

11   Q.   Did Abu Umar, did he ever tell you that he's a member of

12   LeT?

13   A.   No.

14   Q.   Did he ever tell you that he's fought with LeT?

15   A.   No.

16   Q.   Did he tell you that -- LeT or any other organization,

17   like Jaish-e-Mohammed or anything like that?

18   A.   No.

19   Q.   Did he tell you -- give you any addresses for any of

20   LeT's offices or camps?

21   A.   No.

22   Q.   Did he ever tell you that he's -- that he has attended

23   any of the camps?

24   A.   No.

25   Q.   So then what's the connection between him and LeT?

A.   Well, the point is in Northwest Province, those

organizations are well established.  And he being from there

and, you know, his hometown, so I thought that he could hook

me up with someone maybe.

Q.   So you go to Pakistan, there are all these conversations

about -- well, so you go to Pakistan, which you always go to

anyways; right?   But then Northwestern Province or

Waziristan, another place; right?  What are these?  It's part

of Pakistan; correct?

A.   Yeah, part of Pakistan.

Q.   Like a state, one of the 50 states, it's just a state

within Pakistan?

A.   Yes.

Q.   Is there American soldiers there blocking passage for

people to enter Northwestern Province or Waziristan?

A.   No.

Q.   Is there Pakistani soldiers blocking passage, check

points like the Israeli check points, like standing hours in

lines, is there anything like that?

A.   Not that I remember.  I mean, it's the same

country.  It's like -- I mean, there are no customs or

anything like that that I know of.

Q.   So what does it take to go to this Taliban-controlled

area?

A.   I mean --

Q.   Or influenced areas, not controlled.

A.   From Peshawar, Peshawar is the main city, you just take a bus in.  You just go.

Q.   How long of a ride is it from Karachi to Waziristan or the Northwestern Province?

A.   I do not know the exact time, but I would say --

Q.   Is it longer or shorter than our trip to Canada?

A.   I would say shorter than our trip to Canada.

Q.   Okay.  And so it would be --

A.   It would be much shorter.  Because Pakistan is really a small country compared to the U.S. and Canada.  Much shorter.

Q.   So what would prevent -- and you were raised in Pakistan?

A.   Yes.

Q.   So you know and you have got family and you speak the language of the people, you read the language of the people?

A.   Yes.

Q.   And you know how to drive?

A.   I mean, I have traveled alone in Pakistan from Karachi to Lahore before.

Q.   So could you have taken a bus ticket to these areas?

A.   Yes.

Q.   And if someone went to these -- if you went to these areas which are, you know, you hear controlled by the Taliban or heavily influenced by the Taliban and people are walking

1    with guns and there's insurgency going on within Pakistan,

2    how hard would it have been for you to contact these

3    Mujahideen people?

4    A.    Actually very easy.  Because again one of my cousins

5    lives in Lahore, he lives opposite to the headquarters of one

6    of the Islamic parties, and they send people to fight

7    regularly that I know of.  And I have been going there since

8    I was a kid, so I know all those people.

9    Q.    So these organizations such as LeT, Jaish-e-Mohammed and

10   other organizations -- who is the leader of LeT?

11   A.    Hafiz Saeed Mohammed.

12   Q.    And is he wanted by the Pakistani government?  What's

13   his status, do you know?

14   A.    I don't know about now, but --

15   Q.    When you met with Aabid in 2005?

16   A.    I mean, I don't know what was his legal status, but he

17   was open.

18   Q.    He was giving lectures?

19   A.    Yes, he was giving lectures.

20   Q.    He was not in prison; right?

21   A.    No, not that I know of.  I mean, what I know is that he

22   was giving lectures openly.

23   Q.    He was the leader of LeT?

24   A.    Yes.

25   Q.    So -- and are you aware of any public seminaries and

public conventions that LeT as an organization and other

organizations, these jihad organizations, they have public

conventions?

A.   Actually during the time of the feast that they had,

Ramadan fasting, LeT organizes a prayer in the stadium in

Lahore, they organize a prayer, public prayer in the stadium.

Q.   If someone wanted to really join LeT in Pakistani, not a

white convert let's say or something like that, if a

Pakistani wanted to join LeT, would he have any problems?

A.   Not at all.

Q.   What would prevent someone like yourself in these

circumstances that we mentioned, the ease of access for

someone who really wants to, what would prevent you from

joining?

A.   Either lack of intention or -- that's it basically, if

I don't want to join.

Q.   So what actually did happen in Pakistan after you did

go, which caused you to not do whatever it is that you said

in these chats that you would do?

A.   I mean, I talked to the scholars, they said that maybe

you should finish your studies before, and I said okay.

I mean, maybe I should think over what I am doing right now,

and I just went back.

Q.   Well, you said in this statement, One of my goals --

which is Exhibit 168:

```
 1              One of my goals was to become a martyr in the
 2           fight against India in Kashmir or wherever else the
 3           brothers needed me.
 4    A.   Uh-huh.
 5    Q.   So if this is one of your goals, I mean, once you do get
 6    to Pakistan, which is where you go nearly every year, right,
 7    what, suddenly you don't want to become a martyr?
 8    A.   Again, to be a martyr, it's like, no, maybe I will try
 9    some other time or, you know, it was -- it was just like
10    that.  Yes, I want to be a martyr, but maybe next year or
11    maybe -- it was just -- it was postponed I guess.  It was
12    not --
13    Q.   Did you change your mind?
14    A.   I mean, I still wanted to be -- to be of some service to
15    Islam, but I thought that maybe that is not the right way for
16    me right now.
17    Q.   But you inquired of Abu Umar about visiting Abu Umar?
18    A.   Yes.
19    Q.   Why did you not go visit Abu Umar?
20    A.   As I said, because all those scholars kept talking to
21    me, like to me it seemed that I would be doing a little bit
22    actual sinning by leaving, abandoning my parents at this
23    stage.  I'm the only son and I should take care of them in
24    their old age.
25         So I felt that, well, if I want to obey God, he had also
```

1  obligated to take care of your parents.  So I felt like half

2  and half.

3  Q.  Abu Umar invited you to his marriage ceremony as well;

4  right?

5  A.  Yeah, but I did not know the date of his marriage

6  ceremony, and I felt, you could say like a hypocrite, turning

7  back in a way, and I also had to join my college.  It was

8  just --

9  Q.  You say on page two of this Exhibit 168, page two, in

10  the beginning you say:

11          I mentioned that we should attack oil storage

12      facilities and refineries.

13      If you could read it?

14  A.  Yeah, I can read it.

15  Q.  Go ahead.

16  A.  Oh, read the sentence?

17  Q.  That sentence and the following sentence as well.

18  A.          At the mosque I mentioned we should attack oil

19      storage facilities and refineries.  I wanted to

20      attack these places because oil is being stolen

21      from the Muslims, and an attack would cause the

22      price of oil to increase and make more money for

23      the Muslims.

24  Q.  Okay.  This was written by the agent and you signed it;

25  right?

1    A.    Yes.

2    Q.    What's your view of the Saudi government or the Iraqi

3    government?

4    A.    Oh, I don't like them.

5    Q.    Do you consider them to be Muslims?

6    A.    The present Iraqian and Saudi governments?

7    Q.    Yes.

8    A.    Not really.

9    Q.    You consider them apostates?

10   A.    Yes.

11   Q.    There are groups -- what does takfir mean to you?

12   A.    Takfir means to consider someone or call someone an

13   apostate or a disbeliever.

14   Q.    Do you do takfir of the Saudi government and Iraqi

15   government?

16   A.    Yes.  Like not maybe every single person in it, but as a

17   general.

18   Q.    How do you explain that you are saying here, and make

19   more money for the Muslims, when the oil is not -- Muslims,

20   the populations there are Saudi families?

21   A.    It was just a dumb statement to make.

22   Q.    It's incoherent, is it not?

23   A.    It is.  I mean, I said that statement, to make more

24   money for the Muslims, just to make it more light, I guess.

25   Q.    Because those we consider Muslims or you consider

1   Muslims, are they making money off of the oil?

2   A.   Not really at all, not at all.

3   Q.   Is the Pakistani government a Muslim government?

4   A.   No.

5   Q.   Why?

6   A.   Because they do not obey, they are not judged by the law

7   of Allah.  They have man-made laws in their, you know,

8   democracies.  And they also participate in wars against

9   Muslims and they ally themselves with nonMuslims against

10  Muslims.  So they are apostates.

11  Q.   Such as America?

12  A.   Yes.

13  Q.   Now, LeT -- what's LeT's view of the Pakistani

14  government?

15          MR. McBURNEY:  Objection.  No foundation for this

16  question.

17          THE COURT:  Sustained.

18          THE WITNESS:  I cannot answer?

19  BY MR. SADEQUEE:

20  Q.   Would you join any organization which considers the

21  Pakistani government a Muslim legitimate government that must

22  be obeyed by all Muslims?

23          MR. McBURNEY:  Object insofar as this question is

24  his opinion today.  I haven't objected recently, but these

25  questions need to be directed to what Mr. Ahmed would have

1    done in 2005.

2            THE COURT:  Sustained.

3    BY MR. SADEQUEE:

4    Q.   In 2005, did you believe the Pakistani government to be

5    a Muslim government?

6    A.   No.

7    Q.   So you considered the Pakistani government a nonMuslim

8    hostile government?

9    A.   Yeah.

10   Q.   At that time in 2005, were you aware of the relationship

11   between Pakistan and LeT government -- I mean, the Pakistan

12   government and LeT?

13   A.   It was, well, assumed, I guess, I don't know, in

14   Pakistan that the Pakistani government was using these groups

15   such as LeT as a proxy army in Kashmir against India.

16        So it was -- I don't know how close they were, but it

17   was -- it seemed from the fact that even after they were

18   officially banned, their office was open like with an

19   advertisement out that the government was at a minimum

20   tolerating them or even encouraging them.

21   Q.   So did you ever read articles online prior to you going

22   to Pakistan of scholars whom you respect criticizing and

23   discouraging people from joining organizations which would

24   want Kashmir to join Pakistan -- for Kashmir to be

25   independent and then join Pakistan?

A.   I think, yeah, there was an article by Abu Qatada, the
ex-scholar Abu Qatadah al-Falistini.

Should I spell that for you?

There was an article titled "Advice to People Going to
Pakistan."  In it he mentioned that there is no need for
people to die for Kashmir to become part of a country that's
an apostate anyway.  They should try to have Kashmir as an
independent Muslim country.

So any group that tries to join Kashmir to Pakistan
would be wasting its resources and men, so they should
avoid -- and I don't know how much he emphasized that they
should avoid or just cut all relationships or just whatever,
but he mentioned that they should at a minimum avoid them.

Q.   Who is Abu Qatadah?

A.   He's a scholar in U.K., very well-known amongst the
jihadi circles.  I think he's in jail right now.  I think
he's in jail now.

Q.   So why did you -- how frequently did we discuss about
LeT prior to 2006 you going -- I mean, in 2005 you going
to --

A.   Uh-huh.

Q.   How frequently was LeT mentioned?

A.   LeT is not really looked that good in jihad -- okay, for
you, there is a realm of Islam, it's called Salafi Jihadi,
and Salafi-Jihadists do not consider LeT really that good of

1    a group because of their ties or apparent ties to the

2    Pakistani government.  So it's not looked good upon in our

3    circles.

4    Q.    There is e-mails -- where does LeT operate?

5    A.    Mostly in Kashmir.

6    Q.    Not the Northwestern Province; correct?

7    A.    Oh, no.

8    Q.    Is LeT fighting against the Pakistani government?

9    A.    No.  I mean, I don't know about now.  I have been cut

10   off from news for like three years, almost three years.  But

11   at that time they were not fighting the Pakistani government.

12   Q.    Are you aware of any groups -- could you name any groups

13   in Kashmir which is fighting for Kashmir to be a completely

14   independent country, not India, not Pakistan?

15   A.    I'm not exactly sure, but I think maybe --

16            THE WITNESS:  Should I answer for maybe or not, I

17   don't know?

18            MR. McBURNEY:  I'm going to object now based on

19   what little he said so far.  This isn't his area to be

20   discussing.

21            THE COURT:  You need to answer based upon what you

22   know.

23   A.    I'm not aware of a group that --

24   Q.    So you are not aware of any group which is fighting for

25   a completely independent Islamic state for Kashmir?

A.   No.  I mean, I know there are groups, but I don't know
the name of -- like I cannot pinpoint right now the name.  I
know there are groups, but --

Q.   I don't know of any, but -- I don't know.

A.   Maybe there isn't.

Q.   In 2004, when you and I met towards the end of 2004,
what was one of the first -- who is Abu Suffian?

A.   He's a person I met in summer of 2004 in Pakistan.

Q.   More than that, please?

A.   Well, he's a recruiter for LeT, and I saw him in a
mosque.

Q.   You just saw him, or was there any interaction?

A.   I mean, I met him maybe three, three times.

Q.   And what --

A.   He invited me to join the camp.

Q.   Did you?

A.   No.

Q.   So you were actually invited to join LeT in 2004?

A.   Yes.

Q.   And you did not?

A.   No.

Q.   When you went back in 2005, did you still remember the
mosque or wherever you met?

A.   I saw him, I waved to him.  I did not talk to him at
that time.  I waved to him, you know.

1    Q.   At 2005 you again met Abu Suffian?

2    A.   He prayed in the mosque that's close to my cousin's

3    home, so I would go there sometimes and, you know, I saw him

4    occasionally and waved.

5    Q.   So if you already know someone as of 2004, he told you

6    he's a recruiter for LeT?

7    A.   He was.  And he even took me to the area commander

8    I met, I talked to him.

9    Q.   Area commander?

10   A.   LeT works like a real organization, they have -- they

11   divide the area like cities into special sections, and each

12   area has a commander and, you know, a recruiter.  So he took

13   me to him actually in our second meeting.

14   Q.   What do you mean when you say that LeT is a real

15   organization?  You mean an open organization?

16   A.   Yeah.  I mean, until 2004 at least, I have seen their

17   offices with like a board on it.

18   Q.   LeT, welcome?

19   A.   Yeah.

20   Q.   So prior to meeting with Abu Umar, me, anyone, any of

21   these chats, you had already met LeT commanders?

22   A.   One of them, yeah.

23   Q.   Local commanders?

24   A.   I mean, he had been to Kashmir and he had fought in the

25   battle.

1   Q.   If we can go to -- okay, if we could discuss paintball,

2   playing paintball.  Was that -- when we played paintball --

3   how often have we played paintball?

4   A.   Me?

5   Q.   Yes.

6   A.   Just like with you, three times.

7   Q.   Never prior to that you played paintball?

8   A.   I never played paintball before that.

9   Q.   You mentioned that it was for training for jihad.  Now,

10  you study at Georgia Tech, you are fairly well informed about

11  the internet; right?

12  A.   Uh-huh.

13  Q.   You have been to various Islamic websites?

14  A.   Uh-huh.

15  Q.   Do you know *Al Battar, Al Battar Magazine*?

16  A.   It's a magazine, yes.

17  Q.   What is it?

18  A.   I think it was a magazine published by Al-Qaeda in the

19  country of Saudi Arabia.  It's a magazine, basically training

20  magazine a little bit, articles on that, on training, how to

21  train on your own or with people.

22  Q.   And how do you know about this magazine?  Have you seen

23  any of these articles?

24  A.   I have seen the articles, and it's well known on the

25  online community that *Al Battar* is a really useful magazine

for people who want to train without going to a training

camp.

Q.   So did you ever -- when we played paintball in the

woods, did you ever consult any of these training manuals?

A.   No.

Q.   But you were aware of them?

A.   Actually at that time, I could not understand anything

they said because I did not know Arabic at that time fully at

all.  So I did not, no.

Q.   I understand it though.

A.   Yeah.

Q.   I speak Arabic?

A.   You do.

Q.   How many languages to your knowledge do I speak?

A.   To my knowledge, you speak English, Bengali, and you

used to translate for Tibyan, so your Arabic was fluent too.

Q.   So did I bring *Al Battar Magazines*?

A.   No.

Q.   Did we discuss *Al Battar Magazines* or any other training

manuals --

A.   No.

Q.   -- during our paintball playing?

     Okay.  There is also training videos as well, right,

that Al-Qaeda and other organizations release --

A.   Yes.

```
1    Q.   -- that you have seen?

2    A.   That I know of off hand from Al-Tibyan.

3    Q.   Translation you don't need because you can see what they

4    are doing?

5    A.   Yes, uh-huh.

6    Q.   Did you consult any of those before --

7    A.   No.

8    Q.   -- paintballing in the woods?

9    A.   No.

10   Q.   So was it training, supposed training that you did in

11   the woods in Dawsonville, which is where you -- how far is

12   the area that we paintballed from where you lived?

13   A.   Ten minutes' or five minutes' drive.

14   Q.   What was the training supposed to be based on, I mean,

15   if you considered it --

16   A.   I said training, but -- okay, I have to explain a little

17   bit.

18        A lot of times my action may have more than one

19   intention.  Like I can have four or five intentions

20   combined.  And so training, you could say one of them would

21   be training for jihad, but there were other intentions too.

22   Q.   How would you -- how was your experience playing

23   paintball in the woods?

24   A.   It was not that successful, because one of the

25   participants like forgot his helmet.  So you could not really
```

do anything, we just -- because we were afraid of hitting

him.

So we were just, you know, trying to make the best out

of it with one guy without a helmet.  So it was pretty much

not that good.

Q.   Was it a fun time, that event?

A.   I mean, any time you're with friends is fun.  But trying

to play paintball without a helmet, as much fun as you can

get, I guess.

Q.   If we may go to Exhibit 157?

Could you read from the beginning of this private

message?

A.               Sounds like you got somewhat of a plan,

                 Al-HamduLillaah.  Once you get to the U.K., you can

                 contact lots of brothers.  But firstly, I suggest

                 you spend as much time as you can learning your

                 'Arabee, reading, and understanding, and

                 speaking.  I would suggest you do it as much as you

                 can, so that once you get to the U.K., you can

                 focus on important things, like studying with

                 Shaykh Aboo Qataadah, or Shaykh Aboo Baseer.

Q.   Do you know who these scholars are, these shaykhs?

A.   Yeah.  These are two scholars well known in the -- at

least in the jihadi community and even outside.  One of

them -- at least one of them is in jail.  The other one I'm

1 not sure of.

2 Q.   And you read Aboo Qataadah, this is the same Abu Qatadah

3 you mentioned earlier?

4 A.   Yes, he's the same Abu Qatadah who wrote an article

5 about "Advice to People Going to Pakistan."

6     Should I continue?

7 Q.   Yes, continue.

8 A.        Shaykh Aboo Qataadah has many students who

9            could help you find a way to fulfill the rest of

10           your obligations.  But if you don't know 'Arabee,

11           they might hesitate as to your trustworthiness,

12           et cetera, and might not open up to you

13           initially.  You have to prove to be a diligent

14           student, sincere, and upright.  And inshaa'Allaah,

15           the brothers might approach you on their own

16           initiative.  Don't get involved with those who yell

17           and shout.

18 Q.   Continue.

19 A.   Okay.

20           Shaykh Aboo Qataadah is a brilliant shaykh, he

21           is a library of knowledge, benefit from him as much

22           as you can.  But if the language is a barrier, then

23           some of his students are fluent in English, so keep

24           contact with them.

25           Remember, inshaa'Allaah, you are there

1          temporarily.  Do not say things to people who do

2          not need to know.  Do not waste time discussing

3          fantasies with other youth, that you want to do

4          this and that, and et cetera.  Speak less, and when

5          you speak, make sure you have thought out what you

6          are saying.  Speaking less will help you get less

7          attraction from those whose attraction you don't

8          need.

9               At the same time, when the brothers see you

10         are a person who only speaks wisely, and only good,

11         they will recognize this in you, inshaa'Allaah.

12         Mix in the right crowd, which you will find amongst

13         the students of Shaykh Aboo Qataadah.

14    Q.   Read the first paragraph?

15    A.        So keep in mind Habeebee.  You are a chemical

16         scientist here.  Your skills are needed,

17         bi'Ithnillaah.

18    Q.   You skipped.  The first paragraph?

19    A.   Oh, I'm sorry.

20              Also, being with an 'Arabee speaking

21         environment will make you improve your Arabic

22         900 percent faster.  So make your decisions wisely,

23         Akhee.  Again, don't mix with the English-speaking

24         "hyper" youth.

25              And a word of advice to you, Akhee.

1    Q.    Thank you.

2          You have had a lot of online chats with me.  And this is

3    a PM.  What's the difference between a PM and a chat?

4    A.    A PM is a private message, so it's like just to the

5    addressee.  No one else is supposed to read it other than to

6    whom it's addressed to.

7    Q.    And the chat?

8    A.    It's open, so you can expect that anyone who is in the

9    room can see it.

10   Q.    MSN chat, Microsoft Messenger chat?

11   A.    A MSN chat is again a private chat.  It's kind of like a

12   PM, but a PM is on a web forum, and an MSN chat is instant,

13   like interactive.

14   Q.    On a web forum, how can PMs be seen?

15   A.    Only a member who is signed up as a member can --

16   Q.    Do members know each other?   I mean, do members -- how

17   many members are there -- can there be on a forum?

18   A.    Oh, I don't think there is a limit to membership.

19   Q.    Thousands, hundreds?

20   A.    Yeah.

21   Q.    Hundreds of thousands?

22   A.    Yeah.  I mean, I don't think there is a limit to the

23   number of members.

24   Q.    What about on MSN, Microsoft?

25   A.    MSN probably has millions of members.

Q.   No, no.  On a -- on your MSN Messenger, how many members

do you -- how many --

A.   Contacts you mean?

Q.   Yes.

A.   People can have, you know, one or -- from one to

hundreds maybe, you know, contacts on their list.

Q.   How much did you have?

A.   I don't know the number, but probably fifty or sixty,

something like that.

Q.   And these are people who -- Microsoft Messenger chats,

such as the ones that are the majority of these chats, they

are very frequent, are they not?  The contact in the chats,

these are -- how did you add Abu Umar or Azdee or myself or

all these people onto your Microsoft Messenger chat?

A.   How did I add, like you mean how, the function?

Q.   Not the function, the buttons, but -- okay, the question

is like this.  How does this relationship begin?

A.   Oh, I saw you in person in the mosque.

Q.   Yes.

A.   Yes.

Q.   What about Azdee?

A.   You introduced me in one of the chats, Hey, here's a

brother.

     And it's so easy to add people to the chat, you know,

I might talk with one person in a chat room once, and I may

1  even add him and not talk to him again, but just --

2  Q.    Now, on Microsoft -- would this generalization be more

3  or less accurate:  Microsoft Messenger chats are more

4  personal in nature, are a more intimate nature, rather than a

5  PM, private message on the forum, such as this.

6        This is a PM from me to someone named Saajid.  Do you

7  know who Saajid is?

8  A.    I don't know Saajid.  I don't know Saajid.

9  Q.    Do you remember me mentioning anything about Saajid?

10  A.    I don't recall Saajid personally, no.

11  Q.    Have you ever had any conversations with someone named

12  online Saajid?

13  A.    I don't recall that name.

14  Q.    Now, there is a mention of English-speaking hyper

15  youth.  Who is being referred to or what category of people?

16  A.    There were many young people who would just talk a lot,

17  they would spend their time discussing just random, you know,

18  ideas and stuff.  Rather than spending time studying or being

19  serious, you know, they would just talk and just waste time

20  basically and not study.

21  Q.    Throughout your interviews, you mentioned on a number of

22  occasions a number of cases people say things, such as on

23  March 11th you said people say things but they don't do

24  it.  You mentioned it's all talk mostly.  You mention that

25  people get excited easily and make big plans, but there is

nothing really behind them.

        MR. McBURNEY:  I'm sorry, I can't tell -- if
Mr. Sadequee is quoting from interview transcripts of the
interviews of Syed Haris Ahmed, that's hearsay.  He needs to
ask the defendant a question, and perhaps he might impeach
him with something that was said in an interview, but not
quote back to him from -- I object to hearsay.

        THE COURT:  I think that's a fair objection.
Sustained.

BY MR. SADEQUEE:

Q.    If we may go to Exhibit 111, time 4:39:23.

        I think Exhibit 112.

        MR. McBURNEY:  That's 111.

        MR. SAMUEL:  Date?

        MR. SADEQUEE:  The 21st, April 21st, time 4:39.

        THE COURT:  Ms. Casperson, 4:39:23, please.

        MR. McBURNEY:  Page 15.

        MR. SADEQUEE:  Exhibit 112.

        MR. McBURNEY:  He called out the wrong exhibit
first.  We put up the one he's trying to get to.

BY MR. SADEQUEE:

Q.    If you could read from, yeah, where I say:  Also I was
thinking?

A.            Also I was thinking, we should be with LT, due
        to them -- is it cut off? -- due to them being same

1    'Aqeedah, and they fighting against Hindus, so the

2    Murtaddeen shouldn't bother us.

3  Q.   The word there -- you are in this conversation;

4  correct?

5  A.   Yes.

6  Q.   And you have gone over this entire conversation

7  before.

8    What's your understanding of -- because we see

9  continuously throughout this conversation, this phrase is

10  used "I'm thinking" or "I was thinking"; right?

11  A.   Uh-huh.

12  Q.   There is another place on 4:25:32, time 4:35:32, could

13  you read that?

14  A.          4:25:32:  LOL.  I was thinking of getting my

15    nose pierced and tattoos.

16  Q.   This phrase "I was thinking," how do you -- what is your

17  understanding of this phrase, I was thinking?

18  A.   It was just, you know, just random ideas -- either they

19  could be random ideas or thoughts that --

20  Q.   Would this be synonymous with "I was planning"?

21  A.   Not for me.  I mean, I would not consider "I'm thinking"

22  and "I'm planning" to be the same.

23  Q.   Could we go to page -- I mean, 4:48:12?

24    This is you.  Can you read that from there?

25  A.          And I hope and pray to Allah that Sheikh Shami

1           gives us some money.  LOLZ.

2    Q.   Continue.

3    A.   It ends there.

4    Q.   Continue until I tell you to stop.

5    A.           LOL.  Man, he could give us 10,000 if he

6           wanted.  LOL.

7                 LOLZ.  Not that may be, but some.  Aameen to

8           that.

9                 Yeah, like 5,000 each.

10                And there is some sign.

11                LOL.  Aameen.

12                LOLZ.  So shaykh, we were thinking of going

13          for some training.  Oh, son here have 10 thousand.

14          Halleluja.

15                LOLZ.  Shaykh its okay no.  No no it's okay.

16          Okay I offered, shayr.

17                LOL.

18                No, I will not say no.  I will say jazakallah

19          khair.  LOLZ.  Too poor to be polite.

20                Man, even though we are Pakis, we can't be too

21          "kind" for this.

22                Maybe "can I have some more" jazakallaah

23          khyran.

24                No, it's like "only 10,000?  Why you

25          conjused?"

```
 1    Q.    What does the word conjused mean?

 2    A.    It means stingy.

 3    Q.    What language?

 4    A.    In Urdu.

 5                   Heh.   Haha.

 6                   LOL.

 7                   LOLZ.

 8    Q.    So this whole -- what is this?   Who is Shaykh Shami?

 9    A.    He's a shaykh that --

10    Q.    Shami?

11    A.    Yes.

12    Q.    So who -- did you ever ask him for money, ten thousand

13    dollars?

14    A.    No.

15    Q.    Five thousand dollars?

16    A.    No.

17    Q.    What is this then?

18    A.    It was --

19    Q.    I mean, there is a Shaykh Shami?

20    A.    Yes.

21    Q.    That's not his real name, but you are talking about this

22    real person.  And this whole -- can you explain this?   What

23    just took place here?

24    A.    As you can see, there were so many LOLs, it means

25    laughing out loud.  It was just a skit I guess we did, just
```

1   having fun, of our fantasy of getting money.

2   Q.   Because we are all too poor to be polite?

3   A.   Yeah.

4   Q.   So this is a place where again this phrase is used:  We

5   were thinking of going for some training, oh son here have 10

6   thousand?

7   A.   Yes, that's part of the skit that we were doing.

8   Q.   And then hallelujah.

9        Does this reflect something as to what I was giving

10  advice to someone who is not on my private -- MSN Messenger,

11  Saajid, when I told him, quote:  Don't mix with

12  English-speaking hyper youth?

13  A.   To me that would seem like that description, hyper

14  youth, English-speaking hyper youth.

15  Q.   Don't waste time discussing fantasies with other

16  youth?

17  A.   That was one of the fantasies, yeah, you could say.

18  Q.            Speak less, and when you speak, make sure you

19            thought out what you were saying.  Speaking less

20            will help you get less attraction from those whose

21            attraction you don't need.

22       This was advice I was giving to someone else.  Was

23  I following my advice?

24  A.   No, no.

25  Q.   If we may go to the time 4:30:31?

1          THE COURT:  Let me interrupt you for a second since

2    you are going to a new document.

3          We have been going a couple of hours.  Would you

4    like to conclude this cross-examination before we break,

5    or would you like to take a break now?  I'm asking the

6    jurors.

7          Does anybody need a break?  If you do, raise your

8    hand.

9          How much longer do you have?

10         MR. SADEQUEE:  Probably another half an hour,

11   I think.

12         THE COURT:  Why don't we take a short comfort

13   break.  Let's make it ten minutes, and then we will come back

14   and conclude the examination.  Of course, don't discuss the

15   case amongst yourselves.

16         (In open court without a jury present:)

17         THE COURT:  Mr. Ahmed, you may step down.

18         All right.  Anything we need to discuss while we

19   are on the break?

20         MR. McBURNEY:  No, sir.

21         MR. SADEQUEE:  No, sir.

22         THE COURT:  All right.  We will be in recess for

23   ten minutes.

24         (A recess is taken at 11:32 a.m.)

25                          --  --  --

 1              (In open court without a jury present at

 2     11:47 a.m.:)

 3              THE COURT:  All right.  Anything else we need to

 4     discuss before we bring the jurors back in?

 5              MR. McBURNEY:  No, sir.

 6              MR. SADEQUEE:  No.

 7              THE COURT:  Can we bring them back in, please?

 8              (In open court with a jury present:)

 9              THE COURT:  All right.  Let's continue, please.

10     BY MR. SADEQUEE:

11     Q.   If we may get from the chats time 4:30:31?

12              THE COURT:  From what exhibit?

13              MR. SADEQUEE:  I believe it's 112, I believe.

14              MR. McBURNEY:  Time?

15              MR. SADEQUEE:  4:30:31.

16     BY MR. SADEQUEE:

17     Q.   If you could read from there?

18     A.   4:30:31:

19              But al-HamduLillaah, looks like things are

20          set.

21              Don't worry we have practically 3 places to

22          stay at least.

23     Q.   Who is saying this?

24     A.   It says that Abe Umar is saying that.

25     Q.   Continue.

A.    Should I mention the one saying it every time?

Q.    Yes, that would be preferable.  You don't have to

mention the full name, but if you'd say it's me or Abu Umar.

You don't have to mention that Aboo Khubayb al-Muwahhid said

that.

A.            You said:  What about about Azd and James?

              Abu Umar said:  All with many rooms.

              You said:  LOL.

              And Abu Umar said:  That's sorted.

              Then Abu Umar said:  We have a whole house in

         a village to ourselves, insha'Allah.  It was my

         mothers uncles.

Q.    If we could go with 4:58:51?

              MR. McBURNEY:  Page 25.

BY MR. SADEQUEE:

Q.    Can you read from there?

A.            You said:  Paste here what you are writing to

         him.

              And then I write:  The trip to TO has been

         postponed by me and Abu Umar and instead we are

         going to spend that time and money getting some

         experience in cooking in the Curry Place restaurant

         and also trying to find accommodation for you and

         James until you come to the Curry Place

         restaurant.

1                   And you said:  Haven't sent it yet.

2                   And then Abu Umar says:  Put re-arranged

3              instead of post-poned.

4                   I said:  K.

5                   Then you said:  LOL.  "The Magic of Words."

6                   Then I write:  The trip to TO has been

7              re-arranged by me and Abu Umar and instead we are

8              going to spend that time and money getting some

9              experience in cooking in the Curry Place restaurant

10             and also trying to find accommodation for you and

11             James until you come to the Curry Place

12             restaurant.

13                  Then Abu Umar says:  Na'am, meaning yes.

14                  Then Abu Umar continues:  Indeed a single word

15             can make the difference and put --

16                  Then I chime in:  In the meantime you can look

17             for the apartments and we will send the money for

18             you guys.

19                  Then Abu Umar continues:  "Clearing and

20             finalising" instead of "trying to find."

21   Q.   If you could comment on this, how Abu Umar says:  Put

22   re-arranged instead of post-poned, and put "clearing and

23   finalizing" instead of "trying to find"?

24                  MR. McBURNEY:  Objection.  He asked him to

25   comment.  It is not a question.

1    THE COURT:  Sustained.

2  BY MR. SADEQUEE:

3  Q.   Does Abu Umar in this, and elsewhere, is there -- have

4  you found a tendency to try to seem -- when he's saying:  Put

5  "clearly and finalising" instead of "trying to find," does it

6  sound as if he's trying to seem as though he's more than he

7  is?

8  A.   You mean to impress?

9  Q.   Yeah, okay.

10  A.   Yeah.  I mean, me and him are trying to impress other

11  people.

12  Q.   And when he says, A single word can make the difference,

13  because there is this image of Abu Umar amongst -- in the

14  other excerpt, which was 4:30:31, he said that there is a

15  whole village with a house to ourselves?

16  A.   Yeah.

17  Q.   And here it's being mentioned that you said "trying to

18  find," he's telling you, no, write "clearing and

19  finalising."

20      Are you left with the impression that when he said that

21  there is an entire village with a house for ourselves, that

22  that's maybe also another trying to sound bigger than he is

23  or --

24  A.   Yeah, I mean, he said that he has a village -- he

25  controlled, you know, a large, a fairly large village maybe,

but he did not have final housing arrangement for -- even for

me, you know.

Q.   Are you aware when you were in Pakistan of Abu Umar's

trying to arrange for you for your housing over there?

A.   He did not have a house ready for me.  He said, When you

come, just call me, and I will try to -- try to hook you up.

Q.   So to what you just said, he said that when you come

to --

A.   To Peshawar.

Q.   -- to Peshawar --

A.   To call him.

Q.   -- to give him a call?

A.   Yes.

Q.   And then he would what?

A.   Then he would come pick me up from his village in

Peshawar, pick me up, and then we will see where to put you,

to --

Q.   So in the meeting that you did have with him, there was

no mention of -- I mean, there was no -- he did not give you

any addresses or any training camps or offices of these

organizations?

A.   No.

Q.   If we can go to Exhibit 105, 7:29:22?  Could you read

from that?

          MR. McBURNEY:  You don't have page numbers?

1          MR. SADEQUEE:  No.

2          MR. McBURNEY:  7:29:02?

3          MR. SADEQUEE:  No, 7:29:22.  7:29:22.

4          MR. McBURNEY:  Page 39.

5   A.   Read?

6   Q.   Yes, if you could?

7   A.   I think it's James, he said:

8               This basement is amazing, location . . .

9          everything.  It won't wait.  If you are coming mid

10         end of my, then just forget it.  Why come at all?

11         You stay in U.S.  Abu Umar stay in U.K.  We'll

12         chill here.

13      And Abu Umar sends a smiley face.

14      I think that's Azdee.

15  Q.   What's this referring to?

16  A.   Basement?

17  Q.   Yeah, this excerpt, the basement and the comments by

18  James.

19  A.   They were trying to arrange a little, a small apartment

20  or basement for us to come and stay with them.  But when we

21  said that we might not come or we might postpone, he at

22  least -- or both of them, he and Azdee, got really angry at

23  that.

24  Q.   There is a point in time prior to you leaving Pakistan

25  where -- what was my opinion about you going to Pakistan?

A.   Actually you wanted me to go to Canada with them and not
to Pakistan.

Q.   So this is a big -- I will refer you to some other
places in the chats to volcano.  Can you go into the details
of exactly what this --

A.   Volcano?

Q.   -- yeah, was?

A.   I mean, it was definitely Azdee, not as much James, but
Azdee got really angry when I told him that, you know, the
trip to Toronto that we were -- the second trip to Toronto
that we were planning to stay with them was basically not
going to happen.  That's considered as backing out on our
part.

     But I just never had told him that I wanted to go and
live in a basement with them.

Q.   What was my opinion on that?

A.   You said that we should be together, you know, with
friends, no matter what.

     I was like, I mean, I just don't want to work and --

Q.   Did you ever mention something --

     THE COURT:  You need to let him finish his answer.
You interpreted him, so please let him do that.

A.   I mean, I was just of the opinion that I don't want to
go.  So this was you could say a cause of clash between us.

     So Azdee was fuming like a volcano.  He was called like

1   the volcano, he was fuming with anger.

2   Q.   Now, who made the decision to cancel going to Toronto?

3   A.   Well, the thing is I had always like never really agreed

4   with my heart to go to Toronto the second time because I just

5   did not consider it viable to live in a basement and, you

6   know, work or whatever.

7        But since all of you guys agreed to go to Toronto, I was

8   luke warm and agreed.  But then I tried -- I was trying to

9   somehow force my plan into it.

10       So it was -- I was trying to do it.  I don't know whose

11  decision it was like officially, but that was my goal, to

12  postponed the trip to Toronto.

13  Q.   Prior to you going to Toronto, how was -- I mean, prior

14  to you leaving for Pakistan, sorry, how was our relationship,

15  you and I, that is?

16  A.   Well, there were some stages -- do you want me to

17  like -- it was close, and then close to the end it got a

18  little schism because of Toronto.  But before that, it was

19  really close.

20  Q.   Did we use to have arguments prior to you going to

21  Pakistan?

22  A.   About Toronto?

23  Q.   About you going to Pakistan.

24  A.   Yeah.  I mean, I remember there was at least two phone

25  calls that we had and once I think in public -- I mean, in

1  person.

2  Q.   Was there a conversation that you remember that was in

3  the truck I think the day before you went to Pakistan or

4  something where I strongly advised you to not go to

5  Pakistan?

6  A.   Yeah.

7  Q.   What caused you -- what caused you to disregard what

8  Azdee, James and I were saying?

9  A.   Well, I had -- I mean, you could say agreement.  I had

10 this idea that I wanted to go to Pakistan for a while, and

11 then, you know, when we talked about going to Pakistan, it

12 helped my idea.  So basically the plan was somehow helping me

13 in my goals.

14      But when I saw that the trip to Toronto was diverting me

15 away from my initial idea, I tried to basically block that

16 trip.  When I could not do it for you guys, I just backed out

17 of the trip.

18      So I mean, it was my initial idea from the beginning to

19 go to Pakistan regardless of who would follow me or not.  And

20 then I saw Toronto basically as a diversion from Pakistan,

21 so, you know, I backed away from everyone.

22 Q.   Did James or Azdee or I or any of us mention to you that

23 if you went to Pakistan, then the entire Canada thing was not

24 going to happen?

25 A.   It was mentioned many times, I think, like, you know.

1   Q.   So is James or Azdee Pakistani?  Are they Pakistani?

2   A.   I know Azdee is not Pakistani.  James I think maybe is

3   from Afghanistan, I think, or maybe from Pakistan.  I don't

4   know exactly his nationality.

5   Q.   Do you know, did they go to Pakistan?

6   A.   James I know has family, part of his family was in

7   Pakistan because --

8   Q.   Because they lived there.

9   A.   Yeah.

10  Q.   But not because of only these conversations they were

11  there?

12  A.   Sorry?

13  Q.   I'm saying as a result of any of these conversations or

14  after of any of these conversations, did James or Azdee go to

15  Pakistan?

16  A.   Oh, no, no.

17  Q.   There is an e-mail where you say that reservations or

18  visas need to be made.  Do you know if James or Azdee ever

19  applied?

20  A.   As far as I know, they did not apply.

21  Q.   Where were you when the earthquake took place in

22  Pakistan?

23  A.   In 2005 earthquake?

24  Q.   Yes.

25  A.   I think I was here in America.

1          You mean the tsunami?

2     Q.   No, there was an earthquake in Pakistan soon after you

3     returned back.

4     A.   Yeah, I was here in the U.S. then.

5     Q.   So after you came back to the U.S., there were

6     conversations that you had with others, not with Azdee or

7     James, but others of you again changing your mind that you

8     wanted to attend or go to one of these training camps;

9     right?

10    A.   After --

11    Q.   After you came back.  You went to Pakistan.

12    A.   The 2005 trip?

13    Q.   Yes.

14    A.   Yes.

15    Q.   Then you came back to the U.S.

16    A.   Uh-huh.

17    Q.   And then you started talking about, oh, I should have

18    gone to --

19    A.   Yes.

20    Q.   If you felt that way, why did you not return back?  And

21    especially when there was a period of time after the

22    earthquake where no visas were required and no -- I mean,

23    internationally everyone was going to Pakistan because of the

24    earthquake.  You had a perfect opportunity if someone wants

25    to --

A.    I mean, many times people have a desire, but it just
remains a desire.  I mean, you know, you just cannot find it
feasible at that time to do it.  Many times it's just not
good at all.

Q.    Do you know what the word feasible means?

A.    Dictionary meaning?  I don't know --

Q.    I mean --

A.    Like it's not possible due to circumstances or it just
does not seem realistic for you at that time, you know,
because of other obligations or other things you are involved
in.

Q.    When you were in Pakistan in 2005, summer, was it
because it was not feasible for you to go to a training camp,
that did you not attend a training camp?  Is that the
reason?

A.    In Pakistan, no.  I did not attend because I did not
want to attend at that time.

Q.    Does it cost money to attend?

A.    It does not cost money.

Q.    You have translated books before?

A.    Not books, but stuff, small stuff.

Q.    What have you translated?

A.    Like I used to work for -- not work like work, but there
was a website Jihad Unspun translating news articles from
Pakistan.  It was in Urdu, so I would translate it into

1    English.

2    Q.    What about a book called *Perished Nations*?

3    A.    Oh, I did not do it.  Basically I took the job and

4    I gave it to my cousin to do it.  I was basically an overseer

5    of that job.

6    Q.    I translate books; right?

7    A.    Yes, you do.

8    Q.    Do you know what I translate?

9    A.    Why?

10   Q.    No, what books?

11   A.    Oh, what books?  There are many books, many kinds of

12   books that you translated for I think Tibyan Publications.

13   Q.    Most -- during our acquaintance with each other, what

14   type of things did we talk about, the range of things you

15   could say?

16   A.    The range was pretty big, but generally Islamic stuff,

17   sometimes theology, and sometimes jihad too.

18   Q.    When you say jihad, is that -- could you clarify?  When

19   you say we talked about jihad, what does that mean?   What is

20   included in that?

21   A.    What's included is many things, from personal to

22   physical acts of jihad.  So it's just a whole range of

23   stuff.

24   Q.    Does jihad -- when you say that we talked about jihad,

25   does it include reading literature about jihad?

1        You said right now we talked about jihad.

2   A.   Yeah.

3   Q.   So if we are having a debate on self-sacrificial

4   operations, otherwise known as suicide bombings, and its

5   status in Islamic law, are we talking about jihad?

6   A.   Yeah, we are talking about jihad.

7   Q.   Quoting Quran, Hadith, what scholars have said, past and

8   present, are we talking about jihad?

9   A.   Yes.

10  Q.   Hakimiyyah, which is what?

11  A.   It's the way we rule.

12  Q.   Is it also considered -- if someone is talking about

13  hakimiyyah, the government itself, God on earth, is that also

14  considered in our circles on these communities as a jihad

15  topic?

16  A.   It is a jihad topic because it leads to jihad.

17  Q.   If we are talking about biographies of scholars who were

18  killed, is that also jihad?

19  A.   That same general -- yeah.

20  Q.   If we are talking about history of battles, such as the

21  Crusades, or the battles of the Prophet Muhammed -- peace be

22  upon Him -- is that we are talking about jihad?

23  A.   Yes.

24  Q.   If we are talking about the modern day history of the

25  Islamic revolution in Syria, movements throughout the '70s in

1    Egypt, elsewhere, are we talking about jihad?

2    A.    Yes.

3    Q.    And as well if we are talking about making bombs, that

4    is also considered jihad?

5    A.    Yeah.

6    Q.    So, now, of all these topics of jihad that we talked

7    about, what percentage of our discussions would you say would

8    be called talking about blowing things up?

9    A.    I mean, I don't know the percentage, but mostly I was

10   talking about the theology of jihad, like its importance, its

11   obligations, and history and stuff like that.

12        The practical bombing and stuff was minimal to the

13   extent that we did not have anything, any expertise or any

14   knowledge of that.

15   Q.    So when the FBI asks you and has asked you in these

16   interviews did you guys talk about jihad --

17             MR. McBURNEY:  Objection.  We are getting into the

18   interviews.  He can ask the witness questions about things he

19   remembers and things he believes, but not what his responses

20   were in the interview unless there is something inconsistent

21   with what he says now.

22             THE COURT:  You have introduced an exhibit in which

23   he used that term.  I guess he's entitled to ask him what he

24   meant when he used it.

25             MR. McBURNEY:  The term being "jihad"?

```
1              THE COURT:  Yes.

2              MR. McBURNEY:  Okay.

3              THE COURT:  So you may ask him what he meant when

4    he used the term "jihad" in his interviews with the

5    government.

6    BY MR. SADEQUEE:

7    Q.   Jihad is generally defined by all sorts of people as

8    holy war?

9    A.   Yes.

10   Q.   So is that how -- I mean, is jihad more of a concept to

11   us, or is it just a word?  Is it more of an entire -- it's a

12   topic.

13   A.   Yes.

14   Q.   It's a subject.

15   A.   Subject.

16   Q.   It's a -- okay, which has its own subbranches; correct?

17   A.   Yes.

18   Q.   As in history, all sorts of things.

19        So if you were to say that you have discussed jihad with

20   me or anyone else or you read about jihad or you were

21   interested in jihad, is this equivalent to that you are

22   interested in making bombs?

23   A.   Not equivalent.  I mean, again, as you said, that jihad

24   includes a range of topics, so it could mean all, some, or,

25   you know, part of it.  Any of them could be jihad.
```

1    Q.   According to Islam and to the knowledge you have of

2    Islam, what's the best jihad?

3    A.   To say the right word in front of a tyrant ruler.

4    Q.   And then to be killed for it?

5    A.   Yes.  Actually jihad is saying the word.  To kill is to

6    be martyred.

7    Q.   There is two words --

8    A.   The verse that I know is to say the right word in front

9    of a tyrant ruler is the best jihad.

10   Q.   How much of our conversations were debates?

11   A.   How much?   I mean, a little bit was debates.  Not that

12   often, but there were some debates, yeah.

13   Q.   Debates as in -- what about online, debates not with

14   each other perhaps, but online, debating with other people

15   online on these jihad words?

16   A.   Yes.  Sometimes they were debates about particular

17   theological aspects of jihad, and it was a common theme in

18   the community.  Like, there were some people who believed in

19   some tactics and some not or some concepts, and there were

20   debates about it.

21   Q.   You have with you Exhibit 3?

22   A.   Yes.

23   Q.   You have read this before?

24   A.   I have read this, yeah.

25             MR. SADEQUEE:  I would like to tender Defense

Exhibit 3 into evidence, which is --

        MR. McBURNEY:  Objection as to relevance.

        MR. SADEQUEE:  It's actually part of the evidence.

        THE COURT:  I don't know what anybody is talking about.  I have never seen it.

        MR. SAMUEL:  May I speak with him?

BY MR. SADEQUEE:

Q.    This is a book that I translated?

A.    Yes.  That I know of, yeah.

Q.    And I had given it to you?

A.    Yes.

Q.    You have read it?

A.    I have read it, yeah.

        MR. SADEQUEE:  So I would like to tender that into evidence.

        THE COURT:  Any objection?

        MR. McBURNEY:  No.

        THE COURT:  It's admitted.

        MR. SADEQUEE:  I need a copy.

        THE COURT:  So what do you want?

        MR. SADEQUEE:  I want to go over some of the things.

        THE COURT:  Then go over it.

        MR. SADEQUEE:  He has it on the screen.

        THE COURT:  So what do you want to happen next?

1                THE WITNESS:  He wants a copy of it.

2                THE COURT:  You don't have a copy with you?

3                MR. SADEQUEE:  I'm saying to ask him several

4 portions of it --

5                THE COURT:  Go ahead.

6                MR. SADEQUEE:  -- I have to have a copy of it.

7                MR. McBURNEY:  Don't write on it, but here is this

8 one.

9                THE COURT:  There you go.

10 BY MR. SADEQUEE:

11 Q.  When did I give you this book?

12 A.  I don't know the time, but maybe 2005 sometime.

13 Q.  There has been discussion about referring to U.S. as

14 Pharaoh Land?

15 A.  As what?

16 Q.  Pharaoh Land.

17 A.  Yes.

18 Q.  Could you read page four of -- from just the

19 declaration?

20 A.  Okay, a declaration.

21          To the Pharaohs of this Era, and to their

22       regimes, and their agents, to the ministers,

23       bishops, and rabbis of the Tawaghit, to all of them

24       we say:  "We do not worship that which you worship,

25       to you is your religion, and to us is our Din."

1    Q.    Din is?

2    A.    Way of life.

3                    "We disbelieve in you and in your gods,

4              legislations, and your constitutions, and we have

5              rejected your parliaments which you worship along

6              with Allah.  And there has emerged between us and

7              you Hostility and Hatred forever -- until you

8              return to Tawhid, and apply His Legislation Alone

9              and accept it with full submission."

10   Q.    You and I have had frequent -- quite a number of

11   conversations regarding what we believe is the Antichrist.

12   A.    Yes.

13   Q.    And we spent quite a considerable amount of time

14   discussing this and trying to figure out what, for example,

15   the dollar bill sign is; correct?

16   A.    Yes.

17   Q.    We also took footage when we we were in D.C. of the

18   Free Masonic Temple?

19   A.    Yes.

20   Q.    Can you state what our discussions were regarding the

21   Antichrist in relation to the dollar bill?

22   A.    What we -- like what I discussed about, what I recall,

23   is that our opinion was that the Antichrist is not one

24   individual.  I mean, he is an individual, but before that,

25   before his coming, there would be a system that would try to

1    set in place the environment for his arrival.

2        So it would involve a government that would be dedicated

3    to the cause of the Antichrist.

4        It would involve some form of propaganda machinery.  The

5    media and the schools are like that.

6        And it would involve the economic order in a way that

7    the people are basically dependent upon for their food and

8    livelihood upon the Dajjal system, the Antichrist system.

9    Q.    You used this word, Dajjal?

10   A.    Dajjal, it's the Arabic word for Antichrist, it's for

11   Antichrist.

12       So we believe that the system that is working for the

13   establishment of -- of the arrival of the Antichrist involves

14   the U.S. government, the media --

15   Q.    What makes you believe that the U.S. government --

16           THE COURT:  He is -- don't interrupt him.  Let him

17   finish.

18   A.    So we believe that the U.S. government and the media and

19   the corporate system constituted a three aspect way of the

20   system that was promoting the values that would lead to the

21   arrival of the Antichrist, and the three would mean a

22   pyramid, they were made a pyramid for us.  That was somehow

23   represented in the dollar bill by the pyramid that was

24   drawn -- is drawn on the dollar bill.

25       So this conspiracy theory was what we sometimes would

1  discuss about the Antichrist and his arrival.

2  Q.   Now, more specifically, why would Muslims believe after

3  looking at the dollar bill that the United States is going to

4  establish the Antichrist or the Dajjal, just by looking at

5  it?

6  A.   Because the pyramid is linked in the mind of many people

7  to the pharaohs of old of Egypt, and we saw that why would

8  someone represent or bring an old monument other than for the

9  fact that they had some link to it or some affinity for it.

10  Q.   What about the one eye?

11  A.   Also, yeah, the one eye on the pyramid represents to us

12  the implementation of the saying of the Prophet Muhammed --

13  peace be upon Him -- who said that the Antichrist would be

14  one-eyed, and that is one of the signs, that he would have

15  only one eye.

16       So the pyramid with the one eye, for the Muslims, the

17  ones that I know of at least, is a link to the Antichrist and

18  the pharaohs of the past.

19  Q.   You have read -- you have attended Georgia State

20  University?

21  A.   Georgia Tech.

22  Q.   Yeah, and I know you studied a lot of history.  What in

23  ancient Egypt, what is the significance of one eye?

24            MR. McBURNEY:  Object to relevance.  I don't know

25  where we are going here.

1          THE COURT:  What is the relevance?

2          MR. SADEQUEE:  I will go to a different question.

3     BY MR. SADEQUEE:

4     Q.   We talked --

5          THE COURT:  Pull the microphone toward you.  I'm

6     having a hard time hearing you.

7     BY MR. SADEQUEE:

8     Q.   Why did we take videos of the Free Masonic Temple?

9     A.   Free Masons --

10    Q.   Georgia Washington Free Masonic Temple?

11    A.   I mean, Free Masons, even among nonMuslims, are known --

12    for me, they are known to be a secret society whose goals are

13    linked to the devil, like devil worship, and Antichrist is

14    going to be the human representation of the devil.

15         So to us Antichrist and devil are basically the same,

16    and Free Masons are their worshipers.

17    Q.   Have you read any of my writings regarding the

18    Antichrist?

19    A.   I have read -- actually recently I read something from

20    you, yeah.

21    Q.   Now, this book, which was written -- no, I gave it to

22    you in 2004, it opens with the declaration.  This is not a

23    part of the translation of the book, is it?

24    A.   Huh?

25    Q.   This "Declaration of Bara'ah" -- what was does Bara'ah

1  mean?

2  A.    It's the declaration of -- a disavowment or being free

3  from some aspect, some people or some concept.

4  Q.    Have you read anything by MK-ULTRA, does that sound

5  familiar to you?

6  A.    I know MK-ULTRA, I read it in a book that it was some --

7           MR. McBURNEY:  Objection, relevance.

8           THE COURT:  What is the relevance?

9           MR. SADEQUEE:  I want to go into some of our

10  mindset to clarify as to our taking those videos in

11  Washington, D.C., and some things which I have written about

12  Pharaoh of this Era, and why we refer to the United States as

13  Pharaoh Land, so on and so forth.

14           THE COURT:  I'm going to sustain that

15  objection.  You may ask him those questions if you want to

16  ask him directly.

17           MR. SADEQUEE:  Can we play the clip of the Free

18  Masonic Temple?

19           THE COURT:  For the record, Mr. McBurney or

20  Ms. Casperson, what exhibit is that?

21           MR. McBURNEY:  We are looking for it.

22           It will be part of Exhibit 12.  We just need to get

23  the file name.

24           (A video is presented in open court.)

25  BY MR. SADEQUEE:

Q.   Do you recognize this?

A.   Yes.

Q.   Who took this shot?

A.   I'm not exactly sure, but I guess one of us.

Q.   It was I who took that shot.

A.   Okay, yes.

Q.   Do you know what part of D.C. this is, the city?

A.   I don't know the area.  I mean, we were going by subway.  We were at the subway station.  But I don't know --

Q.   Alexandria?

A.   Okay.

Q.   Was it Alexandria?

A.   I mean, I think from the testimony that rings a bell, but I don't know.

          MR. SADEQUEE:  This is --

          MR. McBURNEY:  Exhibit 76.

BY MR. SADEQUEE:

Q.   Could you read from page 15 of this where I say Ikhwan, brothers?

A.   You say:

          Ikhwan, brothers, me and Turab will prolly

          drive up to Virgin Mary by ourselves, insha'Allah,

          and scoop the place, and then return back . . . and

          then later I will come when I get my PP.

Q.   What does the term "Virgin Mary" refer to.

1    A.    Virginia, Maryland area.

2    Q.    And more specifically where did we go?

3    A.    Oh, to D.C.

4    Q.    And D.C. is located -- and D.C. is located between

5    Virginia and Maryland?

6    A.    Yes.

7    Q.    So when I'm referring to the Virgin Mary, I'm referring

8    to Washington, D.C.?

9    A.    Yes.

10   Q.    All right.  Did we make up this code, or was this

11   something that we were referring to?

12   A.    Virgin Mary?  I don't recall we sitting and saying

13   Virgin Mary is Virginia, Maryland.  I think to my knowledge

14   you just made it up on the chat.  I was never present when

15   you said, Okay, Virgin Mary equals this.

16   Q.    Do you remember any conversation where you mentioned

17   that we talked about how the segment of Jews, the sect of

18   Jews who called Jesus a sorcerer, said that he went to

19   Alexandria to learn sorcery in Egypt?

20   A.    Say that again, please?

21   Q.    Do you remember our conversation, if you can recollect,

22   that how the occult Jews back then accused Jesus of going to

23   Alexandria, Egypt, to learn sorcery?

24   A.    I don't recall that conversation, but I know of this

25   concept.

1   Q.   During our visit -- I mean, during our trip to the

2   Virgin Mary area, you don't recollect -- okay, well, whatever

3   you remember.

4   A.   About the Masonic Temple visit?

5   Q.   Yes, and Alexandria.

6   A.   I mean, I just remember that we talked about, you know,

7   the Free Masons, what we thought of them I guess on the

8   trip.  But I don't recall the specifics of the conversation.

9   Q.   Could we go to Exhibit 49-A, page seven?

10      This is a conversation between me and Safiullah.  Do you

11  know, who is Safiullah?

12  A.   My cousin.

13  Q.   Could you read from the line where I say:  We are to

14  submit to God, the Highest.  It's a little beneath half of

15  the page.

16  A.           We are to submit to Allah, the Highest, and we

17           have to make mankind submit to Allah.  You look

18           around today in the world, you see all these people

19           worshiping all these different things.  Some people

20           worship the idols, stones, other worship Prophets,

21           others worship the Kings and Presidents.  Others

22           worship America, U.K.  Others worship the New World

23           Order.

24  Q.   What do I mean when -- others worship the New World

25  Order?

1          MR. McBURNEY:  Objection, calls for speculation.

2    Communication --

3    BY MR. SADEQUEE:

4    Q.   What's your understanding of that when I'm speaking with

5    your cousin?

6          THE COURT:  I don't see the relevance as to his

7    understanding.  But if you want to explain it to me, I will

8    consider it.

9          MR. SADEQUEE:  To understand our mind-set as to --

10   in relation to our understanding of the New World Order,

11   Free Masons, why we took the videos of the Free Masonic

12   Temple in Alexandria.

13         MR. McBURNEY:  I don't mean to split hairs.  If he

14   wants to ask the witness what does he think the New World

15   Order means, that's fine.

16         He wasn't part of this communication.  He doesn't

17   need to opine on it.

18         THE COURT:  You can ask him that.  Or if you

19   explain to him what you meant by the New World Order in this

20   chat, he can explain that too.

21   BY MR. SADEQUEE:

22   Q.   Can you recollect our discussions on the New World

23   Order?

24   A.   Yes.  Do you want me to say it?

25   Q.   Yes.

A.   I mean, basically the New World Order, as I understand

it and as we talked, is that there is again a system that is

trying to have a one world government that will try to make

room for the Antichrist.

And it involves having any hostile regimes removed

through any means possible, through war or through

domination, by bribing, anything, and establish a government

in the entire world that is working for the system of

bringing the Antichrist in person.

That's a summary of it.

Q.   Can you go to page number eight?  There is a part where

I say:  We refuse to be a slave of these Governments?

A.   Yeah.  Read it?

Q.   Yes.

A.              We refuse to be a slave of these Governments,

          these desires, these pirs --

The translator is not right, pirs is not persecutors, it

means saints actually in Urdu, saints.

          -- these sins, these Shayaateen.

Q.   What does Shayaateen mean?

A.   The devils, Satan.

Continue?

Q.   Yeah, the next two lines?

A.              And we declare our Freedom from them, and we

          are only Slaves of Allah.

Q.   Now, you mentioned that -- what was our discussions, to
the best of your recollection, of demons in relation to the
New World Order?

A.   Again, Antichrist represents the human form of Satan,
like he's going to be the most evil of human beings, and that
the demons are the most evil of the spiritual world, of
the --

Q.   Do you recall any discussions which we had about the
movie *The Matrix*?

A.   I mean, we discussed it, yes.

Q.   In relation to the New World Order and our taking the
videos?  Just recollect, as best as you can?

A.   *The Matrix*, when I first saw it, I inferred something
different than when we discussed it.  *The Matrix* to us
represents -- or represented, having talked, how normal human
beings are being manipulated by the Antichrist system and
they don't even like know it.

     We think that we are free, but like in *The Matrix*,
people think they are free, but they are in a computer
world.  I mean, they are not really free.

     So all the propaganda and all the environment around us
makes us think that we are free, but in fact we really are
mentally the slaves of the system.

Q.   Do you recall our conversations regarding Superman --

A.   Superman?

1    Q.    -- and Antichrist?

2    A.    Superman somehow has some links to the Antichrist too

3    for us, because, okay, there are some things that -- Superman

4    can fly to any place, and we have been told that the

5    Antichrist will be able to fly to every place on this world

6    except for two cities.  One of them is the holy city of --

7    sorry, I stutter -- Makkah and Medina.  These two cities are

8    the holy cities of Islam, and he will not be able to go

9    there.

10         And Superman has the weakness, his weakness is

11   kryptonite, and kryptonite is a stone from the heaven.  And

12   in Makkah there is a stone that is from the heaven.

13        And so for us it links that Superman represents the

14   Antichrist in a way, because just like Antichrist cannot

15   enter Makkah today because of the stone that is from heaven,

16   Superman has a weakness from the kryptonite.

17        And kryptonite is green, and green color is also a

18   really holy color in Islam.  I mean, holy color, that's not

19   the right word, but we consider it an Islamic color.  Green

20   is really an Islamic color.

21        And the Prophet's mosque -- peace be upon Him -- in

22   Medina has a dome which is green, so it represents for us

23   that green concept.

24        So those two, green color and the stone from heaven

25   being united, being the weakness of Superman, and the fact

1    that Superman could fly everywhere except for where the

2    kryptonite was was a coincidence -- too much to be a

3    coincidence for us.

4         So we consider it somehow a subliminal message,

5    subliminal message from I don't know who that Superman --

6    Q.    Who is Christopher Reeve?

7    A.    I think he's the actor, I think, who played Superman.  I

8    have never seen the video or the movie, so I don't know.

9         That's what I mean --

10   Q.    Do you remember the discussions in *The Matrix,* the

11   sentinels?

12   A.    The sentinels?  The sentinels in *The Matrix* actually are

13   the robots, but they could be a mockery of the way that the

14   devils make a mockery of the angels.

15        Because angels cannot disobey God.  Like us, we have

16   been given permission to disobey Him, but they cannot.  So

17   the devils mock them as being a robot, even though they are

18   not, but they would mock them as being a robot.

19        And secondly, the devils try to listen -- we have been

20   told in our holy book Quran that they try to listen to the

21   conversations of the angels about what they are planning to

22   do in this world or what they have been ordered to do, and as

23   soon as the angels find out that the devils are listening,

24   they shoot them with -- what is it?

25   Q.    Shooting stars?

A.    Shooting stars.  That's what the shooting stars are, the

fires of the angels.

And in *The Matrix*, the sentinels would shoot the members

of the Zion whenever they would try to listen to them.

So it again somehow -- it was similar in our concept of

how the devils would listen in to the angels, and the angels

would try to shoot them, and the Zionists listening in to the

sentinels and the sentinels shooting them with lasers or

whatever.

So it again linked to us that somehow the system is

showing itself, why I don't know, but through the movies it's

presenting itself that that is how the system -- the

Antichrist system is operating in our world.

Q.    Is it a code?

A.    Huh?

Q.    Was there discussions about this being a code?

A.    I mean, a code or somehow a subliminal message, why I

don't know, but like somehow the system is representing

itself in the movies, showing it to the people for some

reason.

Q.    In an encrypted manner?

A.    Huh?

Q.    Did we say that it was in an encrypted manner?

A.    Yeah.

Q.    So that people would not understand except someone

1    initiated?

2    A.    Yeah.  So basically somehow someone who is looking for

3    it can find it, but someone who is not looking for it cannot.

4    It just seems to him a movie.  But someone who has the

5    insight can find it.

6         So we were just constantly looking at these kind of

7    stuff and trying to find the hand of the system in the way we

8    are being run.

9    Q.    On page eight, the top of page eight, right after the

10   last sentence of page seven which is, "Others worship the New

11   World Order," on the top of page eight, it says "others

12   worship music and movies."  Well, you explained some of

13   that.

14   A.    Like worship movies?

15   Q.    No, I just said that you have just explained some of

16   what was meant over here.

17        Do you recall discussions on the UCC, the Uniform

18   Commercial Code?

19   A.    Not with you, but I have read about it in my website

20   research and stuff like that.

21   Q.    So in the beginning of this book, Exhibit 3, this

22   "Declaration of Bara'ah" or disassociation, is this merely a

23   metaphor when we refer to this as Pharaoh Land, or is it

24   quite literal to us?

25   A.    I mean, there is a lot of linkage from the pharaohs to

1  this land, so it's not a metaphor technically.

2  Q.   Like the pyramids and the bald eagle?

3  A.   Yeah.

4  Q.   You have read articles -- an article called -- from

5  Tibyan Publications which we translated regarding the

6  methodology of the pharaohs in deceiving people?

7  A.   Yes, I remember reading it.

8  Q.   How do you -- what do you recollect from that?

9  A.   It was a long time ago so I don't recall a lot of it,

10 but I do remember that it was mentioned that --

11 Q.   There --

12 A.   Huh?

13 Q.   There was something written about the actual methodology

14 of how this deception takes place, the method of deception?

15 A.   You mean the propaganda?

16 Q.   The sorcery.

17 A.   Oh, the sorcery, okay.

18      Yeah, in the Quran, in the Holy Quran, it's mentioned

19 that the pharaoh, the way he fought the --

20 Q.   Moses?

21 A.   -- Moses -- peace be upon Him -- was using sorcerers,

22 and sorcerers to us represent not just the magic, but also

23 anyone that twists truth, anyone that can take falsehood and

24 present it to people as truth.

25      In this description, a lot of people can apply in modern

1    times, you know, such as the media and stuff like that who

2    take falsehood and can present to people that it is the

3    truth, and they represent the sorcerers of the Pharaoh, which

4    we consider the U.S. goverment.

5        But there are other means of sorcery too that the U.S.

6    government can employ.

7            THE COURT:  Mr. Sadequee, this is a court of law in

8    which evidence is being presented on charges that have been

9    brought in a case.  You need to confine your questions to

10   evidence.  Because this can't be turned into a --

11           MR. SADEQUEE:  I understand.

12           THE COURT:  -- a room in which you can instruct

13   others on theological matters.  So you have to tie all this

14   up into the case, please.

15           MR. SADEQUEE:  I'm going to close out with just one

16   brief -- couple of brief questions.

17   BY MR. SADEQUEE:

18   Q.   Since a lot of this case is going to be about trying to

19   find out what's really inside of a person, if you can recall,

20   I had a theory about how to find out -- not how to find out,

21   but how -- the zilzal theory that I had mentioned.

22   A.   Yes.

23   Q.   Can you briefly state that?  And then I will ask you how

24   that can be tied up.  What is the zilzal theory?

25   A.   What I recall I think is that what you mentioned is that

1   there is an analogy of --

2   Q.    What does zilzal mean?

3   A.    It means shaking, shaking.

4         The analogy is that in a container, there are marbles of

5   different sizes -- is that the idea you are talking about?

6   Q.    That's the idea I'm talking about.

7   A.    There is a container of many different marbles of

8   different sizes, and as you shake them, even though people

9   might assume that the big marbles and heavy ones should go

10  down, actually they will go up.

11  Q.    The laws of physics.

12  A.    Yeah, the laws of physics work like that.

13        So if you keep shaking it, the big ones will go up and

14  the small ones will go down, you know, will go on the bottom

15  and they will separate.  And if you keep doing it, there will

16  be a time that there will be a total separation of the big

17  ones and the small marbles.

18        And this ties in -- this is a law of physics, but in

19  Quran it has been mentioned that shaking and trials and

20  tribulations separate the believers from the hypocrites, from

21  the nonbelievers, because -- so the believers represent the

22  big marbles, the hypocrites and the disbelievers are the

23  small marbles.

24        So a trial, a personal hardship that people experience

25  represent the shaking.  And as they shake, the believers will

rise above the ranks until they will become on top, and the

disbelievers will go on the bottom.

So this physical theory of the marbles is represented in

the Quran in a --

Q.   Social.

A.   -- in a social concept, a social way.

So it is proof that a person fourteen hundred years ago

did not know this physical theory, yet he was able to make an

analogy of it in terms of --

Q.   He did not make that analogy.

A.   I mean, I'm sorry, I'm saying --

THE COURT:  Mr. Sadequee, if you want to ask him a

question, let him answer it.  Don't coach him through

it.  Understand?

A.   So like if someone -- if someone believes that, you

know, nonMuslims believe that Prophet Muhammed -- peace be

upon Him -- wrote the Quran, even though that we believe that

Allah delivered it to Him, so how could the theory that --

how could he have known about this physical theory?  I mean,

he did not know of this physical theory, yet it is in the

Quran.

So the proof -- that's one of the proofs of the Quran

being from God is that trials shake people and the believers

will come on top and the disbelievers will go on the bottom.

And this theory is an exact replica of the physical theory of

marbles, big marbles coming on top and small marbles going on

the bottom by shaking.  That was it.

Q.  So what I was actually going to ask in relation to that,

so you actually do land in Pakistan.  There is all this talk

about training camps, jihad.

A.  Yeah.

Q.  So once you do go to Pakistan, which is what you are

talking about throughout these chats, once you are in that

situation, that shaking situation, you are confronted with

the opportunity, everything is there that you have been

talking about, and then you do not do any of it.

      Can that theory be applied here and be said that's what

the theory was, that it's a separation of not believers and

disbelievers, but hypocrites, so that true colors come out

when trial and tribulation comes?

      So when you are faced with the situation when you are

actually in Pakistan, would it be accurate to say that your

true colors came out and you came back and that you really --

this was empty talk or hypocritical talk in a way?

A.  Yeah, I mean --

Q.  I mean, we can sit here and say all we want, that --

            MR. McBURNEY:  Judge, we are not getting a question

out.

            THE COURT:  Sustained.

            MR. McBURNEY:  We are getting a speech.

1          THE COURT:  Sustained.  Ask a question.

2     BY MR. SADEQUEE:

3     Q.   You have repeated that you want to become a martyr, in

4     the past and in the present?

5     A.   Uh-huh.

6     Q.   But when the opportunity was in front of you on multiple

7     occasions, in 2004 when you were approached by Abu Suffian,

8     the recruiter you met, you did not --

9     A.   I did not go.

10    Q.   Then again in 2005 with Abu Umar, after all these

11    conversations have taken place, you still did not go?

12    A.   Yeah.

13    Q.   What's your self-assessment of yourself?

14    A.   I mean, I said that I thought myself as turning back on

15    my heels.  Even in one of my e-mails or chats I said that.

16    Q.   So what's your assessment of all of these conversations

17    where you are saying that you are going to do this?

18    A.   I mean, they were --

19    Q.   Empty?

20    A.   -- empty talk, yeah.

21    Q.   Were others during our conversations also saying that

22    this is empty talk or jokes, this plan is a joke?  Have

23    others said this?

24    A.   Like me, that I was a joke?

25    Q.   In these conversations, in these chats?

A.    I think Azdee said once that you guys are a joke.

Q.    Were there others as well saying that, similar things, maybe not the word joke, but this is all --

A.    I don't recall like someone actually making the -- saying it was a joke or something.

Q.    Do you recall yourself saying in an e-mail which was to be sent to -- which you sent to me and you had asked me to send it to everyone else, Abu Umar, you say there:  We need to start planning instead of hoping for the best?

A.    Yes.

Q.    Was there an inward realization, even though you might not have said it the way Azdee said it, but an inward realization that this is empty talk or no planning is being done, everyone is just hoping or --

A.    I mean, in a way, everyone was saying that this is going to happen, that is going to happen.  Yeah, I had -- that's why I did not want to go to Canada, because I saw all of them as talking and doing nothing.

Q.    When Abu Umar was in Pakistan, are you aware of him attending any training camps during that visit?

A.    During that visit?  While I was in Karachi, he did not attend a training camp.

            MR. SADEQUEE:  That would be it.

            THE COURT:  All right.  Thank you very much.

            I need to let the jury go to lunch because

1  otherwise they will close it on you, which is not necessarily

2  a bad thing, that you will be deprived of eating in the

3  federal cafeteria, but that's from somebody who eats there

4  all the time.

5       We will take an hour break.  It is now by my watch

6  1:15.  We will come back at 2:15.

7       Don't discuss the case amongst yourselves because

8  the evidence is still coming in.  We will be in recess until

9  2:15.

10       (In open court without a jury present:)

11       THE COURT:  All right.  The jurors have left.

12       How long on your redirect?   I'm really actually

13  more asking whether or not there is any redirect.  If there

14  is not --

15       MR. McBURNEY:  There is.

16       THE COURT:  All right.  So I guess let's let

17  Mr. Ahmed, you may leave and have some lunch, because you

18  will have to come back up.

19       Can you give me a snapshot of what the afternoon

20  looks like?

21       MR. McBURNEY:  Yes, sir.  We will start with

22  redirect.

23       THE COURT:  Right.

24       MR. McBURNEY:  After that we have three -- assuming

25  they are still around -- very brief witnesses -- and they

1    are -- ten-minute witnesses apiece, probably less.

2              And then three witnesses who are more 30-minute

3    witnesses.

4              And then a long witness, who we can either start

5    with today or tomorrow morning.

6              But the answer is we have plenty of people here to

7    fill the day.

8              THE COURT:  All right.  And how about tomorrow?

9              MR. McBURNEY:  I think we will finish tomorrow the

10   government's case.

11             And if you ask that same question at the end of

12   today, I will have a better sense.  But I expect that we will

13   rest tomorrow probably after lunch, given how it's gone

14   today.  But I believe that we will complete our case in chief

15   tomorrow.

16             THE COURT:  And how long is the defense case?

17   This is solely for me to determine how to manage resources.

18             MR. SADEQUEE:  We expect to be around two hours,

19   with one big uncertainty.

20             THE COURT:  Okay, I understand that.

21             All right.  We will be -- assuming there is nothing

22   else to discuss before we break for lunch?

23             MR. McBURNEY:  No.

24             MR. SADEQUEE:  No.

25             THE COURT:  Anything else we need to discuss before

1    lunch?

2              MR. SADEQUEE:  No.

3              THE COURT:  All right.  We will be in recess until

4    2:15.

5                    (A recess is taken at 1:16 p.m.)

6                         --  --  --

1           Thursday Afternoon Session

2              August 6, 2009

3                2:18 p.m.

4                -- -- --

5      (In open court without a jury present:)

6      THE COURT:  All right.  Anything we need to discuss

7  before we bring the jurors back in?

8      MR. McBURNEY:  No, sir.

9      MR. SADEQUEE:  No.

10     THE COURT:  Okay.  Let's bring them in, please.

11     (In open court with a jury present:)

12     THE COURT:  All right.  Ladies and gentlemen,

13  I hope you had a good lunch.

14         Redirect of Mr. Ahmed?

15     MR. McBURNEY:  Thank you.

16                -- -- --

17             REDIRECT EXAMINATION

18  BY MR. McBURNEY:

19  Q.  Good afternoon, Mr. Ahmed.

20     I want to talk to you about two areas, your interviews

21  with the FBI and your trip in 2005 to Pakistan.

22     You sat for five interviews with the FBI in March of

23  2006?

24  A.  Yeah.

25  Q.  Were any of those interviews after you had been

1   arrested?

2   A.   No.

3   Q.   Were you free to go at the end of each of the five

4   interviews?

5   A.   I was.

6   Q.   You discussed with one or another agent about a good

7   time for a follow-up interview after each interview; is that

8   right?

9   A.   Pretty much, yeah.

10  Q.   The first interview was at your school home?

11  A.   Yes.

12  Q.   Then the second interview, I think you all met in a

13  hotel room?

14  A.   Yes.

15  Q.   Ultimately in an office at the FBI?

16  A.   Yes.

17  Q.   You mentioned in response to questions from the

18  defendant that you had been threatened during these

19  interviews.  When you say threatened, are you referring to

20  statements like, If you don't tell the truth, you will be in

21  trouble?  Is that what you meant by a threat?

22  A.   One of them, yeah.

23  Q.   Okay.  That if you don't cooperate, your situation could

24  be worse?

25  A.   Yeah, that's one of them.

Q.   Were there ever threats like, We are going to break your
arm if you don't talk to us?

A.   No.

Q.   Not those kinds of threats?

A.   No.

Q.   You will never see the light of day if you don't talk to
us about X, Y or Z?

A.   No.

Q.   The agents who were talking to you, did they have
weapons prominently displayed, their guns out on the table or
anything you could see like that?

A.   I think in one of the last interviews there was a gun,
but I cannot -- other than that, no.

Q.   Was it a gun that was pointed at you?  It might have
been on the agent's --

A.   No, on the agent.

Q.   Okay.  Similarly with handcuffs, were the agents
clicking the handcuffs as they were talking to you or
displaying handcuffs prominently?

A.   No.

Q.   Were you free to use the bathroom during any of these
interviews?

A.   Yes.

Q.   Break for prayer?

A.   Yes.

Q.   Were you provided food and drink during one or more of
the interviews?

A.   Yes.

Q.   Did you ever consult with -- I don't want to know what
you may have said, but consult with an attorney in between
any of the interviews?

A.   No.

Q.   Did the FBI ever tell you, Don't talk to a lawyer or
don't bring one to the interview?

A.   No.

Q.   You made the decision not to consult a lawyer?

A.   Yes.

Q.   Was there any person on planet Earth that the FBI asked
you not to talk to about the interviews?

A.   Yes.  The defendant.

Q.   But all they did was ask.  They didn't say, And if you
talk to him, you are going to jail for good?

A.   I think they said it might be a borderline -- borderline
felony charge.

Q.   Obstruction?

A.   Yes, something like that.

Q.   Something like that, okay.

     The defendant also asked you about promises that the FBI
agents made, promises such as, As long as you are truthful
with us, you are not going to be in trouble.

A.    Something along that line.

Q.    Were you ultimately truthful with the FBI, meaning did you tell them everything you knew about the plan formed in Canada, getting the basement in Canada, going to Pakistan, et cetera?

A.    Not everything, but a lot of it.

Q.    So you told them some, but not everything?

A.    Not, I mean, some of the small things, but I told them a lot.

Q.    But not everything?

A.    Not everything.

Q.    You never mentioned -- we talked about this earlier -- that Dannymoore address?

A.    No.

Q.    You didn't mention the fact that you actually had the D.C. videos with you when you went to Pakistan in 2005?

A.    No.

Q.    Those are just some examples.

The defendant asked you about the interviews and said, Isn't it the case that they screamed at you and pounded the table?  How many times across the 13 some odd hours, if you add all the hours of the interviews up, did an agent actually pound the table, get up and leave the room as if in anger or frustration with you?  How many times did that happen?

A.    I think once.

1  Q.   Was the atmosphere, apart from that, typically more

2  cordial, respectful, where you had a discussion, or what?

3  A.   I mean, in the beginning it was like that, but from the

4  middle, it did get a little bit, okay, not screaming, but

5  tense for me.

6  Q.   Were the agents getting frustrated that maybe you

7  weren't telling them everything?

8  A.   They were getting frustrated at the way I was telling

9  them, like piecemeal.

10  Q.   Piecemeal.  And did your story change over time?  For

11  example, perhaps initially it was the defendant's idea to go

12  to Washington to take the casing videos, but in a subsequent

13  interview you said, Well, no, actually that was my idea?

14  A.   Yeah.

15  Q.   Is that the kind of thing that made the agents

16  frustrated with you?

17  A.   I mean, I don't know their feeling, but --

18  Q.   Did it appear to you that that was the kind of thing

19  that caused them to be frustrated?

20  A.   Yeah.

21  Q.   You said in response to a question the defendant asked

22  you about the statement, the written statement that you

23  signed, Government's Exhibit 168 -- I wrote this down --

24  I was going to sign anything they put in front of me.  Do you

25  stand by that?

1    A.    Yeah, basically.

2    Q.    You signed several statements.  At the end of the first

3    interview you were presented with a statement written by an

4    agent, not by you, summarizing the interview.  Did you have a

5    chance to read that one?

6    A.    Yes.

7    Q.    And you signed it?

8    A.    Yes.

9    Q.    Then after the third interview, the March 15th

10   interview -- this is the one where you finally revealed it

11   was your camera -- there was a statement then too.  Did you

12   read that one?

13   A.    Yes.

14   Q.    And sign it?

15   A.    Yes.

16   Q.    Is that statement, the March 15th statement, one where

17   you were going to sign anything they put in front of you?

18   A.    I mean, the whole interview I was in that mood, that I

19   would sign basically everything they would --

20   Q.    Well, then I would like to talk about that, in case

21   there is something in here that's not accurate.

22         You have in front of you Government's Exhibit 167?

23              MR. McBURNEY:  At this time the government tenders

24   Exhibit 167.

25              THE COURT:  Any objection?

1          MR. SADEQUEE:  No.

2          THE COURT:  It's admitted.

3     BY MR. McBURNEY:

4     Q.   Can you please read the first two sentences of

5     Government's Exhibit 167, the statement -- before you do

6     that, like the first and the last statement, you didn't pen

7     this, this isn't your handwriting, is it?

8     A.   No.

9     Q.   Okay.  What are the first two sentences?

10    A.          I, Syed Haris Ahmed, voluntarily make the

11               following statement to Special -- S.A. Richards,

12               S.A. Scherck and T.F.O. Sediqi.  There have been no

13               threats or promises made to me.

14         Is that it?

15    Q.   That's all.

16         So that first sentence says you voluntarily make the

17    statement.  Was that true, you made this -- you subscribed to

18    this statement of your own volition?

19    A.   I would have signed it, I mean, no matter what.  I mean,

20    I just would have signed any statement that the FBI asked at

21    that time.

22    Q.   Well, if the statement said that Defendant Sadequee

23    planned everything, it was his idea, and in fact he had a

24    bomb right then and there at the home address on

25    Nowata Drive, would you have signed that?

A.    That's a hypothetical question.  I cannot really answer
at this moment what -- that statement or not.

       But I was scared at that time, I know that.  So I
would -- I may have objected to minor words and stuff, but
the whole stuff, I would have signed anything basically.

Q.    Okay.  Well, let's talk about that, because I believe
you did object to some words.  Let's get to the content of
this statement.  You say:

              As I stated before on April 11, 2005, I was in

              Washington, D.C., with the defendant.

       Is that true or is that fantasy?

A.    That's true.

Q.            The purpose of our trip was to make

              surveillance or scoping videos of various sites in

              Washington, D.C.

       True?

A.    Yeah.

Q.    That's not the FBI forcing words onto you?

A.    No.  My point, I'm not saying it's a lie or not, but I'm
saying the voluntariness, that's the point.  It's not the
true or false.  It's like voluntarily would I have signed or
not.

Q.    Okay, I understand that part.  And I want to shift our
focus then.  My focus is are these statements true or not.

       When you said, I was going to sign anything they put in

1   front of me, the natural concern is you might be signing

2   something that you believed to be untrue.  That's why I want

3   to explore this, so the jury can understand what is in this

4   document that you believe to be true and something you didn't

5   do.  Okay?

6   A.  Okay.

7   Q.  You say:

8               We planned to send these videos to the jihadi

9           brothers overseas.

10      Was that the plan?

11  A.  Plan?  We wanted to do it, but planning, like we did

12  not like sit and discuss it like over.

13  Q.  It was your intention?

14  A.  Intention, yeah.

15  Q.  You go on to say it was your idea to take the trip.  And

16  then there is something crossed out here.  The sentence used

17  to say:

18              Shifa and I were trying to be spies for the

19          jihadi brothers overseas.

20      Was there something about that sentence you didn't like?

21  A.  Yeah.

22  Q.  Did you ask the agents to change the wording?

23  A.  Uh-huh.

24  Q.  Did they change the wording?

25  A.  Yeah.

1  Q.   Does the edit reflect what you asked them to do?

2  A.   It does.

3  Q.   So what does the sentence say as it's corrected?

4  A.           It was my idea to be spies for the jihadi

5       brothers overseas.

6  Q.   These are the same people to whom you intended to send

7  the videos?

8  A.   Yes.

9  Q.   Shifa and I discussed the plan for approximately -- and

10 again there is a change.  It was for several weeks.  Did you

11 ask the agents to change several weeks to approximately ten

12 days?

13 A.   Yes.

14 Q.   And they followed your request and made the change?

15 A.   Uh-huh, yes.

16 Q.   Is there anything -- you don't need to read it outloud,

17 but the top paragraph that's shown on the screen, still on

18 Government's Exhibit 167, it starts with on April 10th, 2005,

19 is there anything in that paragraph that is incorrect?

20 A.   No.

21 Q.   The next paragraph talks about how you gave the memory

22 stick from the camera to Shifa and he told you he was going

23 to copy the videos from the memory stick and send them to --

24 it used to say jihadi brothers overseas, but the word jihadi

25 is crossed out.

1     Did you ask the agents to cross that out?

2 A.    Yes.

3 Q.    With the word jihadi removed, is there anything at the

4 bottom of the page there that is incorrect?

5 A.    Actually he did not tell me at the time I gave him the

6 the video that he wasn't going to -- like he was going to

7 send it to them.

8 Q.    I'm sorry, I did not follow that.

9 A.    He did not -- when I gave him the camera, he did not

10 tell me he was going to send it to them.

11 Q.    At some point after you gave him the memory stick, did

12 he tell you what's reflected in this statement, that he was

13 going to send the videos to brothers overseas?

14 A.    Maybe before, but not afterwards.

15 Q.    Before what?

16 A.    Before the camera -- I mean, before I gave him the

17 video.

18 Q.    So at some point after you had the idea of going to

19 Washington to make these casing videos, the defendant said,

20 I, defendant, am going to send the videos to the brothers

21 overseas?

22 A.    I mean, I cannot recall the incident.  It's been a long

23 time.  But, I mean --

24 Q.    I'm not asking when it happened.  I'm asking did it

25 happen.

1    A.   No, I'm saying I cannot recall the incident itself, like

2    the statement that he made.

3    Q.   But you didn't correct -- you didn't cross out the whole

4    sentence.  All you had them cross out was the word jihadi.

5    A.   I mean, at that time I was trying to shift blame on

6    other people too because I was afraid for myself.  I was

7    trying to put blame -- I mean, share the blame with others.

8    Q.   Well, do you mention in this statement anywhere Azdee or

9    James or Abu Umar, these other people who were planning the

10    trip to Pakistan?

11    A.   Not in this one.

12    Q.   No, so you weren't shifting to them at that time?

13    A.   I was trying to, you know, a little bit here and there.

14    Q.   Okay.  Let's look at the second and final page of this

15    statement, Government's Exhibit 167.  You acknowledge that

16    the videos that they showed you on the CD, which was the

17    Younis Tsouli CD, are some of the ones you took.

18         But the next paragraph, When I went to Pakistan last

19    year -- read that.

20    A.           When I went to Pakistan last year, I hoped to

21            be recruited into a jihad training camp where I

22            could learn how to fight against the kafirs and

23            Muslim oppressors everywhere.

24    Q.   All right.  Now, the reference to Pakistan last year,

25    which trip was that referring to?  This statement was from

1  2006.

2  A.    2005.

3  Q.    Not the time when you went when your sister got

4  married?

5  A.    No.

6  Q.    The time you met with Abu Umar?

7  A.    Yes.

8  Q.    There is nothing crossed out in this paragraph.  It

9  looks like maybe they had a little trouble spelling

10  oppressors, but other than that, did you ask them to change

11  anything in this paragraph?

12  A.    No.

13  Q.    Does this paragraph accurately reflect your intentions?

14  A.    One of my hopes when I went to Pakistan, one of them,

15  but not all.

16  Q.    Was it an intention of yours when you went to Pakistan

17  in 2005 to be recruited into a jihad training camp where you

18  could learn how to fight against kafirs and Muslim

19  oppressors?

20  A.    A hope is different than a solid intention.

21  Q.    Did you take any steps while you were in Pakistan in

22  2005 to pursue this, what you are now calling a hope?

23  A.    Other than talk to Abu Umar, no.

24  Q.    Was that one of the reasons why you talked to Abu Umar?

25  A.    One of the reasons, yeah.

Q.   At the final paragraph, you are acknowledging that it's

true to the best of your knowledge, again this voluntariness,

that you made it freely and voluntarily.  Did you ask the

agents to change anything on that paragraph?

A.   No.

Q.   You met with the agents two more times after that.  At

any point in the interview on the 17th or the 18th, did you

ask the agents to change something in the statement we just

went over?

A.   No.

Q.   If we could pull up 168, which is already in evidence?

     And we have gone through this before so we won't go

through it in much detail.  This is the final written

statement that you adopted at the end of the interview on

March 18th.

     At the highlighted portion, you say:

          One of my goals was to become a martyr in the fight

          against India in Kashmir or wherever else the

          brothers needed me.

     Was that one of your -- to use your new term -- hopes

when you went to Pakistan in 2005?

A.   Be a martyr?

Q.   Yes.

A.   One of my, you know, hopes, yeah, to die.

Q.   Tell the jurors what it means to be a martyr in your

1  mind.  What did you mean there when you adopted the phrase

2  become a martyr?  What does it mean in the violent jihad

3  circle?

4  A.   Die for the cause.

5  Q.   Meaning you have a heart attack as you are thinking

6  about the cause?

7  A.   No, to fight and die for or to be killed, not just --

8  Q.   To be killed in battle against the oppressors?

9  A.   Or it could be also in prison by the oppressors.

10 Q.   Were you contemplating -- you mentioned on direct exam

11 when you and I first spoke that it was difficult for you to

12 leave Atlanta in the summer of 2005 on your one-way ticket

13 because you thought you might never see your family again

14 because you might be a martyr.

15      When you said that and when you subscribed to this

16 statement, were you thinking dying in prison or dying in

17 battle?

18 A.   Actually dying in prison is also a really good way to be

19 a martyr.  Because in Islamic concept, to say the truth in

20 front of a tyrant ruler is the best jihad.  So it's one of

21 the -- one of the good ways of being a martyr.  Both of them

22 are, you know.

23 Q.   I understand that, but that wasn't my question whether

24 it was a good way.  My question was what was your intention

25 or hope if you were going to become a martyr?  Was it to be

in jail for many years until you die, or was it because you

talked about going to training camps to die in battle?

A.    I had split hopes.  That was one of the hopes, but

I read a book from a scholar who died in prison and I was

inspired by him too.

Q.    The battle that you envisioned you might be in, is this

in the Pakistani Army wearing a uniform marching in a

column?

A.    No.

Q.    What kind of battle?

A.    The ones that go on in the mountains of Kashmir.

Q.    Which means what?  Would you be in a military uniform in

a giant column of soldiers?

A.    No.  It's a small band of people.

Q.    You mentioned when the defendant was asking you about

the similarities between your trip to Pakistan in 2004 and

2005 that really they were pretty much the same, visited

family, you had a wedding in '04, but in '05 you were

visiting family and interested in exploring the possibility

of attending a madrassa.

      Did you bring a thumb drive with casing videos of

Washington, D.C., when you went in 2004?

A.    No.

Q.    Was your plane ticket that you got when you went to your

sister's wedding in 2004 a one-way plane ticket?

1 A. No.

2 Q. Was your trip in 2005 different in at least this way:

3 That you had an additional intention, and that was to explore

4 the possibility of getting into a camp so that you could

5 ultimately pursue jihad?

6 A. Well, in 2004 I also wanted to join up Jihad Unspun, so

7 that too was jihad aspects type of -- both had a jihad, you

8 could say, you know, hope.

9 Q. Did you meet with Abu Umar in 2004?

10 A. No.

11 Q. You mentioned a phrase several times on

12 cross-examination, the jihadi community.  What do you mean by

13 the jihadi community?

14 A. You mean the online jihadi community?

15 Q. You said jihadi community.  I don't know whether online

16 in front of it makes a difference or not.  But what is it?

17 A. Online jihadi community is people who talk on the web

18 forums and chat rooms about jihad.  Most of them are young,

19 my age, to roughly around 30.  30 is the maximum.  It's young

20 people who talk about jihad mostly in western countries.

21 Q. When you say talk about jihad, you and the defendant had

22 a long discussion about all the things that fall under that

23 heading of jihad, from historical discussions, the crusaders,

24 scholars, et cetera.

25   Is that mostly what's being discussed in the jihadi

1    community, or is it a narrow, narrower piece of that, the

2    issue of violent jihad?

3    A.   Issue of violent jihad.  I mean, he was talking about

4    the history of violent jihad, and that's also jihad.

5         But a lot of what we discuss is theology, justification

6    for jihad, and the verses of the Quran.  So that is a big

7    part of it, justification and encouragement.

8    Q.   In your 13 some odd hours of interviews with the FBI

9    before you were arrested, did you ever bring up the New World

10   Order?

11   A.   It never came up.

12   Q.   I mean, you were free to say what -- you were asked

13   questions, but you could bring up topics, respond to

14   questions as you saw fit; correct?

15   A.   I mean, the topics were pretty specific about people or

16   things.  They were not about concepts.  Like they asked me

17   about specific persons.  How could I bring a concept not

18   related to them?

19   Q.   Were you ever asked why you did certain things?

20   A.   I mean, I don't recall exactly, but maybe in passing

21   they asked me some questions about that.

22   Q.   I'll pose the question again.  Did you ever bring up the

23   New World Order or the Free Masons or the UCC?

24   A.   The Free Masons did come up in at least one of the

25   discussions, I think.

1    Q.    In what context?

2    A.    They asked me about the building.

3    Q.    Because it was in one of the videos that ended up with

4    Younis Tsouli?

5    A.    Yeah.

6    Q.    When they asked you about the video and the

7    Masonic Temple, is that when you shared with the agents about

8    the New World Order and the Antichrist?

9    A.    Not the Antichrist, I don't think I mentioned the

10   Antichrist, but I mentioned the Free Masons and the devil and

11   the devil worshipers, et cetera.

12   Q.    The jurors have seen the paper version, the equivalent

13   of many, many hours of chats now, many hours of which you

14   participated in.  Do you recall there being heavy doses of

15   discussions about how the New World Order or the Free Masons,

16   the UCC or anything like that was the justification,

17   explanation for this plan that you, the defendant and Azdee

18   and Abu Umar and James had about going to Pakistan?

19   A.    I don't recall a lot of mention of all that stuff.

20   Q.    You and the defendant talked some about fantasy and the

21   hyper youth, and I think you described one part of one of the

22   chats as a skit, that pretend interaction with Sammy Ayoub

23   asking him for money.

24         Were there also parts of these chats that were not

25   skits, where it was actual discussions about how much will

1  the basement cost, who is going to come here when,

2  et cetera?

3  A.   Yes.

4  Q.   You wrote an e-mail -- we looked at it before, we don't

5  need to look at it right now -- everyone calls it the

6  Mother's Day e-mail where you talk about the plan, the plan

7  of getting people to Pakistan.  Was that a skit, that

8  e-mail?

9  A.   It was my way of showing off basically, bravado.

10  Q.   Your way of what?

11  A.   My way of showing some importance in the world.

12  Q.   Did your e-mail not reflect -- did it inaccurately

13  reflect the plan that everyone's intention was to get to

14  Pakistan and then I think you called it ultimately Mountain

15  Hills National Park?

16  A.   As I said, I don't know others' intention, but I was

17  trying to portray myself as somehow, you know, really

18  important, and that's why I wrote that, the importance of the

19  e-mail.

20  Q.   I want to talk about just one specific thing then from

21  one of these chats because this was a group preparing this.

22       If we could pull up 112, please, and go to page 33?

23       There are two paragraphs that look pretty similar there,

24  but just so we are clear, at 5:15:17, who is Al-Muwahid?

25  A.   That's me.

1  Q.  And also in the chat are the defendant and Abu Umar.

2  A.  Yes.

3  Q.  That Abu Umar is the same person you met in Pakistan in

4  2005?

5  A.  Yes.

6  Q.  You write:

7           The trip to TO has been re-arranged by me and

8           Abu Umar, and instead we are going to spend that

9           time and money getting some experience in cooking

10          in the Curry Place restaurant.

11  What part of what I just read is not part of a plan that

12  you and Abu Umar and the defendant had been discussing

13  throughout this chat?

14  A.  I cannot say that -- I mean, I don't get it.

15  Q.  Is there anything in what you typed:

16          The trip to Toronto has been re-arranged by me

17          and Abu Umar, and instead we are going to spend

18          that time and money getting some experience in

19          cooking in the Curry Place restaurant.

20  Did you make any of that up?

21  A.  No.

22  Q.  That is what you and the defendant and Abu Umar had been

23  talking about for 32 pages of chat; right?

24  A.  Yeah.

25  Q.  What is cooking in the Curry Place restaurant?  You

wrote that.  What is that?   Is it cooking?

A.   It's a code word.  It's I think a code word.

Q.   You wrote it.

A.   But it's been a long time ago.

Q.   Had you and Azdee and James and the defendant and
Abu Umar ever had any conversation about going all the way to
Pakistan to learn how to cook?

A.   No.

Q.   What is it that you and Azdee and James and the
defendant and Abu Umar had talked about doing in Pakistan?

A.   We had hoped to, you know, get involved in some jihad
activities.

Q.   That's what you talked about?

A.   Hoped or, yeah, talked about.

Q.   And you are asking James and Azdee to stop doing
concrete action, an apartment search.  Is that the point of
this paragraph?

A.   Yeah, we are telling them we are not coming to Toronto
and to stop the search.

Q.   Near the end of your responses to the defendant's
questions on cross-examination, you said that when you came
back from Pakistan in 2005, given up, you were done trying to
pursue violent jihad.  Is that correct?

A.   At that -- the day I came, yeah, maybe.  But then a few
days later I became ashamed and I thought that I turned back

1  on my heels.

2  Q.   And a few days after that?

3  A.   I mean, I felt really sorry for what I did.

4  Q.   So if we were to fast forward from August 2005, the

5  month and year you came back to October 2005, was it the

6  Syed Haris Ahmed who had given up on violent jihad, or the

7  Syed Haris Ahmed who was ashamed that he turned back on his

8  heels?

9  A.   Ashamed of turning back on my heels.

10  Q.   Did you continue to discuss with people, whether it was

11  the defendant or Zubair Ahmed or others, to include your

12  mother, the possibility of going back to Pakistan to do what

13  you didn't do when you were there in 2005?

14  A.   To appease my self-guilt, I had to express it to people,

15  yeah, if I did talk.

16          MR. McBURNEY:   One second.

17  BY MR. McBURNEY:

18  Q.   One last thing.  Defendant Sadequee brought up a

19  discussion he had with you it sounds like on the eve of your

20  departure for Pakistan in 2005, and he asked you, Didn't I --

21  meaning the defendant -- tell you don't go to Pakistan?

22          You said, Yeah, yeah, that's what you said.

23          Did the defendant say, Don't go to Pakistan because it's

24  dangerous and you might get hurt, or did the defendant say

25  don't go to Pakistan without us?

A.   He was saying, Don't go to Pakistan.  You know, be with us.

MR. McBURNEY:  Okay.  Thank you.

THE COURT:  Does anybody want Mr. Ahmed subject to recall?

MR. McBURNEY:  No, sir.

MR. SADEQUEE:  I had some brief questions to ask.

THE COURT:  Well, the redirect was limited to your cross-examination.  You cannot go into new matters.  Do you want to go into new matters?

MR. SADEQUEE:  No, the very same things Mr. McBurney spoke about.

THE COURT:  Well, it will be limited to that.  If you go astray, you will have to sit down.

-- -- --

RECROSS-EXAMINATION

BY MR. SADEQUEE:

Q.   Just two questions basically.  The -- you were just asked about taking the D.C. videos to Pakistan --

A.   Yes.

Q.   -- as being something differentiating the 2004 trip -- the '05 trip from the '04 trip.

Did you give those D.C. videos to anyone?

A.   No.

Q.   Since he -- the very last question he asked about right

1    before you went to Pakistan, go into as much detail as you

2    remember about our dialogue in the truck?

3    A.    That dialogue or the whole concept of not going to

4    Pakistan, your advice to me?  Because you had more than one

5    times told me that --

6    Q.    What did I say -- what do you remember about the

7    conversation in the truck?  That was in my driveway;

8    correct?

9    A.    Well, you said that, okay, you know, Don't go to

10   Pakistan.  You are disobeying, you know, all the people.

11       I said, I have -- I mean, I am just going.  I have

12   prayed the Prayer of Guidance and, you know, I believe I'm

13   right now.

14       You said that, You will regret the decision to go to

15   Pakistan.

16       I said, I will not.  I have prayed over it.

17       So that was the crux of the stuff, that you said,

18   You will regret the decision of going to Pakistan alone.

19   Q.    Did you also -- there is an e-mail where you are

20   explaining and trying to explain yourself and your decision

21   to go to Pakistan to us.  You mentioned that you spoke with

22   Sammy Ayoub, and you give a number of reasons, and you

23   changed your -- is that correct?

24       I mean, the e-mail I don't have right now.  Can you

25   explain that?  Do you remember that e-mail?

1   A.    A private message?

2   Q.    A private message, yes.

3   A.    A private message to Azdee?

4   Q.    I believe it was to me and maybe cc'ed to Azdee and

5   them?

6   A.    Basically again I was just fully convinced that I had to

7   go to Pakistan even before the whole trip to Toronto was

8   agreed to.

9         And so when I saw the trip to Toronto as a diversion

10   from it, I just backed away from you.  So I was basically

11   trying to justify to myself and to you all the reasons I

12   could come up with to make my -- make my idea seem right.

13        So I said, okay, I have talked to Sammy Ayoub, I prayed

14   the Prayer of Guidance, and then I tried to come up with

15   other benefits that somehow could appease you guys, like, you

16   know, I could search for an apartment or search for a

17   location over there in Pakistan.

18   Q.    Did our relationship -- your decision to go to Pakistan,

19   what type of an impact did that have on your relationship

20   with me and your relationship with Azdee and James?

21   A.    Well, with Azdee and James, it just ended.  I mean,

22   afterwards I did not have any contact with them since after

23   that.

24        With you, it was hurt.  I mean, we stopped being as

25   close, because there was an argument, a big argument on this

 1   concept of should I go to Pakistan or not.

 2              MR. SADEQUEE:  That would be it.  Thank you.

 3              THE COURT:  All right.  Anything further?

 4              MR. McBURNEY:  No, sir.

 5              THE COURT:  All right.  Does anybody want Mr. Ahmed

 6   subject to recall?

 7              MR. McBURNEY:  No.

 8              MR. SADEQUEE:  No.

 9              THE COURT:  All right.  Mr. Ahmed, you are being

10   released.  Don't discuss your testimony with anybody until

11   you hear the case has been concluded.  Thank you for being

12   with us.

13              All right.  Can you call your next witness,

14   please?

15              MR. BLY:  Mellissa Harper.

16                         --   --   --

17                      MELLISSA HARPER

18   being first duly sworn by the Courtroom Deputy, testifies and

19                      says as follows:

20                         --   --   --

21                      DIRECT EXAMINATION

22   BY MR. BLY:

23   Q.   Good afternoon.

24   A.   Hi.

25   Q.   Can you please state and spell your name for the court

1   reporter and the jury?

2   A.   Yes, my name is Mellissa Harper, M-e-l-l-i-s-s-a

3   H-a-r-p-e-r.

4   Q.   Ms. Harper, how are you currently employed?

5   A.   I'm currently employed by Immigration and Customs

6   Enforcement.

7   Q.   What's your -- what are your job responsibilities with

8   we will call it ICE for short?

9   A.   ICE.  My official title is deportation officer.  I'm

10  currently on a unit that prosecutes federal criminal

11  violations of immigration law.

12  Q.   How long have you been with ICE?

13  A.   Two years.

14  Q.   What was your job before you were employed with

15  Immigration and Customs Enforcement?

16  A.   I worked for Customs and Border Protection, that was

17  formerly known as the Immigration and Naturalization

18  Service.

19  Q.   Were your job duties and responsibilities with Customs

20  and Border Protection similar to what you do now with ICE?

21  A.   Well, now I remove them, and before I was supposed to

22  determine if they could come in.

23  Q.   Good point.

24       Where were you --

25           THE COURT:  I would say that's different.

BY MR. BLY:

Q.    Where were you working when you were with Customs and Border Protection?

A.    I was working at the Atlanta airport.

Q.    And that's where you inspected passengers as they were coming into the United States?

A.    Yes, it is.

Q.    How long were you employed at CBP or Customs and Border Protection?

A.    From 2001 till 2007.

Q.    I direct your attention to August 19th of 2005.  Were you working on that day?

A.    Yes, I was.

Q.    And was that at the Atlanta airport?

A.    Yes.

Q.    What were your job duties on August 19th, 2005?

A.    On that day I was assigned to a secondary inspection area.

Q.    Could you explain for the jury what that means?  What does secondary mean, what's the process like when somebody gets off that international flight at Hartsfield and needs to enter the country?

A.    Okay.  When an airplane arrives at the airport from an international destination, the passengers deplane and come and line up.  Basically we have like a hundred booths they

1  line up at.

2      If in the initial questioning nothing is suspicious or

3  uncovered, then they are admitted into the United States and

4  allowed to move on.

5      If the officer at primary feels they need more

6  questioning, then they are sent to a secondary inspection

7  area.

8  Q.   And the secondary inspection area that you mentioned,

9  that's where you were working on August 19; is that right?

10 A.   That's right.

11 Q.   On August 19, 2005, when you were working in the

12 secondary inspection area for arrivals at Hartsfield, did you

13 come to have an interview with Syed Haris Ahmed?

14 A.   Yes, I did.

15 Q.   Was this a planned interview, something that came up

16 spontaneously?

17 A.   It was a planned interview.

18 Q.   Who -- are you familiar with what Mr. Ahmed's itinerary

19 was on that day, where he was arriving from?

20 A.   Yes.  He was arriving from Amsterdam.

21 Q.   Anyplace before Amsterdam, or was Amsterdam where his

22 travel started?

23 A.   He started Pakistan, Bahrain, and then Amsterdam.

24 Q.   So he started out in Pakistan, had some intermediate

25 stops, and then ended up in Atlanta?

1    A.    That's right.

2    Q.    When was the first time that you saw Mr. Ahmed on August

3    19th, 2005?

4    A.    After he went through primary inspection and was

5    referred into the secondary room, I saw him when he entered

6    the room.

7    Q.    Okay.  Describe that room for me, what's it look like?

8    A.    There is one big open room in the front with like three

9    rows of chairs and a high counter that the officers are

10   behind.  When someone comes in the room, they have already

11   been given a folder to put their passport and entry documents

12   in.

13        And they come up to the counter, there is a rack, and

14   you put your folder in the rack.

15   Q.    So what happens after Mr. Syed Haris Ahmed gets into

16   this big room with the rows you described?

17   A.    He came in, he put his folder down.

18        And I knew that it was him.  I had been told it was

19   him.  So I picked up his paperwork.  I made sure I had

20   everything I needed initially, and I called him up to the

21   counter to verify his identity.

22   Q.    Where did you go after that?

23   A.    We went into an interview office, which is a separate

24   part of secondary.

25   Q.    What's that room look like?

A.    It looks like a typical business office.  It's about I
would say twelve-by-twelve, has about a five-foot window that
looks directly onto the main room of secondary so that other
people can see in and we can see out.

Q.    Was there anybody else in the room with you when
Mr. Syed Haris Ahmed came back in there?

A.    Yes.  FBI Agent Williamson was in the room, and for a
short time ICE Agent Heerlein was in the room.

Q.    Did you have occasion to talk to Mr. Ahmed after you all
got back to the interview room that you described?

A.    Yes, I did.

Q.    Did you ask him why he went to Pakistan?

A.    Yes, I did.

Q.    What did he say?  What did he say why he went there?

A.    Originally he said he went to Pakistan for religious
training, and almost immediately he acknowledged that that
had -- he said, That has a bad connotation.  I mean spiritual
training.

Q.    Did he say anything about going to further his interest
in violent jihad?

A.    No, he did not.

Q.    Did he say anything about going to further his interest
in joining a training camp?

A.    No, he did not.

Q.    Did he say anything about the places that he visited

1  that would have given you as a law enforcement agent a reason

2  to suspect any sort of a dangerous motive?

3  A.    No, he did not.

4  Q.    Did you ask Mr. Syed Haris Ahmed about his prior

5  international travels, trips prior to the return from

6  Pakistan?

7  A.    Yes, I did.

8  Q.    What did he say about that?

9  A.    He said that he twice had been to Pakistan before, and

10  that he had recently taken a trip to Canada with a friend of

11  his named Shifa.

12  Q.    Did he say why he went to Canada?

13  A.    He said he went to Canada to visit some family members.

14  Q.    Did he mention any family members in particular?

15  A.    Yeah, he mentioned an uncle.

16  Q.    Did he say what that uncle's name was, if you remember?

17  A.    I think it's Azdee Omani.

18  Q.    How long did this interview with Mr. Syed Haris Ahmed

19  last?

20  A.    I think it was about an hour and a half, two hours

21  maybe.

22  Q.    When he came back into the room -- this gets a little

23  bit back to how the process works.  But when he comes back

24  into the room, did he have any bags or luggage with him, any

25  of that sort of thing?

1    A.    Yes, he did.

2    Q.    What did he have with him?

3    A.    He had a backpack with him.

4    Q.    Now, when somebody comes back through to secondary and

5    has a backpack with him, would that be carry-on luggage, or

6    would somebody have their checked luggage with them when they

7    come back through to secondary?

8    A.    No, initially they would only have their carry-on

9    luggage.

10   Q.    So he comes back with the backpack.  That would have

11   been carry-on?

12   A.    Yes.

13   Q.    Did you search the backpack during the course of your

14   interview?

15   A.    Yes, I did.

16   Q.    And where was the backpack in the room?

17   A.    Initially the backpack was on the floor between he and

18   I when it was full.  And as I emptied it out, I moved some of

19   the stuff up onto the top of the desk.  He was on one side of

20   the desk, I was the other.

21   Q.    Was he in the room during this?  He was able to see what

22   you were doing and what you were taking out of the bag?

23   A.    Yes, he was in the room the entire time.

24   Q.    Did you find anything in the bag that was of interest?

25   A.    Yes.

Q.   What did you find in the bag?

A.   In the bag we found his itinerary, also some personal

writings which he described as personal essays.  He had an

address book with a lot of names and phone numbers written in

it, and he had some books that contain pictures of some

airplanes and things like that.

Q.   What did you do with these items that you found in the

backpack?

A.   We made copies of everything.

Q.   So you made photocopies of them?

A.   Yeah, photocopies, yes, sir.

Q.   Did Mr. Syed Haris Ahmed keep the originals of

everything that was in his bag?

A.   Everything was returned to him.

Q.   You should have some exhibits in front of you there.

They should be numbered Government's Exhibit 154 and

Government's Exhibit 155.

     If you could take a look at those, I will ask if you

recognize those?

A.   Yes.

Q.   Are those fair and accurate copies of items that you

found while searching Mr. Syed Haris Ahmed's backpack on

August 19th, 2005?

A.   Yes, they are.

          MR. BLY:  Your Honor, I tender Government's Exhibit

1    154 and 155.

2              THE COURT:  Any objection?

3              MR. SAMUEL:  154?

4              MR. BLY:  154 and 155.

5              MR. SADEQUEE:  No objection.

6              THE COURT:  They are admitted.

7    BY MR. BLY:

8    Q.   Agent Harper, let's take a look at Exhibit 154.

9    And maybe if we could put up the third page of that

10   document, let's take a look at the bottom.  There's two

11   things shown.

12        Let's take a look at the one on the bottom, the Delta

13   boarding pass.  Does that show a passenger's name?

14   A.   Yes.

15   Q.   And what's the name shown on that boarding pass?

16   A.   Syed Ahmed.

17   Q.   And what's the date of travel?

18   A.   July 17th.

19   Q.   And where is the origin and the destination for that

20   travel?

21   A.   It's departing Atlanta and arriving in Houston.

22   Q.   Let's take a look at page four of that document.  Let's

23   look at the item all the way in the bottom right-hand corner

24   with the initials PIA on top of it.  Is that also a boarding

25   pass?

1   A.   Yes, it is.

2   Q.   Also with the name Syed Ahmed?

3   A.   Yes, it is.

4   Q.   And is the date of travel also July 17th?

5   A.   Yes.

6   Q.   What's the origin and destination for that itinerary

7   there?

8   A.   Houston, Texas; Karachi, Pakistan.

9   Q.   Let's look -- staying on that page for the top item,

10  all the way at the top there, it's got the KLM initials

11  on the top of it.  Who is the traveler shown on that

12  itinerary?

13  A.   Syed Haris Ahmed.

14  Q.   And what is the origin and the final destination for

15  that travel?

16  A.   He originated in Karachi, stopped in Bahrain, Amsterdam,

17  and arrived in Atlanta.

18  Q.   Can you tell by looking at that whether that was a

19  one-way ticket or a round-trip ticket?

20  A.   It's a one-way ticket.

21  Q.   Agent Harper, let's look at Exhibit 155.  Is this the

22  address book that you were referring to before that you found

23  in the backpack?

24  A.   Yes, it is.

25  Q.   Let's take a look at the eighth page of that

1   exhibit.  Maybe if you can read it, what's the name and the

2   phone number for that first entry on that page?

3   A.    Omar.

4   Q.    What's the number listed there?

5   A.    00923005604920.

6          MR. BLY:  No further questions, Your Honor.

7          THE COURT:  Any cross?

8          MR. SADEQUEE:  No.

9          THE COURT:  All right.  Does anybody want

10  Agent Harper subject to recall?

11         MR. BLY:  No, Your Honor.

12         THE COURT:  Mr. Sadequee, do you want her subject

13  to recall?

14         MR. SADEQUEE:  No.

15         THE COURT:  Agent Harper, we appreciate your

16  testimony.  You are released, but you should not discuss your

17  testimony until you hear the case has been concluded.

18         THE WITNESS:  Yes, sir.

19         THE COURT:  Call your next witness, please.

20         MR. BLY:  Neil Rabinovitz.

21                        --  --  --

22                    NEIL RABINOVITZ

23  being first duly sworn by the Courtroom Deputy, testifies and

24                    says as follows:

25                        --  --  --

```
1                    DIRECT EXAMINATION

2    BY MR. BLY:

3    Q.   Good afternoon, sir.

4    A.   Good afternoon.

5    Q.   If you could, please state and spell your name for the

6    court reporter and the jury?

7    A.   Neil Rabinovitz, first is N-e-i-l, last is

8    R-a-b-i-n-o-v-i-t-z.

9    Q.   Sir, how are you currently employed?

10   A.   I'm a special agent with the Federal Bureau of

11   Investigation here in Atlanta.

12   Q.   How long have you been with the FBI?

13   A.   Approximately eleven years.

14   Q.   And what's your current job assignment at the FBI?

15   A.   I'm currently assigned to our Joint Terrorism Task

16   Force, and physically assigned at our office out at

17   Hartsfield-Jackson Airport.

18   Q.   How long have you had that specific job responsibility?

19   A.   Approximately five years.

20   Q.   Sir, I would like to direct your attention to August

21   18th of 2005.  Were you working on that day?

22   A.   I was.

23   Q.   Was that again down at the Atlanta airport?

24   A.   Yes, it was.

25   Q.   What was your job task or responsibility on August
```

1   18th?

2   A.   Along with my counterpart with Immigration and Customs

3   Enforcement, we were tasked to search a piece of checked

4   luggage that was traveling outbound.

5   Q.   Was that for a specific passenger?

6   A.   It was.

7   Q.   What was the passenger's name for the luggage that you

8   were asked to search that day?

9   A.   It was Ehsanul Sadequee.

10  Q.   Do you know, are you familiar with where Mr. Sadequee

11  was traveling that day?

12  A.   I am, yes.

13  Q.   What was his itinerary?

14  A.   He was traveling from Atlanta Hartsfield-Jackson Airport

15  to JFK in New York, connecting to a flight to Dubai and on to

16  Bangladesh.

17  Q.   You said you searched a bag.  Was this a piece of

18  checked luggage?

19  A.   It was, it was checked luggage.

20  Q.   How did you go about identifying the bag that you

21  searched?

22  A.   Once the bag was checked in through Delta Airlines, it's

23  assigned a bag tag number.  So we obtained that number, went

24  underneath, underneath the airport.  Once you check a bag and

25  it goes on the conveyer belt, it goes underneath that level

1   there where all the bags are sorted.

2       We went down there and obtained the bag underneath.

3   Q.   Was there anything on the bag to indicate who it

4   belonged to?

5   A.   There was.

6   Q.   What was that?

7   A.   There was a sticker that the airline puts on it which

8   has the bag tag number as well as the passenger name.

9   Q.   Just to be clear, did you ever have any actual contact

10  with Defendant Sadequee on that day, or was your contact

11  solely with the piece of luggage?

12  A.   Solely with the luggage.

13  Q.   Let's talk about the search.  You indicated that you

14  identified the bag.  What did you do once you identified the

15  bag?

16  A.   We stayed underneath where the bags come down to be

17  sorted.  We just located just an open area where we could lay

18  the bag down and open it up.

19  Q.   What did you do after you opened it up?

20  A.   We started going through the main compartment, removing

21  items, searching.  Searching that main compartment.

22  Q.   What did you find in the main compartment?  What's the

23  bag look like?  Just a typical looking suitcase?

24  A.   Just a typical suitcase, yes.

25  Q.   So you opened it up, you looked through the main

1    compartment.  What did you find in there?

2    A.    The main compartment contained -- there was a portfolio

3    with some documents and clothing, just a lot of clothing.

4    Q.    Things somebody might take with them when they go on a

5    trip?

6    A.    Correct.

7    Q.    What did you do?  Did you search the entire part of the

8    main portion of the suitcase?

9    A.    We did.

10    Q.    Okay.  What did you do after that?

11    A.    As we searched, we remove each item so that ultimately

12    the suitcase, the main compartment, is completely empty.

13         Then by hand we felt around the lining to see if there

14    was anything out of the ordinary that we could feel located

15    there.

16    Q.    Did you feel anything in the lining after you had

17    emptied out the main portion of the suitcase?

18    A.    Yes.

19    Q.    What did you feel?

20    A.    Just there were items.  We could tell there were items,

21    something underneath the lining of the suitcase.

22    Q.    Were you able to identify those items?

23    A.    Not at that point.

24    Q.    Were you able to get to them?

25    A.    Yes.

Q.   How did you do that?

A.   The suitcase had a lining that's attached to the shell
by a zipper.  So basically you just had to unzip the lining
and remove the lining.

Q.   You unzipped the lining.  What are you looking at then?
What's between that lining and whatever else is part of the
suitcase?  What do you have after you unzip the lining?

A.   Once you unzip the lining, it's just the shell of the
suitcase.

Q.   So the part right on the outside, nothing between the
outer part of the suitcase and the lining that you unzipped?

A.   Correct.

Q.   What did you find in that area between the zippered
lining and the outside of the suitcase?

A.   There were a number of pieces of slips of paper with
various names and numbers on them -- letters and numbers.
There was an address book.  There was a map of the
Washington, D.C., area.  And there were two compact disks,
CDs in a CD case.

Q.   What did you do with the items that you took out of this
area between the lining and the outside of the suitcase?

A.   The paper items, everything except for the CDs, I took
those to a -- Delta Airlines had some offices down there, so
I just took them to one of the Delta offices and used a
photocopier and copied those.

Q.   What did you do with the originals?   What did you do
with everything that you took out of that suitcase?

A.   All the originals were placed back in the suitcase once
they were copied.

Q.   Officer Rabinovitz, you should have some exhibits there
in front of you.  Let's look at Government's Exhibit 160, 161
and 162.

     I would ask you to take a look at those.

A.   Okay.

Q.   Sir, are those fair and accurate copies of the documents
that you removed from that area between the lining and the
outside of the suitcase on August 18, 2005?

A.   They are, yes.

          MR. BLY:  Your Honor, I tender Government's
Exhibits 160, 161 and 162.

          THE COURT:  Any objection?

          MR. SADEQUEE:  No objection.

          THE COURT:  They are admitted.

BY MR. BLY:

Q.   Officer Rabinovitz, let's go in order.  Let's look at
Government's Exhibit 160.

     I think you mentioned an address book before.  Is this
the address book or a copy of the address book that you
removed from that area in the suitcase?

A.   It is, yes.

Q.   Take a look at the first page.  Is there a name on the
first page?

A.   Yes, there is.

Q.   What's the name there?

A.   It says Shifa Sadequee.

Q.   Let's take a look at the second page.  Under the
personal information up at the top left-hand corner, what
name is listed?

A.   It says Ehsanul, middle initial I period, Sadequee.

Q.   A little bit further down on that page, is there an
address listed?

A.   There is, yes.

Q.   What is that address?

A.   Under father?

Q.   Yeah.

A.   Appears to be 4204 Nowata, N-o-w-a-t-a, Drive,
Northeast, Roswell, Georgia  30075.

Q.   Okay.  Officer Rabinovitz, let's take a look at
Government's Exhibit 161.

     You mentioned a map before.  Is this a copy of the map
that you removed from that area between the lining and the
outside of the suitcase?

A.   It is, yes.

Q.   What's it a map of?

A.   It states that it's of Fairfax County, Virginia.  You

can see some other landmarks, Maryland, Washington Dulles

International Airport on the first page.

    Then the second page appears to be the Washington --

downtown Washington, D.C., area.

Q.    You mentioned Mr. Sadequee's travel itinerary

before.  Did his travels that day take him through the

Washington, D.C., or Fairfax County area?

A.    No, sir.

Q.    Let's take a look at Government's Exhibit 162.

    This is a slip of paper that you found again in that

area between the lining and the outside of the bag?

A.    Yes.

Q.    What are the initials?  It looks like some numbers and

then some letters in the middle.  What are those letters?

A.    AU.

Q.    Mr. Rabinovitz, you mentioned that you found some CDs in

that same area.  What did you do with the CDs?

A.    The CDs were taken to the main FBI office to be copied.

Q.    Do you know what was on those CDs?

A.    It was my understanding that one of them contained a

movie and the other one was encrypted.

Q.    What happened to the bags?  So you got all the stuff out

of the bags, stuff out of the main compartment, stuff out of

the area between the lining and the outside.  What did you do

with the original stuff that was in there when you found it?

1    A.    All the original items that were underneath in the

2    lining, those were replaced once the CDs came back from the

3    FBI office.

4    Q.    Did you put them back in that same area?

5    A.    Yes, sir.  And then all the items that were in the main

6    compartment were replaced exactly where they were.  And then

7    the bag was sealed up.

8    Q.    What did you do with the bag?

9    A.    We put it on -- it had already missed the flight to JFK

10   from Atlanta, so we put it with the assistance of Delta

11   Airlines, put it on a later flight to JFK so that it could

12   meet up for the outbound flight to Dubai from JFK.

13                MR. BLY:  One moment, sir.

14                No further questions.

15                THE COURT:  Any cross?

16                MR. SADEQUEE:  No.

17                THE COURT:  Does anybody want Agent Rabinovitz

18   subject to recall?

19                MR. BLY:  No, sir.

20                MR. SADEQUEE:  No.

21                THE COURT:  All right.  Agent, we appreciate your

22   testimony.  You are being released, but you should not

23   discuss the case until you hear it's been concluded.

24                THE WITNESS:  Yes, sir.

25                THE COURT:  Thank you.

1          Call your next witness, please.

2          MR. BLY:  Government calls William Puller.

3                    --  --  --

4                    WILLIAM PULLER

5     being first duly sworn by the Courtroom Deputy, testifies and

6                    says as follows:

7                    --  --  --

8                    DIRECT EXAMINATION

9     BY MR. BLY:

10    Q.   Good afternoon, sir.

11    A.   Good afternoon, sir.

12    Q.   If you could please state and spell your name for the

13    court reporter and the jury?

14    A.   William Puller, P-u-l-l-e-r.

15    Q.   Sir, how are you currently employed?

16    A.   I'm an investigative specialist with the Federal Bureau

17    of Investigation.

18    Q.   What's an investigative specialist do?

19    A.   I work as part of a surveillance team.

20    Q.   How long have you had that position?

21    A.   Just over six years now.

22    Q.   Sir, I direct your attention to September 19th of

23    2005.  Were you working as an investigative specialist with

24    the FBI on that day?

25    A.   Yes, sir.

Q.   Who were you tasked with surveilling that day?

A.   Our assignment for that day was surveillance of Syed Haris Ahmed.

Q.   If you could, what were the general time frames of when you were working that day?

A.   Our shift for that day was 7:00 a.m. to 3:00 p.m.

Q.   At some point in the morning, did you come to see Mr. Ahmed?

A.   Yes, sir.

Q.   Where was that?

A.   Originally he left his residence, drove to a nearby MARTA station, and returned to an area near his residence, eventually made his way to the Georgia Tech campus at about 8:45.

Q.   Was Mr. Ahmed a student at Georgia Tech?

A.   Yes, sir, at that time he was.

Q.   What happened after Mr. Ahmed entered the Georgia Tech campus or the area of the campus?

A.   He walked to the Woodruff Mechanical Engineering Building on campus.  He had a morning class that day, I believe.

Q.   Okay.  What happened after that?

A.   I remained outside.  I was out on foot.  I stayed outside for a portion of time.

     At about 10:08, one of the other team members noticed

Mr. Ahmed using one of the computers in a common area inside

the building.  I eventually went inside the building as well

probably about 10:45 or so.

Q.   Let's talk a little bit about the Woodruff Building.

What kind of building is that?

A.   It's one of the engineering buildings on campus.  It

consists of a bunch of classrooms, has a computer lab, also

has some industrial arts type workshops there.

Q.   When you walked in the door, you said you went in that

building around 10:00 that morning.  When you walk in, what

do you see?

A.   If you go in, there is a small hallway, a reception

area.  Off to either side are hallways that lead to different

classrooms and workshops.  There is also a small common area

with tables and chairs and vending machines, and a table in

the back of that common area with computers on it.

Q.   When you walked in that day, did you see Mr. Syed Haris

Ahmed?

A.   Yes, sir.  He was using one of the computers in the

common area.

Q.   Is this somebody you had seen before, were you familiar

with what he looked like?

A.   Yes, sir.

Q.   You said he was using one of the computers in the common

area.  What did you do after you saw that?

A.   I sat down at one of the tables in the common area where I could watch Mr. Ahmed use the computer.

Q.   Could you see him from where you were sitting?

A.   Yes, sir.  His back was towards me.

Q.   What did you see after you sat down?

A.   Basically I just saw Mr. Ahmed staying at the computer.

Q.   While Mr. Ahmed was at the computer, did anybody else come up and use that same computer, the one that he was on?

A.   No, sir.

Q.   Did anybody else come up and talk to him or anything like that?

A.   No, sir.

Q.   How long did Mr. Ahmed stay on that computer that he was using?

A.   I believe according to the log, he was on it from 10:08 to 10:51.

Q.   Did he leave at some point?

A.   Yes, sir.  Right after he completed using the computer at about 10:51, he exited through a door that was right next to the computers there in the common area.

Q.   What did you do when Mr. Ahmed left the computer that he was using?

A.   I got up and I walked over to that computer and got on to that computer.

Q.   Were you able to see it, see the computer the whole time

1  from when Mr. Ahmed left until you got to it?

2  A.   Yes, sir.  It's not that far.

3  Q.   Did anybody else come up and quick get in there and get

4  on to check their e-mail or anything like that?

5  A.   No, sir.

6  Q.   What did you do after you got up to the computer that

7  Mr. Ahmed had been using?

8  A.   I opened up one of the web browsers to see if there was

9  any browsing activity that was visible in the history file.

10 Q.   You say in the history file.  First of all, which web

11 browser was it that you opened up?

12 A.   I opened up -- initially I opened up Firefox, but there

13 was no browsing activity.  So then I opened up Internet

14 Explorer.

15 Q.   You opened Internet Explorer and you mentioned the

16 browsing history.  Explain that a little bit?

17 A.   Each web browser has a function built into it that

18 allows you to go back over various days to review websites

19 that you visited.  For instance, you could go back to sites

20 that you looked at yesterday or chronologically by date

21 further back in time, provided there was any browsing history

22 that day.

23 Q.   Is this a complicated process to get this history to

24 show up?   How do you do it?

25 A.   No, sir.  It's a built-in function of the web

browser.  There is a button on the toolbar that says

history.  You can also use a key combination to open up that

window.

Q.   After you opened up the history for the computer that

Mr. Ahmed was using, does it show that any websites had been

visited?

A.   Yes, sir.  There was browsing history for that day.

Q.   And you say for that day.  Does the history indicate a

time on there so I can tell that this was today and something

else was --

A.   Every day that there is web history, it shows up in the

history folder.  For instance, there will be a folder listed

for today, there would be one listed for yesterday, and then

previous dates will be listed by date.

Q.   So the sites we are going to talk about you knew were

visited on September -- or at least the history indicated

were visited on September 19, 2005?

A.   Yes.

Q.   What sites were displayed in the history after you

opened that function up?

A.   There were various sites there.  Some automotive

websites.  Also Google, a search engine.  A couple of

different web-based e-mails sites, Hotmail and Google

Mail.  Drudge Report, and there was a website Totse.com that

was also visited.

Q.   Let's talk about Totse.com.  Under Totse.com, were you
able to tell what websites or what links from that website
had been visited?

A.   Yes, sir.  Every main website has its own folder.  For
instance, if you went to CNN and viewed several stories, you
would have a CNN.com folder, then inside there would be links
of each web page that you viewed on that site.

     And on Totse, there were three pages that were visited
on that day for that site.

Q.   Let's talk generally about Totse.com.  Are you familiar
with that website?

A.   Yes, sir.  It's just a general interest type of
website.  It has information on various topics, ranging from
relationships, to just about anything you can think of,
whatever you could think of.

Q.   What sites were visited from that computer?  What sites
at Totse.com were accessed?

A.   The three pages that I noticed that were listed was one
titled "Ten Great High-Explosive Mixtures."  There was
another page titled "Introduction to Steganography."  And a
third page which was entitled "How to Beat SWAT Team, Special
Operation Groups and Special Operations."

Q.   You mentioned "Ten Great High-Explosive Mixtures,"
mentioned "Introduction to Steganography," and you mentioned
"How to Beat Special Forces, SWAT and Special Operation

1   Groups"?

2   A.   That's correct.

3   Q.   Anything else from Totse that was of interest or stood

4   out?

5   A.   No, sir.  That was the only three pages there was for

6   that site.

7   Q.   Do you know what steganography is?

8   A.   Yes, sir.  It's a method of secret communication.  In

9   this particular case, it's how to hide one type of file in

10  another file.

11       For instance, if I wanted to hide a word-processing

12  document inside a picture, there it explains how to use

13  software to do that.

14  Q.   Do you know, was the FBI able to determine whether the

15  Totse sites that you just described, were they able to

16  determine whether those sites were visited during the time

17  frame that you were there actually watching Mr. Syed Haris

18  Ahmed on that computer?

19  A.   Yes, sir.  We maintained control of that computer until

20  the agent could come and retrieve it for examination.

21       Subsequent examination determined that that site was

22  visited during the time Mr. Ahmed was on the computer.

23            MR. BLY:  No further questions.  Thank you, sir.

24            THE COURT:  Mr. Sadequee?

25            MR. SADEQUEE:  No questions.

1          THE COURT:  Would anybody like Agent Puller subject

2    to recall?

3          MR. BLY:  No, Your Honor.

4          MR. SADEQUEE:  No.

5          THE COURT:  We appreciate very much your

6    testimony.  You are released, but don't discuss your

7    testimony until you hear the case is concluded.

8          THE WITNESS:  Yes, sir.

9          THE COURT:  Thank you.

10          Can you call your next witness, please?

11          MR. McBURNEY:  Judge, Zubair Ahmed is the next

12    witness.  He will be longer than those others.  I don't know

13    what your break planning is for the afternoon, but for your

14    information this will be a longer witness.

15          THE COURT:  How do you define long?

16          MR. McBURNEY:  I suspect that my direct examination

17    will be twenty-five minutes.  I think the cross could be a

18    longer one based on what Zubair Ahmed has to talk about.  But

19    I don't know.

20          Longer than the last two.  I don't want you to feel

21    that we are in the ten-minute groove here for this witness.

22          THE COURT:  I got that.

23          Let's take our break, and then when we come back in

24    fifteen minutes, we will go until the end of the day.  So we

25    will be in recess for fifteen minutes.  Please don't discuss

1    the case yet.

2              (In open court without a jury present:)

3              THE COURT:  Anything we need to discuss before we

4    take our break?

5              MR. McBURNEY:  No, sir.

6              MR. SADEQUEE:  No.

7              THE COURT:  All right.  We will be in recess.

8              (A recess is taken at 3:33 p.m.)

9                          --  --  --

10             (In open court without a jury present at

11   3:52 p.m.:)

12             THE COURT:  We are experiencing a little break

13   creep, meaning that we don't promptly get back.  I want to

14   keep it to 15 minutes, so let's be prepared to come back in

15   15 minutes.

16             I'm not complaining now.  I just want to make sure

17   that doesn't become a habit.

18             Anything we need to discuss before we bring the

19   jurors back in?

20             MR. McBURNEY:  No, sir.

21             MR. SADEQUEE:  No.

22             THE COURT:  Bring them in, please.

23             (In open court with a jury present:)

24             THE COURT:  All right.  Please call your next

25   witness.

 1              MR. McBURNEY:  Zubair Ahmed.

 2                      --  --  --

 3                     ZUBAIR AHMED

 4    being first duly affirmed by the Courtroom Deputy, testifies

 5                   and says as follows:

 6                      --  --  --

 7                   DIRECT EXAMINATION

 8    BY MR. McBURNEY:

 9    Q.    Good afternoon, sir.  Could you please state your name,

10    spelling your name slowly?

11    A.    Zubair Ahmed, Z-u-b-a-i-r  A-h-m-e-d.

12    Q.    How old are you?

13    A.    30.

14    Q.    Where do you live, city, state?

15    A.    Chicago, Illinois.

16    Q.    Mr. Ahmed, have you pled guilty to conspiracy to provide

17    material support to terrorism?

18    A.    Yes.

19    Q.    In what federal district?

20    A.    Northern District of Ohio.

21    Q.    Have you been sentenced yet?

22    A.    No.

23    Q.    Did you through your attorneys work out some plea

24    bargain where you were charged with a lessor offense in

25    exchange for your guilty plea?

```
1    A.    Yes.

2    Q.    Did you through your attorneys negotiate a specific

3    sentence range based on your cooperation in the case there

4    and your willingness to testify here?

5    A.    Yes.

6    Q.    Who is it who will decide what your final sentence is in

7    whatever range you have negotiated?

8    A.    Judge Carr.

9    Q.    That's a judge in the Northern District of Ohio?

10   A.    Yes.

11   Q.    Not Judge Duffey?

12   A.    No.

13   Q.    Is there a floor to your sentencing range, meaning you

14   can't get lower than a particular number based on --

15   A.    Eight to ten.  Not lower than eight, not more than ten.

16   Q.    What month and year, as best you recall, were you first

17   approached or interviewed by law enforcement in connection to

18   this case, meaning your case?

19   A.    I believe it was either February or March of '07.

20   Q.    Roughly how many times were you interviewed by federal

21   law enforcement, whether it's FBI or ICE, before you ended up

22   entering a guilty plea?

23   A.    I don't know, like four.

24   Q.    Pardon me?

25   A.    Approximately four times.
```

1 Q. When you were first interviewed by law enforcement, were

2 you forthcoming about your crimes?

3 A. No.

4 Q. The second interview, did you provide more information

5 but still withhold some?

6 A. Yes.

7 Q. After you were charged and had proffer sessions, did you

8 ultimately share with law enforcement the full extent of your

9 criminal activity?

10 A. Yes.

11 Q. Did you at some point in your life pursue violent jihad,

12 take steps to go overseas to join a terrorist organization of

13 some sort?

14 A. Yes.

15 Q. What was your objective?

16 A. My objective -- my objective was to enter any of the

17 theaters of war, Iraq or Afghanistan.

18 Q. Did you actually get to Iraq or Afghanistan?

19 A. No.

20 Q. Where were you going to get training?

21 A. I don't know, but it was eventually probably going to be

22 Pakistan.

23 Q. Did you even make it to Pakistan?

24 A. No.

25 Q. How far did you get geographically?

```
 1   A.    Cairo, Egypt.

 2   Q.    Did you plan with someone else to make this trip with

 3   the ultimate destination of Pakistan?

 4   A.    Yes.

 5   Q.    Did you have an agreement with someone else to go

 6   together to get to Pakistan?

 7   A.    Yes.

 8   Q.    But you didn't complete all the steps?

 9   A.    No.

10   Q.    The defendant in this case, not your case, is

11   Ehsanul Islam Sadequee.  Have you ever met the defendant?

12   A.    No.

13   Q.    Have you ever chatted with him online?

14   A.    No.

15   Q.    Ever talked with him on the phone?

16   A.    No.

17   Q.    Do you know a Syed Haris Ahmed?

18   A.    Yes.

19   Q.    Have you met him?

20   A.    Yes.

21   Q.    Face-to-face?

22   A.    Yes.

23   Q.    Have you chatted with him online?

24   A.    Yes.

25   Q.    Talked to him on the phone?
```

```
1    A.    Yes.

2    Q.    E-mailed him?

3    A.    Yes.

4    Q.    Have you discussed with Syed Haris Ahmed your interest

5    in pursuing violent jihad?

6    A.    Yes.

7    Q.    Did he discuss with you his same interest?

8    A.    Yes.

9    Q.    You mentioned you met him in person.  How long ago was

10   that, roughly?

11   A.    Six years ago.

12   Q.    Where did you meet?

13   A.    In my house.

14   Q.    Had you met online prior to that?

15   A.    Yes.

16   Q.    In what context?

17   A.    Chat forums, internet.

18   Q.    A Chicago Bears chat forum?

19   A.    No.  It was Islamic chat forums.

20   Q.    Did you and Syed Haris Ahmed establish a series of codes

21   indicating certain steps along the progression of pursuing

22   violent jihad?

23   A.    Yes.

24   Q.    What was that?

25   A.    One was ideological support, two was logistical support,
```

1   and three was fighting.

2   Q.   First, second, third, or one, two, three, that

3   progression?

4   A.   Yes, uh-huh.

5   Q.   Did you use that lingo with Syed Haris Ahmed and others

6   when you chat or e-mail online?

7   A.   Yes.

8   Q.   While you discussed your interest and plans and

9   intention to get to third, get into violent jihad fighting,

10  did Syed Haris Ahmed ever discuss with you what was going on

11  in Atlanta in his pursuit of third?

12  A.   No.

13  Q.   When you say no, did he ever mention to you that he had

14  met people in Atlanta and formed his own institute or

15  training group?

16  A.   Yes.

17  Q.   Not specifics, but the generalities?

18  A.   Yeah.

19  Q.   You should have in front of you, sir, a bunch of e-mails

20  and chats.  If you would pull out of the pile 175, 177, 178,

21  179, 180, 181 and 182?

22       Do you see all of those?

23  A.   I have 182, there is no -- 180 I have right here.

24  Q.   Okay.

25  A.   Okay.

1   Q.   Are those documents you have seen before?

2   A.   Yes.

3   Q.   Are those either e-mails or chat sessions in which you

4   and Syed Haris Ahmed were participants?

5   A.   Yes.

6   Q.   Are they all e-mails and/or chat sessions in which at

7   one point or another, either directly or using code like

8   third, you and Syed Haris Ahmed talked about pursuing violent

9   jihad?

10  A.   Yes.

11          MR. McBURNEY:  The government tenders 175, and 177

12  through 182.

13          THE COURT:  Any objection?

14          MR. SADEQUEE:  No objection.

15          THE COURT:  They are admitted.

16  BY MR. McBURNEY:

17  Q.   Let's put up 175, please?  If you would go to the second

18  page?

19       This is an e-mail chain involving a number of

20  people.  Who is the sender of the e-mail that we have on the

21  second page of Government's Exhibit 175?

22  A.   It's Haris.

23  Q.   That moniker, Thandy Mazaq, are you familiar with that?

24  A.   Yes.

25  Q.   It's also says Syed Ahmed, but you have seen

1    Thandy Mazaq before?

2    A.    Yeah.

3    Q.    The distribution list includes Safiullah Hussaini.  Do

4    you know who that is?

5    A.    Yes.

6    Q.    Who is that in relation to Syed Ahmed?

7    A.    A friend.

8    Q.    And Zubair Ahmed, that's you?

9    A.    That's me.

10   Q.    And then Asad Khan.  Who is that?

11   A.    A friend.

12   Q.    Did Safiullah Hussaini have a nickname in your circle?

13   A.    Yes.

14   Q.    What was that?

15   A.    Fallen Angel.

16   Q.    Did Asad Khan have a nickname?

17   A.    Bhonday Mazaq.

18   Q.    Syed Haris Ahmed writes about "our commitment to the

19   three-step plan" at the end of the first sentence in that

20   second paragraph.  What is the three-step plan?

21   A.    The third, which would be fighting for jihad.

22   Q.    This is the three steps you described, ideological

23   support --

24   A.    -- logistical and then fighting.

25   Q.    This e-mail is dated October 18, 2004.  Syed Haris Ahmed

1 says part way through that paragraph, if you can read the

2 sentence that starts with "I have"?  "I have found new

3 people," can you read that aloud, please?

4 A.   I'm trying to find it.

5 Q.   Okay.

6 A.   Can you like highlight it up there?

7 Q.   It should look blue there.

8 A.   Oh, okay.

9           I have found new people.  One is a friend of

10          Safi.  I met him in person and, insha'Allah, he's a

11          good addition for us.

12 Q.   Where is Syed Ahmed, city and state, in October of '04?

13 You are in Chicago or somewhere in the midwest.  Where is

14 Syed Haris Ahmed?

15 A.   Atlanta, Georgia.

16 Q.   And he's found new people, one of whom knows Safi, Safi

17 being Safiullah Hussaini?

18 A.   Yeah.

19 Q.   If we look at the first page, this is a response to

20 Syed Haris Ahmed's e-mail from whom?

21 A.   Me.

22 Q.   It's the same day, October 18, 2004.  And you start by

23 saying:

24          Well, me and my cuz made it very close to

25          third degree.

1          What is that a reference to?

2     A.   My trip to Egypt for jihad.

3     Q.   And at the very bottom, the P.S.:

4               The biggest problem everyone will face for

5          third is our stupid parents.

6          What's that a reference to?

7     A.   It's a reference to my experience when my dad came and

8     intervened.

9     Q.   Let's look at 177, Government's Exhibit 177.

10         This is a series of e-mails between what two people?

11    A.   It's me and Haris.

12    Q.   If we could magnify the top half of the page, please?

13         We are no longer in October of 2004.  What's the month

14    and year now?

15    A.   January '05.

16    Q.   Read the paragraph in Syed Ahmed's e-mail of January 22

17    that starts with "Our studies"?

18    A.             Our studies are fine now, mashallah.  We are

19         turning the pages of book for preparation for exam

20         for entering the third level of expertise.

21    Q.   Could you slow down a little bit while you are reading?

22    A.   Okay.

23               It would be cool if you could come and see our

24         preparation.  I think you can learn from our book

25         too.  Just try to come ASAP, man, because the

1    institute in which we are training for the exam is

2    here and it is very good.  We have learned a lot

3    from it.  You will be surprised how good the

4    institute is.  I don't think I can emphasize it

5    enough.  So please, man, come here even for like a

6    day to check out the institute.

7  Q.  Did Syed Ahmed invite you on a number of occasions after

8  January 22, 2005, to come down and meet him and the other

9  people that he was pursuing third with?

10  A.  Yes.

11  Q.  Did you ever make it?

12  A.  No.

13  Q.  What was your response?  You responded the next day.

14  A.    Cool, you keep doing your thing.  I found a

15    tutor for third degree.  Also my tutor said I can

16    start big, so it's all good.  Yeah, insha'Allah,

17    I'll really try to come by.  Give me a couple

18    weeks.

19  Q.  You refer to a tutor for third degree.  What is that

20  reference to?

21  A.  It's in reference to a firearms trainer that I met.

22  Q.  In Chicago or wherever -- where were you in January of

23  '05?

24  A.  I was in Michigan.

25  Q.  What were you doing?

1    A.    Going to school.

2    Q.    And had you in fact made some connection that you

3    thought might lead you to a firearms trainer?

4    A.    Yes.

5    Q.    Government's Exhibit 178, if you could magnify again the

6    top three-fifths?

7          Now what month and year are we in?

8    A.    March '05.

9    Q.    Syed Ahmed writes to you on March 1, talks about money,

10   wants to know when you will be coming.  What does he say

11   after, Let me know when you will be coming?

12   A.                Make it after the 13th of this month.  I will

13                be free then, insha'Allah.  I attend Georgia Tech,

14                lots of "technical" guys, so if you need hook-ups

15                with engineers, just let me know.  Laugh outloud.

16                Come with walking shoes and clothes, we will

17                show you with the mountain side of Georgia which

18                shall be beneficial, if you know what I mean.

19   Q.    First, Syed Haris Ahmed says, Don't come visit me after

20   the 13th of March 2005?

21   A.    Yes.

22   Q.    Did he ever tell you where he was going to be in the

23   beginning part of March?

24   A.    I don't remember where it was.

25   Q.    This last part, Come with walking shoes and clothes, we

will show you the mountain side of Georgia which shall be
beneficial, what's that a reference to?

A.   The mountains and hiking and stuff.  And from my
understanding, it was to simulate some sort of environment
which would be similar to Afghanistan.

Q.   Similar to where?

A.   Afghanistan.

Q.   Did you ever make it to the mountain side of Georgia?

A.   No.

Q.   Government's Exhibit 75, it's already in evidence, and
if you could go -- I don't have 75 in front of me -- the
second page, please?  Great.

     The bottom of this page, we are now on March 13, the
date that the defendant said don't come before then -- and
I'm sorry, that's Syed Haris Ahmed said, and he's writing to
you on the 13th of March.  What does he say, the highlighted
part?

A.              Went to some place don't want to mention
          online.

Q.   In fact, read the whole sentence.  I know it spills over
to the next page.  What does he say?

A.   From the beginning?

Q.   Starting with man?

A.              Man, things have changed, insha'Allah.  Now
          went to some place don't want to mention online.

1   Q.   And?

2   A.              And hooked up with people.  Just come any

3              time.  I'm free.  College is not a problem.  I'm

4              broke too.  Ever think about "fay"?  We will talk

5              when you come.

6   Q.   So Syed Haris Ahmed went somewhere he doesn't want to

7   talk about online.  What does that tell you, that he doesn't

8   want to put it in an e-mail?

9   A.   That he wants to talk to me in person.

10  Q.   What types of things did you and Syed Haris Ahmed

11  refrain from discussing in detail when you were e-mailing or

12  chatting?

13  A.   Anything about jihad.

14  Q.   If we could go to the second page again, please, in this

15  e-mail chain.  You responded to Syed Haris Ahmed, and then he

16  writes back that same day and asks a question.  What does he

17  ask?

18  A.              Hey, man, you mentioned a loong time ago that

19              we can take loans and then run away from these

20              banks.  Update me on that.

21  Q.   Tell the jurors what the concept is of taking a loan and

22  running away with it, which I understand means not paying it

23  back?  But what is the Islamic angle on that?

24  A.   My opinion was that you can't do that based on --

25  Q.   You cannot?

1   A.   You cannot do that based on my studies.

2   Q.   Were there other scholars or other individuals who had a

3   different perspective?

4   A.   Yes.

5   Q.   Had you shared that perspective with Syed Haris Ahmed as

6   well?

7   A.   Yes.

8   Q.   And what is that perspective?

9   A.   That perspective was that if you do that, then it has to

10   be paid back.  Because if you die a martyr, then you are in

11   purgatory.

12   Q.   That's the perspective you were sharing with him, saying

13   it cannot be done?

14   A.   Yes.

15   Q.   Okay.  Were there other angles on that topic of taking

16   money from a western bank and not paying it back?

17   A.   Some scholars say it can be done.

18   Q.   Why is that?

19   A.   I don't know the exact reason why.

20   Q.   Okay.

21   A.   But that's what their opinion was.

22   Q.   Let's look at the first page, please, of this.  So

23   that's what you explained, what you just told the jury, that,

24   Look, actually that is a debt, and if you die with a debt,

25   that's a bad development, in the top e-mail March 15th?

1          You don't need to read it outloud.  Is that the essence

2    of what you are telling him?

3    A.    Yeah.

4    Q.    Why is it that you or Syed Haris Ahmed might be dying in

5    the near future?

6    A.    I decided on following the path of jihad.

7    Q.    Okay.  181, please.

8          So it's a one-page e-mail exchange between what two

9    people?

10   A.    It's me and Haris.

11   Q.    If you could magnify the bottom e-mail?

12         Syed Ahmed writes to Zubair Ahmed on June 16,

13   2005.  What does he say?  Read the first three lines.

14   A.                I'm going in end of July, 17 to be exact.  The

15              problem is that I'm going not for some fun and

16              games, but to see if I can get some business done.

17              If you know what I mean.  So I think it is

18              important we meet before that.

19   Q.    Where was Syed Haris Ahmed going in July of 2005?

20   A.    He was going to Pakistan.

21   Q.    But not for fun and games, but to see if he can get some

22   business done.  What's that a reference to?

23   A.    My understanding of it was in reference to finding

24   connections for jihad.

25   Q.    179, if you could?

1          This is an e-mail exchange, and if we could go to page

2     three and magnify the bottom half of the page?

3          Okay.  What's the date of this e-mail?

4     A.   August 21st, 2005.

5     Q.   It's from Haris Ahmed.  Who is Ibnahmed460?

6     A.   It's me.

7     Q.   The author identifies himself, he says, "It's me"?

8     A.   "Haris."

9     Q.   What does he say?  Keep reading.

10    A.              I came back now.  The situation was that I met

11                 some teachers and they told me to go back and help

12                 my parents for now.  Being the only son has some

13                 responsibilities, you should know too.  Well,

14                 I hope those teachers are right; otherwise, I'm

15                 screwed that I turned back on my heels.  Try

16                 meeting now.  Man, wanna talk to you.  Rest is

17                 okay.  Wasalam.  Safi gives you his regards.

18    Q.   Safi, that's the Safiullah that you three --

19    A.   Yes.

20    Q.   You and Haris talked with sometimes?

21    A.   Yes.

22    Q.   Haris Ahmed came back from where in August of '05?

23    A.   Pakistan.

24    Q.   Turning back on my heels, that's odd phrasing.  Does

25    that have religious significance?

A.   Yes.  It's a reference to a verse in the Quran which
talks about turning back on your heels from the battlefield
is a major sin unless it be a stratagem of war.  I'm
paraphrasing the quote.

Q.   But from the battlefield?

A.   Yes.

Q.   Being the only son has some responsibilities, you should
know too.  What is that a reference to?

A.   I share a similar situation where I'm the only son.

Q.   That was part of -- you had a footnote in one of your
e-mails saying parents are the biggest problem, that
situation?

A.   Yes.

Q.   You write back at the top of this page -- the header of
the e-mail is on the previous page, but at the top, this is
your response.  What do you say about the teachers that
Syed Haris Ahmed had spoken to in Pakistan?

A.   I said that the teachers are wrong.

Q.   I understand what the word wrong means, but what's your
point?

A.   The point is that there is a -- since the jihad now is
defensive in the sense that someone attacked -- namely, the
United States -- and occupied our countries, so it becomes an
obligation for Muslims to do what they can to expel them.
And this is I think -- I referred to third is kifaya -- I

1    mean third is 'ain.

2    Q.   I think we will get to that.  But is there in Islam a

3    distinction between an obligatory violent jihad and an

4    optional one?

5    A.   Yes.

6    Q.   And you were saying defensive war, that's the obligatory

7    one?

8    A.   Yes.

9    Q.   What's the optional one?

10   A.   Optional one would be like if there was a country and

11   you are guarding the borders.

12   Q.   Okay.  If we could go to the second page and magnify the

13   top half, enlarge the top half?

14        So Syed Haris Ahmed wrote back to you at the bottom of

15   the page, and you have yet another response on the 22nd of

16   August.  You ask him a question about the scholars.  What did

17   you say?

18   A.   I asked him if --

19   Q.   Down here you say:

20               Bro, I'll call you right now.

21   A.               Did the scholars do third degree?

22   Q.   What does that mean?

23   A.   That means did they fight jihad.

24   Q.   What's the significance if the scholars he talked to had

25   not fought jihad?

A.   The scholars that fought jihad have more authority in religion.

Q.   You say, I'll call you right now, August 22, 2005.  Several hours later, same day, Haris Ahmed says: After the phone call with you, I'm more depressed.

Did you two actually talk on the phone?

A.   Yes.

Q.   What did he say after he's more depressed?

A.   He said:

            And if it is, then didn't I turn back on my
        heels?

Q.   You skipped a little bit.  It's I'm more depressed, then there is an ellipsis, and what?

A.   He said:

            Third is 'ain.

Q.   What is 'ain?  It says regulation, but what does it mean in the context of jihad?

A.   That you have to do it.

Q.   This is the obligatory?

A.   Obligatory, yes.

Q.   Keep going?

A.            And if it is, then didn't I turn back on my
        heels?  Cuz the scholars said it is kifaya.  Scary
        stuff.  May Allah guide us all.

Q.   What does that mean, if he turned back on his heels, the

1    scholars said it is kifaya?

2    A.    He's concerned about his position with God.

3    Q.    The first page, please, if you would enlarge the bottom

4    e-mail?

5        So you respond to Syed Haris Ahmed.  What do you say in

6    this paragraph down here:  I can go into detail?

7    A.              I can go into detail about the 'ain, but

8                scholars differ.  And the parent hadith is weak

9                from one scholar that I know, and kutha exploited

10               that so that things don't happen.

11   Q.    Tell the jurors what you are saying in this paragraph?

12   A.    I'm saying that I can go into details about it being

13   'ain, but many scholars have different opinions.  And I said

14   that there is a hadith that says that you have to get your

15   parents' permission, but I found out that Oriental scholars

16   fabricated that hadith and they put it in Islamic books so

17   that Muslims don't fight jihad.

18   Q.    So that -- a hadith is what?

19   A.    It's weak.

20   Q.    No, a hadith is what?

21   A.    Oh, it's a saying of the Prophet.

22   Q.    And you describe that one as a weak one, meaning it's

23   trumped by other sayings of the Prophet?

24   A.    Yes.  There is like -- there is weak hadith, there is

25   hadith that are okay, and there are strong ones, all based on

1   chains of narration, and these are what the scholars have

2   been deciphering over the years.

3   Q.   And what is your understanding if one were to rank

4   hadiths that say you need to participate in the 'ain, the

5   obligatory jihad versus the parent hadith?

6   A.   Strong.

7   Q.   Which is stronger?

8   A.   The one where you have to participate in jihad.

9   Q.   Okay.  If we could enlarge again and then magnify this?

10          So now Haris Ahmed writes back.  What does he say?

11  A.            Okay, you had reasons, but I didn't, and

12          I even had a connection that could get me to the

13          third.  So that's my problem.

14  Q.   All right, stop for a second.  You had reasons, that's

15  meaning Zubair had reasons, Zubair Ahmed had reasons, but

16  Haris Ahmed didn't.  What were your reasons?

17  A.   My reasons were I didn't have a connection and I was

18  lied to.

19  Q.   And Haris Ahmed is saying he did have a connection to

20  get him to third?

21  A.   Yes.

22  Q.   Keep reading?

23  A.            So that's my problem.  If parents issue is

24          weak, then I'm screwed cuz few people depended on

25          me to make way for third too.  They were waiting

1          for me to go so I could establish a way for

2          them.  So basically I got them screwed too cuz they

3          are now in a limbo.  All that was in my hands.

4          Shit, man, it all seems bad for me.

5  Q.   So Haris Ahmed is telling you that he was going ahead of

6  other individuals and they were waiting for him to get

7  established?

8  A.   Yes.

9  Q.   180.  This is not an e-mail.  What is this?

10 A.   This is an MSN Messenger conversation.

11 Q.   It is between Piddikashorba.  Who is Piddikashorba?

12 A.   Haris Ahmed.

13 Q.   And I think you have already told us Ibnahmed460 is you?

14 A.   Yes.

15 Q.   All right.  We don't need to enlarge anything right

16 now.

17      So Piddikashorba, Haris Ahmed, asks you if you read

18 *Millat Ibrahim*.  You say no.

19      And he asked you if you know a Shaykh Maqdisi.  Who is

20 that?

21 A.   It's a contemporary scholar which he explains why jihad

22 is third 'ain, it's an obligation.

23 Q.   Maqdisi explains why jihad is an obligation?

24 A.   Yes.

25 Q.   And Haris Ahmed goes on to talk about he almost met

1   someone who translates Maqdisi's books into Urdu.

2       If we can go to the second page, what does he say at the

3   top, the top line?

4   A.              It was hot those days in PK, arrests

5          everywhere.

6   Q.   Is hot a reference to the temperature?

7   A.   No.

8   Q.   What's he talking about?

9   A.   Law enforcement.

10  Q.   He goes on at the line 4:30:33 and he says?

11  A.             KHI has tons of Salafi schools, man.

12  Q.   KHI is short for what?

13  A.   Karachi.

14  Q.   What's a Salafi school?

15  A.   Salafi is a school of thought which says that we should

16  follow the Prophet and the predecessors after Him, His

17  companions.

18  Q.   Is the Salafi school more or less associated with

19  violent jihad than other schools, or is there no connection

20  at all?

21  A.   It's more.

22  Q.   At the bottom of page two starting at 4:31:01, what does

23  Syed Haris Ahmed say?

24  A.   Can you like highlight it or point it out?

25  Q.   Sure.  Can we magnify the bottom part?  Thank you.

A.                    Man, no wonder so many AQ people found in
                      KHI.  It's full of SJ.  I barely searched and got
                      like tons and tons of them.

Q.   All right.  His first line, Man, no wonder so many AQ
PPL.  What is that?

A.   Al-Qaeda people.

Q.   And KHI you said is Karachi?

A.   Karachi.

Q.   It's full of SJ.  What is SJ?

A.   Salafi-Jihadists.

Q.   What does that mean?

A.   That's the opinion where all the governments, meaning
the governments where it's Muslim should be overthrown and
Islamic law should be established.

Q.   A Salafi-Jihadist, is that someone who supports violent
jihad?

A.   Yes.

Q.   Then Haris Ahmed says, I barely searched and got like
tons and tons of them.  What -- did he tell you where he was
in Pakistan?

A.   He says he was in Karachi.

Q.   And finally if we could put up 182?
     While we are getting that up, if you could look back at
180 which is in front of you, what's the date of that chat we
just went over with Al-Qaeda people in Karachi?  180, it was

1  the two-page chat we just did.

2  A.    November 15, 2005.

3  Q.    November 15, 2005.  And now we have another chat from

4  that same day, this is Government's Exhibit 182.  Who is

5  involved in this chat?

6  A.    Me and Haris.

7  Q.    If we go to page two, the very first line at

8  2:32:53 a.m., Haris Ahmed asks you what?

9  A.    How far from Firoun's Land to your place now?

10  Q.    Who is Firoun?

11  A.    Firoun is the Pharaoh.

12  Q.    So Pharaoh's Land refers to what city?

13  A.    I don't know what city it refers to, but I'm assuming

14  it's America.

15  Q.    Were you in America at the time?

16  A.    Yeah.

17  Q.    And Haris Ahmed says, We can come if you can make it

18  worthwhile for us, man.

19        Is this chat in part a discussion about you and

20  Syed Haris Ahmed meeting over Thanksgiving?

21  A.    Yes.

22  Q.    What does Syed Haris Ahmed say at 2:34:11?

23  A.               You will be free on Friday.

24  Q.    Keep going with what he says?

25  A.               Yeah, but then one day it can be used.

```
1   Q.   You have pointed out it's only one day, not two or

2   three.

3        And he says there is a difference this time.  What does

4   he say?

5   A.               Last time we met, remember, we were first.

6                    Last time was good.

7                    Now we both have come back from almost

8        third.

9   Q.   Stop.

10       So last time we met, when was the previous time --

11  really the only time you met Syed Ahmed?

12  A.   It was before my jihad trip.

13  Q.   That's the reference to first?

14  A.   Yes.

15  Q.   Now he says, We both have come back from almost

16  third.  What does that mean for you?

17  A.   For me, it's my Egypt trip.

18  Q.   And he goes on, Syed Haris Ahmed, to say what at

19  2:35:25?

20  A.               And I have some people who are in touch with

21       third.

22  Q.   Let's go to page four.  You at 2:36:21 say what?

23  A.               Sometimes I think maybe I made a mistake.

24  Q.   And then two lines down you continue?

25  A.               Seriously, if I had real hard-core connect,
```

```
 1              I wouldn't hesitate.

 2   Q.    What's the mistake that you are thinking about there?

 3   A.    That I came back from Egypt.

 4   Q.    And if you had a hard-core connect, you wouldn't

 5   hesitate to do what?

 6   A.    To join the insurgency.

 7   Q.    What does Syed Haris Ahmed say in response?

 8   A.              I think that too, especially when we had like

 9              five to eight bros all damn serious.

10   Q.    Then you ask him at 2:36:55 what?

11   A.              When did we have that many?

12   Q.    And he says, not we, but --

13   A.              I did.

14   Q.    And then at 2:37:07 he says?

15   A.              A few months ago.

16   Q.    Continue with what he says?

17   A.              I was transcountry, man.  We met in one

18              country people from three countries.

19   Q.    Okay.  And finally, Mr. Ahmed, if you look at page five,

20   November 15th, 2005, at 2:38:41 a.m., what does Syed Haris

21   Ahmed tell you?

22   A.              But anyhow, man, the thing is third is still

23              not broken for me.  All the bros want third.

24              MR. McBURNEY:  Thank you.

25              THE WITNESS:  That's it?
```

1      MR. McBURNEY:  From me.

2      THE WITNESS:  I meant reading.

3      THE COURT:  All right.  Mr. Sadequee?

4                    --  --  --

5                 CROSS-EXAMINATION

6  BY MR. SADEQUEE:

7  Q.   Good afternoon.

8  A.   Salaam.

9  Q.   Let's go over some of the things that the government

10 asked you.

11      You and I have never met?

12 A.   No.

13 Q.   This is the first time I'm speaking with you?

14 A.   Yes.  The first time I heard your name was when my

15 defense attorney asked me, which I never met you and I never

16 heard of your name.

17 Q.   Nor any internet conversations or anything of that

18 nature at all?

19 A.   No.

20 Q.   This is the very first contact with you.

21      You are here because you know my co-defendant,

22 Mr. Syed Haris Ahmed; correct?

23 A.   Yes.

24 Q.   You have met in person with him, chatted with him on the

25 internet as well; correct?

1   A.   Yes.

2   Q.   You and Haris have been discussing jihad or

3   jihad-related matters since the year 2002?

4   A.   Yes.

5   Q.   Two years before I ever even met Haris Ahmed.

6        You went to Cairo when?

7   A.   I went to Cairo in 2004, summer of 2004.

8   Q.   In some of these chats with Syed Haris Ahmed, you

9   referred to a buddhee?

10  A.   Buddhee, that's Urdu, it means old lady.

11  Q.   That's referring to?

12  A.   That's referring to a person that used to have a

13  website, Beverly.  Beverly is her name.

14  Q.   The Jihad Unspun website?

15  A.   Yes.

16  Q.   You went to Cairo to meet --

17  A.   Yes.

18  Q.   -- this old lady?

19  A.   Yes.  I was going to help her with a documentary.

20  Q.   A jihad-related documentary?

21  A.   Yes, to depict what's going on in the tribal areas of

22  Pakistan, because CNN, BBC and all those people, in my

23  opinion, they lie.

24       But she didn't know my intention.  My intention

25  eventually was to join the battlefield.  But I was helping

her with her documentary.  That's why I went to Egypt, I was
going to get her and go -- once we finished that, I was going
to say good-bye to her basically.

Q.   Your family is from Pakistan?

A.   Actually my dad is from India and my mom is from
Pakistan.

Q.   You have been to that area before?

A.   I have been to India.  I have never been to Pakistan.  I
have no family left in Pakistan.

Q.   You have family in India?

A.   Yes.

Q.   How often have you been to India?

A.   Last time I went to India, I was ten years old.

Q.   You still have family in India?

A.   My grandfather and a couple aunts and uncles.

Q.   Do you have family in Egypt?

A.   No.  But do you -- I mean, Beverly was not family.  She
was just a friend.

Q.   So did you go to Egypt for training?

A.   No.

Q.   You started to speak with Haris about jihad in 2002.
And since then he had been to Pakistan after he was --

A.   You mean before my trip?

Q.   In 2002 --

A.   Yeah.

Q.   -- you and Haris started talking about jihad?

A.   Yeah.

Q.   And, for example, in 2004 when he went, you were still in contact with him; correct?

A.   Yes.

Q.   Were there conversations between 2002 and 2004, his trip to Pakistan, about joining jihad activities?

A.   Me?

Q.   No, about Haris joining jihad-related activities?

A.   No.

Q.   So what was discussed?

A.   What was discussed was whether jihad is right in our situation and Islamic history, things of that nature.

Q.   Islamic law related stuff?

A.   Yes.

Q.   Did you ever encourage him by telling him to go to Pakistan for training?

A.   I don't remember.

Q.   He expressed to you that he was interested in pursuing religious Islamic studies?

A.   Yes.

Q.   Did he mention any schools or possible places of study?

A.   No, nothing specific.  He was -- it was just general, I just want to get religious studies.  He used to always talk about that.

Q.   He used to always talk about that?

A.   Yeah, and he used to ask me about fiqh issues.  Fiqh is basically jurisprudence issues.

Q.   Are you aware of the current -- not 2009 current, but as what's been going on in Pakistan, Afghanistan?

A.   Are you talking about what is going on --

Q.   The theater of jihad, as you mentioned?

A.   Yes.

Q.   How accessible are these training camps to a native of Pakistan?

A.   I couldn't answer that question, because I don't know where they are, I don't know how to find somebody to get there.

My trip was not -- well, it was just like if you find somebody, you find somebody, if you don't, you don't.  It wasn't like, Oh, I know so-and-so and he's going to get me there or something like that.  So I can't answer the question.

Q.   There is areas which are either controlled or heavily influenced by the Taliban?

A.   Now, yes.

Q.   Of Pakistan?

A.   Yes.

Q.   Not a separate country, but within Pakistan?

A.   Within Pakistan.

1   Q.   Whole provinces which are basically run by the Taliban?

2   A.   Yes.

3   Q.   So if someone wanted to join the Taliban, how hard would

4   it be?

5   A.   It would be -- I'm assuming now it would be pretty easy,

6   because they hold actual physical land.

7   Q.   As of 2004, 2005, what about?

8   A.   It would be very difficult to join, in my opinion.

9   Q.   You have heard of Waziristan as well?

10  A.   Yes.

11  Q.   These areas, the Northwestern Province, Waziristan,

12  these are run by tribal elders which are sympathetic to

13  Al-Qaeda or to the Taliban; correct?

14  A.   Yes.

15  Q.   It's been like that for how long, do you know?

16  A.   Hundreds of years.

17  Q.   The Pakistan government does not have much authority

18  over them; correct?

19  A.   No.

20  Q.   For hundreds of years, something like that?

21  A.   Yes.

22  Q.   And Haris went over there, and he came back.  He spoke

23  to certain scholars; correct?

24  A.   Yes.

25  Q.   And do you know which scholars he spoke with?

1   A.   Are you talking about specific names?

2   Q.   No, just generally what scholars.

3   A.   Deobandi scholars.  Deobandi.

4   Q.   Now, Haris, is he Deobandi?

5   A.   No.  He's just a Muslim, regular Muslim.

6   Q.   But are you aware -- did you and him speak about the

7   Deobandis?

8   A.   Yes.

9   Q.   Did he like the Deobandis or agree with them?

10   A.   I don't know if he liked them or not.  It was a

11   confusing issue.  There is many opinions that run in their

12   religious circle.

13   Q.   Did Haris consider himself a Salafi-Jihadi?

14   A.   I really don't remember him telling me if he's a

15   Salafi-Jihadist.  We used to talk about it, though.

16   Q.   What is a Salafi-Jihadi, if you could explain?

17   A.   Someone that wants to follow the companions of the

18   Prophet after the Prophet passed away in establishing the

19   rule of law.  And in order to do that, if there is another

20   entity that is against that, that one would wage jihad to

21   accomplish that.

22        And then even within the jihad, there is a lot of rules

23   and regulations to follow.  You can't just start attacking

24   people.

25   Q.   So a Salafi-Jihadi is not by definition equivalent to a

1  terrorist?

2  A.   No.

3  Q.   Would you call it a movement or a --

4  A.   I would call it a freedom-fighting entity.

5  Q.   Entity?  Is it an organization?

6  A.   No, it's not like a set organization.  It's just a way

7  of thinking.

8       Personally, I don't even think one should be a

9  Salafi-Jihadist.  They just should be Muslim.  I think all

10  these different denominations are -- you know, they are a

11  result of many conspiracies against our ummah, which are our,

12  you know, Muslims.

13  Q.   Is Lashkar a Salafi-Jihadi organization?

14  A.   Lashkar-e-Tayyiba?

15  Q.   Yeah.  LeT, sorry.

16  A.   I would think so.

17       Wait, no, no, because their aim is to fight for

18  Kashmir's liberation.  Their aim is not to overthrow the

19  Pakistani government.

20  Q.   Haris asked you to read a book called *Millat Ibrahim*?

21  A.   Yes.

22  Q.   Is that a Salafi-Jihadi book?

23  A.   I never read it.  I don't know.

24  Q.   Shaykh Abu Muhammad al-Maqdisi, the scholar that you

25  referred to that he almost met someone who translated his

1    books?

2    A.    Yes.

3    Q.    Shaykh Abu al-Maqdisi is a -- is he a Salafi-Jihadi

4    scholar?

5    A.    I believe he described himself as a Muslim.  I don't

6    know if he called himself a Salafi-Jihadist, and I can't

7    speak on his behalf.

8    Q.    Are you aware of his other writings?

9    A.    His other writings?

10   Q.    Yes.

11   A.    I don't remember specific names.  I probably came

12   across -- I read -- through those years I read many scholarly

13   books and articles and stuff.  I don't remember any specific

14   names of any.

15   Q.    Do you know the names of some scholars who are

16   associated with the Salafi-Jihadi trend or movement, school

17   of thought, whatever you want to call it?

18   A.    Anwar al-Awlaki.

19   Q.    Sorry?

20   A.    Anwar al-Awlaki.

21   Q.    Anwar al-Awlaki?

22   A.    Yes.

23   Q.    You consider him Salafi-Jihadi?

24   A.    Me?

25   Q.    Yes.

1   A.   Yes.

2   Q.   He's a respected scholar?

3   A.   Oh, yeah.

4   Q.   Well known.

5        Is Tibyan Publications a Salafi-Jihadi-oriented

6   publication?

7   A.   I didn't really -- like Haris used to mention it to me a

8   lot.  I really didn't -- I just went and checked the website

9   out.  I didn't really download anything on there, so I can't

10  really say.  Because I was just watching videos and stuff.  I

11  wasn't really reading anything.

12       And at that time I was really busy.  Like I was working

13  full-time, I was living out-of-state, paying for my own

14  apartment and stuff.  And then I got engaged too, so I had to

15  come up with finances to get married.

16            MR. SADEQUEE:  That will be it.  Thank you.

17            THE COURT:  Any redirect?

18            MR. McBURNEY:  No, sir.

19            THE COURT:  Does anybody want Mr. Zubair subject to

20  recall?

21            MR. McBURNEY:  No.

22            THE COURT:  Do you want Mr. Zubair subject to

23  recall?

24            MR. SADEQUEE:  No.

25            THE COURT:  All right.  Mr. Zubair, we appreciate

1    your testimony.  You are released, but you should not discuss

2    your testimony until the case is concluded.

3              THE WITNESS:  Thank you.

4              THE COURT:  Thank you for being with us.

5              Do you have a short witness?

6              MR. McBURNEY:  Relatively, and I think it will be

7    pretty interesting, and he's flying back to Bosnia tomorrow

8    at noon.  So we can finish with him in the morning, but we

9    may run five minutes past and see.

10             But he can be here in the morning as well, but I'm

11   glad we are starting with him now, with the Court's

12   permission?

13             THE COURT:  All right.  Do you know who he is?

14             MR. McBURNEY:  I do, and I think they are getting

15   him.  He is Investigator Cengic, and there is an interpreter

16   involved.

17             THE COURT:  We will need to swear both the

18   interpreter and the witness.  Let's begin with the

19   interpreter.

20             (The oath is given to Interpreter Elmedin Krgo by

21   the Clerk.)

22             THE CLERK:  Could you please state and spell your

23   name for the record?

24             THE INTERPRETER:  First name is Elmedin,

25   E-l-m-e-d-i-n, last name is K-r-g-o, nickname is Dino,

1    D-i-n-o.

2              THE COURT:  Now, if we put a chair up there, would

3    that be best for you?

4              THE INTERPRETER:  Whatever you want, Your Honor,

5    it's fine with me.

6              THE COURT:  Well, you are a very accommodating

7    person.

8              THE INTERPRETER:  That's my job.

9              THE COURT:  Can you put that chair up there?

10   I don't want him to have to stand.

11             THE INTERPRETER:  Thank you, sir.

12             THE COURT:  You are welcome.

13             THE INTERPRETER:  Do you want it this side or --

14             THE COURT:  Whatever is best for you and your

15   interpretation, that's fine.  And we will give you this

16   microphone so you don't have to reach over.

17             Now we need to swear the witness.

18                       --  --  --

19                     ANES CENGIC

20   being first duly sworn by the Courtroom Deputy, testifies and

21                   says as follows:

22                       --  --  --

23                   DIRECT EXAMINATION

24   BY MR. McBURNEY:

25   Q.   Good afternoon.  Would you please state your name,

1  spelling it, for the record?

2  A.   Cengic, Anes.

3  Q.   Spell it?

4  A.   It's a different spelling.  C-e-n-g-i-c, that's the last

5  name.

6  Q.   C-e-n-g-i-c is the last name.  The first name?

7  A.   Anes, A-n-e-s.

8  Q.   Investigator Cengic, when I ask the questions, even if

9  you may understand them in English, allow the interpreter to

10  translate them into Bosnian before you respond, please.

11       Where do you work, sir?

12  A.   Federal Affairs Ministry with the Federal Ministry

13  Police of Bosnia-Herzegovina.

14  Q.   So you are a federal police officer?

15  A.   Yes.

16  Q.   What's your title?

17  A.   My position is senior investigator of Counter-Terrorism

18  Department.

19  Q.   How long have you been a police officer?

20  A.   For twenty years.

21  Q.   Were you one of the investigators on the case of

22  Mirsad Bektasevic?

23  A.   Yes.

24  Q.   Was Bektasevic known by any other names or nicknames?

25  A.   Yes, he had three nicknames.  Mirso, Abu Sayaf and

1    Maximus.

2    Q.   Maximus.

3       You should have in front of you a whole bunch of

4    pictures, 199 and then 201 through 221.

5    A.   There is not 199, I think.  I don't have 199 and 200.  I

6    have 201.

7    Q.   Well, we start with 201.  We skip 200.  199 is a picture

8    of a person.  Is that up there?

9    A.   No.

10    Q.   Okay.  Mr. Williams, if you could -- it seems to have

11    flipped out.

12       Do you recognize, without describing what they are, 199

13    and then 201 through 221?

14    A.   Yes.

15    Q.   Are those fair and accurate depictions of all those

16    images?

17    A.   Yes.

18    Q.   They are all pictures you have seen before?

19    A.   Yes.

20    Q.   And apart from 199, were you present when all the

21    pictures were taken?

22    A.   Yes.

23          MR. McBURNEY:  The government tenders 199 and 201

24    through 221.

25          THE COURT:  Any objection?

```
 1              MR. SADEQUEE:  No objection.

 2              THE COURT:  I haven't admitted them yet.

 3              MR. McBURNEY:  Oh, I'm sorry, I thought he said no

 4   objection.

 5              MR. SADEQUEE:  No objection.

 6              THE COURT:  They are admitted.  Go ahead.

 7              MR. McBURNEY:  Put up 199, please.

 8   BY MR. McBURNEY:

 9   Q.   Who is this?

10   A.   Bektasevic.

11   Q.   Maximus?

12   A.   Yes, Maximus.

13   Q.   I will slow my pacing down so the interpreter can

14   finish.

15        Bektasevic is of what nationality?  Where was he from?

16   A.   He was born in Serbia, but he's a citizenship of

17   Sweden.

18   Q.   Sweden citizen, born in Serbia?

19   A.   Yes.

20   Q.   From what region in Serbia did he come?

21   A.   His parents came from an area called Sandzak.

22   Q.   Is that also known as Sandzakee?

23   A.   Yes, that's actually the name of the people who live

24   over there.  Sandzakee is the people from that area.

25   Q.   Did Mirsad Bektasevic come to Bosnia in early October of
```

1   2005?

2   A.   Yes.

3   Q.   Did Bosnian law enforcement receive information from

4   another country that Mirsad Bektasevic could be engaged in

5   suspicious activity in Bosnia?

6   A.   In exchange of -- in an international exchange of

7   information, we got some input that that guy named Mirsad

8   from Sandzak is coming to Bosnia.

9   Q.   What did the federal police entity to which you belong

10  do once this information came?

11  A.   We first try to find last name to identify that person,

12  and then we use our Secret Service and other services, we

13  tried to locate him in this area.

14  Q.   Was Bektasevic eventually located in Sarajevo?

15  A.   I'm not sure, but approximately after fifteen days to

16  one month we actually located him.

17  Q.   But at some point he was found?

18  A.   Yes.

19  Q.   And Bektasevic had been in Sarajevo or Bosnia for

20  several weeks before you found him?

21  A.   Yes.  Actually he came to Sarajevo, then he went to

22  Sandzak, and then came back to Sarajevo.

23  Q.   Did surveillance ever observe Bektasevic in a cyber

24  cafe', a place where you can get online?

25  A.   He was actually noted, he was seen at that place.

Q.   Okay.  And at some point did the federal police get
involved?  Did the case get handed over from the
Secret Service to the federal police?

A.   Yes.  That's because Secret Service did their job, they
located him, and then he was transferred to us to step in.

Q.   Were the federal police able to determine where
Bektasevic was living in Sarajevo?

A.   After that moment when they spotted him the first time,
they start to follow him to actually find his place where he
lived.

Q.   And did you find it?

A.   Yes, of course.

Q.   Did you ultimately arrest Mirsad Bektasevic?

A.   Yes.  Actually we followed him on his way to that
address, that place.  Of course, we first contacted our DA to
get approval if we can do an arrest.

Q.   DA meaning prosecutor?

A.   Yes.  Of course, the court and the DA, that's the
procedure.

Q.   So you received authority to arrest Bektasevic, also to
search his home?

A.   Yes, both of those.

Q.   What was the day in October 2005 that you arrested
Bektasevic and searched his home?

A.   October 19, 2005.

1   Q.   Were you there?

2   A.   Yes.

3   Q.   Tell the jurors what happened when you sought to arrest

4   Bektasevic?

5   A.   After we got order from DA and the court actually we can

6   do arrest and search, of course we came with our car without

7   any sign in front of that place, that house.  There was three

8   of us inside the car.

9        And in the meanwhile, we got information actually he got

10  some explosive already and he has it with him.

11  Q.   In the house?

12  A.   Actually we had information they have some backpack with

13  some explosive in it before he came to the house.

14       Because the situation was kind of urgent, we tried to

15  park our car in the driveway of that house and we were on the

16  way to our entry of the house.  We did not have to ask; he

17  opened the door at that moment.

18  Q.   He being?

19  A.   Bektasevic, Mirsad.

20  Q.   Did you recognize him?

21  A.   Yes, because of picture I saw before that one,

22  I recognized Mr. Bektasevic.  And actually I asked him,

23  Are you Mirsad Bektasevic?

24  Q.   Did you identify yourself as being police?

25  A.   Yes.  At that moment when he answered to me, Yes, I'm

1  Mirsad, I showed my police badge.

2  Q.   Did he come with you?

3  A.   What happened, something really opposite what I expected

4  we were going to find there.  When I mentioned to him

5  actually that we had an order from DA and the court that we

6  have a right to search his place and showed my badge, he

7  punched me.

8       At that moment I was more confused than hurt because

9  I didn't know what's going on.  We tried to push -- I tried

10 to push him inside of house, he tried to push me outside of

11 house.  And because that space is very narrow, that hallway

12 is very narrow, my friends or my colleagues were unable to

13 help me in that altercation.

14 Q.   Did you eventually subdue Bektasevic and get him into

15 custody?

16 A.   Yes, I pushed him inside of that room.  We had kind of

17 wrestling, we had kind of clash, I tried to subdue him.  And

18 I pushed him in the room on the left.

19 Q.   But ultimately you did subdue him?

20 A.   Yes, that happened.

21 Q.   Was there anyone else found inside Bektasevic's

22 apartment?

23 A.   In the room at the right, there is other person.

24 I didn't know at that moment who was that.

25 Q.   Was he arrested?

A.   Yes, the second person we arrested --

Q.   Did the second person --

A.   -- staying with Mirsad.

Q.   Did the second person have a weapon?

A.   He has a gun with a silencer on it, and actually he tried to use that gun.

Q.   Was anyone hurt?

A.   No, luckily nobody.

Q.   What did you find of interest to the investigation in Bektasevic's apartment?

A.   Later we checked and found about 19 kilos and 900 grams of explosive.

Q.   So almost 20 kilograms of explosives?

A.   Yes, almost 20 kilograms of explosives.  We found initial capsules for initiation of explosive.

Q.   A detonator?

A.   Yes, detonators.

     We found a suicidal belt.

Q.   The suicide belt is different from the 20 kilograms of explosives, that's something different?

A.   Yes, that's separate.

Q.   Did you find any documents in the apartment that connected the apartment to Bektasevic and the gentleman with the gun?

A.   I didn't understand your question.  Please?

Q.   Did you find any paperwork in the apartment, a passport
or bills or anything, that had Bektasevic's name or the other
person's name?

A.   We found a passport to both persons, we found some keys,
and also some other small stuff which belonged to the two of
them.

Q.   What was the name of the other person, the man who had
the gun?

A.   Abdulkadir Cesur.

Q.   What country was he from?

A.   Turkey.

Q.   Did Bektasevic have any items on him, in his pockets, in
his hands, that were of interest to the investigation?

A.   In one of his pockets we found a few handgun bullets and
a small eight-millimeter cassette, video cassette.

Q.   A video cassette or audio?

A.   Video cassette, small video cassette.

Q.   Not the big VHS size?

A.   No.

Q.   Did you find any telephones or SIM cards or program
cards for phones?

A.   Yes, we found a couple of those cell phones and a couple
of those cards.

Q.   What charges were Bektasevic and Cesur arrested on?

A.   Preparation for terroristic attack.

1   Q.   You mentioned earlier that surveillance had seen

2   Bektasevic go to a cyber cafe'.  Did you collect hard drives

3   from the cyber cafe' in Sarajevo?

4   A.   Yes.  Later also with approval, order from court, we

5   searched, we took those hardware and computers.

6   Q.   Did you find a second location, second apartment that

7   Bektasevic used?

8   A.   Because at that moment we don't believe he actually

9   lived in the apartment.

10  Q.   The apartment where you arrested him, you are saying it

11  was obvious he didn't live there?

12  A.   That was obvious that he does not live at that place.

13  Q.   How is it obvious?

14  A.   No food, glasses, silverware, nothing, no toilet paper.

15  Just empty.

16  Q.   Okay.  So you found a second location connected to

17  Bektasevic?

18  A.   Yes.

19  Q.   What did you find there that was related to the

20  investigation?

21  A.   We found some other proof, paper to prove that he

22  actually lived at that location.  We found a phantom hat or

23  actually a ski mask with just eyes open.  We found some

24  glove, those talkie-walkie radio -- what do you call it?

25  Q.   Two-way radios?

A.   Two-way radios, thank you.

     Some compass, some stuff.

          MR. McBURNEY:  Judge, this may be a good time to
break, given the time, and we will just start first thing
with Investigator Cengic in the morning.

          THE COURT:  I think that makes sense.

          Ladies and gentlemen, we are going to break for the
evening.  Have a good evening.  Don't discuss the case with
anyone, including those at home.  And we will start promptly
tomorrow at 9:00.

          (In open court without a jury present:)

          THE COURT:  All right.  Officer Cengic, you are
released for the evening, but you should not discuss your
testimony with anybody since you are in the middle of it.

          THE WITNESS:  I will not speak with anyone.

          THE COURT:  Good point.  We will see you in the
morning.

          THE INTERPRETER:  Am I excused?

          THE COURT:  Yes.

          All right.  What does tomorrow look like as far as
witnesses?

          MR. McBURNEY:  Tomorrow before --

          THE COURT:  How much longer do you have with this
officer?

          MR. McBURNEY:  Probably twenty minutes.

1          Then we have a 20-minute witness and --

2          THE COURT:  Before you do that, how long do we

3     think the cross is going to be of this person?

4          MR. SADEQUEE:  I can't -- I'm not sure.

5          THE COURT:  All right.  Who do you have next?

6          MR. McBURNEY:  Probably a 20-minute direct.

7          THE COURT:  Of who?

8          MR. McBURNEY:  Of Dearsley, Inspector Dearsley, who

9     is another British official.

10         THE COURT:  Okay.

11         MR. McBURNEY:  Then Agent Scherck, the case agent.

12    That will be a long direct and I expect a long -- well,

13    45-minute direct.  I expect a long cross.  There will be a

14    number of important chat communications.

15         THE COURT:  All right.

16         MR. McBURNEY:  And then the expert,

17    Mr. Kohlmann.  And then two more agents.

18         We will finish tomorrow.  I still believe we will

19    finish tomorrow.  But the cross-examination of Agent Scherck

20    and Mr. Kohlmann, I could see why they might take a while.

21         THE COURT:  I originally said we would stop at 4:00

22    on Friday, but that was with the expectation that we go two

23    full weeks.  I hate to lose an hour, but I said that we would

24    stop at 4:00.  If you have relied upon that, we will stop at

25    4:00.  But if we can, I would like to go as long as we can

1    tomorrow.

2              MR. McBURNEY:  We can have witnesses here.  The

3    closer we get to the end of the day, the more I might lobby

4    for, if evidence is closed, even if one could cram the

5    closings in --

6              THE COURT:  No, we are not going to do closings

7    tomorrow because we have to have a charge conference.

8              MR. McBURNEY:  Well, then we can have witnesses

9    here through 5:00, not a problem.

10             THE COURT:  Or we can make you do your closing

11   tomorrow.

12             MR. McBURNEY:  At 6:00?

13             MR. SAMUEL:  May I speak?

14             THE COURT:  Yes.

15             MR. SAMUEL:  We know of two defense witnesses.  Can

16   we rest assured not to have them here tomorrow, or should we

17   have them here?

18             THE COURT:  Who are they?

19             MR. SAMUEL:  Sonali, his sister, and Mariam, who we

20   did by deposition, she missed her flight, she's in town, and

21   I think the government would prefer to have her live,

22   unless --

23             MR. McBURNEY:  Yes.

24             MR. SAMUEL:  We could play the video, but --

25             MS. COLLINS:  We should have her here if she is

here.

MR. SAMUEL:  We will.  You saw her at the first trial, Mr. Ahmed's sister.  We took her deposition, then she missed her flight.   So --

THE COURT:  How could that have happened?  After all that big to-do and her insistence that she leave, how did that come about?

MR. SAMUEL:  Because of that to-do I'm sure.  But I don't know, she missed her flight.

THE COURT:  Realistically, we are not going to get to them tomorrow, are we?

MR. McBURNEY:  I don't know their ability to -- how much time they need to get down here, and I will let the defense know at lunch, but I could see there being a few hours at the end of the day.

We could decide we could do the charge conference then.  So I think they should leave them on call and then at lunch we can --

THE COURT:  Well, why don't we make a final call on that at lunchtime.

All right.  Now, who is the young man at the second table on the right?

MR. SAMUEL:  Right here?

THE COURT:  Yes.

MR. SAMUEL:  My intern, Your Honor, a University of

1   Georgia student.

2        THE COURT:  Yes.  This is a courtroom.  Of course,

3   the defendant is representing himself, and there are obvious

4   security concerns in this case.  You are not to be handing

5   things from the gallery to Mr. Sadequee while court is in

6   session.  Do you understand that?

7        MR. MANSOUR:   Yes, sir.

8        THE COURT:  If anything, there should be no passing

9   of anything, I don't care who is in the gallery, during the

10   course of the trial.  And anything that is passed under the

11   circumstances of this case should be passed only to

12   Mr. Samuel or Mr. Wahid.

13        MR. MANSOUR:   Yes, sir.

14        THE COURT:  Do you understand that?

15        MR. MANSOUR:   Yes, sir.

16        THE COURT:  Anything else we can discuss this

17   evening?

18        MR. McBURNEY:  No.

19        MR. SADEQUEE:  No.

20        THE COURT:  All right.  We will be in recess.

21        I do want to start promptly tomorrow morning at

22   9:00.  If there are any issues that you need to address,

23   although there shouldn't be, but if there are, I'm always

24   here by 7:30 and I would like to take them up before we get

25   started.

1    We were delayed an hour today.  I don't like doing

2 that for them.  I understood the circumstances, the analysis

3 that I needed, but let's try to get started right at 9:00

4 tomorrow.

5    MR. SAMUEL:  May I ask?

6    THE COURT:  Yes.

7    MR. SAMUEL:  I'm wondering about the charge

8 conference.  Would you consider allowing standby counsel to

9 do that rather than try to work with Mr. Sadequee and teach

10 him all of that?

11    I mean, the charges have been submitted.

12    THE COURT:  I reviewed all the charges.  There is I

13 think three fundamental issues.

14    I think that's Mr. Sadequee's call.

15    MR. SAMUEL:  It's okay with you if it's okay with

16 him?

17    THE COURT:  I think that would probably make

18 sense.

19    Does the government have any objection to that?

20    MR. McBURNEY:  If you are comfortable with the

21 temporary hybrid approach, I think it would make for a more

22 productive charge conference.

23    THE COURT:  I believe that would be the case.

24    MR. SAMUEL:  I will explain to him what we are

25 talking about.

1          THE COURT:  It might help us avoid the 35-minute

2     lecture on every principle of First Amendment law that exists

3     under the Constitution.

4          Anything else we need to discuss before we break?

5          MR. McBURNEY:  No, sir.

6          MR. SADEQUEE:  No.

7          THE COURT:  All right.  See you in the morning.

8          (Proceedings adjourn at 5:14 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3  UNITED STATES OF AMERICA        :
                                   :
4  NORTHERN DISTRICT OF GEORGIA    :

5

6          I, Nicholas A. Marrone, RMR, CRR, Official Court

7  Reporter of the United States District Court for the Northern

   District of Georgia, do hereby certify that the foregoing 258
8
   pages constitute a true transcript of proceedings had before
9
   the said Court, held in the city of Atlanta, Georgia, in the
10
   matter therein stated.
11
           In testimony whereof, I hereunto set my hand on
12
   this, the 31st day of August, 2009.
13

14

15

16
                         /s/ Nicholas A. Marrone
17                       _____
                         NICHOLAS A. MARRONE, RMR, CRR
18                       Registered Merit Reporter
                         Certified Realtime Reporter
19                       Official Court Reporter
                         Northern District of Georgia
20

21

22

23

24

25