1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF GEORGIA
2              ATLANTA DIVISION

3    UNITED STATES OF AMERICA        )
                                     )
4              Plaintiff,            )    CRIMINAL ACTION FILE
                                     )    NO. 1:06-CR-147-WSD-2
5    v.                              )
                                     )    ATLANTA, GEORGIA
6    EHSANUL ISLAM SADEQUEE (2)      )
                                     )
7              Defendants.           )
     _____)

8

9              TRANSCRIPT OF PROCEEDINGS
     BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
10     UNITED STATES DISTRICT JUDGE, AND A JURY

11                  VOLUME 5
           Monday, August 10, 2009

12

13   APPEARANCES OF COUNSEL:

14   For the Plaintiff:          OFFICE OF THE U.S. ATTORNEY
                                 (By:  David E. Nahmias
15                                     Robert C. McBurney
                                       Christopher Bly)
16
                                 U.S. DEPARTMENT OF JUSTICE
17                               (By:  Alexis L. Collins)

18   For the Defendant:          Ehsanul Islam Sadequee, *Pro Se*

19   Standby Counsel:            GARLAND SAMUEL & LOEB
                                 (By:  Donald Franklin Samuel
20                                     Amanda Clark Palmer)

21                               Khurrum B. Wahid

22        *Proceedings recorded by mechanical stenography*
              *and computer-aided transcript produced by*
23              NICHOLAS A. MARRONE, RMR, CRR
                  1714 U. S. Courthouse
24                75 Spring Street, S.W.
                   Atlanta, GA  30303
25                    (404) 215-1486

1038

1    I N D E X

2    *Witness*                                    *Page*

3    EVAN F. KOHLMANN
         Cross (By Mr. Sadequee)                 1040
4        Redirect (By Ms. Collins)               1117

5    MARK RICHARDS
         Direct (By Mr. McBurney)                1120
6        Cross (By Mr. Sadequee)                 1129
         Redirect (By Mr. McBurney)              1133
7
     CATHERINE WILZ
8        Direct (By Ms. Collins)                 1135
         Cross (By Mr. Sadequee)                 1149
9
     MARIAM AHMED
10       Direct (By Mr. Sadequee)                1187
         Cross (By Mr. McBurney)                 1197
11       Redirect (By Mr. Sadequee)              1201

12   SHARANIKA SONALI SADEQUEE
         Direct (By Mr. Sadequee)                1203
13       Cross (By Mr. Bly)                      1232
         Redirect (By Mr. Sadequee)              1239
14

15   *Charge Conference*                          *1254*

16

17

18

19

20

21

22

23

24

25

1    Monday Morning Session

2    August 10, 2009

3    9:01 a.m.

4    -- -- --

5    P R O C E E D I N G S

6    -- -- --

7    (In open court without a jury present:)

8    THE COURT:  All right.  Good morning,

9  everybody.  Is there anything we need to discuss before we

10  bring the jurors back in?

11    MR. McBURNEY:  No, sir.

12    THE COURT:  I assume Mr. Kohlmann is here; is that

13  correct?

14    MR. McBURNEY:  He's right outside.

15    THE COURT:  Mr. Sadequee, anything from you?

16    MR. SADEQUEE:  No.

17    THE COURT:  Let's bring the jurors in, please.

18    (In open court with a jury present:)

19    THE COURT:  All right.  Good morning, ladies and

20  gentlemen.  I hope you had a good weekend.

21    We are still in the government's case.  You recall

22  Mr. Kohlmann had completed his direct examination on Friday

23  and is now subject to cross-examination by Mr. Sadequee.

24    And I would remind you, Mr. Kohlmann, that you are

25  still under oath.

1    THE WITNESS:  Thank you, Your Honor.

2    THE COURT:  Mr. Sadequee?

3                   --  --  --

4              EVAN F. KOHLMANN

5    being previously duly sworn by the Courtroom Deputy,

6         testifies and says further as follows:

7                   --  --  --

8              CROSS-EXAMINATION

9    BY MR. SADEQUEE:

10   Q.   Good morning.

11   A.   Good morning.

12   Q.   I would like to ask -- to begin by asking you this

13   question.  Have you ever testified for the defense?

14   A.   No, I have not.  I was requested on only one occasion,

15   and the only occasion I didn't was because of the fact that

16   it was a war crimes case where the defendant was a nonMuslim

17   defendant accused of committing war crimes against Muslims.

18   And I didn't want to be involved in justifying genocide

19   against Muslims.

20   Q.   How much do you get paid to come testify?

21   A.   It depends.  I get paid by the hour.

22   Q.   In this case?

23   A.   I get paid by the hour.  My standard hourly rate is $350

24   an hour.

25   Q.   You consider yourself a social scientist; correct?

1   A.   That is correct, yes.

2   Q.   And you have also studied comparative religion?

3   A.   That is correct.  I have a degree or certificate in

4   Islam and Muslim-Christian Understanding.

5   Q.   You have spoken to people who consider themselves

6   jihadists?

7   A.   I believe so, yes.

8   Q.   And you have spoken to those who don't consider --

9   Muslims who do not consider themselves jihadists, but Islamic

10  activists?

11  A.   Oh, many, many, yes.

12  Q.   Do those -- in your conversations with Muslims, activist

13  Muslims, do they consider jihad a part of Islam?

14  A.   They consider jihad a part of Islam if you are talking

15  about internal spiritual jihad.

16       But when you are talking about physical violent jihad,

17  only in very limited scenarios.  Not in any present situation

18  that I can think of, no, other than perhaps the

19  Israeli-Palestinian conflict.

20       But beyond that, I would say that would be the only

21  conflict where I have met mainstream Islamic activists who

22  have considered jihad to be a legitimate cause.

23  Q.   What about the Chechen --

24  A.   Chechnya is a difficult case.  There are some who

25  believe that it is a legitimate jihad.  However, among

1  moderate Islamic activists, the predominant opinion is that

2  the Russians are committing aggression and that should stop,

3  but that the proper response to that is not more violence.

4  The proper response to that is to achieve economic prosperity

5  and peace for Chechnya and to achieve a withdrawal of Russian

6  military forces.

7      In other words, moderate Islamic activists generally

8  don't advocate violence as a methodology.

9  Q.   But do they believe, theoretically speaking, that there

10  is a more jihad concept in Islam?  Not whether or not this is

11  a correct time in the Islamic point of view, that's not the

12  question.  The question is do they believe in Islam there is

13  such a thing as warfare called jihad?

14  A.   So you are setting aside the spiritual sense of jihad?

15  Q.   Yes.

16  A.   You are talking about the physical sense?

17      Yes, I mean, certainly in the history of Islam, if you

18  look, yes.  But in terms of whether it's a pillar of Islam,

19  it is only a pillar of Islam Shiites, not Sunnis.

20  Q.   The institution of jihad has a -- throughout Islamic

21  history has been, until the last few centuries, has been an

22  active history of jihad; correct?

23  A.   Depending on what you are referring to as jihad and

24  depending on who you are referring to as having an active --

25  not all sections of the Muslim world have long experiences or

1    long histories of jihad.  It's only certain areas where jihad

2    comes up and in certain schools of thought.

3         Jihad is not a central concept to all schools of thought

4    in Islam.

5    Q.   I mean, for example, throughout the various Islamic

6    states or empires or dynasties, whatever you want to call it,

7    the vast -- or many, the Ottomans, you know --

8    A.   If you are talking about a thousand years ago,

9    yes.  Yes, a thousand years ago, jihad was a concept that was

10   used, yes.

11   Q.   The Ottomans, are they a thousand years ago?

12   A.   No, that was a century ago.  But even the Ottomans

13   didn't -- the Ottomans were Muslim and they ran an Islamic

14   empire, but the way that they ran their empire, they didn't

15   even call their soldiers Mujahideen.  They called them

16   Janissaries.

17        So the idea that this was some kind of Islamic jihad,

18   I don't know if you could really argue that, not at least in

19   the terms of the contemporary Ottoman empire of the 19th and

20   20th centuries.

21   Q.   Jihad -- does jihad equal terrorism?

22   A.   Jihad equals jihad.  I think jihad is -- jihad is holy

23   struggle.  And in the violent sense, it's holy physical

24   struggle, violent struggle.

25        Whether or not it is terrorism, that's a legal

definition.  In this country, generally speaking, acts of

jihad are defined as terrorism if they are committed against

innocent civilians, noncombatants, or individuals who are not

in a conflict zone or with organizations which are banned

organizations.

Q.   Is it true that Muslims who do believe in jihad consider

jihad similar to what in Christianity is considered a just

war theory?

A.   I really couldn't answer that question.  I don't believe

in jihad myself, and the jihadis -- I can explain it from an

Islamic perspective, but I don't think I can compare jihad --

Q.   The Muslims you have spoken with --

A.   Yeah.

Q.   -- what's their -- is their philosophy of jihad akin to

a just war theory?

A.   Define what you mean by a just war theory.

Q.   Do they believe they are killing innocent people and

they seek to cause chaos and mayhem, or is it their

philosophy and their view that they are fighting aggression

and they are fending off aggression?

A.   That is one theme.  However, the idea that all

Mujahideen or all jihadis or all jihadists are the same or

have the same motivation or the same mind set is obviously

not the case.

     Some jihadis are more religious-focused, the idea that

they are looking for particular verses from the Quran and

saying in this verse it says that, you know, it is our duty

to fight against the kuffar, the infidels and the

apostates.

Other people say, well, this is an illegitimate

political occupation of Muslim lands, so that's my just

cause.

But it depends, it can be religious, it can be

political, it can be a variety of different things.  But

ultimately it all boils down to acts of violence, yes.

Q.   In Islam there is warfare or jihad.  Is this the laws,

rules, conditions, regulations behind it?

A.   Depending on what school you are in and depending on

which scholars you follow and depending on how dedicated you

are.

There are some that are more rigorous about following

rules of jihad and about the fatwahs of jihad.  But it should

be emphasized that there is no one rule book for jihad, there

is no one set of guidelines for jihad.  It entirely depends

on which scholars you follow and which school of Islam you

are part of.

There are some moderate scholars of Islam which again

say, Well, if it's a situation where the Muslim community is

embattled and they are about to be threatened with genocide,

then we have a duty to respond.

1    There are others that say, It's our duty to aggressively

2    go out and establish the Kalafate, establish the state of

3    Muslim, regardless of whether or not Muslims are actually

4    threatened or not.  It's our duty to establish the state by

5    any means necessary.

6        So to generalize, I don't think you can

7    generalize.  I think it depends on the individual person.

8    Q.   But is there any school of thought that says that there

9    is -- it's a free-for-all, anyone can do anything, or --

10   A.   It really depends on your perspective.  There are some

11   people out there -- and I'm not claiming that they are

12   mainstream, but there are some people out there that are

13   known as -- that are known as the khawaarij or the deviants

14   or the dissenters who more or less argue that the ends

15   justify the means.

16   Q.   Who are the who khawaarij?

17   A.   The khawaarij?  The khawaarij are people who believe in

18   jihad but believe simply that everything that came after

19   God's law and laid down the Quran has been manufactured by

20   humans, has been corrupted and everything else, and thus the

21   only rules that they apply are the ones that they interpret

22   from the Quran through individual interpretation or

23   ijtihad.

24       That's i-j-t-i-h-a-d.

25   Q.   The khawaarij that you mentioned, they are people who

1  consider anyone who commits a sin, such as in Islam let's say

2  drinking alcohol, could not be a Muslim; correct?

3  A.   Not just that, they consider in some cases khawaarij

4  simply declare that if you are Muslim or you are supposed to

5  be a Muslim and you are living in a nonMuslim society and you

6  permit yourself to live in nonMuslim society, then by

7  definition you are the enemy, you can be excommunicated from

8  Islam.  You can declare takfir on someone and you

9  excommunicate them.

10       And once they are excommunicated from Islam, you can do

11  anything you want to them.  You can steal their money, you

12  can kill them, you can kidnap them.  They are no longer

13  within the Dar of Islam, the House of Islam.

14       They are also -- khawaarij are also known as takfiris.

15  Q.   Now, the khawaarij, other than the khawaarij, the

16  previous question was the vast majority of -- for example,

17  the Tibyan Publications, the publications you read, are these

18  khawaarij material or are these material which sets out laws

19  and regulations?

20  A.   That's entirely a subjective question.  There are people

21  that view Tibyan Publications as khawaarij because of the

22  fact it advocates individuals going out without any command

23  and committing acts of jihad on their own.

24       There are others that view Tibyan Publications as the

25  centerpiece of the modern, the modern jihadi mindset.  But

those are people that generally are supportive of Al-Qaeda
and Osama Bin Laden.

Likewise, there are lots of Muslims out there that view
Osama Bin Laden and people like Abu Musab al-Zarqawi as
khawaarij, as deviants, as fanatics, people that have taken
the rules of jihad and perverted them for their own cause.

And to be fair, even some of the scholars in Tibyan have
made comments to that effect after they have been imprisoned;
namely, people like Abu Muhammad al-Maqdisi and
Shaykh Dr. Iman Afada

Q.    Now, since you mentioned the khawaarij, is it not true
that one of the main tenets of the khawaarij scholars of
Islamic law mentioned is that they consider that anyone who
commits what's called kaba'ir or major sins such as
committing adultery and drinking alcohol and so on and so
forth, anyone who does such things is according to khawaarij
not a Muslim?

A.    Generally speaking that is correct, yes.

Q.    Does Tibyan Publications advocate that belief?

A.    I couldn't tell you offhand, I'm not sure.

But again your definition of what khawaarij is is
subjective.  There are other people who view the idea that
anyone that's issuing a fatwah saying that other Muslims who
you don't know and you can't name personally should be
murdered or should be killed, that right there is an act of

khawaarij, that right there is excommunicating someone and

justifying their murder without justification.

So I mean, I understand what you are saying, but the

modern definition of khawaarij is much more subjective than a

simple rule about whether or not they have committed a great

sin or not.

If you are going out and killing somebody without having

them identified by name and without being able to identify

the specific sin that that person committed, then you are in

fact -- you could be in fact part of a khawaarij, yes.

Q.   And in your readings of Tibyan Publications and

analyzing it, have you come across any material which Tibyan

Publications has translated warning against the khawaarij or

clarifying or criticizing the khawaarij?

A.   I believe there are some documents, but again the

definition of Al-Qaeda, for instance, Al-Qaeda, the

organization, terrorist organization, they attack other

people as being khawaarij.

For instance, there is a terrorist group in Algeria

known as the Armed Islamic Group which went out and started

killing civilians, and as a result Osama Bin Laden and other

jihadi leaders declared them to be khawaarij, people who were

killing others for unspecified sins.

Yet at the same time, there are plenty within the modern

Muslim community who refer to Bin Laden and his crew as

themselves khawaarij for killing Muslims without

justification and explaining that they are sinning by living

in a nonIslamic country or by living under the Al-Salul, the

government of Saudi Arabia, and by doing that, that is a

justification in and of itself.

So again it really depends on your perspective.  There

is no one hard, fast definition of who is

khawaarij.  Khawaarij simply refers to deviants, fanatics,

people who are twisting the definitions of Islam to fit

whatever political agenda that they have.

Q.   Is it not true that Tibyan Publications does not declare

the masses, the populaces of Muslim countries -- the

population of Muslim countries, not talking about the

governments, but Tibyan Publications does not consider the

masses to be -- or does not do takfir, which is declaring the

masses to be nonMuslim?

A.   Tibyan didn't do what the -- Tibyan did exactly kind

of -- it fit with the Al-Qaeda mindset; okay?

Tibyan, for instance, was against the kind of khawaarij

that the GIA was doing in Algeria, just the same way that

Osama Bin Laden was against that khawaarij.  They never said

all Muslims who are not with us are against us and thus they

should be murdered.

However, Tibyan also justified the killing of Muslims if

they were bystanders in the way of a particular target, and

they didn't specify that Muslims should not be killed.

So I think again it depends on the way you view khawaarij.  I think there are a lot of moderate Muslims that would view a lot of the fatwahs endorsing suicide missions, endorsing blowing up bombs in front of crowds, knocking down buildings, that kind of stuff, generally speaking in modern Islam is point of fact khawaarij.  Any moderate Muslim would identify that as being fanatic or deviant behavior.

Q.   Are you familiar with -- you mentioned a couple minutes ago Abu Muhammad al-Maqdisi.  Who is Abu Muhammad al-Maqdisi?

A.   Abu Muhammad al-Maqdisi is a Jordanian cleric who was imprisoned in the early 1990s in Jordan for his role in allegedly inciting acts of violence by Salafi-Jihadis inside of Jordan, the bombings of movie theaters, attacks on government officials.

Al-Maqdisi, while he was in prison, met another young Jordanian, Abu Musab al-Zarqawi, and he became Zarqawi's spiritual mentor.

Maqdisi at present is considered to be one of the shining lights in the world of Salafi Jihad.  He is a cleric, but he issues fatwahs, he speaks with people, he endorses the general mission of jihad and of the Mujahideen.

Q.   Are you familiar with one of his books called *Waqfat Ma'thamarat Al-Jihad*?

A.   I believe I am.  *The Guidelines for Jihad;* correct?

1  Q.   It was his -- translated as Reflections on the Fruits of

2  Jihad or the Results of Jihad.

3  A.   I believe you are referring to his assessment of

4  Abu Musab al-Zarqawi when he was in prison.

5  Q.   It was a series of articles which came out as a book,

6  yes.

7  A.   Right, when he was in prison; correct?

8  Q.   Yes.

9  A.   Yes.  I am familiar with that, yes.

10  Q.   What is the topic of that book or what's addressed

11  within that book?

12  A.   Abu Mohammed al-Maqdisi essentially argued that Zarqawi

13  had gone beyond what had been justified by -- in other words,

14  Abu Mohammed al-Maqdisi had described Zarqawi as almost

15  becoming khawaarij, a takfiri.

16      He described that Zarqawi had gone beyond the rules of

17  jihad and was doing damage to jihad by some of the stuff that

18  he was doing inside of Iraq.

19      But again that was written -- that was published while

20  he was being held in prison --

21  Q.   But --

22  A.   -- in Jordan.

23  Q.   But he came out I believe in 2005 and did an Al Jazeera

24  interview; correct?

25  A.   That's correct.

Q.   He mentioned this book as well?

A.   That's correct, he did.

Q.   And he did have some criticisms on the Iraqi jihad;
correct?

A.   Very specifically with regards to Iraq, but not with
regards to any other jihad.  Not with regards to Osama Bin
Laden, not with regards to Ayman al-Zawahiri, not with
regards to strikes against the United States.  Only with
regards to what was going on specifically in Iraq.

Q.   Now, this book, *Reflections on Jihad, Waqfat* or
*Reflections on the Fruits of Jihad*, did he criticize the
tactics which were being used, such as some of the things you
mentioned about civilian casualties, disregard for --

A.   Not necessarily civilian casualties, but Muslim
casualties.  His concern was that Zarqawi's tactics in Iraq,
by bombing mosques, by bombing community centers, by bombing
places that were exclusively Muslim, that Zarqawi was
threatening to drive a stake in the middle of the
Salafi-Jihadi community and destroy the support for the jihad
among ordinary Muslims.

Q.   Did Tibyan Publications translate this?

A.   I believe they did, yes.

Q.   Is this a book on tactics, or is it a book on Islamic
laws of jihad in connection to --

A.   Well, again, that's a subjective question.  I think the

answer is A and B.  It's a little of Column A and a little of

Column B.  It depends on your perspective.

There are people that are looking to these documents for

tactical advice.  There are some people who are just

generally interested in the spiritual context.  But it

depends exactly who you are talking about.

Q.   I think I will ask again, is the books of Abu Muhammad

al-Maqdisi, these are books on religious law, theological

philosophy, or are these military training-type material?

A.   It really depends on what you are talking about.  Right

now Abu Muhammad al-Maqdisi at this very moment is engaged in

something that is known as the Friends of Osama Conference

where he's taking open questions from Salafi-Jihadis on the

internet who consider themselves to be friends of Osama Bin

Laden about jihad and about the Mujahideen, and giving them

answers which are beneficial to Al-Qaeda, at this very moment

right now.

So it really depends on what questions, what context,

and what book.

Q.   Now, Abu Muhammad al-Maqdisi, let's go back into who he

is.  He's been in prison?

A.   That's right, yes.

Q.   How many years was he in prison?

A.   Gosh, at least ten years.

Q.   And he was released in --

A.    2005, I believe.

Q.    And what was he charged with?

A.    I'm not familiar with the exact charge, but I can tell you that the conditions under which he was arrested were there was a series of cinema bombings, movie theater bombings and other terrorist attacks inside of Jordan.  The JID, Jordanian Intelligence Services and the police began investigating this.

They traced this back to a network of Salafi-Jihadis whom they blamed Abu Muhammad al-Maqdisi, among others, for inciting.  Al-Maqdisi was arrested as a state security threat, and he was held in prison.

Q.    And he was released; correct?

A.    I believe in 2005, although again I'm not exactly sure about the conditions of that release.  I believe it's a supervised release.

Q.    And then he was again rearrested?

A.    Yes.

Q.    What was the basis for him --

A.    I'm sorry, I don't know the conditions under which he was arrested.

Q.    And then now he's again rereleased?

A.    Yes.  It happens when clerics continually violate the line between what is, you know, speaking your views and what is inciting violence, it happens that the government of

1   Jordan has no choice but to step in and take matters into

2   their own hands.

3   Q.   Is that common in Arab countries or Muslim countries,

4   that scholars or Islamic activists are arrested because their

5   message is considered a threat?

6   A.   Well, it depends on which countries and it depends on

7   what kind of activists.

8        There are plenty of countries where Islamic activists

9   are free to live and preach.

10       I mean, Saudi Arabia, the kingdom of Saudi Arabia, which

11  is the home of Islam, the Laga Armain, the Land of the Two

12  Holy Places, you have got dozens of clerics that live there

13  who preach jihad, who preach about the Mujahideen, and who

14  live in relative freedom.

15       I mean, we just went over a list of them last week where

16  there was at least three or four different clerics who I'm

17  familiar with who have openly espoused support for Al-Qaeda

18  and live in freedom.  The same goes for the UAE, Oman,

19  Bahrain, Gudur.

20       The only places where Islamic activists have serious

21  problems with the authorities are Egypt, Jordan sometimes,

22  and Syria.  And Libya.  Excuse me, Libya.

23  Q.   Abu Muhammad al-Maqdisi was charged in relation to a

24  terrorism case, correct, Bayat al-Imam?

25  A.   That's correct, yes.  That was the first case in '94,

that's correct, yes.

Bayat al-Imam was the group that Zarqawi was a part of.  This was a group that had formed back in Afghanistan in the early 1990s and had come to Jordan again with the hopes of establishing an Islamic government, upsetting the Israeli-Palestinian peace accord.  The name of the group is Bayat al-Imam.

Q.   He was released eventually from that, Abu Muhammad al-Maqdisi I mean?

A.   Yeah.  I mean, I believe after a decade, yes.

Q.   So he was held without being convicted?

A.   I don't know what the exact conditions were of the legal case, to be honest.  I know what he was accused of, I know what he's written of.  I don't know the details of his legal case in Jordan, though.

Q.   On these -- now, Abu Muhammad al-Maqdisi has a website; correct?

A.   He has multiple websites now, yes.

Q.   Could you name them?

A.   Sure.  Al-Maqdisi.com, Tawhed.ws, Tawhed.net, Abuqatada dot something.  There are several of them, yes.

Q.   Now, these websites, as well as Tibyan Publications, a lot of the material and literature on these websites, is it of a debate type of nature, that there is a lot of online debate on --

A.   There is a lot of stuff on there, but there is
everything from tactical advice about how to commit terrorist
acts, about how to set off bombs, to the logistics of
jihad.

I just testified in a case a few months ago involving an
individual who used the al-Maqdisi.com website to post a
guide book on how to commit suicide operations.

So there is a large breadth of information.  But the
information all deals with Salafi Jihadi -- the mindset of
Salafi-Jihadis.  Everything from the tactics, the philosophy,
the ideology, but it's all on there.

Q.   On the Tibyan Publications publications, let me be more
specific, are there any books published or articles published
on how to commit a terrorist act?

A.   Yes.  *The Islamic Permissibility of Self-Sacrificial
Operations, Suicide and Martyrdom*, it explicitly states --

Q.   Is that how to?

A.   Yeah, it explicitly states if you want to become a
martyr, the modern form of martyrdom is to pack a suitcase
full of explosives, to go into a crowd, and to detonate it in
a crowd of people, and that is the modern definition of
martyrdom.

That's straight out of the fatwah.  That's both from the
Arabic and the English versions.

Q.   Now --

A.    I mean, it doesn't tell you how to build the bomb, but

that kind of material you can get from anywhere.  I mean,

that's not something you need any kind of specific website

for.  The tactics are what's important.

Q.    This book that you mentioned, *The Self-Sacrificial*

*Operations in Islam*, is this a book on a legal fatwah as in

the position of self-sacrificial operations or otherwise

known as suicide operations?

A.    A legal fatwah -- first of all, you have to be very

careful.  The person that issued this is not a cleric.  The

person that issued this is the commander of Al-Qaeda of

Saudi Arabia, Shaykh Yusuf Al-Uyayree, the man who founded

Al-Qaeda in Saudi Arabia, who was a former instructor at an

Al-Qaeda camp in Afghanistan, and who participated in

Blackhawk Down in 1993 in Somalia.

This person is a military figure with no clerical

credentials.  This is someone who cannot issue a fatwah

except if it's a political fatwa.

Now, the fatwah itself, if you want to call it a fatwah,

it had religious elements, sure, but it was tactical as

well.  It was written by someone was a tactical Al-Qaeda

leader and it was written from a political perspective.

There is religious justifications, but to call that a

religious document is I think entirely misunderstanding who

Shaykh Yusuf Al-Uyayree is, who he was, and what he did.

Q.   Is he considered a scholar?

A.   No, absolutely not.  The only people who consider him a scholar were Al-Qaeda, that's it.  Nobody, nobody in the mainstream Islamic community considers Yusuf Al-Uyayree a scholar.  In fact, I doubt most moderate Muslims even know who Shaykh Yusuf Al-Uyayree is.

Q.   Are you -- on the websites, is he called a commander or is called a shaykh?

A.   He is called both a commander and a shaykh.  He's called an ameer, he's called a shaykh, he's called imam.  He's called all these things, but this is just euphemisms.

     The only people who see him as a scholar are Al-Qaeda.  There is not -- I would challenge you to find a single mainstream Muslim who would identify Shaykh Yusuf Al-Uyayree as a scholar.

     In fact, again, I would find it hard to believe that most moderate Muslims even know who Yusuf Al-Uyayree is. He's an Al-Qaeda military commander.  He has no clerical qualifications whatsoever.  He is someone who was taught in the field.

     He was in prison in Saudi Arabia for four years.  He was imprisoned by the Saudis in 1995 after a series of car bombs went off in Riyad.  They don't usually do that to clerics.  This is someone who is an Al-Qaeda military commander.

1     Q.    Are you familiar with a scholar, mainstream scholar

2     named Anwar al-Awlaki?

3     A.    He is also not mainstream, but, yes, I'm familiar with

4     Shaykh Anwar al-Awlaki.

5     Q.    When you say he's not mainstream, I understand that's

6     your opinion.   But isn't it true if anyone goes onto the

7     websites or any mainstream Islamic catalogues, bookstores,

8     they will find a huge section on Anwar al-Awlaki lectures?

9     A.    It entirely depends what you define as mainstream.

10        In the 9/11 Commission Report, it is alleged that

11    Anwar al-Awlaki had contacts with two 9/11 hijackers in

12    San Diego, California, and he apparently provided them with

13    clerical instruction and advice.

14        Anwar al-Awlaki has been imprisoned by the government of

15    Yemen, is no longer allowed in the United States.   He does

16    not come here anymore because he would be arrested if he

17    was.

18        Anwar al-Awlaki in the last two weeks alone has issued

19    two fatwahs openly endorsing jihad and the Mujahideen, not in

20    a spiritual sentence, not in a generic sense, but

21    specifically saying Al-Qaeda in Yemen, the Mujahideen are

22    winning, that's great, Allahu Akbar.

23        He is a jihadi cleric, he is not a mainstream cleric.

24    He's only a mainstream cleric among Salafi-Jihadis.

25        I mean, again, this is no secret.   I mean, you can go to

his website.  The number one entry on his website right now
is Jihad in Yemen:  "The Mujahideen Victories Against the
Government, Al-Qaeda is Winning."  It's in English.

Q.    Prior to the last two weeks or one year, let's say --

A.    Okay.

Q.    -- was Anwar Al-Awlaki considered one of the major North
American Islamic scholars?

A.    Well, North American -- he's not allowed in
North America anymore.  He's not allowed in North America
anymore.  He's banned.  If he comes here, he's going to be
arrested.

       He stays in Yemen right now because of the fact that he
was arrested there.  I don't believe the Yemeni government is
even willing to allow him to leave.

       Now when he addresses conferences outside of Yemen, he
has to speak via videoconference, because most of the time
he's not allowed to go to the countries where he's giving
these speeches.

       Even in Yemen there is pressure on him right now to stop
saying what he's saying.  So again, if that's mainstream, I
would love to know what extreme is.

Q.    Are his lectures available publicly in this country?

A.    There are lectures available of Osama Bin Laden, of
Ayman al-Zawahiri, of Anwar al-Awlaki, of dozens, of hundreds
of clerics that are available in this country.  They are

available on the internet, they are available in

bookstores.

There are lectures by Al-Qaeda military commanders

speaking here in the United States that are available here in

this country.  That doesn't mean anything.

Q.    In Islamic conferences, mainstream -- ISNA, for example,

Islamic Society of North America, so on and so forth, they

have conventions annually or so.  Anwar al-Awlaki lectures

are available at these.

A.    I haven't attended an ISNA conference in years.

I couldn't tell you.

Q.    Are you familiar -- okay, Anwar al-Awlaki is a scholar;

correct?

A.    That's a very subjective question.  I regard anyone who

writes or translates a lecture, like "Constants on the Path

of Jihad," and explains that, well, this is what

Yusuf Al-Uyayree wrote in Saudi Arabia and here is how you

would adapt it if you were living in Europe, that's

tactical advice for people that are looking to emulate

Shaykh Yusuf Al-Uyayree who are living in Europe, tactical

advice for people that are looking to emulate an Al-Qaeda

commander who are living in Europe.

If that's what you consider a scholar, he's a premier

scholar.

Q.    Did he study by himself or did he study from the

1  Islamic --

2  A.   Oh, yeah, sure, he's formally studied Islam.  But to be

3  a scholar of Islam requires much more than simply to study

4  material.

5  Q.   Of course.  Is he a respected scholar in North America?

6  A.   He's respected among Salafi-Jihadis.

7  Q.   And no one else respects him?

8  A.   He is respected among hard-core Salafis and

9  Salafi-Jihadis.  He's not a mainstream scholar.

10       Again, he's not -- Anwar al-Awlaki is not a mainstream

11  scholar.  Mainstream scholars don't have to worry about being

12  arrested when they enter the United States.

13  Q.   When was -- when did he leave the United States?

14  A.   I think in 2002 or 2003.

15  Q.   But prior to that, was he considered a mainstream

16  scholar?

17  A.   I honestly -- again, it really depends on your

18  perspective.  Among Salafi-Jihadis he's always been

19  considered to be a very important key scholar.  But outside

20  of that narrow Salafi-Jihadi school, I would believe that

21  most people probably have not heard of him or have only heard

22  of him in abstract.

23       He's not a mainstream scholar.  He's not someone that a

24  lot of people read.  He's someone that a lot of

25  English-speaking Salafi-Jihadis read, that's true.

Q.   Have you heard of IslamicBookstore.com?

A.   No, but I'm sure it's an online bookstore that sells

books about Islam.

Q.   It's the largest online bookstore.

     Is it true that if you go to their catalogue, there is a

whole section on Anwar al-Awlaki lectures?

A.   I have no idea.

Q.   The point I was trying to get at is do you know that

Anwar al-Awlaki called Yusuf Al-Uyayree a brilliant scholar

and so on and so forth?

A.   I believe he did, yes.  But again, the reason is because

Awlaki took Al-Uyayree's book, *Constants on the Path of*

*Jihad*, which instructs people about how to become Mujahideen

in their own ways, and translated that into English and

prepared that and edited that specifically for a

North American and European audience.

     For instance, one of the things that he wrote in the

book was it is -- what Usuf Al-Uyayree wrote in his book was

that if you are a Muslim and you are a supporter of jihad or

true to Islam, you have to wage jihad no matter where you

are, no matter what society you are in, no matter what the

conditions you are in.

     And Al-Awlaki wrote in his thing what Yusuf Al-Uyayree

wrote means that if you are living in Europe or you are

living in North America or wherever you are living, you can't

adjust your circumstances.  You have to pursue jihad no

matter what.

     Now, anyone that says that if you are living in

North America or Europe and that that means you still

participate in jihad no matter what, that's not a mainstream

view.  Someone who is saying you should commit acts of

violence if you are living in a western society, that's not a

moderate or mainstream view, and that's not a view that most

Muslims would adhere to or accept.

     And I think it's insulting to many Muslims that that's

an idea most Muslims believe or hold to their hearts.

Q.   Now, you said -- what's the topic of this book,

*Constants of Jihad*, you mentioned?

A.   The topic is *Constants on the Path of Jihad*, for those

that are following the path of jihad or wish to follow the

path of jihad, these are the mileposts on the road, these are

the goal signs, this is what you should be doing in order to

make sure that you are following down the path of a true

Mujahid.

Q.   What are the topics of the chapters let's say covered in

this?

A.   I don't know the chapters offhand.

Q.   Because you said earlier that this is -- right now you

just said these are the things you should be doing.  Like

what?

1   A.    Again, the main focus of *Constants on the Path of Jihad*,

2   the main theme is that no matter where you are, no matter

3   what society you are in, no matter what the context of your

4   life is, you cannot adjust jihad to fit your life.  Jihad has

5   to adjust your life.

6        In other words, you have to modify your existence in

7   order to accommodate the necessity of holy war, of physical

8   violence, and that it's incumbent on Muslims everywhere, not

9   just on the battlefield, not just in Al-Qaeda, but all

10  Muslims to participate in violent acts.

11       Again, that's not a view that I think most Muslims would

12  accept either for themselves or for their community.

13  Q.    Now, the book you mentioned earlier, *The*

14  *Self-Sacrificial Operations in Islam*, this is a book which

15  provides -- isn't it true the topic of this book is to

16  provide legitimization or justification in Islamic law,

17  through the evidences of Islamic law, the Quran, the Sunnah,

18  the Qiyas, so on and so forth, and verdicts of scholars, to

19  provide a justification for self-sacrificial operations?

20  A.    There is nothing in the Tafsir and there's nothing in

21  the Quran about taking a suitcase full of explosives and

22  detonating it in a crowd of people, but that is in the

23  *Islamic Permissibility of Self-Sacrificial Operations,*

24  *Suicide or Martyrdom*.  It's in both the Arabic and it's in

25  the English version that was translated by Tibyan.

1    Now, that's not religious advice, that's not School of

2  Islam advice.  That's tactical advice about how to carry out

3  an act of violence, no matter how you look at it.

4    There is nothing in the Quran and there's nothing in the

5  Tafsir about blowing up a suitcase full of explosives,

6  period.  It's not there.   That is practical advice about how

7  to carry out a terrorist act.

8  Q.   I think you are not being clear -- or perhaps my

9  question is not clear.

10  A.   I mean, again, it's very clear.  This is a document

11  which provides legitimation for suicide operations and

12  explains to people, Just in case you have any question about

13  what we are talking about in terms of a suicide mission, we

14  are not talking about here in terms of running into the front

15  line with a gun, we are not talking about bayoneting someone.

16  We are talking about the modern form of martyrdom is to take

17  a suitcase full of explosives and detonate it in a large

18  crowd of people.  That's what it says in the document.

19  Q.   It says -- does that give -- in the document, does it

20  say to take a suitcase full --

21  A.   Yes, it says specifically a suitcase full of explosives

22  in the English version.

23  Q.   Does it also say in the English version about if there

24  is a weapons cache or something to that effect and someone, a

25  Mujahideen would go on a mission to attack that, to destroy

the weapons of the enemy and thereby killing themselves in
that process?

A.   Perhaps, but that's also tactical advice that has
nothing to do with the Quran or Tafsir.  That's practical
advice about how to commit a terrorist act.  Again, it's more
tactical advice.

This is not religious stuff.  This is -- there is
religious stuff in there, and there are quotations from the
Quran, there are quotations from Hadith.  But the idea is
that this is supposed to be a comprehensive look at the idea
of self-sacrificial operations.  And it's no wonder, because
the person who wrote it was a tactical Al-Qaeda commander.

Q.   Those two examples that you gave, are those -- when they
are mentioned in the book, are they mentioned by way of
giving an example of what is an example of a self-sacrificial
operation, or is that the topic of the book as in these are
the ways that you can do -- you can actually go out and
perpetrate or commit a self-sacrificial --

A.   Well, it's only a ten-page manual, so if that takes
up -- or it's only a ten- or twenty-page manual, so if that
takes up three or four pages, that's a lot of it.

Now, whether or not there are examples or not, that's
tactical advice.

Q.   You are saying that the book, *Islamic Ruling on the*
*Permissibility of Self-Sacrificial Operations*, is a ten-page

1   book?

2   A.   A ten- or twenty-page, depending on which copy you have.

3   Q.   From Tibyan Publications?

4   A.   I'm not sure of the length of the Tibyan version.  I'm

5   referring to one of the Arabic versions I have.

6   Q.   But do you read Arabic?

7   A.   Not fluently, no, but I do have a translator who sits

8   right next to me.  So it doesn't really matter whether it's

9   in Arabic or English.

10  Q.   Do you know how long the English -- the Tibyan

11  Publications copy now I'm talking about is?

12  A.   I couldn't tell you the exact page number, the exact

13  number of pages, no, I don't know.

14  Q.   Because the way you are describing it, it really seems

15  you are describing a completely different book.  We will be

16  able to --

17  A.   Well, that's your opinion.  But I should emphasize that

18  that's not -- I mean, these are not issues that are -- if you

19  read the book, it's right in there.

20      And again, to tell someone to blow themselves up with a

21  suitcase full of explosives, no moderate Islamic cleric would

22  ever advise anything like that, no mainstream Islamic cleric

23  would even suggest something like that.

24      And what's more is that if you suggest something like

25  that along with telling someone that carrying out suicide

missions is part of their Islamic duty, what do you expect

that their response is going to be?  Their response is going

to be following the examples that they are given.

They are being told -- people are being told in this

document that it's their religious obligation if they want to

go to paradise and avoid hell is that they must go out and

commit suicide operations.  And this document suggests that

the only way of committing a suicide operation or a martyrdom

operation is to blow yourself up or to somehow carry out a

deed of Islam where you are sacrificing yourself in a violent

way in a contemporary context.

That's tactical advice.  I mean, that's giving --

inciting someone and giving people tactical ideas about how

to execute it.

Q.   You just mentioned that this book says that if someone

wants to go to paradise, this book states -- you just said

that this book states if someone wants to go to paradise, it

is their religious obligation to blow themselves up?

A.   In the view of this, if you do not -- in the view of

this document, okay, if you are not working towards the

greater benefit of Islam, right, if you are not struggling

for jihad, if you are not working to support the Mujahideen,

then you are not a real Muslim, then you are not adhering to

Islam; all right?

And if you are going to support the jihad and the

1  Mujahideen, you should be willing to commit any act, any

2  sacrifice that is necessary, including giving up your own

3  life, if that's what is necessary for the greater cause of

4  Islam.

5       In this case what it is suggesting is that the

6  contemporary form of martyrdom is to blow yourself up with a

7  suitcase full of explosives.  Not to blow yourself up and

8  that's it, but specifically with a suitcase full of

9  explosives.

10      That is not in the Quran and it's not in the Hadith, and

11  no moderate scholar, no mainstream scholar would those words

12  ever come out of their mouth.  Explosives, that would never

13  come out of a mainstream scholar's mouth, period.

14           MR. SADEQUEE:  Could I speak with my counsel?

15  BY MR. SADEQUEE:

16  Q.   Okay.  How long have you monitored the Tibyan

17  Publications website?

18  A.   I started monitoring Tibyan Publications in general in

19  approximately 2004, mid2004.

20  Q.   Have you read all the material on it?

21  A.   I don't know if I have read every single one, but I have

22  read a lot of material off of Tibyan, yes.

23  Q.   Now, you mentioned I believe on Friday regarding

24  al-Jamaa'atu I-Salafiyyatu li I-Da'wati wa I-Qitaal?

25  A.   The GSPC, The Salafist Group for Prayer and Combat in

1  Algeria, which is a designated foreign terrorist

2  organization.

3  Q.   Now, they changed their name; correct?

4  A.   That is correct, yes.  They changed it to al-Tanzim

5  al-Qadai fi Bilad al-Maghrib, the Al-Qaeda Network in the

6  Land of the Maghreb, Maghreb meaning North Africa.

7  Q.   Were these, the GSPC, are they -- or were they -- what

8  were they before they changed their name?

9  A.   Before they changed the name to the GSPC?

10  Q.   No, before they became AQ al-Maghreb, Al-Qaeda

11  al-Maghreb, what were they?

12  A.   What do you mean, what were they?

13  Q.   The GSPC, were they a big organization?

14  A.   This is again a subjective question.  What do you mean

15  by big?  It's a couple hundred guys who are fighting a jihadi

16  conflict against the Algerian government, the Algerian

17  military, moderate clerics, civilians, anyone else who got in

18  their way.

19       They carried -- in December 2007, they carried out a

20  massive suicide bombing against the United Nations in

21  Algiers, killed a whole bunch of people.  They are a jihadi

22  organization with roots from Afghanistan.

23  Q.   And when they changed their name or they pledged

24  allegiance to Al-Qaeda or whatever, was this just an online

25  announcement, or did they actually have contacts where they

1  actually did formally announce their allegiance?

2  A.   When you say formal contacts, you mean formal contacts

3  over the telephone or e-mail, in person?

4  Q.   For instance, when Zarqawi's group, which was previously

5  Jamaat al-Tawhid wal-Jihad, before it became Al-Qaeda in Iraq

6  or the Land of the Two Rivers, they had -- is it true that

7  Zarqawi released an announcement or someone from Al-Qaeda in

8  Iraq released an announcement saying that we have contacted

9  Osama Bin Laden and we are pledging our allegiance to

10  Osama Bin Laden --

11  A.   That is correct.

12  Q.   -- and now we are going to become Al-Qaeda in -- so it

13  wasn't just someone posting online we are Al-Qaeda in Iraq?

14  A.   No, it was a formal process.

15  Q.   Now, with GSPC, something similar to that?

16  A.   Yes.  There was a speech given by first

17  Ayman al-Zawahiri, there was another speech given by another

18  individual by the Abu Laith al-Libi, and then a statement

19  that was issued in response from the ameer of the GSPC, who

20  is known as Abu Musab Abdel Wadoud.

21  Q.   So it was official when this was --

22  A.   I mean, these were known organizations that preexisted,

23  so, yes.

24  Q.   With regards to what was shown earlier, Al-Qaeda in

25  Northern Europe, are you familiar with any of any such

1    process taking place?

2    A.   Well, I saw that communicated when it was posted on the

3    internet and I read it, but the organization itself only

4    exists in the minds of the people who created it.

5    Q.   Okay.  So it exists nowhere else?

6    A.   Well, the people that created it very much believed that

7    it existed because they were going to make it exist.  But it

8    was a new organization which they were attempting to

9    establish.

10   Q.   But no one, such as Ayman al-Zawahiri or Osama Bin Laden

11   or any other -- Abu Laith al-Libi --

12   A.   I mean, if you are asking whether or not they ever

13   endorsed it, they never had a chance.  If the organization

14   had carried out an act of violence, perhaps they would have

15   endorsed it.

16        But Al-Qaeda doesn't endorse groups until they carry out

17   acts of violence and establish themselves on the scene.  Now,

18   that happens very frequently.  Zarqawi's group is a good

19   example.

20        When Zarqawi's group first started up in Iraq, Zarqawi

21   was kind of seen as a nobody, as somebody who was just a

22   small fish, so Al-Qaeda didn't want to give them the official

23   credentials.

24        But once Zarqawi established himself with acts of

25   violence and killed a whole bunch of people and took control

1  of large portions of Iraq, then all of the sudden Al-Qaeda

2  was very eager to bring them into the fold.

3      That's the way it usually happens.  An organization

4  starts up, it establishes itself, it carries out acts of

5  violence, it proves itself in the world of Salafi Jihad and

6  to Al-Qaeda, and eventually then a merger takes place.

7      But it's very rare for a group simply to emerge and

8  immediately align itself.  These groups emerge organically.

9  Q.   You mentioned also in the list of scholars whom Tibyan

10  Publications considers as scholars the Abdullah ar-Rashood

11  was a military leader?

12  A.   The only video of Shaykh Abdullah ar-Rashood that exists

13  is of him sitting on a table with an antitank missile on a

14  table in front of him and a machine gun sitting behind him

15  while he talks about knocking down large buildings.

16      Once again, there is no mainstream or moderate cleric in

17  any religion on this earth that I can think of who would

18  videotape themselves sitting at a desk with an antitank

19  missile sitting in front of them.

20      He was an Al-Qaeda commander, he was killed in Iraq

21  fighting U.S. forces.  When he was killed fighting U.S.

22  forces in Iraq, Al-Qaeda in Iraq issued a statement

23  announcing his death and announcing that he had been a senior

24  figure in Al-Qaeda in Iraq and in Saudi Arabia, and that he

25  had gone down shooting.

```
1          That's not a scholar.  That is a military figure.
2    Q.    Okay.  You have heard the lecture "And Incite the
3    Believers"?
4    A.    Yes, I have seen it.
5    Q.    Okay, you have seen it.  And you say that he talks about
6    knocking down buildings.  Is that the subject of the --
7    A.    It's one of the subjects, yeah.  The idea is inciting
8    the believers to jihad, and he mentions that one of the
9    aspects of jihad is shaking the infidels and knocking down
10   large buildings, specifically knocking down large
11   buildings.
12         Again, the translation is done by Tibyan.  I'm just
13   giving you the translation that was done by Tibyan.  You can
14   go back to that and see, it's right there.
15         It's on my -- I even took the section where he's talking
16   about this and put part of this on my website as an example
17   that this individual just was killed in Iraq, he's a senior
18   Al-Qaeda figure, and this is what he was saying in terms of
19   his operational mandate.
20   Q.    Who is be Abdullah ar-Rashood?
21   A.    He's a senior figure of Al-Qaeda in Saudi Arabia.
22   Q.    Prior to that?
23   A.    He was a Salafi-Jihadi cleric who help found Al-Qaeda in
24   Saudi Arabia.  He was nobody before he helped found Al-Qaeda
25   in Saudi Arabia.  Nobody knew who he was.  He was a nobody
```

1  Salafi-Jihadi cleric in Saudi Arabia who established himself

2  primarily by aligning himself openly and visibly with

3  Al-Qaeda -- Tanzim al-Qaida fi Bilad al-Haramain.  The

4  Al-Qaeda Network in the Land of the Two Holy Places, in the

5  land of Saudi Arabia.

6      That's what made him famous.  That's what he's known

7  for.  He's not known for anything else but that.  In fact,

8  the lecture -- again, the lecture that you can almost always

9  find of his is "And Incite the Believers," the one where he

10  was already a most wanted figure, one of Saudi Arabia's

11  twenty-five most wanted.

12      Saudi Arabia doesn't generally put clerics on their

13  twenty-five most wanted list.  They only put tactical

14  military figures.

15      That's why some of the other people who were on their

16  list, like Shaykh Nassar bin Al-Fahd, who is a cleric and who

17  wrote such fatwahs as "The Use of Weapons of Mass Destruction

18  Against the United States," which you could argue are pretty

19  violent fatwahs, yet this is someone who was never added to

20  their twenty-five most wanted list because he's a cleric.

21      But Abdullah ar-Rashood was added to that list.  He is

22  not a cleric.  He is a jihadi leader.  He is a commander in

23  the field.  The fact that he's had clerical training, that's

24  just a footnote on his life.

25  Q.   What's the basis for you saying that he's a military

1 leader?

2 A. He was killed fighting U.S. forces in Iraq. When he was

3 killed, Al-Qaeda in Iraq, Zarqawi's organization, put out a

4 statement explaining that Ar-Rashood was an ameer in

5 Al-Qaeda, was fighting with U.S. forces, and had gone down in

6 a hail of bullets.

7 Q. Now, Al-Qaeda has -- and a lot of these jihad

8 organizations, they also have a branch called ahir tal

9 shariah or something, a legal committee; correct?

10 A. The Shariah Council.

11 Q. Yes.

12 A. That's correct, yes.

13 Q. So are these military leaders, or are these clerics and

14 scholars?

15 A. I don't think you could call them clerics and

16 scholars. They are people who hold guns, they hold weapons,

17 they shoot.

18 The fact that they also issue verdicts, Islamic verdicts

19 about killing other people is just part of what they do. But

20 most of the people that you see on these councils, even when

21 you see them in videos, are carrying weapons, are wearing

22 camouflage, and are in the field with the Mujahideen.

23 If they are shooting, they are not clerics. They are

24 militants.

25 Q. Are you familiar with Abu Umar As-Saif?

1 A.    Yes.

2 Q.    Who is that?

3 A.    Shaykh Abu Umar As-Saif was the head of the Shariah

4 Council of the Islamic Army of the Caucuses.  Abu Umar

5 As-Saif is a Saudi national who traveled to Chechnya in

6 1995.

7     He both issued verdicts for the Islamic Army authorizing

8 them to carry out attacks on Russian forces, to kill

9 Russians, even to launch operations inside of the former

10 Soviet Union.  He authorized the killing of Russian prisoners

11 of war.  And he was fighting in the field.

12     I was just watching a video of him yesterday holding a

13 weapon, wearing camouflage, sitting alongside Shamil Basayev,

14 the person who organized the 2005 Beslan school

15 hostage-taking massacre.

16     Obu Umar As-Saif was the one justifying the acts like

17 the massacre at Beslan.  He was Shamil Basayev's religious

18 interpreter slash contact with Al-Qaeda in Saudi Arabia.

19     Abu Umar As-Saif was so influential that in 2004, he was

20 featured in a video produced by Al-Qaeda in Saudi Arabia

21 where even though he was all the way over in Chechnya, his

22 advice for the Mujahideen in Iraq and Saudi Arabia was being

23 put directly into Al-Qaeda propaganda.

24 Q.    Do you know who he studied with or what kind of --

25 A.    Yes, he studied under Shaykh Ibn al-Uthaymeen in

1  Saudi Arabia, who was one of Saudi Arabia's most prominent

2  clerics and who has also issued fatwahs endorsing jihad and

3  Mujahideen.

4  Q.   He's the number two scholar in Saudi Arabia, or was the

5  number two scholar in Saudi Arabia.

6  A.   Was, but, yes.  Like I said, he's also issued fatwahs

7  about jihad and Mujahideen, specifically in Chechnya.

8  Q.   Uthaymeen is a mainstream scholar in Saudi Arabia?

9  A.   He's mainstream in Saudi Arabia, but I don't think you

10  could consider him mainstream necessarily outside of

11  Saudi Arabia.

12  Q.   Outside of the Salafi-Jihadi community?

13  A.   I would say the Salafi community.  He's pretty

14  influential in the Salafi community in general, but he's also

15  influential in the Salafi-Jihadi community very specifically,

16  yes.

17       Primarily because of the fact that, unlike some senior

18  clerics in Saudi Arabia, he has not held back his tongue when

19  it comes to certain aspects of jihad and Mujahideen.

20       I'm sorry, Ibn Uthaymeen is I-b-n U-t-h-a-i-m-e-e-n.

21  Q.   The discussions on these forums and debates on jihad,

22  would you agree that they cannot be understood with being

23  taken out of -- they cannot be understood in a vacuum, but

24  have to be read in context with regional history?

25  A.   That's a subjective question.  I think that's really a

1   question for Muslims more than it is for me, or imam, Islamic

2   clergy, really, not for me.

3   Q.   Have you -- how many books has Tibyan Publications

4   published?

5   A.   I don't know the total number, but it's up there.  It's

6   between I think 20, 25, 30.  They still publish stuff, so

7   it's growing.

8   Q.   And articles?

9   A.   Sure, articles, fatwahs, books, yes.

10      Videos I should add.  Sorry.

11   Q.   Al-Qaeda in Saudi Arabia, they have or they had two

12   magazines; correct?

13   A.   Al-Qaeda in Saudi Arabia did have two magazines, *Sawt Al*

14   *Jihad*, the *Voice of Jihad Magazine*, and *Al Battar*, the

15   military training manual, which was named actually after

16   Shaykh Yusuf Al-Uyayree whose nickname was Al Battar, the

17   slicing sword, the blade.

18   Q.   Could you give a description of what these two magazines

19   are?

20   A.   They are actually very similar, to be honest.  *Sawt Al*

21   *Jihad* was supposed to be the official correspondence of

22   Al-Qaeda in Saudi Arabia, messages from senior Al-Qaeda

23   leaders, explanations of past operations, et cetera.

24      *Al Battar* was supposed to be a training manual for how

25   to carry out missions.  There were schematics for how to

1    carry out an assassination mission on a particular Saudi

2    leader.  There were explanations on how to disassemble and

3    reassemble particular weapons common to the Mujahideen,

4    explanations of urban warfare written by senior Al-Qaeda

5    leaders.

6         But in practice you would find bits and pieces of these

7    articles spread throughout.  In other words, you would find

8    content that really should have been in *Al Battar* in *Sawt Al*

9    *Jihad*.  You would find material relating to tactical

10   operations in *Sawt Al Jihad*.

11        And vice versa.  You would find stuff written by senior

12   Al-Qaeda leaders that wasn't necessarily tactical, but more

13   philosophical, which was also in *Al Battar*.  It was a mix.

14   Q.   And did Tibyan Publications translate any *Al Battar*

15   material?

16   A.   I'm not familiar actually, not in a formal level that

17   I'm familiar with.  But perhaps they did.  I don't know.

18        I should add that when you say Tibyan, do you mean the

19   organization or the forum?   Because there were many articles

20   from *Sawt Al Jihad* and *Al Battar* which were translated into

21   English and posted on the Tibyan Publications forum.  I don't

22   know if they were ever officially released as Tibyan

23   Publications marked documents, however they were being posted

24   by apparent administrators on the forum.

25        So in other words, you could say that administrators of

1  Tibyan were actively disseminating English translations of

2  articles from *Al Battar* and *Sawt Al Jihad* to people, part of

3  their network, yes.

4  Q.  But those could have been translated by anyone;

5  correct?

6  A.  Well, that's true, but they were being disseminated by

7  the administrators of Tibyan and they were being headlined as

8  English translation of *Al Battar* number whatever.

9  Q.  But these translations are available from websites such

10  as Eprism or so, which are --

11  A.  I don't really know where they got them from.  But I do

12  know that the English translations were posted on the Tibyan

13  Publications forum by administrators advising people, Hey,

14  *Al Battar No. 11*, here is an article by Abdel Aziz al-Muqrin,

15  "War Inside the Cities, Urban Warfare," here you go.

16  There were many articles like that which translations

17  were posted.  Did Tibyan do the translation?  I don't know.

18  The point is that they -- regardless, they were disseminating

19  it to their network, yeah.

20  Q.  Are you familiar with a Shaykh Abu Basir?

21  A.  Abu Basir al-Tartusi?

22  Q.  Yes.

23  A.  Yes, I am.

24  Q.  Who is he?

25  A.  Abu Basir al-Tartusi is a Salafi-Jihadi cleric who is

based in the United Kingdom.  He frequently contributes

fatwahs and other reactions to Islamic events or current

events on the internet.

One of the more famous events that he responded to, he

issued a fatwah endorsing the July 7, 2005, bombings in

London.  The fatwah was eventually reposted on the website of

the Salafist Group for Prayer and Combat, GSPC.

Q.   Could you repeat -- I don't know if I heard you

correctly.  Did you say that Shaykh Abu Basir endorsed the

July 7th --

A.   He wrote a document which appeared to endorse, yes,

which appeared and was posted on the website of the GSPC.  I

believe it's still available on their current website.

Q.   Is this -- I'm aware that he actually publicly

criticized --

A.   He may have also, but he did write this document, and it

was posted on the website.

Q.   When was this posted?

A.   It was shortly after 7-7.  August of 2005.

Q.   Do you remember the title of that document?

A.   Not offhand.  But I can give you a copy of it.  I have

copies of it.

Excuse me, by the way Tartousi is T-a-r-t-o-u-s-i, Abu

Basir, A-b-u B-a-s-i-r.

THE COURT:  We need to move on, Mr. Sadequee.

1  BY MR. SADEQUEE:

2  Q.    Are you familiar with -- what is Markaz ud-Dawa?

3  A.    Markaz-ud-Dawa -- Markaz-ud-Dawa-wal-Irshad; correct?

4  Markaz-ud-Dawa-wal-Irshad is the -- or was, excuse me, the

5  political wing of Lashkar-e-Tayyiba.  It's now known as

6  Jamat-ud-Dawa.

7  Q.    Now, Markaz-ud-Dawa, they have a military branch?

8  A.    They have a what?

9  Q.    A military branch or a militant branch?

10  A.    The difference between Markaz-ud-Dawa and Lashkar is in

11  writing only.  There is no difference.  The spokesman for

12  Markaz-ud-Dawa is Abdullah Muntazir.  He's also the spokesman

13  for Lashkar-e-Tayyiba.  Hafiz Mohammed Saeed is the head of

14  Markaz-ud-Dawa.  He's also the head of Lashkar-e-Tayyiba.

15        Lashkar-e-Tayyiba was formed when Markaz-ud-Dawa went

16  into Afghanistan and identified local Pakistani military

17  figures fighting in the jihad there who it can partner up

18  with.

19        In essence, there would be no Lashkar-e-Tayyiba without

20  Markaz-ud-Dawa.  All the senior leadership of

21  Lashkar-e-Tayyiba is the leadership of Markaz-ud-Dawa.

22  Q.    What's the meaning of Markaz-ud-Dawa?

23  A.    Markaz-ud-Dawa means the missionary center.  The Dawa

24  center, missionary center.

25  Q.    Dawa also mean preaching; correct?

A.   Dawa means missionary work.  Dawa can include preaching,
it can include jihad, it can include a lot of different
things depending on what your definition of missionary work
is.

   Some Salafi-Jihadis believe that jihad is an integral
element of Dawa.  Some other moderate mainstream Muslims do
not believe jihad is an integral element of Dawa.  It just
depends who you are talking about.

Q.   The full name, Markaz-ud-Dawa-wal-Irshad, irshad means?

A.   I forget.  Jurisprudence?  Something like that.   It's
the -- guidance?  Guidance, excuse me.

Q.   So how many offices, to your knowledge, does it have?

A.   They have -- well, they had a bunch.  I can't for sure
say how many of them are still open.  But they had offices in
places like Karachi, Lahore, Attock, Muridke, Muzaffarabad,
Balakot, and they had contacts in offices across Pakistan up
until approximately 2002, 2003.

   At that point when the Pakistani government cracked down
on their activities, their footprint shrank.  They still had
offices, but a lot of them were closed or shuttered and they
moved most of their operations into eastern Pakistan.

Q.   You mentioned earlier on Friday that the Northwest
Province and Waziristan, these are dangerous places for even
Pakistanis?

A.   I didn't say that they are dangerous places.  I said

Wana is a dangerous place.

In March of 2005, two Pakistani journalists, local guys from Islamabad, went up to Wana because it was -- again, it was a no man's land, and they wanted to see how dangerous it was and they wanted to see what was going on up there, they wanted to try to interview Taliban people. They weren't coming up there with a hostile intent at all.

They went up there, and in their way into Wana they were hit by another car, the car opened up the side, and two people with AK-47s got out and killed them.

Shortly thereafter a statement was issued by a group calling itself Sipah-e-Islam -- S-i-p-a-h e Islam -- explaining that these two individuals were working on behalf of the Christians and were suspected to be American spies and thus they were executed.

Wana is the location of many of the missile strikes, the guided missile strikes that we hear about in the media. In fact, there was just a missile strike there last week that was targeting the head of the Pakistani Taliban.

Wana is the capital of the Pakistani Taliban-controlled territory. It's an exceptionally dangerous place to be. There is even a lady who converted to Islam in Canada and who wanted to take a Taliban commander as a husband who went over there several months ago looking to find -- again, a supporter of the Taliban, a big supporter of the Taliban, who

was kidnapped and is now being held by the Taliban for ransom
and they are threatening to execute her.

So I think the answer is that, regardless of whether you
are Pakistani, regardless of whether you are Muslim,
regardless of whether you are even an Al-Qaeda supporter,
this area is exceptionally dangerous to be in.

There are people here who are Jihadis, there are people
here who are kidnappers, there are people here who are
opportunists.  There is no absolutely no control whatsoever
by the Pakistani government.  The only sign of the Pakistani
government is that every few years, the Pakistani military
launches an invasion where they try to take back this
territory, always unsuccessfully.

And this is why you see the deals between the Pakistani
government and the Taliban.  When you see those deals, those
deals are all taking place pretty much in Waziristan, in
south Waziristan.

Q.    Now, when we are talking about the Pakistani Taliban,
they are related to the actual Afghani Taliban; correct?

A.    Somewhat, yes.

Q.    A branch off of it?

A.    Yes, a branch, yes.

Q.    Could you go into the history of how the Taliban post
the Soviet era, when the Soviets, what do you call it,
retreated, the vacuum that took place and how the Taliban

1  arose?

2  A.    Sure.  Following the end of the Soviet-Afghan War, there

3  was chaos in Afghanistan.  The Mujahideen commanders who had

4  fought against the Soviet Union including several who are now

5  Pakistani Taliban commanders, couldn't agree to share power

6  amongst themselves.  So they started waging war against

7  themselves, and they destroyed large parts of Afghanistan.

8       In 1995, a group of clerics along the Afghan-Pakistani

9  border, radical clerics of this Deobandi school, decided that

10  the answer to this was that these Mujahideen, these former

11  commanders were no longer Islamic, and the answer was that an

12  even stricter form of Islam needed to be established in

13  Afghanistan.  That this Islam was too moderate, it was too

14  weak, it was too flimsy, and that the real Islam needed to be

15  established by force.

16       Led by a native of Kandahar named Mullah Omar, these

17  individuals crossed over the border, mostly with just a

18  madrassa of students, students carrying AK-47s, and crossed

19  over the border and seized control of Kandahar.  At that

20  point there really was no central government, so there was no

21  one to fight them.

22       Once they discovered that there was no one to fight

23  them, the Taliban began expanding their control of the

24  territory, they began fighting the remaining war lords, they

25  began executing enemies of Islam, they killed the former

president of Afghanistan, they murdered Shiites.

The Taliban were a Pashto organization, Pashto meaning that -- in southern Afghanistan, it's controlled by one ethnic group, it's called the Pashtuns.  Northern Afghanistan has different ethnic groups.  These ethnic groups frequently come into conflict with each other, they kill each other, they get in wars with each other.

And the Taliban are a Pashto movement.  So a lot of times what you had is as the Taliban began seizing control over other areas of Afghanistan, they would commit atrocities against other ethnic groups, even if they were Muslims, the Tajiks, Usbeks and others.

It was an exceptionally bloody conflict.  It was a front-line conflict, kind of like World War I.  Thousands of people died.  It was largely a stalemate up until about October of 2001.

Q.  Is it not true that as a result of the civil war that took place in the vacuum after the Soviets retreated, that the people wanted the law and order which the Taliban were establishing?

A.  Well, they wanted law and order.  I don't know if they wanted the Taliban.

They wanted law and order, sure.  But again no Tajik and no Uzbek and no Hazar or Shiite, which comprise a very large section of Afghanistan, is ever going to say or ever would

have said we wanted the Taliban here, because the Taliban are

Pashto and the Taliban are fundamentally a Pashto-Islamic

movement.

    There is no way that a Tajik or an Uzbek or a Hazar

would have said, Please, Taliban, come, please control us.

That doesn't happen.

Q.   A couple of questions.  You mentioned that the Tajiks,

the Uzbeks form a large -- they are minorities; correct?

A.   They are individually a minority.  But if you take up

the Tajiks, the Uzbeks and the Hazara, the Shiites, who all

basically form a united front -- that's what the northern

alliance is.  The northern alliance is these groups that

united to fight against the Taliban -- that's about 40,

45 percent of Afghanistan.

    So that is -- they are a minority, sure, but that's a

significant minority, yeah.

Q.   Is it not true that the Taliban had Uzbeks-Muslims

fighting along with them?

A.   They had nonAfghan-Uzbeks, they had Uzbeks from

Uzbekistan who were Uzbek-Islamic extremists, yes, that's

true.  They come from a group that -- I mean, it's a

well-known Islamic movement that's a designated foreign

terrorist organization.

    But those people are not Afghan-Uzbeks.  They are

Uzbek-Uzbeks.  They may be of the same ethnicity, but they

are a different nationality and they have an entirely

different agenda.

Also the people that you are talking about, the Islamic

Movement of Uzbekistan, the IMU, they are a tiny group.  It's

a group of maybe a couple hundred people at most.

I'm talking about the population of Uzbeks in

Afghanistan.  I'm talking about thousands, maybe millions of

people.

Q.   But the way you phrased it earlier, it sounded as if you

were saying that the basis of the conflict between the

Taliban and these other ethnic groups was ethnicity, whereas

you were saying that there is actually Uzbek ethnic people

who are --

A.   No, no, it largely was ethnic.  When the Taliban took

over Mazar-e-Sharif in 1997, they began dragging Shiites and

Uzbeks into the streets and boiling them in pots alive.  The

same thing had been done by Uzbeks and Tajiks to the

Taliban.  It's not -- it was a tit-for-tat kind of thing.

But they weren't picking people on the basis of what

side they were on.  They were picking people on the basis of

their ethnic background.  Shiites, Hazar-Shiites have been a

routine target of the Taliban in Western Afghanistan.

And Shiites in general have been a particular target.

When the Taliban took over Mazar-e-Sharif, they went into the

Iranian consolate there and they murdered the Iranian Consul.

1  The reason that they murdered the Iranian Consul was because

2  he was a Shiite, not because he was an Uzbek or not because

3  he was a Muslim or nonMuslim, but because he was a Shiite and

4  it was a sectarian thing.

5      The Taliban are -- again it's a very specific ethnic and

6  sectarian -- it's a Deobandi-Pashto movement.  There is a

7  handful of Uzbeks and there is a handful of Tajik extremists

8  who fight with them, but the hundreds of thousands and

9  millions of Tajiks and Uzbeks who live in Afghanistan, the

10  sweeping majority of those people have never supported the

11  Taliban, have never had anything to do with the Taliban,

12  never wanted the Taliban to come into their lands, and have

13  suffered terribly under the Taliban.

14      You should speak to some of the Tajiks up in the plains

15  north of Kabul who had their farms destroyed, who had their

16  way of life destroyed by the Taliban and had to flee for

17  their lives.  I mean, this is a basic rule of Afghan

18  history.

19      This is not something new, either.  I mean, this goes

20  back -- these ethnic and sectarian fissures in Afghanistan go

21  back far longer than the contemporary jihad that's existing

22  there now.

23  Q.  Back to Jamat-ud-Dawa, is it true that Jamat-ud-Dawa is

24  officially permitted by the Pakistani government to help the

25  government in relief activities in Pakistani-controlled

1 | Kashmir in 2005?

2 | A.   It was involved.  I don't know if it was allowed to be

3 | involved.  I don't know if anyone ever wrote a thing.

4 |     Merely what the Pakistani government said is that we

5 | can't crack down on them providing humanitarian relief to

6 | people.

7 |     If we see that there is politics involved or if we see

8 | that they are trying to use this as a cover for something

9 | else, then we will get involved.  But as long as it's just

10 | providing humanitarian relief, because of the fact that we

11 | can't do this on our own and because it would look very bad

12 | politically, we can't stop them from doing that.

13 |     That doesn't mean that they liked it, that they

14 | encouraged it.  In fact, my understanding is that they

15 | actively discouraged it afterwards when they realized that

16 | these activities were in fact being used as a cover for

17 | recruitment and other activities that had nothing to do with

18 | humanitarian aid.

19 | Q.   And Jamat-ud-Dawa is the same as Lashkar-e-Tayyiba you

20 | are saying?

21 | A.   Yes.  When Lashkar-e-Tayyiba was banned in 2002,

22 | I explained that they changed their name.  So they changed

23 | their name from Markaz-ud-Dawa and Lashkar-e-Tayyiba simply

24 | to Jamat-ud-Dawa.

25 |     Now, what's the difference?  Jamat-ud-Dawa means the

1 Dawa organization.  Markaz-ud-Dawa means the Dawa

2 center.  It's pretty much the same thing.  It's just a very

3 small change of the name.

4 Q.   Now, Abu Zubaydah was captured from an LeT safe house?

5 A.   That's correct, he was.

6 Q.   And Abu Zubaydah is --

7 A.   Abu Zubaydah al-Filastini was a former training camp

8 manager in Afghanistan.  He ran a series of guest houses

9 along the Afghan-Pakistani border which channeled primarily

10 North Africans into terrorist training camps in Afghanistan

11 prior to October of 2001.

12 Q.   So his arrest was made possible because the U.S.

13 depended on Pakistanis' help and the Pakistanis depended on

14 LeT's help and they made that --

15 A.   Oh, no, no, no, no, no.  That arrest had absolutely

16 nothing to do with help from Lashkar-e-Tayyiba, period.  That

17 was not given by assistance by Lashkar-e-Tayyiba.  That's

18 entirely incorrect.  I don't think Lashkar-e-Tayyiba played

19 any helpful role whatsoever in terms of that arrest, not as

20 far as I know.

21 Q.   Is it true that Al-Qaeda has accused the head of LeT,

22 Hafiz Saeed Mohammed, of conspiring against the jihadi

23 networks?

24 A.   No, not in any official statement, no.  Maybe behind the

25 scenes, but not in any official statement.  And as far as

1   Lashkar-e-Tayyiba is concerned, Lashkar-e-Tayyiba has

2   publicly and openly endorsed the Taliban, has openly called

3   for people to fight against the United States in Afghanistan,

4   has openly called for the establishment of an Islamic state

5   in Pakistan.

6       Again, I mean, Hafiz Mohammed Saeed, the person you just

7   described, specifically said that as far as Musharraf, the

8   wrath of God would be on him for abandoning the cause of

9   jihad.

10  Q.   And is he still --

11  A.   He was just under house arrest.  I mean, he was just

12  freed.

13  Q.   He was just --

14  A.   He was under house arrest.  He was imprisoned by the

15  Pakistanis.  He was just freed now.

16  Q.   So as of right now he's a free man?

17  A.   Just in the last few days, yes.  He was under house

18  arrest for months.

19  Q.   It happened on and off?

20  A.   It's difficult for the Pakistanis politically to hold

21  them unless they have something that they can charge him

22  with.  This is the first time I know that he's ever been

23  arrested, but it's because of the fact that the Pakistanis

24  I think are starting to lose patience with these people.

25  Q.   The head of LeT is today a free man?

1   A.   He's under surveillance.  I believe he has travel

2   restrictions, but he is -- he may still be confined to his

3   home, but he's -- he's free.  I believe the Indian government

4   is currently seeking his extradition.

5   Q.   LeT was banned in 2003 in Pakistan?

6   A.   I believe 2002 actually.

7   Q.   And it stopped functioning at that time under that name?

8   A.   In approximately 2002, yes, it began -- it stopped

9   operating as Markaz ud-Dawa and began operating as

10  Jumat ud-Dawa, and it stopped using the name

11  Lashkar-e-Tayyiba and just called itself Jumat ud-Dawa.

12  Q.   So in 2005 one could not actually go see an LeT

13  recruiter?

14  A.   Yeah, you could.  Again, this was just for show.  If you

15  showed up at a Jumat ud-Dawa office, Abdullah Muntazir, who

16  is the spokesmen for Lashkar-e-Tayyiba, is also the spokesman

17  for Jumat ud-Dawa.  It's the same thing.  If you go speak

18  with Abdullah Muntazir or a recruiter for Jumat ud-Dawa, you

19  are speaking with a recruiter from Lashkar-e-Tayyiba.  They

20  just changed the name, that's it.

21  Q.   But technically in 2005 LeT did not exist?

22  A.   No, it existed.  It just changed its name.  I mean,

23  again, if you look at the designation, for instance, the U.S.

24  government has designated both Lashkar-e-Tayyiba,

25  Markaz ud-Dawa and Jumat ud-Dawa.

1    If you look at the designation for Jumat ud-Dawa, the

2  designation as a foreign terrorist organization, it

3  specifically states, I mean, Jumat ud-Dawa is

4  Lashkar-e-Tayyiba.  This is just an alias and that it's still

5  conducting operations.

6    In fact, if you go there, I mean, they still call

7  themselves Lashkar-e-Tayyiba among themselves.  They just

8  don't advertise that openly anymore because they realize

9  there are legal implications to that.

10 Q.  You are saying Jumat ud-Dawa is one of the listed

11 organizations designated as a foreign --

12 A.  Yes, I think as of '03 or '04, it's specifically

13 designated, Jumat ud-Dawa.  Again, that's in the

14 *Federal Register*.  You don't have to take my word for it.

15 Q.  You are saying Jumat ud-Dawa -- when was it that

16 Jumat ud-Dawa was designed as a foreign terrorist

17 organization?

18 A.  I couldn't tell you exactly, but it was either in 2004

19 or 2005.  It's in the *Federal Register*.  You can look it

20 up.  Jumat ud-Dawa is specifically designated as

21 Jumat ud-Dawa as an alias for Lashkar-e-Tayyiba.  It's listed

22 as such by the U.S. Treasury Department, it's listed as such

23 by U.S. State Department, and it's in the *Federal Register*,

24 not to mention the fact that the website of Jumat ud-Dawa is

25 identical, the same as the website of Lashkar-e-Tayyiba.

1   They just changed one word at the top.  It's the same

2   thing.  I have copies of both websites.  You can see, it's

3   the same material.

4       I should add as well that Jumat ud-Dawa put out open

5   statements soliciting donations for jihad and Mujahideen

6   under Jumat ud-Dawa in English.

7   Q.   Do you know the dates?   Because the date I have is

8   Jumat ud-Dawa is not designated by the United States until

9   April 27 of '06?

10  A.   I couldn't give you the exact date, but it's been

11  designated.  I believe it's before that, though.  I mean,

12  I don't have the designation in front of me, but it's been

13  designated.

14  Q.   But the point is that prior to April 27 of 2006, it was

15  not designated?

16  A.   I couldn't respond to that because I don't have the

17  *Federal Register* in front of me.

18      But I caution you in that, because I think it was

19  designated as something before that, I don't know where it

20  was published, but I think as early as 2005.  But don't quote

21  me on that because again I don't have the *Federal Register* in

22  front of me.

23  Q.   Now, back to the Northern Western -- the area, the

24  Taliban-controlled area.  Is that an area where nonArabs --

25  I mean, excuse me, nonPakistanis such as Arabs and other

1    nationalities such as Uzbeks have been; correct?

2    A.    There are a small group of them, yeah, yeah.

3    Q.    So.  And is it --

4    A.    But they are discrete and they are separated away.  They

5    don't mix in so much with anyone who is not a local Pakistani

6    Taliban member.

7    Q.    Now, if a Pakistani who is familiar with Pakistan,

8    speaks the language, culture, knows -- religious, everything,

9    wanted to go to this Taliban-controlled area and join the

10   jihad, would it be a problem for him to join the jihad?

11   A.    Would it be a problem?

12   Q.    I mean, would he --

13   A.    It would be exceptionally dangerous, it would be

14   exceptionally risky.  If you don't believe me, ask

15   Jude Kenan Mohammed, the young man who was arrested in

16   Peshawar just a few months back, the American national but of

17   Pakistani origin.

18        The fact is that a lot of people have said, oh, it's not

19   a big deal, and they have gone up there and they have been

20   killed or they have been kidnapped or they have been

21   assaulted.

22        I mean, again, you have got two Pakistani journalists

23   from major publications who did not consider themselves to be

24   agents of the Americans, these were independent people

25   looking to give the Pakistani Taliban a voice, and they were

gunned down as being spies for the United States.

Someone who comes into that region is automatically going to be looked on very suspiciously, Why are you coming here?

It's true, if you go to that region and you get in touch with the right people and you know the right people and you get in contact with them ahead of time, sure, you can get hooked up with the Pakistani Taliban or a jihadi group.

But if you simply show up in that region without making arrangements ahead of time or without knowing somebody there, you are putting yourself at an exceptionally dangerous situation, probably one of the most dangerous situations on earth.

Because you not only have to worry -- you have to worry about so many different things. You have got to worry about thieves, you have got to worry about missile strikes, you have got to worry about the Pakistani Taliban, you have to worry about dissident Taliban members, you have to worry about local opportunists, I mean, you have got to worry about the Pakistani government. I mean, nobody is your friend, nobody.

Q. Now, the Pakistani Taliban have their hold of influence though; right?

A. That is the center of their hold of influence, Wana and South Waziristan.

Q.   So whatever law and order is there, it's placed by them, the Shar'ee Allah; right?

A.   I would argue there isn't much law and order there right now.  The Shar'ee Allah that's being enforced is not really being enforced.  It's being enforced in individual small areas.

But this is a no-man's-land.  The Pakistani Taliban, it's not one organization that's very discrete with a very highly, you know, organized infrastructure.  These are individual commanders looking to make a name for themselves.

There was just a report yesterday that two of the top Pakistani military commanders may have killed each other in a dispute over leadership.

So the idea that you would be safe just going in there because of the fact that you are a Pakistani Taliban member or you are allied with them or you speak their language or you look like that, that's nonsense.  I mean, they are killing each other.

Q.   So let's come back.  Now, if someone, a jihadi --

THE COURT:  Excuse me, how much longer do you have?  We are going on two hours now.

MR. SADEQUEE:  I think the last five minutes.

THE COURT:  All right.

BY MR. SADEQUEE:

Q.   If a jihadi wants to or someone who aspires or intends

to become -- join the jihad, is it not true that even if he

fails to join and if he's intent on becoming a martyr and

gets killed on the way, he would still be considered a

martyr?

A.    That's entirely dependent on what cleric you follow,

that's entirely dependent upon -- I mean, that's a subjective

call on the part of a cleric and on the part of an

individual, and it's not accepted among a lot of people.

     There are a lot of people who, even if religiously they

might become a martyr if they are martyred going to the

field, that's not the way that they want to go out.  They

haven't spent all this time and all this money and all this

effort preparing for jihad to get taken out along the way.

     I mean, these people are not interested in suicide

missions.  They are interested in achieving

something.  I mean, this is not just -- the act is not just

killing myself for the sake of killing myself.  It's trying

to achieve something by killing myself.

     You don't achieve anything by being arrested or by

being -- or by being taken out en route.  You only achieve

something by meeting these people and getting assigned a

mission.

     So I am sure that there are some people who have the

mindset that, well, if I get killed along the way, at least I

will still be a martyr, but I don't think that's their number

1  one priority.

2  Q.   We talked about Yusuf al-Uyayree.  Are you familiar with

3  one of his articles called "The Path to the Land of Battar"?

4  A.   I am indeed.

5  Q.   Does it not say in that article that what matters is the

6  intention and trying to go, and if you get killed, you would

7  be awarded for your intention?

8  A.   Yeah.  Again, this is the whole thing, this is supposed

9  to reassure people that despite the hardships and despite the

10  dangers, you should still go.  And don't worry, if your

11  intention is correct, you will still be a martyr.

12      But there is a difference between that, well, if it

13  happens, you know, so be it, versus this is what I want to

14  happen.

15      I would say that, just logically speaking, the vast

16  majority of people who end up in that direction, they are

17  looking to join something, they are looking to do something,

18  they are looking to carry out something.  Simply being

19  murdered and becoming a martyr for Islam unknowingly I don't

20  think is the top of their agenda.

21      I mean, you don't spend that amount of time and effort

22  and put yourself at that kind of risk just to end up in

23  prison or to be killed.  I mean, these guys are looking to

24  achieve something.  If they want to die, they want to die on

25  their own terms.

1    Sure, the idea is is that you are not going to get

2  cheated if you get, you know, intercepted along the way, you

3  are not going to get cheated out of martyrdom.  But that's

4  just religious assurances.  That doesn't have anything to do

5  with the tactical mission of what they are trying to do.

6  Q.   Now, Afghanistan is a jihadi zone, correct, or a war --

7  A.   Some of it is.

8  Q.   And Kashmir is to the right of Pakistan.  So to the west

9  of Pakistan there is Afghanistan and to the east of Pakistan

10  there is Kashmir; right?  That's another jihadi zone.

11    Now, within Pakistan, there is Waziristan and also

12  these other territories that's also a conflict jihad zone;

13  correct?

14  A.   Well, again, it depends.  Are you saying it is a

15  legitimate jihad zone --

16  Q.   No.

17  A.   -- or are you saying there is a jihad going on there?

18  Q.   Yes.

19  A.   There is a jihad going on there, yes.

20  Q.   And then there is multiple jihad organizations all over

21  the place; correct?

22  A.   You mean in Waziristan or --

23  Q.   I mean, in that whole region, Afghanistan, Pakistan --

24  A.   Yes, there is a wide panoply of different jihadi

25  organizations and Mujahideen organizations fighting in this

1  region, yes.

2  Q.    So if someone wanted to, was determined to join the

3  jihad or a training camp, with all these variety of avenues

4  and options and organizations, would that -- would it not be

5  quite easy to get --

6  A.    No.  Pakistan is a police state.  Pakistan is a police

7  state.  If you come in there -- here, look, if you are from

8  Muridke or if you are from Muzaffarabad and you live in the

9  city, so you have constant contact with Lashkar-e-Tayyiba or

10  Jaish-e-Mohammed or something like that, yeah, you can join

11  an organization like that pretty easily.

12     But if you don't live in Muzaffarabad or you don't live

13  in Balakot or you don't live in Muridke and you are not

14  from -- Lashkar-e-Tayyiba is the Ali Hadith sect, it's a

15  very, very small Sunni sect; okay?  Most Sunni Muslims are

16  not from that sect; okay?

17     So normally speaking, other than foreigners, the only

18  people in Pakistan who they court are people of the

19  Ali Hadith sect; right?

20     Again, if you are -- these are small militant

21  organizations.  For the most part, they are

22  proscribed.  Jaish-e-Mohammed, illegal, and very much illegal

23  in Pakistan.  Trying to join these organizations as an

24  outsider or someone who is not intimately familiar, whose

25  family is not part of this, who isn't part of the mosque

where these people are recruiting, they know that there are

spies coming.

If you went there before 2001, then it was fairly

open.  If you went there '99, 2000 -- I interviewed people,

Americans who went there -- it was fairly open back then.

But everything changed when the U.S. invaded

Afghanistan.  The whole -- the dynamics of the region

changed.  The Pakistani government began looking for people

who were coming and trying to join these organizations.  And

so did the United States government.

So the idea that these organizations simply are willing

to accept anyone who comes in is ridiculous.  I mean, they

have to exercise some degree of operational security, because

otherwise they are going to get loaded down with American and

Pakistani spies, among others.

They need to make sure that the people that are coming

in they judge to be jihadis worth their time, people worth

their effort, and they also have to be at a level where, you

know, if the U.S. government is looking to investigate

Lashkar-e-Tayyiba bank accounts or camps or something like

that, they can't simply press a button and have the full

dossier on hand.

They are underground organizations.  At least after 9/11

they have been underground organizations.  Jaish-e-Mohammed

changed their name.  Lashkar-e-Tayyiba changed their

name.  They shut down many of their offices.  They changed

their phone numbers.

Q.   You mentioned they are underground, but at the same time

you mentioned that the very head of LeT is free?

A.   He's free, but do you know where he is right now?   Do

you have a street address?  Neither do I.

     If I wanted to find Hafiz Mohammed Saeed in Pakistan

right now, I couldn't tell you where he is.  I couldn't

tell you what street he's on, what city he's in.  Trying to

find someone like that is trying to find a needle in a

haystack.

     If you know where you are going or if you have a contact

that's there that's already made contact with them, sure, you

can join them, no problem.

     But if you simply show up at their doorstep with your

bag in one hand and a ticket in the other, you have to

understand that these people don't know whether or not that

person is a spy, whether or not they are legitimate, whether

or not they are a crazy person.  They don't know.

     And they have to be very careful.  Because if they take

in spies into their organization now, they are in deep

trouble.

Q.   You mentioned do I know or does anyone know where

Hafiz Saeed Mohammed, the leader of LeT is.  Well, clearly

he's -- as you mentioned, he was in custody of the Pakistani

1  government.

2  A.   That's right, he was.

3  Q.   As of just very recently?

4  A.   That's correct, he was, yes.

5  Q.   So it's not that he's hiding?   I mean, it's more or

6  less still he can be accessed; correct?

7  A.   Yeah, but there is a difference -- again, there is a

8  difference between seeing Hafiz Mohammad Saeed and joining

9  Lashkar-e-Tayyiba.

10      You know, look, Jaish-e-Mohammed is a great example.  I

11  had a colleague of mine, a reporter from up in Canada who

12  back in 2005 had heard all about this particular camp in

13  Balakot run by Jaish-e-Mohammed.

14      So he got together some Pakistanis and they went up to

15  Balakot, and they tried getting near the camp.  Because they

16  wanted to see if they could get footage of the camp, see the

17  camp, meet anyone who was at the camp.

18      They couldn't get anywhere near it; okay?  There were

19  armed guards watching, making sure no one came anywhere

20  near.  You couldn't get close, whether you were Pakistani or

21  local, unless you already made contact with them.

22      If you already made contact with them and you set up a

23  relationship, no problem.  But if you simply show up at the

24  doorstep of a training camp, you have to understand, these

25  people have a natural degree of skepticism.  They have to for

1    their own survival.

2    Q.    Now, I think that you are making a distinction.  I'm

3    asking if someone wanted to go to -- perhaps they might not

4    be accepted by this organization, Jaish-e-Mohammed or LeT,

5    the organization might not accept them or take them in, but

6    if someone wanted to visit an office or a camp of these

7    organizations --

8    A.    Well, again --

9    Q.    -- they could do that?

10   A.    Again, many of the offices have been closed down since

11   2001, and you can't get anywhere near the camps.

12        I was able to have a local Pakistani, a colleague of

13   mine, go and videotape inside of Lashkar-e-Tayyiba's camp in

14   Muridke; all right?  The only way I was able to do that was

15   by first contacting Abdullah Muntazir, the official spokesman

16   of Lashkar-e-Tayyiba, interviewing him, speaking with him at

17   length, explaining to him what my intentions were, then we

18   were given invitation to send someone to Muridke.

19        There is a giant barbed-wire fence all the way around

20   the compound, and it's way out.  I mean, it's a huge, very

21   thick barbed-wire fence.  Nobody is getting anywhere near

22   that compound unless Lashkar wants them to get near it or

23   allows them to get near it.

24        My understanding was that then opening the gates on this

25   occasion when we went in was one of the very few occasions

1    they have let in outsiders to see the camp, and even then it

2    was a very highly chaperoned visit.  They would only let us

3    film certain things.  It was very scripted.

4        You know, they are not that open.  I mean, they were

5    open, but events after 2001 have forced them to kind of seep

6    further and further underground.

7    Q.    Now, you are talking about a media team or --

8    A.    These are people that work for me.

9    Q.    Okay.  But I'm speaking of if a Muslim, a devout Muslim,

10   a jihad-oriented Muslim wanted to go to these camps, would

11   they --

12   A.    There is no way for them to know that you are a

13   jihad-oriented Muslim until they talk to you.  You have to

14   first -- you have to speak -- they can't just look at you and

15   say, Well, you are a jihadi-oriented Muslim.  They have to

16   speak with you.

17       And in order to speak with you, they have to see you in

18   person or they have to speak to you on the telephone.  So,

19   again, if you call them or you write them ahead of time and

20   you work this out and you make the arrangements and they

21   accept you, sure.

22       But if you simply show up at their gate, regardless of

23   whether you are carrying a camera, an AK-47, or a bag of

24   balloons, they are not going to let you in unless they know

25   who you are.  It's just a simple rule of operational

1  security.  They are not stupid.

2  Q.   But the question which I think I'm trying to get at is

3  this.  If someone wanted to visit -- it's one thing --

4  you are speaking of to be entered into, to actually be

5  accepted.

6  A.   No, I'm speaking, again, visiting.  I'm saying that if

7  you simply show up, you are not going to be allowed to visit,

8  you are not going to be allowed to come in, you are not going

9  to be allowed to do anything until they know who you are,

10 period, period.

11 Q.   And how would they find out who you are?

12 A.   If you contact them ahead of time, or if you come from a

13 network of individuals who they know somehow, either they

14 know your cleric or they know the organization you are a part

15 of or they have assurances from someone that you are familiar

16 with, your friend, your associate or whoever.

17     But they have to have some kind of prearranged knowledge

18 of who you are.  Because again, they don't know who you

19 are.  You could be a spy, you could be a journalist, you

20 could be anyone.  And they don't judge people by simply

21 looking at them.

22 Q.   But isn't it true that in the videos, in the jihad

23 videos that are released by Al-Qaeda and all these other

24 organizations, they openly actually invite Muslims come join

25 us, come to us?

1    A.    Right, but Lashkar-e-Tayyiba has never done that.

2    Q.    Well, other organizations have, such as Al-Qaeda, such

3    as --

4    A.    Lashkar-e-Tayyiba has never done that.

5    Lashkar-e-Tayyiba has never issued -- Lashkar-e-Tayyiba in

6    general doesn't issue videos.

7         But they have never issued -- they certainly have never

8    issued a video which encouraged people to come there.  What

9    they said is if you want to contact us, here is our phone

10   number, here is our e-mail address, call first.

11   Q.    So -- okay, you are saying that if someone wants

12   to contact -- wanted to join, they have a public:  This is

13   how you can join us?

14   A.    Yes, there is a public way, but it's not explicit as,

15   you know, filling in your name and putting in your

16   information.  The idea is is that if you want to know more

17   about us or you have something you want to ask us, contact us

18   first, you know.

19        But, sure, again, they were accepting recruits in 2005,

20   foreign recruits in 2004 and 2005, but you had to come

21   through the right way.

22   Q.    So --

23   A.    And you had to come through a way where they felt you

24   were genuine and legitimate and that you weren't going to

25   cause them lots of problems.

1    But, again, this is just the way it works.

2  Q.   So if someone wanted to join LeT, it's not a mystery.

3  LeT is saying this is our phone number, this is our address,

4  contact us?

5  A.   The phone number is out there.   The e-mail address is

6  out there.  If you want to contact them, you can contact

7  them, yeah, sure.

8         MR. SADEQUEE:  Thank you.  Nothing further.

9         THE COURT:  We have been going almost two hours

10  now.  I'm going to take a break for the jury.

11         How long is your redirect?

12         MS. COLLINS:  I just have two or three questions.

13  It will be very short, Your Honor.

14         THE COURT:  Well, I have heard that before.

15         Let's take our midmorning break.  We will break

16  until about quarter after.  Please don't discuss the case.

17  The evidence is still coming in.  We will be in recess for

18  fifteen minutes.

19         (In open court without a jury present:)

20         THE COURT:  Is there anything we need to discuss

21  before we break?

22         MR. McBURNEY:  No, sir.

23         THE COURT:  All right.  We will be in recess.

24         (A recess is taken at 11:00 a.m.)

25                        --   --   --

1       (In open court without a jury present at

2  11:17 a.m.:)

3       THE COURT:  Just to remind those in the courtroom,

4  if somebody does have an electronic device on, all electronic

5  devices have to be turned off.  Please do so, because they

6  are already interfering with the PA system.

7       All right.  Anything we need to discuss before we

8  bring the jurors back in?

9       MS. COLLINS:  Not from the government, Your Honor.

10       THE COURT:  Mr. Sadequee, anything else before the

11  jurors come back in?

12       MR. SADEQUEE:  No.

13       THE COURT:  All right.  Bring the jurors in,

14  please.

15       MR. SADEQUEE:  I would like to --

16       THE COURT:  The jurors are coming back in.  We can

17  take that up at the next break.

18       Well, tell them to hold up the jurors so I could

19  take up Mr. Sadequee's latest question.

20       Yes, Mr. Sadequee, what do you have?  I'm going to

21  hold the jurors up even though you've stated you were ready.

22       MR. SADEQUEE:  I was going -- I wanted to tender a

23  document into evidence as an exhibit, Exhibit 5.

24       THE COURT:  Is there any objection?

25       MS. COLLINS:  No, sir.

1    THE COURT:  It's admitted.

2    All right.  They can come in now, please.

3    (In open court with a jury present:)

4    THE COURT:  All right.  Go ahead.

5    MS. COLLINS:  Thank you, Your Honor.

6                    -- -- --

7                REDIRECT EXAMINATION

8    BY MS. COLLINS:

9    Q.   Mr. Kohlmann, you testified on cross that before LeT

10   would accept any new recruit into their camp or into their

11   organization, that they would want to vet that person first

12   to determine whether they were legitimate.  Did I interpret

13   your testimony correctly?

14   A.   That's correct.  Particularly after 2001 and the

15   crackdown on jihadi organizations inside of Pakistan, yes.

16   Q.   And that's true in mid2005?

17   A.   It's definitely true in mid2005, yes.

18   Q.   So would -- for that prospective recruit, would knowing

19   someone who has a connection to the organization or can some

20   way facilitate with that organization, would that help them

21   in getting through that vetting process?

22   A.   Not only help them, that's exactly what

23   Lashkar-e-Tayyiba wanted to do.

24       They were actively looking for people in the

25   United States, the United Kingdom and elsewhere who could

serve as intermediaries and could help vet people on the

ground before they ever left North America or Europe and got

to Pakistan.

So that by the time they got to Pakistan, it was a group

of people who already were vetted, who were already ready to

go, who could be trusted.

There were Americans that were recruited for this task,

there were others.  But the point is is that Lashkar was

trying to export the vetting process beyond Pakistan back to

the countries of origin.

Q.   Now, based on your research, was Aabid Khan trying to be

one of those facilitators or connectors?

A.   Yes, Aabid Khan was trying to serve as a connector for

both Lashkar-e-Tayyiba and Jaish-e-Mohammed.

In fact, what it appeared that he was doing was that he

was using these two organizations and competing them against

each other, trying to get one to give him a better deal over

the other one, kind of like buying a used car.

That's basically what he was doing was setting these two

organizations against each other to get the best deal

possible so that ultimately his people who he could bring

over there wouldn't have to bring money, they wouldn't have

to bring weapons, they wouldn't have to bring anything.  They

would just show up and everything would be taken care of for

them.

1          MS. COLLINS:  No further questions, Your Honor.

2          THE COURT:  All right.  Does anybody want

3   Mr. Kohlmann subject to recall?

4          MS. COLLINS:  Not from the government.

5          THE COURT:  Does the defense?

6          MR. SADEQUEE:  No.

7          THE COURT:  All right.  Mr. Kohlmann, we appreciate

8   your testimony.  You are being released, but you should not

9   discuss your testimony with anybody until you hear the case

10  has been concluded.

11         THE WITNESS:  Thank you very much, Your Honor.

12         THE COURT:  Call your next witness, please.

13         MR. McBURNEY:  The government recalls

14  Agent Mark Richards.

15         THE COURT:  You may be seated.  We have sworn you,

16  haven't we?

17         THE WITNESS:  Yes, sir.

18         THE COURT:  Just to remind you, you are still under

19  oath.

20         THE WITNESS:  Yes, sir

21                       --  --  --

22                     MARK RICHARDS

23  being first duly sworn by the Courtroom Deputy, testifies and

24                     says as follows:

25                       --  --  --

                           DIRECT EXAMINATION

BY MR. McBURNEY:

Q.   Good morning, Agent Richards.

A.   Good morning.

Q.   I want to talk a little bit about the point in time when

the FBI here in Atlanta decided to approach Syed Haris Ahmed

to see if he would speak with the FBI about matters of

interest to the FBI.

     Do you remember what month and year that occurred?

A.   March of 2006.

Q.   What was the FBI's -- were you involved in those

interviews?

A.   Yes, I was.

Q.   Were you involved in planning the interviews?

A.   Yes, I was.

Q.   Did you participate in four of the five?

A.   Yes, I did.

Q.   What was the FBI's intent, its goal in approaching

Syed Haris Ahmed?  What was it hoping find out?

A.   We wanted to learn more about Mr. Ahmed's and

Defendant Sadequee's trip to Washington, D.C., to Canada.  We

wanted to learn about Mr. Ahmed's trip to Pakistan.  And we

wanted to learn more about what Mr. Sadequee -- where he was

and what he was up to at that point in time.

Q.   At that point, meaning in March of '06?

1    A.    Correct.

2    Q.    The very first interview -- and we heard a little bit

3    from Mr. Ahmed himself -- was where?

4    A.    The first interview was at his residence on Ethel Street

5    in downtown Atlanta near Georgia Tech.

6    Q.    Did you participate in that one?

7    A.    Yes, I did.

8    Q.    How many more interviews were there after the first?

9    A.    There were four more.

10   Q.    Were they back to back to back, no break for Mr. Ahmed?

11   A.    No.  There was between one and two days' break sometimes.

12   Q.    Were these interviews noncustodial, meaning was

13   Mr. Ahmed free to cut the interview off at any time?

14   A.    Yes, they were noncustodial, and he was told that they

15   were noncustodial.

16   Q.    Did you just use that term, or did you explain to him

17   what that meant?

18   A.    I told him he was free to leave during any time.

19   Q.    Now, the first interview, it was at his house.  Was he

20   free to tell you to go away?

21   A.    Yes.

22   Q.    Were you ever told to go away at any of the interviews?

23   A.    No.

24   Q.    Was Mr. Ahmed free to bring a lawyer with him if he had

25   wanted to have counsel present for any of these interviews?

1  A.   He was free to do so, yes.

2  Q.   Was he free to consult with anyone with the possible

3  exception of one person in between these various interviews?

4  A.   Yes.

5  Q.   Did you tell him up front, in the first interview, Look,

6  we have five interviews planned and these are the days, or

7  was it more of an organic process, that's how it ebbed and

8  flowed?

9  A.   That's just the way it worked out.  We obtained some

10  information from him, and once we -- we needed to go back and

11  dissect and digest it a little bit, then we decided we needed

12  to talk to him again a day or two later.

13  Q.   During the four interviews in which you participated,

14  how many hours does that encompass, roughly?

15  A.   During the ones that I participated in, approximately

16  ten or eleven hours.

17  Q.   During those ten or eleven hours, can you count for the

18  jurors the number of times when you were in the room that

19  someone went to the point of raising his voice, pounding his

20  fist, standing up and storming out of the room?

21  A.   Yes.

22  Q.   How many times?

23  A.   Once.

24  Q.   Tell the jurors not so much what Syed Haris Ahmed was

25  saying, but what was going on at that time?

A.   The time that you are referring to, I believe, was on Wednesday, March 15th, when we were asking a question and we were not getting any kind of accurate or truthful answer.

Q.   March 15th was the second or the third interview?

A.   That was the third interview.

Q.   So there is some line of questioning you are pursuing, you are not getting what you believe to be accurate or truthful -- what happened?

A.   I raised my voice, I told him that he is the one that wrote the word or phrase, a code word or code phrase that we were asking him about, and I told him that I had to go speak to my boss, and I raised my voice.  And I left the room, and I went and called my boss.

Q.   During the ten-plus hours of interviews in which you participated, did you ever observe any of the other agents who participated doing what you did?

A.   Not to that degree.

Q.   What do you mean by that?   Did anyone else stand up and yell and storm out of the room?

A.   Not that loudly, and they didn't necessarily stand up that I can remember.

     I believe there were times when we raised our voice a little bit here and there just because we were not receiving truthful answers to some of the questions we knew.

Q.   The setup of these interviews, and in particular the

1    last three which I think we heard were at the FBI, was this

2    in a room where the defendant was in the corner and there was

3    a bright light shining on him and, even though you told him

4    he could go, he would have to get past guards standing at a

5    door?

6    A.    No.  The interviews at the FBI were conducted in a

7    supervisor's office that was empty at the time.

8    Q.    At some point during one of the interviews, did you

9    learn that the video camera, the camera that was used to make

10   the videos, was still in Syed Haris Ahmed's or his family's

11   possession?

12   A.    Yes.

13   Q.    Which interview, one, two, three, four, or five?

14   A.    It was the third interview, number three, that was

15   conducted on March 15th.

16   Q.    Is that not something you would have asked about in the

17   very first interview?

18   A.    Yes, it was.

19   Q.    When was it finally revealed to you?

20   A.    It was finally revealed to us that it was his camera

21   that was used to take the videos in Washington, D.C., during

22   the March 15th interview, approximately seven hours into the

23   total culmination of the duration of the interviews.

24   Q.    When you learned that the camera might still exist

25   at Syed Haris Ahmed's family home, did you stop the

1    interview?

2    A.   We were wrapping up that third interview as it was.

3    Q.   Did anyone go to collect the camera?

4    A.   Yes.  I did not, but there were two or three agents that

5    asked if we could have the camera.  And they traveled with

6    Mr. Ahmed up to his family residence, and he provided them

7    with the camera.

8    Q.   It's in front of you.  You should have in front of you a

9    bag that is -- if the bag isn't labeled, what's in it is --

10   as Exhibit 31.  Do you recognize that?

11   A.   Yes, I do.

12   Q.   What is it?

13   A.   It's the camera that he provided to the agents that day

14   that we placed it into evidence.

15   Q.   Okay.

16        MR. McBURNEY:  I think that's already been

17   admitted.  If it hasn't been admitted, we tender Government's

18   Exhibit 31?

19        THE COURT:  Any objection?

20        MR. SADEQUEE:  No objection.

21        THE COURT:  It's admitted.

22   BY MR. McBURNEY:

23   Q.   Was that camera submitted to the FBI lab in Quantico to

24   determine if it could be connected in any way to the videos

25   of Washington, D.C., that were found on Younis Tsouli's

1   computer, Aabid Hussein Khan's computer, and Syed Haris

2   Ahmed's family computer?

3   A.   Yes, it was.

4   Q.   Was there a linkage demonstrated?

5   A.   The linkage was that the videos that were taken were

6   taken with the same type of camera.

7   Q.   We were just talking about how the defendant was free to

8   consult with an attorney -- that Syed Haris Ahmed was free to

9   consult with an attorney or talk with family or whomever in

10  between these interviews.

11      Was there one person that you asked Syed Haris Ahmed not

12  to communicate with or at least discuss the fact that you

13  were interviewing him?

14  A.   Yes, there was one individual.

15  Q.   Who was that?

16  A.   Defendant Sadequee.

17  Q.   Did you just mention that sort of off-the-cuff at the

18  end of the first interview, or was this something that you

19  repeated?

20  A.   I repeated it during all -- I believe all of the

21  interviews.  And it wasn't just a request.  It was a strong

22  encouragement not to speak with Mr. -- or Defendant Sadequee.

23  Q.   During the interviews, did you ask Syed Haris Ahmed how

24  he communicated when he did with the defendant?

25  A.   Yes, I did.

1   Q.   Did he provide you with a number of e-mail addresses

2   that at one point or another in time he had used to

3   communicate with the defendant?

4   A.   Yes, he did.

5   Q.   Can you put up Exhibit 260?  This is just a

6   demonstrative aid.

7       At any point during the 13, 14, 15 hours of interviews,

8   however many hours it was, did Syed Haris Ahmed give you the

9   address that's on the screen here as Exhibit 260,

10  Dannymoore1126@yahoo.fr?

11  A.   No, he did not.

12  Q.   The .fr stands for what, if you know?

13  A.   It's an e-mail address that is out of France.

14  Q.   I think the next witness will cover this, but did the

15  FBI at some point after the interviews were over come to

16  learn that Syed Haris Ahmed used the e-mail address on the

17  screen, Government's Exhibit 260, to communicate with the

18  defendant?

19  A.   Yes.

20  Q.   After the final interview, August -- well, what was the

21  date of the last interview?  Probably not August.  March?

22  A.   March 18, 2006.

23  Q.   Did the FBI learn if Syed Haris Ahmed traveled to the

24  defendant's family home, the residence on Nowata Drive?

25  A.   Yes, he traveled there to 4204 Nowata Drive, it's the

1  family residence of the Sadequee family, on March 19th, which

2  was the next day.

3  Q.   Was that something out of the ordinary for Syed Haris

4  Ahmed to do?

5  A.   Yes, it was.

6  Q.   Had he been to that house in the past three, four or

7  five months?

8  A.   No.

9  Q.   What was he observed doing at the house?

10 A.   He was observed at the house --

11 Q.   He, meaning Syed Haris Ahmed at the Nowata Drive

12 residence?

13 A.   Correct, I'm sorry.  Mr. Ahmed was observed at the

14 Nowata Drive residence leaving the residence with

15 Amimul Sadequee, which is the brother of the defendant.

16      They departed the residence, and they got into

17 Mr. Ahmed's car and drove to a Shell Gas station/convenience

18 store close-by.

19 Q.   Did they get gas?

20 A.   I don't recall if they got gas, but they stepped into

21 the convenience store.

22 Q.   And then Mr. Ahmed returned the defendant's brother to

23 the Nowata Drive address?

24 A.   Right.  They departed the convenience store a few

25 minutes later and returned, Mr. Ahmed returned

1 Amimul Sadequee back to the home address on Nowata Drive.

2        MR. McBURNEY:  All right.   Thank you,

3 Agent Richards.

4        THE COURT:  Any cross?

5                    --  --  --

6                CROSS-EXAMINATION

7 BY MR. SADEQUEE:

8 Q.   Good morning.

9 A.   Good morning.

10 Q.   During the course of the interviews, did Haris say a

11 number of times that his heart was pounding?

12 A.   I remember he said that one time, yes.

13 Q.   Was he told a number of times that, Do you want to spend

14 the rest of your life in a six-by-six cell, or something to

15 that effect?

16 A.   I know I don't -- I don't remember me saying that to

17 him.  Something to that effect may have been said at some

18 point, but I don't recall myself saying that.

19 Q.   Was he ever told, This is judgment day?

20 A.   I would have to listen to the interviews again.

21 Q.   How many agents interviewed him at a time?  Was it just

22 one agent with him, or was it a number of agents sitting with

23 this one individual, Syed Haris Ahmed?

24 A.   It was -- I could go interview by interview.

25        The first interview, there were two of us.

1   The second interview, there were three of us.

2   The third interview, I believe there were three of us as
3   well.

4   The fourth interview, there was three of us, but most of
5   the time one of us was -- would leave the room once in a
6   while.  And I think Special Agent Allen was brought in to ask
7   a few questions during the fourth interview.

8   And during the fifth interview, there was only one --
9   two agents.  I was not present during the fifth interview.

10  Q.   And in all these interviews, Mr. Ahmed was by himself in
11  terms of he had no one -- none of his family or relatives or
12  friends with him; correct?

13  A.   No.  We asked Mr. Ahmed to come and answer questions,
14  not his family.

15  Q.   Does it -- from your experience, does it happen that
16  when FBI agents interview any individual, that they feel
17  intimidated?

18  A.   That who, the FBI agents feel intimidated?

19  Q.   That being the interviewee being interviewed feels
20  intimidated, especially if there are multiple agents
21  interviewing him at the same time?

22  A.   I have interviewed some individuals who have told me
23  they felt intimidated, but I don't really know how people
24  feel unless they tell me.

25  Q.   To your knowledge, was Haris -- Mr. Ahmed ever

1   interviewed by FBI agents prior to your interviews of him or

2   these set of interviews that took place?

3   A.   Yes, he was.

4   Q.   So it was his first encounter with the FBI?

5   A.   Which?

6   Q.   It was Mr. Ahmed's first encounter with the FBI?

7   A.   Which was?

8   Q.   In March.

9   A.   No.  I answered your question that he -- to my

10  knowledge, he was interviewed previously by FBI agents.

11  Q.   Oh, at the airport you mean?

12  A.   Correct.

13  Q.   But in terms of interviews for the purpose of a criminal

14  investigation, this was his first encounter or series of

15  encounters; correct?

16  A.   Regarding the subject matter, yes.

17  Q.   Whereas the airport interviews were more or less routine

18  type of interviews; correct?

19  A.   The airport matter was routine.  But I mean, the

20  objective at that point also was to figure out what he had

21  been doing in Pakistan.

22  Q.   But travelers who are traveling overseas or through

23  airports, it's routine, those are routine interviews, it's

24  expected more or less, people expect it?

25  A.   It depends on what kind of traveling.  I would have --

1    I'm not sure I understand the question, I guess.

2    Q.   The question is that when people are traveling, they

3    expect or they are ready to be interviewed, or it's not

4    something out of the blue or threatening?   It's not --

5    whereas the interviews in March, which were interviews for

6    the purpose of a criminal investigation, that doesn't happen

7    to people routinely; correct?   The average person is not a

8    target of an investigation, criminal investigation?

9    A.   If you mean an average person that has never

10   committed -- does not commit crimes.  People that are targets

11   of criminal investigations have usually at least been alleged

12   to have committed some type of --

13   Q.   So in March, this was his first encounter with this type

14   of interviews by FBI agents for this type of an

15   investigation, and he's clearly being interviewed on -- he's

16   one of the subjects of this investigation; correct?

17   A.   Clearly at this point in time.  At this point, I mean

18   today, yes.

19   Q.   And when such statements are said to him such as, Do you

20   want to spend the rest your life in a six-by-six, this is

21   judgment day, and he himself opens up and tells the agents

22   that his heart is pounding, I understand that there is not a

23   gun pointed to his head, but is there a degree of

24   intimidation that was -- that the agents within the

25   boundaries of the law were applying to him?

1    A.    During the interview, we were trying to get truthful and

2    accurate information.  And if we felt we were not getting

3    that type of truthful, accurate information, certain phrases

4    were used:  You could -- this would be a problem for you, you

5    may be in trouble, things like to that effect, if that's what

6    you are referring to.

7              MR. SADEQUEE:  That would be it.  Thank you.

8              THE COURT:  Any redirect?

9              MR. McBURNEY:  Yes.

10                        -- -- --

11                   REDIRECT EXAMINATION

12   BY MR. McBURNEY:

13   Q.    Just to clear up one thing, Agent Richards.  When you

14   described both on direct examination and cross-examination

15   you were getting answers you didn't like or you didn't think

16   were truthful, do you mean that you had objective evidence

17   that contradicted what Syed Haris Ahmed was telling you in

18   the interviews, or you just didn't like his demeanor and so

19   that's when you were going to say, Hey, you are going to get

20   in trouble now?

21   A.    Usually we had objective evidence that showed that he

22   was not providing us with truthful answers to our questions.

23             MR. McBURNEY:  Okay.  Thank you.

24             THE COURT:  All right.  Does anybody want

25   Agent Allen subject to recall?

1    MR. McBURNEY:  This witness is not subject to
2  recall from the government.
3    THE COURT:  Well, you don't want Agent Allen
4  subject to recall, do you?
5    MR. McBURNEY:  He's now long gone.
6    THE COURT:  I'm just checking.
7    Well, for this agent then, Agent Richards, let me
8  ask my second line of questions.
9    MR. McBURNEY:  Same answer, not subject to recall,
10  please.
11    THE COURT:  Mr. Sadequee?
12    MR. SADEQUEE:  No.
13    THE COURT:  You are being released.  Please don't
14  discuss your testimony with anyone until you hear the case is
15  over.  Thank you for being with us.
16    I thought your next witness would be Agent Allen,
17  but now that we know he's not subject to recall, please call
18  your next witness.
19    MS. COLLINS:  The government calls
20  Catherine Wilz.
21                            --  --  --
22                         CATHERINE WILZ
23  being first duly sworn by the Courtroom Deputy, testifies and
24                       says as follows:
25                            --  --  --

                         DIRECT EXAMINATION

BY MS. COLLINS:

Q.   Good morning.  Could you please state your name and
spell your last name for the court reporter?

A.   Catherine Wilz, W-i-l-z.

Q.   Where do you work?

A.   I work with the Department of Defense, Defense Criminal
Investigative Service.

Q.   And are you affiliated with the Joint Terrorism Task
Force?

A.   Yes, I am.  I'm currently detailed to the Atlanta JTTF.

Q.   And how long have you been with the JTTF?

A.   August of 2004.

Q.   How long have you been -- are you a special agent?

A.   I'm a special agent.

Q.   How long have you been a special agent?

A.   Over ten years.

Q.   And what has been your role in this investigation in
this case?

A.   I am one of the primary case agents for the Syed Haris
Ahmed investigation.  I have also worked closely with
Agent Scherck and assisted him on this case.

         MS. COLLINS:  Could we put up Exhibit 260, which is
a demonstrative exhibit?

BY MS. COLLINS:

1    Q.   Do you recognize this e-mail address?

2    A.   Yes, I do.

3    Q.   And did the FBI come to learn who -- whether Mr. Ahmed

4    used this e-mail address?

5    A.   Yes.

6    Q.   And can you describe the circumstances where the FBI

7    came to learn that?

8    A.   While under surveillance by FBI, I don't know what their

9    title is, the people who were doing the surveillance observed

10   the Defendant Ahmed at the Dawson County Library on a

11   computer.  And when they went back and pulled up the history,

12   that e-mail account was identified.

13   Q.   And what date did that happen on?

14   A.   That happened on March 21, 2006.

15   Q.   Had the FBI ever before seen Mr. Ahmed using that public

16   library, the computer at that public library?

17   A.   No.

18   Q.   Now, did the FBI subsequently acquire e-mails related to

19   this account?

20   A.   Yes.

21   Q.   Actually before we move on, this is -- the e-mail

22   account that I just wrote up on Exhibit 1 is the account we

23   have been talking about used by Mr. Ahmed?

24   A.   Yes.

25   Q.   On your desk should be Exhibit 268?

1  A.    Yes.

2  Q.    Do you recognize that?

3  A.    Yes, I do.

4  Q.    What is it?

5  A.    It's an e-mail.

6  Q.    From whom?

7  A.    Dannymoore1126@yahoo.fr.

8  Q.    Was that Mr. Ahmed?

9  A.    Yes.

10  Q.    And who is the person he's sending it to?

11  A.    We believe it to be the Defendant Ehsanul Sadequee.

12        MS. COLLINS:  At this point, Your Honor, the

13  government tenders Exhibit 268.

14        THE COURT:  Any objection?

15        MR. SADEQUEE:  No objection.

16        THE COURT:  It's admitted.

17        MS. COLLINS:  Thank you.  If we could put it up on

18  the screen.

19  BY MS. COLLINS:

20  Q.    You mentioned this is from Dannymoore1126,

21  Mr. Ahmed.  What's the date on this?

22  A.    March 21, 2006.

23  Q.    Now, how does the time stamp which is next to it

24  correlate to the time in which Mr. Ahmed was seen using the

25  Dawson County Library using this account?

1   A.    It corresponds to that time.

2   Q.    And the CET is?

3   A.    Central European Time because of the Yahoo! France.

4   Q.    So when you change that to Eastern Standard Time, it's

5   the same time?

6   A.    Correct.

7   Q.    Let's take a look at the first paragraph.  Can you read

8   that to the jury, please?

9   A.              Peace be on you.  The dogs came to me.  This

10                  time they were not usual.  They had done their

11                  homework.  They even had info regarding both of our

12                  trips.

13                  Well, when they brought up the thing about our

14                  second trip, they got me.  I was not prepared for

15                  that due to my own shortcomings in faith.  So in

16                  the first meeting, I slipped, F-D.

17  Q.    Let me ask you about the reference, This time they were

18  not usual.  Before the round of interviews in March of 2006,

19  how many times had the FBI interviewed Mr. Ahmed?

20  A.    I recall two times.  There was a time when he came in

21  from Pakistan where he was interviewed at the airport, and

22  there was another time when he was interviewed because he had

23  been seen with PVC piping, and so some agents interviewed him

24  in relation to that.

25  Q.    And in the second line when he says, They have info

1  regarding both of our trips, what trips?  How many trips did

2  the FBI -- how many trips did Mr. Ahmed make with

3  Mr. Sadequee that the FBI had asked about?

4  A.    These were the two trips, one to Canada, one to

5  Washington, D.C.

6  Q.    And which one would have been the second trip?

7  A.    The second trip was the Washington, D.C., trip.

8  Q.    Okay.  Let's continue on to the next paragraph.

9  A.              And then after, I prayed to God, and slowly

10              I regained my confidence.  Then it was all damage

11              control after that.

12              Basically I told them, which is true to the

13              best of my knowledge, that we were kids who got

14              just excited.  They asked what you meant by saying

15              T has a great idea in one of our conversations.

16              They had all conversations between us.

17              So I told them the truth, that it was the idea

18              of mine to by make some cool video, and I took my

19              car and my camera for that purpose and you just

20              hopped on the chance for a free trip.

21  Q.    Let me interrupt you for a second and just ask a

22  question.

23      T, who is that -- who has that referred to throughout

24  the communications we have seen?

25  A.    T is Turab, the defendant Syed Haris Ahmed.

1  Q.  And talking about make some cool video, what video is

2  being referred to here?

3  A.  The Washington, D.C., videos.

4  Q.  Continue after the for a free trip?

5  A.          Then they asked what is Mother's Day and

6          picnic.  I told them the truth, that we wanted to

7          go to Curry Place and picnic, and Mother's Day

8          meant our meeting there.  It was called picnic

9          because we would go there and be together, so it

10          would be sort of a picnic.

11          Then they asked, We know you are into the J,

12          so you must have talked about ideas.

13          I was like, Yes, I hated the Free Masons, so

14          I wanted to meet them one day.  And at some point

15          in my life I hated the Yanks too.  But basically it

16          was all childish stuff but I'm over it now, and

17          that since I knew they were after me since I came

18          here, I told you to come by the Maricustus route,

19          which meant by sea.

20  Q.  Just going back up to they asked what is Mother's Day

21  and picnic.  What was the FBI referring to when they asked

22  about that?

23  A.  That's the Mother's Day e-mail that Defendant Ahmed had

24  sent to Sadequee for dissemination.

25  Q.  Is that the document where he talks about going to Curry

1    Place and they are all meeting for a picnic?

2    A.    Correct.

3    Q.    Going on to the third paragraph?

4    A.             I could have denied the last trip, but fear

5              overcame me and I accepted it.  But after that in

6              all my meetings with them, it was damage control,

7              to tell them that we were kids who got

8              overexcited.

9              In the beginning they seemed mostly interested

10             in you, but if I'm not mistaken they seem a little

11             less interested now.

12             I just pray to God that my initial mistake of

13             accepting that we took those videos could be

14             overcome by my telling them how we were kids.  And

15             that's why I think for two days they haven't called

16             me.  Otherwise it used to be almost every day they

17             call me to their offices and keep me for hours.

18   Q.    What is the last trip?  What would that have been?  At

19   the top of that paragraph, I could have denied the last trip?

20   A.    Oh, that's the Washington, D.C., trip.

21   Q.    That was the last trip before these interviews that

22   Mr. Ahmed took, to Washington, D.C.?

23   A.    His last trip was his trip to Pakistan.

24   Q.    And when he says why for two days they haven't called

25   me, when was the date of the last interview that the FBI

1   conducted prior to this e-mail?

2   A.   March 18, 2006.

3   Q.   Okay.  Continue on to the second to last and last

4   paragraph, please?

5   A.               To prove to them how childish we were, I told

6                    them how we once -- how once we joked about

7                    disabling GPS, and we then went on the Star Trek

8                    stuff about lasers and all.

9                    Yes, I made a lot of mistakes, but after my

10                   initial blunder all my intention was damage

11                   control.

12                   So if they come after you, be prepared to be

13                   asked a lot of questions.  Try not to come to

14                   Pharaoh Land for some time.

15                   Peace be on you.

16  Q.   And Pharaoh Land, what does that refer to?

17  A.   United States.

18  Q.   Now, did the defendant respond to this e-mail from

19  Mr. Ahmed?

20  A.   Yes, he did.

21  Q.   Can you take a look at Exhibit 269?

22  A.   Yes.

23  Q.   Is that the defendant's response?

24  A.   Yes, it is.

25  Q.   And what's the date on that?

A.    March 23rd, 2006.

          MS. COLLINS:  Your Honor, the government tenders
Exhibit 269.

          THE COURT:  Any objection?

          MR. SADEQUEE:  No.

          THE COURT:  It's admitted.

          MS. COLLINS:  If we could put it on the screen,
please?

BY MS. COLLINS:

Q.    Okay.  So this is to the Danny Moore address that
Mr. Sadequee used; correct?

A.    Right.

Q.    Okay.  Would you go ahead and can you read that, please?

A.               Peace be on you.

                Hmm, what are you talking about?  I don't get

          any of it.

                Hmmm.  Anyways, do they know about the True

          Preaching that I do?   Please respond to that

          question.  And I need you to send me a detailed

          account of what you were asked and what you

          answered and how much they know about me.  Be as

          much detailed as possible.

                Download -- a program -- and then encrypt the

          word doc and then upload it and then give me the

          link here.  I need this ASAP.  Peace.

1  Q.    That True Preaching, which is capitalized, TP, what does

2  TP stand for?

3  A.    TP is Tibyan Publications.

4  Q.    Now, was -- at some point after Mr. Ahmed sent the

5  e-mail on March 21, 2006, was he arrested by the FBI?

6  A.    Yes, he was.

7  Q.    And were you present?

8  A.    Yes.

9  Q.    Was he detained in custody after that day?

10 A.    Yes, he was.

11 Q.    What, if anything, did the FBI proactively do with the

12 Dannymoore1126@yahoo.France account?

13 A.    The FBI, we drafted -- we wrote out some e-mails, and we

14 sent them posing as Syed Haris Ahmed.

15 Q.    And who did you send them to?

16 A.    Defendant Sadequee.

17 Q.    And what was the purpose in doing that?

18 A.    The purpose of that is we were trying to make sure or

19 give Defendant Sadequee the thought that Haris Ahmed had not

20 been arrested.  We did not want him to know that

21 Defendant Ahmed had been arrested.

22 Q.    Did you -- were you at all interested in seeing what the

23 defendant's response would be to the further e-mails?

24 A.    Yes.

25 Q.    And who wrote those e-mails for the FBI?

1    A.    I did.

2    Q.    And how many did you write?

3    A.    Two.

4    Q.    Did the defendant respond to each one?

5    A.    Yes.

6    Q.    Take a look at Exhibits 271 and 273, which should also

7    be on your table.

8    A.    Yes.

9    Q.    What are those?

10    A.    Those are his responses.

11    Q.    To your two e-mails?

12    A.    My my e-mails.

13         MS. COLLINS:  Okay.  Your Honor, the government

14    tenders Exhibit 271 and 273.

15         THE COURT:  Any objection?

16         MR. SADEQUEE:  No, no objection.

17         THE COURT:  They are admitted.

18         MS. COLLINS:  Thank you.

19    BY MS. COLLINS:

20    Q.    We can start with Exhibit 271 on the screen.  What's the

21    date of this e-mail?

22    A.    April 4, 2006.

23    Q.    And in the e-mail that you had sent to which this is the

24    response, had you asked the defendant any questions?

25    A.    I had asked him if he had been approached by law

1   enforcement.  I don't remember the exact phrasing, but that

2   was the gist of it.

3   Q.   And how does he respond to that?  Go ahead and read the

4   first paragraph.

5   A.             No, so far I have not been taken in for any

6               Q'ing other than in Augie when I came at the

7               birdport in J ef kay.

8   Q.   The birdport in J ef kay, what is that reference to?

9   A.   The airport, John F. Kennedy Airport.

10  Q.   And that was the interview with Agent Scherck?

11  A.   Correct.

12  Q.   And continue on.

13  A.             Please send me a detailed account ASAP, keep

14              me updated.  Do they know you are AT and me Bread?

15  Q.   AT, who is that?

16  A.   Aboo Turab, Syed Haris Ahmed.

17  Q.   And Bread, what is that a reference to?

18  A.   That's Khubz.

19  Q.   Is that a nickname for the defendant?

20  A.   It's a nickname for Defendant Ehsanul Sadequee.

21  Q.   Then Exhibit 273?

22       In between 271 and 273, had you written another e-mail

23  to the defendant?

24  A.   Yes, I did.

25  Q.   And had you asked him any questions in that?

1    A.    Yes.

2    Q.    What did you ask?

3    A.    Again I would have asked him has law enforcement

4    approached him.

5    Q.    What is the date on this response?

6    A.    April 16, 2006.

7    Q.    Okay.  Go ahead and read -- read the first couple of

8    paragraphs?

9    A.                 Peace.  We know for sure that our house over

10                 here is under surveillance.  We have witnessed them

11                 with our own eyes.

12                 I need detailed account.  Why do you refuse to

13                 send it to me?  This is urgent.

14                 I have got some Q's you need to answer:

15                 What do you mean "they found our vds on the

16                 bro's comp"?  Who?  You mean the nude beach ones?

17                 If so, and along with your confession that you shot

18                 the vids, they can piece two and two together, and

19                 they know for sure that me and you are T and K.

20   Q.    When he says, What do you mean they found our vids on

21   the bro's comp, is that -- had you made a reference to that

22   in one of your prior e-mails?

23   A.    I did.  I had said that they, law enforcement, had found

24   the Washington, D.C., videos on the brother's, the brother's

25   overseas computer.

1  Q.   And they know for sure that me and you are T and K.   Who

2  are T and K?

3  A.   Turab is Syed Haris Ahmed, and K is Khubz,

4  Ehsanul Sadequee.

5  Q.   Continue on, please?

6  A.            That was your biggest mistake.  I don't know

7            why you didn't read the material I had told you to

8            read before.  If you had read them, then you would

9            not have fallen into the great damage you have

10            brought onto all of us.

11            Then there is a link to a website.

12            Read through all of that, memorize it, and be

13            ready for next time.

14  Q.   Continue on to the last paragraph?

15  A.            Again:  Send me a detailed account of what

16            took place, what was said, questioned, answered,

17            et cetera, during the sessions, all of them,

18            A to Z.  This is important, so that when/if I am

19            taken, I can answer accordingly.  Or if they find

20            discrepancies, they will take us both for longer

21            and worser.

22            Please give me the account ASAP.  Peace.

23  Q.   Do you know when the defendant was arrested in

24  Bangladesh?

25  A.   He was arrested by the FBI on April 19th, 2006.

1   Q.   So just a few days after this last e-mail?

2   A.   Correct.

3          MS. COLLINS:  No further questions, Your Honor.

4          THE COURT:  All right.  Any cross?

5          MR. SADEQUEE:  Yes.

6                    --  --  --

7                  CROSS-EXAMINATION

8   BY MR. SADEQUEE:

9   Q.   Good afternoon.  Could we go to Exhibit 149?

10         MS. COLLINS:  What's the date on that?

11         That is Exhibit 269.

12  BY MR. SADEQUEE:

13  Q.   On the second paragraph here when I go, Hmmm, anyways do

14  they know about the True Preaching that I do?  You mentioned

15  that this is a code for Tibyan Publications?

16  A.   That's what we assessed it to be, yes.

17  Q.   So after Haris tells -- Mr. Ahmed tells me that he's

18  been interviewed by the FBI, my first concern is do they know

19  about Tibyan Publications; is that correct?  Or the first

20  question I'm asking him is do they know about Tibyan

21  Publications?

22  A.   First you ask him, What are you talking about?

23  Q.   Well, when I say, Do they know about the True Preaching

24  that I do, in relation to the FBI, I mean, the do they, they

25  refers to the FBI?

1   A.   Correct.

2   Q.   So in relation to his interview by the FBI, my first

3   concern is Tibyan Publications; is that correct?

4   A.   I don't know if it was your first concern.  That's what

5   you mention here.

6   Q.   It's the first thing I mention in this e-mail was in

7   relation to the FBI's interviews; correct?

8   A.   Okay.

9   Q.   Is that correct?

10  A.   It's what you mention here, yes.

11  Q.   Okay.  If we may go to Exhibit 228?  There is a chat,

12  September 19th, if we may go to 8:11:55 a.m.?

13          MS. COLLINS:  Page 41.

14  Q.   Right after -- this is a conversation about my FBI

15  interview at JFK Airport.  Can you read from there?

16  A.   I'm sorry, where are you at?

17  Q.   This is 8:11:55 a.m., September 19th.

18  A.           What did they ask you?  Just for personal

19          information, in case the situation ever arises.

20  Q.   If you could continue to read?

21  A.           Just like, what do you do, where do you work,

22          study, why you doing to B, where you going to stay,

23          et cetera.

24  Q.   Continue.

25  A.           I see.

But that's because they don't know jack about
me. Then you say, LOL. About TP.

Q. Now, this is in reference to the JFK interview;
correct?

A. Yes.

Q. And again here I mention TP, correct, Tibyan
Publications?

A. Correct.

Q. And I'm not concerned with my visit to D.C. or Canada;
is that correct? I had not mentioned it in this e-mail;
correct?

A. I would have to look at the whole chat, but from what I
have read, no, you did not mention the D.C. or Canada
trips. But you mention what you do, where you were, where
you were going.

Q. That's -- am I there rephrasing or summarizing what I
was interviewed about, questions that I was asked by the FBI
at JFK?

A. Correct.

Q. So in this e-mail and in this chat, when I say, They
don't know jack about me or about TP, would it be accurate to
say that my main concern or my main or primary fear in
relation to my activities would be my activities with Tibyan
Publications, the publications?

A. I don't understand. Could you rephrase the question?

1   Q.   In Exhibit 269 and 228 where I am -- this is after

2   Haris's -- after I find out about Haris's interview, and in

3   this one, this is after I am interviewed by the -- at JFK by

4   the FBI.

5   A.   Right.

6   Q.   In both places, is it true that I'm not mentioning

7   D.C. as a concern to me or my visit to Canada as a concern to

8   me?

9   A.   Well, you ask him for a detailed account of what you

10  said.  I don't know what you were thinking, what you call --

11  and in earlier e-mails, you were informed by Haris that the

12  FBI did ask him about the D.C. and Canada trips.

13       I guess I don't understand your question.

14  Q.   In your assessment of the post-Haris interview, the

15  post-Haris notifying me of his being interviewed, I am

16  saying -- if I may just read out from what I wrote to Haris:

17  Anyways do they know about the True Preaching that I do?

18  Please respond to that question.

19       Out of all the things I could have asked him about, do

20  they know about D.C., do they know about the trip to Canada,

21  why do you think that I asked him about Tibyan Publications,

22  the True Preaching that I do?

23  A.   Because with --

24  Q.   Why would I --

25  A.   Why would you care about --

```
 1   Q.   Why would I single that out, out of all of the other

 2   things?

 3             MS. COLLINS:  Objection.  This calls for

 4   speculation.

 5             THE COURT:  Can you answer the question?

 6             I'm going to sustain that objection.

 7             MR. SADEQUEE:  That would be it.

 8             THE COURT:  Any redirect?

 9             MS. COLLINS:  No, Your Honor.

10             THE COURT:  Does anybody want Agent Wilz subject to

11   recall?

12             MS. COLLINS:  Not from the government, Your Honor.

13             MR. SADEQUEE:  No.

14             THE COURT:  Agent Wilz, we appreciate your

15   testimony.  You are released, but you should not discuss your

16   testimony until you hear the case has been concluded.

17             Call your next witness, please.

18             MR. McBURNEY:  Judge, at this time the government

19   tenders Exhibit 1 as a summary exhibit to assist the jurors

20   in connecting monikers with individuals.

21             And with that, we rest our case in chief.  We don't

22   have any more witnesses.

23             THE COURT:  Any objection to the summary exhibit?

24             MR. SADEQUEE:  No.

25             THE COURT:  All right.  It's admitted as a summary
```

1    exhibit.

2         The government has rested, meaning that they have

3    concluded their case.  I think this is a good time to break

4    for lunch before we get into the next part of the

5    proceedings.

6         We will convene for lunch for an hour.  We will

7    begin again at 1:10.

8         Again, only part of the case is in.  You certainly

9    can't deliberate until you have my instructions, which you

10   have not received, so please do not discuss the case among

11   yourselves or with anyone else.  We will see you in about an

12   hour.

13        (In open court without a jury present:)

14        THE COURT:  The one thing I think I will do, now

15   that we have played the exhibits, as you know, I have made

16   certain redactions to remove extraneous materials from the

17   exhibits that we just saw, I usually give a redaction

18   instruction explaining the redactions were made where

19   I determined that the information is not related to the case,

20   just because I think people want to know what the black boxes

21   are.

22        Is there any objection to me giving that

23   instruction?

24        MR. McBURNEY:  No.

25        MR. SADEQUEE:  No objection.

1    THE COURT:  All right.  Then I will draft something

2  up and try to get it to you before I actually give it.

3    All right.  Anything we need to discuss before we

4  adjourn for lunch?

5    Any motions, for example, to be made?

6    MR. McBURNEY:  Nothing from the government.

7    THE COURT:  Anything from the defense?

8    MR. SAMUEL:  Could I discuss it with him during

9  lunch?

10    THE COURT:  You may.  If we are going to do that,

11  can we come back about ten minutes early?

12    MR. SAMUEL:  It won't take but three minutes, but,

13  yes.

14    THE COURT:  All right.

15    MR. SAMUEL:  I will explain what the process is.

16    THE COURT:  Then we will just reconvene at the

17  regular time.

18    And over lunch I'm going to look at my revisions

19  that I have made over the weekend on the instructions, those

20  where I have combined certain elements of the proposed

21  instructions into a single element, and give you a chance to

22  look at those before we have our conference.

23    Now, just timing, maybe I can get a more accurate

24  read on examinations now that we are done with Mr. Kohlmann

25  since that went somewhat longer than I was told, although

1    I think I understand why.

2            You have two witnesses still, Mr. Sadequee?

3            MR. SADEQUEE:  Yes.

4            THE COURT:  And how long do you think the first

5    witness will take?

6            MR. SAMUEL:  If I could ask, we did a deposition,

7    she's here.  He's literally going to read the deposition, use

8    that as a format.  It's 46 pages including the cross.

9            The videotape itself, which we offered to play not

10   having the witness here, but unfortunately -- not

11   unfortunately, she's in town -- I think it goes forty-five

12   minutes.  It may take a little longer.

13           THE COURT:  Forty-five you think?

14           MR. McBURNEY:  That would be round trip, that would

15   be both sides, and that's probably a little longer, because

16   we weren't sure how the deposition would be tailored.  We

17   might have gone further than we needed to with that.

18           THE COURT:  Well, I understand he's going to ask

19   every question that's in the deposition, so it looks like it

20   will probably go that long.

21           MR. McBURNEY:  Okay.

22           THE COURT:  Unless Mr. Samuel wants to help him

23   remove some of those if they are not really material to the

24   case.  But if he wants to read all those questions, I guess

25   he can.

1        And then how about the second witness?  How long is

2  the second witness?

3        MR. SADEQUEE:  I think somewhere between thirty

4  minutes and one hour, somewhere in between that.

5        THE COURT:  All right.  And how long do you think

6  the cross of the second witness will be?

7        MR. McBURNEY:  I suspect it would be ten -- it's

8  the defendant's sister.  I don't think we will do a whole lot

9  with that situation.

10       THE COURT:  All right.

11       MR. McBURNEY:  I do want to raise -- we flagged it

12  I think on Friday, the issue of character witnesses and

13  what's the appropriate scope of character witnesses.

14  Mr. Samuel assured us he would talk with his client, the

15  defendant, who will be asking the questions.

16       We, perhaps more so than in the deposition,

17  particularly because now Syed Haris Ahmed has testified --

18  when the deposition was taken no one thought he would be

19  here -- we will be all the more vigilent in objecting to

20  improper character questions.

21       As I think about what these two witnesses know

22  about the facts of the case as opposed to about the defendant

23  or, in Ms. Ahmed's case, her brother, I think we may be

24  bumping into that some.

25       So I just want to flag that for the Court.

1    THE COURT:  Well, I think it would be helpful if

2    you would go through some specific examples here what your

3    objection would be so that Mr. Sadequee can hear that, so

4    that I can tell him whether or not your objections make sense

5    under the law.

6    MR. McBURNEY:  Sure.  Well, a concrete example

7    would be that Ms. Ahmed testified both at the trial of

8    her brother and during the deposition about how Syed Haris

9    Ahmed was a peace-loving person and he loved to do good

10   things for people, an example of how he would ask his mother

11   to bake a certain meal, cook a certain meal for friends when

12   they come over, that has nothing to do with this case.  It's

13   a specific example of I guess you could call it good

14   character on Syed Haris Ahmed's part, and it's not

15   appropriate.

16        As a concrete example, I suspect that if the

17   defendant's sister is going to be on the stand for close to

18   an hour, we are going to get into examples of a good deed the

19   defendant did while he worked at Raksha, a particular

20   conference about empowering women or helping battered women.

21   That's inappropriate.

22        And the question may start out appropriate, well,

23   tell me what you know about my --

24        THE COURT:  Excuse me.

25        Mr. Sadequee, the purpose of this is for you to

1   listen to it.  Are you listening to what Mr. McBurney has

2   said rather than going through these, looking through these

3   papers?

4          Because you need to understand what the scope of

5   your examination of these witnesses can be, so would you

6   please listen?

7          MR. McBURNEY:  With the sister, the defendant's

8   sister, the concern is that a seemingly innocuous question,

9   Describe my work at Raksha -- it's really not about his

10  character, but it's a little bit of his background -- could

11  very easily segue without a subsequent question into specific

12  good acts that the defendant participated in that aren't for

13  the jury's consideration in this trial.

14         And so that's the concern.  I am confident

15  Mr. Samuel has talked to the defendant about it, but I'm

16  flagging it now in a more open forum so that the defendant

17  can acknowledge, if he chooses to, that he's aware of the

18  restrictions imposed by the Rules of Evidence on character

19  evidence.

20         THE COURT:  All right.  Have you read the

21  restrictions on character evidence at a criminal trial?

22  They would be in the Rules of Evidence that you promised to

23  me that you would read and study.

24         MR. SADEQUEE:  I would like -- I would review

25  them.  I wasn't intending to go into all the good things I

1    have done.

2              THE COURT:  I know that, but you in fact did

3    that with Ms. Bhattacharyya.  So I do believe that you

4    tend to lapse into that about the things that you did and

5    you were a good worker and elicited her opinion of what

6    a good worker you were and that you had done good things

7    and that you treated people kindly when they came to visit

8    the nonprofit.  Those are all questions I know you have

9    asked.

10             You need to talk to Mr. Samuel and get clear

11   direction from him as to the limited scope of character

12   evidence now that we are calling your witnesses.  Do you

13   understand that?

14             Does the defense intend to only present two

15   witnesses?

16             MR. SADEQUEE:  Yes.

17             THE COURT:  All right.  Do you intend to testify?

18             MR. SADEQUEE:  Do I have to make a decision right

19   now?

20             THE COURT:  You will need to make a decision and

21   let me know after lunch.

22             MR. SADEQUEE:  Okay.

23             THE COURT:  Because I have to make an inquiry of

24   you before the conclusion of your case to make sure that it's

25   clear as to what your intention is; clear to me, that is.

1          All right.  Anything else we need to discuss before

2  we break for lunch?

3          MR. McBURNEY:  No, sir.

4          THE COURT:  Anything else?

5          MR. SADEQUEE:  No, sir.

6          THE COURT:  All right.  We will be back at 1:10.

7              (A recess is taken at 12:19 p.m.)

8                  --  --  --

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<div align="center">Monday Afternoon Session</div>

<div align="center">August 10, 2009</div>

<div align="center">1:17 p.m.</div>

<div align="center">--  -- --</div>

1                     Monday Afternoon Session

5       (In open court without a jury present:)

6       THE COURT:  First, did everybody have a chance to

7 review the redaction instruction?

8       MR. McBURNEY:  Yes.

9       THE COURT:  Any objection to it?

10      MR. McBURNEY:  Not from the government.

11      THE COURT:  Any objection from the defense as to

12 the redaction instruction?

13      MR. SADEQUEE:  No.

14      THE COURT:  All right.  One housekeeping matter.

15 What was the exhibit number for the exhibit that the

16 defendant introduced, 5?

17      MR. SAMUEL:  It was the *Federal Register;* right?

18 It was 5.

19      THE COURT:  5.

20      MR. McBURNEY:  Mine has a 5 on it.

21      THE COURT:  All right.

22      MR. WAHID:  We missed 2, so what happened --

23 anyway.

24      THE COURT:  So we admitted Defense Exhibit 5;

25 correct?

1    MR. SADEQUEE:  Yes, it's the *Federal Register* about

2  Jumat ud-Dawa being entered -- being designated as a foreign

3  terrorist organization as of April 27th of 2006.

4    THE COURT:  All right.  What else do we have?

5    MR. SADEQUEE:  I had a motion to --

6    THE COURT:  Go ahead.

7    MR. SADEQUEE:  I move for a judgment of acquittal

8  on all four counts on the basis that the government has not

9  shown that:

10    One, I did not provide material support to support

11  a violation of either 2232 (b) or 956.

12    (A), nobody testified that the video was intended

13  or did provide material support for any purpose.

14    (B), Haris Ahmed did not agree to commit any crimes

15  of violence in the United States, so there is no 2332 (b),

16  and there was no showing that he intended to commit any

17  violence in a foreign country.

18    There is no showing of any conspiracy -- two, there

19  was no showing of any conspiracy or serious attempt to join

20  LeT.

21    And three, LeT did not exist in 2005.  The

22  organization was named Jumat ud-Dawa, JuD, and it was not on

23  the terrorist list until 2006, which is Exhibit 5.

24    THE COURT:  All right.  Anything else?

25    MR. SADEQUEE:  No.

1       THE COURT:  What's the government's response?

2       MR. McBURNEY:  As the Court knows, the standard for

3   assessing a Rule 29 or a motion for acquittal is to view all

4   the evidence in the light most favorable to the government

5   and draw all the reasonable inferences and credibility

6   determinations in favor of the government.

7       And having done that, the question then is could a

8   reasonable trier of fact find the defendant guilty beyond a

9   reasonable doubt.

10      As to Counts One and Two, I suggest we are well

11  past that.  There has been ample evidence that there was a

12  conspiracy, Count One, an agreement to provide material

13  support, whether it was people or these videos, for some

14  terrorist conspiracy, whether it be one to commit acts

15  overseas or in the United States.

16      In terms of Count Two, the attempt, there has been

17  evidence of more than a substantial step.  At a minimum, we

18  have Syed Haris Ahmed going to Pakistan.  If that's the

19  particular strand of the defendant's activity we are going to

20  follow, we also have all this evidence of what was going on

21  in Bosnia, his close co-conspirator, with whom the defendant

22  had e-mail, chat and telephonic communication, gathering the

23  armaments and having the arsenal.

24      Counts Three and Four, I think we meet the

25  standard.  I acknowledge it's a closer call, but this is a

very, very favorable standard for the government.  And there

has been evidence that a reasonable juror can rely upon that

one of the focuses of we will call it the Mother's Day

conspiracy involving the defendant, Syed Haris Ahmed, the

Canadians, and Aabid Hussein Khan -- there has been

uncontradicted testimony that he, Khan, was a facilitator for

LeT training camps -- that those individuals had conspired to

get to an LeT training camp.

Not that that was necessarily the ultimate goal,

but that's not what the government needs to show.  The

government needs to show that there was an agreement to

provide personnel that at some point would be under the

direction and/or control of LeT, and while in a training camp

that's precisely what Syed Haris Ahmed or the defendant or

Aabid Hussein Khan would be.

And in terms of Count Four, a concrete step in that

direction, we have all the arrangements made with Mr. Khan as

well as Syed Haris Ahmed's travel to Pakistan, hardly a small

step, where he in fact met with Aabid Hussain Khan to discuss

these very issues.

So the government's position is that we have met

the burden to survive a motion such as this.

THE COURT:  Anything further from you,

Mr. Sadequee?

MR. SADEQUEE:  No.

1    THE COURT:  All right.  Well, I find under the

2  standard that is set forth in Rule 29 that there is

3  sufficient evidence to sustain a conviction against the

4  defendant on all four counts, and the motion is denied.

5    So now we go on to the defense case.  There was one

6  other matter you were going to discuss amongst yourselves

7  over lunch about the defendant's testimony.  Have you done

8  that?

9    MR. SADEQUEE:  At this point I don't think I am

10  going to be testifying, but I would like to ask if after my

11  two witnesses, if I do change my mind, would I be able to

12  testify?

13    THE COURT:  Well, I will just wait until after the

14  two witnesses and determine then whether you made a final

15  decision.

16    Can we do something about that buzz, Jessica?

17    MR. McBURNEY:   You didn't ask if there was

18  anything else, and we did have something.

19    THE COURT:  What else is there?

20    MR. McBURNEY:  I'm sorry, we were presented

21  reciprocal discovery during the lunch break, items the

22  defendant intends to admit through his sister.  They fall

23  into three categories:  Things related to the wedding in

24  Bangladesh, some school and test records, and then finally a

25  book from Tibyan.

1      THE COURT:  First of all, why was that so late,

2  Mr. Sadequee, under your obligations -- and your lawyers

3  understand their obligation -- to provide reciprocal

4  discovery to the government in a timely manner?  And if so,

5  why wasn't that obligation met?

6      Mr. Samuel, since you have been responsible for

7  this case until today, I would like your explanation first.

8      MR. SAMUEL:  Sure.  Your Honor, some of the --

9  well, can I begin by saying I think the government doesn't

10  object to most of it, for what it's worth.  A lot of it is

11  very simple evidence about his school records there.

12      Some of it we just did not have, wasn't even in

13  this country until recently.

14      THE COURT:  How recently?

15      MR. SAMUEL:  I am going to have to check with the

16  family as to when it arrived.  I think some of it actually

17  arrived over the weekend.

18      THE COURT:  When did you first learn about it?

19      MR. SAMUEL:  Well, I got e-mails last night.

20      I want to be careful because that's my

21  understanding of what happened.  I'm not 100 percent sure

22  about that.  I need to check with the family.

23      But they are very simple kind of school records

24  from Bangladesh University he attended, the wedding, the cost

25  of the wedding.  Some of these issues didn't come up until

1   during the course of cross-examination.

2          The amount of money he took out of his bank

3   account, that's actually a government -- from the

4   government's discovery to us, the bank records showing the

5   amount --

6          THE COURT:  Well, that's an issue that's been

7   present in this case for a long time.

8          MR. SAMUEL:  The money?

9          THE COURT:  Yes, and it was clearly something that

10  was anticipated by the defense because they discussed a lot

11  about that on cross-examination.  So I'm not accepting that

12  that was a surprise to you at all.

13         MR. SAMUEL:  Well, it's not a surprise.  We have

14  the bank records.  What was not clear to us was the

15  significance of it.

16         And in fact, to be honest with you, the government

17  at one point asked me whether I would stipulate to the

18  admissibility of the bank records, and I said sure.

19         So I actually thought the bank records were going

20  to come in through one of the government's witnesses.  These

21  are records they gave us, and I thought the records were

22  going to come in through one of the government's witnesses.

23         Again, I don't think there is any controversy about

24  these exhibits.  There is nothing that would -- I mean, you

25  can take a look at them, they are all up here.  They are

1    photographs and all. I don't have a problem --

2          THE COURT: Well, there is some controversy;

3    otherwise, it wouldn't have been brought to my attention

4    outside the presence of the jury.

5          MR. SAMUEL: Right. But if Mr. McBurney can focus

6    on the two exhibits that he's most concerned with, I can more

7    narrowly tailor my response perhaps.

8          MR. McBURNEY: There are a handful of photographs

9    of the defendant's wedding and a multihour video of his

10    wedding.

11          It was explained to us at lunch that the photos

12    would be tendered through the defendant's sister and some

13    segments of the video were to be played through the sister.

14    Our objection is focused on those two.

15          There is no contest here that the defendant was

16    married. In fact, one of the exhibits we were given at lunch

17    is the certificate of marriage from Bangladesh, and we don't

18    intend to oppose that in any way.

19          But what went on at the wedding and how people

20    looked and, for example, footage of the defendant and his

21    bride feeding each other, that has nothing to do with this

22    case and only to do with the fact that at some moment in

23    time, there was a peaceful video of the defendant and his

24    bride-to-be or maybe by that time his wife exchanging a

25    tender moment. And that's not appropriate here.

1     So rather than get up and object when the witness

2   is there, because we actually did get to see this a few

3   minutes before the witness took the stand, I wanted to flag

4   photos and videos as something we don't think are relevant,

5   in particular given that if called upon we will stipulate

6   that the defendant did in fact get married apparently under

7   the laws of Bangladesh to the woman whose name was mentioned

8   in the defendant's opening statement.  We have never

9   contested otherwise.

10     THE COURT:  What's the relevance of the videotape

11  and the photographs?

12     MR. SADEQUEE:  To demonstrate the expenses, the

13  money expended and all of the wedding costs and how --

14     THE COURT:  How do photographs establish who paid

15  for the wedding?

16     MR. SADEQUEE:  It would go along with other

17  documentation that I have about the expenses.

18     THE COURT:  Then the photographs are cumulative.

19  If you have got evidence as to the dollar amounts that were

20  spent, what do the pictures add to that evidence, considering

21  that the government apparently is not going to contest that

22  the money was spent?

23     MR. SADEQUEE:  Well, to demonstrate a wedding did

24  take place.

25     THE COURT:  That's not at issue apparently.  So how

1  are they relevant?

2          MR. SADEQUEE:  Well, I believe it's relevant from

3  the point that it would demonstrate what I was doing in

4  Bangladesh and the time and effort behind the wedding, the

5  marriage, and the various time-consuming --

6          THE COURT:  Isn't your sister going to testify that

7  there was a wedding and that you were there and that she saw

8  you get married?

9          MR. SADEQUEE:  She did not attend the wedding

10 herself.  She was in the States over here.

11         THE COURT:  So who is going to authenticate the

12 pictures?

13         MR. SADEQUEE:  Well --

14         THE COURT:  Who is going to identify the pictures

15 if she wasn't there?

16         MR. SADEQUEE:  She knows the individuals.

17         THE COURT:  Yeah, but she wasn't there.  So if she

18 knows the individuals, she doesn't -- she can't authenticate

19 the pictures.  Somebody has to authenticate that they are

20 true and accurate representations of what occurred in the

21 pictures or the videotape, and she can't do that.

22         So how are you going to authenticate the exhibits?

23         MR. SADEQUEE:  Well, she knows the individuals in

24 the pictures.

25         THE COURT:  It doesn't matter.  Somebody has to

1   authenticate that what's depicted on the pictures are a true

2   and accurate representation of what occurred on the date and

3   at the time the pictures were taken.  Who is going to do

4   that, since we now know she can't because she wasn't there?

5           Mr. Samuel will tell you that you have to have

6   somebody who authenticates the pictures.  So why don't you

7   tell him that, Mr. Samuel, and maybe we can move on instead

8   of whispering all this to him.

9           MR. SAMUEL:  Can I show you the pictures?  I mean,

10  all she's going to do is identify them.

11          THE COURT:  She can't identify them.  She wasn't

12  there.

13          MR. SAMUEL:  She can't identify the video, I think

14  you are right about that.  I know you are right about that.

15          THE COURT:  So that's excluded, because there is

16  not -- it can't be authenticated.

17          MR. SADEQUEE:  I mean, all they are, they are

18  pictures, and she can say, Yes, that's your wife, that's my

19  father -- that's our father.  I mean, they are just a series

20  of photographs.

21          I think a family member can say, Yes, I can

22  identify that's your wife and that's you, without saying,

23  I was there at the moment that picture was taken.

24  Authentication can occur by someone who is not present.

25          THE COURT:  Well, is she going to say, Yes, that's

1  you, and that was at the wedding and you had a great

2  wedding?

3          Yeah, I agree, if there is a picture, she can say,

4  Yes, that's Mr. Smith, or, Yes, that's Mr. Ahmed.

5          MR. SAMUEL:  That's all these photos will do.

6          THE COURT:  Well, I know, but I'm not sure -- he's

7  the one asking the questions, not you, and what he asks is

8  unpredictable.

9          MR. SAMUEL:  What I have written down is:  Can you

10  identify these photos and who is in them?  That's the

11  question I wrote down associated with these pictures.

12          The video I recognize is more problematic.

13          THE COURT:  Well, problematic meaning that you

14  acknowledge that it's not admissible because it can't be

15  authenticated?

16          MR. SAMUEL:  I think it is true that Sonali cannot

17  say that video correctly reflects what occurred there,

18  because she wasn't there.   There is no way she can look at

19  that video and say that's precisely what happened at the

20  wedding because she was four thousand miles away.

21          THE COURT:  And you admit that authentication is a

22  prerequisite to admissibility?

23          MR. SAMUEL:  I certainly agree that authentication

24  in one form or another is a prerequisite for admissibility,

25  of course.

1    THE COURT:  And do you agree that the witness about

2    to be called is not somebody who can authenticate the video?

3    MR. SAMUEL:  I don't think she can authenticate the

4    video properly other than to identify the people in it.  She

5    could not say that the events depicted, the movements, the

6    people doing things or saying things accurately reflects it

7    because she wasn't there.

8    THE COURT:  All right.  Well, the video is not

9    admissible because the prerequisites to admissibility can't

10   be met through this witness.

11   With respect to the pictures and somebody

12   saying that's -- well, I'm not -- why is it relevant as to

13   who these people are?   What does that have to do with the

14   case?

15   MR. SAMUEL:  Well, the government has introduced

16   considerable evidence about him going to Bangladesh, what he

17   was doing there.  The chats contain considerable evidence

18   about him getting married.  There is some suggestion in some

19   of the chats that it's all fake.

20   You know, just because the government is willing to

21   stipulate to something doesn't mean we are not allowed to

22   prove it.  We would have stipulated to heaven knows how much

23   of their --

24   THE COURT:  I understand all that.  But that means

25   the fact that there are wedding pictures is what you are

1     arguing makes them relevant.

2              MR. SAMUEL:  To show there was a wedding.

3              THE COURT:  But all this witness can do since she

4     wasn't at the wedding, she doesn't know if those pictures

5     were taken when they went to a costume party.

6              MR. SADEQUEE:  Well, if I may, Your Honor, these

7     chats and discussions were telling online people or people

8     are saying, discussing the idea of using a wedding as a cover

9     to travel.

10             THE COURT:  I understand.  You need to listen,

11    Mr. Sadequee.  The question is the relevance of these

12    pictures.

13             You are arguing, and so is your lawyer -- who

14    although I shouldn't allow him to be, I'm trying to get over

15    this very late-breaking evidentiary issue which wouldn't have

16    been an issue if the defense had met their obligation to

17    timely provide reciprocal discovery.  But I'm going to let

18    that go for now, as I have a number of other issues.

19             So the question is are the pictures relevant.  You

20    are saying they are relevant to prove that there was a

21    wedding.  This witness was not at the wedding and cannot say

22    when these pictures were taken.

23             So how is that probative that a wedding occurred?

24             MR. SADEQUEE:  I believe the pictures and also the

25    video --

1    THE COURT:  The video is excluded.  You can't get

2   the video in because nobody can authenticate it.  There is

3   nobody that you are going to call that can say I was there

4   and what I'm looking at now is a true and accurate depiction

5   of what I saw.

6    So the video is not admissible.

7    MR. SADEQUEE:  She has been to a wedding -- the

8   place where my wedding took place is the same place where my

9   brother's wedding took place, and she did attend -- she knows

10  the locality.

11   THE COURT:  That's irrelevant.  What is the legal

12  issue here is whether somebody can take a piece of evidence

13  that you are trying to admit, whether under the Rules of

14  Evidence that I told you you were bound by in this case,

15  whether that's an admissible piece of evidence.

16   And you don't have a witness that can look at

17  either of these depictions for the purpose that you want to

18  introduce them, which is to establish that a wedding

19  occurred.

20   MR. SADEQUEE:  I --

21   THE COURT:  I get to finish.

22   And in the absence of that, that's not probative

23  evidence of a wedding.  Because we don't know when these

24  pictures were taken.  We don't know if they went to a play,

25  we don't know if somebody went to a costume store.

1    What you want to do is you want her to say,

2    I understand my brother -- that you got married, and that

3    looks like a place where I have been where other weddings

4    have happened, that looks like wedding attire, and so

5    therefore I conclude that that wedding must have taken place

6    even though I was never there.

7    And that's not -- that's not a proper standard for

8    the admission of evidence in a federal court.

9    MR. SADEQUEE:  If I may just clarify about -- my

10   reasoning is this.  That she can testify that this wedding --

11   that the place, the building, the center where our wedding

12   took place is the same place from the video --

13   THE COURT:  I understand that.  How is that

14   relevant to the issue of whether on the day that's depicted

15   in these pictures that your wedding occurred?  She can't do

16   that because she wasn't there.

17   MR. SADEQUEE:  I understand that.  But she can

18   authenticate that everyone in the video is in a wedding -- is

19   in the center, it's called White Castle, and the very seat

20   that I was seated in is the very seat that my brother was

21   seated in when she actually did attend my brother's wedding.

22   THE COURT:  How does that make the pictures

23   admissible?

24   MR. SADEQUEE:  I think would that not be

25   authentication, the fact that she -- although she was not

present the very day I was getting married, she was present

at my brother's wedding, which is the same -- exact same

place, same room, same everything?

THE COURT:  So your argument is because she's been

there before and that she knows where weddings take place and

she saw these pictures, it is likely that what she's looking

at was your wedding?  Is that what you are saying she would

say?

MR. SADEQUEE:  Together with the fact that she also

knows many of the people who are in the video.

THE COURT:  I don't think that -- what you need is

you need somebody -- and the way that it needs to be done in

every court of law is that somebody has to come in and say

here is a picture, I was there, and this picture is an

accurate representation of that place because I am familiar

and was there at the place and this is what happened.

MR. SADEQUEE:  But she was there but not on this

date.

THE COURT:  Well, I know that.  If she had been

there 25 years ago, that's not probative of whether what

happened on the day you claim happened happened.

I mean, you can talk to Mr. Samuel some more --

I mean, you have been doing it all day -- and get his

explanation legally.  Since I don't think you understand

authentication, get him to explain to you authentication and

1    have him inform you whether or not, because he's an officer

2    of this court, he will have to tell accurately whether or not

3    you have met the requirements of the rule.

4            MR. SADEQUEE:  I think, for example, if I may

5    compare it to the D.C. videos, the government had put up

6    witnesses asking is this D.C., is this this building, is this

7    that building.

8            THE COURT:  There was no objection to that

9    evidence.

10           The question here is what is the law as it relates

11   to these pictures.  That's where we begin.

12           MR. SADEQUEE:  It's my understanding that the

13   government did not object to the wedding videos.

14           THE COURT:  They have just done that.  Of course,

15   they didn't know about it apparently until today.

16           Look, let's stop going through this

17   charade.  Mr. Samuel, you are making this argument.  All you

18   are doing is having him read things out of your book.  You

19   address this so we can go on here.

20           Even though I will say, Mr. Sadequee, I told you

21   when this case started that this is very difficult, and you

22   told me that you understood that you would be bound by the

23   rules of the court and you told me that you understood that

24   you would have to abide by the Rules of Evidence.

25           And I told you and I have told you twice that I

would not allow hybrid representation.  This is exactly the

reason why I didn't allow hybrid representation, because we

are about to waste a half an hour because you did two

things:

One is you decided on a strategy to allow -- to

tell the government for the first time moments before a

witness that you have exhibits, even though you and your

lawyer knew that discovery was required to be provided by you

a long time ago.

And then, second, you are not prepared to address

this issue as you were required to be prepared.

But I will now hear from Mr. Samuel, because we

need to go on with the case since we have had a jury now

waiting for almost 40 minutes to come back and continue

listening to testimony.

Mr. Samuel?

MR. SAMUEL:  Your Honor, 901 has no hard and fast

rules that a person must be present when a picture was

taken.

I think the casing videos is a good comparison.

Whether objected to or not, I think the casing videos are

admissible because a witness who lives in Washington can say

I recognize that building, that's the Capitol.  I recognize

all the HAZMAT trucks going by because there was a --

THE COURT:  Yeah, I understand all that, but that's

1  because the relevance was obvious.  Here -- and all you are

2  doing is you are saying, yes, I recognize that as a

3  historical landmark or a governmental building of great

4  historical importance.

5       It's a totally different issue where you are saying

6  that a particular event that you are relying upon and your

7  client is relying upon in this case actually occurred at a

8  particular place.

9       And you are asking, even you, if you will admit it,

10  are saying I want this witness to engage in a series of

11  deductions:  That I have been to a place where other weddings

12  have happened, I see these people, I don't know that these

13  pictures are on a particular date, I don't know if that's the

14  actual ceremony, but it looks to me like it is, and it looks

15  to me like the people that would have attended my -- the

16  defendant's wedding, and that you want those logical series

17  of deductions, with the final deduction being, therefore,

18  I conclude that this picture fairly and accurately represents

19  the event that I believe happened.

20       Show me some authority for that.

21       MR. SAMUEL:  Well, 901 doesn't say, first of all,

22  you must be present when a picture was taken any more than a

23  document to go into evidence the person has to be present

24  when it's written.  He could recognize it.

25       THE COURT:  Give me a case on this issue.

1       MR. SAMUEL:  Well, you know, there is a case

2  called -- 901 (b) (4), the rule itself says that a party may

3  authenticate documents through appearances, contents,

4  substance, internal patterns or other distinctive

5  characteristics.

6       THE COURT:  That's the rule; I want a case.

7  Because I don't believe that you will find an

8  Eleventh Circuit case that would allow this evidence in under

9  these circumstances.  And that's what I want.

10      MR. SAMUEL:  I can give you cases that cite that

11 rule.  I am not sure -- I don't have the cases in front of me

12 right now, but I can give you cases --

13      THE COURT:  Yeah, because you are burdened by the

14 same problem, which is you just found out about this evidence

15 because Mr. Sadequee chose not to share it with you.

16      MR. SAMUEL:  I don't blame it on my client.  But

17 I think the key issue here is that you can use circumstantial

18 evidence to authenticate a document.  It does not direct

19 eyewitness account in order to authenticate a document.

20      Someone can take a picture of this courtroom right

21 now and someone who knows this courtroom and knows you and

22 knows me, knows actors, could later say, I recognize that

23 picture, I recognize that scene.

24      Now, it's possible they were engaged in a role play

25 or it's certainly conceivable, and they could cross-examine

1    the witness and say, Well, isn't it possible --

2                THE COURT:  So do you believe, I mean --

3                MR. SAMUEL:  I wouldn't be saying it if I didn't

4    believe it.

5                THE COURT:  Do you believe if a picture is taken of

6    my courtroom -- that's a great example -- of my courtroom

7    where I have been listening to moot court arguments in the

8    past, that if somebody looked at a picture and saw me in my

9    robe and saw lawyers at tables could say this fairly and

10   accurately depicts a federal criminal proceeding in the

11   courtroom of Judge Duffey?

12               MR. SAMUEL:  I do think they can say that.  I think

13   a witness could say that.  The witness could be

14   cross-examined, and Mr. McBurney could say, Well, how do you

15   know they weren't just doing a moot court, and the witness

16   would probably say, Well, I guess that's possible.

17               THE COURT:  Mr. Samuel, you need to appear here

18   more often then.

19               I'll tell you, if you believe that's the law, we

20   are going to take a break, I'm going to do some independent

21   research.

22               The one thing that just chaps me more than anything

23   is to have these kinds of issues arise under these

24   circumstances.  Because if I had even known this before

25   lunch, I would have done the research at lunch.

But instead I walk in here blindsided by a legal issue in a criminal case, by you, by the government, and by Mr. Sadequee.  And the only people inconvenienced here are the jurors, even though you all knew that this was an issue and chose to wait until the eleventh hour for you even to bring it to my attention.

And I don't know why that happened, but we are now about to further inconvenience the jurors so that I can do what I'm entrusted to do, is to try to make accurate rulings based upon the right factual predicate.

But this apparently is important to the government because they otherwise wouldn't have raised it.  So we are going to take a break, I'm going to do the research that nobody else has done, and I will reach a conclusion as to whether or not it's admissible.

MR. SAMUEL:  May I point out, this is not our first witness.  The other witness is going to be first.  I could have somebody from my office doing some research during this break here.  There is only going to be two or three cases.

I think nobody is going to be able to say a picture of a wedding, no case will say that, but I think we will be able to help you before the witness gets on the stand, before the break, the afternoon break, that a picture can be authenticated by someone who can say, I can identify that place, those people, without having said I was

1    there.

2          And I will commit to you to have that done before

3    the afternoon break.  Our first witness will take, whatever,

4    45 minutes or an hour, and there is no exhibits with that

5    witness.

6          THE COURT:  All right.  I want the government to

7    send somebody down to their office and do the same thing.

8          Although, frankly, I don't know why this is such a

9    big issue.  But if it is to you and you want to keep it out,

10   then we will do the legal research and I will make the

11   ruling.

12         All right.  Now is there anything else?

13         MR. McBURNEY:  No, sir.

14         THE COURT:  All right.  Bring the jurors back in,

15   please.

16         (In open court with a jury present:)

17         THE COURT:  All right.  Ladies and gentlemen, thank

18   you for coming back.  I apologize for the delay.

19         I often take responsibility for the delays.

20   I won't take responsibility for this one, but I do only

21   because I think that we have violated our promise to you to

22   use your time efficiently and we have not this time.  But we

23   are prepared to proceed with the case.

24         Before we do, you will recall that Exhibits 268,

25   269, 271 and 273, those were the four documents that were

1   received in evidence, and they were communications that were

2   shown to you on the screen, that those four documents had

3   portions that we call redacted, which is another way of

4   saying that they had portions that were deleted from your

5   view.  You probably saw them as black boxes.

6           I just wanted to explain that to you.  I was the

7   one that determined that the redactions in those documents be

8   made.

9           There are many reasons a part of a document may be

10  redacted and thus not received in evidence.  For example, a

11  portion of an exhibit may contain irrelevant information that

12  I determine should not be admitted in the case.

13          You are not, though, to speculate or guess what

14  information was redacted or the reasons why it was

15  redacted.  I'm simply instructing you that you should only

16  consider the information that was not redacted subject to the

17  same instructions which apply to other exhibits.

18          So with that, Mr. Sadequee, call your first

19  witness.

20          MR. SADEQUEE:  The defense calls Mariam Ahmed.

21          THE COURT:  I'm sorry, who?

22          MR. SADEQUEE:  Mariam Ahmed.

23          THE COURT:  If you will stand in the witness box, I

24  will have you sworn in.

25                              --  --  --

MARIAM AHMED

being first duly affirmed by the Courtroom Deputy, testifies

and says as follows:

-- -- --

DIRECT EXAMINATION

BY MR. SADEQUEE:

Q.   Good afternoon, Ms. Ahmed.  Would you please state your
full name, and spell it?

A.   Mariam Ahmed, M-a-r-i-a-m  A-h-m-e-d.

Q.   Can you state your relation to Mr. Syed Haris Ahmed?

A.   I'm his older sister.

Q.   Could you tell the jury how old he is today?

A.   He is 25.  He will be 26 in December.

Q.   Are you married?

A.   Yes.

Q.   Could you state when you got married?

A.   July 2004.

Q.   And where do you presently live?

A.   In Pakistan.

Q.   Where in Pakistan?

A.   Karachi.

Q.   How often do you travel back and forth?

A.   Since I have been married, I have traveled at least four
times.

Q.   So since 2004 you have traveled back and forth to the

1    United States four times?

2    A.    Yes, four times.

3    Q.    Can you give us -- tell us a little bit about your

4    brother Haris Ahmed, just a brief overview?

5    A.    Sure.  I am older than him, three years older than him,

6    and we have always been very close.  He's always been a very

7    caring, soft-natured --

8                MR. McBURNEY:  Objection.

9                THE COURT:  Sustained.

10               Well, what's the relevance of this testimony?

11               MR. SADEQUEE:  I will leave that.

12               THE COURT:  All right.

13   BY MR. SADEQUEE:

14   Q.    Can you tell us something about Haris's travels to

15   Pakistan?

16   A.    Yes.  We have always traveled in summer to see our

17   family, relatives.  We went in 2000, me and just him.  We

18   stayed there for the whole summer.

19        And then we went as the whole family in 2002.

20   It was my cousin's wedding.

21        And then 2004 for my wedding.

22        And then he came in 2005 to see me and my daughter, who

23   was born in 2005.

24   Q.    He lived in Pakistan prior to coming to the

25   United States how long?

1   A.    Excuse me?

2   Q.    How long did he stay in Pakistan prior to coming to the

3   United States?

4   A.    I didn't understand you.

5   Q.    Prior to moving to the United States --

6   A.    Oh, okay.  He was twelve and half when he moved.

7   Q.    So he had also friends as well; is that correct?

8   A.    Yes.

9   Q.    Where did Haris study over here?

10  A.    When we moved here first, he went to East Cobb in a

11  school in Marietta, Georgia, for one year.

12        Then we moved to Roswell.  He went to Centennial High

13  School for two years -- three years I mean.

14        And then we moved to Dawsonville.

15  Q.    When he went -- what does your husband do in Pakistan?

16  A.    He is a finance manager for Procter & Gamble.

17  Q.    How many cousins does Haris have in Pakistan?

18  A.    I can't number them, but we have a lot of cousins, close

19  family, extended family.  We are very close with everybody.

20  Q.    How long did he stay with you in 2004 when he went for

21  your wedding?

22  A.    Me and my sister and my mom went to Pakistan before he

23  came.  He came I think sometime in June, and then he stayed

24  till I think August, first week of August.  I'm not sure

25  exactly.

1　Q.　So about a month or two?

2　A.　Yeah, a month or two.

3　Q.　And then in 2005 how long did he stay?

4　A.　For one month.

5　Q.　So less than --

6　A.　Yeah.

7　Q.　To your memory, when he went to your wedding in 2004,

8　what were his activities in Pakistan?　What was he doing in

9　Pakistan?

10　A.　Well, he was helping my dad plan the wedding obviously,

11　getting the hall and the catering and everything else.

12　　　And then he was always with cousins, because he's very

13　popular among his age group, and we have a lot of cousins his

14　age.　So he was always at least with either one of them,

15　whoever was there present.　So he was always with them,

16　joking around and playing and everything.

17　Q.　And when he went in 2005 to visit you --

18　A.　Yeah.

19　Q.　-- what was he doing in Pakistan?

20　A.　The same thing.　He went to see me -- he came to see

21　me.　He stayed at my house at least one or two days, I think,

22　and then he would visit family, my uncles and my aunts, and

23　he was always with cousins.

24　Q.　How close is he with his cousins?

25　A.　He's very close with his cousins.　In fact, for years

1  he's very close with them.

2  Q.   When you say close, would you say something like his

3  best friends?

4  A.   Yes.

5  Q.   How long before him going to Pakistan did you learn of

6  him going to Pakistan, in 2005 I mean?

7  A.   I think my mom called me maybe a few weeks before or

8  maybe a week or two before telling me that he's coming, and I

9  was very happy.  And she said that he's coming to see me and

10  my daughter, he's very excited too.

11  Q.   When was your daughter born?

12  A.   June 2005.

13  Q.   So -- and he came in July 2005?

14  A.   July, yes.

15  Q.   Okay.  Haris, did he mention anything about Islamic

16  studies --

17  A.   Yes.

18  Q.   -- in relation to his travel?

19  A.   When he came to stay with me, we had talks.

20       MR. McBURNEY:  Objection, hearsay.

21       THE COURT:  Sustained.

22  BY MR. SADEQUEE:

23  Q.   Do you know if Haris was trying to advance in Islamic

24  studies?

25  A.   Yes.

Q.   Did you see him or observe him researching Islamic studies in terms of universities, like formal Islamic studies?

A.   Yes, I always knew that he wanted to advance his Islamic education, and he was pursuing that with asking my cousins which college, which school should I attend, which is a good one?  He was always asking about opinions, which was right.

Q.   Did he ever try to get enrolled in these Islamic schools or universities?

A.   Yes, he wanted to, but he actually didn't get to that point, I don't think.  He wanted to.  He narrowed down some schools.

Q.   Did he ever show interest in memorizing the Quran?

A.   Yes, he's always been trying to memorize the Quran.  He had memorized big sort of verses of the Quran, but he wanted to complete the whole Quran, which could be done in an Islamic school.

Q.   Is that something that Muslims do?

A.   Yes, very often.

Q.   How -- you have watched your brother grow up.  How is his -- what's your observation of his adherence to Islamic -- is he religious?

A.   Yes, he's always been very religious.

Q.   And his cousins that he has, what's his relationship with them in terms of are they also religious and are they --

1  what type of conversations --

2  A.    Well --

3  Q.    -- have you seen them or heard them have?

4  A.    Well, I know for a fact that they are religious in terms

5  of they perform the duties, but not to the extent that when

6  Haris was -- there is some that he was very close with about

7  talking about, you know, memorizing the Quran, learning other

8  things, the Hadiths, the Prophet Mohammed's -- sallalahu

9  aleyhi wasallam -- way of life.  He had close contacts about

10 this with some cousins.

11 Q.    In 2004 and 2005 when he visited Pakistan, did he sleep

12 overnight elsewhere other than your own home?

13 A.    Yeah, yeah.  I mean, mostly he was with my cousins, my

14 uncles and my aunts.  He hardly stayed with me because I live

15 with my extended family.

16 Q.    You mean your husband's family?

17 A.    Yes.

18 Q.    So he would stay with his own cousins?

19 A.    Yes.

20 Q.    Is that something which is abnormal or is that something

21 that Muslims, it's common to do?

22 A.    No, it's not abnormal, because we always used to spend

23 nights at my uncle's house or cousin's house.  It's been a

24 tradition, a normal thing for us.

25 Q.    Now, how often, if he did not stay at your house, would

1   you have contact with him or see him while he's staying over

2   elsewhere, at his cousin's or his uncle's?

3   A.   I think I would see him a couple times a week.

4   Sometimes he would come over, sometimes I would go see him.

5   And usually at least once a day he would call me on the phone

6   and I would call him, where are you, what are you doing and

7   all that.

8   Q.   Now, is your entire family and Haris's cousins all in

9   Karachi?

10  A.   No.  We have cousins in Lahore, in Islamabad and in

11  other cities.

12  Q.   Now, in 2005 did he go to visit any of those cousins?

13  A.   No.  He was in Karachi that time.

14  Q.   Did he ever mention to you about joining any kind of

15  terrorist organization while he was over there?

16  A.   No, never.

17  Q.   Did he mention to you that he wanted to go to a training

18  camp for some type of military work while he was there?

19  A.   No.  I never had that discussion with him.

20  Q.   Did he ever carry any weapons?

21  A.   No.

22  Q.   In Pakistan, since you live over there -- how long have

23  you been living over there, I forget?

24  A.   Since I have been married in 2004.

25  Q.   So about five years?

1  A.    Yes.

2  Q.    So -- and you have also lived there when you were

3  growing up?

4  A.    Yes.

5  Q.    How much have you traveled across Pakistan in whole?

6  A.    I have been to Lahore, Islamabad, there have been a few

7  cities I have been to.

8  Q.    So how easy is the access to weapons or getting into --

9  if someone wants to join the Taliban or go to Kashmir, is

10  that easy or hard?

11  A.    It's very easy, fairly.  If you want to, you can just

12  kind of go look around and you would find something.

13  Q.    Do you know why he did not attend -- he did not attend

14  any Islamic school?

15  A.    Well, because he was convinced to go back and finish his

16  studies first and then come back and reenroll in Islamic

17  school, which takes more than a couple of years to finish.

18  Q.    So in essence during the month's stay that he stayed in

19  Pakistan, he spoke to --

20  A.    Yes, he spoke to my cousins and some scholars, and they

21  told him to go back and finish his studies and then come

22  back.

23  Q.    His studies at Georgia Tech you mean?

24  A.    Yes, Georgia Tech.

25  Q.    Could you tell us, is it normal for people who live in

1  the United States, Pakistanis who live in the United States

2  to go back to the Pakistan in the summer?

3  A.   No, it's actually common because you get more time to

4  spend there with your family and friends.  Usually everybody

5  travels in summertime.

6  Q.   How is the school year in Pakistan?  When is the big

7  break?  Like over here there is summer break is the big

8  yearly annual break.  How is it in Pakistan?

9  A.   It's the same.  You have a very long big summer

10  vacations.

11  Q.   So all his cousins also are on their summer break?

12  A.   Yes.

13  Q.   You mentioned that Haris is popular amongst his

14  cousins.  What do you mean by that?

15  A.   Well, because he's very easy to talk to, very friendly,

16  and a very fun-loving, joking kind of guy.

17  Q.   Have you ever seen in Pakistan any of these, I mean,

18  what's called jihadi conventions such as LeT holds with

19  posters all over?

20  A.   I have not seen it, but they would probably be there.

21  But I have not witnessed this.

22  Q.   Did he ever discuss with you his intentions of getting

23  married to anyone?

24  A.   He would joke around about getting married, but I'm not

25  sure he actually wanted to get married so soon.

Q. Okay. So what, other than talking to his sort of scholars that you mentioned who told him to come back, did he talk with anyone else who told him to come back to the United States?
A. Yes. It was my cousin Kamran, he's a very close friend of -- he's like a brother to us, older brother, and Haris actually looks up to him. So he told him, and one of his friends who is also a scholar, he told him to finish his studies and then come back.

MR. SADEQUEE: That would be all. Thank you.

THE COURT: All right. Mr. McBurney?

MR. McBURNEY: Thank you, Judge.

-- -- --

CROSS-EXAMINATION

BY MR. McBURNEY:

Q. Ms. Ahmed, did I understand your testimony correctly that you only learned of your brother's intention to visit Pakistan in the summer of 2005 just a couple weeks before he came over?
A. Uh-huh, yes.
Q. We have met before; yes?
A. Yes.
Q. I have had the opportunity of asking you questions before?
A. Yes.

1  Q.   I think you told me before, Karachi is a very large

2  city; is that right?

3  A.   Yes.

4  Q.   When your brother was there in the summer of 2005 --

5  maybe other summers as well, but in particular 2005 -- he

6  didn't stay with you and your husband and his extended family

7  for many of the days that he was there?

8  A.   That's correct.

9  Q.   He bounced around from cousin to cousin and to relative?

10 A.   Yes.

11 Q.   Sometimes those relatives lived very near to your home,

12 and sometimes they lived ten, fifteen miles away.  Is that

13 right?

14 A.   Yes.

15 Q.   So while you kept in touch with him perhaps almost daily

16 by phone or e-mail, you didn't necessarily see him

17 twenty-four hours day, seven days a week, for the month he

18 was there?

19 A.   Yeah, that's correct.

20 Q.   Have you ever been to Wana?

21 A.   No.

22 Q.   Have you ever been to Waziristan?

23 A.   No.

24 Q.   Any of the northwest frontier provinces?

25 A.   Well, northwest?  No, I don't think so.  I have been to

the northern areas, but I don't know the cities included in
that.

Q.   You mentioned on direct examination in response to a
question from Mr. Sadequee that it's pretty easy to get into
a training camp if you want.  Did you ever try?

A.   No.

Q.   Any of these many cousins that you have described you
have and your brother has, is that something they tend to do?

A.   No.

Q.   When your brother was interviewed by Customs and Border
people when he returned from this trip we have been talking
about, summer of 2005, he told the folks interviewing him
that he had gone to Canada that same year in March, March
2005, to visit an uncle of yours named Azdee Omani.

     Do you have an uncle named Azdee Omani?

A.   No, I don't.

Q.   While your brother was in Karachi in the summer of 2005,
he met with and spent almost half a day with Aabid Hussein
Khan.  Do you know that person?

A.   No.

Q.   Did you ever hear your brother talk about him?

A.   No.

Q.   Ever hear your brother talk about Abe Umar or Abu Umar,
that being the same person?

A.   No.

1  Q.   When we talked before, you described some of the e-mail

2  addresses that you know your brother to use.  Piddikashorba?

3  A.   Yes.

4  Q.   Thandy Mazaq?

5  A.   Yes.

6  Q.   Those are up there on page three of Government's

7  Exhibit 1.  Thandy Mazaq, Piddikashorba.

8       A name your brother used when he was having

9  conversations of a particular nature was Aboo Turaab

10 al-Qurashee.  Are you familiar with that name?

11 A.   No.

12 Q.   Is that a name your brother ever shared with you?

13 A.   Well, I can't recall actually, but it seems like I have

14 heard this name.  But I don't remember when he told me or

15 what.  Maybe it's like a nickname.  I can't remember actually

16 when he told me that, though.

17 Q.   But it's not a name with which he would correspond with

18 you?

19 A.   No.

20 Q.   He would be Haris or brother or Thandy Mazak or

21 Piddikashorba?

22 A.   Yes.

23 Q.   And finally there is one Dannymoore1126.  Is that an

24 e-mail address he ever used with you?

25 A.   No.

1    MR. McBURNEY:  All right.  Give me one second.

2  BY MR. McBURNEY:

3  Q.   The defendant, Ehsanul Sadequee, was a friend of your

4  brother's.  Had you met Ehsanul Sadequee before today?

5  A.   No.

6    THE COURT:  Does that mean you are done?

7    MR. McBURNEY:  Thank you, yes.

8    THE COURT:  I'm always the last to know.

9    Any redirect?

10    MR. SADEQUEE:  Just one.

11                          -- -- --

12                  REDIRECT EXAMINATION

13  BY MR. SADEQUEE:

14  Q.   Haris reads a lot of books?

15  A.   Yes.

16  Q.   Okay.  Has he ever shared with you what literature he

17  read, Islamic books?

18  A.   Since I was married for the last five years, so I'm not

19  really -- we only talk on the phone or e-mail, so we don't

20  really discuss a lot of it.  But whenever I visited him,

21  yeah, he actually talked about he read this.  Or something in

22  general, he would read a lot of magazines other than Islamic

23  books, like *Reader's Digest*, *National Geographic*, other

24  things.

25  Q.   What about with his cousins, did you ever see him or

1  hear him conversating about literature that he reads?

2  A.    Yeah, they talk a lot about it, discuss what they

3  read.  One of my cousins, Kamran, also reads a lot of books,

4  so they talk about reading.

5  Q.    You mentioned one of your cousins is a scholar?

6  A.    No, he's not a scholar.  He is just someone he looks up

7  to, Kamran.

8              MR. SADEQUEE:  Okay.  That's all.

9              THE COURT:  Does anybody want Ms. Ahmed subject to

10  recall?

11             MR. McBURNEY:  No, sir.

12             THE COURT:  Mr. Sadequee?

13             MR. SADEQUEE:  No.

14             THE COURT:  We have finished your

15  testimony.  Please do not discuss your testimony with anybody

16  until you hear the case has been concluded.  Thank you for

17  being with us.

18             THE WITNESS:  Thank you.

19             MR. SADEQUEE:  Defense calls Sonali Sadequee.

20             MR. McBURNEY:  Judge, we have discussed with

21  defense counsel, and I think we have sorted things out.

22  Thank you.

23             THE COURT:  All right.  Can someone get

24  Ms. Sadequee?

25             AGENT WILZ:  She's in the restroom.

```
1        THE COURT:  We would call that in my house
2   oversharing.
3        You might want to read the United States v.
4   Patterson, 277 F 3d 709, a 2002 case of the Fourth Circuit,
5   and Shahid v. City of Detroit, 889 F 2d 1543, a Sixth Circuit
6   case, just on the subject we talked about earlier while we
7   are waiting for the witness.
8        Ms. Sadequee, if you will come forward and stand in
9   the witness box, I will have you sworn in.
10                      --  --  --
11                 SHARANIKA SONALI SADEQUEE
12   being first duly affirmed by the Courtroom Deputy, testifies
13                  and says as follows:
14                      --  --  --
15                  DIRECT EXAMINATION
16   BY MR. SADEQUEE:
17   Q.   Good afternoon.
18   A.   Good afternoon.  Salaam.
19   Q.   Could you please state your name and spell it?
20   A.   Yeah.  My name is Sharanika Sonali Sadequee,
21   S-h-a-r-a-n-i-k-a, Sonali, S-o-n-a-l-i, and Sadequee,
22   S-a-d-e-q-u-e-e.
23   Q.   Could you tell the jury your relationship to me?
24   A.   Sure.  Shifa, I'm his immediate older sister and one of
25   my favorite people in the world.
```

Q.   I didn't hear the last part?

A.   You're just one of my favorite people in the world.

Q.   Of course.

Could you tell us about briefly our family, parents, what they do, siblings, what they do?

A.   Sure.  So we have four siblings in the family.  Shifa and I have an older brother and an older sister.  I'm the middle and Shifa is the youngest.  And our mom is here in Atlanta and our dad is in Bangladesh.

Q.   What do you do?

A.   Right now I do a few different things.  So I work with the multiple community organizations working for social justice and human rights issues here in Atlanta and nationally as well.  And then I also do a lot of nutrition and wellness coaching for individual clients and also corporate clients.  And then I also do marketing for multiple different marketing agencies here in Atlanta but then also nationally.

Q.   What about your studies?

A.   Sure, okay.  I have my B.A. from Georgia State University, and after that I served a national fellowship, National New Voices Fellowship offered by the Ford Foundation and Academy for Educational Development in serving the Atlanta community here working closely with the South Asian community around human rights, social justice and violence

1    against women.

2        And then after my fellowship, I went into my nutrition

3    coaching/counseling practice, and received my certification

4    from Institute for Integrated Nutrition in Manhattan and the

5    Teachers College of Columbia University.

6        And let's see, what else?

7    Q.   That's --

8    A.   That's good, okay.  I have a whole bunch of other stuff,

9    but --

10            THE COURT:  Could you back up just a bit from the

11   microphone.  It picks you up --

12            THE WITNESS:  Is this good?

13            THE COURT:  A little closer.  Just don't get so

14   close when you speak into it.

15            THE WITNESS:  Is that good?  Can you hear me?

16            THE COURT:  Yes.

17            THE WITNESS:  Okay.

18   BY MR. SADEQUEE:

19   Q.   Can you tell us about our other siblings and their

20   educational background?

21   A.   Yeah.

22   Q.   And my education?

23   A.   Sure.  So our older sister, Sharmin Sadequee, is a

24   doctorate student in Michigan where she is studying

25   sociocultural anthropology and studying specifically the

effect of 9/11 on the Muslim community and the impact that

has had on the Muslim community and the greater community in

this country.

        And then my -- our older brother, Amimul Sadequee, is a

graduate of Georgia State University, studied business, and

is now doing a nine-to-five job at a computer firm here in

Atlanta.

        And Shifa, you went to school in Ajax, Toronto, for a

couple of years, and then went to go live with our mom and

dad in Bangladesh where you studied at a university there and

then also home-schooled there.

        And then you came back here to resume your studies here

in the U.S. where you studied for your SATs, your GEDs.  You

did really good, you taught yourself.

        So, yeah, that's where your studies ended.

Q.    Now, you mentioned I studied in Ajax, Toronto, Canada?

A.    Uh-huh.

Q.    How long did I study over there?

A.    You were there for a few years.  A couple years at

least.

Q.    Have you ever -- you visited Toronto before?

A.    Yeah, I visited our aunt there, who lives there.  At

least she did at that time.

Q.    Can you tell -- you mentioned also that I got my

GED.  Could you state how -- everything that you know about

1   me and the GED and SATs and how --

2   A.   Sure, sure.  So in about when, you know, you came back

3   here with me in 2004, you wanted to resume your studies and

4   you -- because, you know, you had studied in Canada, you

5   studied in Bangladesh, you didn't have the American system

6   educational credentials.

7      So in order for you to resume your studies actually here

8   in the U.S. and in Atlanta, you had to get your SATs

9   completed and your GED scores so that you could actually

10   enroll in a university here.

11      So you studied, gosh, almost all day long for many days

12   so you could take your SATs.  So you took your SATs.

13   Actually I was the one that took you over to the SAT office,

14   signed you up for the actual examination and all of the

15   logistics around that in Marietta, which was the closest

16   office to where we lived at that time.

17      And then, you know, you took your SATs, and got good

18   scores.

19         MR. SADEQUEE:  I would like to ask the witness if

20   she recognizes these exhibits.  I would like to tender --

21         THE COURT:  What exhibits?

22         MR. SADEQUEE:  There is Exhibits 10 to 22.

23         THE COURT:  I mean, where are they physically?

24   Right here?

25         Would you give those to the witness?

1    THE COURT SECURITY OFFICER:  10 through 22.

2    THE CLERK:  There are sticky notes on the exhibits.

3    THE COURT:  One second.  Let me see those.

4    There are some Post-it notes on these

5    exhibits.  Should I take those off?

6    MR. SAMUEL:  (Nods head.)

7    BY MR. SADEQUEE:

8    Q.  Can you review these and see if you know what these are?

9    A.  You want me to review them and tell you --

10   Q.  For example, we were talking about the SATs and

11   GED.  I think you will find it there.

12   A.  Sure, okay.  So these are your university from

13   Bangladesh -- so right here, this is the one you got from the

14   GED scores.

15   Can you guys hear me?

16   Q.  I can hear you.

17   A.  So, yeah, this is -- the one is the GED letter of

18   congratulations.  This is your scores.

19   No, this is your SAT score right here, and this is your

20   GED congrats letter.

21   I think this is -- yeah.

22   THE COURT:  We probably need more discipline in

23   this because she's generally describing and publishing the

24   contents of the letters.  None of these documents have been

25   admitted yet.

1        So you need to have them identified, and then you

2  have to move for their admission.  And then if there are any

3  objections, I have to rule on the objections before I can

4  decide whether they are admitted or not.

5        MR. SADEQUEE:  Yeah, I would like to have Exhibits

6  10 through 22 tendered into evidence.

7        THE COURT:  Any objection?

8        MR. BLY:   No, Your Honor.

9        THE COURT:  They are admitted.

10        THE WITNESS:  You said 10 to --

11        MR. SADEQUEE:  22.

12        THE WITNESS:  Okay.  So I mean -- this is it.

13  BY MR. SADEQUEE:

14  Q.   Do you recognize these items?

15  A.   Yeah, uh-huh.

16  Q.   You are familiar with them?

17  A.   Yeah.

18  Q.   If we could go over some of these?

19        MR. SAMUEL:  Your Honor, can the ELMO be turned on?

20  BY MR. SADEQUEE:

21  Q.   While she's doing that, let me ask, you came to

22  Bangladesh in 2004; correct?

23  A.   Yes.  That was the last time I was there, yes.

24  Q.   What was the purpose of your visit then?

25  A.   Well, our older brother was getting married at the time,

1    and so I wanted to be there for his wedding.

2    Q.    Can you speak up a little bit?

3          So in 2004, how long was your stay in Bangladesh?

4    A.    Oh, several weeks.  I think about a month, month and a

5    half or so.

6    Q.    Do you know -- you went shopping in relation to my

7    brother's wedding?

8    A.    Yeah, we did shopping almost, if not every weekend, it

9    felt like every other day.

10   Q.    How is it -- how is it --

11   A.    It's pretty exhausting.  Shopping you mean for the

12   wedding?  Oh, my gosh, yeah, it's pretty exhausting.  There

13   is so much -- so much stuff that you have to do.

14   Q.    Could you tell us about how weddings are in Bangladesh,

15   and then compare it to weddings over here in the States in

16   the western culture?

17   A.    For one thing, weddings, they are very elaborate, and

18   for both sides of the family it's very expensive.  There is

19   gatherings, receptions, like ceremonies and rituals for

20   several days in a row.

21         And everybody in the family or extended family, friends,

22   they all gather at different times for participating at

23   different ceremonies and different rituals.

24         And everybody is helping each other out.  And that's

25   really, it's just wonderful to watch all these family members

1  that you haven't seen in many months or even sometimes years

2  come together, because it's such a big deal to support and

3  bless the couple.

4      There is food -- oh, my gosh, the food is incredible.

5  Q.  Can you tell us about how are the expenses in a wedding,

6  a typical wedding, or the wedding that you have attended, our

7  older brother's wedding?

8          MR. BLY:  I would object to the relevance of the

9  brother's wedding.

10          THE COURT:  Sustained.

11  A.  It's pretty expensive.

12          THE COURT:  Sorry, I sustained the objection.

13          THE WITNESS:  Oh, okay.

14  BY MR. SADEQUEE:

15  Q.  If we could put up -- if you could read No. 16, Exhibit

16  No. 16, if I could ask --

17          THE COURT:  Jessica?

18  BY MR. SADEQUEE:

19  Q.  Could you tell us -- you were with me -- you helped me

20  get a bank account; correct?

21  A.  Uh-huh.

22  Q.  Could you explain that as well, how --

23  A.  Yeah.  Well, you wanted to save up money so you could go

24  and marry Happy, and, you know, it was like you really didn't

25  know much how to do anything, so I had to show you how to do

1    a bunch of stuff, including like how to open up a bank

2    account.

3       So I took you to our nearby Bank of America and made

4    sure you brought your ID and just helped you sign up for the

5    account.

6    Q.    Do you see Exhibit No. 22?

7    A.    Uh-huh, right here.

8    Q.    What is that?

9    A.    This is your Bank of America statement.

10    Q.    Could you read how much money I had when I -- or I took

11    out when I went to Bangladesh?

12    A.    Okay.   So in here, 7-19-05, you have about four thousand

13    dollars.

14    Q.    Could you read the exact amount?

15    A.    Sure, $3,950.01 is your beginning balance.

16    Q.    And that was withdrawn on --

17    A.    So --

18    Q.    -- July 19th did you say?

19    A.    That was your beginning balance here, this statement

20    indicates.

21       Now, let me see.   So on 8-17, you had taken out

22    $3,851.96.

23    Q.    So is that all the money from the documents?

24    A.    It looks like it's all the money, other than some fees

25    that you accrued that probably took away some of the

1   remainder difference.

2   Q.   So if we may now go into Exhibit 16?

3   A.   Okay, it's right here.

4           THE COURT:  Mr. Samuel, could you help him,

5   please?

6           MR. SAMUEL:  You want an honest answer?

7           THE COURT:  Your face said it all.

8           MR. SAMUEL:  I'm not an expert on this.

9           THE COURT:  Thank you.

10  BY MR. SADEQUEE:

11  Q.   Could you tell us, you see this name right here?

12  A.   Narayangonj, yeah.

13  Q.   Above that.

14  A.   Oh, that's Happy's name.

15  Q.   And that's who?

16  A.   That's your wife.

17  Q.   And you know her?

18  A.   Yes, of course.

19  Q.   You met her?

20  A.   Yes.

21  Q.   And could you give us -- explain what this document is a

22  little bit?

23       Let me just go over stuff.  These are -- are these

24  wedding items?

25  A.   Yeah, they look like they are jewelry.  It's earrings,

1   necklace, and then different -- the other ones are very

2   specific wedding type of jewelry, special wedding jewelry,

3   like the choor and tikli.

4   Q.   What is a choor?

5   A.   Choor is the one that goes from here to your nose, and

6   the tikli is this one that you wear.

7   Q.   And kaan taana?

8   A.   Kaan taana, I think that is -- is that maybe the one --

9   if you can translate that in English, I might know.

10  Q.   Well, actually --

11  A.   I'm not familiar with that piece of jewelry.

12  Q.   I cannot answer the questions.

13  A.   Okay.

14  Q.   So do you know, could you estimate --

15          THE COURT:  Mr. Sadequee, I can't hear you because

16  you are away from the microphone.

17  A.   Oh, you know, I believe the kaan taana is the other

18  piece, it's the one you wear in your hair.  Because there is

19  another piece that you wear, it kind of dangles down in your

20  hair, yeah.

21  Q.   If you could -- there is pictures; right?  Can you go

22  over the pictures, Exhibit No. I believe 20?

23  A.   Uh-huh.  Yeah, I have seen these.

24  Q.   Do you notice some of the jewelry that you talked about

25  in there?

1    A.    There it is, yes.

2          Okay.  So that's -- it's very bride-specific jewelry.

3    Q.    For the record, if you could just sort of --

4    A.    Sure.

5    Q.    I will put it right here so that you could just explain

6    it.

7    A.    Take this one, because this one actually has the jewelry

8    bigger.

9          Okay.  So the tikli or the one that you put in the --

10   Q.    Can you identify the person?

11   A.    Sure.  That's Happy Shahnaz, that's your wife.

12   Q.    So could you identify some of the jewelry which we saw?

13   A.    Yeah, yeah.  So the jewelry is made of gold and lots of

14   other semi-precious stones.  The one that is on top of her

15   head, like it's going down in front of her forehead, that's

16   the tikli.

17         The one that I just said, kaan taana, is the one that's

18   hanging on the hair and it drapes down right by the side.

19         And then the other piece is the choor, which goes from

20   the ear to the nose.

21         And then, of course, you have the earrings, and then the

22   big necklaces that are very specific to bridal jewelry.

23   Q.    And that's --

24   A.    That's --

25   Q.    Is there more jewelry visable?  The necklaces; correct?

1   A.   Well, she's wearing probably three different necklaces

2   made of gold and semi-precious stones.

3   Q.   You can read Bangla; correct?

4   A.   Very slowly.

5        You know what else is there that's not showing in this

6   picture is probably her rings.  She has some bridal rings

7   that usually most brides wear.

8   Q.   Can you read -- some of this is Bangla, so could you

9   read what diamond is sold?

10  A.   I'm having trouble seeing that one, so I'm going to look

11  in here.

12  Q.   That should be in Exhibit 16.

13  A.   Okay.  So can you point at what it is that you would

14  like me to read?

15  Q.   This item right here.

16  A.   Okay.  So this means one, so ring basically, and it's

17  the type of ring it is, that's what it is describing.

18  Q.   Could you read the price?

19  A.   The price in the bottom, in the corner, in the bottom

20  corner right there, yeah, so that one says thirty-nine

21  thousand -- or thirty-nine hundred, sorry, Dhaka, which is

22  the Bengali currency.

23  Q.   Can you approximately say how much that is equivalent to

24  in dollars?

25  A.   Actually, sorry, it's thirty-seven, it's thirty-seven

1    hundred.

2         Gosh, now?

3    Q.    We can get back to the calculations later.

4    A.    I need to convert.

5    Q.    We will be able to do that later.  It might not be

6    necessary right now.

7         Could you read what these items are?  I believe it's

8    somewhere in that packet.

9    A.    So these are describing the specific jewelry pieces and

10   the different types of jewelry, and so it's basically

11   describing how much, you know, how much gold and then how

12   much of the semi-precious stones.

13        And all together, basically it's saying there is about

14   eighty-one thousand Dhakas that were invested in the gold,

15   and then about nineteen hundred in the -- no, that's the

16   taxes, sorry.

17        So all together it's about, about ninety thousand

18   dollars -- I mean, Dhakas.

19   Q.    So when you went in 2004 to Bangladesh for my brother's

20   wedding, did you meet Happy?

21   A.    Yeah, totally.  I met with her several times.

22   Q.    Did she come over to our house?

23   A.    Yes.

24   Q.    When did you find out that I was going to get married or

25   that I had intentions of getting married?

A.   When you were here, before you left to go to Bangladesh.

Q.   In 2004 when Happy came to our house, what was the
relationship between our father and her father?

A.   Well, the fathers had all our life, always had some
family feud, you know, disagreements with each other.

Q.   At that point in time in 2004 when you were in
Bangladesh, did our father's -- my uncle's side, meaning
Happy's father's, come to our brother's wedding?

A.   Yeah.

Q.   Did anyone from our father's side --

A.   Our father's?

Q.   -- yes, come to my brother's wedding?

A.   If our dad and our dad's side of the family?   You mean
our paternal side of the family, if they came to Amimul's
wedding?   Is that what you are asking?

Q.   Yes.

A.   Yeah, they were.

Q.   Did Happy come to our brother's wedding?

A.   I believe so.

Q.   Do you recall that 100 percent, are you sure, or you are
not --

A.   There were a lot of, a lot of people who came.

Q.   If you don't recall, then you don't recall.

     What was the relationship between our father and Happy's
father in 2004 when you came to Bangladesh, briefly?

1   A.   If I remember, it was off and on.  There were --

2   I remember seeing them talk to each other.

3   Q.   Did you ever see Happy's father while you were in

4   Bangladesh?

5   A.   Yes, I did.

6   Q.   Where did you see him?

7   A.   He came over.

8   Q.   On the 2004 trip?

9   A.   Yeah, he came over to our house once, but dad wasn't

10   there.  He came to see us, Amimul and I, because we were

11   visiting.

12   Q.   You are saying Happy's father came over to our house in

13   2004?

14   A.   Well, I don't recall clearly.  I do recall -- I do

15   recall seeing him.  I'm not sure if it was at our house or it

16   was within their house.  There were lots of, lots of other

17   relatives that I was meeting with.

18   Q.   In 2004 you visited Bangladesh, did you go to Portula

19   (sp.)?

20   A.   I went to Portula at least once.

21   Q.   In 2004?

22   A.   Uh-huh, yes.

23   Q.   What is Portula, can you explain?

24   _____

25   * (sp.)  Indicates phonetic spelling.

A.    That's our dad's -- our dad's town where a lot of his
family and extended family lives.

Q.    And when did you -- or when did I tell you that I was
going to get married, at what point in time?

A.    Several years ago.  You told me -- definitely 2004
I knew that you were going to go get married and you liked
Happy.  And it was like 2003, 2004, around that time that you
actually communicated you were actually going to get married.

Q.    When did I tell Aparna, meaning our boss at Raksha, when
did I tell her that I would be going back to Bangladesh, at
what point in time?

            MR. BLY:  Objection, Your Honor.  Hearsay.

            THE COURT:  Sustained.

BY MR. SADEQUEE:

Q.    Did I -- did you ever see me with paintball guns at the
house, paintball -- whatever it's called, paintball guns?

A.    I know you played around and had sports and --

Q.    Did you ever see me with paintball guns at the house?
Did I --

A.    I think they are plastic, plastic toys.  I don't know
what kind of a specific --

Q.    You saw me with something; correct?

A.    Uh-huh, yeah.

Q.    Did I ever -- do you recall me talking to you about

1   going to the woods?

2   A.    Yeah.

3   Q.    Did I describe to you our -- my, Haris's, the experience

4   in the woods?

5          MR. BLY:  Objection, Your Honor.  Hearsay.

6   BY MR. SADEQUEE:

7   Q.    Did I ever invite you to come to the woods?

8   A.    Yeah, you did.  You invited my friends too.

9   Q.    Could you repeat that?

10  A.    I said you invited my friends too.

11  Q.    Could you elaborate on that?

12  A.    Sure.  I remember I think you and I were talking just

13  briefly one day, and you said -- you know, you said you were

14  going to go to the woods.

15        I said, I want to go to the woods too, you know, go to

16  the park and hang out, hang out with you and Haris.  And I

17  was like cool, maybe I could bring my friends too.

18        I think you actually offered, Hey, you can bring your

19  friends too.

20        We were actually supposed to go kayaking one time too.

21  Q.    Was there -- have we actually been to the woods together

22  before, not -- any woods?

23  A.    You mean with you, or with you and Haris?

24  Q.    No, with me.

25  A.    With you?

```
1   Q.   And your friends.

2   A.   We hung out at lots of places together.  Did we go to a

3   park together?

4        I don't recall going to a park, but I know we hung out a

5   whole bunch of other places.

6   Q.   Do you recall us going swimming?

7   A.   You mean --

8   Q.   Not in the river, not in the woods, but in swimming

9   suits?

10  A.   At a swimming pool?   I don't recall going swimming.

11  Q.   You don't recall going swimming?

12  A.   No.

13  Q.   Do you recall -- we lived in Harmony Bay; correct?

14  A.   Yes.

15  Q.   Harmony Bay?

16  A.   Uh-huh.

17  Q.   Does that have a swimming pool or in the apartment

18  complex next to it?

19  A.   Oh, yes.

20  Q.   Did we ever go swimming there?

21  A.   I know we talked about going.  I don't recall actually

22  going.

23  Q.   Do you recall any of your friends named Sari?

24  A.   Yeah.   Yeah, you and Sari were really good friends.

25  Q.   Do you recall us going swimming?
```

MR. BLY:  I'm going to object.  The question has
been answered several times.

THE COURT:  Sustained.

BY MR. SADEQUEE:

Q.   So you mentioned earlier that I had offered or I had
brought up the idea of going to the woods with your friends?

A.   Uh-huh.

Q.   Do you recall what my -- what you observed of my -- of
my attitude towards recreational activities, such as going to
the woods and -- what do you recall?

A.   Well, you liked being in the park and spending time with
nature.  You enjoyed being out and about, having fun, playing
and hanging out with friends.

Like I said, I really -- I was looking forward to having
some time to go kayaking with you.

Q.   Now, a bit about our family.  We come from a South Asian
family.  Can you explain growing up, how were our parents,
especially in relation to us all, but to me as well, in terms
of spending a night in other people's or our friends' houses,
or just freedom of travel?   What was our relationship with
our friends with regards to that?

Do you understand the question?

A.   Let me make sure.  You are asking like what did our
parents feel about us spending the night with our friends?

Q.   Yes.

1    A.    Well, it is a little different, you know, for me

2    because --

3    Q.    In relation to me.

4    A.    Okay.  Well, I mean, if we are hanging out together,

5    they were totally fine.

6          For you, you know, they were protective at times.  And

7    then at times, as long as, you know, it was like they knew

8    the parents --

9    Q.    Has our father ever allowed us to spend the night over

10   any of our friends' house?

11   A.    Not usually, huh-uh.

12             MR. BLY:  Objection, relevance.

13             MR. SADEQUEE:  I'm getting to it.

14             THE COURT:  What is the relevance?

15             MR. SADEQUEE:  My next question makes it --

16             THE COURT:  Well, you need to explain to me what

17   the relevance is.

18             MR. SADEQUEE:  That in that period of time in two

19   thousand -- end of 2004, this was the first time that I was

20   in Atlanta not under the supervision of my mom and dad, and

21   this was -- I got an opportunity to actually go out and do

22   whatever activities with my friends.

23             THE COURT:  How is that relevant to any issue in

24   the case?

25             MR. SADEQUEE:  Well --

1          THE COURT:  Go ahead.  Go ahead.

2    BY MR. SADEQUEE:

3    Q.   I just said it, so --

4    A.   Well, dad was usually protective.  He didn't allow, he

5    didn't approve of you or anybody, any of us really growing up

6    staying with our friends.  He pretty much prohibited us from

7    spending the night with our friends.

8    Q.   So where was our father and our parents during 2004,

9    2005?

10   A.   Both our mom and dad were in Bangladesh.

11   Q.   So -- do you see Exhibit No. 21?

12   A.   You said 21?

13   Q.   Yes.

14   A.   Uh-huh.

15   Q.   Do you recognize this?

16   A.   Yeah.  This is one of the books that you gave me to read

17   a long, long time ago.

18   Q.   Do you recall when, around what time?

19   A.   It was 2004ish, yeah.

20   Q.   Do you recall the publication's name?

21   A.   Uh-huh.  At-Tibyan.

22   Q.   Did you ever read this book?

23   A.   I looked at it, I glanced at it.  I didn't read it cover

24   to cover.

25   Q.   Do you recall what I mentioned about this book?

A.   Yeah.  You said that I might enjoy reading it and there

is a lot of good information there and Hadiths and

information on just religious information.

Q.   What type of topics or range of topics did we -- we used

to discuss?

          MR. BLY:  Objection, Your Honor.  I think the

witness testified she did not read the book, so I would

object on foundation grounds.

          THE COURT:  My understanding was your question is

that over your lifetime, you want to know all the things, the

kinds of things that you discussed?  Is that what you are

saying?

          MR. SADEQUEE:  No, I'm saying, for example --

          THE COURT:  Or are you limiting it to that

publication, which is the exhibit that you just referred to?

          MR. SADEQUEE:  Well --

          THE COURT:  Ask your question again.  It's

obviously not clear to me, so I can't rule on it.

          MR. SADEQUEE:  This last question you mean?  The

last question, okay.

BY MR. SADEQUEE:

Q.   I'm asking what types of topics, whether it be in

relation to this book or not, just in general, what subject

matters did we have conversations about, especially since

let's say 2004 when I came back to the U.S. or during -- from

1    the time that you came to Bangladesh?

2    A.    Okay.

3        MR. BLY:   I object, hearsay and relevance,

4    Your Honor.

5        THE COURT:   That would include if you had

6    discussions about where you were going to go out to dinner

7    or what kind of food you like.   It's got to be relevant to

8    the case.   I'm going to sustain the objection.

9    BY MR. SADEQUEE:

10    Q.    Do we ever talk about political issues?

11    A.    Yes, we talked a lot about the environment, we talked

12    about climate change, we talked about what you enjoy reading,

13    what you are exploring, what you are learning, and about the

14    various different books and articles and magazines that

15    you -- both you and I read in general.   And that included

16    Islamic stuff, that included like you loved to read books on

17    animals and creatures, and bugs as well.

18       We explored lots of different topics around -- we also,

19    yeah, we discussed topics about like different, you know,

20    social movements around, like I said, certain political

21    stuff.

22    Q.    What was the reason -- okay, I offered this book to

23    you.   You did not read it, but what was the reasoning behind

24    you not reading it?

25    A.    I had a whole bunch of other stuff to read as well, and

it just kind of, you know, prioritizing what it is that I read.

And I glanced at it and, you know, I hope to get there, you know, get to it one day.

Q. So it was not a priority to you to read it?

A. At that time it wasn't a priority when you first gave it to me.

Q. Had you heard of Tibyan Publications before? Did I mention it to you before?

A. I don't recall you mentioning it, but, you know, like I saw this back then. So that's how I just learned about it then. But then I also learned a lot about it as a result of this case.

Q. Now, you had seen me -- how often did I work on the computer?

A. You would work on the computer, what, maybe --

Q. Not at work, not at Raksha. I'm talking about at home.

A. At home, I mean, you know, you were studying, either you were studying or talking to Happy on the phone or you were helping me out or hanging out, or you are on the computer.

Q. Do you recall, if you were to give a percentage, how much time did you see me sitting in front of the computer?

A. Not any more than I do. Gosh, maybe a few hours a day, maybe a couple hours a day, I mean, in terms of what I saw you.

1  Q.    What else did I use to do at home?

2  A.    You studied a lot for your GEDs mainly and for your

3  SATs.  You talked with Happy a lot, pretty much every evening

4  on the phone.

5      And then, you know, occasionally you would hang out with

6  my friends, you would hang out with me.  We would go to

7  different pot lucks, health food events and different

8  conferences.

9      We volunteered a lot as well.  You were working with a

10  few nonprofit groups here in Atlanta, working for peace and

11  justice issues, working to end violence against women.

12  Q.    I am saying in terms of what did I do at home?

13  A.    Well, sometimes, you know, we would comment, we would

14  talk about this kind of work at home and discuss them so we

15  could do our work better.

16      And, let's see, you and I used to make food together a

17  lot because you were learning how to make food for yourself.

18  Q.    Have you observed any violent behavior on my part?

19  A.    Never.

20  Q.    Has anyone ever complained to you about me being

21  violent?

22  A.    No.  Quite the contrary, everybody that has ever met you

23  has always said how precious you are.

24          MR. BLY:  Objection, Your Honor.

25          THE COURT:  Sustained.

BY MR. SADEQUEE:

Q.   Did you ever see me -- did you ever see me teaching our sister-in-law how to shoot paintballs or something?

A.   I think you guys -- I think you guys talked about it.  I don't recall actually seeing you, but I remember you guys talking about it.

Q.   Did you ever have any intention of one day going paintballing with me?

A.   I did, I wanted to go, do some paintball.  It sounds like fun.

Q.   Now, after I did my GEDs and SATs, do you recall what universities we had talked about in my further studies?

A.   Yes.  We were -- well, we were considering -- and I was, you know, I was kind of offering certain suggestions to you just to get you introduced to different options that are out there around Kennesaw, Kennesaw University, Georgia State University.

You had -- let's see, I think those are the only two that we really got to talking about.  And then there were other options that I just never got to share with you just because of timing.

Q.   Now, you mentioned that in Bangladesh I studied -- do you know when I went back in 2005, what did I study over there?

A.   I'm sorry, I didn't hear your question.

Q.   In 2005 I went back to Bangladesh and I continued my studies.  Do you know what I was studying in 2005, 2006, prior to my arrest?

A.   Prior to your arrest?   Yeah, you were studying the math and academics, just, you know --

Q.   You know what, if you could look at Exhibit 10 and 11?

A.   Yeah.

Q.   Do you recognize those?

A.   The academics, yes.

Q.   What are those?

A.   This is your tuition payment receipt and class schedule for the North South University in Bangladesh where you enrolled around the math and English classes.

Q.   Is this the one you are looking at?  Is this what you are describing to me?

A.   Yeah, this looks like the schedule.

Q.   Could you read what it says?

A.   This looks -- it says cash received for your tuition fees.  It's by the Dhaka bank.

Q.   Now, if we could go to Exhibit  -- how often did I use to speak about getting married prior to going to Bangladesh throughout --

A.   A lot.  You talked about -- I mean, you were really concerned too because Happy was -- Happy was about -- you know, her parents were pressuring her to get married, and

1  that was really concerning to you because you loved her and

2  you really wanted to be with her and you wanted to make sure

3  you could be with her.

4      So you talked about her a lot.  You talked to her a lot,

5  almost every night.  And, yeah, like -- it was almost like

6  she totally supported you and everything that you were doing

7  and making sure you had the money, you were saving up for the

8  wedding.

9  Q.   And this was -- what period of time did I begin -- at

10 what point in time did I start discussing with you about --

11 and my family about getting married to Happy?

12 A.   Well, it became really urgent once you found out that

13 her family was pressuring her to get married to somebody

14 else.  And, you know, that was -- that was concerning to me

15 as well to hear that.

16     And it was probably I would say several, several weeks

17 before -- several maybe even months before you actually went,

18 before you actually were able to go over there.

19         MR. SADEQUEE:  That would be it.  Thank you.

20                     --  --  --

21                 CROSS-EXAMINATION

22 BY MR. BLY:

23 Q.   Good afternoon, Ms. Sadequee.

24 A.   Good afternoon.

25 Q.   You mentioned that you work for a nonprofit

1   organization.  Is that right?

2   A.   Yes.

3   Q.   That's Raksha?

4   A.   Raksha.

5   Q.   Okay.  And Defendant Sadequee worked there at times

6   also?

7   A.   Yes, he did.

8   Q.   Ms. Casperson, if we could pull up Exhibit 60?

9        Ms. Sadequee, this is a document that's already in

10  evidence and titled "The Ruling Regarding Killing One's Self

11  to Protect Information."

12       Is this a document that you have seen before?

13  A.   No.

14  Q.   You haven't read it?

15  A.   No.

16  Q.   You certainly didn't write it, did you?

17  A.   No.

18  Q.   Could we look at Exhibit 60-A?

19       Ms. Sadequee, this is the same document.  It's a

20  Microsoft Word document with the properties box displayed

21  showing that the company associated with the Microsoft Word

22  version where this document was created is Raksha.

23       That's where you work; correct?

24  A.   Yes.

25  Q.   Based on the title, "The Ruling Regarding Killing One's

1  Self to Protect Information," is that the kind of document
2  that Raksha would normally be producing?
3  A.   Not necessarily, no.  But Raksha, we do a lot of
4  education and awareness on interfaith issues, all faith-based
5  type of materials.
6       So there is a chance, but not -- not -- I haven't come
7  across that document when I was working there.
8  Q.   Does Raksha do education on topics like killing one's
9  self to protect information?
10 A.   Not that I'm aware of.
11 Q.   This document was found -- and the author, I think you
12 said this before, is listed as Sonali Sadequee.  This is not
13 something you wrote; correct?
14 A.   No.
15 Q.   This document was found on a computer of a person in the
16 United Kingdom named Waseem Mughal.  Is that a name that you
17 are familiar with?
18 A.   No.
19 Q.   Not somebody you have run into as a client of Raksha or
20 anything like that?
21 A.   Not that I know of.
22 Q.   You mentioned that your brother, Defendant Sadequee,
23 studied in Toronto for a period; is that right?
24 A.   Yes.
25 Q.   He was not studying in Toronto in March of 2005.  Is

1 that correct?

2 A.   March 2005?  That's when he was in Atlanta.

3 Q.   He was living in Atlanta in March of 2005; right?

4 A.   Uh-huh.

5 Q.   So he was not still enrolled in school in Toronto in

6 March of 2005?

7 A.   No.

8 Q.   You talked a fair bit about different friends and

9 associates of both you and Defendant Sadequee, and I wanted

10 to talk to you about a few names to see if they are folks

11 that you are familiar with.

12      A gentleman by the name of Aabid Hussein Khan.  Is that

13 somebody that you know?

14 A.   No.

15 Q.   You might know him by the name Abu Umar, is that name

16 familiar?

17 A.   The name Omar is familiar, but I'm not sure if it's the

18 same person that you are talking about.

19 Q.   Abu Umar was often used by Mr. Khan as an online or

20 e-mail moniker.  You are not familiar with it in that

21 context, are you?

22 A.   No.

23 Q.   The name Younis Tsouli, is that somebody you are

24 familiar with?

25 A.   No.

1    Q.    Maybe the nickname Irhabi 007, Terrorist 007, is that a

2    name you are familiar with?

3    A.    Now, I should say some of these names I have become

4    aware of as a result of this case.

5    Q.    But they are not somebody that --

6    A.    That I have known, no.

7    Q.    Not anybody that you have talked to?

8    A.    No.

9    Q.    Nobody that you know, nobody that you have talked to

10   your brother about?

11   A.    No.

12   Q.    How about Mirsad Bektasevic, is that somebody you know

13   or have heard about?

14   A.    From this case.

15   Q.    But not before this case?

16   A.    No.

17   Q.    Maximus, that wasn't somebody that you and your brother

18   ever talked about?

19   A.    No.

20   Q.    You talked a little bit about your brother's

21   wedding.  This was not a wedding that you were in attendance

22   at; correct?

23   A.    Correct.

24   Q.    Do you have Exhibit 16 up there in front of you?  It's

25   the one with the receipts and invoices.

1  A.    Is this the one?

2  Q.    It was the one with the -- that discussed the jewelry,

3  that had the invoices and receipts for the jewelry.

4  A.    This is probably it.  I think the sticker fell off.

5        This is it, yes.  It's a different page.

6        MR. BLY:  If I might be able to see that for a

7  second?

8        Thank you.

9  BY MR. BLY:

10  Q.   I'm not going to go back through all of that nearly in

11  the detail I did before, but I wanted to ask you one question

12  about it.

13       This is part of the document, Exhibit 16, you talked

14  about before that lists some jewelry and prices paid for the

15  jewelry.  I would ask you, if you could, to read the name at

16  the very top of the document?

17  A.   Just to be sure, maybe point at it.

18  Q.   Sure.  Right there where it says name?

19  A.   Okay.  So that's looks like my dad's name.

20  Q.   So on this paid invoice, the name at the top, that's

21  your father's name?

22  A.   Uh-huh.

23  Q.   Defendant Sadequee showed you a document that he gave

24  you to read.  It was an At-Tibyan Publications document.

25       I think you said you did not read that one.  Is that

1    correct?

2    A.    Correct.

3    Q.    I would like to show you just a couple other Tibyan

4    documents and ask if your brother shared those with you.

5          Ms. Casperson, if we might be able to bring up

6    Exhibit 46-A?

7          This is another Tibyan Publications document titled

8    "Fundamental Concepts Regarding Al-Jihad."  Is this ever a

9    document that you have read?

10   A.    Not -- no, I haven't read this particular document.

11   Q.    This wasn't anything your brother shared with you?

12   A.    No.  But I have seen those kind of documents around.

13   Q.    You have seen these kind of documents around?

14   A.    Uh-huh.

15   Q.    Let's look at 56-A.  It's another At-Tibyan Publications

16   document titled "Verdict Regarding the Permissibility of the

17   Martyrdom Operations."  Is this a document that you have read

18   before?

19   A.    Not this particular one, no.

20   Q.    So this wasn't anything your brother shared with you and

21   asked you to read?

22   A.    No.  But I have seen lots of documents like that over

23   the years.

24              MR. BLY:  Nothing further, Your Honor.  Thank you.

25              THE COURT:  All right.  Any redirect?

1    MR. SADEQUEE:  Yes.

2                    -- -- --

3                 REDIRECT EXAMINATION

4  BY MR. SADEQUEE:

5  Q.   This is another jewelry item.  If you could read the

6  name?

7  A.   That's Happy's name, Happy Shahnaz.

8  Q.   Do you know if Happy works in Bangladesh?

9  A.   I think she was working at one point.

10  Q.   Does she have any income in Bangladesh?  Or what does

11  she do in Bangladesh?

12  A.   She was studying.  She was going to school, college

13  there.

14  Q.   Does she work in Bangladesh?

15  A.   I'm not sure if she was actually employed in

16  Bangladesh.

17  Q.   So would you say she has no income in Bangladesh?   Is

18  it typical for a woman of that age to work in Bangladesh?

19  A.   Oh, no.  I mean, her parents supported her.  I know that

20  for sure.

21  Q.   And in Bangladesh how is it culturally, right, for

22  wedding ceremonies, the exchange of jewelry items?   Who pays

23  for what?

24  A.   Well, the groom, you know, the groom's family actually

25  pays for the vast majority of the wedding expenses in

1    general.  I mean, it's customary, tradition.

2    Q.    The government asked you about my father's name.

3    A.    Uh-huh.

4    Q.    Now, do you know if our father -- what was his attitude

5    with regards to me and Happy getting married?

6    A.    Well, you know, originally, because Happy's dad and our

7    dad didn't really get along the best, you know, they weren't

8    agreeing.  But eventually, you know, everybody else, like

9    Happy's mom, our mom, you know, us, the siblings, and, you

10   know, Happy's friends and your friends, we were all

11   supportive of you guys getting married.

12        And so we, we convinced the fathers to support it as

13   well.  And so he eventually -- and they eventually supported,

14   because it was very clear that you guys really wanted to be

15   with each other and you guys loved each other very much.

16   Q.    Now, if I may just go back to this, this is my father's

17   signature.  Now, the writing here, it's all in -- a lot of it

18   is in -- what language?

19   A.    It's Bengali.  That handwriting is really fancy Bengali.

20   Q.    Do you know if I'm literate in Bengali?  Do I read it

21   and write it?

22   A.    Not that I'm aware of, no.

23   Q.    Does my father read and write Bengali?

24   A.    Of course.

25            MR. SADEQUEE:  Thank you.

1　　　　　THE COURT:  Does anybody want Ms. Sadequee subject

2　to recall?

3　　　　　MR. BLY:  No, Your Honor.

4　　　　　MR. SADEQUEE:  No.

5　　　　　THE COURT:  We appreciate your testimony.  Please

6　don't discuss it with anybody until you hear the case has

7　been concluded.

8　　　　　THE WITNESS:  Okay.

9　　　　　THE COURT:  Thank you for being with us.

10　　　　　I'm going to take our midafternoon break.  We will

11　be in recess for fifteen minutes.

12　　　　　The case is still coming in, so please don't

13　discuss it amongst yourselves or with anybody else.  We will

14　be in recess for fifteen minutes.

15　　　　　(In open court without a jury present:)

16　　　　　THE COURT:  All right.  The jury has left.

17　　　　　Have you made your decision about your own

18　testimony, Mr. Sadequee?

19　　　　　MR. SADEQUEE:  I don't believe I will be

20　testifying.

21　　　　　THE COURT:  You know, this is a trial, and you have

22　requested it.  You certainly have the right to a trial.

23　　　　　At a trial you really have two rights about your

24　own testimony.  First, you have the right to testify, if you

25　choose to do so.  But you also have the right not to testify,

1    and those are two rights that are personal to you.

2            Do you understand those rights?

3            MR. SADEQUEE:  Yes.

4            THE COURT:  And is it your decision not to testify

5    in your case?

6            MR. SADEQUEE:  Yes.

7            THE COURT:  All right.  Is there anything further

8    I need to cover regarding that issue, Mr. McBurney?

9            MR. McBURNEY:  I think the defendant is aware of

10   the instruction that you will give as the Court that the jury

11   is not to hold that against him in any way, the standard

12   language.  I assume Mr. Samuel has explained that to him when

13   he made that decision.

14           THE COURT:  Mr. Samuel, is that something that you

15   have discussed with Mr. Sadequee, what his right is and what

16   choices he has?

17           MR. SAMUEL:  Yes.

18           THE COURT:  And his -- was his answer today

19   consistent with your discussions with him?

20           MR. SAMUEL:  Well, we had many discussions, many

21   options.  Obviously things kind of changed as of last week.

22           But we have been talking about it, and my

23   understanding was that the decision he just made was the

24   decision he was going to make, but he was always somewhat

25   tentative.  So I think he's been very thoughtful about it.

1          THE COURT:  And that is true that the jury will be

2     instructed that the fact that you did not testify cannot be

3     held against you in any way.

4          All right.  Do you have any other witness to call?

5          MR. SADEQUEE:  No.

6          THE COURT:  All right.  So does the defense rest?

7          MR. SADEQUEE:  Yes.

8          THE COURT:  Is there any rebuttal?

9          MR. McBURNEY:  No, sir.

10          THE COURT:  All right.  Here is what I plan.  I am

11     going to release the jury for the rest of the day, which I

12     will -- I will do in about ten minutes after we have our

13     break.

14          Now understanding that the defense has rest and

15     that the government has rest, are there any motions that you

16     want to make?

17          MR. SADEQUEE:  Can I renew the earlier motion?

18          THE COURT:  Yes, you may.  And I'm assuming that

19     you are renewing it based upon all the grounds that you had

20     stated previously.  Is that correct?

21          MR. SADEQUEE:  Yes.

22          THE COURT:  And would the government like to

23     respond to the renewed motion?

24          MR. McBURNEY:  We renew our response.  I don't

25     think anything that the jury has heard through these past two

1    witnesses changes the calculus I shared with the Court.

2         THE COURT:  And I agree.  Under Rule 29, I find

3    that there is sufficient evidence to support a verdict on all

4    four of the counts, and therefore I'm denying the motion

5    under Rule 29.

6         So here was my plan.  My plan was to release the

7    jury, and then beginning about 4:30 to have our charge

8    conference.

9         I have given you my revised conspiracy

10   charge.  That's only the portion having to do with

11   conspiracy.  There are a number of definitions that have to

12   be discussed, but I'm going to work from the submissions that

13   you have given to me for the definitions, and they of course

14   would follow on Counts One and Two, would follow both of

15   those counts.  But we can go over that at the charge

16   conference.

17        Did you in fact get the revised conspiracy charge

18   for Counts One and Count Three?

19        MR. McBURNEY:  Yes, sir, as well as the First

20   Amendment piece as well.  Those were the three things we

21   received.

22        THE COURT:  And, Mr. Samuel, did you and

23   Mr. Sadequee receive the same materials?

24        MR. SAMUEL:  Yes.

25        THE COURT:  All right.  So that will give you a

1    chance to review that if you haven't had chance to do so

2    already.

3            Customarily -- and I'm actually all set up to do

4    the charge conference in my chambers, but that is based upon

5    whether or not the defendant is going to attend.  Often

6    defendants don't attend the charge conference.

7            I know that you are handling that on his behalf,

8    but does the defendant want to be at the charge conference?

9            MR. SAMUEL:  I think he should be, Your Honor.

10           THE COURT:  All right.  Then we will do it in

11   here.  Then let's move the charge conference to 4:45 because

12   I will have to get reset up with all my organization in

13   here.

14           No, let's still make it 4:30.  I will just work

15   fast.  I think the charge conference will go forty-five

16   minutes to an hour.  Then we will adjourn for the evening.

17           Then my plan would be beginning promptly at 9:00,

18   we will begin with openings -- I mean, with closings.  Then

19   right after closings, I will give my charge, and then they

20   will begin deliberating.  So they will be deliberating by

21   late morning.

22           Does that plan sound satisfactory to everybody?

23           MR. McBURNEY:  Yes, sir.

24           THE COURT:  I forgot how long I gave you for

25   closings.

1    MR. McBURNEY:  One hour.

2    THE COURT:  An hour?

3    MR. McBURNEY:  It was a moment of weakness on your

4  part.

5    THE COURT:  That's what I thought I said.

6    All right.  Anything else we need to discuss before

7  we take our portion of the break?

8    All right.  We will be back in about ten minutes.

9    (A recess is taken at 3:45 p.m.)

10                        --  --  --

11    (In open court without a jury present at

12  4:04 p.m.:)

13    THE COURT:  Is there anything we need to discuss

14  before we bring the jurors back in?

15    MR. McBURNEY:  No, sir.

16    THE COURT:  Mr. Sadequee, anything?

17    MR. SADEQUEE:  No.

18    THE COURT:  All right.  Could you bring the jurors

19  in, please?

20    (In open court with a jury present:)

21    THE COURT:  Welcome back, ladies and gentlemen.

22    Mr. Sadequee, do you have any more witnesses?

23    MR. SADEQUEE:  No.

24    THE COURT:  Then does the defense rest?

25    MR. SADEQUEE:  Yes.

1  THE COURT:  And does the government have any

2  rebuttal evidence?

3  MR. McBURNEY:  No, sir.

4  THE COURT:  Ladies and gentlemen, that means that

5  the evidence is closed, and we go on to the next portion of

6  the proceeding, which are closing arguments and the jury

7  charge.

8  But that will not happen today, because I can never

9  determine the law to charge you on until the evidence is all

10  in.

11  Now that the evidence is all in, I have to go back

12  and make sure that I cover all of the issues that need to be

13  covered with you in the charge.  And because it will take me

14  about an hour to do that, it doesn't make any sense for you

15  to wait here, because we will not get to closing arguments

16  this afternoon and the case necessarily will go on to

17  tomorrow.

18  So I thought the most efficient use of your time

19  would be to release you now so that I can meet with the

20  lawyers and go over the charge, and also meet with the

21  defendant and go over the charge with him, so that when you

22  come back tomorrow, that's all done.

23  And tomorrow at 9:00, the first order of business

24  will be closing arguments, and as soon as the closing

25  arguments are over, I will charge you, and then after the

charge, you will begin your deliberations.  So my estimation

is that you will begin deliberating by late morning.

So I just think that's the best way to manage your

time, and that's the schedule that I'm going to put in

place.

Now, just because the evidence is all in doesn't

mean you can discuss it, because you can't discuss it without

knowing the charge.  So again, even though you are retiring

for the evening, do not discuss the case amongst yourselves

or with anybody else.

We will begin tomorrow morning at 9:00 with the

closings and then go right into the charge to you and then

you will begin your deliberations.  So have good evening, and

we will see you tomorrow morning at 9:00.

(In open court without a jury present:)

THE COURT:  All right.  I'm going to need some time

in here alone talking with my clerk as I get organized since

we are having the charge conference in here rather than in my

chambers.

So I'm going to ask everybody to leave the

courtroom so that I can have my discussions with my law

clerk.  But you can come back in -- it's already 4:00.  I'm

going to need about twenty minutes, so come in back in

shortly before 4:30 so we can start.

So whatever you need, I will give you about five

navigation
United States District Court
Northern District of Georgia

1    minutes and I will collect my things, but take whatever you

2    need to get ready for the charge conference with you.  And

3    then if everybody would please leave while I get set up,

4    everybody can come back in at 4:30.

5              MR. SAMUEL:  Your Honor, there was a document that

6    we were trying to find on the internet after Mr. Kohlmann

7    testified.  We didn't find it until after lunch.  We couldn't

8    print it out.  We were having trouble printing it out.

9              Mr. Sadequee was asking whether he can introduce

10   that one document.  It came up during Mr. Kohlmann's

11   testimony.  It was not something, as I understand it,

12   Mr. Sadequee actually asked him about.  It was an answer that

13   Mr. Kohlmann gave that brought up the topic of another

14   article or book.

15             And he's asked me to ask you if we could tender

16   this one document.  I'm going to try to print it out now.  We

17   still have not been able to.

18             I'm going to show it to the government and

19   hopefully encourage them to continue to allow us to introduce

20   this one other document.

21             MR. McBURNEY:  I explained to the defendant that we

22   oppose this.  We were flexible enough with the

23   eleventh-and-a-half-hour discovery.

24             I understand it's something that came up on

25   cross-examination, but it's an article about which the

defendant had much to say on Tibyan, et cetera, and didn't

strike me as something that wasn't a foreseeable topic of

discussion with our expert witness, if not his own expert

witness that he more recently dismissed.

So we oppose the after-the-closure-of-evidence

introduction of this item.

THE COURT:  Well, Mr. Kohlmann testified this

morning now about three hours ago, four hours ago.

MR. SAMUEL:  Right.

THE COURT:  I have come in twice since then and

asked if there is anything to be brought up with the

Court.  I came in before -- I released the jury to ask if

there was anything else, and I specifically asked

Mr. Sadequee if he had any other evidence, any other

witnesses I guess I said, and he said no.  And I asked does

the defense close -- rest, and he said that they did.

So I have released the jury with the instruction

that we will -- that the evidence is over.  And if the

evidence were reopened, the government would have the right

to call Mr. Kohlmann back to explain whatever he said about

that document.  It would seem to me that Mr. Kohlmann would

have the right to review the document to see whether or not

what the defendant claims would be -- it says what he thinks

it says, which has not always been the case.

But I have been generous in giving you,

1   Mr. Sadequee, every opportunity to tell me if there is

2   something else that you want.  And the purpose of having the

3   discussion before I brought the jury back in with you about

4   the case was to make sure that when the jury came back in,

5   that there was no more evidence and that the evidence was

6   over, and you told me that it was.

7          So your request after the evidence has been closed

8   and after you have rested, without any more specific

9   articulation about any relevance that this document may have,

10  is denied.

11         Anything else?

12         MR. McBURNEY:  No, sir.

13         THE COURT:  All right.  I will let you know when

14  I'm ready for everybody to come back in.

15         (A recess is taken at 4:12 p.m.)

16                         --  --  --?

17         (In open court without a jury present at

18  4:42 p.m.:)

19         THE COURT:  All right.  I want to make sure the

20  record is clear about this late request by the defense to

21  introduce this document, because I want the appeals court to

22  know exactly what happened.

23         It concerns an unspecified document from the

24  internet the defense told me was mentioned by Mr. Kohlmann

25  during his testimony.  At the time it was mentioned to me it

had not yet been printed out off the internet even though the document had been mentioned apparently by Mr. Kohlmann, whatever the document is, some three or four hours before it was first brought to my attention.

What happened this afternoon is this. That after the defendant put up his last witness, his sister, I had the jury retire to the jury room, and while they were retired I asked the defendant if he had any further witnesses, and he said no.

Then I asked if he was going to testify, and he said that he wasn't going to. I told him of his rights to testify, and he told me that he understood his rights and that he elected not to testify.

And then I asked him before -- this is all before the jurors came back, I said does the defense rest, and he said that the defense rests.

And then in his presence, I asked the government if they had any rebuttal, because the government now knew that the defense didn't intend to offer any more evidence, and the government told me that they had no rebuttal.

And only after I got those representations did I ask the jurors to come back in. And again I asked the defendant if he had any more witnesses, and he said no. And then I said does that mean that the defendant rests, and he said yes.

1   Then I asked the government if they had any

2   rebuttal, and they said no.  Then I told the jurors that the

3   evidence was closed.

4   And based upon the representations of the defendant

5   and of the government, which were making decisions as was

6   apparent to me based upon what Mr. Sadequee said his case

7   was, I told them what the schedule was, which is that they

8   would be released for the afternoon because there was no more

9   evidence to be heard, no more evidence for them to consider,

10  and that they would come back tomorrow and hear

11  closings.  And the jury was released.

12  Then and only then did the defendant say that he

13  had a document which he has not identified which Mr. Samuel

14  told me had not yet been printed off of the internet having

15  to do with some matter that was never articulated to me that

16  somehow related in some way to Mr. Kohlmann's testimony.

17  The most I heard was that Mr. -- it had come up

18  I think is the way that it was put by the defense, it had

19  come up in his testimony and that they had been looking for

20  it and had found it, but they hadn't been able to print

21  it.  I was never told what the document was or how it related

22  to the case.

23  It is clear that the defendant has no more

24  witnesses, so I don't know how the document would ever be

25  introduced.  Even if I had allowed it, there is nobody to

1   identify it, there is nobody to testify about it, there is

2   nobody to explain it.

3          His request was simply for me to make an

4   accommodation to him to take a document that was not properly

5   identified or had not properly been introduced about a

6   witness who was done testifying some three or four hours ago

7   and to simply offer it into evidence.

8          There is no grounds to do that, I have no legal

9   foundation to allow it, it is out of time, and it is not

10  allowed.

11         Is there anything about that history that I got

12  wrong?

13         MR. McBURNEY:  I don't believe so, Judge.

14         THE COURT:  Mr. Sadequee, is there anything about

15  that history of what happened this afternoon and what you

16  wanted to do that is not correct?

17         MR. SADEQUEE:  No.

18         THE COURT:  All right.  Let's go on then to the

19  charge conference.

20         I'm going to work from the standard instruction

21  that I have given to you and that is on our website.  I'm

22  going to have this copy of the standard instruction marked as

23  an exhibit because we will be working from it.

24         So if you will mark that as a Court's exhibit,

25  Jessica, I would appreciate it.

1    All right.  Does everybody have copy of the

2 standard instruction?

3    MR. McBURNEY:  The Court's Standard Instructions to

4 the Jury, and then in parentheses, Before Deliberations?

5    THE COURT:  Yes, that's it.  Do you have a copy of

6 it?

7    MS. CLARK PALMER:  I do, Your Honor.

8    THE COURT:  I forget your name.

9    MS. CLARK PALMER:  Amanda Clark Palmer.

10    THE COURT:  Is it just Clark Palmer or just Palmer,

11 what's your preference?

12    MS. CLARK PALMER:  Clark Palmer.

13    THE COURT:  All right.  So let's begin on page

14 one.  I will begin with it is my duty to instruct you on the

15 rules of law.  So I will give the instruction that's on page

16 one.

17    The instruction on page two is the duty to follow

18 instructions, presumption of innocence.  But that assumes the

19 defendant would testify, so I will not give that one.

20    I will give the instruction on the next page, which

21 is the duty to follow instructions, presumption of innocence,

22 when any defendant does not testify.  Because that has the

23 language that says if a defendant elects not to testify, you

24 should not consider that in any way during your

25 deliberations.  That's why we give that instruction.

1           On page four is the definition of reasonable -- and
2   so far, does anybody have any objections to the instructions
3   I intend to give?
4           MR. McBURNEY:  No, sir.
5           MS. CLARK PALMER:  No, Your Honor.
6           THE COURT:  All right.  Then on page four begins
7   the definition of reasonable doubt, and that's all contained
8   on that page.  Any objection to the instruction on reasonable
9   doubt?
10          MS. CLARK PALMER:  No, Your Honor.
11          MR. McBURNEY:  No.
12          Not a great charge, but it's the pattern
13  charge.  We are not seeking to change pattern charges today.
14          THE COURT:  That would be a good choice on your
15  part.
16          The next is consideration of the evidence, direct
17  and circumstantial, argument of counsel, and comments by the
18  Court.
19          I have to amend that, as I have done already, to
20  address the fact that the defendant is representing himself.
21  And so my proposal is in line four that begins, Anything the
22  lawyers said, and then I would add the following:  Or which
23  the defendant said when acting in his capacity as his
24  counsel, such as questions he asked of witnesses, any
25  responses he made to the Court, or in his opening and closing

1    statements, are not evidence in the case.

2              Any objection to that addition?

3              MS. CLARK PALMER:  No, Your Honor.

4              MR. McBURNEY:  No.

5              THE COURT:  In the line -- two lines down where it

6    says lawyers say, I would add after that so that that would

7    read beginning with the first sentence:  What the lawyers say

8    and what the defendant says acting as his own counsel is not

9    binding upon you.

10             Any objection to that addition?

11             MS. CLARK PALMER:  No, Your Honor.

12             MR. McBURNEY:  No, sir.

13             THE COURT:  All right.  Next is credibility of

14   witnesses.  I intend to give that instruction as it's

15   presented on page six and seven.

16             Any objection to it?

17             MR. McBURNEY:  No.

18             MS. CLARK PALMER:  No, Your Honor.

19             THE COURT:  Next is impeachment, inconsistent

20   statement, and felony conviction.  Any objection to that

21   instruction as it appears on page seven and eight?

22             MR. McBURNEY:  Assuming giving at least on our copy

23   the felony offense language is bracketed --

24             THE COURT:  Yes.

25             MR. McBURNEY:  -- that we did have a witness with a

1  felony offense.

2          THE COURT:  I understand.  I am going to give

3  that.  I'm actually going to move that to the end of

4  that.  Because looking at this again, I think it's a bit

5  misplaced, so I'm moving it to the end of that entire

6  instruction.  But that will be given.

7          MR. McBURNEY:  Okay.  Then no objection.

8          THE COURT:  Any objection?

9          MS. CLARK PALMER:  Are you going to take out on

10  page eight where it says defendant testifies --

11          THE COURT:  I'm not there yet.

12          MS. CLARK PALMER:  Oh, I'm sorry.  I apologize.

13          THE COURT:  Well, seven and eight, but only the

14  impeachment, inconsistent statement, and felony conviction

15  instruction?

16          MS. CLARK PALMER:  No objection.

17          MR. McBURNEY:  Judge, before we move to the next

18  charges on eight, we submitted a proposed charge about

19  accomplice immunity.

20          THE COURT:  I'm not there yet.

21          MR. McBURNEY:  Okay.  I wasn't sure if you were

22  putting it --

23          THE COURT:  I'm putting it in this area, but we are

24  not there yet.

25          I will not give the defendant testifies with no

felony conviction or the defendant testifies with felony

conviction, so those two on page eight are deleted.

I did intend -- you recall I gave a short

instruction on prior conviction of Mr. Ahmed.

MR. McBURNEY:  Yes.

THE COURT:  I was going to give that now.  I have

already dealt with the felony convictions, and I thought with

respect, since he is a co-defendant, I would give that

instruction next.

MR. McBURNEY:  That it has no bearing on this

case?

THE COURT:  Right.  I will just remind you all, I

will just read it to you again:  Mr. Ahmed's conviction

should not be used as evidence that the defendant is guilty

of the offenses with which he is charged.  You will be

required to consider only the evidence presented in this

trial to determine if the defendant is guilty or not guilty

of the offenses charged in this case.

And I think that logically follows where we have

talked about somebody testifying with a felony offense, that

we deal with him separately, because I think he is a special

witness in the case.

MR. McBURNEY:  No objection.

THE COURT:  Okay.  Then I intended to give the

accomplice immunity, plea agreement instruction, because

1  again that is a credibility-oriented instruction.  And

2  I intended to give it as Government's Request to Charge

3  No. 15 sets out.

4          Is there any objection to that instruction?

5          MS. CLARK PALMER:  No objection.

6          THE COURT:  All right.  The next is on page nine of

7  the standard instruction, impeachment, bad reputation or

8  opinion concerning truthfulness.

9          I don't think there was any evidence of that that

10  I remember?

11          MS. CLARK PALMER:  I can't think of any.

12          THE COURT:  All right.  Then I will not give that

13  instruction.

14          Then I will give the expert witness instruction as

15  it's set forth on page nine, but I probably will say there is

16  one expert that testified in this case, that was

17  Mr. Kohlmann, and then read the instruction after I --

18          MR. SAMUEL:  We had the computer guy.  The computer

19  guy was an expert.

20          THE COURT:  Did I qualify him as an expert?

21          MR. McBURNEY:  We didn't tender him as an

22  expert.  He can call him one, but we didn't proffer him that

23  way.

24          MR. SAMUEL:  Okay.

25          THE COURT:  So it will be identified only with

1    respect to Mr. Kohlmann.  Any objection to that?

2                MR. McBURNEY:  No.

3                MS. CLARK PALMER:  No objection.

4                THE COURT:  I will give the notetaking instruction

5    on page ten as it's written in the standard instruction.  Any

6    objection to that?

7                MS. CLARK PALMER:  No objection.

8                MR. McBURNEY:  No.

9                THE COURT:  A very controversial instruction.

10               Now we get to the instructions that are specific to

11   the case.  In the first introduction part, I will just note

12   it charges the defendant with four offenses, each of which is

13   called a count, and then I will say in order for you to find

14   the defendant guilty of any of the charges -- any of the

15   counts charged in the indictment, the government must prove

16   to you beyond a reasonable doubt that the defendant committed

17   each element of the offense.

18               And then now let's move to the counts.  As I told

19   you, in going through the suggestions by the parties,

20   I didn't like giving some instructions and having somebody

21   wait a long time, especially only the Count Three conspiracy,

22   and have to remember back what the specific instructions were

23   on conspiracy generally.

24               So as I said, while there is some redundancy here,

25   it has been my practice to fully instruct where there is more

1   than one conspiracy on conspiracy each time there is a

2   conspiracy charge.

3         So I have given to you my thoughts on Count One and

4   the charge that I would like to give, so let me -- and does

5   everybody have a copy of that?  It says at the top,

6   Count One, conspiracy to provide material support to

7   terrorists.

8         Unlike the government's, it's in a font large

9   enough for me to actually read it.  So I would encourage the

10   government to read the Court's local rules and enlarge their

11   font to 14 points for the benefit of us who do a lot of

12   reading.

13         Any comments on the charge as I have redrafted it?

14         MR. McBURNEY:  One from the government.

15         Do you want me to stay seated, go to the podium?

16         THE COURT:  No, that's fine.

17         MR. McBURNEY:  We have included in the previous

18   trial on the charge as well as the charge here reference to

19   the reasonable foreseeability.  It's in Government's Request

20   to Charge No. 2.

21         There is a paragraph -- the sixth paragraph, Under

22   the law, a conspiracy is a criminal partnership, et cetera,

23   and cites the case law that stands for the proposition that

24   all members of a conspiracy are responsible for the acts

25   committed by other members as long as they are reasonably

1    foreseeable and help advance the conspiracy, which was one of

2    the focuses of our trial brief in this case.

3         We submitted it as a separate charge in the

4    preceding trial, the bench trial, and the Court we were told

5    gave it to the fact-finder as one of the instructions.

6         We incorporated it here in Government's Exhibit 2

7    rather than have it be a stand-alone.  It didn't make it into

8    your description of conspiracy law that you don't need to

9    know every member of the conspiracy, et cetera.  We would ask

10   that that language be in there.

11   THE COURT:  Well, it was included in the first

12   trial because I understand the law of conspiracy, and

13   actually I thought it was redundant then.

14        If you go to the first -- but I'm willing to listen

15   to what you have to say, but I also don't want to confuse

16   people.

17        If we are giving them this charge on what a

18   conspiracy is, you will see on the first page of what

19   I provided to you, so it says, Under the law, conspiracy is a

20   kind of agreement or a kind of partnership -- your language

21   duplicates that -- in criminal purposes in which each member

22   becomes the agent or partner of every other member.

23        So when I began to look at yours as an additional

24   charge and began to collapse these, the logical place to put

25   that would be right after this.  And I said, well, I would be

1   saying a lot of the same things again.

2          And whenever I say something a second time, I'm

3   afraid the jurors will say, well, it must be something

4   different the second time he said it.

5          MR. McBURNEY:  The magic sentence for us is the

6   second sentence of our paragraph basically explaining what

7   you mean in yours where you say they serve as agents or

8   partners for every other member.

9          And our perspective is that the concept of agency

10  or partnership isn't necessarily clear to the jurors.  So the

11  sentence in the government's charge, page four of what we

12  submitted, the second full sentence of that final paragraph,

13  Thus all members of a conspiracy are responsible for the acts

14  committed by other members as long as they are committed to

15  help advance the conspiracy and are reasonably foreseeable

16  consequences of the conspiracy.

17         I believe that's the logical "so what" of you are

18  an agent or a partner.  What does that mean to me as a

19  juror?

20         THE COURT:  But this sounds a lot to me like overt

21  acts.  Because your position I think on this offense is that

22  there is no overt -- no actions required of anybody other

23  than an agreement.

24         MR. McBURNEY:  This is true, but any actions that

25  may have been taken in furtherance of the conspiracy, all

members of the conspiracy are responsible for them insofar as
they are reasonably foreseeable and in furtherance of the
conspiracy.

MR. SAMUEL:  That is like a *Pinkerton* instruction
which doesn't relate to the conspiracy.  It's what proves a
substantive offense.  It doesn't help you with a conspiracy
offense.

THE COURT:  Yes, a conspiracy is complete when the
agreement is reached.

MR. SAMUEL:  But the foreseeable acts is what
defines who is responsible for a substantive offense
committed by a co-conspirator.

THE COURT:  Where did you get this, and what's the
context -- well, do you have the case?  I didn't bring all
the cases in with me.

Is that in the context of a conspiracy where overt
acts are not required?

MR. McBURNEY:  No, I think this would be in the
context of the more -- the 371 type case.

I understand Mr. Samuel's point.  I think it is an
accurate statement of the law again insofar as the defense is
going to be, Look, there was just this conversation this one
time, and we point to concrete steps that were taken in
furtherance of the conspiracy.

They may not have been taken by the defendant

himself.  Mirsad Bektasevic collects all these armaments.

THE COURT:  What you are really saying is that you can look at the overt -- the actions of people as evidence of the underlying agreement, but the way that it's written, it's as if you are responsible for something that's not required under the offense elements.

MR. McBURNEY:  Okay.  In our trial brief, as we framed it, it was more in terms of relevance and admissibility here.

I hear where the Court is coming from.

THE COURT:  I mean, there is probably a further articulation of -- I mean, you could change this sentence I would think to say that any conduct of any member of a conspiracy, or the conducts of the -- the conducts of the people alleged to be part of the conspiracy can be used to determine if an agreement had been reached, which I think that is an accurate statement of the law.  But I think that this, this language is not consistent with what the elements are.

What's your thought on that, Mr. Samuel?

MR. SAMUEL:  I think when you start advising the jury this is the kind of evidence you can look at to help you find that someone is guilty of a certain element, you are going beyond what is necessary for a jury instruction.

Obviously there is a lot of argument --

1    THE COURT:  Make a note of that, Nick, that he just
2  said that something that's not required as a jury
3  instruction, because we will get to that later.
4    MR. SAMUEL:  Forget about what I said, then.
5    I mean, the point is that the government is
6  saying -- I assume their argument -- and it's not an
7  inappropriate argument -- is you could look at what Haris did
8  down the road to determine whether Haris and Sadequee agreed
9  to this earlier.
10    But it's not a legal issue.  That's just a factual
11  way in which people reason.
12    We could also say -- and I don't think we have
13  asked the Court to instruct the jury -- you could look at the
14  fact that Mr. Sadequee got married and did nothing else in
15  Bangladesh, and therefore you can find -- that you should
16  instruct the jury, therefore you should find that he was
17  never guilty of a conspiracy.
18    Those are all closing argument points, they are not
19  jury instruction points.  Jury instructions are simply here
20  are what the elements of the offense are, here is what the
21  crime is.
22    THE COURT:  I mean, I go back to say that it's
23  redundant, at least large portions of your addition are
24  redundant; and second, as you have stated it, I don't think
25  it is a correct statement of the law.

1    And that it becomes then an evidentiary issue, I

2 believe, which you can argue. And like I said before, every

3 time you say something -- there are two things. Every time

4 you want something more, then the defense wants something

5 more.

6    And then we get into this convoluted instruction

7 that people can't understand because everybody is trying to

8 get an instruction that addresses specific little things in

9 the case that they want to argue.

10    MR. McBURNEY: I understand, and I will withdraw

11 this concern. I think it is something that I can articulate

12 in the closing, look at the actions in support of the

13 agreement that was made.

14    THE COURT: Okay. So then is this instruction that

15 I have redrafted acceptable to everybody?

16    MS. CLARK PALMER: We have a couple of comments,

17 Your Honor.

18    How are you going to handle definitions, if you

19 were --

20    THE COURT: I'm not there yet. I'm going to get to

21 the definitions, because they apply to both the conspiracy

22 and the substantive offense.

23    MS. CLARK PALMER: Okay. And then in the last

24 sentence in the first paragraph on page one, you have knowing

25 or intending that the material support or resources --

1           THE COURT:  What page one are you talking about?

2           MS. CLARK PALMER:  Of the charge on Count One,

3    conspiracy to provide material support to terrorists.

4           THE COURT:  That page?

5           MS. CLARK PALMER:  Yeah.

6           THE COURT:  Okay, where are you?

7           MS. CLARK PALMER:  Well, I will just skip -- at the

8    very last line, acts of terrorism transcending national

9    boundaries.

10          THE COURT:  Yes?

11          MS. CLARK PALMER:  And we had talked in the

12   preliminary instructions and also in the instructions we

13   submitted, we called it something different.

14          THE COURT:  You know, I agreed with that at the

15   beginning of the case, but nobody has ever said violence in

16   this case.  I think that's the word that you chose before?

17          MS. CLARK PALMER:  In the preliminary instructions,

18   and then in our proposed jury instructions we called it to

19   kill, kidnap or maim people in the United States with conduct

20   transcending national boundaries.

21          THE COURT:  Well, that's the element.  This is a

22   general description.  So we will get to the elements in a

23   second where I do that and that's what they have to follow.

24          But this is to give them an introduction to what

25   the charge addresses.  And I will agree with you that

I changed -- agreed to change terrorism to violence, but I
have tried to listen carefully and make notes of how many
times people talked about violence, and I think there was one
person that said that.  Everybody else has referred to it as
terrorism, everybody, including the defendant.

So what they know they have to follow are the
elements of the offense.  This is just a way of getting the
introduction -- and it's almost as if we are taking a word
that has been replete throughout the testimony and nullifying
it.

And so the evidence just came in differently than I
expected, and everybody has referred to this as terrorism.

MS. CLARK PALMER:  Are you going to include a
definition of acts of terrorism transcending national
boundaries after we go through the instructions for --

THE COURT:  I'm trying to think, project ahead, but
if we get to a place where you think it needs more
definition, let's deal with it then.  But otherwise I think
this is a fair -- in the context of the evidence in this
case, is a fair preliminary description.

So -- maybe we ought to do this one page at a
time.

Any objection to page one of Count One?

MR. McBURNEY:  No, sir.

And I will add that it's in fact how it's

1    charged.  Your document says he's charged with X, and the

2    language in the indictment is exactly what you are tracking

3    here.  It's not the elements; it's a description of how the

4    defendant is charged.

5                THE COURT:  That's true too.

6                MR. McBURNEY:  The jurors will get the indictment,

7    and that's exactly what it says.

8                THE COURT:  That's true.  All this is is here is

9    what the government has said about him in the charging

10   instrument.

11               So I'm still on page one.  I have got a bid from

12   the government that they don't object.  I'm looking for the

13   defense's?

14               MS. CLARK PALMER:  We are okay with page one.

15               THE COURT:  Page two?

16               MR. McBURNEY:  No objection.

17               MS. CLARK PALMER:  No objection to page two.

18               THE COURT:  Page three?

19               MR. McBURNEY:  Still no objection.

20               MS. CLARK PALMER:  No objection, just to note again

21   it says acts of terrorism, but understanding that we are

22   going to hopefully define that at some point.

23               THE COURT:  All right.  Then the concluding lines

24   on page four, any objection?

25               MR. McBURNEY:  No.

1    MS. CLARK PALMER:  No objection.

2    THE COURT:  Just bear with me.  I want to keep

3    everything straight here.

4    All right.  Then we go to Count Two, and I worked

5    from the Government's Request to Charge No. 7 with a couple

6    of changes.  This is their page 13, I believe, at the last

7    line of Paragraph 1, that it says "and," but it seems to me

8    that "or" is more appropriate.

9    So I was proposing that we change it from "and" to

10   "or."  So any objection to that change?

11   MR. McBURNEY:  No.

12   MS. CLARK PALMER:  No objection.

13   THE COURT:  And the next paragraph, to me it was

14   clearer in the third line.  Rather than saying the

15   defendant -- well, Count Two charges the defendant with

16   actually doing so, which I didn't like, I thought it read

17   better to read that Count Two charges the defendant with

18   actually providing or attempting to provide material

19   support.

20   Admittedly that's wordsmithing, but I thought it

21   was clearer.

22   MR. McBURNEY:  It's good wordsmithing.  No

23   objection.

24   MS. CLARK PALMER:  No objection.

25   THE COURT:  All right.  Any objection then to the

1   second page of the elements that are set forth, reserving the

2   terrorism transcending national boundaries issue?

3           MS. CLARK PALMER:  No objection.

4           THE COURT:  All right.  Before we get to the

5   definitions, I thought we would address the Defendant's

6   Request to Charge 2-B, so the question I think is 2-B or not

7   2-B.

8           I think the fundamental question is this.

9   I understand why you requested it, and we have relied on the

10  assumption that you would provide us with legal support, so

11  we didn't do any independent research, although we are

12  prepared to do that.

13          That where the government does not charge a lesser

14  included offense, is there a requirement to charge in the

15  instructions on a lesser included offense?

16          Because I know that charging decisions often are

17  made with the view that the government takes the position

18  that that's the offense that they want to prove, that that's

19  what the government wants to put evidence up on, and if they

20  win on that, fine; if they lose on that, then the defendant

21  gets the benefit of not being convicted of the lesser

22  included offense.

23          But I might be wrong about that, now having read

24  this, which is -- has anybody done any research on this?

25          MR. NAHMIAS:  Not on that precise issue,

1    Your Honor.  But my understanding of the law is the

2    government can choose to charge it or not, and the defendant

3    if it's not charged can choose to go with only what the

4    government charged.

5             Or if there actually is a lesser included offense,

6    and we don't believe this is a proper lesser included

7    offense, the defendant can request the charge.

8             THE COURT:  In *Wright Miller's* discussion of this,

9    it says, On the charge on whether to instruct the jury, the

10   defendant is certainly entitled to charge about the lesser

11   included offense as a matter of right.

12            MR. SAMUEL:  That's correct.

13            MR. NAHMIAS:  I believe as a matter of right,

14   assuming it's a proper lesser included offense charge.

15            THE COURT:  Right.  Okay, so that's the first

16   issue.  So if they request it and it is indeed a lesser

17   included offense, he would be entitled to that.

18            So if it was a murder offense and if he had degrees

19   of murder, he would be entitled to an instruction on the

20   lesser included offense of a killing that has less than

21   malice aforethought.

22            So now I guess the question is is this a lesser

23   included offense, the threat of the providing of material

24   support charge.

25            And it seems to me two different kinds of conduct.

1   You know, one would be material support, and the other would

2   be making a threat.  So what is your authority for the fact

3   that this is a lesser included offense, Ms. Clark Palmer?

4         MS. CLARK PALMER:  Your Honor, the statute in

5   Counts One and Two is 18 U.S.C. 2339 (a).  In that statute,

6   the crime is -- if I can paraphrase -- providing material

7   support and conspiring to provide material support to be used

8   in preparation for or to carry out, and then it lists a whole

9   bunch of other crimes.  One of those other crimes is

10  18 U.S.C. 2332 (b).

11        The government didn't specify --

12        THE COURT:  Well, by that argument, the lesser

13  included offense is the provision of material support,

14  because it would be providing material support for the

15  purposes of making a threat of something.  Because I assume

16  what you are about to say is that the list includes this

17  threat under the list -- that list in 2332 (b) includes the

18  threatening offense?

19        MS. CLARK PALMER:  The government did not allege in

20  the indictment whether the material support was used in

21  preparation for or to carry out either 2332 (b) or the other

22  one which was alleged, which was 956.

23        And the test for whether another offense is a

24  lesser included offense is whether it has all the same

25  elements as the greater offense.  And in this case, one of

the ways that a person could violate the greater offense of

2339 (a) is if they violate 2332 (b), which could be a

threat, and then they provide material support to carry out

the threat.

So the additional element that distinguishes the

lesser included of 2332 (b) from 2339 (a) is the provision of

material support.

THE COURT:  Well, 2332 (b), which defines

prohibited acts in subsection (b) -- all right, here is where

I get hung up.  The charge in Count Two is to provide

material support including for acts of terrorism transcending

national boundaries.

2332 (b) simply defines what the prohibited acts

are; that is, the things for which you cannot provide

material support, which includes a threat.

MS. CLARK PALMER:  Uh-huh.

THE COURT:  So it seems backwards to me.  It's the

provision of material support to do a threat, as opposed to

saying, well, if you don't provide -- what you are really

saying if you don't provide material support, you could be

charged with a different offense; that is, the prohibited act

offense of threatening?

MS. CLARK PALMER:  Right, correct.

THE COURT:  But I don't see how how that's a lesser

included offense.

1        And where are the elements of the offense for this?

2   Is that in there?  The instruction I have doesn't have the

3   elements.

4        MS. CLARK PALMER:  Of 2332 (b)?

5        THE COURT:  Right.  Because 2332 (b) isn't an

6   offense.  It's a listing of prohibited acts; right?

7        MS. CLARK PALMER:  You can also be charged with the

8   offense of violating 2332 (b), which would be threatening.

9        THE COURT:  I guess that's right.  So what are the

10  elements of a 2332 (b) offense of threats?

11       MS. CLARK PALMER:  Threatening, conspiring or

12  attempting to kill, kidnap or maim -- kill, kidnap, maim,

13  commit an assault resulting in serious bodily injury, or

14  assaulting with a dangerous weapon any person from the U.S.

15  within the U.S., or creating a substantial risk of serious

16  bodily injury to any other person by destroying or damaging

17  any structure, conveyance or other real or personal property

18  within the United States or --

19       THE COURT:  That sounds like a whole different

20  offense.  One is to provide material support for an act of

21  terrorism, and the other is to threaten.

22       MS. CLARK PALMER:  But the material support as

23  alleged has been provided to either -- to be used either in

24  the preparation for or the carrying out of this offense,

25  2332 (b).

1    The government didn't specify if it was only to be

2  used for preparation, or if it was and/or to be used to carry

3  it out.  So it's possible that the jury could decide that the

4  material support was used to carry out or was intended to be

5  used to carry out a violation of 2332 (b).

6    So this says if you don't find that it was material

7  support that was provided, there is still the lesser included

8  of threatening to commit an act of terrorism transcending

9  national boundaries.

10    I guess if I could say it a different way, you can

11  violate 2332 (b) -- or 2339 (a) without violating 2332 (b),

12  but you can also violate it and also violate 2332 (b) at the

13  same time.

14    2339 (a), there is two different ways to violate

15  that statute.

16    THE COURT:  What does the government say about

17  that?

18    MR. NAHMIAS:  Well, to begin with, looking at

19  2339 (a) itself, that crime can be commited by providing

20  material support through any of the underlying types of

21  predicate 2332 (b) offenses.  And the penalty is fifteen

22  years regardless of the penalty in 2332 (b).

23    So it's not a lesser included offense.  It's

24  fifteen years no matter how the underlying predicate may be

25  committed.

But to be a lesser included offense to begin with, the elements of 2339 (a) have to overlap the underlying elements. And we can prove under the *Hassoun* case -- and I believe it's hopefully in your instruction as you gave in the prior trial -- you can prove the material support offense even if the underlying predicate is not a completed offense, because it can be in preparation for.

So the elements are not the same. The elements of 2339 (a) can include material support in preparation for an underlying crime that is not completed, whereas 2332 (b), the threat, would have to be a completed crime, a threat to commit one of those violent acts.

THE COURT: That's true.

MR. NAHMIAS: And then conversely, with regard to the threat, the elements required for most threats -- and we haven't done a lot of research on threat cases -- but threats have to be communicated. That's an element that would have to be proved in 2332 (b).

We can prove the 2339 (a) offense without any proof of any communicated threat. So there is an element of 2339 (a) -- 2339 (a) can be proved without an element of these supposed lesser included offenses. So they don't overlap in elements.

The description of 2332 (b) is not accurate just as a matter of kind of the way they propose the instruction. It

is not limited to killing, kidnapping and maiming in the
United States.  There is a longer list, which I think you
will describe probably in your instructions of how you
properly would even form a 2332 (b) offense.

And finally, you can only have an
affirmative offense -- a lesser included offense if the
defendant's theory of the defense is consistent with the
lesser included offense but not the major offense.

The best example is someone who is charged with
drug possession with intent to distribute wants a lesser
included offense for simple possession, and his defense is,
yeah, I have the hundred grams of marijuana for personal use,
not for use -- not for distribution.

I'm not aware of any defense that's been raised in
this case that would allow the idea that he is guilty of a
threat, but not guilty of material support for that threat.

THE COURT:  Right, because he denies entirely the
conduct.

MR. NAHMIAS:  He denies entirely the intent.

So for all of those reasons, I think it's an
improper instruction.

MS. CLARK PALMER:  I do agree that you can violate
2339 (a) without violating 2332 (b).  But in the indictment
it doesn't allege whether 2332 (b) -- it doesn't allege how
the material support was to be used.  Was it to be used in

1    preparation for or to carry out?

2         And since it doesn't specify which one, there is a

3    possibility that -- or one of the ways -- one of the ways the

4    government is alleging that 2339 (a) has been violated is

5    that the material support would be used to carry out

6    2332 (b).

7         And if it was going to be used to carry out

8    2332 (b), that means the jury would have to find that an act

9    of terrorism transcending national boundaries --

10        THE COURT:  But they haven't alleged any threat in

11   this, have they?

12        MS. CLARK PALMER:  Yeah, there has been a chat

13   I think where there was some discussion about how the video

14   clips were to be used.  And our argument is that the video

15   clips are not material support, and that's where we come in

16   with the lesser included.

17        Okay, if the video clips are not material support,

18   is there still the lesser included that it was a threat to

19   commit an offense, one of the prohibited acts under 2332

20   (b)?

21        THE COURT:  So what do you think is the evidence of

22   a threat to commit one of the 2332 (b) offenses?

23        MS. CLARK PALMER:  I think there was a chat where

24   Mr. Sadequee -- and I don't remember who the other

25   participants were, but they were talking about what to do

with the videos, and they were talking about, you know, maybe

using them in a movie and describing the movie and our --

THE COURT:  How is that a threat?  I thought the

testimony was that the movie was going to be used to rile up

the brothers and to excite the brothers, not to threaten

anybody.

MR. SAMUEL:  There was a reference in the chat in

either September 23rd or maybe even October 15th where Tsouli

and Mr. Sadequee and Bektasevic are talking about maybe using

the movie to scare people.  There is a few different

references in that chat.

THE COURT:  Scaring is different than threatening.

MR. SAMUEL:  Well, I don't think so.

THE COURT:  You don't?

MR. SAMUEL:  I mean, that's what they are talking

about.  It was to threaten them, it was to say, you know, the

Mujahideen are in Washington, that's why they are going to

splice it together.  They are going to splice the Bektasevic

tape to the Washington tape and threaten people without any

actual -- nothing to back it up, but it was just designed to

be a threat to the people of Washington.

Again, that's one view of how you can look at the

chat and what the people are talking about.

MR. NAHMIAS:  If I can make one other argument on

this point?  Because we are talking I believe about 2-B, and

2-A is a similar instruction with regard to Count One that the defense submitted. And it becomes clear there, because there they talk about the lesser included offense being a conspiracy to threaten under 2332 (b). That is not an offense.

2332 (b), if that's a lesser included offense, says you can either commit the act, attempt to commit the act, conspire to commit the act, or threaten to commit the act. It does not have a conspiracy to threaten.

And so the evidence --

THE COURT: First, I'm not -- I'm sorry, go ahead.

MR. NAHMIAS: The evidence would either have to support a threat, which requires a communication of that threat to a victim, or it would have to support -- for the conspiracy charge, it would have to support -- well, it would have to be a threat or an attempt or a conspiracy. There is not such a thing under 2332 (b) as a conspiracy to threaten or an attempt to threaten. That's just not an offense under 2332 (b).

They are trying to mix a conspiracy under 2339 (a) and the threat under 2332 (b), but you can't -- then it's not a lesser included offense. Then you are mixing two statutes together.

The lesser included offense has to stand or fall on its own. And if you look at 2332 (b), A is the substantive

offense, and B says whoever threatens to commit an offense or

attempts or conspires to do so.  It doesn't say whoever

attempts or conspires to threaten.  That's just not an

offense.

THE COURT:  I think that's probably true,

Mr. Samuel.  Would you agree with that on the 2-A offense?

MR. SAMUEL:  Oh, our instructions?

MS. CLARK PALMER:  Yes.

MR. SAMUEL:  Oh, I see.  Yeah, it's a firmer

argument clearly on 2-B.

THE COURT:  You mean 2-A?

MS. CLARK PALMER:  We have a better argument on 2-B

and not a very good argument on 2-A.

THE COURT:  I would agree with you on that.

MR. SAMUEL:  2-A is problematic.

THE COURT:  That's because it's wrong; right?

Wouldn't you agree that Mr. Nahmias is right on 2-A?

MR. SAMUEL:  It is more complicated on 2-A, because

the overlapping conspiracies plus --

THE COURT:  Well, let me just put it more plainly.

MR. SAMUEL:  I'm just not sure that ultimately we

wouldn't still be talking about a 2339 (a) offense.  We would

just be talking about a different predicate, which doesn't do

us any good.  We have got to get rid of the 2339 (a) to make

it a lesser included, which is what we can do in Count Two.

Otherwise fifteen years is fifteen years, we haven't achieved anything.

It's under Count Two where you can eliminate the material support element of the offense and just say instead of -- if you just think of it as concentric circles --

THE COURT: Well, let's stick with the conspiracy for a second.

Don't you concede that you can't charge this lesser included offense as you have tried to charge it in 2-A?

MR. SAMUEL: I think we can come to that realization.

THE COURT: The realization that you have to concede that?

MR. SAMUEL: Yes.

THE COURT: All right. So you conceded that 2-A is not a proper charge, so I will not give that.

Which brings us now back to Count Two and 2-B.

MR. NAHMIAS: And again, there, Your Honor, to be an offense, it has to be a threat, and a threat requires the communication of the threat to the victim. There is no attempt to threat charge, there is no conspiracy to threat charge, and I don't think there is any evidence in the record that a threat was communicated to the victim.

There may be in this one chat they are talking about a discussion of threatening people, but there is no

1   evidence that that threat was then communicated to the

2   victim.

3          THE COURT:  Where do you get this requirement that

4   the threat be communicated?  Where is that?

5          MR. NAHMIAS:  That's -- there isn't a lot of law on

6   this threat charge.  In almost all the threat instructions

7   and pattern instructions --

8          THE COURT:  But theoretically you can't have a

9   threat if somebody doesn't know they have been threatened.

10         MR. NAHMIAS:  Right, there is not a threat.

11         Now, some statutes allow for an attempted threat or

12  conspiracy to threat, and I suppose it could have been

13  charged under 371.

14         THE COURT:  Right.

15         MR. NAHMIAS:  But this statute standing alone is

16  not -- you have to have a threatening, and a threat if it's

17  just in the defendant's head doesn't threaten anyone.

18         THE COURT:  Does somebody have their electronic

19  device on?  And if so, could you turn it off?  I'm getting

20  some static in the speaker.

21         Somebody still has their Blackberry on.

22         MR. SAMUEL:  It was not mine.

23         THE COURT:  I'm not accusing anybody.

24         MR. SAMUEL:  Guilty conscience.

25         THE COURT:  It's just an observation.

                    Ms. Clark Palmer, do you have to have a

communication?  I mean, is there any evidence that there's

the communication of a threat?

                    MS. CLARK PALMER:  I think there was in the chat

that was talking about the videos.

                    THE COURT:  Well, first, do you have to have a

communication for there to be a threat?

                    MS. CLARK PALMER:  Quite frankly, I don't

know.  I didn't research that particular definition.

                    THE COURT:  Well, can you be charged with a crime

of having a threat in your head but never telling anybody

about it?

                    MS. CLARK PALMER:  Right, I don't think so.

                    THE COURT:  I don't think so either.

                    So what then, if any, evidence is there of an

actual communication of a threat to anybody?

                    MS. CLARK PALMER:  Well, the threat was

communicated to another --

                    THE COURT:  The person to whom it was communicated

wasn't threatened.  It was the concept of issuing a threat

that was communicated.  It wasn't the communication of the

threat itself to somebody else.

                    Because the discussion is, Hey, we have got these

videos, let's threaten people, let's communicate that, and as

you have said, that could constitute a threat.

1       MS. CLARK PALMER:  Uh-huh.

2       THE COURT:  But it wasn't, Let's communicate it

3   and, by the way, let's have a little radio show and tell them

4   that we are going to do this or put it on the internet.

5   Nobody ever knew about that plan.

6       MS. CLARK PALMER:  Nobody knew about it, but

7   I think there was a discussion about putting it up on the

8   internet.

9       THE COURT:  Right.  Well, let's assume that's

10  true.  But there has been no communication of it.

11      MS. CLARK PALMER:  Outside whichever people were

12  involved in that chat.

13      THE COURT:  Doesn't the threat have to be

14  communicated to somebody who is being threatened?

15      If that was the case, if I bought your argument,

16  you could never have co-conspirators talking about

17  threatening people.

18      MS. CLARK PALMER:  There was the discussion of the

19  movies and the video clips, and that chat was talking about

20  putting them up as part of the announcement.

21      THE COURT:  I agree with all that.  I agree that

22  that was the plan.

23      MS. CLARK PALMER:  Uh-huh.

24      MR. SAMUEL:  They actually did it.

25      MS. CLARK PALMER:  And they actually announced the

formation of Al-Qaeda in Northern Europe.  And though the

video itself wasn't put up at that time, they had discussed

putting up the video.

THE COURT:  Yes, but there was no -- the threat in

your view were the videos -- I think Mr. Samuel has already

said this, that the threat would have been to publish the

videos in some -- and piecing it together with Bektasevic's

stuff so that the people that saw that would be threatened,

that they would say, whoa, violence now associated with

people in Washington, D.C.  That was what the thought was

that they would do.

So the threat was never made.  The idea of

threatening was formulated, and there was some specific

discussion of how that would be done.

But we go back to our initial discussion, which is

can you have a threat if it's never been communicated?

MS. CLARK PALMER:  I will add to that, talking

about what the threat was, that they did announce the

formation of Al-Qaeda in Northern Europe, and that could be

viewed as a threat, taking the videos out of it.  In that

case --

THE COURT:  Threat to whom, to the world?

MR. NAHMIAS:  Your Honor, I believe that chat came

after that -- the written bayaan happened on September 11th,

2005, and the chat is the 21st of September.  It's dated

1    afterwards.

2            THE COURT:  So if that's true, that doesn't work

3    for you.

4            MS. CLARK PALMER:  Take the chat out of it.  What

5    about just the announcement of Al-Qaeda in Northern Europe,

6    and our theory would be in that case there was no material

7    support, so 2339 (a) wouldn't be violated; instead it would

8    be a threat under 2332 (b).

9            MR. NAHMIAS:  I believe the evidence was that he

10   had no knowledge of the written bayaan at the time it was put

11   out.

12           THE COURT:  I think that's true.

13           Is there any evidence that he knew of the bayaan?

14   In fact, I think he asked, he said, I didn't have anything to

15   do with drafting it.  In fact, he specifically said, Isn't it

16   true that you don't have any evidence that I had anything to

17   do with writing that bayaan?

18           So the evidence is that there was no evidence that

19   he had participated in the drafting of the bayaan.

20           MR. SAMUEL:  So they won't argue that that can be

21   used against him in any way then, that's not attributable to

22   him?  That what co-conspirators do -- it sounds like what we

23   were talking about ten minutes ago, that you are held

24   responsible for what co-conspirators do.

25           MR. McBURNEY:  Conspiracy is different from a

```
 1   threat.  We have already established you can't conspire to

 2   threaten.  The question is whether the threat was

 3   communicated.

 4           MR. SAMUEL:  That's exactly what *Pinkerton*

 5   achieves, which is if people are in a conspiracy, you are

 6   held responsible substantively for what your co-conspirators

 7   do.

 8           MR. NAHMIAS:  Again, the problem is the lesser

 9   included offense is just 2332 (b), subsection (b).  There is

10   no conspiracy to threaten.  It has to be freestanding a

11   threat if that's going to be a lesser included offense.

12           If you want to tie it in with 2339 (a) and we can

13   have conspiracies to prepare for a threat, we would argue

14   this chat is a conspiracy -- is material support and

15   conspiracy to provide material support in preparation for a

16   threat.  We could argue that.

17           But that's a 2339 (a) offense, not a lesser

18   included offense.

19           MR. SAMUEL:  We are talking about Count Two.  We

20   are not talking about conspiracy anymore.

21           *Pinkerton* is that --

22           THE COURT:  Here is what we are going to do.  I am

23   operating in a vacuum.  Nobody has given me any cases.

24           You will file memorandums on this position

25   simultaneously no later than 7:00 in the morning.  I need
```

1    something in writing.  I need to read the cases.

2              Now, this is a pretty late request for an

3    instruction, but I need more help than this discussion,

4    because I have got to go back and read some things.  I cannot

5    rule on this today.

6              So, Mr. Bly, you might want to start working on

7    that.

8              I have tried to -- I have tried to save people from

9    having to do that, but it's clear that it's more complicated

10   than I thought.  So we will do that tomorrow.

11             All right.  The next then is the Government's

12   Request to Charge No. 8, which is the definition of terms.  I

13   had just a couple of changes to that.

14             One is in the first line, I would add the word

15   after to furnish.

16             And then in the second line, to make readily

17   available, which comes from the language of the statute -- or

18   it comes actually from the *Sattar* case which I think comes in

19   turn from the statute.

20             Are there any objections to those changes?

21             MR. McBURNEY:  No.

22             MS. CLARK PALMER:  No objection.

23             THE COURT:  Any objection to the other

24   definitions?

25             MR. McBURNEY:  No.

        1          MS. CLARK PALMER:  I did -- if we could start with

        2    personnel, in our instruction that we submitted in

        3    Jury Instruction No. 1 on page three, our definition goes

        4    into a little more detail about what personnel does mean, but

        5    more importantly what it does not mean.

        6          And there are several cites in there where that

        7    language is very close to what's actually in the cases that

        8    I cited.

        9          THE COURT:  This is your Proposed Instruction

       10    No. 2?

       11          MS. CLARK PALMER:  No. 1, and then it's page three

       12    of the whole document.  The page number is three.

       13          THE COURT:  Okay.

       14          MS. CLARK PALMER:  It's the last paragraph on that

       15    page and it continues on to page four.

       16          THE COURT:  Well, I generally don't instruct people

       17    on what things are not.  I deal with -- this is all that

       18    First Amendment theme that is throughout your instructions.

       19    I deal with that in a single, you know, a single global

       20    instruction on this.

       21          I mean, if personnel means that the defendant

       22    knowingly provided one or more individuals to work under the

       23    direct supervision of other conspirators -- well, their

       24    definition is the term personnel refers to one or more

       25    individuals and may include the defendant himself.

1    Now, it has to be read in the context of the

2  elements of the offense.  If I were to adopt yours, there are

3  a lot of different things that you could say it does not

4  mean.  The purpose of an instruction is to say here is what

5  you have to find, but consistent with Mr. Samuel's admonition

6  is that the more you add, the more complicated it gets.

7    And if that's the case, then shouldn't there be

8  other things that it also doesn't mean, or other things that

9  it does mean?

10    Do you know of any court that's given an

11  instruction where they say and here is what personnel means,

12  but let us tell you what it does not mean?

13    MS. CLARK PALMER:  I don't.

14    The one sentence that I would particularly

15  highlight is where it says it does not mean provide persons

16  who would speak on behalf of terrorists or terrorist

17  organizations or provide moral support or simply receive

18  training, but to provide personnel who, after receiving

19  training, would serve as soldiers, recruiters and procurers

20  of supplies for the conspiracy.

21    And I believe that sentence is almost verbatim from

22  the case I cited, which is *United States v. Khan.*

23    THE COURT:  But that's not a jury instruction.

24    MS. CLARK PALMER:  It's not a jury instruction.

25    THE COURT:  That's a general discussion of law.

1    MS. CLARK PALMER:  That's correct.

2    THE COURT:  What was the jury instruction in that

3    case?

4    MS. CLARK PALMER:  I don't think I have that.

5    MR. McBURNEY:  We are aware of no material support

6    case where personnel has been defined in this way, in

7    particular excluding certain categories.

8    I think if the Court were to read the *Khan* opinion,

9    this is being taken a little bit out of context, this claim

10   that simply going to receive training would not consist of

11   personnel.  The case goes on to explicitly say that

12   conspiring to get training is in fact provision of

13   personnel.

14   Now, there is language that fits what is being

15   said, but it's taken out of context, and it's another danger

16   of you could find in number of cases where at some point in

17   an opinion, not in a jury instruction, but in an opinion the

18   court might have said "not" and then described something.

19   But we are aware of no instruction that has so

20   limited it.  And *Khan* later on in the opinion goes on to say

21   providing one's self for the purposes of receiving training

22   is in fact a form of personnel and thus material support.

23   THE COURT:  All right.  *Khan* does say that.

24   MS. CLARK PALMER:  But the government's definition

25   doesn't even refer to training.  And there has been a lot of

1   evidence in this case about going to Pakistan to get

2   training, and there was a lot of discussion about training,

3   which is why I pointed out that particular section in our

4   jury instructions.

5           THE COURT:  So are you proposing a change to the

6   government's definition of personnel?

7           MS. CLARK PALMER:  In addition.  The term personnel

8   refers to one or more individuals and may include the

9   defendant himself, but it does not mean to simply receive

10  training, and then but to provide personnel who, after

11  receiving training, would serve as soldiers, recruiters, and

12  procurers of supplies for the conspiracy.

13          THE COURT:  So your argument is that providing

14  yourself for training is not attempting to provide material

15  support?  And if so, what's your authority for that since the

16  charge includes an attempt to provide material support?

17          MS. CLARK PALMER:  Just citing directly from the

18  *Khan* case which says at page 822 --

19          THE COURT:  Can you give me a copy of *Khan?*

20          All right.  Go ahead and read it.

21          MS. CLARK PALMER:  The conspiracy alleged in

22  Count Five is not to provide personnel who would speak on

23  behalf of LeT or provide moral support or simply receive

24  training, but to provide personnel who, after receiving

25  training, would serve that organization as soldiers,

1    recruiters and procurers of supplies.

2         THE COURT:  So you think by implication that

3    says -- I mean, clearly the court there did not say, And by

4    the way, if you were to go to training, that that's not

5    enough.  It's just saying in that case, they were alleging

6    more than that.

7         MS. CLARK PALMER:  Well, I think that's important,

8    because that's how -- that's how we know that the statute is

9    not infringing on any First Amendment concerns, is that --

10        THE COURT:  Well, going -- so you think that going

11   to training would be a First Amendment association right?

12        MS. CLARK PALMER:  Yeah.  I think there is also

13   some other -- there is some other cases, and I think I have

14   cited to them later on in our -- later on in our

15   instructions.

16        Like, for example, educating others about advocacy

17   for a certain organization.

18        THE COURT:  That's different than saying you are

19   going to go to a place to learn to be a terrorist.

20        MS. CLARK PALMER:  But the sentence right before

21   the one I just read says because criminal statutes -- let me

22   go back and read this sentence.

23        Although defendants have repeatedly argued that

24   attending an LeT training camp does not -- I'm sorry.

25        Because we read criminal statutes narrowly to avoid

constitutional infirmities, we find that the statute as

applied to this case does not implicate First Amendment

concerns, and then they --

       MR. SAMUEL:  Because they did more than --

       MS. CLARK PALMER:  Because they did more than just

speak on behalf of the organization or provide moral support

or to simply receive training.  And because they did more

than simply receive training, there was no concern about

infringing on First Amendment rights.

       And I believe the evidence presented here is

similar.  There has been a lot of evidence about receiving

training by LeT, and this instruction is necessary to

delineate between what's protected by the First Amendment and

what is not in providing personnel.

       THE COURT:  Well, is seeking to attend a terrorist

training camp providing personnel so as to constitute

material support?

       MR. McBURNEY:  For 2339 (a), yes.

       One problem we have with the definition of

personnel proposed by the defense here is that it pulls in an

important element from 2339 (b) being under the direction or

control.  That is what Congress added to 2339 (b) to protect

it from First Amendment attacks.

       But for 2339 (a), as *Khan* says, the sentence that

Ms. Clark Palmer started with --

1    THE COURT:  What page is this quote from?

2    MS. CLARK PALMER:  822.

3    MR. McBURNEY:  822.  It's the paragraph that starts

4    "moreover."

5    THE COURT:  One second.

6    MR. McBURNEY:  Sure.

7    THE COURT:  All right.

8    MR. McBURNEY:  It's the paragraph that starts with

9    "moreover."

10   THE COURT:  Well, *Khan* says:

11           Moreover, as discussed in findings of fact

12           above, Khan and Chapman conspired to provide and

13           actually provided model airplane video and

14           navigation equipment to LeT through Sing.  Such

15           equipment fits the definition of material support

16           cited above as both communications equipment and

17           physical assets.

18           The evidence also shows that the paintball

19           leaders, including Chapman and Abdur-Raheem,

20           conspired to provide material support to LeT in the

21           form of personnel.  Although defendants have

22           repeatedly argued that attending an LeT training

23           camp does not constitute providing personnel to

24           that organization under 2339 (a) and 2339 (b), we

25           do not find that argument applicable given the

1    facts of this case.

2    So the issue of providing material support in the

3    form of personnel to attend training was not addressed in

4    this case; correct?

5    MS. CLARK PALMER:  Providing personnel to attend

6    training, is that what you are --

7    THE COURT:  Right.  The evidence also shows, as

8    defendants have repeatedly argued, that attending an LeT

9    training camp does not constitute providing personnel to that

10   organization.  That's what the defendants were arguing.  The

11   court said, We don't find that that argument applies here.

12   So the court is saying that to the extent that the

13   defendants were arguing that you can't provide material

14   support in the form of training camps, we don't address that,

15   would you agree with that, because they said it's not

16   applicable?  That's not what happened in the case, and that's

17   not what the court's finding was.

18   MS. CLARK PALMER:  Correct.

19   THE COURT:  So you then, after that finding by the

20   court, you rely on some other language.  Where is that?

21   MS. CLARK PALMER:  A few more sentences down, just

22   a couple, then because we read criminal statutes narrowly to

23   avoid constitutional infirmities, we find that the statute as

24   applied to this case does not implicate First Amendment

25   concerns at all.

And the reason the First Amendment concerns aren't implicated is because personnel does not mean simply receiving training --

THE COURT:  Now, that's not what this case says.  This case says -- this is an "as applied" constitutional argument, and this court is saying that as applied in this case, the training camps is not an issue because we found that as applied here, that the evidence was there was material support to LeT in the form of personnel and they say why.

But -- so now you are going down to a more general argument.  You are actually relying upon the Ninth Circuit decision in *Humanitarian Law Project,* 352 F 3d 382.

Sarah, did you bring all of those cases in?

THE CLERK:  Not yet.

MR. McBURNEY:  Judge, while she's getting those cases for you --

THE COURT:  Well, let me finish reading this.

MR. McBURNEY:  I'm sorry.

THE COURT:  I just don't think this case addresses that issue.

I admit that the court in making this as applied argument and looking at the language of 2339 (a) and the claim that it was unconstitutionally vague went through this history about the charging decisions as set forth in the

United States Attorney's manual, but then they say because we
read criminal statutes narrowly to avoid constitutional
infirmities, we find that the statute as applied in this case
does not implicate First Amendment concerns at all.

So they are saying in this case there are no
First Amendment concerns, and then they go on to stay the
conspiracy alleged in Count Five was not to provide personnel
who would speak on behalf of LeT or provide moral support or
simply receive training, but to provide personnel who, after
receiving training, would serve that organization as
soldiers, recruiters and procurers of supplies.

I don't think it's a fair reading of the case to
say the court was saying, By the way, if you just received
training, we, the court in this case, find that that would
make the statute unconstitutional. I think it was an
observation that they were making, saying that I don't really
even have to go that far because that's not what was alleged
in this case.

MS. CLARK PALMER: Well, our concern was the
definition of personnel is just that there is not much
there. It's because it's not in the statute, so we looked at
some other case law to help provide a context for what
personnel means.

Because there are -- there are some aspects of
personnel that are protected by the First Amendment, and

1    I think you did address some of those in your First Amendment

2    instruction.

3            But I don't think your First Amendment instruction

4    gets as specific as what we have here going on.

5            THE COURT:  Well, I know that, because there are a

6    million different ways that you can exercise the First

7    Amendment.

8            MS. CLARK PALMER:  Uh-huh.  But, for example, one

9    of the other lines I included is that entirely independent

10   action is not sufficient to qualify as being as active in an

11   organization as required by the definition of personnel, and

12   the reason --

13           THE COURT:  I don't even know what that means.  If

14   I was a juror, I couldn't understand that.  What does that

15   mean?

16           MS. CLARK PALMER:  Well, there has to be some

17   coordination with the group that is supposedly going to be

18   preparing for or carrying out these attacks in 957 or

19   2332 (b).  There has to be some coordination with those

20   people in order to be providing personnel to

21   them.  Therefore, entirely independent action does not

22   qualify as providing personnel.

23           And that has been one point that has been --

24           THE COURT:  What authority do you have that there

25   has to be coordination, and how do you define coordination?

1       MS. CLARK PALMER:  I -- now I'm on the

2  *United States v. Abu-Jihaad* case that was in Footnote 3.

3       THE COURT:  This is the District of Connecticut

4  case?

5       MS. CLARK PALMER:  Uh-huh.

6       THE COURT:  What page are you on?

7       MS. CLARK PALMER:  They start talking about the

8  term personnel on page 396.

9       There is a couple different portions in here that

10  specifically relate to our definition.  And at page 400 they

11  start specifically talking about the statute 2339 (a), and if

12  you --

13       THE COURT:  Hold on for one second.

14       MS. CLARK PALMER:  Okay.

15       THE COURT:  I'm going to call the jurors and delay

16  them until 11:00.

17       Why don't we just charge the language in the

18  statute?

19       MR. McBURNEY:  That's exactly what we have

20  proposed.

21       THE COURT:  Not on this, did you?

22       MR. McBURNEY:  Huh?

23       THE COURT:  Not in this definition of personnel.

24  Why don't we just read the definition of personnel from the

25  statute?

1    MR. McBURNEY:  For 2339 (a) or (b)?  I do want to
2  make sure we are not conflating the two.

3    The charge proposed by the defense pulls in
4  elements of 2339 (b).  Any reference to *Humanitarian Law*
5  *Project* is necessarily dealing only with 2339 (b).

6    There was a constitutional infirmity with 2339 (b)
7  at one point, and it was corrected by changing the definition
8  of personnel for that statute where they have to be under the
9  direction and control of the designated terrorist
10  organization.

11    That's not part of 2339 (a) which alleges that they
12  are support to a criminal conspiracy, and there is no
13  First Amendment protection to any actions made in furtherance
14  of a criminal conspiracy.

15    The definition of personnel in 2339 (a) is as
16  presented in the government's definition:  One or more
17  persons including the individual charged.

18    THE COURT:  Sarah, do you have a copy -- can you
19  get the statute that's in the book, the red book?

20    All of your argument on personnel definition,
21  including your cites to this case, refers to the definition
22  of personnel in 2339 (b).

23    MS. CLARK PALMER:  In the *Abu-Jihaad* case, at page
24  400, about halfway between 400 and 401, there is discussion
25  of the term personnel as used in context of 2339 (a), and it

says:

> In the context of that statute, it seems
> apparent that the term refers to those individuals
> who are provided or made available to prepare for
> or carry out the crimes prohibited by that
> statute.
>
> The individual need not be an employee or
> quasi-employee, but there must be some form of
> coordination, joint action, or understanding.
> Entirely independent action is not sufficient to
> qualify as being at least active in an organization
> as required by the definition of personnel.

THE COURT:  So that's one district court's view of that that has not been decided on appeal, I assume?

MS. CLARK PALMER:  I don't believe so, Your Honor. This is --

MR. McBURNEY:  That's very factually intensive.  Ms. Collins actually prosecuted that case and can explain, if the Court wants, the rather unique facts of *Abu-Jihaad* that are contained in this opinion.  I'm sure she will distill that.

MS. COLLINS:  Yes, Your Honor.

In this case, the judge was dealing with how to apply the definition of personnel in a case where the person provided information under the old form of the statute where

it really delineated very specifically certain forms of items
that would be material support. And information was not one
of those.

And the issue was: Is providing information
providing personnel? And that's the issue the court was
wrestling with, which is very different from the facts of
this case.

THE COURT: So then this discussion goes back to
don't you need people?

MR. NAHMIAS: I mean, having lived through the
evolution of this statute at the department, there is this
big distinction between (a) and (b).

Personnel in (a), because you are providing
material support including personnel to some other crime,
eliminates most of the First Amendment issues, because you
are not just kind of joining a group. You are actually
providing support with the intent or the knowledge that you
are promoting some other crime.

(b) is more difficult under the First Amendment
because it's material support to a group, and there are
associational rights and First -- and speech rights. And
there were a lot of concerns, especially the *Humanitarian Law
Project* line of cases, of which there are about six or seven,
with the old definition of 2339 (b) which just said
personnel, that's it.

1       THE COURT:  Right.

2       MR. NAHMIAS:  And after the first case --

3       THE COURT:  That's why they amended it to include

4  the First Amendment language.

5       MR. NAHMIAS:  And that's how it was -- and with the

6  direction and control amendment, because there was concern if

7  you just go to a training camp but all you did is go there,

8  that you might not be providing support unless you were

9  acting under the direction and control of the group.

10      I should say that there were convictions in cases

11  like the *Lackawana* case and others because the evidence --

12  and I think there was evidence in this case -- is that while

13  you are at the training camp, you are at the direction and

14  control of the group and doing what they say.

15      But in any event, that specific language was added

16  in (b), and it should apply to Counts Three and Four of this

17  indictment, just not Counts One and Two.

18      THE COURT:  I think that's true, I think that that

19  is the distinction between the two sections of the statute.

20      MS. CLARK PALMER:  What about the part that there

21  has to be some sort of coordination and that an entirely

22  independent action does not count as being active in an

23  organization?

24      I think there is still under 2339 (a), there has to

25  be coordination, joint action or understanding between

1  Mr. Sadequee and whoever is preparing for or going to carry

2  out either a violation of 956 or 2332 (b).

3       THE COURT:  What's the government's response to

4  that?

5       MR. McBURNEY:  Several things.

6       Again, that language comes from *Abu-Jihaad,* which

7  had this unique scenario.

8       THE COURT:  I understand that.

9       MR. McBURNEY:  But second, the *Hassoun* case, which

10  I think we will get to in later proposed charges from the

11  defense, deals with the issue of how well formed and how well

12  known the ultimate criminal conspiracy needs to be for the

13  person providing the material support.

14       And under *Hassoun,* it's not the case that there has

15  to be active links to this organization or ultimate

16  conspiracy.  The defendant needs to have the specific intent

17  that his material support is going to that end.  But the

18  government need not show to that end:  On this date, and this

19  is where the bomb will go off, with this organization.  It

20  need not be that well formed.

21       So this claim that there has to be an active link

22  between the two I don't think is supported by case

23  law.  *Hassoun* is in this circuit.  It is not from the

24  District of Connecticut.

25       THE COURT:  Right.  I'm going to give the -- define

1   personnel according to what's proposed by the

2   government.  Your objection to that is overruled.

3            Any other objections to the definitions that are

4   set forth in Government's Request to Charge No. 8?

5            But I will give you credit for putting up the good

6   fight.

7            While you are considering that, let's make sure the

8   record is clear as to what you believe the term personnel,

9   how the term personnel should be defined, so that the circuit

10  can look at that.

11           MS. CLARK PALMER:  I have it defined as --

12           THE COURT:  You want it defined as you set forth in

13  the -- on page three and page four of Defendant's Proposed

14  Jury Charge No. 1?

15           MS. CLARK PALMER:  Right.

16           THE COURT:  All right.  Thank you.

17           Any other objections to the definitions in

18  Government's Request to Charge No. 8?

19           MS. CLARK PALMER:  We are just looking at one

20  thing.

21           THE COURT:  Yes.  Anything else?

22           MS. CLARK PALMER:  Your Honor, the government has

23  also included the definition of a conspiracy to murder or

24  kidnap persons outside the United States, which refers to

25  18 U.S.C. 956.

1    And I would just note that in our jury

2  instructions, we obviously have a much more detailed

3  definition of what that statute says, 956.

4    THE COURT:  You have almost an independent jury

5  instruction as if this was -- the same sort of instruction

6  you would give if this was a charge under that statute.

7    MS. CLARK PALMER:  Well, the 2339 (a) does

8  reference these other statutes, as we said before, which is

9  why we went on to define the other statute.  Because --

10    THE COURT:  Well, I know.  But here is what it

11  would be.  That's a fundamental objection I have to your

12  approach.  I think you are intentionally trying to make it

13  more complicated.

14    That by giving it in the format that you have

15  requested, it is as if the jury has to make multiple findings

16  of proof beyond a reasonable doubt of all the elements that

17  you have set forth in this very long, complicated charge.

18    The question is what is wrong with the definition

19  of murder as set forth in Defendant's Request to Charge

20  No. 8?  What's missing about defining murder that you believe

21  is required by the law?

22    MS. CLARK PALMER:  No, I agree murder is fine.

23    I'm just going back the page before when they

24  define the phrase a conspiracy to murder or kidnap persons

25  outside the United States, that whole phrase, which is

1    18 U.S.C. 956.

2           And I would just say that, number one, 2339 (a) is

3    a complicated statute and it references other statutes.  And

4    then also the jury has to or should find, in order to find

5    somebody guilty of 2339 (a), you have to find, well, was

6    material support going to be used in preparation for or to

7    carry out, and then which scheme, either the 956 or the

8    2332 (b), was it going to be used for.

9           THE COURT:  Right.

10          MS. CLARK PALMER:  I think that finding has to be

11   made.

12          And for that reason we went on to define, okay,

13   well, what is a violation of 956?  Because the jury is going

14   to have to decide was the material support to the way we

15   paraphrased it is kill, kidnap or maim people within the

16   United States, or kill, kidnap or maim people outside of the

17   United States?

18          THE COURT:  Yeah, but what you propose, you tell

19   them you have to find the government proves the following

20   essential elements.  They don't have to do that, do they?

21          You are basically saying you have got to prove that

22   a 956 offense was committed.

23          MS. CLARK PALMER:  Well, they have to -- no, the

24   government has to prove at least one of the unlawful objects,

25   meaning, you know, kill, kidnap or maim as set forth in 956.

1       THE COURT:  They don't have to prove that there was

2  a killing, a kidnapping or a maiming, do they?

3       MS. CLARK PALMER:  They have to prove that the

4  material support and resources were to be used in preparation

5  for or carrying out one of those.

6       THE COURT:  But they do have to prove that there

7  was an offense if in fact it even was carried out; right?

8  You can provide material support without it being

9  successfully committed; right?

10       MS. CLARK PALMER:  Agreed.  But I still think that

11  the statute 956 ought to be defined beyond just saying this

12  short sentence.

13       THE COURT:  How would you define it, short of me

14  instructing them to go through a separate deliberation on a

15  separate crime, which I think even you agree is not

16  required?

17       You know, the government can jump in and help move

18  this along.

19       MR. NAHMIAS:  Sorry.

20       MR. McBURNEY:  I didn't want to -- Footnote 31,

21  which is on page 16 of our proposed charges, deals with this

22  issue.

23       THE COURT:  I know.

24       MR. McBURNEY:  And we cite the Court to three

25  different sets -- well, two sets of jury instructions, and

1   then more importantly the *Hassoun* case that makes it clear

2   that because, as is the situation in this case, the material

3   support is criminalized, can be given in preparation for this

4   ultimate object, the predicate offense need not have been

5   completed let alone proven as elements.

6          And then we provide two jury instructions,

7   *Abu-Jihaad* and *Hayat,* where the court simply summarized the

8   conduct for them, which is what we are proposing here.

9          We share the Court's concern.  If you list all

10  those elements, then you are going to need to say, but the --

11         THE COURT:  Yeah, I'm not doing that.  And I think

12  the defense has conceded that that would be -- at least

13  I understood that they would agree that is too much.

14         Ms. Clark Palmer, would you agree that that's too

15  much?

16         MS. CLARK PALMER:  That they would have to prove

17  all the elements of 956?

18         THE COURT:  Well, that I should not instruct on all

19  the elements of a separate offense as if they have to prove a

20  separate offense?

21         MS. CLARK PALMER:  Maybe not all the elements, but

22  I think some elaboration has to be given.

23         THE COURT:  Like what?

24         MS. CLARK PALMER:  Well, I was reading through our

25  instructions.

1    Well, even just reading that part of the statute

2    that I have set out on our page six.

3    MR. McBURNEY:  To follow the Court's direction in

4    terms of jumping in, another problem we flagged with that is

5    that it lists, in part, segments of 956 that the government

6    didn't even charge.  We list 956 (a), and this statutory

7    excerpt extends beyond that.

8    We weren't trying to shortcut the description of a

9    conspiracy to murder or kidnap persons outside the

10   United States.  We are trying to succinctly describe

11   it.  That's what we set forth based on 956 (a) (1) in the

12   jury charge.

13   THE COURT:  So, Ms. Clark Palmer, you want me to

14   instruct on all that single-spaced language on page six?

15   MS. CLARK PALMER:  Yes, Your Honor.

16   MR. NAHMIAS:  Your Honor, that just cites the

17   statutory language.

18   THE COURT:  That's not even a reasonable resolution

19   to the problem.

20   The purpose of an instruction is to help the

21   jury.  If instructions were simply me -- I mean, what you

22   want me to do is I will take out the statute and just read

23   them the statute and say, By the way, you are on your own.

24   Is that what you want?

25   MS. CLARK PALMER:  No.  And then I will skip to the

1  page 13.

2  THE COURT:  Well, let's go to the Government's

3  Request to Charge No. 8, the phrase a conspiracy to murder or

4  kidnap persons outside the United States means an agreement

5  or mutual understanding between two or more people to commit

6  outside the United States. . .

7  Any problem with that language so far?

8  MS. CLARK PALMER:  No.

9  THE COURT:  Okay.  So then we pick up . . . an act

10  that would constitute . . .

11  Any problem with that language?

12  MS. CLARK PALMER:  I'm sorry, on page 16?

13  THE COURT:  Right.

14  MS. CLARK PALMER:  No.

15  THE COURT:  Then we get . . . murder or kidnapping.

16  So what's your problem with murder or kidnapping,

17  considering that we define murder in two terms down?

18  MS. CLARK PALMER:  Right.  I think the point of our

19  instruction is that the jury has to find -- the jury has to

20  find which statute, 2332 (b) or 956, the defendant was

21  knowing or intending the material support would be used for.

22  THE COURT:  Why?  If they are instructed it has to

23  be one or the other, why do they have to find one or the

24  other?

25  MS. CLARK PALMER:  To --

1          THE COURT:  Do you want them to be told that they

2     have to agree upon whether or not it's murder or kidnapping?

3          MS. CLARK PALMER:  That's what we have in our

4     instruction.  I think we said that all twelve of them have to

5     agree that -- which object of the conspiracy it was.

6          MR. NAHMIAS:  Your Honor, that's proposed

7     Government's Exhibit --

8          THE COURT:  Yeah, you have a whole instruction on

9     that.

10          MR. NAHMIAS:  Yes.

11          THE COURT:  What's wrong with their instruction on

12     that?  In fact, it's separated out where they have to make a

13     separate finding.  I think that is --

14          MS. CLARK PALMER:  I see it.

15          THE COURT:  Multiple objects, Request to Charge

16     10.

17          MS. CLARK PALMER:  That's okay.

18          THE COURT:  So do you have any objection to the

19     definition of conspiracy to murder or kidnap persons outside

20     of the United States?

21          MS. CLARK PALMER:  No.

22          THE COURT:  Any objection to any of the other

23     definitions?

24          MS. CLARK PALMER:  Let me just check quickly.

25          No.

1    THE COURT:  Then the next is Government's Request

2  to Charge No. 10, multiple objects.  I have a couple of

3  suggestions.

4    In the first paragraph, I would have it read that

5  Count One and Two charge that the defendant conspired to

6  provide or conceal, attempt to provide or conceal, or

7  actually provide or conceal material support or resources

8  with respect to two crimes or offenses,

9  period.  Specifically, a conspiracy to commit or kidnap

10  persons outside of the United States and acts of terrorism

11  transcending national boundaries.

12    That's essentially wordsmithing, but it seems to

13  read better to me.

14    MR. McBURNEY:  No objection.

15    MS. CLARK PALMER:  No objection.

16    THE COURT:  And then just for clarification, in the

17  begining of the next paragraph, taking out the word "such," I

18  would say:  In a case like this where two offenses or objects

19  are involved, it is not necessary for the government to

20  prove.

21    So I would add that to remind them we are dealing

22  with two offenses.  I just thought that was clarifying.

23    Any objection?

24    MS. CLARK PALMER:  No objection.

25    MR. McBURNEY:  No, sir.

1       MR. SAMUEL:  Your Honor, excuse me, the defendant

2  has asked if he could be excused.  I think he's found his

3  limit.

4       THE COURT:  Well, I found my limit too.  Could

5  I excuse myself?

6       MR. SAMUEL:  He just mentioned the Eighth Amendment

7  to me.

8       THE COURT:  Where are the marshals?

9       Would you like to take him back then?

10      Let me make it clear, Mr. Sadequee, we are in the

11  middle of the charge conference that you had asked to

12  attend.  My understanding is that you would now like to be

13  excused from the remainder of the conference.  Is that

14  correct?

15      MR. SADEQUEE:  Yes.

16      THE COURT:  Then we will have the marshals take you

17  back.

18      (Whereupon, the defendant leaves the courtroom.)

19      THE COURT:  All right.  Then with that second

20  change, any objection to this instruction?

21      MR. McBURNEY:  No, sir.

22      MS. CLARK PALMER:  No objection.

23      THE COURT:  Then the next is Government's Request

24  to Charge No. 9, material support for resources.  Any

25  objection to that request to charge?

         MS. CLARK PALMER:  No objection.

         THE COURT:  Now we are to Count Three, which is the

second conspiracy count.  Is there any objection to my

redrafting of Count Three?

         MR. McBURNEY:  No.

         MS. CLARK PALMER:  Well, now we go back to the

definition of personnel.  Since we were talking before about

the distinction of personnel under 2339 (b) and 2339 (a), if

you were inclined to put in a definition about what it does

or does not include, I think it would either go here or after

the charge on Count Four.

         THE COURT:  Has the government even proposed a

definition for personnel?

         MR. McBURNEY:  Yes, sir.  In 13, Government's 13,

it applies to Count Four as well, but we are in the 2339 (b)

context.

         THE COURT:  I don't see a definition for personnel.

         MR. NAHMIAS:  I'm sorry, it's 14.

         MR. McBURNEY:  14, right, page 29.

         MS. CLARK PALMER:  Okay.  This says individuals who

act entirely independent.

         THE COURT:  So that includes what you want;

correct?

         MS. CLARK PALMER:  Yes, it does.

         THE COURT:  See, patience pays off.

1     MS. CLARK PALMER:  It does.

2     THE COURT:  All right.  Going back to the core

3  charge as I have rewritten it, any objections?

4     MR. McBURNEY:  No.

5     THE COURT:  I'm sorry, did you --

6     MS. CLARK PALMER:  No, Your Honor.

7     THE COURT:  Ms. Clark Palmer, no?

8     Then the next is the instruction of Count Four,

9  which is Government's Request to Charge No. 12, any objection

10  to that request?

11     I know the government doesn't object since

12  they posed it.

13     MR. McBURNEY:  Correct.

14     THE COURT:  How about the defense?

15     MS. CLARK PALMER:  No objection.

16     THE COURT:  Then Government's Request to Charge

17  No. 13 has a number of definitions.  Any objections to the

18  definitions?

19     MS. CLARK PALMER:  No, Your Honor.

20     THE COURT:  Then Charge No. 14, which we have just

21  briefly discussed, any objections to Request to Charge

22  No. 14?

23     MR. McBURNEY:  Before we go to 14, I'm sorry, I was

24  just pointed out in the mode of simplifying the final

25  paragraph of Charge 13, we can limit it to a citizen of the

1    United States.

2            THE COURT:  Right, because that's the evidence in

3    the case, I agree.

4            Any objection to that, Ms. Clark Palmer?

5            MS. CLARK PALMER:  No objection.

6            THE COURT:  How about 14?

7            MS. CLARK PALMER:  No objection.

8            THE COURT:  Then that would conclude the core

9    substantive and conspiracy offense instructions.

10           Then I would charge Government's Request to Charge

11   No. 4, which is the instruction on attempt.  Any objection to

12   that instruction?

13           MS. CLARK PALMER:  No objection.

14           THE COURT:  Then the next I would give is the

15   aiding and abetting instruction in the Government's Request

16   to Charge No. 3.  Any objection to that instruction?

17           MS. CLARK PALMER:  No objection.

18           THE COURT:  Then I would give the First Amendment

19   issue instruction that I have drafted.  Any comments on that?

20           MS. CLARK PALMER:  Do you want me to go first?

21           THE COURT:  Yes.

22           MS. CLARK PALMER:  The only topic that I think the

23   instruction does not address that we included in our request

24   is the topic of the First Amendment protecting speech that

25   encourages others to commit violence, which would be our

1    instruction -- like a combination of our Instruction 6, 7 and

2    8.

3             THE COURT:  What's a short addition that you would

4    propose to address that?  Just what you said?

5             Is there any objection to adding that?

6             MS. CLARK PALMER:  I think 7 and 8 are sort of

7    redundant, and 8 --

8             THE COURT:  Well, what I'm asking is, taking my

9    reformed charge, what would you add and where would you add

10   it so I can get some language to consider?

11            MS. CLARK PALMER:  I would add it at the end of the

12   first paragraph, or actually maybe right before the last

13   sentence of the first paragraph.

14            THE COURT:  Well, wouldn't it be more appropriate

15   at the very end where I'm talking about specific things?

16            MS. CLARK PALMER:  I mean, I don't have a strong

17   preference one way or the other.  I thought it maybe should

18   go in the front because it's talking about what is protected,

19   and then you switch to talking about what's not protected.

20            THE COURT:  And then I go back and show what is

21   protected.

22            MS. CLARK PALMER:  Right.  I mean, either

23   way.  I don't have a strong preference.

24            THE COURT:  And what would you add?

25            MS. CLARK PALMER:  Do you want me to just read

1  something out?  I would combine these, our Instructions 6, 7

2  and 8.

3          THE COURT:  Well, combine them in your mind and

4  then give me what the combination looks like.

5          MS. CLARK PALMER:  Okay.  Advocacy of illegal

6  action at some indefinite future time is protected by the

7  First Amendment.

8          THE COURT:  Tell me what that means?  You have

9  seen these people.  They are not going to know what that

10  means.

11          MS. CLARK PALMER:  Well, I guess to say even

12  shorter --

13          THE COURT:  Encouraging somebody else to engage in

14  terrorism also is not a crime?

15          MS. CLARK PALMER:  Yeah, it's -- the distinction is

16  some indefinite point in the future.  Just suggesting that

17  somebody should do something that may cause somebody else or

18  may -- or suggesting some sort of illegal action may occur

19  sometime in the future is protected by the First Amendment,

20  and a person can advocate --

21          THE COURT:  So in your world, if you say you need

22  to go out and kill John Doe --

23          MS. CLARK PALMER:  No, I'm talking about just

24  advocating something that is illegal or advocating a point of

25  view that may make it likely for other people to go out and

1   commit -- may incite others to go out and commit crimes,

2   that's protected.

3           An example would be saying that people should smoke

4   marijuana, that shouldn't be illegal.  That's illegal, but

5   you can advocate for that without yourself being convicted of

6   a crime.

7           THE COURT:  What if I added to the end of this or

8   merely encouraging another person to commit a crime in the

9   future?

10          MS. CLARK PALMER:  I think that is a succinct

11  summary.

12          MR. McBURNEY:  Put that at the end of?

13          THE COURT:  The entire instruction.  There is a

14  list of things.  Any objection from the government?

15          MR. McBURNEY:  I'm processing it.  Merely

16  encouraging another person --

17          THE COURT:  I don't have that much time to wait for

18  you to process something.

19          MR. McBURNEY:  I'm writing, how about that?

20          THE COURT:  Okay, you may write first, and then I

21  will give you moment to think about it.

22          MR. McBURNEY:  Could you please repeat the proposed

23  addition?

24          THE COURT:  Were you not listening when I said it

25  the first time?

1        MR. McBURNEY:  I was.

2        THE COURT:  But you would like -- you just want to

3   make sure you got it down correctly?

4        MR. McBURNEY:  Every word.

5        THE COURT:  Or merely encouraging another person to

6   commit a crime in the future.

7        MR. McBURNEY:  The government's view is this.  It

8   was already a gray area with the Court's inclusion of the

9   language advocating on behalf of a terrorist organization,

10  because recruitment in some respects can come in the form of

11  advocacy.  But we were prepared not to object to the Court's

12  formulation here.

13       Going further as is being requested by the defense

14  is now creating other gray areas.  Solicitation is a

15  crime.  If you solicit someone else to go commit a crime,

16  that's speech.

17       Hey, Syed Haris Ahmed, go to Pakistan, I think it's

18  a great idea.  You get training, and let's see what we will

19  do with that.

20       I don't want the jury to think that that conduct is

21  protected by the First Amendment, because it's not.  I think

22  it's gray, but a grayness that we are willing to accept, with

23  advocating on behalf of a terrorist organization, even though

24  I think that could be stretched if that's where Mr. Sadequee

25  wanted to argue in his closing, Hey, it's not recruiting, I'm

1   just saying this way of life is a good life, you should try

2   it.

3          But now we are expanding that and encompassing more

4   conduct that in fact is prohibited and is not protected by

5   the First Amendment and conduct that arose in this

6   case.  That is our concern.

7          All of the -- I understand the defense is moving

8   away from all the platitudes about the First Amendment that

9   it originally proposed that arose in the noncriminal context,

10  but here the defendant's speech very much makes up a part of

11  his criminal conduct, as we included in some of our

12  citations.

13         There are no pantomime conspiracies here, and the

14  more the Court comes in and says, Let me tell you what the

15  First Amendment protects, your words draw brighter lines than

16  our words, and it's --

17         THE COURT:  I wish that were true.

18         MR. McBURNEY:  They have a tendency to do

19  that.  And this is an area --

20         THE COURT:  Give me an example of what encouraging

21  another person to commit a crime in the future, where that

22  would not be protected?

23         MR. McBURNEY:  If the conspiracy is you need to go

24  get this training, which I think already is a crime, and then

25  we will let you know what to do.

1    THE COURT:  That's true, I agree with

2    that.  I think that this language is too ambiguous.

3    MS. CLARK PALMER:  But there has been a lot of

4    evidence in the case about the other things that Mr. Sadequee

5    was doing, his activities on the At-Tibyan Publications, and

6    the government has pointed out a lot of documents that were

7    on there, and some comments that Mr. Sadequee had made about

8    Al-Qaeda.

9    And that's where the concern comes in.

10   THE COURT:  I know that.  Those all go to his

11   intent.  I mean, that shows what he intended to do in

12   entering into this conspiracy.  So that's why that was

13   admitted.

14   MR. SAMUEL:  We do want to make sure the jury

15   doesn't convict based on that.  I mean, otherwise they are

16   just relying on arguments of counsel, that Mr. McBurney won't

17   argue that.

18   Again, the jurors, who aren't schooled at all in

19   this, may say, Look at the stuff he had on his website, we

20   should just find him guilty.  A juror could reason that way,

21   and we should discourage that.

22   THE COURT:  That was the whole purpose of the first

23   paragraph.  This means that individuals are permitted to

24   express controversial or even despicable views, freely

25   practice their religion, and associate with other individuals

1   and groups.  A person therefore may not be convicted of a

2   crime solely on the basis of his opinions, beliefs or

3   associates, no matter how unpopular.

4            MS. CLARK PALMER:  There is no temporal

5   element.  There is no discussion of encouraging something to

6   happen in the future.  That's why I brought this up.

7            MR. SAMUEL:  The list also doesn't include what is

8   so key here, which is the possession of all of these

9   materials and the translation which, if I remember correctly,

10  they even have in their bill of particulars.

11           THE COURT:  So I guess we could say that the mere

12  possession of the materials alone is not evidence of a

13  crime.  However, though, the possession of those materials

14  can in fact be used to determine the defendant's

15  intent.  Would you agree with that?

16           MR. McBURNEY:  Yes.

17           THE COURT:  I mean, because the danger of what you

18  want is they say, oh, his mere possession of that, we can't

19  consider that in any way.

20           MR. SAMUEL:  No.

21           THE COURT:  Which is what happens when you start

22  adding all these little things in is that there are ways in

23  which those materials can be used by a jury.

24           MR. SAMUEL:  It would almost be like a 404 (b)

25  instruction at that point, and I would be okay with that.

1    I mean, I think it's important because of the way

2    they presented 50-A and 49-A and those exhibits, you know.

3        THE COURT:  So what's wrong with what I just said?

4        MR. SAMUEL:  Well, I just need to think about it a

5    little bit, but -- in essense, nothing.  I just would want to

6    make sure it's carefully worded that, you know, maybe you can

7    make reference to you have seen certain things that he

8    possessed, and that is certainly not an offense, though you

9    may consider that evidence along with all other evidence in

10   this case in deciding --

11       THE COURT:  Give me a second.

12       This is just something off the top of my head after

13   a very long day.  I would conclude it by saying that:

14   Finally, evidence has been introduced in this case consisting

15   of religious treatises and instruction.  The mere possession

16   of this material is not alone a crime, but you may consider

17   it as evidence in considering whether the government has

18   proved the elements of the offenses with which the defendant

19   has been charged.

20       MR. McBURNEY:  A couple of comments from the

21   government.

22       As a counterproposal, we were going to suggest --

23   you have a list of views in the first paragraph.  This means

24   individuals were permitted to express controversial or even

25   despicable views, comma, possess written materials -- without

1    a description whether they are religious or not.  I think

2    there has been some debate about whether they are

3    religious -- possess written materials, et cetera.

4            And then the second paragraph you go on to say,

5    Therefore, you may consider evidence of statements -- which

6    is the first item -- opinions, and then, comma,

7    possessions -- that would be the reference to the written

8    materials, rather than calling them out as being somehow

9    unique from his opinions and everything else that were

10   expressed.

11           THE COURT:  So you would say statements, written

12   material, opinions --

13           MR. McBURNEY:  That's fine.  I had the word

14   possessions, meaning things he possessed, but written

15   materials is fine.  That may be a closer parallel to the

16   structure of the preceding paragraph.

17           THE COURT:  That gives everybody a chance to argue

18   however they want to argue on the written materials, and it

19   doesn't confine anybody to any kind of or specific written

20   materials.  That seems to make sense to me.  Is everybody in

21   agreement with that?

22           MS. CLARK PALMER:  Yes, we are.

23           THE COURT:  Let me just make sure that you have

24   just -- we have all agreed on the same thing.

25           In the first paragraph, third sentence, it would

1  read:  This means that individuals are permitted to express

2  controversial or even despicable views, possess written

3  material, freely practice their religion, and associate with

4  other individuals and groups.

5         And then I would add in the second paragraph,

6  second line from the bottom, I would just add:  Written

7  materials after statements and before opinions?

8         MS. CLARK PALMER:  Okay.

9         MR. McBURNEY:  I think it should be added one more

10 place I just noticed.  The final sentence -- I think this is

11 really the point the defense wants to make.  The final

12 sentence of the first paragraph:  Cannot be convicted of a

13 crime solely on the basis of his opinions, comma, written

14 materials, comma, beliefs.  I think that's their concern.

15        THE COURT:  I'm sorry, where are you again?

16        MR. McBURNEY:  The final sentence of the first

17 paragraph.

18        THE COURT:  So after opinions add written

19 materials?

20        MR. McBURNEY:  Yes, sir.

21        THE COURT:  So I would add now written materials

22 between opinions and beliefs.  Now is everybody satisfied?

23        MS. CLARK PALMER:  With the whole instruction or

24 just what we --

25        THE COURT:  With the whole instruction as amended?

1    MS. CLARK PALMER:  What did we decide about

2  encouraging another person to commit a crime in the future?

3  Did you decide not to give that?

4    THE COURT:  Well, yeah, for the reasons that I

5  don't know what that means.  And I think that that is covered

6  in the first part of the -- they have agreed to advocate it

7  on behalf of the terrorist organization.

8    So one, I think that you could probably argue that

9  it's included in that already, because you are advocating

10  that somebody engage in wrongful conduct or a crime in the

11  future, since we are talking about terrorist organizations,

12  terrorist groups.

13    And I think that certain things can be --

14  encouraging another person to commit certain kinds of crimes

15  I think can in fact be a grounds for somebody to be

16  convicted.

17    MS. CLARK PALMER:  Yeah, I agree that the law sets

18  out a lot -- not a lot, but there are some limitations as to

19  when that's protected and when it's not.  Just in the

20  interest of brevity I just said it that way.

21    THE COURT:  So going back to this instruction, I

22  have amended it to address three specific instances where I

23  have inserted the concept of written materials.  With those

24  amendments to the First Amendment issues that I proposed, is

25  there any objection?

1    MR. McBURNEY:  No.

2    MS. CLARK PALMER:  No objection.

3    THE COURT:  All right.  The next was a request for

4    there to be -- let me step back for a second.

5    I believe that with that final instruction, that I

6    have essentially concluded -- I have concluded the

7    instructions on the offenses in the case and then I go -- now

8    I go back and pick up with the standard instruction that I

9    give, and there are some additional issues we need to

10   address.

11   The next is the instruction on on or about,

12   knowingly and willfully.  The government has requested an

13   addition to that, and that is set forth in their Government's

14   Request to Charge No. 1.

15   Is there any objection to adding that to the

16   knowing and willfully definition?

17   MR. WAHID:  I'm sorry, Judge, you want to add

18   knowing and willfully to the pattern?

19   MR. SAMUEL:  No, add that.

20   THE COURT:  No, add that to the end of the knowing

21   and willfully instruction in my general instructions.

22   MR. SAMUEL:  You can consider all the evidence in

23   the case to decide whether he acted knowingly and willfully.

24   I mean --

25   THE COURT:  I wasn't asking for outrage about it.

I was just asking your --

MR. SAMUEL:  It's the level of outrage that should be reflected by the court reporter.

THE COURT:  That wasn't -- that was said in jest.  I think what Mr. Samuel is saying is that he objects to it because it's redundant.

MR. SAMUEL:  Sure.

MR. McBURNEY:  I think the way the First Amendment issue has been framed now, we have no problem with the Court not including number one.

THE COURT:  I really think it's picked up in that now.

MR. McBURNEY:  Indeed.

THE COURT:  Okay.  So I will just give my regular -- the instruction as it's set forth in the standard instruction.

And then there is the government would also like added to this instruction -- whole instruction is the on or about, knowingly and willfully instruction, they wanted an instruction on disjunctive language.  And that's their Request to Charge No. 5.

I really do think that's appropriate.  And now that I know more about the case and have looked at the statute again, there are an awful lot of ors and ands.

MS. CLARK PALMER:  No objection.

THE COURT:  All right.  Then I would -- then moving

on in the general instruction, I will obviously not give the

caution on single defendant, single count, but I will single

defendant, multiple counts.

I assume nobody has any objection to the

instructing on that, do they?

MR. McBURNEY:  No.

MS. CLARK PALMER:  No objection.

THE COURT:  All right.  Then of course I won't give

the multiple defendants, multiple counts.

The next -- I guess this is one that we probably

should have taken up when we were talking about the specific

charges, but the charge about unlawful combatants.

Ms. Clark Palmer, I think they are going to make

you argue this.

MS. CLARK PALMER:  Yeah.

THE COURT:  Where did this come from?

Oh, this came from Major Corn's article.

MS. CLARK PALMER:  And a couple others that I just

couldn't find to print out for you, so I didn't cite them.

THE COURT:  Who were the lawful combatants?  What

evidence was there of lawful combatants?

MS. CLARK PALMER:  There has been testimony, and

the person that I remember right now was Mr. Ahmed about how

LeT functions and that they operate openly, that they have a

1   hierarchical military structure, that they wear emblems

2   I believe he said.  Either he or Mr. Kohlmann talked about

3   how they wear --

4           THE COURT:  So does the FARC.  Are FARCs lawful

5   combatants down in Colombia?

6           MS. CLARK PALMER:  I don't know anything about

7   FARCs.  I didn't know anything about LeT before this case

8   either.

9           THE COURT:  Well, those are all interesting

10  observations, but what makes them lawful combatants?

11          MS. CLARK PALMER:  Well, we also heard I think

12  again from Mr. Ahmed about how LeT operates in Pakistan

13  openly, and that sometimes they operate at the direction of

14  the Pakistani government, and that they are under the belief

15  that they are fighting, you know, a just war against their

16  oppressors.

17          And I know that they have been designated by the

18  U.S. as a terrorist organization, but we have had testimony

19  about --

20          THE COURT:  I know we had testimony about

21  Mr. Ahmed's belief about -- although I don't think it was as

22  clear as you have stated it, but let's assume that LeT wears

23  uniforms and they function somewhat openly.  I think even

24  Mr. Kohlmann said that.

25          MS. CLARK PALMER:  Uh-huh.

THE COURT:  What makes them lawful combatants?

MS. CLARK PALMER:  Well --

THE COURT:  By that definition, the Cosa Nostra would be lawful combatants, because they have a hierarchical structure and they operate in a disciplined way and they believe that they are engaged in justifiable activity.

MS. CLARK PALMER:  I don't know how to comment on that.  But I will say from the, you know, the *Lindh* case that I cite here talks about the Geneva Convention, which I think in that case they also set out those four requirements that I stated there.

And then the point that comes from Major Corn and Major Smith's article is about under the International Law of Armed Conflict, that lawful combatants cannot be held criminally liable for killing, kidnapping or maiming people. And that goes to what's charged in Count One and Count Two.

THE COURT:  So your argument is that the LeT, which is a designated foreign terrorist organization, that when they cross into Kashmir and somebody serves as a suicide bomber, that because they believe that Kashmir ought to be liberated and then should become Muslim, that they are lawful combatants?

MS. CLARK PALMER:  Well, I did include in this instruction the second paragraph, second sentence:  If the persons to whom Mr. Sadequee allegedly conspired to provide

or provided material support intended only to assume
combatant status for the purpose of protecting other Muslims
under attack in such places as Chechnya, Iraq, Afghanistan,
Pakistan or India, they are cloaked with combatant immunity.

THE COURT:  On a one-to-ten scale, how serious are
you about this, one being very serious and ten being I will
take a shot at it?

MS. CLARK PALMER:  Towards ten, but I think there
still has been -- I recognize I didn't cite to a case where
this type of a jury instruction had been given before, but I
don't think that means it couldn't be given.

And it's also -- well, I don't know what the word
is, but I think that the authority I did cite to you does
hold the concepts that I set out on this jury instruction,
and I think it's worth a shot.

THE COURT:  What evidence is there -- because here
is your definition.  Under the International Law of Armed
Conflict, combatants are presumed to be entitled to combatant
immunity, and they may not be held criminally liable for
killing, kidnapping or maiming persons or destroying
property, provided that in doing so they conduct themselves
in accordance with the International Law of Armed Conflict.

First, what evidence is there that LeT conducts
themselves in accordance with the International Law of Armed
Conflict?

1           By the way, tell me what is the International Law

2   of Armed Conflict?

3           MS. CLARK PALMER:  I was just going to see if I

4   could read that to you.

5           MR. NAHMIAS:  Do you want the government to jump

6   in, or do you want us to wait?

7           THE COURT:  No, this is sort of fun.

8           MS. CLARK PALMER:  I don't have that right at my

9   fingertips, but the part I flagged out of the --

10          THE COURT:  Well, then let's just jump into what

11  evidence is there that they have acted in accordance with the

12  International Law of Armed Conflict?

13          MS. CLARK PALMER:  Well, I will go back to the

14  four -- the four elements that I set forth in the last

15  paragraph, the operating under a hierarchical military

16  structure, uniforms, carry arms openly, conduct their

17  operations in accordance with the laws and customs --

18          THE COURT:  What evidence is there, for example,

19  that they carry arms openly?

20          MS. CLARK PALMER:  I think Mr. Ahmed said that --

21  well, I think he may have been talking about something

22  different.

23          THE COURT:  How about that they conduct their

24  operations in accordance with the laws and customs of war?

25          MS. CLARK PALMER:  Well, he talked about -- and

1　I think, I think Mr. Kohlmann touched on this too, that

2　sometimes LeT operates at the direction of or at least with

3　the consent of the Pakistani government.

4　　　　THE COURT:  Does that constitute operating in

5　accordance with the laws and customs of war?  I think

6　Mr. Kohlmann was pretty clear that they are terrorists and

7　engage in terrorist attacks.

8　　　　MS. CLARK PALMER:  Well, Mr. Sadequee tried to

9　challenge him on that and get him to address some of the

10　points that Mr. Ahmed made about how they are viewed in

11　Pakistan.

12　　　　And the point of this is the -- there is the

13　United States' viewpoint of LeT, and then there is the people

14　in Pakistan's viewpoint of LeT, and there has been evidence

15　that those are different.

16　　　　THE COURT:  Well, what evidence is there of the

17　Pakistani viewpoint of LeT?  We have Mr. Ahmed, who is not a

18　Pakistani.  He's an American.

19　　　　MS. CLARK PALMER:  Right.  Well, he is of Pakistani

20　descent.  He was -- was he born here?

21　　　　MR. SAMUEL:  He was born there.

22　　　　MS. CLARK PALMER:  He was born in Pakistan.

23　　　　MR. SAMUEL:  Dual citizen.

24　　　　MS. CLARK PALMER:  And I also believe Mr. Kohlmann

25　said that LeT operated with the consent of the Pakistani

1    government.

2           THE COURT:  That's your best shot?

3           MS. CLARK PALMER:  At the moment.  I can't find

4    more on the laws of -- International Law of Armed Conflict

5    right now.

6           THE COURT:  What does the government have to say

7    about the unlawful combatant instruction request?

8           MS. COLLINS:  Your Honor, we believe that this memo

9    is not an accurate statement of what a lawful or unlawful

10   combatant is.  But also there is no evidence that LeT meets

11   any of the requirements or meets all of the requirements.

12          Specifically, you were just asking about the law of

13   war.  The *Lindh* case, 212 F Supp 2d 541, at 558 is talking

14   about the Taliban and the fact that it is not a lawful

15   combatant because they target civilian populations and they

16   target civilians in their attacks.

17          Mr. Kohlmann testified about LeT attacks, and one

18   in particular that he described -- he described several, but

19   there was one in particular against the Red Fort, which is a

20   tourist site in India, and that was deliberately targeting

21   civilians.  Civilians were killed, they took the place over

22   in one of their commando-style raids.

23          And under *Lindh* as well as there is another case,

24   *U.S. v. Pineda,* which is from the District of Columbia,

25   Federal District Court, 2006 Westlaw 785287, talked about the

1   fact that when you target civilians, that does not comport

2   with the laws of war, and therefore the FARC in the *Pineda*

3   case, the Taliban in the *Lindh* case, do not qualify as lawful

4   combatants.

5           There are other issues with this instruction that I

6   can address, but that --

7           THE COURT:  Didn't LeT engage in an attack just

8   last week in which they targeted civilians?

9           MS. COLLINS:  We were talking about evidence

10  pre2005 since we limited him talking about 2005 and before,

11  given Your Honor's instructions about Dubai and things like

12  that.  We didn't want him to discuss anything after that, and

13  that's the relevant time period on this case.

14          THE COURT:  I agree.  I guess it's my observation

15  that they haven't changed much, it appears.

16          MS. COLLINS:  No, I don't think they have changed.

17          And, Your Honor, it has to meet all four

18  qualifications.  It also has to -- there is an additional

19  qualification that's not stated in the jury instruction that

20  is discussed in both *Lindh* and *Pineda,* the fact that they

21  actually have to fight on behalf of the state, and there is

22  no evidence that LeT fights on behalf of the Pakistani

23  government.

24          Mr. Kohlmann testified that they have been banned

25  by the Pakistani government, that they routinely threaten the

1  Pakistani government.  There is no evidence that they fight

2  on behalf of them.

3          THE COURT:  Any further response?

4          MS. CLARK PALMER:  Nothing further.

5          THE COURT:  Do you agree that that last requirement

6  is one of the requirements?

7          MS. CLARK PALMER:  I don't see that in the exact

8  section of *Lindh* I'm looking at.  I'm not saying it's not in

9  there.  I just don't see it.

10          MS. COLLINS:  I would direct the Court's attention

11  to page 554.

12          THE COURT:  What page was it?

13          MS. COLLINS:  It's in *Lindh,* page 554.  The court

14  says:

15              Importantly, this lawful combatant immunity is

16              not automatically available for anyone who takes up

17              arms in a conflict.  Rather, it is generally

18              accepted that this immunity can be invoked only by

19              members of regular or irregular arm forces who

20              fight on behalf of the state and comply with the

21              requirements for lawful combatants.

22          In Pineda as well they discuss, as a threshold

23  matter, the Geneva Convention applies only between parties,

24  and the FARC is not a signatory to the Geneva Convention,

25  it's not a state.

1    So that was also in *Pineda,* but the salient

2 language is in *Lindh.*

3    MS. CLARK PALMER:  I see that part now, generally

4 accepted, this immunity didn't -- I would just go back to

5 what has been said before about LeT fighting with the

6 consent, if not support of the Pakistani government.

7    THE COURT:  I find that the evidence does not

8 support the giving of this instruction, so I will not give

9 it.  I sustain the government's objection.

10    All right.  Then after that I give the duty to

11 deliberate instruction, and the verdict instruction.  Any

12 objections to those instructions in my standard

13 instructions?

14    MS. CLARK PALMER:  No objection.

15    MR. McBURNEY:  No.

16    THE COURT:  All right.  I will give you my thoughts

17 on the verdict form.

18    Jessica, could you hand that to them?

19    Any objection to the verdict form?

20    MR. McBURNEY:  No.

21    MS. CLARK PALMER:  Just if we could have a couple

22 more minutes?

23    We are talking about the Government's Request to

24 Charge No. 9 where at the last sentence it says that the jury

25 must unanimously agree upon which type of material support or

1   resources was provided or attempted to provide or conspired

2   to provide, and that should be included on the verdict form.

3           THE COURT:  Well, if they are instructed on that,

4   why would they have to make that special finding?

5           MS. CLARK PALMER:  I take that back.

6           We don't have any objection to the verdict form.

7           THE COURT:  All right.  Thank you.

8           Now, is there any jury instruction that you

9   requested that I have not addressed that you want me to

10  address?

11          MS. CLARK PALMER:  You have addressed all of ours.

12          MR. McBURNEY:  Same here.

13          THE COURT:  So I will look forward to get from you

14  some briefing on this lesser included offense as it applies

15  to Count --

16          MS. CLARK PALMER:  Two.

17          MR. McBURNEY:  Count Two.

18          MR. NAHMIAS:  Just to be clear, just Count Two as I

19  understand it now, and only on the issue of -- just so we are

20  clear with what the proposed lesser included offense is,

21  I understand that it is the threat prong of 2332 (b), not

22  attempt to threaten or conspiracy to threaten, but just the

23  question of whether a threat under that is a lesser included

24  offense.

25          THE COURT:  That was my understanding.

```
 1              MS. CLARK PALMER:  That's correct.

 2              THE COURT:  All right.  I am going to tell the

 3    jurors to come at 10:00 rather than 11:00.  We have gotten in

 4    touch with all but two of them.

 5              So I think that will give me enough time now that

 6    we are only dealing with that one issue for me to decide that

 7    and make a final decision on that instruction and whether the

 8    lesser included offense gets charged, and then we will be

 9    ready to go.

10              MR. McBURNEY:  So we will get e-mail briefs to

11    Ms. Birnbaum by 7:00 tomorrow morning?

12              THE COURT:  Yeah, she's not briefing anything for

13    you.  You are briefing it for her.

14              MR. McBURNEY:  Right, we will e-mail the brief to

15    her at 7:00, and that will get its way --

16              THE COURT:  Or if you want to get it in earlier.

17              THE CLERK:  Do I have to be here at 7:00?

18              THE COURT:  Can you e-mail it instead to Sarah?

19              MR. McBURNEY:  Yeah, we will get her e-mail

20    address.

21              THE CLERK:  Thanks.

22              THE COURT:  Anything else we need to discuss before

23    we break?

24              MR. McBURNEY:  When should we be back tomorrow?

25              THE COURT:  9:15.
```

1    MR. SAMUEL:  Do you -- is anything we did here

2    sufficient means of preserving any issues?  I don't know if

3    there are any, but to the extent that there were, he's not

4    going to be able to articulate any objections after the

5    charge.  If that's the rule, so be it.

6        I mean, the Eleventh Circuit generally would

7    require a full recitation of objections, but some judges say

8    but I will allow you to adopt everything we did in the charge

9    conference.

10        THE COURT:  Oh, you may do that, yeah.

11        MR. SAMUEL:  We can adopt everything we have just

12   done?

13        THE COURT:  Yes.

14        MR. SAMUEL:  I'm just going to write out a little

15   thing for him to say, I adopt everything that occured at the

16   charge conference including waiver of some issues, withdrawal

17   of some -- but there were at least one or two objections I

18   think that we --

19        THE COURT:  Well, armed combatant.

20        MR. SAMUEL:  Right.

21        THE COURT:  And --

22        MR. McBURNEY:  The record will show what they are.

23        MR. SAMUEL:  As long as we can adopt what we did

24   today.

25        THE COURT:  What I do is I don't do that in front

1  of the -- I don't ask for your objections in front of the

2  jury anyway.  I send them out, and when they are out I ask if

3  anybody objects to the charge as given.

4      And then you can say you don't object to the charge

5  as given, however you do want to preserve the objections that

6  you made during the charge conference.

7      MR. SAMUEL:  Okay.

8      THE COURT:  And I think that's enough to protect

9  the record.

10      MR. SAMUEL:  If it's okay with you -- it's okay

11  with every court, as long as you say it's okay with you.

12      THE COURT:  And he doesn't have to -- you don't

13  have to write anything out.  If you want to do that, you may

14  do that.

15      MR. SAMUEL:  All right.

16      THE COURT:  Can we adjourn for the evening?

17      You did very good job.  Thank you.

18      MS. CLARK PALMER:  Thank you, Your Honor.

19      THE COURT:  You did too.

20      MR. SAMUEL:  But it wasn't her first.

21      MR. NAHMIAS:  The one thing I argued, we have

22  homework on.

23      THE COURT:  You know, I did get a little irritated

24  about the -- what was it?

25      MR. SAMUEL:  The photographs.  But the two cases

1  you gave us, we looked at them, we thought maybe they were

2  supporting our position on the photograph authentication

3  issue.

4       THE COURT:  I don't think so, but that's neither

5  here nor there.

6       Yeah, I guess I do want to at least reiterate to

7  everybody that I spend a lot of time on this, and I need to

8  read things.  I'm not as intuitive as other judges are.

9       The reason why I get here early in the morning is

10 that I have got to read cases, and I don't -- I'm never

11 comfortable unless -- I get a little anxious when I'm asked

12 to make a ruling without the benefit of being able to go back

13 into my office and say let me read what this case really

14 says.

15      And it was a little late, but you have done a good

16 job on the case.  It's been a privilege to preside over this

17 because of the quality and the professionalism of the

18 lawyers.

19      And that should not be -- I don't want anybody to

20 read anything into what I said when I was irritated this

21 afternoon that I don't deeply respect all that you have done

22 on behalf of your clients even though you wanted to do more,

23 because the lawyering has been superb.

24      And this is what makes this job such a privilege is

25 when we have cases like this.  It's been a hard case, and I'm

1 trying very hard to make the right rulings, but that's why

2 your input is so valuable to me.  Because you present issues

3 in objective ways, but at the same time with the proper

4 advocacy on behalf of your clients, and I'd hate to be

5 deprived of that.

6 　　　　So thank you for your help today and for your being

7 patient with me.

8 　　　　We are in recess.  See you tomorrow morning at

9 9:15.

10 　　　　(Proceedings adjourn at 7:25 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    C E R T I F I C A T E

2

3    UNITED STATES OF AMERICA          :
                                       :
4    NORTHERN DISTRICT OF GEORGIA      :

5

6            I, Nicholas A. Marrone, RMR, CRR, Official Court

7    Reporter of the United States District Court for the Northern

8    District of Georgia, do hereby certify that the foregoing 316

9    pages constitute a true transcript of proceedings had before

10   the said Court, held in the city of Atlanta, Georgia, in the

11   matter therein stated.

12           In testimony whereof, I hereunto set my hand on

13   this, the 1st day of September, 2009.

14

15

16

17                           /s/ Nicholas A. Marrone
                             _____
18                           NICHOLAS A. MARRONE, RMR, CRR
                             Registered Merit Reporter
                             Certified Realtime Reporter
19                           Official Court Reporter
                             Northern District of Georgia

20

21

22

23

24

25