IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA          )
                                  )
          Plaintiff,              )     CRIMINAL ACTION FILE
                                  )     NO. 1:06-CR-147-WSD-2
v.                                )
                                  )     ATLANTA, GEORGIA
EHSANUL ISLAM SADEQUEE (2)        )
                                  )
          Defendants.             )
_____)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
UNITED STATES DISTRICT JUDGE, AND A JURY

VOLUME 6
Tuesday, August 11, 2009


APPEARANCES OF COUNSEL:

For the Plaintiff:          OFFICE OF THE U.S. ATTORNEY
                            (By:  David E. Nahmias
                                  Robert C. McBurney
                                  Christopher Bly)

                            U.S. DEPARTMENT OF JUSTICE
                            (By:  Alexis L. Collins)

For the Defendant:          Ehsanul Islam Sadequee, *Pro Se*

Standby Counsel:            GARLAND SAMUEL & LOEB
                            (By:  Donald Franklin Samuel
                                  Amanda Clark Palmer)

                            Khurrum B. Wahid

*Proceedings recorded by mechanical stenography*
*and computer-aided transcript produced by*
NICHOLAS A. MARRONE, RMR, CRR
1714 U. S. Courthouse
75 Spring Street, S.W.
Atlanta, GA  30303
(404) 215-1486

1                     I N D E X

2                                              *Page*

3   *Closing by Mr. McBurney*               *1359*
   *Closing by Mr. Sadequee*             *1391*
4   *Rebuttal by Mr. McBurney*             *1409*

5   *Judge's Charge to the Jury*           *1423*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         Tuesday Morning Session

2                         August 11, 2009

3                         9:28 a.m.

4                         -- -- --

5                     P R O C E E D I N G S

6                         -- -- --

7         (In open court without a jury present:)

8         THE COURT:  Well, I have studied the issue but

9   apparently there has been a change in positions; is that

10  right?

11        MR. SAMUEL:  Yes, Your Honor.

12        THE COURT:  It doesn't surprise me, but what is the

13  change in position?

14        MR. SAMUEL:  Your Honor, defendant asks to withdraw

15  the lesser included on Count Two.

16        THE COURT:  All right.  I think that was the

17  conclusion I had reached, that it's not supported.  But

18  I appreciate -- and it was very helpful to have the

19  submissions, and I actually made a chart of the elements of

20  both of the offenses, and that's where I began my

21  comparison.  That's how I analyzed where the legal issues

22  were.

23        So that's been withdrawn.  There are no lesser

24  included offenses to be instructed on.

25        The one thing -- and I have gone back and forth in

my own mind about this because it could be that the defendant

doesn't want it -- you know, I gave a limiting instruction

regarding the December 2001 e-mail right after the e-mail was

introduced.

Sometimes if it's requested, I will give them also

in the instruction, but sometimes the defendant would not

like to draw attention to it.  So I didn't know what your

preference was.  I'm pleased to do that if you want.

MR. SAMUEL:  We don't think another limiting

instruction is necessary, Your Honor.

THE COURT:  Then I will not do that.

All right.  Is there anything else we need to

discuss before -- my plan is as soon as all the jurors are

here, I thought we would start, if that's okay with

everybody?

MR. NAHMIAS:  That's fine.  I assume 10:00 we

should be here ready to go?

THE COURT:  Well, for example, if they are here in

the next five minutes, I would like to start.

MR. NAHMIAS:  Okay.  Then I will get Mr. McBurney

and Ms. Collins.

THE COURT:  Now, I think them being here in the

next five minutes is unlikely, but if you will be on call, as

soon as they are here, we will give you a call and we will

get started.

1    MR. NAHMIAS:  So we will be on call in our office.

2    THE COURT:  Yes.  Anything else we need to do

3    before we adjourn?

4    MR. SAMUEL:  No, Your Honor.

5    THE COURT:  Then we will be in recess.

6    (A recess is taken at 9:31 a.m.)

7                    -- -- --

8    (In open court without a jury present at

9    10:10 a.m.:)

10   THE COURT:  Is there anything we need to discuss

11   before we bring the jurors in?

12   MR. McBURNEY:  No, sir.

13   THE COURT:  Mr. Sadequee?

14   MR. SADEQUEE:  No.

15   THE COURT:  Let me make a couple comments before

16   the jury does come in.

17          First, I want to remind you, Mr. Sadequee, that you

18   may of course discuss the evidence in the case and what the

19   evidence you believe shows, but closing arguments are

20   restricted to the evidence in the case and your views on what

21   that shows with respect to the charges and what you believe

22   would be an appropriate verdict in the case.

23          Second, I would tell the spectators that this is

24   a court of law and that this is a federal criminal trial,

25   and that there should not be any audible or other visible

1    signs made by any member of the audience during the course

2    of the presentations or during the course of my

3    instructions.

4         And if somebody were to engage in making audible

5    remarks or gestures or the like, that I will have them

6    removed from the courtroom.

7         All right.  Please bring the jurors in.

8         (In open court with a jury present:)

9         THE COURT:  Good morning, everybody.  I hope you

10   had a good evening.

11        As you know, yesterday all the evidence was

12   presented and it was closed, both parties rested.  We have

13   had our charge conference, and we are now prepared to proceed

14   to the next two phases at least in the courtroom that are to

15   be conducted, the first of which are the arguments, the final

16   arguments made by the parties.  And then after that we will

17   immediately move into my instructions or what we sometimes

18   call my charge to you on the law.

19        The closing statements that are about to be made

20   are not to be considered by you either as evidence in the

21   case or as your instruction on the law.  The statements and

22   arguments are intended to simply help you understand the

23   issues and the evidence that has been admitted as well as the

24   positions taken by the parties.

25        And we begin with the government.

1    MR. McBURNEY:  I want to start by thanking you for

2  your patience and your service.  In a minute I'm going to

3  delve into the facts of the case and explanation of some of

4  the law that applies in this case, but I want to start while

5  I remember by thanking you all for your time.  We are in the

6  second week now.  You have clearly paid attention to the

7  witnesses and the evidence, and very shortly the case will be

8  in your hands to decide the guilt or innocence of

9  Defendant Sadequee.

10    The government's position is very clear in this

11  case.  It's that the evidence has shown beyond a reasonable

12  doubt -- doubt for which you could give a valid reason, not

13  an irrational doubt, a reasonable doubt -- the evidence has

14  shown beyond a reasonable doubt that the defendant has

15  conspired with others to provide material support to

16  terrorists, he's attempted to provide material support to

17  terrorists, and in fact at least in the form of the casing

18  videos, he was successful in providing material support to

19  terrorists.  And that's what I want to talk about in the next

20  few minutes.

21    If I could distill the case into a single sentence,

22  which isn't quite fair given all the hours and days and

23  hundreds of exhibits you have seen, it would be that the

24  defendant provided material support to violent jihad.  That's

25  what the case is about.

1    But the indictment has broken that into four

2 different ways he has done so.  So the next level of

3 distillation would be the defendant conspired with others to

4 provide material support -- people, personnel -- and

5 property -- the casing videos -- to violent jihad, to

6 terrorists.  Not a defined group; I will talk a little bit

7 more about what the destination is in Count One.

8    Second, the defendant attempted with others to

9 provide people and property -- the casing videos -- to

10 terrorists, to violent jihad.

11    And in fact, it's Count Two where I submit to you

12 the government has actually shown the completed act.  These

13 casing videos ended up in the hands of Younis Tsouli, someone

14 who was a recruiter for Al-Qaeda in Iraq, someone who was a

15 publicist for Al-Qaeda in Iraq, and they ended up in the

16 possession of Aabid Hussein Khan, Abu Umar, the facilitator,

17 the gatekeeper for LeT camps in Pakistan.

18    The third thing I would say is that the defendant

19 conspired with others to provide personnel, just people, to

20 LeT.  That's Count Three.  The defendant conspired with

21 others to provide people to LeT.

22    And finally, the defendant actually took a concrete

23 step in conjunction with others, he attempted to provide

24 personnel to LeT.

25    Those are the four pieces of the case.  They

collapse into the notion that the defendant provided material support to violent jihad. But those are the four counts that you need to consider in this case.

Now, as I said in the opening and as you have heard throughout the evidence, this is not a case about free speech. The defendant is not here before you because he thought LeT was a good organization, because he had a poster in his bedroom that said Taliban Forever, because he wrote an article saying Osama Bin Laden is the greatest living individual. That's protected conduct in this country. He's not here because of his beliefs, because of his writings.

He's here because of his actions, the agreements he entered into, and the steps he and others took to provide material support to violent jihad.

It's also not a case about actual acts of terrorism. As I promised in the opening, you didn't see any bombs go off. The defendant, the most we put in his hands was a paintball gun.

Now, you saw a video of a very serious arsenal, bullets, grenades, that lemon detonator timer, AK-47s, et cetera. There were guns in the mix, not in the defendant's hands.

It's not a case about the actual commission of the crime of terrorism, the bomb going off, the person being kidnapped, someone being beheaded. It's about the

1  defendant's support for those things.

2       This is what the case is about.  And that really

3  doesn't show up real well, but as reminder, that's the

4  gentleman in the video that was found in Mirsad Bektasevic's

5  pocket who was making the two detonators, the timing devices

6  that would allow the electrical current to go through to the

7  bomb, the lemon and then the travel alarm clock.  He had the

8  Quran in front of him and a handgun just before that second

9  light went off.

10       And Bektasevic was filming, and every time the

11  light would go off indicating the circuit was complete and in

12  theory the bomb would go off, Mirsad Bektasevic said,

13  Allahu Akbar, God is great.

14       This is what the case is about.  Not the

15  defendant's thoughts, not his beliefs, not his translations

16  for Tibyan Publications, but it's about this arsenal that his

17  co-conspirator, the person he talked to on the phone from

18  Bangladesh, the person he chatted with online, the person he

19  e-mailed, the person whose contact information was on the

20  Raksha computer months before the defendant ended up in

21  Bangladesh, it's about the defendant's conspiracy with

22  Mirsad Bektasevic and others to do things like this, collect

23  explosives, bomb belts, bullets, grenades.  That's what the

24  case is about, not his thoughts.

25       And it's about these, the casing videos that the

defendant made with Syed Haris Ahmed in April of 2005 when

they traveled to Washington, D.C., and then sent to, in

Syed Haris Ahmed's words, the jihadi brothers

overseas.  That's what the case is about.

Now, the material support in this case breaks down

into four episodes, if you will, four different attempts,

conspiracies, steps that the defendant took.  And that's the

common thread across all four.  This screen shows you two of

them.  You have heard about all four of these.

The defendant, Syed Haris Ahmed, James, that's

Deenin, the gentleman in Canada they met with when they went

to Canada in March of 2005, Azdee Omani, another Canadian,

and Aabid Hussein Khan, Abu Umar, we learned from Syed Haris

Ahmed when he testified that Abu Umar joined them in Canada,

these folks conspired to provide themselves, personnel, to

terrorists overseas.

They conspired to go to Curry Land and ultimately

to Mountain Hills National Park.  You saw the Mother's Day

e-mail from Syed Haris Ahmed.  If it didn't work out getting

to Pakistan, go to Two Rivers, join Al-Qaeda in Iraq.  But

ideally let's get to Kashmir and train with LeT and, in the

defendant's own words, remember the students, the students

are our final main goal, the Taliban, into Afghanistan and

ultimately support violent jihad.

That's what Count One is all about, that's what

Count Two is all about, the provision of personnel in support of violent jihad.

Now, you learned about a second set of activities in which the defendant participated. I just mentioned this, that he and Syed Haris Ahmed went to Washington, D.C., to gather these casing videos. These videos, not of the Washington Monument or the Smithsonian, but of the Department of Energy, Department of Commerce, of the fuel tank farm outside of Washington, D.C., and occasionally the political statement: This is where our brothers attacked the Pentagon, the defendant's brothers, Al-Qaeda flying a plane into the Pentagon killing soldiers.

These videos, as you saw, were destined for the jihadi brothers. And we actually found at least two people who received them. They were on Tsouli's computer and they were on Khan's computer.

So that's the second way in which the defendant with others provided material support.

Third, the defendant, Saajid and Hamzah. Saajid is the 17-year-old -- at least he was 17 in May of 2005 -- American trying to get to the U.K. Hamzah, the South African.

Now, I have Aabid Hussein Khan's name up there with a question mark, and we will get to this later in the closing. It appears that he assisted the defendant in

helping recruit Saajid and Hamzah.

There is a chat that we will look at in some detail that was found on Aabid Hussein Khan's hard drive. It's using a moniker that we were not able to connect to him, but it stands to reason, it was a chat involving only two people, the defendant and someone named Zoro, and it's found on Khan's computer, that it was Khan.

But really the identity of the person doesn't matter. What matters is what was discussed. How do we get these guys, how do we get them on board, how do we get them in camps, how do we get them to participate in violent jihad in the United States and abroad.

We will look at what the defendant wrote. The defendant wrote to Saajid about Saajid's ability to carry out his highest duties here, here in the United States.

And finally the last thrust of the defendant's efforts to provide material support for violent jihad -- we are going chronologically through these, so the final one in time that you heard about was the September-October episode with Mirsad Bektasevic, Maximus. Bektasevic's cohorts there in Sarajevo, the two gentlemen in the video who were holding the guns while Bektasevic issued the speech in the background.

Younis Tsouli was part of this plan and, according to the defendant, he even had some brothers in Bangladesh who

were willing to come to Sweden.  This is the Al-Qaeda in

Northern Europe plan that the defendant had where they would

provide themselves as personnel for Al-Qaeda in Northern

Europe and perhaps reuse his videos, the casing videos.  When

they issued this announcement, that would include

Mirsad Bektasevic's video, the one found his pocket, of the

detonators, of the arsenal, and of the training out in the

woods where they were attaching a grenade to a tree and

running a trip wire ankle-high in the grass.

All four schemes, the common denominators are two:

The defendant, and his efforts to support violent

jihad.  That's what you have seen in the evidence that has

been presented to you over this past week, and that evidence

supports all four counts that you will see in the indictment.

Now, what I want to talk about now is the

how.  This is about who, the defendant, did what, provide

material support, and how did he do it.  And it's alleged in

several ways in the indictment.

Counts One and Three are conspiracies.  We will

talk a little bit about the law of conspiracy.  You will get

the final word on what the law of conspiracy is from the

Judge when he charges you, but I have the opportunity to

explain some of that to you, which I'm about to do.

Count Two charges an attempt or a completion.  It

says that the defendant and others provided or attempted to

provide material support, personnel and property.

And Count Four is attempt only. We are going to talk a little bit about attempt as well. But we will start with conspiracy.

First and most important, despite what you may hear from the defendant in his closing argument, conspiracy is an agreement. It's an illegal agreement. It's an agreement to break the law. It is not a plan.

If we all sit around and say, It's hard economic times, we need some money, let's go rob a bank. Are you in? I'm in. Great.

We have entered into a conspiracy to rob a bank. We didn't talk about Bank of America versus Wachovia, Peachtree or Piedmont, while it's open or break in afterwards because you have the code to the vault. That's all part of the plan. Those are the details. That's not what the defendant is charged with.

A conspiracy is simply an agreement. The crime for Count One at least was likely completed sometime in Canada when the defendant and Syed Haris Ahmed met up with Azdee, Aabid Hussein Khan, Deenin, others, they sat around and said we need to go to Pakistan, we need to go to Curry Land, get that training, so we can join in violent jihad. Once they entered into that agreement, the crime is complete.

Now, you have seen a number of substantial steps

that were taken in support of that agreement, but that's not required under the law.

If you find that the defendant entered into an agreement with the people I just mentioned about getting to Curry Land and ultimately to Mountain Hills National Park, he's guilty.

If you find that he had entered into an agreement with Mirsad Bektasevic and Younis Tsouli and others to be an Al-Qaeda in Northern Europe, the agreement is done. All the additional steps are evidence, are proof of the agreement, but the crime is the agreement itself.

And of course in this case we have all sorts of plans. We don't need to show plans, but you have sat through a number of chats when there was the back-and-forth about a basement apartment, who is coming, are you coming in June, my passport won't be ready for six weeks, Haris Ahmed wanting to go to Pakistan first. All that planning you got to see.

You got to see a lot of the planning between Tsouli, Bektasevic and the defendant about what their bayaan, their announcement video would say. Should it include the pornos, the videos of Washington, D.C.? What should Bektasevic include in his training video?

You got to see some of the planning, but that's not what's required to prove a conspiracy count.

A few more points on conspiracy. A formal

agreement is not required.  We don't need a contract.  You
don't have to sign in blood or swear allegiance to Osama or
anything like that.  It's a shared understanding to enter
into this criminal enterprise.  That's the agreement.

Now, we have a fairly detailed description of the
agreement in this Mother's Day e-mail that Syed Haris Ahmed
sent around.

In this case and under these laws, no overt acts or
concrete step is required.  Had Canadian authorities in
conjunction with the FBI kicked in the door of wherever the
defendant and others were meeting in Canada after a
conversation had been reported where they all said, Yes, we
all need to go to Pakistan to get training so we can support
violent jihad, in theory the case is done and we could have
tried to bring that case.

You don't need to have the overt acts of looking
for a basement apartment, Ahmed actually going to Pakistan,
meeting with Aabid Hussein Khan.  We have all these things,
but they are not required.

Complete knowledge is not required.  If we are all
in a conspiracy together, we have a general understanding, we
are going to rob the bank, if three of you know, I've just
got to get the getaway car, but you don't know exactly what
time we're going to get to the bank, you just know the
getaway car needs to be in the parking lot five blocks away

by 5:00 p.m. on Friday, you don't need to know more about it, you are in on the conspiracy. You know we are robbing the bank. You don't need to know all the details.

Defendant Sadequee doesn't need to know exactly when Syed Haris Ahmed is going to meet with Aabid Hussein Khan in Karachi to talk about getting to Wana to get into a camp, as long as he knows the general outlines of the plan.

Equal participation is not required. There can be a leader, there can be followers, there can be an ameer. We saw that Syed Haris Ahmed was voted the ameer of this effort to get to Curry Land and then onward to Mountain Hills National Park. The defendant was elected ameer of Al-Qaeda in Northern Europe.

As long as you are in, it's one for all and all for one, even if your part is small. Even if in the defendant's case he didn't make it to Pakistan, but he was in with James and Azdee and Abu Umar, We have got to get there, we will send Syed Haris Ahmed first.

And finally, success is not required. They don't have to achieve their ultimate aim. They have agreed to provide material support. We don't need to show that they actually provided the actual support. And as I mentioned before, we don't need to show that some act of terrorism ever did occur.

Now, this is the most technical I will get,

1    I promise.  Count One is somewhat complicated in its

2    structure.  The Judge's instructions will be complicated, the

3    indictment is a little complicated in its wording.

4           Count One alleges that the defendant and others

5    conspired to provide material support to another conspiracy,

6    but not an entity, not LeT, but some conspiracy, either

7    what's called a 956 (a) -- that's just a statute, it's a

8    number -- a conspiracy to commit violent acts abroad,

9    terrorist acts outside the United States, or 2332 (b), acts

10   of terrorism it says that transcend national boundaries,

11   which we'll let the Court explain, that means that the act

12   would be here.  Some of the planning is outside the U.S., but

13   the act is here.

14          So to distill it, in Count One the defendant is

15   charged with conspiring with others to provide material

16   support for some plan, some conspiracy, to commit violent

17   acts abroad or in the United States.

18          Now, you have seen evidence of both:  Joining LeT,

19   joining Al-Qaeda in Iraq, joining Taliban.  That's violent

20   acts abroad.  Al-Qaeda in Northern Europe.  That's violent

21   acts abroad.

22          Now, the discussion with Saajid about Saajid

23   becoming an operative here in the United States, that's

24   local.  Syed Haris Ahmed talking about oil installations,

25   that's local.  These casing videos and what that means,

1    that's local.

2        And you will even see, assuming we have time, an

3    excerpt from one of the defendant's chats with Azdee where

4    the defendant talks about something brewing in the

5    United States in a year or so.  That's the local part.

6        But the important thing for you is this underlying

7    conspiracy need not be well-defined.  You don't need to worry

8    about, Oh, where was the violent act abroad?  Was it going to

9    be a killing or a kidnapping?  Was it going to be August

10   10th, 2005?  Was it going to be with -- he wanted to join so

11   many organizations, LeT, JeM, which one was it?  That's not

12   the government's burden here.

13       The government's burden is to show that the

14   defendant and others conspired to support such a thing.  It

15   doesn't need to be well defined.

16       In some instances it is.  Al-Qaeda in Northern

17   Europe was somewhat well-defined.  We know what they wanted

18   to do, attack those who were supporting the war in

19   Afghanistan or Iraq.  But even then we don't have a location

20   or a date.  It's not the government's burden and not your

21   concern.

22       Now, evidence of the agreement in this case comes

23   in a number of places.  This is Syed Haris Ahmed's written

24   statement from March 18th, 2006.  And he says, after talking

25   about how easy it is to get weapons in the United States:

1        The main conversations in Canada were related

2        to going to Pakistan to obtain military-style jihad

3        training.  One brother -- Syed Haris Ahmed --

4        should go ahead and set up housing and make

5        arrangements and then the others could come over.

6        There is the agreement they entered into in Canada,

7    and they tried to follow through.  We don't need to show

8    success, but you saw all sorts of planning.

9        Then in a chat between again Syed Haris Ahmed and

10   Abu Umar, Khan:

11       What happens after camps, Ahmed asks.  Does it

12       cost much?

13       And then Khan indicating where the destination

14       was, Well, it doesn't cost much, but then they

15       launch you into Kashmir, i.e., where LeT fights.

16       This was their agreement, this was their plan:  Get

17   with LeT, get to Kashmir, and get into some fighting.

18       I want to shift to attempt, the other way in which

19   it is alleged that the defendant committed his crimes.

20       Instead of calling people co-conspirators, we call

21   them aiders and abetters, people who assist in the

22   attempt.  We need to show, the government needs to show, you

23   need to find beyond a reasonable doubt that the defendant and

24   his aiders and abetters intended to provide material support,

25   and in fact they took a substantial step toward providing

material support.  Not just an agreement, not just an

understanding, but someone did something, a step that, unless

it was frustrated, would have tended to result in their

goal.

Meaning Syed Haris Ahmed buys a plane ticket, flies

to Karachi, meets with Abu Umar.  But for his turning back on

his heels, chickening out, they would have achieved their

plan.  Syed Haris Ahmed would have gone to a camp.

So attempt, again this same intent, this

understanding, but a step forward, not just the agreement,

something more.

You are still liable for all the actions of your

aiders and abetters.  If you are in the crew that is making

the attempt, it doesn't matter who it is that takes that step

forward.  If you are in the mix, again, all for one and one

for all.

Finally, I promise, last principle of law, "and"

means "or."  The Judge will instruct you about what the

government needs to prove in the disjunctive.  The government

needs to prove that the defendant provided personnel or

property, that it was in support of a conspiracy to commit

terrorist acts abroad or terrorist acts locally.

But if in your deliberations you tried to reconcile

the Court's directions with the indictment -- and you will be

given a copy of the indictment -- you are going to see "and"

Northern District of Georgia

1  all over it.  That's how we charge things.  And for reasons

2  that are beyond me, "and" means "or" in an indictment.

3       And I say this only so you don't get hung up in

4  deliberations.  You will hear "or" from the Judge, and that's

5  the law.  The indictment says "and," but the government only

6  needs to prove in the disjunctive, one of the options, not

7  all of the options.

8       Now, we have talked about how the defendant and his

9  co-conspirators, his aiders and abetters, provided material

10  support, conspiracy, attempt.  Now, I want to talk about the

11  what, what did they provide, the personnel and property for

12  Counts One and Two, and then for Counts Three and Four, the

13  LeT count, people alone.

14       Let's start with the defendant.  How do we know

15  that the defendant intended to provide himself, that he was

16  part of the mix?

17       We have any number of exhibits.  You heard very

18  early on when Agent Williamson was on the stand about the

19  defendant's interest in December 2001 to join the Taliban:

20  My name is Ehsanul Islam Sadequee.  I am writing to you

21  because I need to go Afghanistan to join the Taliban.  Thus

22  begins our story, December 2001.

23       We fast forward to April 2005.  The defendant,

24  chatting with Aabid Hussein Khan and Syed Haris Ahmed -- no

25  LOLs here -- the defendant suggests, the defendant suggests:

We should be with LT, Lashkar-e-Tayyiba, given what they are

doing, fighting against the Hindus, et cetera.

        The defendant wants to provide himself to the

Taliban, he want to be with LT, and ultimately, of course,

this same chat from April 21, 2005:  Our main last goal is to

get with the students.  Let's train under the Taliban --

under LeT, let's be under their direction and control, learn

how to use the guns, about how to make the assaults.  But of

course, our main last goal, circling back to the desire

expressed in December 2001, is to be with the students.

Mountain Hills National Park is the plan all along.

        The defendant a day later expresses his frustration

when it looks like the plans aren't going to move as

quickly:  Man, I want to go to Curry Land by July at the

latest.  Not Syed Haris Ahmed needs to go, not Zubair Ahmed

should be recruited by Syed Haris Ahmed.  I, the defendant,

want to go to Curry Land.  Not to Bangladesh to get married,

Curry Land to get the training.

        And then if we move into September and October, we

have this.  This is an excerpt from Government's Exhibit

247.  It's the last page of this visa application that has to

be presented, and it says right here:  Application for

visitor's visa must be submitted personally.  This is from

the Swedish Embassy in Dhaka, Bangladesh.  This was found on

Younis Tsouli's computer.

1    If we think through all the players in the mix with

2    Al-Qaeda in Northern Europe, there is only one who was in

3    Dhaka who was trying to get to Sweden.  The defendant was

4    trying to provide himself, personnel, to Al-Qaeda in Northern

5    Europe.  He needed to get from Dhaka to Sweden to join up

6    with the group.

7         Now, beyond the defendant, we know he conspired

8    with Haris Ahmed, Azdee, James and Khan, Aabid Hussein Khan,

9    to provide yet more people.  Those four people.

10        This is an excerpt from the Mother's Day e-mail

11   written by Syed Haris Ahmed but distributed by the

12   defendant.  You will remember the chat where he uploads it on

13   YouSendIt to Khan, and Khan scolds him for putting something

14   this sensitive on a public server like that.

15        Ahmed writes:  This is a message regarding the

16   Mother's Day celebration that we, that we are planning in the

17   Curry Place and Beyond Restaurant, meaning Afghanistan.

18        So we know that the defendant Syed is trying to

19   provide himself as personnel, was conspiring with

20   Haris Ahmed, Azdee, James and Khan, all five of them, to get

21   to Pakistan.

22        Again, we don't need to show that they were

23   successful.  There's no evidence that Azdee made it to

24   Pakistan.  I'm not arguing that.  No evidence that James did.

25   We know Khan did.  Khan met with Syed Haris Ahmed in

Pakistan.

Saajid and Hamzah, May 2005. The defendant conspired with these two so they could provide themselves to violent jihad, one of them here and one of them wherever it was Hamzah was trying to go. We don't need to show where he tried to go.

This is what the defendant wrote to Saajid, the 17-year-old American: Saajid, you have the capacity of fulfilling your largest obligations in your native land. Our native land, here in the United States. Not blowing himself up in Pakistan or in Israel. Here. No LOLs here, no smiley face, LOLZ. This is a private message between the defendant and Saajid. It's not a public forum. This is where one gets deliberate before one writes. It's not realtime with typos or anything like that.

The defendant goes on: I know that the brothers are looking for people like you, Americans, Muslims, but at the same time they can disappear into a kaafir assembly, if you get what I mean.

Once you get to school where you can be trained how to fulfill your obligations, how to shoot arrows, make traps -- now we are getting into code here -- when you are there you will find more people and discuss with those in authority who have experience.

This is the defendant conspiring with Saajid,

conspiring with Hamzah, so that they could provide

themselves.  He's helping recruit them into violent jihad,

and one of them is here in the United States.

Now, there is more to this particular story.  This

is the chat I mentioned that was found on defendant -- on

Aabid Hussein Khan's computer, Zoro, and then Khubayb, the

defendant, in reference to the whole Saajid exchange.  And I

have highlighted some areas here.

And you will remember this.  We went through

this.  There were actual excerpts from Saajid's private

messages that the defendant had pasted in here where he

talked about being a 17-year-old convert, et cetera.

So Zoro, presumably Aabid Hussein Khan, said:  I'm

not so sure that Saajid should go to Curry Land with or

before us.  That is their plan, we are going to Pakistan.

So defendant:  Give him something to study.  Not

how to be a good Muslim, not, you know, the shots you need to

get before you go to Pakistan.  Issues about martyrdom and

operations, killing women and children.  This is the

individual that the defendant described as being useful

getting into kafir assemblies, a football game, church

service.

And finally Aabid Hussein Khan concludes:  He,

Saajid, is an asset to us.  He's a tool, he's a weapon.

No LOLs in this chat.  You can look at it.  It's

1    Government's Exhibit 142.  You will have it.  At no point

2    does the defendant say, Whoa, whoa, you are talking about the

3    United States.  That's where I was born.  Some of my family

4    lives here.  No, no, no, no, no, no.  We need to get this guy

5    overseas and he will just kill some people I don't

6    know.  That's not in there.

7              Finally, the last group of personnel that the

8    defendant conspired with to provide support for violent jihad

9    is Tsouli, Bektasevic, and Bektasevic's associates.  This is

10   the Al-Qaeda in Northern Europe.  And you have read the

11   chats.  You can read them again, 233, 234, it's all spelled

12   out what their plan is.  You have seen the video that

13   Bektasevic made after he discussed it with the defendant and

14   Younis Tsouli.

15             We know these people were conspiring.  You will

16   have the bayaan.  It's not particularly helpful in that

17   format, but you have got a translation of it.  That's

18   Exhibit 241-A, the announcement released on September 11,

19   2005, at 8:46 a.m., precisely when the first jet crashed into

20   the World Trade Center.

21             These guys don't kid around.  They understood the

22   symbolism of that.  It's printed on the bottom of the bayaan,

23   announcing the formation of the organization to which the

24   defendant belonged.

25             And if there is any question about whether the

defendant belonged, we have Government's Exhibit 233, a chat between the defendant, Mirsad Bektasevic before he made it to Bosnia, and Younis Tsouli.

And Mirsad says:  Guys, I need to know this.  Are we a jumat, are we a group, are we NR, are we Al-Qaeda in Northern Europe?

No, question.  Tsouli says:  Max, of course we bloody are.

Keep reading the chat.  The defendant joins in soon thereafter:  We are all one community.  We are one.

The defendant conspired with Tsouli, Bektasevic, Bektasevic's associates, and perhaps individuals in Bangladesh.

He goes on in the chats to say, I have got some brothers from Dhaka who will want to come check out what we set up in Sweden, presumably stocked with all the armaments we see in the video.

Now, that's personnel.  That's personnel to the various conspiracies to commit terrorist acts, that's personnel to LeT.  Syed Haris Ahmed and Ahbid Khan talking about LeT.

We also have property.  And the property in this case, very simple, is the casing videos.  It's the casing videos.

Now, what's frightening about these casing videos

is not that the Masonic Temple is in them. It's not that they were professionally done. They are not. It's not a high-gloss video that you would see on a National Geographic presentation or something on Nova. It's the message that they send that we are in your backyard.

Osama Bin Laden can't come into the United States, but Saajid can operate in the United States, the defendant and Syed Haris Ahmed can move around freely, and they can get this close to the World Bank. You can't read it right here, it says the World Bank Group on the side. They can get this close to a fuel tank farm. They actually got a lot closer to the Capitol, but this is the video of the Capitol that was found on Younis Tsouli's computer.

All four of these videos were found on Younis Tsouli's computer. Two of them, the top two, were also found on Aabid Hussein Khan's computer. Younis Tsouli, working closely and directly with Al-Qaeda in Iraq, recruiting people, getting them through Syria in Al-Qaeda in Iraq, releasing their beheading videos, their IED videos. Ahbid Hussein Khan, the camp facilitator, that's where these videos ended up. Not with Azdee stuck in Canada, or with James.

And if there is any question about what these videos were meant for, we have Syed Haris Ahmed's statement from March 15th, the day he finally revealed that he still

had the camera that made them, and after denying for several
interviews that it was the defendant who made them, his claim
was it's defendant's camera, defendant's camera.  Finally on
March 15th, Well, actually it was my camera, it's at my
parents' house.

He says in his statement:  I went to Washington,
D.C., with Ehsanul Shifa Sadequee.  The purpose of our trip
was to make surveillance or scoping videos of various sites
in Washington, D.C.  We then planned to send these videos to
the jihadi brothers overseas.  Khan, Tsouli.

And we know how they got there.  The defendant
walked into Raksha, put them on a computer there, and sent
them, Jimmy's 13th birthday and volleyball party --
volleyball contest.  You saw the chats when he transferred
them.

And what does he say about them?  This is the
chat.  You can look at it, Government's Exhibit 117, April
26, 2005.  Khan says:  I love reading this type of
material.  He's referring to the World Bank video, the first
one that went across, Jimmy's 13th birthday.

Then the defendant says:  If you think it will
raise the morale and incite the football team, then show it
to them.  That's not the Atlanta Falcons.  It's not a soccer
team he's talking about.  It's the crew that's part of the
plan, it's the people who want to support violent

jihad.  Show them the video if you think it will raise morale and incite the team.

You heard Omer Kamal talk about what would happen when they watched these videos, these recruiting videos, that they would get pumped up.  They would watch the last will and testament of some guy before he blew himself up, killing U.S. soldiers.  That's what this is about.  That's what the defendant was doing.

And what did the defendant hope to do with these videos?  This is an excerpt from Government's Exhibit 234, the chat between the defendant and Azdee in Canada.  Azdee's cautioning him:  These videos, I don't think it's so smart, because they can catch on when you were in Washington, D.C. Remember the Chinese guy?

The defendant won't have any of that.  He's a step ahead.  First of all, the release he's going to have -- and this is in reference -- this date, by the way, this is when Mirsad Bektasevic is arrested.  The defendant doesn't know it yet.  He's talking about the video that he's going to release with Tsouli and Bektasevic, with Bektasevic's training footage, the arsenal, out in the woods blowing something up, along with the Washington, D.C., videos.

Defendant says:  It's going to make them piss.  It will awaken them.

Azdee says:  No, no, no, they will be able to tell

1  when you were in Washington, they will put two and two

2  together.

3          No, defendant says:  The thing is we are not going

4  to show those clips.  Just some random buildings from the

5  area.

6          World Bank, Masonic Temple, fuel tank farm, you

7  can't tell what day those videos were made.  There is no

8  HAZMAT truck driving by.  You don't have the two Capitol

9  security guards in those videos.

10          Just some random buildings from the area.  There

11  won't be bait.  There's that word again.  Don't worry, I know

12  what I'm doing is illegal, but I won't get caught.

13          He goes on, in case there was any doubt in your

14  mind that the defendant was planning with others something to

15  happen in the United States:  You know a good thing about it

16  is?  Nothing is going to happen there -- where the videos are

17  going to be released, the United States, he's in Bangladesh

18  at the time, the defendant is -- for at least another good

19  year.

20          So here is the impact they will have.  People

21  aren't going to die, but look what's going to happen:  They

22  increase their security, they are only tiring their

23  resources, losing money, will start to get bored with all the

24  high alerts, the long lines at the airport for security

25  checks.  They become accustomed to it, they start joking

about the alerts, they let their guard down, and year from
now, who knows what happens.

Not letting their guard down in Afghanistan or
Pakistan, but here where Saajid could be doing his thing.

Now, finally -- I actually get to talk to you guys
twice.  I start, the defendant will address you, if he so
chooses, and then I get to come back in rebuttal.  But before
that, I want to talk a little bit about the destination of
the material support.

We talked a lot about the defendant's plans with
others for Counts One and Two, whether it was LeT or Al-Qaeda
in Iraq or Al-Qaeda in Northern Europe or the
Taliban.  Counts Three and Four are a little more complicated
for the government because they are narrower.

And I will tell you this, the evidence is
overwhelming of defendant's guilt on Counts One and Two.
It's just there, in every chat, every communication.

Three and Four are more difficult counts.  You may
well struggle over that, because the evidence that LeT was a
destination is less abundant than the evidence that the
defendant conspired with others and made an attempt to
provide material support to violent jihad.

There is nonetheless evidence, so I want to talk
about that.

Lashkar-e-Tayyiba, a designated terrorist

organization, designated by the United States.  And there was

some confusing testimony, and you may hear from the

defendant, Well, you know, they actually changed names.  LeT

doesn't even exist in 2005, so there can be no crime because

one can't join LeT.

But by any other name exists LeT.  It hasn't gone

away.  It changed its name because it was outlawed by the

Pakistani government.  It remains outlawed, and it gets

redesignated every time it needs to be redesignated by the

United States.

It's a terrorist organization.  The defendant

conspired with others to provide personnel to LeT.  Here is

how we know.

You have seen this before.  Defendant's own words,

April 21, 2005, in a chat with Syed Haris Ahmed and Khan, the

facilitator, the person who could actually get them in.

Defendant says:  We should be with LT.  His idea, we should

be with LT.

You have seen this before when Khan and Syed Haris

Ahmed are talking:  I get in the camps and then I'm going to

go fight, and where is all this happening?  There is not --

well, it could really be anywhere.  It could be anywhere in

Pakistan, it could be in Wana, Waziristan, it could be in

Afghanistan.  It's Kashmir that they are thinking about.

And you have heard the testimony from

1   Mr. Kohlmann.  If you are going to go to Kashmir, LeT is your

2   ticket.

3           But we know more.  We know what the plan was.

4   Syed Haris Ahmed in his March 18th statement:  When I went to

5   Pakistan to receive military training in a jihad camp, I had

6   hoped to join LeT.

7           It's right there.  It can't be stated more

8   clearly.  And remember what I said about attempt and

9   conspiracy.  The defendant doesn't need to be the one who was

10  going to get to LeT.  As long as it's someone who had joined

11  the plan with him, a co-conspirator -- here Syed Haris

12  Ahmed -- or an aider or abetter.  If the plan was to get

13  someone on the ground, get someone training, that someone

14  could be Syed Haris Ahmed and not the defendant.  Although we

15  see in the first excerpt, the defendant himself had

16  contemplated joining LeT.

17          But we know more about the conspiracy's connection

18  to LeT.  You heard Mr. Kohlmann talk about this briefly.

19          This is a letter, it's Government's Exhibit 96, and

20  it came up twice, once through Mr. McGee, the computer

21  forensics guy.  And he testified that this letter was

22  modified for the last time on Aabid Hussein Khan's media in

23  early May 2005.

24          Early May 2005.  Well, where does that fall in the

25  conspiracy?  Well, we have seen all the chats from April, and

the plan as it exists in early May is Haris Ahmed will go over first to be joined by Sadequee, maybe James, maybe Azdee, and they will get some training in Pakistan and probably end up in Afghanistan.

This is a letter written by, you can see at the bottom, your brother in Islam, Ahbid Khan. What does it say? This is from the top line: A brother who I trust is getting ready to go to Pakistan, and so I thought it a good time to send a letter.

Khan, who had already been to a training camp, he discussed it in his chat with Syed Haris Ahmed, is aware of a brother, he doesn't want to name names, he's aware of Syed Haris Ahmed who is getting ready to go to Pakistan. So let me send you guys, you training camp operators, a note.

He goes on to say: I was meaning to ask if you can help arrange for the training of a few brothers from abroad. Amongst them are nonPakistan nationals. The defendant, Azdee Omani, James. I hope it can be arranged for their safety and travel, accommodations met, which they will pay for any costs involved in providing the protection, the protection, and so on, insha'Allah.

We have already seen the discussions that these folks had about needing to raise money because it was going to cost some money to get into a training camp.

And finally Aabid Hussein Khan, the facilitator,

1  aware of what it takes to get into a training camp:  I have

2  heard that the Pakistani government is now taking down names

3  for anyone wanting to train.  To train, now he's revealing

4  what this is all about.

5  Is this the case, and is there a way around this,

6  such as lying to them, the Pakistani government, by telling

7  them that we are villagers, as the Prophet permitted the use

8  of deception in war?  Of course, the war on Islam that the

9  defendant and others are joining to protect the ummah.

10  This is a letter written by Aabid Hussein Khan, and

11  he explains at the bottom how he's delivering it.  He

12  actually hands the letter to someone.  He says:  Send any

13  response you have to my e-mail address, which is in there, or

14  tell the brother who delivered the letter what the answer

15  is.

16  So we have someone that Evan Kohlmann identified as

17  a facilitator for LeT writing a letter about one person

18  coming first to come to Pakistan, he trusts him, and then

19  others joining, some of whom are not Pakistani.  That's the

20  evidence that shows that the defendant and others were

21  conspiring to provide personnel to LeT and actually took a

22  concrete step, the attempt, sending Syed Haris Ahmed to

23  Pakistan, he met with Abu Umar, and then turned back on his

24  heels.

25  That's the evidence you have seen.

I will come back when the defendant is done, if he
chooses to address you, to make a few final points.  But
I want to repeat what I said at the beginning of the
closing.

The evidence in this case is clear, the evidence in
this case is overwhelming at least as to Counts One and
Two.  The defendant conspired with others, he took concrete
steps with others, and in fact with the videos actually
successfully providing material support to violent
jihad.  They also conspired and attempted to provide
individuals to LeT, to work under their direction and control
in a training camp in Pakistan.

Thank you.

THE COURT:  All right.  Mr. Sadequee?

MR. SADEQUEE:  Good morning.

I would like to start by thanking you for being
patient with me for being so fast throughout my presentations
including what I was -- I'm trying to do my best representing
myself although I'm not a lawyer.

And I would also like to thank the Court for being
patient with me, for letting me say things during my
presentation myself.  It's not as easy as you see in *Law and
Order*.

So I want to explain in this closing argument,
closing statement the reasons why I'm innocent and not guilty

of the four charges, the four crimes I'm charged with in the
indictment, and explain to you some of the issues I think are
important and necessary when examining this case concerning
my religion and those of other Muslims.

The government gave you some explanations as to
what the law is.  The Court will after our closing
arguments --

THE COURT:  Mr. Sadequee, can you pull the
microphone closer, please?  Thank you.

MR. SADEQUEE:  The Court will tell you on the fact
that certain persons who associate with each other and
assemble and discuss common aims and interests does not
establish proof of a conspiracy.  That's not my words, that's
what the Court will be addressing when the Court explains to
you, the jury, what the law is.

The Court will also tell you that to be guilty of a
conspiracy, the government must prove beyond a reasonable
doubt that two or more people came to a mutual understanding
to try to accomplish a common and unlawful plan, and that --
so that's actually what the Court will be saying.

So I did not conspire.  And before previously to
understand what conspire is, some synonyms of that are to
plan, design, to plot.

I did not conspire with anybody, neither Mr. Haris
Ahmed, nor Abu Umar, nor Mr. Bektasevic, nor Younis Tsouli,

to either engage in terrorism by killing, kidnapping or
injuring someone in this country or in another country.

I did not conspire with anybody to provide material
support to LeT.

I did not attempt -- so just to explain what the
word attempt means, it means to make an effort, to undertake,
to try.  I did not attempt to provide material support to any
terrorist organization.

So let me tell you why the evidence shows that I am
innocent of these charges.

First, the D.C. videos.  You have seen the D.C.
videos.  You see that they are very amateurish and
useless.  Anyone who wants to -- any real terrorist would
probably go to Google Earth and get satellite imaging of what
they want instead of footage from a camera, which is not even
a camera designed to take video for this.  It's actually a
digital photo camera which can take very grainy video
footage.

So someone could go to Google Earth and get
satellite live images of locations from anywhere around the
world, and on the internet you could get much better
pictures.

And that's actually what terrorists do.  They would
not go to some people who could be spies from Atlanta,
Georgia, as Mr. Kohlmann alluded to.

1    When I was speaking with Tsouli, Irhabi 007, and

2  the Bosnian guy, Mr. Mirsad Bektasevic, in a chat in October,

3  we had a lot of chats and discussions about what to do with

4  these videos and making a -- splicing the video, the D.C.

5  videos with some videos that Mr. Bektasevic would make and

6  how this would be a media stunt to get media attention, to

7  get -- prove something to some scholars for whatever purpose,

8  to scare people, to -- it was not to -- it was not a material

9  support to help terrorists engage in planning terrorist

10  attacks.

11    The government says I'm guilty because I conspired

12  and attempted to provide material support -- the indictment

13  alleges that I conspired and attempted to provide material

14  support to terrorists in the form of personnel.  The idea in

15  the indictment is that I agreed with Haris that Haris or

16  I would personally become terrorists or will join LeT.

17    Here is why I'm not guilty of that charge.  Haris

18  and I never agreed that he would go to Pakistan to join

19  LeT.  He always wanted to go back to Pakistan, which he

20  always goes back and forth to Pakistan.  He's lived there his

21  early years of his life.  His sister is there.  He actually

22  went to Pakistan, as you heard yesterday, the very month

23  after his sister had given birth to his niece.  And he goes

24  to Pakistan every summer on summer break with his cousins,

25  who are his best friends, who are also on summer break in

Pakistan.

And his activities in Pakistan, other than a single afternoon with Abu Umar, was nothing different from his other visits to Pakistan. In fact, the most dangerous time in his stay in Pakistan was perhaps in 2004, when I never met him, when he actually by himself came into contact with LeT commanders and LeT recruiters. The name that he gave was Abu Suffian.

That was at a time when he neither met Abu Umar nor any of these chats ever took place. I don't know him, he doesn't know me. And he actually met LeT commanders, I mean, and he did not join any terrorist training camp.

And now in 2005 he met with Abu Umar one evening and never met him again. He did not attend nor visit any training camps, let alone join LeT.

The government says or uses this phrase, the fact that it was not successful does not mean -- but they ignore the fact that it was not actually attempted to begin with. For something to be unsuccessful, there has to be actually an attempt for it to be unsuccessful. If there is no attempt, of course it is not going to be successful because there was no attempt to begin with. It's logical.

So he never attempted to attend one of these training camps or any of these training camps, which are all over Pakistan, which anyone can go to if they wanted to go to

1    really, as his sister, who lives in Pakistan most of her

2    life, a practicing Muslim, mentioned.

3            And also the government's expert witness,

4    Mr. Kohlmann, said that LeT has publicly their phone number,

5    their e-mail address, other contact information, that if you

6    want to join us, here, this is how.  They don't have on any

7    of their websites, you know, contact Abu Umar or

8    Aabid Hussein Khan, he's our guy, if you want to join us, do

9    it through him.

10           According to the expert testimony of the

11    government's witness, they have -- it's public, these are the

12    avenues, call us, contact us, that's the way, and this is

13    public information.

14           As far as all the chats, I think the principle

15    which we have all heard is that actions speak louder than

16    words.  There are all these chats, words.  I think what

17    should be really looked at is what's actually done.

18           The government says there is an agreement.  You

19    will see throughout many of these chats that there is

20    discussions about wanting to go to Toronto, and there is

21    disagreements.  Some people want to do some things, some

22    people want to do something else.  I was talking about going

23    over to Toronto, trying to get an apartment, getting a job in

24    Toronto.

25           As for what Haris actually did in Pakistan, Haris

went there, spent all of about a month and a half stay or a
month long stay, hanging around his cousins, talking to some
scholars.  What did he actually visit?  He visited Islamic
schools and universities.  He did not visit any training
camps, along with all his cousins and his relatives, and then
came back home to Atlanta.

If you wanted to become a terrorist, if you wanted
to join a terrorist organization or camp, it seems like much
more attempt, regardless of whether or not it would have been
successful, of course, but there would have been an attempt
on his part trying to get into these camps, trying to make --
make it, make his way to these areas such as Kashmir or the
provinces within Pakistan which are jihad areas.  He did not
leave his home city of Karachi.  Which he did leave in other
respects in 2005, but he did not leave his own city.

The simple truth is that the reason he did not
attempt is because he truly, behind those words and chats,
did not truly intend to do what he was saying and talking
about and chatting online with people.

If he wanted to, he already met LeT
commanders.  It's not a matter of being unsuccessful.  It's a
matter of not wanting to attempt to join.

I can't be found guilty on either conspiring or
attempting to provide personnel to a terrorist group based on
that.

1    Now, in December of 2005, right when Haris is

2  coming back to Pakistan, without talking or e-mailing me or

3  telling me, I was going to Bangladesh to get married.  The

4  fact that he was coming the very day after I left for

5  Bangladesh the government wants to make something out of, but

6  it's really not something.

7    Now, I went to Bangladesh.  The government tries to

8  make it appear as though my getting married was a cover for

9  jihadi activities in Bangladesh.

10    Now, if you went over some of the evidence

11  provided, exhibits provided as evidence yesterday, you will

12  see that almost all of my money went on my wedding expenses,

13  a wedding which I was hoping to get married even before I met

14  any of these individuals, as my sister explained.

15    You know, I think where one spends his money, you

16  can tell a lot about a person like where he spends his money

17  or how he spends his money.  Show me the money, you know,

18  says a lot about the person.

19    We should ask ourselves, if the wedding is the

20  cover and the jihad is the real intention, then how come all

21  of his resources are being spent on the wedding?  And also

22  you should ask how much money is he spending on his so-called

23  jihad intentions?

24    Now, so throughout 2005, there are these chats

25  about trying to go to Pakistan.  Now, when I'm in Bangladesh,

when I'm a stone's throw away from Pakistan -- I mean, you have geographically Bangladesh, India, and then Pakistan, India is, you know, where Kashmir and -- so now I'm on the other side of the world, I'm a stone's throw away from Pakistan, and all of the sudden you see that I'm not even talking about going to Pakistan anymore then. I'm talking about Sweden and Bosnia and Indonesia.

Now, the government has come up talking about and showing you the video of Mr. Bektasevic in Bosnia, the video that he made. So some points with regards to this I would like to mention.

As the government agents have testified, I never met Mr. Bektasevic in my life. There is no evidence that he did -- he, Mr. Bektasevic, did anything with the video in terms of giving it to other people. I mean, he had it in his pocket when he was arrested.

Now, the chat in which -- the conversation online that I had with him when we were talking, to go back to it, you will see that before he offers to make these videos with actual weapons, we were offering -- I offered the idea of creating false images of weapons using computer graphics, and then Tsouli offers, Mr. Irhabi 007, he offers the idea of using toy guns.

That's when Mr. Bektasevic says, you know, I think I'll go back to Bosnia, there is real weapons over there.

In fact, the first time I ever saw this video was actually just a few weeks ago when the government gave us material that they would be using in this trial. I had never seen that video before, meaning the Bosnian video.

And the video is obviously very scary, so I don't want to tell you actually ignore what's on the video, but I do want to mention and make sure that you do know that the context within which -- the surrounding information, that it is necessary to note the background of this video which you have seen in these chats. I never saw any of those weapons.

I was not involved in helping them get any of those weapons. I mean, he is in a war zone or a former war zone and, you know, which had NATO peacekeeping forces the year prior to him being arrested, peacekeeping because -- foreign troops, because there is a need for peacekeeping forces, it's a war zone or conflict over there.

Obviously I have never been there, so I can't say how easy it is to access weapons, but at the time of his arrest I believe he was -- Mr. Bektasevic was in his late teens. So I guess it would be much more easier than in the States, in America over here to get weapons.

I do not know where he got those weapons or -- I'm not involved in any way, in any way or shape or form of him -- having facilitated him getting those weapons.

Now, you can see in the chats with him and
Mr. Tsouli that everything we talked about was -- you could
read for yourself and see. It's a lot of just ridiculous
things.

For example, Mirsad Bektasevic was in his late
teens and Mr. Tsouli was in his early 20s, and myself, I'm in
my late teens at that period of time. I was arrested when I
was 19. So these chats, Mr. Tsouli and Mr. Bektasevic, they
decide to form a new branch of Al-Qaeda called Northern
Europe, Al-Qaeda in Northern Europe.

If you actually think about what's happening is
that there is two individuals who suddenly decide that
between them they are going to form a new jihad organization,
right, and it is as Mr. Kohlmann, the government's expert
witness, said, something to the effect that it did not exist
anywhere outside the minds of those individuals, meaning this
Al-Qaeda in Northern Europe did not exist outside of the
minds of those individuals.

And he went into the history of how -- or the
manner in which actual Al-Qaeda organizations are formed and
how they release statements from, you know, Afghanistan,
various leaders, and on video, on audio and so on and so
forth. They don't make an online post on their official
notepad with that heading. That's not how it's done. There
is formal acknowledgments and so on and so forth.

1      This is also perhaps one of the reasons why nothing

2   was ever heard of afterwards of this Al-Qaeda in Northern

3   Europe, what, this one announcement, and the end.

4      You can see in the chats with Mr. Tsouli and

5   Bektasevic on September 21st at 3:20:23, 3:21:49, 3:24:46 and

6   3:27:41 the same conversations as in the earlier chat with

7   Abu Umar and Haris, that we spent a lot of time talking about

8   who is going to be the boss, who is going to be the ameer,

9   who is in charge of communications, who is in charge of

10  operations.

11     There is a point where we call Mr. Bektasevic, who

12  is in his late teens -- actually I might be wrong about this,

13  but he was 17 when he was arrested -- we say that he's going

14  to be the field commander, and he's not -- and as the Bosnian

15  agent himself testified, that his -- the trip in which he was

16  arrested in Bosnia was the first trip that he took without

17  his parents outside of Sweden.  Imagine.

18     I guess it was -- there is discussions with him, Do

19  we have a plan?  Nobody agreed on anything.

20     I request that you would read particularly the

21  chats on September 21st and the 23rd of September where there

22  is these ridiculous conversations that show really there was

23  no real criminal conspiracy or a real attempt to commit a

24  crime, attempt to commit a crime.

25     Now, what these chats do demonstrate quite clearly

is that we were immature young guys who had imaginations
running wild.  But I was not then and I am not now a
terrorist.

The prosecutors also spent a lot of time talking
about Tibyan Publications and showing you some articles and
books that were on the website, and then at the same time as
they are showing you certain cut-and-paste excerpts of what
they want to show, they try to claim that this case is not
about my thoughts and words and beliefs, not about what
I translate, not about my work, what I, myself, refer to as
True Preaching, which prior to my arrest used to be my main
concern.

They take out a couple of excerpts, cut and paste,
and show it to you so that you find -- show it to you out of
context so that you would find those words deplorable, to
aggravate your feelings.

There are a lot of books and articles on the Tibyan
Publications website that perhaps you would find offensive,
but there are also a lot of thought-provoking articles and
books and literature which perhaps would help ask -- help
promote -- help promote debates and encourage, encourage
thinking and reflecting.

If you go in the public library near your home, you
will probably find a lot of books and literature that you
might find offensive as well.

You might find books and literature which regard Jesus as a great man and a messenger of God. You might find other books that consider Him to be, having gone to Alexandria, Egypt, to be a sorcerer.

You might find books which say that the United States -- you know, about the United States of being great, spreading liberty and democracy all over. And you might find books that the United States is run by aliens and demons from other galaxies taking over the world.

You might find books that the United States is a land of justice and -- where justice is done and justice is served. You might find books that the United States, the laws are codes, such as the UCC, enslaving the people.

You might not agree with it all, but there is a lot of thought-provoking material and controversial material. These are supposed to be protected by First Amendment.

As you heard Haris testify, Mr. Ahmed testify, I spent a lot of my time trying to translate various books and articles for Tibyan Publications. You might remember a chat where I discussed about working and enjoyed working from midnight to, I don't know, the morning working on translations, and how that too actually was one of my intentions, to move somewhere where I could just do that all day long.

          Now, I also want to say some things about the
e-mails and the chats in general.  You have heard from
Zubair Ahmed, you heard from Haris Ahmed, you have heard from
Mr. Omer Kamal.  One of the questions on the jury
questionnaire was have you met Muslims, and many of you said
you are not familiar with Muslims.

          So I mean, I understand that a lot of this might be
very -- talking with Muslims and going over internet chats is
not something which you are accustomed to and our dialogue
and our way of conversating, the words we use, the vocabulary
and how we go from one language to another, using Arabic and
Urdu and English all at the same time, all of this is strange
and confusing.

          Now, Omer Kamal mentioned how we were passing by a
particular Shiite mosque and how Haris and I were passing by
Dobbins Air Force Base, we made some comments about taking it
over or attacking it, and it was never ever discussed ever
again.  This is -- this is something -- then the government
actually puts in the indictment that these were things that
were discussed, and it's just mind boggling how such things
can be completely taken out of context and made into
something that it never was.

          But we were not terrorist conspirators.  The vast
majority of us, Haris, I, Omer Kamal, Tsouli,
Mirsad Bektasevic, at the time of these chats were either in

1  our late teens or in our early 20s.

2  I guess if someone can't see the difference

3  between -- or chooses not to see the difference between -- or

4  pretends to not see the difference between teenagers or

5  early -- young men who talk -- who type faster than they can

6  think -- there is one e-mail where I'm saying think before

7  you say something and don't mix with hyper English-speaking

8  youth -- if someone wants to find such chats to read a

9  conspiracy and not to see the difference between hyper

10 English-speaking youth, I mean, yeah, someone can find them

11 guilty, ignore the difference between these people and actual

12 terrorist conspirators.

13 But I do hope that you would see that young men who

14 talk in online chats, venting their frustration, venting

15 their anger in their own ways, there is various ways of

16 speaking and having vent, blow off steam, as Omer Kamal

17 mentioned, that there is a difference between this category

18 of people and actual terrorists or those actively engaging,

19 providing material support to terrorists.

20 It should be mentioned that there is no evidence

21 that the government has shown that even the other

22 participants, meaning James and Azdee, not only did not

23 attend any training camps, did not even go to Pakistan, that

24 they did not even get a visa to go to Pakistan, despite all

25 the chats.  Like I said earlier, actions speak louder than

words, or the absence of actions speak louder than words.

The two individuals who did go to Pakistan are Aabid Hussein Khan and Mr. Ahmed, who are both born in Pakistan, raised in Pakistan, both have accents, and more or less regularly, or at least on an annual basis, going to and forth from Pakistan, despite any of these chats, before any of these chats.

Now, you might not like what I write or translate about or say, but this case is not supposed to be about what we think or, as the government said, you know, in the chat I said I'm thinking about joining LeT, and then possibly one of the explanations of that was contemplating joining LeT, contemplating. So this case is not supposed to be what we think or contemplate about, even if that contemplating is done outloud with others or over the internet.

This is supposed to be about what we did, action, or the absence thereof. We did not conspire to kill or kidnap or maim anybody. We did not conspire nor attempt to provide material support to any real terrorist. There is no evidence showing that I agreed or planned or conspired with others to kidnap, kill or maim anybody.

The only real activity that I was involved in was translating Islamic radical literature. In fact, even during my imprisonment I have translated and also written articles and books. I don't know if they will ever see the light of

day, but a lot about what's been happening in my case and
broad subjects.  I hope perhaps, if God wills, they will be
released and people will be able to read it, anyone will be
able to read it.

But I'm not a terrorist.  I hope that however much
you might disagree and dislike however strongly things that I
have said or translated or wrote or thought outloud about,
that you will be fair and that you will not convict me just
because -- just because of what I have said.

Again, I emphasize that actions do speak louder
than words.  So however loud my words and chats may be, let
it not silence what actual actions that I did take.

I did spend all of my money in Bangladesh for what
the government claims was actually my cover for my real
jihadi activities, which I spent no money on.  If you follow
the money or show the money, you know, that would show you a
lot.

Again, I thank you for your patience and the
attention and the effort that you will make to be fair, and
I close by saying that I hope God assists you in making the
correct and just decisions.

And we all -- I'll end by saying the Islamic
prayer.  *(Prays softly)*  All praise belongs to God, Lord of
all people.  Thank you.

THE COURT:  Thank you, Mr. Sadequee.

1    Mr. McBurney?

2    MR. McBURNEY:  I'm back.

3    I want to clear several things up defendant just

4 shared with you.  First his age.

5    Everyone you have heard about in this case, with

6 the possible exception of Saajid who identified himself as

7 17, was an adult, 18, 19, 20, the very same age as

8 U.S. soldiers being killed in the videos that the defendant

9 and others got excited over.  That's the age set we are

10 talking about.

11    We have got the warriors involved in the actual

12 armed struggles, U.S. soldiers, British soldiers, et cetera,

13 and the would-be terrorists.  They are all the same age.  So

14 the hyper youth the defendant describes the set he belongs to

15 is the same age as the soldiers that they are going to fight

16 against if they join LeT or Taliban, Al-Qaeda in Iraq.

17    The defendant described one of his schemes, his

18 video that would include the D.C. casing videos and the

19 training video from Mirsad Bektasevic as something that's

20 just designed to scare people.  I thought that was very

21 telling.

22    That's what terrorists do, they scare people.  They

23 are called terrorists because they seek to change policy

24 through fear, through terror.

25    When someone's head gets chopped off, that's the

means to an end:  Get the U.S. out of Iraq.  They know they

are not going to be able to take the Army head on.  They

would lose.  But through terror they try to change policy.

So this video that the defendant wanted to release

with others he just said was designed to scare people.  It's

in the chats, scare the United States so they raise the

security level and then they let their guard down.  That's

what terrorists do.

Let's talk a little bit about Syed Haris Ahmed's

trip to Pakistan and what happened soon thereafter.  The

defendant told you, argued in his closing statement -- which

is not evidence, just like my closing argument is not

evidence, I'm sharing with you the government's perspective

on the evidence, you decide the facts -- that really

Haris Ahmed went to Pakistan to see his new niece and check

out some Islamic schools.

But what you saw, Government's Exhibit 228, a chat

between the defendant, Waseem Mughal -- this is one of

Younis Tsouli's cohorts in London, arrested on terrorism

charges -- and Azdee, the Canadian, in early September.  It's

after the defendant has gone overseas to Bangladesh, and

Syed Haris Ahmed is back here regretting that he turned back

on his heels and declaring to others that the third is not

broken for me.

The defendant is telling these other people, Let me

tell you what went down in Pakistan.  And the expression --
and you will read it, I'm not giving you anything out of
context.  You get the entirety of all these documents.  The
government was chastised by the defendant for taking things
out of context.  That's not the goal here.  The clips that
you have seen are designed to give you some insight.  But
read from start to finish these chats.

Through witnesses at times we would jump around
some of these chats.  These guys were online forever talking
about this stuff, and we touched upon the high points.  But
read it all.  The truth will speak to you from there.  It's
not a joke, it's not a game, it's not LOLZ.  It's conspiring
to provide material support to violent jihad.  They don't use
those words, but you will see what their intent was, what
their plans were and the steps that they took.

But back to Ahmed.  The defendant is describing to
Mughal and to Azdee what Syed Haris Ahmed did in Pakistan,
and the defendant expresses disgust and amazement that Ahmed
had the chance, he met with Khan, and Khan said, Come on up
to Wana -- that's where we first saw Wana, what's Wana, and
Evan Kohlmann, Mr. Kohlmann told you it's actually one of the
most dangerous places on earth, unless of course you have a
contact like Khan.

Khan was in Wana, and he came down to Karachi to
meet with Syed Haris Ahmed, and then Syed Haris Ahmed

chickened out.  Not that he didn't intend to do it.  There

wasn't this, Oh, what was Ahmed doing?  Did you know Ahmed

went to Pakistan?  I didn't know that.  What was he doing

there?

He knew exactly what the plan was, and he discusses

it with Mughal and with Azdee, and they expressed revulsion

at the fact that Ahmed blew this opportunity, didn't follow

up with Khan.  Khan said, Come on, I will meet you here, now

just get up to Waziristan, get to Wana, and I will get you

in.

Defendant's words, not mine, not out of

context.  Read 228.

Bektasevic, an adult, a terrorist.  The defendant

proposed to you in his closing that he really didn't know

what Bektasevic was doing there, he didn't know the guy,

never met him, wasn't quite sure what was going on.  Again,

his own words undercut his position.  Now when he's on trial,

his liberty is at stake, he tells you, I don't know much

about it, I just translate for Tibyan.

Read the chats.  Read the chats from October 15,

October 16, just before Bektasevic is arrested.  They are

talking about a silencer.  Hey, how that's silencer work?  It

sounds like you are farting.  What about you are working on

Al-Qaeda traps, the big kind, and he talks about detonators

and this and that.

The defendant didn't have his hands on these things, but he knew what was going on, and you can read about the plan.

The defendant is pleading with Bektasevic to get back to Sweden.  I need to get to Sweden, it's hot here in Bangladesh.  Not temperature hot; arrests, crackdowns.  You will see the phrase, a severe boiling crackdown.  Defendant's words, no LOLZ.  There's trouble here in Bangladesh, I need to get out.  When are you going to get back to Sweden?

And Bektasevic says, All in due time, brother.  I need to finish what I'm doing here.

And you saw what they were doing there, you saw effectively the lab they had in that kitchen where they were rolling out the plastic explosives, getting it ready to travel.  They can put it in a suitcase if it's all flat.  They had their bomb belt, they got their supplies, and the plan, as it's discussed by the defendant and Mirsad Bektasevic is to get together in Sweden.

It's not pie in the sky.  Someone did get a visa application, a visa application from Bangladesh to Sweden, not from the United Kingdom to Sweden, not Pakistan to Sweden, but Bangladesh to Sweden.

What Evan Kohlmann said about Al-Qaeda in Northern Europe as the reason why no one heard about it is that it hadn't had a chance to make a name for itself.  The way to

get on the map isn't just do a bayaan.  It's by doing
something.  Getting a bomb done, explosives and silencers,
and then actually doing something.

Of course Al-Qaeda in Northern Europe
disappeared.  They got caught before they could do
something.

And that's what this work is all about.  The goal
is to catch the terrorist before he flies the plane into the
building, before the backpack is full of that plastic
explosive and Saajid has gotten into some kafir assembly here
in the United States.  The purpose is to stop people before
they get that far.

There has to be an agreement and in this case
plenty of concrete steps, but no government is obligated to
wait until the fuse is actually ticking, someone has turned
that little lemon egg timer you saw them build, so it's tick,
tick, tick, okay, now we can arrest them.

Actually if they turned the fuse, it's a concrete
step, it's a different crime.  You blow up the bomb, that's a
different crime, and it's not what the defendant is charged
with.

The defendant, as I said, chastised the government
for taking things out of context.  I ask you, one, as I just
said, read the whole document.

But more importantly, think about some of these

things.  Take the Saajid private message that the defendant

wrote.  No hyper youth at this time.  A deliberative process,

wrote the e-mail, sent it, not realtime, not typing faster

than he's thinking.

Ask yourself what possible context could you put

this in that could be construed favorably for the defendant,

that it's just mere speech?  What possible -- if you come up

with one and it's reasonable, I guess maybe that's reasonable

doubt.

I submit to you that for any number of the

defendant's communications, there isn't that context you can

put it in and say, Oh, now I understand it, he's just a kid,

he's just joking around, they didn't mean any of this.

How do we know they didn't mean any of this?  I'm

going to skip around these slides a little bit.  I talked

about this in opening, consciousness of guilt, things that

you can see from evidence that indicate that the defendant

was aware that what he was doing was criminal, not a game.

One example is code.  Now, I don't want this to be

misconstrued, not code where you would replace A with Z and

B with Y, but just different words so that if someone is

doing a word search because the government gets a hold of an

e-mail and they say is anyone asking about Iraq, search for

Iraq, it says Two Rivers.  Instead of writing jihad, you

write J or G-had.

1    If it's fun and games, just go ahead and write

2  it.  You could say we are just kidding around.  Yeah, I wrote

3  about jihad either because I'm a translator of these

4  fundamental Islamic texts, or I'm just kidding around.

5    There was a discussion about moving offline.  If

6  the defendant was just having a game with his friends, then

7  why would there be things like this?  This is from the

8  Virgin Mary chat.  It was attached to an e-mail that the

9  defendant sent to Syed Haris Ahmed:  Read this all

10  urgently.  Azdee is J.  Hey, I figured out a plan to get into

11  Pak Land without being suspected

12    Defendant:  Whoa, is it okay to say this over MSN,

13  you have got a plan?  We are talking about violent jihad

14  here.  Don't say it on MSN because the wrong person might see

15  it.  Not meaning the defendant's mother.  Law

16  enforcement.  Is it okay to say over MSN or should we go

17  offline, private message, somewhere more secure?

18    Azdee goes on:  Marriage is the only way I see as a

19  way to get in there.

20    Defendant says:  Yeah.

21    Briefly on marriage.  The defendant married

22  Happy Shahnaz, no question about it.  You saw pictures,

23  smiles, beautiful outfits.  Some money was spent on the

24  wedding.  The defendant's money?  I don't know.  There is no

25  evidence that it was his money.  The father's money, Happy's

1   father's money?  I don't know.  That's not what this case is

2   about.  We don't contest that the defendant got married.

3          But we also show you through the chats that after

4   he was married, the defendant was trying to figure out how he

5   could get his wife to Sweden as well.  In those chats I'm

6   asking you to read, Yeah, I'm coming to Sweden.  I want to

7   bring my wife too.  How do we get her in?  She's not a U.S.

8   citizen.

9          Or the chats with Khan:  If you are going to get us

10  a house somewhere, a safe house in Pakistan, it's got to have

11  room for my wife too.  It's part of the equation.  Not that

12  she's a co-conspirator.  The wedding is a *fait accompli.*

13  He's getting married.

14         It may well be an excellent cover to get into

15  Pakistan.  You see a chat where he's writing to the Pakistani

16  Embassy in Dhaka saying, Hey, I may need to go on a honeymoon

17  or something after I get married as a way to get into

18  Pakistan.

19         The wedding was real.  I don't mean to belittle it

20  in any way.  I'm sure it was a wonderful event for the

21  defendant and his wife.  It has nothing to do with the rest

22  of what he was doing in his life.

23         False cover.  Why send the casing videos to

24  Aabid Hussein Khan in Jimmy's 13th birthday and volleyball

25  contest if this is all fun and games?  Why cover it up that

1   way, and lock it?

2           Why use Dannymoore1126@yahoo.France?  You remember

3   those e-mails that Syed Haris Ahmed sent to the defendant:

4   The dogs came to me.  Not the FBI, the dogs.  I was weak,

5   I revealed some things.  It's not a game.  He's afraid of

6   what happened.

7           And the defendant's response is particularly

8   telling:  What on earth did you tell him?  What did you tell

9   them?  I need to know so that if they come after me, our

10  stories can mesh.  If there are any discrepancies, we could

11  be put away for longer.

12          We don't put people away for childish games.  We

13  put people away, find them guilty because they conspire with

14  others and attempt with others to provide material support

15  for terrorism.

16          Smuggling.  If it's a game, why does the defendant

17  have an encrypted CD and the very map of Washington, D.C.,

18  hidden in his luggage, not in open with the clothes, but in

19  the compartment behind?

20          Why is there lying?  Why did the defendant tell the

21  FBI, I went to Canada alone.  Why not say, I went to Canada

22  with Syed Haris Ahmed, we met with these guys.  It was just

23  talk.

24          Why did Syed Haris Ahmed when interviewed initially

25  upon returning from Pakistan say, I visited my uncle,

Azdee Omani, just visiting friends?  Why does he lie in the

interviews about whose camera it is?  Why does he withold the

script form e-mail account?

Finally, destruction of evidence.  Why does

Syed Haris Ahmed destroy the thumb drive with the casing

videos?  After the first interview, why does he rush home and

burn texts and books?

And why this?  This is the language I was talking

about.  These are two excerpts from the Danny Moore e-mails

from the defendant, his responses:  Send me a detailed

account of what took place.  If they find discrepancies, they

will take us both for longer and worser.  No LOLZ or a wink

or anything like that.

This is not a case about the defendant's beliefs or

his ideas or hyper youth.  It's about that, that bomb belt,

physical concrete things, actions the defendant took, going

to Bangladesh, meeting these people, entering into

agreements, recruiting people.  That's what the case is

about.

It's about this statement from Bektasevic about how

these weapons are going to be used, how we are planning, how

everything is prepared.

It's a case in which the defendant conspired with

others and attempted with others to provide material support

to terrorist groups to include LeT.

1    The evidence in this case is clear.  It doesn't

2  matter whether the defendant hated America or loved

3  America.  It matters what he did.  He broke the law, and he

4  needs to be held accountable.

5    I ask you to go back and deliberate and return a

6  verdict that speaks the truth in this case, which is a

7  verdict of guilty as to Counts One, Two, Three and Four.

8    And should you have any questions as you

9  deliberate, you should feel free to address them to the

10  Court.

11    Thank you.

12    THE COURT:  Thank you, Mr. McBurney.

13    We have been going for two hours.  My charge will

14  take half an hour or so.  Would you like to take a short

15  break before we do the charge?

16    You will see when you return -- retire to the jury

17  room this time that I have for you ordered lunch and it's

18  available for you.  I would suggest that you wait until after

19  the charge, and then as you are getting settled to begin your

20  deliberations, you can have lunch then.

21    Again, the case is not yet to be deliberated

22  because you don't have my charge.  We will take a ten-minute

23  break and be back at 20 after.

24    (In open court without a jury present:)

25    THE COURT:  Just one reminder.  As I told you, it's

1   my practice with respect to the three alternates, which are

2   Mr. Riescher, Ms. Dervan and Ms. Thomas, that after I send

3   them back and get your -- to see whether there are any

4   objections to the charge as I gave it, I tell them not to

5   deliberate when we are done with our discussion, then I call

6   the three alternates back.

7   And I tell them that they are free to go, but they

8   cannot discuss the case until they hear that the case is

9   concluded because they may be called back in the event that

10  we need them.  But I don't make them stay in the courthouse

11  while the deliberations are going on, although they are told

12  they can't talk about the case in the event that we do need

13  them.

14  Is there any objection?  I don't think there was in

15  the pretrial conference.  I want to make sure there is no

16  objection to that process.

17  MR. McBURNEY:  No, sir.

18  MR. SADEQUEE:  No objection.

19  THE COURT:  All right.  Anything we need to discuss

20  before we take our short break?

21  MR. McBURNEY:  No.

22  MR. SADEQUEE:  No.

23  THE COURT:  All right.  We will be in recess.

24  (A recess is taken at 12:13 p.m.)

25  -- -- --

```
 1            (In open court without a jury present at
 2    12:26 p.m.:)
 3            THE COURT:  Anything we need to discuss before we
 4    bring the jurors back in?
 5            MR. McBURNEY:  You may have touched upon this.  The
 6    indictment has been redacted.  Are you going to -- one, for
 7    the record, I want to make it clear that a few paragraphs
 8    were removed in consultation with the defense, and then two,
 9    I was just inquiring whether you would again be giving the
10    redaction instruction?
11            THE COURT:  All I was going to say is that three
12    paragraphs have been redacted, 39, I guess part of 40, and
13    part of 41.  I'm going to say that I have decided with the
14    agreement of counsel that those contained extraneous matters
15    and that I have had them removed.
16            MR. McBURNEY:  And all of 42.
17            THE COURT:  Okay.  So it's all of 39?
18            MR. McBURNEY:  Yes.
19            THE COURT:  All of 40, and all of 42?
20            MR. McBURNEY:  And part of 41.
21            THE COURT:  Okay.  Is that explanation acceptable
22    to everyone?
23            MR. SADEQUEE:  Yes.
24            MR. McBURNEY:  Yes.
25            THE COURT:  All right.  Anything else we need to
```

 1    discuss before we bring the jurors in?

 2              MR. McBURNEY:  No, sir.

 3              THE COURT:  All right.  Bring them in, please.

 4              (In open court with a jury present:)

 5              THE COURT:  Ladies and gentlemen, you have heard

 6    all of the evidence and you have heard the arguments of the

 7    parties.  It's now my duty to instruct you on the rules of

 8    law that you must follow and must apply in deciding this

 9    case.

10              When I have finished, you will go to the jury room

11    and begin your discussions or what we often call your

12    deliberations.  It will be your duty to decide whether the

13    government has proved beyond a reasonable doubt the specific

14    facts necessary to find the defendant guilty of the crimes

15    charged in the indictment.

16              You must make your decision only on the basis of

17    the testimony and other evidence presented here during the

18    trial, and you must not be influenced in any way by either

19    sympathy or prejudice for or against the defendant or the

20    government.

21              You must also follow the law as I explain it to

22    you, whether you agree with that law or not.  And you must

23    follow all of my instructions as a whole; that is, you may

24    not single out or disregard any of my instructions on the

25    law.

1      The indictment or formal charges against any

2  defendant are not evidence of guilt.  Indeed, every defendant

3  is presumed by the law to be innocent.

4      The law does not require a defendant to prove their

5  innocence or to produce any evidence at all.  And if a

6  defendant elects not to testify, you should not consider that

7  in any way during your deliberations.

8      The government has the burden of proving a

9  defendant guilty beyond a reasonable doubt, and if it fails

10  to do so, you must find the defendant not guilty.

11      Let me define for you what reasonable doubt

12  means.  While the government's burden of proof is a strict or

13  heavy burden, it is not necessary that a defendant's guilt be

14  proved beyond all possible doubt.  It is only required that

15  the government's proof exclude any reasonable doubt

16  concerning the defendant's guilt.

17      A reasonable doubt is a real doubt based upon

18  reason and common sense after careful and impartial

19  consideration of all the evidence in the case.  Proof beyond

20  a reasonable doubt, therefore, is proof of such a convincing

21  character that you would be willing to rely and act upon it

22  without hesitation in the most important of your affairs.

23      If you are convinced that the defendant has been

24  proved guilty beyond a reasonable doubt, say so.  If not

25  convinced, say so.

As I told you before, you must consider only the evidence that I have admitted in the case. The term evidence includes the testimony of the witnesses and the exhibits admitted in the record.

Remember that anything the lawyers said is not evidence in the case, and anything the defendant said when he was acting in his capacity as his own lawyer, such as questions he asks, arguments he made, and any of his responses to the Court, are not evidence.

It is your own recollection and interpretation of the evidence that controls. What the lawyers said and what the defendant said when he was acting as his lawyer is not binding upon you.

Also you should not assume from anything I may have said that I have any opinion concerning any of the issues in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your decision concerning the facts.

In considering the evidence, you may make deductions and reach conclusions which reason and common sense lead you to make, and you should not be concerned about whether the evidence is direct or circumstantial.

I told you earlier that direct evidence is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is proof of a

chain of facts and circumstances tending to prove or disprove any fact in dispute.

Because that is so abundantly clear, let me use an example to illustrate the difference between the two.

I happen to like to fish on a river in north Georgia. There are a number of times when I go down in the morning that there is one particular person who I see on the other side of the river, and he's there in waders and he has got his vest on and he's got a pole in his hand and he's casting out to the water.

I see him, I'm an eyewitness to what he's doing. That's direct evidence that somebody that morning has fished and is fishing in the river.

But sometimes on my side of the river, there is a little sandy place where I stand. I will go down and take -- for example, the days I go down after a rain that evening, I will look in the sand and I will see very fresh imprints of what is clearly a wader, I will see little pieces of leader that have been discarded there in the sand, sometimes I will see a lore or a fly, and all of that looks fresh to me.

That is circumstantial evidence that somebody that morning had been fishing in the river. It's not direct because I didn't see them, but it's a number of facts that lead to a conclusion.

The law makes no distinction between the weight

1  that you may give to either direct or circumstantial

2  evidence.

3        When I tell you that you must consider all the

4  evidence, I don't mean that you have to accept all the

5  evidence as true or accurate.  You should decide whether you

6  believe what each witness had to say, and how important that

7  testimony was.

8        In making that decision, you may believe or

9  disbelieve any witness, in whole or in part.  Also the number

10  of witnesses testifying concerning any particular dispute is

11  not controlling.

12        In deciding whether you believe or do not believe

13  any witness, I suggest that you ask yourself a few questions:

14        Did the witness impress you as one who was telling

15  the truth?

16        Did the witness have a personal interest in the

17  outcome of the case?

18        Did the witness seem to have a good memory?

19        Did the witness have the opportunity and ability to

20  observe accurately the things he or she testified about?

21        Did the witness appear to understand the questions

22  clearly and answer them directly?

23        Did the witness's testimony differ from other

24  testimony or other evidence?

25        You should ask yourself whether there was evidence

tending to prove that a witness testified falsely concerning

some important fact, or whether there was evidence that at

some other time a witness said or did something, or failed to

say or do something which is different from the testimony the

witness gave before you during the trial.

In making that evaluation, you should keep in mind,

of course, that a simple mistake by a witness does not

necessarily mean that the witness was not telling the

truth. The significance of the inconsistency may depend on

whether it has to do with an important fact or with only an

unimportant detail.

The fact that a witness has been convicted of a

felony offense is another factor you may consider in deciding

if you believe that witness.

As I told you once before, Mr. Ahmed's conviction

should not be used as evidence that the defendant is guilty

of the offenses with which he is charged. You will be

required to consider only the evidence presented in this

trial to determine if the defendant is guilty or not guilty

of the offenses charged in this case.

The testimony of some witnesses must be considered

with more caution than the testimony of other witnesses. In

this case the government called Mr. Zubair Ahmed, a witness

who has been promised that he will not be charged or

prosecuted. The government also has called as one of its

1   witnesses Mr. Syed Haris Ahmed, a person named as a

2   co-conspirator in the indictment with whom the government has

3   entered into a -- I'm sorry, who has been named as a

4   co-conspirator in the indictment.

5       Where there has been an agreement reached with a

6   witness that affects the exposure that that witness has, you

7   may consider that.  A witness who hopes to gain more

8   favorable treatment may have a reason to make a false

9   statement because the witness wants to strike a good bargain

10  with the government.  And that would apply to both

11  Mr. Zubair Ahmed and Mr. Syed Haris Ahmed.

12      So while witnesses of these kinds may be entirely

13  truthful when testifying, you should consider such testimony

14  with more caution than the testimony of other witnesses.  And

15  of course, the fact that a witness has pled guilty to a crime

16  charged in an indictment is not evidence in and of itself of

17  the guilt of any other person, as I have explained with

18  respect to Mr. Haris Ahmed.

19      Mr. Evan Kohlmann was called as an expert witness

20  in this case.  When knowledge of a technical subject matter

21  might be helpful to the jury, a person having special

22  training or experience in that technical field is permitted

23  to state an opinion concerning those technical matters.

24      Merely because a witness has expressed an opinion

25  as an expert, however, does not mean that you must accept

that opinion.  The same as with any other witness, it is up
to you to decide whether to rely upon it.

In this case I have allowed you to take notes
during the course of the trial, and most of you -- in fact,
maybe all of you at one time or another have taken advantage
of the opportunity to take notes.

You will have your notes available to you during
your deliberations, but you should not use -- you should use
them only as an aid to your memory.  In other words, you
should not give your notes any precedence over your
independent recollection of the evidence or the lack of
evidence.

And neither should you be unduly influenced by the
notes of other jurors.  I emphasize that notes are not
entitled to any greater weight than the memory or impression
of each juror as to what the testimony may have been.

Now, moving on to the specific charges in this
case, I am now going to explain the indictment which charges
the defendant with four offenses, each of which is called a
count.

I'm not going to read the counts verbatim because
you will be given a copy of the indictment for reference
during your deliberations, and you will have that with you in
the jury room.

I want to note now that when you receive the

1   indictment, I have made the decision after consulting with

2   the lawyers that certain limited amount of material that is

3   now extraneous to the case now that the evidence has been

4   presented has been redacted.

5          This redaction is different than the redaction you

6   saw before because there will just be spaces where the

7   language used to be and it's obvious that there is text

8   that's missing.  But I have determined that those were

9   extraneous and should be removed from the indictment now that

10  all the evidence is in.

11         Where you will see the redactions or the removal of

12  text from the indictment are as follows:  All of Paragraph 39

13  has been redacted, part of Paragraph 40, part of

14  Paragraph 41, and all of Paragraph 42.  And as you go through

15  the indictment you will see where the redactions have been

16  made.

17         If you find the defendant guilty of any of the

18  counts charged in the indictment, the government must prove

19  to you beyond a reasonable doubt that the defendant committed

20  each element of the offense.

21         Let me begin with Count One, which is conspiracy to

22  provide material support to terrorists.

23         Count One of the indictment charges the defendant

24  with conspiracy to commit a crime.  Specifically, Count One

25  charges that beginning in or about late 2002 and continuing

1   until on or about April 20, 2006, the defendant,

2   Mr. Sadequee, Mr. Syed Haris Ahmed, and others, knowingly

3   conspired to provide material support or resources, namely,

4   personnel or property, or to conceal the nature or source of

5   said material support or resources, knowing or intending that

6   the material support or resources were to be used in

7   preparation for or in carrying out a conspiracy to kill or

8   kidnap persons in a foreign country or acts of terrorism

9   transcending national boundaries.

10          Certain federal laws make it a crime for anyone to

11  conspire or agree with someone else to do something which if

12  actually carried out would amount to another federal crime or

13  offense.  So under the law, a conspiracy is an agreement or a

14  kind of partnership in criminal purposes in which each member

15  becomes the agent or partner of every other member.

16          In order to establish a conspiracy offense, it is

17  not necessary for the government to prove that all of the

18  people named in the indictment were members of the scheme, or

19  that those who were members had entered into any type of

20  formal agreement, or that the members had planned together

21  all the details of the scheme, or the acts that the

22  indictment charges would be carried out in an effort to

23  commit the intended crime.

24          Also because the essence of a conspiracy offense is

25  the making of the agreement itself, it is not necessary for

1    the government to prove that the conspirators actually

2    succeeded in accomplishing their unlawful plan.

3           For you to find the defendant guilty of this count,

4    the government must prove beyond a reasonable doubt that the

5    defendant committed each element of the offense. The

6    elements of this offense are:

7           First, that two or more persons in some way or

8    manner came to mutual understanding to try to accomplish a

9    common and unlawful plan; that is, to provide material

10    support or resources, or to conceal or disguise the nature,

11    location, source or ownership of material support or

12    resources.

13           Second, that the defendant, knowing the unlawful

14    purpose of the plan, willfully joined it.

15           And third, that the defendant did so knowing or

16    intending that the material support or resources were to be

17    used in preparation for or in carrying out a conspiracy to

18    murder or kidnap people outside the United States or acts of

19    terrorism transcending national boundaries.

20           A person may become a member of a conspiracy

21    without knowing all of the details of the unlawful scheme and

22    without knowing who all of the other members are. So if a

23    defendant has a general understanding of the unlawful purpose

24    of the plan and knowingly and willfully joins in that plan on

25    one occasion, that is sufficient to convict that defendant

1  for conspiracy, even though the defendant did not participate

2  before and even though the defendant played only a minor

3  part.

4  Of course, mere presence at the scene of a

5  transaction or event, or the mere fact that certain persons

6  may have associated with each other and may have assembled

7  together and discussed common aims and interests, does not

8  standing alone establish proof of a conspiracy.

9  Also a person who has no knowledge of a conspiracy

10  but who happens to act in a way which advances some purpose

11  of one does not thereby become a conspirator.

12  Count Two.  Count Two of the indictment charges

13  that beginning in or before late 2004 and continuing until on

14  or about April 20th, 2006, the defendant, Mr. Sadequee, and

15  Mr. Syed Haris Ahmed, and others, aided and abetted by each

16  other, provided or attempted to provide material support or

17  resources, namely, personnel or property, or concealed the

18  nature or source of said material support or resources,

19  knowing or intending that the material support or resources

20  were to be used in preparation for or in carrying out a

21  conspiracy to kill or kidnap persons in a foreign country or

22  acts of terrorism transcending national boundaries.

23  While Count One charged the defendant with

24  conspiring, that is, agreeing to provide material support or

25  resources, Count Two charges the defendant with actually

providing or attempting to provide material support.  In other words, Count Two charges the substantive crime which the defendant is charged in Count One to have conspired to commit.

For you to find the defendant guilty of this count, the government must prove beyond a reasonable doubt that the defendant committed each element of the offense.  The elements of this charged offense are:

First, the defendant provided material support or resources, attempted to provide material support or resources, or concealed or disguised the nature, location, source or ownership of material support or resources, and

Second, the defendant did so knowing or intending that the material support or resources were to be used in preparation for or in carrying out a conspiracy to murder or kidnap people outside the United States or acts of terrorism transcending national boundaries.

Let me give you some definitions that apply to these charges and my instruction on them.

The term provides means to furnish, supply, to make ready or available, transfer or send.

The terms conceal or disguise mean to hide or to keep from being seen, found, observed or discovered.

The term material support or resources includes any kind of property, tangible or intangible, or service,

including personnel, except medicine or religious materials.

The term personnel refers to one or more individuals, and may include the defendant himself.

The phrase a conspiracy to murder or kidnap persons outside the United States means an agreement or mutual understanding between two or more people to commit outside the United States an act that would constitute murder or kidnapping if it were committed inside the United States.

The term United States includes all the states, territories and possessions of the United States, and all places and waters subject to the jurisdiction of the United States.

The term murder is the unlawful killing of a human being with malice aforethought.

To kill with malice aforethought means an intent at the time of the killing to take the life of another person, either deliberately or intentionally, or to willfully act with callous and wanton disregard for human life.

To kidnap a person means to forcibly and unlawfully hold, keep, detain and confine the person against his or her will.

So involuntariness and coercion in connection with the victim's detention is an essential part of the offense.  It need not be proved, however, that a kidnapping was carried out for ransom or personal monetary gain so long

as it is proved that the actor acted willfully intending to
gain some benefit from the kidnapping.

The phrase an act of terrorism transcending
national boundaries means conduct occurring outside the
United States in addition to conduct occurring inside the
United States that involves any one of the following
prohibited offenses in any one of the following special
circumstances.

The prohibited offenses are committing, threatening
to commit, attempting to commit, or conspiring to commit an
unlawful killing, kidnapping, assault with a dangerous weapon
against, or assault that results in serious bodily injury of
any person in the United States, or destruction of real or
personal property within the United States that creates a
substantial risk of serious bodily injury.

The special circumstances are, one, the victim or
the intended victim of the offense is the United States
government or an official or employee thereof, including a
member of the uniformed services; second, the offense would
obstruct, delay or affect interstate commerce; three, the
real or personal property is owned or possessed by or leased
to the United States in whole or in part, or the mail or any
facility in interstate or foreign commerce would be used in
furtherance of the offense.

The term interstate commerce refers to commercial

1  activity between places in different states.

2  The term foreign commerce refers to commercial
3  activity between some place in the United States and some
4  place outside the United States.

5  Count One and Count Two charge that the defendant
6  conspired to provide or conceal, attempted to provide or
7  conceal, or actually provided or concealed material support
8  or resources with respect to two crimes or offenses;
9  specifically, a conspiracy to murder or kidnap persons
10 outside the United States, and acts of terrorism transcending
11 national boundaries.

12 In a case like this one where two offenses, that
13 is, two objects are involved, it is not necessary for the
14 government to prove that the defendant was involved in the
15 provision or concealment of material support or resources to
16 both of these substantive offenses. It would be sufficient
17 if the government proves beyond a reasonable doubt that the
18 defendant was involved in the provision or concealment of
19 material support or resources to one of those offenses. But
20 in any event, in order to return a verdict of guilty, you
21 must unanimously agree upon which offense.

22 Also the government is not required to prove that
23 the defendant himself actually engaged in a conspiracy to
24 murder or kidnap persons outside the United States or an act
25 of terrorism transcending national boundaries. Instead, the

1  offenses charged in Count One and Count Two involve the

2  provision or concealment of material support or resources to

3  such a conspiracy to murder or kidnap persons outside the

4  United States or, two, acts of terrorism transcending

5  national boundaries.

6       The government also is not required to prove that a

7  conspiracy to murder or kidnap persons outside the

8  United States or acts of terrorism transcending national

9  boundaries have been completed, because the conduct

10 prohibited by the offenses charged include providing or

11 concealing material support or resources in preparation for

12 such crimes.

13      For the same reason, it is not necessary for the

14 government to prove the identity of any contemplated victim

15 of the conspiracy to murder or kidnap, the identity of any

16 contemplated victim or property to be destroyed as a result

17 of acts of terrorism transcending national boundaries, the

18 specific location outside the United States where the

19 contemplated murder or kidnapping was to occur, or the

20 specific location inside the United States of any acts of

21 terrorism transcending national boundaries.

22      Count One and Count Two -- let me explain what

23 material support or resources mean.  Count One and Count Two

24 each charge two separate types of material support or

25 resources:  Personnel and property.

1    In such a case, it is not necessary for the
2    government to prove both types of material support or
3    resources.  It would be sufficient if the government proves
4    beyond a reasonable doubt one type of material support or
5    resources.  But in that event, in order to return a verdict
6    of guilty, you must unanimously agree upon which type of
7    material support or resources.
8    Count Three of the indictment charges the defendant
9    with a second conspiracy to commit a crime.  Some of this is
10   going to sound redundant because we are going to go over
11   information in the charge on conspiracy.  I am doing this so
12   you are reminded that each count requires the same analysis
13   independent of each other.
14   So specifically, Count Three charges that beginning
15   in or about late 2004 and continuing until on or about April
16   20, 2006, Defendant Sadequee, Syed Haris Ahmed and others
17   conspired to provide material support or resources, namely,
18   personnel, to a designated foreign terrorist organization,
19   namely, Lashkar-e-Tayyiba, by agreeing to provide personnel
20   including but not limited to the defendant himself or
21   Syed Haris Ahmed to work under the direction and control of
22   Lashkar-e-Tayyiba knowing that Lashkar-e-Tayyiba has engaged
23   or engages in terrorist activity or terrorism.
24   Certain federal laws make it a crime for anyone to
25   conspire or agree with someone else to do something which if

actually carried out would amount to another federal crime or offense.  So under the law, a conspiracy is an agreement or a kind of partnership in criminal purposes in which each member becomes the agent or partner of every other member.

And as I have instructed before, in order to establish a conspiracy offense, it is not necessary for the government to prove that all of the people named in the indictment were members of the scheme, or that those who were members had entered into any formal type of agreement, or that the members had planned together all of the details of the scheme or the acts that the indictment charges would be carried out in an effort to commit the intended crime.

Also because the essence of a conspiracy offense is the making of the agreement itself, it is not necessary for the government to prove that the conspirators actually succeeded in accomplishing their unlawful plan.

For you to find the defendant guilty of this count, the government must prove beyond a reasonable doubt that the defendant committed each element of the offense.  And the elements of this offense are:

First, that two or more persons in some way or manner came to a mutual understanding to try to accomplish a common and unlawful plan, that is, to provide material support or resources to Lashkar-e-Tayyiba, a foreign terrorist organization;

Second, that the defendant, knowing the unlawful purpose of the plan, willfully joined it;

Third, that the defendant did so knowing that Lashkar-e-Tayyiba had engaged or engages in terrorist activity or terrorism;

And fourth, that either the defendant is a national of the United States, or the offense occurred in whole or in part within the United States.

A person may become a member of a conspiracy without knowing all the details of the unlawful scheme and without knowing who all of the other members are. So if a defendant has a general understanding of the unlawful purpose of the plan and knowingly and willfully joins in that plan on one occasion, that is sufficient to convict that defendant for conspiracy even though the defendant did not participate before and even though the defendant played only a minor part.

Of course, as I told you before, mere presence at the scene of a transaction or event, or the mere fact that certain persons may have associated with each other and may have assembled together and discussed common aims and interests does not standing alone establish proof of a conspiracy.

Also a person who has no knowledge of a conspiracy but who happens to act in a way which advances some purpose

1   of one does not thereby become a conspirator.

2          Count Four of the indictment charges that beginning

3   in or before late 2004 and continuing till on or about April

4   20th, 2006, Defendant Sadequee, Syed Haris Ahmed, and others,

5   aided and abetted by each other, attempted to provide

6   material support or resources, namely, personnel, to a

7   designated foreign terrorist organization, namely,

8   Lashkar-e-Tayyiba, by attempting to provide personnel

9   including Syed Haris Ahmed and the defendant -- I'm sorry,

10  including Syed Haris Ahmed to work under the direction and

11  control of Lashkar-e-Tayyiba, knowing that Lashkar-e-Tayyiba

12  has engaged or engages in terrorist activity or terrorism.

13         For you to find the defendant guilty of this count,

14  the government must prove beyond a reasonable doubt that the

15  defendant committed each element of the offense.

16         The elements of this offense are:

17         First, that the defendant knowingly attempted to

18  provide material support or resources to Lashkar-e-Tayyiba, a

19  foreign terrorist organization;

20         Second, that the defendant did so knowing that

21  Lashkar-e-Tayyiba has engaged or engages in terrorist

22  activity or terrorism; and

23         Third, that either the defendant is a national of

24  the United States or the offense occurred in whole or in part

25  within the United States.

1    Now, let me give you some definition of terms as

2  they are used in these two counts, Three and Four.

3    As used in these instructions, the term foreign

4  terrorist organization means an organization designated as a

5  foreign terrorist organization by the Secretary of State

6  through a process established by law.

7    The term terrorism means premeditated

8  politically-motivated violence perpetrated against

9  noncombatant targets by subnational groups or clandestine

10 agents.

11   The term terrorist activity means any activity

12 which is unlawful under the laws of the place where it is

13 committed, or which if it had been committed in the

14 United States would be unlawful under the laws of the

15 United States or any state, and which involves any of the

16 following:

17   The hijacking or sabotage of any conveyance,

18 including an aircraft, vessel or vehicle;

19   The seizing or detaining and threatening to kill,

20 injure or continue to detain another individual in order to

21 compel a third person including a governmental organization

22 to do or to abstain from doing any act as an explicit or

23 implicit condition for the release of the individual seized

24 or detained;

25   Or the use of any explosive, firearm or other

weapon or dangerous device other than for mere personal

monetary gain with intent to endanger, directly or

indirectly, the safety of one or more individuals or to cause

substantial damage to property.

The term national of the United States means a

citizen of the United States.

For these two counts, that is, Counts Three and

Four, material support or resources alleged in each Counts

Three and Four is personnel.

You may not convict the defendant of Count Three or

Count Four unless you find beyond a reasonable doubt that the

defendant knowingly conspired or attempted to provide a

foreign terrorist organization with one or more individuals,

who may be and include the defendant himself, to work under

that terrorist organization's direction or control; or to

organize, manage, supervise or otherwise direct the operation

of that organization.

Individuals who act entirely independently of the

foreign terrorist organization to advance its goals or

objectives shall not be considered to be working under the

foreign terrorist organization's direction and control.

I have used the word attempt in these instructions,

so let me explain that to you.  Count Two and Count Four of

the indictment charge that the defendant attempted to commit

the substantive offense charged.  In some instances, it is a

1   crime for anyone to attempt the commission of an offense even

2   though the attempt fails and the intended offense is not

3   actually carried out or fully committed.

4        The defendant can be found guilty of an attempt to

5   commit that offense only if both of the following facts are

6   proved beyond a reasonable doubt:

7        First, that the defendant knowingly and willfully

8   intended to commit the offense as charged;

9        And, second, that the defendant engaged in conduct

10  which constituted a substantial step toward the commission of

11  the crime and which strongly corroborates the defendant's

12  criminal intent.

13       A substantial step means some important action

14  leading to the commission of a crime, as distinguished from

15  some inconsequential or unimportant act.  It must be

16  something beyond mere preparation.  It must be an act which,

17  unless frustrated by some condition or event, would have

18  resulted in the ordinary and likely course of things in the

19  commission of the crime being attempted.

20       Count Two and Count Four of the indictment charge

21  that the defendant and others aided and abetted by each other

22  committed the substantive offense charged.  The guilt of a

23  defendant in a criminal case may be proved without evidence

24  that the defendant personally did every act involved in the

25  commission of the crime charged.

1       The law recognizes that ordinarily anything a

2   person can do for one's self may also be accomplished through

3   direction of another person as an agent, or by acting

4   together with or under the direction of another person or

5   persons in a joint effort.

6       So if the acts or conduct of an agent, employee or

7   other associate of the defendant are willfully directed or

8   authorized by the defendant, or if the defendant aids and

9   abets another person by willfully joining together with that

10  person in the commission of a crime, then the law holds the

11  defendant responsible for the conduct of that other person

12  just as though the defendant had personally engaged in the

13  conduct.

14      However, before any defendant can be held

15  criminally responsible for the conduct of others, it is

16  necessary that the defendant willfully associate in some way

17  with the crime and willfully participate in it.

18      Mere presence at the scene of a crime and even

19  knowledge that a crime is being committed are not sufficient

20  to establish that a defendant either directed or aided and

21  abetted the crime.  You must find beyond a reasonable doubt

22  that the defendant was a willful participant and not merely a

23  knowing spectator.

24      In this case you have heard evidence about various

25  political or religious statements and opinions held by the

defendant and other individuals.  The First Amendment to the
Constitution protects the freedom of speech, religion and
association.  This means that individuals are permitted to
express controversial and even despicable views, possess
written material, freely practice their religion, and
associate with other individuals and groups.

A person, therefore, may not be convicted of a
crime solely on the basis of his opinions, written materials,
beliefs or associates, no matter how unpopular.

However, the First Amendment does not allow a
person to engage in a criminal conspiracy or to commit a
substantive crime simply because the conspiracy or other
crime was in part initiated, demonstrated or carried out by
means of or were accompanied by spoken, written or printed
words.

Therefore, you may consider evidence of statements,
written materials, opinions and activities of the defendant
and of other individuals when determining issues of the
existence or formation of a conspiracy, the conduct of a
conspiracy, intent and motive, even if those statements,
written materials, opinions or activities are also political
or religious in nature.

The defendant is not guilty of this offense merely
because you find he was a member of a terrorist group or
merely because he advocated on behalf of a terrorist

1  organization or merely because he believed or subscribed to

2  the goal of an organization or religious or political

3  movement or objective.

4       The term knowingly as that term is used in the

5  indictment and in my instructions means that the act was done

6  voluntarily and intentionally and not because of mistake or

7  accident.

8       The term willfully as that term is used in the

9  indictment or in these instructions means that the act was

10  committed voluntarily and purposely with the specific intent

11  to do something the law forbids, that is, with bad purpose

12  either to disobey or disregard the law.

13       I have said in these instructions and you will note

14  in the indictment that the indictment charges that certain

15  offenses were committed on or about a certain date.  The

16  government does not have to prove with certainty the exact

17  date of the alleged offense.  It is sufficient that the

18  government proves beyond a reasonable doubt that the offense

19  was committed on a date reasonably near the date alleged.

20       The indictment in this case also charges several

21  means of violating the law, and it's done so using the

22  conjunctive; that is, using the word "and."  So let me

23  explain that term to you.

24       These jury instructions are framed in the

25  disjunctive, using the word "or."  That is, the government

1  need not prove beyond a reasonable doubt that the defendant

2  engaged in each alleged means of violating the law.  Proof of

3  guilt as to only one means is sufficient, but you must

4  unanimously agree as to which has been proved.

5       A separate crime or offense is charged in each

6  count of the indictment.  Each count and the evidence

7  pertaining to it should be considered separately.

8       The fact that you may find the defendant guilty or

9  not guilty as to one of the offenses charged should not

10 affect your verdict as to any other offense charged.

11      I caution you that you are here to determine from

12 the evidence in this case whether the defendant is guilty or

13 not guilty.  The defendant is on trial only for those

14 specific offenses alleged in the indictment.

15      Also the question of punishment should never be

16 considered by you in any way in deciding the case.  If the

17 defendant is convicted, the matter of punishment is for me

18 alone to determine.

19      Any verdict that you reach in the jury room,

20 whether guilty or not guilty, must be unanimous.  In other

21 words, to return a verdict you must all agree.  Your

22 deliberations will be secret.  You will never have to explain

23 your verdict to anyone.

24      It is your duty as jurors to discuss the case with

25 one another in an effort to reach agreement, if you can do

1  so.  Each of you must decide the case for yourself, but only

2  after full consideration of the evidence with other members

3  of the jury.

4      While you are discussing the case, do not hesitate

5  to reexamine your own opinion and change your mind if you

6  become convinced that you are wrong, but do not give up your

7  honest beliefs solely because the others think differently or

8  merely to get the case over with.

9      Remember, you are in a very real way judges, judges

10  of the fact, and your sole and only interest is to seek the

11  truth from the evidence in the case.

12      When you go to the jury room in a second, you will

13  first select one of you to act as your foreperson.  The

14  foreperson will preside over your deliberations and will

15  speak for you here in court.

16      I have prepared for you a verdict form.  It is

17  simple.  You will have this with you in the jury room.  It's

18  simply a form where for each count, you have to find whether

19  the defendant was guilty or not guilty of that count.  And so

20  there are four counts listed, and that will record your

21  verdict on each of the counts.

22      When you have reached unanimous agreement, you will

23  have the foreperson fill in the verdict form, date and sign

24  it, and then return it to the courtroom.  Actually indicate

25  to the Court Security Officer you have reached a verdict, and

1    I will tell you when you should return.

2          If at any time you want to communicate with me, the

3    foreperson should write down your message or your question

4    and pass it to the Court Security Officer who will bring it

5    to me.  I will then respond as quickly as I can.  Sometimes

6    I respond in writing, sometimes I will have to bring you in

7    because I need to explain something to you.

8          But I caution you, whether in your note or whether

9    you come in here to discuss something with me, you should

10   never tell me what your numerical division is at the

11   time.  That is simply information that is part of your

12   deliberations and should not be disclosed to me or to anybody

13   else.

14         These are your instructions.  I'm now going to ask

15   you to retire to the jury room.  You cannot begin your

16   deliberations until you get all of the exhibits.  We have

17   gone through those.  It's a matter of once you are there

18   delivering those to you.  That will be done in the next

19   couple of minutes.

20         And then there are fifteen of you.  Twelve jurors

21   deliberate in the American criminal justice system, meaning

22   three of you have served as alternates.

23         I haven't identified who the alternates are because

24   I never know whether an alternate ultimately in a case that

25   goes for a period of time will actually sit as a juror.  But

1    now that we are at the point where deliberations will begin

2    and because only twelve jurors are permitted under our system

3    to deliberate, after you go back here in second and get

4    settled, I am going to call three of you out.

5          Those three -- in fact, it's Mr. Riescher,

6    Ms. Dervan and Ms. Thomas are the alternates.  I will have

7    you come back out, give you some further instructions about

8    your conduct until the case is over.  There is always the

9    possibility that somebody would have to -- an alternate would

10   have to replace a juror even after the deliberations have

11   started.  That's happened before.

12         So your service is not yet completed.  But I wanted

13   everybody to know who the alternates are because I know you

14   have been together now for eight days and -- I guess nine

15   now, and so the alternates will not be with you during your

16   deliberations.

17         So if you will please retire to the jury room, get

18   settled, do not discuss the case until you get the exhibits

19   and I give you permission through the Court Security Officer

20   to begin your deliberations.

21         (In open court without a jury present:)

22         THE COURT:  All right.  Are there any -- preserving

23   the objections that were asserted at the charge conference,

24   are there any objections to the charge as given?

25         MR. McBURNEY:  Judge, when you were -- yes --

1  presenting what was Government's Exhibit 15 about plea

2  agreements and immunity, you identified Zubair Ahmed as

3  someone who received immunity.  He has not.  His has a plea

4  agreement.

5      Omer Kamal received immunity, as did Syed Haris

6  Ahmed.  You did not mention Omer Kamal.  You would include

7  him and then redesignate Zubair Ahmed as someone who

8  testified pursuant to a cooperation agreement.

9      THE COURT:  I think yesterday we only talked about

10  the two Ahmeds, so I do think I need to recharge on that.

11      MR. McBURNEY:  And then if there is not an

12  objection from the defense, I just want to note this for the

13  record.  When you were describing the date range for

14  Count One, you had it start in late 2002 rather than 2004.

15  For the remaining three counts you got it late 2004 through

16  April 20th, 2006.

17      I don't think you need to recharge on that.  I'm

18  just flagging it for the record.  But the first one, yes.

19      THE COURT:  They have the indictment, of course,

20  with them.  So what's the defense's position on the last

21  issue?

22      MR. SAMUEL:  I think that should be corrected only

23  because the 404 (b) issue can confuse them a little bit.

24      We would just request that we preserve the

25  objections and all the arguments made yesterday.

1    THE COURT:  Yes, you may do that.

2    All right.  So that was in what charge?

3    MR. McBURNEY:  Your description of Count One, when

4  you gave the offense instructions for Count One, you listed

5  it as late 2002 rather than late 2004.

6    THE COURT:  So I just misspoke, because I have in

7  the charge 2004.  But you are sure I said 2002?

8    MR. McBURNEY:  That's the unanimous recollection of

9  this table.

10    THE COURT:  Well, we know the quality of your

11  unanimous recollections.

12    I am going to say within Count One -- I'm not going

13  to read the whole thing, of course -- that I misspoke and

14  that the count charges that beginning on or about late 2004

15  and not 2003 and continuing to on or about April 20th, 2006,

16  that that's the applicable date range.

17    Is that a sufficient explanation for that?

18    MR. McBURNEY:  Yes.

19    THE COURT:  Let me just look at the immunity.

20    Actually, I mean, this has to be rewritten, because

21  I can't say that he's a witness who's been promised that he

22  will not be charged or prosecuted, because they know that

23  he's been charged and prosecuted.

24    MR. McBURNEY:  Well, for Syed Haris Ahmed,

25  correct.  Omer Kamal, that fits.

1       THE COURT:  But you have to say different things

2   for different people.

3       MR. McBURNEY:  Yes.

4       THE COURT:  We clearly should have gone over this

5   last night, and I'm sorry that we didn't.

6       So in this case the government called a witness,

7   Syed Haris Ahmed, who has been promised that he will not be

8   charged or prosecuted for the testimony that he gave in this

9   trial.

10      I guess we say the government also called -- what's

11  Mr. Omer's first name?

12      MR. McBURNEY:  It is Omer, last name Kamal.

13      THE COURT:  So he's been given a nonprosecution

14  agreement?

15      MR. McBURNEY:  Yes, sir.

16      THE COURT:  Did that come out in evidence?

17      MR. McBURNEY:  It did.

18      THE COURT:  Then the government also called as one

19  of its witnesses Mr. Zubair Ahmed with whom the government

20  has entered into a plea agreement that provides for the

21  possibility of a lesser sentence than he otherwise would have

22  been exposed to.

23      We say such plea bargain, we are really only

24  talking about the plea bargaining with Mr. Zubair Ahmed;

25  correct?

1    MR. McBURNEY:  Correct.

2    THE COURT:  Okay.  Let me just read this to you so

3  that I get it right this time.

4         In this case the government called Mr. Syed Haris

5  Ahmed -- I'm sorry.  In this case the government called a

6  witness, Mr. Syed Haris Ahmed, who has been promised that he

7  will not be charged or prosecuted for the testimony he gave

8  in this trial.

9         The government also called Mr. Omer Kamal as a

10  witness who has been promised he will not be charged or

11  prosecuted.

12         The government also called as one of its witnesses

13  Mr. Zubair Ahmed, a person named as a co-conspirator in the

14  indictment, with whom the government has entered into a plea

15  agreement providing for the possibility of a lesser sentence

16  than the witness would have otherwise been exposed to.

17         This plea bargaining, as it's called, with

18  Mr. Zubair Ahmed has been approved as lawful -- and then

19  carry on with the instruction.

20         Is there any objection to that revision?

21    MR. McBURNEY:  No.

22    MR. SAMUEL:  No, Your Honor.

23    THE COURT:  All right.  Can we have them come back

24  in for just two short follow-up matters, and then when I send

25  them back out, I'm going to keep Mr. Riescher, Ms. Dervan and

1  Ms. Thomas here; okay?

2      (In open court with a jury present:)

3      THE COURT:  One of the things I do during that

4  break is to see if I have made any mistakes in the charge,

5  which obviously is an important part of the case, and I have

6  realized that I made a couple of mistakes that I want to

7  correct now.

8      The first is in Count One I gave you a date range.

9  I may have said late 2002 and continuing until on or about

10  April 20th, 2006.  Count One charges that beginning in or

11  about late 2004, not 2002 -- that's in the indictment you

12  will see -- and continuing until on or about April 20th,

13  2006.

14      So I'm correcting if I said 2002 -- and I think

15  I probably did -- as the beginning of that date range, it

16  should be 2004.

17      I made one instruction which I think was very

18  confusing and I'm just going to give that again because it

19  has to do with credibility of witnesses and three specific

20  witnesses.  So let me just give you that instruction again.

21      I told you that the testimony of some witnesses

22  must be considered with more caution than the testimony of

23  other witnesses.

24      In this case, the government called a witness,

25  Mr. Syed Haris Ahmed.  Mr. Ahmed has been promised that he

will not be charged or prosecuted for the testimony he gave
in this trial.  You already know that he was convicted of
previous offenses, but there is an agreement that has been
reached that he will be not charged or prosecuted for the
testimony he gave here.

The government also called Mr. Omer Kamal as a
witness, and he has been promised that he will not be charged
or prosecuted.

And then, finally, the government called as one of
its witnesses Mr. Zubair Ahmed, a person named as a
co-conspirator in the indictment, with whom the government
has entered into a plea agreement providing for the
possibility of a lesser sentence than the witness would
otherwise be exposed to.

This plea bargaining, as we call it, with
Mr. Zubair Ahmed has been approved as lawful and proper, and
is expressly provided for in the rules of our
court.  However, a witness who hopes to gain more favorable
treatment may have a reason to make a false statement because
the witness wants to strike a good bargain with the
government.

So while witnesses of these kinds may be entirely
truthful when testifying, you should consider such testimony
with more caution than the testimony of other witnesses.

And of course the fact that a witness has pled

guilty to the crime charged in the indictment is not evidence in and of itself of the guilt of any other person.

Does that clarify --

MR. McBURNEY:  Yes, sir.  Thank you.

THE COURT:  Does that clarify it, Mr. Samuel?

MR. SAMUEL:  (Nods head.)

THE COURT:  All right.  Thank you.

Please retire again, except if I could have Mr. Riescher, Ms. Dervan and Ms. Thomas stay, I will give you some further instructions.

(In open court with only the alternates present:)

THE COURT:  I will say it's always hard for me to do this.  I have gone back and forth to decide whether or not to tell the alternates at the beginning or whether I ought to wait and tell them at the end.  There are two options, neither of which are perfect.

I just have decided in my practice to do that at the end, because I want everybody to listen intently as if they are going to deliberate, because there is the understanding, and it's happened once before, where somebody had to leave the trial and an alternate during the course of the trial took over.

I have watched you, you have paid very careful attention to what's going on.  And I always feel bad that you have invested all this time and that you may not

1  deliberate.  But I hope you understand that that's the way

2  the process works.

3        This was a case where I had one extra alternate

4  just because of the nature of the case and I wanted to make

5  sure that if something were to happen, that we could in fact

6  have a deliberating jury.

7        So I hope you understand and that you accept that

8  I'm trying to do what is best in the criminal justice system

9  and at the same time what is best for you.

10        What I do at this point, though, is you are

11  not required to stay here during the deliberations.  There

12  are some courts that actually make you stay until it's over

13  in case someone has to be replaced.  I don't think that's

14  fair.

15        And I also know that now I'm going to tell you you

16  still may not discuss the case with anybody, even though I'm

17  going to allow you to go about your regular responsibilities.

18  But there is a chance that something could happen to one of

19  the jurors and we would have to call one of you back to serve

20  as a juror, which is why you can't discuss the case with

21  anybody else.

22        Will each of you pledge not to discuss the case

23  when I release you until you hear that the case is over?

24        All right.  They have all agreed.

25        We have your contact information, and when the case

1   is over -- well, if we need you, we will call you.  When the

2   case is over, I will personally call you and tell you what

3   the result was and again thank you for your extended service

4   albeit not in the jury box or in the deliberation

5   room.  I figure that's the least I can do.

6          So with that, you are released subject to being

7   called to replace a juror.  Don't discuss the case with

8   anybody.  And then we will be in communication sometime in

9   the future.

10         Thank you again for your service.

11         (In open court without jurors present:)

12         THE COURT:  Everybody has gone through the evidence

13   and it's all here ready to be delivered to the jury?

14         MR. McBURNEY:  Yes, sir.

15         MR. SAMUEL:  I was wondering whether the statements

16   were going out.  I know they were admitted and there was no

17   objection, but usually a witness's statement, prior statement

18   does not go out to the jury.

19         Mr. Sadequee would ask the two or three -- I know

20   two, maybe three --

21         THE COURT:  Well, they are admitted, aren't they?

22         MR. SAMUEL:  Well, they were admitted for purposes

23   of identification, for purposes of cross-examination.

24         THE COURT:  I think they were admitted as

25   exhibits.

 1          MR. SAMUEL:  Well, I agree there was no objection,

 2     but sometimes exhibits come in that don't go out to the

 3     jury.

 4          I think written statements of witnesses including

 5     prior written statements, just like depositions, don't go

 6     out.  I don't think Mr. Sadequee articulated that at the time

 7     it was introduced, but --

 8          THE COURT:  Well, in my court, because I believe

 9     the Federal Rules of Evidence mean that if you are going to

10     use it for a limited purpose it can be identified, but it's

11     not admitted as an exhibit.

12          I have told them that -- I told them in their

13     preliminary instructions that if in fact there is a portion

14     of a document, that they don't have to worry about the

15     context in which it's in because they will get the whole

16     statement, and I have told them that anything that's an

17     exhibit is something that will be available to them during

18     their deliberations.

19          You are looking at a rule.  Is there a rule,

20     Mr. McBurney?

21          MR. McBURNEY:  Yes, my associate has pointed out --

22          THE COURT:  I would be very careful relying upon

23     his advice.

24          MR. McBURNEY:  I'm going to trust this one.

25          Rule 613, prior statements of witnesses.  Extrinsic

evidence of prior inconsistent statements are not admissible

unless and until we went through the procedure we did, which

was to elicit the current statement and then present the

prior inconsistent statement and it was identified, it was

tendered.

And frankly, if there was going to be any

limitation placed on it, which I don't think 613 (b) allows,

that was the time, when we tendered it.

And the Court has made it very possible for

Mr. Samuel or Mr. Wahid to share with Defendant Sadequee any

point they may have about when to object or when not or any

fine point like that, and that time has passed.

It's in.  It's been referenced.  Parts of it have

been referenced.  And to your point, you have explained to

the jury they will get to see the whole thing.

And I think that those two exhibits, which

I believe are 167 and 168, they were treated like any other

piece of evidence, and properly so.

THE COURT:  Mr. Samuel, do you have any authority

that would allow me at this point on this record not to allow

them to go to the jury?

MR. SAMUEL:  Well, obviously no objection was made

at the time.  I wasn't making objections then, nor do I think

I was allowed actually at that point.

THE COURT:  Well, let me correct that.  You were

1    appointed standby counsel.  I told you at any time that you

2    could consult with him, that he was available to consult with

3    you.

4         And we had a long discussion last night about a

5    variety of things, and it's only at this what I would say is

6    the 12th hour that this has ever come up.  And you have had

7    lots of comments to me about legal matters on breaks and

8    certainly had a long discussion last night.

9         So I take a little offense that you claim that you

10   couldn't make objections or that you couldn't have brought

11   this up earlier.

12        MR. SAMUEL:  I could have certainly brought it up

13   earlier.  I couldn't bring it up while the witness was being

14   cross-examined.

15        I don't think while the jury was in here and a

16   witness was being cross-examined and the prosecutor was

17   introducing documents that I -- I never did that during the

18   trial.  I didn't think I was permitted to.

19        I certainly could have done it at the end when --

20        THE COURT:  Well, you were not permitted to because

21   your client --

22        MR. SAMUEL:  Sure.

23        THE COURT:  -- didn't permit you to because he

24   insisted on being his own lawyer in the case.

25        And I explained to him that he was responsible for

all of the rules of evidence and procedure, and he understood
that and agreed to it.

What are the exhibit numbers?

MR. McBURNEY:  167 and 168, I believe.

There were in fact three statements.  We tendered
only two of them.  That's why it's just those two numbers.

MR. SAMUEL:  I don't have anything else to argue.

I'm not sure I agree with Mr. McBurney's associate
that 613 makes the document admissible for all purposes.
I think it can be identified and you can cross-examine the
witness with it.  I don't believe that makes it admissible in
total for the jury's consideration.

In fact, the only portion that is admitted
technically is the inconsistency itself, not the entire
document, unless the opposing party then wants to put it in
context.

If a witness has given, as in this case, a
multipage statement, a couple lines of which the government
wants to cross-examine him with or impeach him with a prior
inconsistent statement, only the inconsistency is admissible,
not the entire document.

All of which is not necessarily relevant to the
question of do we send prior written statements of witnesses
into the jury room for purposes of deliberations.

THE COURT:  Well, this is a very interesting

1    discussion, which now eight days into the case seems to me

2    exceedingly late, considering that I have not put any

3    restrictions on the government.  We have shown portions of

4    the statement.  They have been used in testimony, they have

5    been used in argument.

6          And to come back now -- I guess I would have to go

7    through and create a record as to what has been shown and

8    what hasn't been shown, because nobody raised it with me that

9    only portions of these you now contend should be admitted.

10          MR. SAMUEL:  No, no, I didn't articulate it well.

11          The document itself doesn't go back to the jury

12   room in my opinion, no matter how much of it was shown to the

13   witness or no matter how much of it was used to

14   cross-examine.

15          The fact that it's portrayed to the jury, portrayed

16   to the witness on the screen, it would be no different than

17   if we took a deposition in a -- not that I know much about

18   it, but in a civil case and you cross-examine a witness with

19   a deposition.  You could show it on the screen, you can

20   cross-examine him with it, but you wouldn't take the

21   deposition and send it back to the jury, even though you

22   cross-examined him with it, even though it may be identified

23   during the trial.

24          THE COURT:  I don't know, I have been doing this

25   for a long time.  Nobody ever introduces and marks as an

1    exhibit a deposition transcript.

2         What they do is they ask somebody who has made a

3    statement, they show them the transcript, they admit that

4    they -- they show that they testified under oath, they admit

5    that they have taken the oath before, then they read the

6    prior inconsistent statement and it's over.

7         Here the additional step is actually -- so it's

8    never an issue of what goes back because that never goes back

9    because it's not an exhibit.  Here it has been introduced as

10   an exhibit to which there was no objection, and in the

11   absence of an objection I admitted it.

12        Now, I think the government should evaluate whether

13   or not they want this to be an issue in the case.

14        MR. McBURNEY:  I'm confident that this isn't going

15   to be what sends this case back.

16        I think the facts of this case make those two

17   statements particularly relevant for the jury's

18   consideration.  Syed Haris Ahmed said in response to a

19   question from the defendant I would have signed anything.  He

20   put the entire contents of those statements at issue.  Boy,

21   when they were done with me, I would have signed

22   anything.  He basically disavowed the contents of the entire

23   statements.

24        THE COURT:  The other thing that happened in this

25   case is we went through those whole statements and

everywhere -- we went through the whole thing with him so that he -- and he showed where he in fact changed the statements and initialed the changes, that he had a chance to review them all.

So they did come in for a purpose other than the purpose that you are claiming that they came in for.  A lot of it was in response to his testimony, which I think was elicited by Mr. Sadequee or at least it was inquired into by Mr. Sadequee about whether or not he would have signed anything, and then I think it was in fact on redirect that they went through the statements to show that in fact, no, he had gone through them, read them all, signed them, and where he wanted to make corrections, he made corrections.

I think for that reason they are admissible, and I overrule that objection.

I'm afraid to ask if there is anything else.  There seems like there always is.  But is there anything else?

MR. McBURNEY:  No.

THE COURT:  Mr. Sadequee?

MR. SADEQUEE:  No.

THE COURT:  All right.  Let's take -- I'm going to deliver the exhibits to the jurors and instruct them that they may begin their deliberations.

Any objection to me giving that instruction?

MR. McBURNEY:  No.

1    THE CLERK:  Do you want to take Exhibit 1 --

2    MR. McBURNEY:  Yes, however you want to do it.

3    THE CLERK:  We could take it off.  There is a stand

4  back there.

5    THE COURT:  Jessica has your cell phone numbers,

6  does she?

7    MR. SAMUEL:  We will be downstairs or in the room.

8    THE COURT:  Downstairs in the cafeteria?

9    So you know how to get in touch with everybody if

10  we have to, Jessica?

11    THE CLERK:  Yes.

12    THE COURT:  All right.  Anything else we need to

13  discuss before we recess?

14    MR. McBURNEY:  No.

15    THE COURT:  Anything else, Mr. Sadequee?

16    MR. SADEQUEE:  No.

17    THE COURT:  All right.  We will be in recess.

18    (A recess is taken at 1:46 p.m.)

19                        --   --   --

20

21

22

23

24

25

1    Tuesday Afternoon Session

2    August 11, 2009

3    4:41 p.m.

4    -- -- --

5    (In open court without a jury present:)

6    THE COURT:  Before we get started, I did talk to

7    Mr. Samuel about -- having reviewed the record following my

8    charge, I did tell Mr. Samuel and confirmed with him that his

9    objections to the charge conference yesterday and the

10   arguments that he made are preserved on behalf of you,

11   Mr. Sadequee, which I implied -- which I understood,

12   interpreted to mean that there were no objections to the

13   charge as was given.

14        But in going through the record, I noticed that I

15   apparently didn't specifically ask that, and I wanted to make

16   sure that my understanding was correct, that while your

17   objections and the arguments that were made at the charge

18   conference last night are preserved, that there were no

19   objections to the charge as given after I made the two

20   corrections that I made?

21        Is that correct, that there are no objections to

22   the charge as it was actually given?

23   MR. SADEQUEE:  Yes, no objections.

24   THE COURT:  Anything else we need to take up before

25   we bring the jurors in?

1       MR. McBURNEY:  No, sir.

2       MR. SAMUEL:  No, sir.

3       THE COURT:  They just reported to me that they were

4  at a good breaking point, and so I'm going to dismiss them

5  for the evening with their admonition.  And they told me that

6  they wanted to start again tomorrow at 9:00.

7       So if we could bring them in, please?

8       (In open court with a jury present:)

9       THE COURT:  Well, ladies and gentlemen, thank you

10  for your hard work so far.  I understand that you believe

11  that you are at a good breaking point and that you would like

12  to break for the evening and return tomorrow at 9:00.  Is

13  that correct?

14       JURY FOREPERSON MEYER:  Yes, sir.

15       THE COURT:  I think that makes sense.

16       Of course, it's even more important -- although

17  it's always been important, but it's as important that you

18  not discuss the case with anybody because you are now in

19  deliberations only among those people that you are allowed to

20  deliberate with, and that's you.

21       And I would get away from this this evening, put it

22  aside, have a good evening's rest, spend some time with your

23  families, and then come and start fresh tomorrow.  In the

24  interim, don't discuss the case amongst yourselves or with

25  anybody else including your family.

1    So with that -- the other instruction is you cannot

2 begin deliberating again until everybody is here.  But as

3 soon as everybody is here, go ahead and start your

4 deliberations.  You won't have to come back in and I won't

5 have to give you the go-ahead.

6    Once you, Mr. Foreman, determine everybody is

7 there, go ahead and begin the deliberations again.

8    All right.  Have a good evening.  We will see you

9 tomorrow.

10    (In open court without a jury present:)

11    THE COURT:  All right.  Anything else we need to

12 take up?

13    MR. McBURNEY:  No, sir.

14    THE COURT:  Mr. Sadequee?

15    MR. SADEQUEE:  No.

16    THE COURT:  All right.  Then we will be in recess,

17 and we will be back in touch with you when we hear something

18 further tomorrow.  We are in recess.

19    (Proceedings adjourn at 4:45 p.m.)

20

21

22

23

24

25

1 C E R T I F I C A T E

2

3   UNITED STATES OF AMERICA        :
                                    :
4   NORTHERN DISTRICT OF GEORGIA    :

5

6           I, Nicholas A. Marrone, RMR, CRR, Official Court

7   Reporter of the United States District Court for the Northern

    District of Georgia, do hereby certify that the foregoing 122

8   pages constitute a true transcript of proceedings had before

9   the said Court, held in the city of Atlanta, Georgia, in the

10  matter therein stated.

11          In testimony whereof, I hereunto set my hand on

12  this, the 1st day of September, 2009.

13

14

15

16
                        /s/ Nicholas A. Marrone
17          _____
                        NICHOLAS A. MARRONE, RMR, CRR
18                      Registered Merit Reporter
                        Certified Realtime Reporter
19                      Official Court Reporter
                        Northern District of Georgia
20

21

22

23

24

25